**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| STONE & WEBSTER, INCORPORATED | ) |
| *et al.*, | ) Case No. 00-02142 (PJW) |
| | ) |
| Debtors, | ) Jointly Administered |
| ————————————————— | ) |
| | ) |
| STONE & WEBSTER ENGINEERING | ) |
| CORPORATION and STONE & WEBSTER, | ) |
| INCORPORATED, *et al.*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -against- | ) Adv. Pro. No. 02-3963 (PJW) |
| | ) |
| SAUDI ARABIAN OIL COMPANY, | ) |
| | ) |
| Defendant. | ) |
| ————————————————— | ) |

## NOTICE OF APPEAL

TO:    Adam G. Landis, Esquire
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, DE 19801

*Counsel for the SWE&C Liquidating Trust*

Lorraine McGowen, Esquire
ORRICK HERRINGTON &
 SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103

*Counsel for the SWE&C Liquidating Trust*

Dennis A. Meloro, Esquire
GREENBERG TRAURIG
1007 North Orange Street
Suite 1200
Wilmington, DE 19801

*Counsel for Saudi Arabian Oil Company*

James E. Houpt, Esquire
ORRICK HERRINGTON &
SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4417

*Counsel for the SWE&C Liquidating Trust*

Cyrus Benson, III, Esquire
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036

*Counsel for Saudi Arabian Oil Company*

PLEASE TAKE NOTICE that, pursuant to Rule 8001 of the Federal Rules of Bankruptcy Procedure, proposed intervenor The Shaw Group Inc. ("Shaw"), by and through its undersigned counsel, hereby appeals to the United States District Court for the District of Delaware from the Opinion and Order entered by the United States Bankruptcy Court for the District of Delaware dated August 31, 2007, denying Shaw's Motion to Intervene.  A copy of the Court's Opinion and Order dated August 31, 2007 is attached hereto as Exhibit A.

The names of all parties to this action and their respective attorneys are as set forth above.

ASHBY & GEDDES

/s/ Catherine A. Strickler
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
Attorneys for The Shaw Group Inc.

Dated: September 7, 2007
183639.1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INCORPORATED, | ) Case No. 00-2142(PJW) |
| et al., | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| ——————————————————— | ) |
| | ) |
| SWE&C LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 02-03963(PJW) |
| | ) |
| SAUDI ARABIAN OIL COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Stephen E. Jenkins
Gregory A. Taylor
Catherine A. Strickler
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Attorneys for The Shaw Group
Inc.

Adam G. Landis
Kerri K. Mumford
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Lorraine S. McGowen
Alyssa Englund
Orrick, Herrington &
Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103-0002

James E. Houpt
Orrick, Herrington &
Sutcliffe LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814

Counsel to the SWE&C
Liquidating Trust

Dated: August 31, 2007

**WALSH, J.**

      This opinion is with respect to the motion (Adv. Doc. # 61) of the Shaw Group Inc. ("Shaw") to intervene (the "Motion") pursuant to Rule 24 of the Federal Rules of Civil Procedure in this adversary proceeding (the "Saudi Aramco Proceeding") between plaintiff SWE&C Liquidating Trust (the "Trust") and defendant Saudi Arabian Oil Co. ("Saudi Aramco"). For the reasons discussed below, the Motion is denied.

**BACKGROUND**

## I. The In-Kingdom Contract

      The complicated facts of the underlying dispute date back to June 28, 1994. On or about that date, Saudi Aramco entered into a construction contract (the "In-Kingdom Contract") with Bugshan Stone & Webster Limited ("BS&W") to upgrade Saudi Aramco's oil refinery in Ras Tanura, Saudi Arabia (the "Ras Tanura Project"). In this adversary proceeding the subject construction contract is variously referred to in the documents and by the parties as either the In-Kingdom Contract or the Ras Tanura Project. The In-Kingdom Contract is attached to the complaint in the Saudi Aramco Proceeding (the "Complaint") (Adv. Doc. # 1, Ex. A.) and is more accurately identified as a Contract for Construction dated as of June 28, 1994 by and between Saudi Aramco and BS&W (designated by Saudi Aramco as Contract No. 65004/00). BS&W is a joint venture entity formed under the laws of the Kingdom of Saudi Arabia by

Abdullah Said Bugshan & Brothers ("Bugshan") and Stone & Webster Engineering Corp. ("SWEC"), a debtor in the related chapter case and a subsidiary of Stone & Webster, Incorporated ("S&W"), another debtor in the related chapter case.

BS&W financed the Ras Tanura Project through a loan of up to $35,000,000 from Saudi American Bank ("SAMBA") (the "Loan"). To secure the Loan, SWEC and Bugshan agreed to each guaranty 50% of the Loan and BS&W purportedly gave SAMBA a security interest in its receivables from the Ras Tanura Project. SWEC issued its guaranty through a letter dated October 11, 1994 (the "Guaranty") (Adv. Doc. # 61, Ex. 1, Ex. A), which it updated and reaffirmed in a January 22, 1998 letter. (Id. at Ex. 1, Ex. B.)

Disputes arose over the Res Tanura Project with BS&W claiming that Saudi Aramco had failed to pay it over $100,000,000. BS&W could not repay the Loan and therefore, on December 22, 1998, SWEC and Bugshan entered into an agreement (the "Payment Letter") to each repay half of the $31,800,000 outstanding balance of the Loan at a rate of $650,000 per month. Bugshan made all of its payments, but SWEC did not pay the full amount it agreed to.

II. Asset Purchase Agreement

On June 2, 2000 S&W, together with its subsidiaries including SWEC (collectively, the "Debtors"), filed a voluntary petition for bankruptcy in this Court under Chapter 11 of the

4

Bankruptcy Code, 11 U.S.C. § 101 et seq.[1]  On the date of the petition SWEC owed SAMBA $6,872,979 on the Guaranty.

On July 14, 2000, the Debtors and Shaw entered into an Asset Purchase Agreement (the "APA") wherein Shaw agreed to purchase substantially all of the Debtors' assets and assume certain of their liabilities.  (Adv. Doc. # 61, Ex. 1, Ex. D.) This Court approved the APA on the same date (Case No. 00-2142, Doc. # 340) and the closing took place shortly thereafter.

Shaw's purchase was not simply the purchase of assets. Shaw entered into a going concern purchase transaction with the Debtors whereby Shaw acquired a large complex international engineering and construction business and assumed a large and varied block of liabilities.  Shaw paid the Debtors $143,400,000 in cash and common stock.  The purchased assets included real property, supplies and inventory, the interest of the Debtors in assumed contracts, permits and other governmental approvals, interest in intellectual properties, investments, general intangibles of the business, all corporate office furniture and equipment, data center hardware and equipment, accounts receivable, cash, a cold storage business, security and other deposits, prepaid expenses, retirement plans, interest in a process business, and all proceeds of the foregoing and all other property of the Debtors of

---

[1]    Individual sections of the Bankruptcy Code will be cited herein as "§ __."

5

every kind, character or description, tangible and intangible, known or unknown, wherever located and whether or not reflected in the financial statements or similar properties described above. Shaw did not acquire all of the Debtors' assets. Certain assets, identified in the APA as "Excluded Assets," were not sold to Shaw but were retained by the Debtors. (Adv. Doc. # 61, Ex. D, pp. 15-16.)  Shaw assumed a myriad of liabilities, identified as obligations of the Debtors arising out of the performance of the assumed contracts, liabilities under certain mortgage loans, liabilities under the seller's outstanding bank indebtedness, unpaid accounts payable (except for unpaid accounts payable related to contracts not assumed or excluded assets), billings in excessive cost and revenues recognized with respect to the assumed contracts, accrued liabilities relating to the assumed contracts and hired employees, liabilities for accrued taxes (subject to certain exceptions), bank indebtedness and specified guarantees, and other liabilities related to the assets and the assumed contracts. (Adv. Doc. # 61, Ex. D, pp. 16-17.)  According to the APA, those liabilities exceeded $400,000,000. (Adv. Doc. # 61, Ex. D, pp. 3-4.)  At the sale hearing the Debtors' counsel stated that the assumed liabilities actually amounted to $525,772,000. (Doc. # 319, p. 20.)

The Debtors' liquidating plan was confirmed on January 16, 2004. Pursuant to the terms of the plan, certain groups of

Debtors were substantively consolidated to become the Consolidated SWINC Estate and other Debtors were substantively consolidated to become the Consolidated SWE&C Estate. As of the effective date of the plan, all the assets of the Consolidated SWE&C Estate were transferred to the Trust.

III. The SAMBA Proceeding

On August 24, 2000 SAMBA filed a cure claim in SWEC's chapter 11 case asserting a claim of $6,872,979 based on the Guaranty and the Payment Letter. The cure claim is asserted first against Shaw and alternatively against SWEC. (Adv. Pro. # 01-7766, Doc. # 1, Ex. D.) Thereafter, on October 18, 2001, SAMBA brought an adversary proceeding (the "SAMBA Proceeding") against Shaw, SWEC and SWINC Acquisition Three, Inc.[2] Like the cure claim, the complaint alleges that through the APA Shaw assumed SWEC's outstanding liability to SAMBA under the Guaranty and the Payment Letter or, alternatively, if there was no such assumption then SWEC remains liable. (Adv. Pro. # 01-7766.) At that time, SAMBA alleged that the outstanding balance of principal and interest owed under the Guaranty and the Payment Letter was $6,728,529.[3] (Adv. Pro. # 01-7766, Doc. # 1, ¶ 58.) Shaw and the Debtors answered in response that Shaw did not assume the Guaranty or the Payment

---

[2]    SWINC Acquisition Three, Inc. was Shaw's intermediary for acquisition of the Debtors' assets.

[3]    The record does not explain why this figure is different from the cure claim figure.

7

Letter under the APA.  (Adv. Proc. # 01-7766, Doc. ## 5 and 6.) James P. Carroll, the Chief Restructuring Officer of S&W, stated in a sworn declaration that the Debtors and Shaw never intended to include the Guaranty and Payment Letter in the APA.  (Adv. Pro. # 01-7766, Doc. # 31, p. A-212.)  Shaw and SAMBA filed cross motions for summary judgment, and after briefing, the case was removed on September 9, 2004 to the District Court for the District of Delaware.  (Adv. Pro. # 01-7766, Doc. # 88.)  On June 12, 2003 this Court entered an order approving a settlement agreement between the Debtors and SAMBA whereby, inter alia, SAMBA released the Debtors from any claim arising out of the Guaranty and Payment Letter. (Case No. 00-02142, Doc. # 4289.)

On May 3, 2005, the District Court issued an opinion and order denying Shaw's motion for summary judgment and granting SAMBA's cross motion for summary judgment (the "District Court Opinion").  Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), Civ. No. 04-834-SLR, 2005 U.S. Dist. LEXIS 7912 (D. Del. May 3, 2005).  The District Court ruled that according to the plain terms of the APA, Shaw assumed the Guaranty and the Payment Letter and must therefore pay SWEC's outstanding balance.  Shaw filed a Notice of Appeal with the United States Court of Appeals for the Third Circuit on May 26, 2005.  In a February 7, 2006 opinion, the Third Circuit remanded the appeal to the District Court for resolution of issues related to damages.

8

On November 8, 2006, responding to a motion by SAMBA, the District Court issued an Amended Memorandum Opinion holding that SAMBA was entitled to prejudgment simple interest at 9%, post-judgment compound interest at 3.33% and attorneys' fees and costs. Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), 354 B.R. 686 (D. Del. 2006). On February 13, 2007, the District Court issued an order awarding SAMBA $345,714.50 in attorneys' fees. Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), 360 B.R. 64 (D. Del. 2007). As a result of the interest and fees assessments, Shaw's liability to SAMBA is approximately $10,000,000. (Adv. Doc. # 68, p. 4.) Now that all issues of the SAMBA Proceeding have been resolved in the District Court, Shaw's appeal to the Third Circuit is set to move forward with Shaw having filed its opening brief on July 30, 2007. As a result of Shaw posting a supersedeas bond the District Court Opinion is stayed pending appeal.

IV. The Saudi Aramco Proceeding

On July 4, 2000, the Mohammad Al-Mojil Group ("Al-Mojil"), a subcontractor that worked on the Ras Tanura Project, commenced an arbitration proceeding in Saudi Arabia against BS&W after BS&W terminated portions of Al-Mojil's responsibilities. (Adv. Doc. # 1, ¶¶ 32-33.) SWEC and S&W argued that BS&W terminated Al-Mojil's responsibilities because Al-Mojil breached its obligations under its subcontract, which breach was largely

9

caused by Saudi Aramco's wrongdoings and failure to perform its obligations under the In-Kingdom Contract. (Id. at ¶ 31.)  On May 21, 2001, a lower court in Saudi Arabia issued a judgment of approximately $51,000,000 in favor of Al-Mojil (the "Al-Mojil Judgment").  (Id. at ¶ 35.)  SWEC and S&W believe that they are potentially liable for the Al-Mojil Judgment under a June 2, 1994 guarantee wherein S&W agreed to guarantee any award rendered against BS&W in connection with the In-Kingdom Contract.  (Id. at ¶ 36 and Ex. B.)  In order to contest this potential liability and to seek redress for Saudi Aramco's alleged wrongdoings and breach of performance under the In-Kingdom Contract, SWEC and S&W commenced the Saudi Aramco Proceeding on May 31, 2002.  In their complaint, SWEC and S&W assert the following: (1) SWEC and S&W are entitled to a declaratory judgment stating that they are not liable for the Al-Mojil Judgment; (2) to the extent that SWEC and S&W are found liable for the Al-Mojil Judgment, they are entitled to indemnification from Saudi Aramco; (3) a claim against Saudi Aramco for breach of the In-Kingdom Contract; (4) a claim against Saudi Aramco for withholding at least $148,000,000 in funds from BS&W. (Id. at ¶¶ 44-76.)  The Trust, as SWEC's successor in interest, substituted for SWEC as a plaintiff in the Saudi Aramco Proceeding on March 12, 2004.  (Adv. Doc. # 26.)  S&W withdrew as a plaintiff through a stipulation filed on August 26, 2005 (Adv. Doc. # 24.)

On November 7, 2002, when the SAMBA Proceeding was still pending before this Court, SAMBA moved to intervene in the Saudi Aramco Proceeding, arguing that it was entitled to any proceeds arising out of Saudi Aramco's alleged breach of the In-Kingdom Contract. SAMBA requested that the Court recognize a September 21, 1994 letter (the "Specific Payment Instruction Letter") (Adv. Doc. # 19, Ex. A, Ex. 2) and a January 22, 1995 assignment document (the "Assignment of Contract Proceeds") (Id., Ex. A, Ex. 1) as constituting a perfected assignment of the proceeds of the In-Kingdom Contract to SAMBA. This Court denied SAMBA's motion on April 25, 2006, finding that "whether [SAMBA] has an assignment is extremely questionable," and furthermore, it was a question of Saudi law that would be best resolved in a court in Saudi Arabia.[4] (Adv. Doc. # 54, p. 6, line 2 – p. 7, line 21; p. 24, lines 3-13.) SAMBA appealed the denial of its motion to intervene to the District Court and the District Court affirmed this Court's denial of SAMBA's motion on August 29, 2007. Saudi American Bank v. Saudi Arabian Oil Co. (In re Stone & Webster, Inc.), Civ. No. 06-399-SLR, slip op. (D. Del. Aug. 29, 2007).

On June 10, 2004, this Court referred the parties to the Saudi Aramco Proceeding to a Court appointed mediator. (Adv. Doc.

---

[4]    For further details on why this Court finds that the Specific Payment Instruction Letter and the Assignment of Contract Proceeds do not constitute a perfected assignment of the proceeds of the In-Kingdom Contract to SAMBA, see section III. of the Discussion section infra.

# 28.)  According to an April 15, 2005 status report, the parties had "tentatively settled the matter."  (Adv. Doc. # 31, p. 1.) After further mediation, the Trust reported in a May 1, 2007 status report that the parties had "agreed to the terms of a settlement" and needed only to "complete documentation of the settlement." (Adv. Doc. # 60, p. 1.)  The Trust stated further that it expected that the parties would seek dismissal of this action "within the next few weeks."  (Id.)  A dismissal has not yet been sought.  At oral argument on the Motion, counsel for the Trust advised the Court that Saudi Aramco did not wish to conclude the settlement until Shaw's Motion was resolved.

On July 29, 2007, Shaw filed the Motion pursuant to Rule 24 of the Federal Rules of Civil Procedure, which is made applicable by Rule 7024 of the Federal Rules of Bankruptcy Procedure.  (Adv. Doc. # 61.)  In its Complaint in Intervention, Shaw requests: (1) a declaration stating that (I) Shaw is entitled to all proceeds[5] derived under the In-Kingdom Contract; (ii) Shaw has subrogated to SAMBA's rights to recover from BS&W under the In-Kingdom Contract; and (iii) BS&W's Assignment of Proceeds and the Specific Payment Instruction Letter are valid and enforceable; (2) an order enjoining Saudi Aramco from making payments related to the

---

[5]    As Shaw has only been found liable to SAMBA for approximately $10,000,000, it is unclear how Shaw could believe itself entitled to all of the proceeds of the In-Kingdom Contract if the recovery against Saudi Aramco exceeds that amount.

In-Kingdom Contract to any party other than Shaw and enjoining the Debtors and SAMBA from receiving any such payments; (3) a ruling that the Debtors will be unjustly enriched if Shaw is required to repay the Loan while the Trust recovers from Saudi Aramco; and (4) indemnification under Section 9.01 of the APA for any losses incurred as a result of the Guaranty and the Payment Letter. (Adv. Doc. # 61, Ex. 1, ¶¶ 28-44.) Simply stated, Shaw seeks intervention in order to obtain from Saudi Aramco that which otherwise would go to the Trust if the Trust is successful in its breach of contract cause of action. In effect, Shaw is pursuing a claim against SWEC.

## DISCUSSION

### I. Intervention Under Rule 24

Shaw claims that it is entitled to intervene under either Rule 24(a)(1) of the Federal Rules of Civil Procedure, which provides for intervention as of right, or Rule 24(a)(2), which provides for permissive intervention. Rule 24(a)(1) provides: "Upon timely application anyone shall be permitted to intervene in an action . . . when a statute of the United States confers an unconditional right to intervene." Shaw argues that it has an unconditional right to intervene under § 1109(b). That section provides: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may

raise and may appear and be heard on any issue in a case under this chapter." Courts generally interpret § 1109 broadly to allow interested parties to intervene in adversary proceedings. In re James Wilson Assocs., 965 F.2d 160, 169 (7th Cir. 1992) (interpreting § 1109(b) as meaning that "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains"). However, although the language of § 1109(b) suggests a broad application and makes no mention of standing, courts have held that parties that wish to intervene must show that they have constitutional standing. 7 Collier on Bankruptcy ¶ 1109.04[4][a]; Hobson v. Travelstead (In re Travelstead), 227 B.R. 638, 649 (D. Md. 1998) ("Although § 1109(b) does allow a party in interest to 'be heard on any issue in a case under [Chapter 11],' it does not obviate generally applicable rules of standing."). Standing is a "threshold question in every federal case," including bankruptcy cases. Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm., 321 B.R. 147, 157 (D.N.J. 2005).

The constitutional requirement of standing requires that any party wishing to sue show (1) they suffered an injury, (2) a causal connection between the alleged injury and the conduct being challenged, and (3) redressability. Amtrak v. Pa. PUC, 342 F.3d 242, 254 (3d Cir. 2003). Additionally, courts will also refuse to hear claims on "prudential" grounds if a claim asserted under a

14

statute falls outside of the "zone of interest" of that statute.
See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S.
150, 153, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970); Cent. S.D. Coop.
Grazing Dist. v. Sec'y of the United States Dep't. of Agriculture,
266 F.3d 889, 895 (8th Cir. 2001). To assert prudential standing,
a party must belong to the class of the persons that the statute is
intended to protect. In re James Wilson Assocs., 965 F.2d at 168.
Courts have ruled that § 1109(b) "does not confer standing in the
absence of a legally protected interest affected by the bankruptcy
proceeding." In re Martin Paint Stores, 199 B.R. 258, 263 (Bankr.
S.D.N.Y. 1996). Therefore, in order to have standing to intervene
under § 1109(b), parties must show that they are intended
beneficiaries of another section of the Bankruptcy Code or that
they have some other grounds for standing. Id.

In addition to the requirements for showing standing, §
1109(b) contains a "party in interest" requirement that is akin to
standing. While the term "party in interest" is nowhere defined,
§ 1109(b) lists several examples of parties that are considered
"parties in interest," "including the debtor, the trustee, a
creditors' committee, an equity security holders' committee, a
creditor, an equity security holder, or any indenture trustee."
It is clear that this is not an exhaustive list of parties that may
be "parties in interest." In re Combustion Eng'g, Inc., 391 F.3d
190, 214 n.21 (3d Cir. 2004); In re Amatex Corp., 755 F.2d 1034,

1042 (3d Cir. 1985).  Courts have held that "[t]he test to determine whether an entity is a party in interest is 'whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation.'" Baron & Budd, P.C., 321 B.R. at 158 (quoting In re Torrez, 132 B.R. 924, 934 (Bankr. D. Cal. 1991)); see also In re Amatex, 755 F.2d at 1042; Unofficial Comm. of Zero Coupon Noteholders v. Grand Union Co. (In re Grand Union Co.), 179 B.R. 56, 58 (D. Del. 1995).

In order to show that it has standing (and in order to show grounds for intervention under Rule 24), Shaw must show that it has an interest in the dispute between the Trust and Saudi Aramco.  If Shaw is entitled to the proceeds of the Trust's breach of contract claim, then Shaw has (1) an alleged injury, (2) caused by Saudi Aramco, (3) that can be redressed through participation in this case.  Those three elements are sufficient to establish constitutional standing.  Additionally, if Shaw is entitled to the proceeds of the of the Trust's claim, then Shaw has a "sufficient stake in the outcome of the proceeding," Baron & Budd, P.C., 321 B.R. at 158, and qualifies as a "party in interest" under § 1109(b).  If Shaw is a "party in interest," then Shaw is an intended beneficiary of § 1109(b) and would therefore have prudential standing.  However, as will be shown below, Shaw has no right to the proceeds of the Trust's breach of contract claim

against Saudi Aramco, and therefore Shaw lacks standing to participate in the Saudi Aramco Proceeding.

Shaw also argues that it is entitled to intervene under Rule 24(a)(2), which provides: "Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." The Third Circuit has ruled that intervention under Rule 24(a)(2) requires proof of four elements:

> 1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests.

Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 220 (3d Cir. 2005); see also Kleissler v. United States Forest Serv., 157 F.3d 964, 969 (3d Cir. 1998). In order to intervene under Rule 24(a)(2), a party must meet all four of these requirements. Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 366 (3d Cir. 1995). As with Rule 24(a)(1), the determination of whether Shaw may intervene comes down to whether Shaw has a sufficient interest in the Saudi Aramco Proceeding. As will be shown below, Shaw does not qualify under the second and third elements.

II. Overview of Shaw's Position

Shaw argues that it has a substantial stake in this adversary proceeding under several theories, all of which are ultimately unconvincing.[6]  Shaw claims that it is entitled to the proceeds of the Trust's breach of contract claim against Saudi Aramco under a theory of subrogation.  Specifically, Shaw argues that BS&W assigned the proceeds from the In-Kingdom Contract to SAMBA, giving SAMBA the right to recover for any Saudi Aramco breach of contract.  Because the District Court has found that Shaw must perform on the Guaranty and the Payment Letter in favor of SAMBA, Shaw argues that it is subrogated to SAMBA's rights to the In-Kingdom Contract proceeds.

Shaw also argues that it assumed the right to any benefits from the In-Kingdom Contract through the APA.  According to Shaw, BS&W only failed to repay the Loan because of Saudi Aramco's breach of the In-Kingdom Contract.  Therefore, Shaw believes that it is entitled to the proceeds from any breach of contract claims against Saudi Aramco.

Finally, Shaw argues that it is entitled to intervene in the Saudi Aramco Proceeding under a theory of unjust enrichment. Shaw claims that if the District Court Opinion is upheld and Shaw

---

[6]    Shaw only requests permission to intervene provided that the District Court Opinion is upheld.  (See Adv. Doc. # 61, ¶ 17.)  Shaw consistently maintains that it did not assume the Guaranty or the Payment Letter and that the District Court was wrong.  However, insofar as the District Court Opinion is upheld, Shaw believes that it has a right to intervene in the Saudi Aramco Proceeding.

is forced to pay off the Guaranty and the Payment Letter and if the Trust ultimately recovers from Saudi Aramco, then the Trust will be unjustly enriched.

III. Subrogation

The U.S. Supreme Court has summarized the equitable doctrine of subrogation as follows: "[O]ne who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other." American Surety Co. v. Bethlehem Nat'l Bank, 314 U.S. 314, 317, 62 S. Ct. 226, 86 L. Ed. 241 (1941). As an equitable doctrine, subrogation should only be applied in the "'exercise of a proper equitable discretion, with a due regard for the legal and equitable rights of others.'" McAlister v. Sentry Ins. Co., Civ. No. 91-1701, 1991 U.S. Dist. LEXIS 7945, at *20 (E.D. Pa. June 11, 1991) (quoting Am. Surety Co. of New York v. Bethlehem National Bank of Bethlehem, 116 F.2d 75, 76 (3d Cir. 1940), rev'd on other grounds, 314 U.S. 314 (1941)).

Shaw asserts that it has a right to intervene in this action because it is subrogated to SAMBA's rights to the proceeds of the In-Kingdom Contract, which SAMBA allegedly received by assignment from BS&W. Shaw argues, as did SAMBA, that the Assignment of Contract Proceeds and the Specific Payment Instruction Letter operate, in effect, to perfect the security interest created in the Assignment of Contract Proceeds. (See Adv.

Doc. # 19, Ex. 1, Ex. B.)  As stated by counsel for SAMBA in the
April 25, 2006 SAMBA intervention hearing: "[W]e are asking for
injunctive relief.  The injunctive relief is to stop payments from
being made that aren't made in accordance with the assignment of
contract proceeds and specific payment instruction letter." (Adv.
Doc. # 54, p. 15, line 14 - p. 16, line 2.)  Of course, I rejected
that argument on April 25, 2006.  (Adv. Doc. # 54, p. 24, lines 3-
13.)  I will restate and amplify on my ruling with respect to
SAMBA's claim of a security interest.

Shaw, like SAMBA, claims that BS&W assigned all proceeds
from the In-Kingdom Contract to SAMBA through a January 22, 1995
"Assignment of Contract Proceeds" executed by BS&W in favor of
SAMBA. (Adv. Doc. # 19, Ex. 1, Ex. A.)  This document provides for
an assignment of the proceeds of the In-Kingdom Contract as a
security interest to SAMBA, and contains this important provision:
"[BS&W] hereby further agrees that: (1) The Assignor [i.e., BS&W]
shall immediately notify all payors under the Contract [i.e., the
In-Kingdom Contract] of this assignment in such form as may be
requested by the payor, or, if no specific form is required, by
letter in substantially the following form." (Id.)  The Assignment
of Contract Proceeds then lays out the following form letter:

Re: (Contract)

Dear Sirs:

We hereby advise you that we have executed an
assignment of proceeds of (the Contract) in

favour of [SAMBA].  All proceeds of the
Contract due to us should therefore be paid
directly to Account No. ____ .

Saudi American Bank
Branch, Al-Khobar (Fluor Branch)
P.O. Box 842, Al-Khobar

(Id.)

As I stated in denying SAMBA's motion to intervene, I
doubt that BS&W effected a valid assignment under Saudi banking
law, which I assume applies, because BS&W never issued the kind of
notice letter called for in the Assignment of Contract Proceeds.
(Adv. Doc. # 54, p. 6, line 2 – p. 7, line 21; p. 24, lines 3-13.)

For a number of reasons, the Specific Payment Instruction
Letter does not effect the result that SAMBA asserts.

(1) Contrary to BS&W's agreement in the Assignment of Contract
Proceeds to advise payors of the assignment of the contract
proceeds to SAMBA, the specific Payment Instruction Letter does not
even mention an assignment.

(2) That letter only tells Saudi Aramco what BS&W bank account
in SAMBA should receive the proceeds.  The Specific Payment
Instruction Letter states in relevant part: "This letter requests
and authorizes you to pay Saudi American Bank, Fluor Branch, P.O.
Box 842, Al Khobar 31952, Saudi Arabia for credit to our account
any and all compensation due from you under contract number 65004,
as it may be changed from time to time."  (Id. (emphasis added).)
BS&W directs payment to go into "our account" at SAMBA, and not to

21

SAMBA itself. The Specific Payment Instruction Letter then goes on to state: "We shall mark all our invoices presented to you Pay to Saudi American Bank, Fluor Branch, P.O. Box 842, Al Khobar 31952, Saudi Arabia <u>for account of 'Bugshan S&W Company Limited</u>.'" (<u>Id.</u> (emphasis added).)

(3) As the Specific Payment Instruction Letter is dated September 21, 1994, four months before the Assignment of Contract Proceeds was signed, it seems highly unlikely that the Specific Payment Instruction Letter was sent pursuant to the instructions in the Assignment of Contract Proceeds.[7]

(4) Finally, the Specific Payment Instruction Letter also states: "Payments hereunder shall only be made against invoices submitted by us and not otherwise." (<u>Id.</u>) There is nothing in the record thus far that suggests that the money judgment being sought by the Trust against Saudi Aramco would be with respect to invoices submitted by BS&W. Indeed, two of the four counts of the Complaint (declaratory judgment and indemnification) would not likely be the product of invoices submitted by BS&W. Thus, a judgment in favor of the Trust could be otherwise then from "invoices submitted by" BS&W.

It is Shaw's obligation to prove under applicable law that the Assignment of Contract Proceeds and the Specific Payment

---

[7]    In denying SAMBA's motion to intervene, I did not note this particular infirmity in SAMBA's alleged security interest.

Instruction Letter created a perfected security interest in the proceeds. On this issue, Shaw offers nothing in addition to the argument made by SAMBA in its intervention motion and SAMBA failed to meet its burden. At the hearing on SAMBA's intervention motion, SAMBA's counsel did not attempt to validate the assignment under Saudi law, or any other law. Thus, I conclude again that SAMBA has not proved that it has a perfected security interest in the contract proceeds. (Adv. Doc. # 54, p. 6, line 2 – p. 7 line, 21.) As SAMBA has no legal or equitable rights to the proceeds, there is no basis to apply the doctrine of subrogation in Shaw's favor. See McAlister, 1991 U.S. Dist. LEXIS 7945, at *20.

## IV. Claim Arising out of the In-Kingdom Contract

Shaw next argues that it assumed the right to any benefits from the In-Kingdom Contract through the APA. The Motion includes numerous assertions of this entitlement, including the following:

> [I]f the District Court's decision is upheld and Shaw pays SAMBA under the Guaranty for the remaining balance of BS&W's debt, Shaw is the entity with the right to recover proceeds under the In-Kingdom Contract.

> * * *

> [T]o the extent the Guaranty or Payment Letter are considered Assumed Contracts or Assumed Liabilities under the APA (as they were by the [District] Court) Shaw is entitled to recover for any third-party claims or interests in the Ras Tanura Project.

> * * *

> Now that Shaw has been adjudged liable for
> SWEC's Guaranty, and hence BS&W's outstanding
> debt to SAMBA, Shaw has the right to recoup
> its liability that ultimately resulted from
> breaches by Saudi Aramco of the In-Kingdom
> Contract.

(Adv. Doc. # 61, pp. 8-9.)  In its August 8, 2007 letter to the
Court, Shaw restated the relief that it is seeking through the
intervention: "to enforce its <u>ownership of assets</u> under the APA,
namely <u>its right to future revenues</u> from the In-Kingdom contract."
(Adv. Doc. # 73, p. 3 (emphasis added).)  As detailed below, all of
these statements fly in the face of (a) the District Court's
finding that the In-Kingdom Contract is clearly identified in the
APA as an Excluded Asset, and (b) Schedule 2.02(e) of the APA,
which states that the Debtors retain any and all claims arising out
of that contract.

Shaw argues that it obtained the right to intervene in
the Saudi Aramco Proceeding by assuming benefits to the In-Kingdom
Contract through the APA.  The essence of Shaw's position is as
follows: The District Court Opinion found that Shaw assumed the
Guaranty and the Payment Letter.  If that decision is upheld, then
Shaw will have to pay SAMBA over $10,000,000.  But for Saudi
Aramco's breach of the In-Kingdom Contract, Saudi Aramco would have
paid BS&W in full and BS&W would have paid off the Loan.
Consequently, Shaw should receive out of whatever recovery the

Trust obtains from Saudi Aramco a reimbursement of the money Shaw must pay to SAMBA.

Since SAMBA's motion to intervene has been denied, the only plaintiff in the Saudi Aramco Proceeding is the Trust. Therefore, if money is diverted to Shaw, it would reduce the Trust's recovery. This produces an anomalous result: the Trust, as successor to SWEC, pays the obligation that the District Court found Shaw to be liable for.

The District Court Opinion hardly serves as a basis for Shaw to argue that it has rights in the In-Kingdom Contract through the APA. To the contrary, the District Court specifically identified the In-Kingdom Contract as an "Excluded Asset," i.e., an asset not assigned to Shaw. In re Stone & Webster, Inc., 2005 U.S. Dist. LEXIS 7912, at *8-9. Thus, in concluding its ruling the District Court stated:

> The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral,"

(Id. at *21 (quoting Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super. 1977))), and noted in an adjoining footnote: "Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument

that the contract at issue is the Ras Tanura Contract."    (In re

Stone & Webster, Inc., 2005 U.S. Dist. LEXIS 7912, at *21 n.12).

Shaw argues that the District Court did not rule on

whether Shaw assumed the In-Kingdom Contract, noting that the above

quoted footnote only says that In-Kingdom Contract is not "at

issue." (Id.) According to Shaw, "[h]olding that the In-Kingdom

Contract was not 'at issue' is entirely different than holding that

'Shaw did not assume' the In-Kingdom Contract." (Adv. Doc. # 68,

p. 6.) I disagree. While the District Court may not have made a

specific ruling that Shaw did not assume the In-Kingdom Contract,

it did find that the APA explicitly stated that the In-Kingdom

Contract was an "Excluded Asset." In re Stone & Webster, Inc.,

2005 U.S. Dist. LEXIS 7912, at *8-9.

According to Shaw's reading of the APA, the Guaranty and

the Payment Letter are "Assumed Contracts" or "Assumed Liabilities"

under the APA, and therefore Shaw is entitled to recover any third-

party claims or interest relating to the Guaranty or the Payment

Letter. Shaw quotes Section 2.01 of the APA:

> Sellers shall sell, assign, convey, transfer
> and deliver to Buyer . . . and Buyer shall
> purchase from Sellers, the Assets . . .
> including the following: . . . (k) any and all
> claims and causes of action, including
> privileges related thereto, of any Seller
> against any third parties relating to . . .
> (ii) the Assumed Liabilities or the Assumed
> Contracts. . . .

(Adv. Doc. # 61, Ex. 1, Ex. D, pp. 15-16 (emphasis added).)  Shaw argues that the Trust's claims against Saudi Aramco in the Saudi Aramco Proceeding are covered by Section 2.01 because they are claims that relate to the Assumed Liabilities or the Assumed Contracts.  However, the Guaranty and the Payment Letter clearly are not a basis for the Debtors having a claim or cause of action against another party.  Just the opposite is the case.  Those two documents constitute the basis of a claim owned by SAMBA against SWEC.  Furthermore, Schedule 2.02(e) of the APA unequivocally states that Shaw has no right to a claim against Saudi Aramco. Schedule 2.02(e) identifies Special Project Claims which are included in the Excluded Assets.  One of these Special Project Claims is described as

> Any and all claims or liabilities available at law or in equity, or arising under the project agreements in Saudi Arabia for the Ras Tanura Refinery Upgrade Project ("RTRUP") - Package 2 - Utilities, those agreements including, but not limited to, the following:
>
>         * * *
>
> Contract for Construction dated as of June 28, 1994 by and between Saudi Arabian Oil Company ("Saudi Aramco") and BS&W (designated by Saudi Aramco as Contract No. 65004/00).

(Adv. Proc. # 01-7766, Doc. # 50, Ex. 22, p. A979 (emphasis added).)

Shaw's argument that the Guaranty and the Payment Letter give rise to rights in the In-Kingdom Contract is contradicted by

this provision of the APA, which explicitly severed that contract from the Guaranty and the Payment Letter and left the In-Kingdom Contract claim rights solely with the Debtors.  While at one time the In-Kingdom Contract and the Guaranty and the Payment Letter may have been tangentially related, as of the effective date of the APA they became completely independent of each other.  The plain and explicit language of the APA says that Shaw has no rights whatsoever arising out of the In-Kingdom Contract.

It is also worth noting that Section 31.5 of the In-Kingdom Contract contains the following "no third-party beneficiary" provision: "This Contract shall not be deemed for the benefit of any third party nor shall it give any person not a party to this Contract any right to enforce its provisions." (Adv. Doc. # 1, Ex. A, p. A-38.)  Although the effect of this provision must be determined under Saudi law, there is significant American case law authority for enforcement of such no third-party beneficiary provisions. See, e.g., In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 733 (S.D.N.Y. 1989) (applying Delaware law); India.com, Inc. v. Dalal, 412 F.3d 315, 321 (2d Cir. 2005) (applying New York law); Pa. State Emples. Credit Union v. Fifth Third Bank, 398 F. Supp. 2d 317, 324 (M.D. Pa. 2005) (applying Pennsylvania and Ohio law).

V. Unjust Enrichment

28

Shaw argues that if the Trust recovers from Saudi Aramco in the Saudi Aramco Proceeding and Shaw is not permitted to intervene, then the Trust will be unjustly enriched.  According to Shaw:

> Under the APA, if Shaw has been determined to assume the Guaranty and Payment Letter as it relates to the Ras Tanura Project, then it also receives any benefits related to the Ras Tanura Project.  Because of the structure of the APA, the Debtors will be unjustly enriched unless Shaw is allowed to recover proceeds owing under the In-Kingdom Contract.

(Adv. Doc. # 61, p. 13.)    This argument is merely a recharacterization of Shaw's contract right argument.

In order to show unjust enrichment, a party must prove the following elements: (1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value.  Lauren W. v. DeFlaminis, 480 F.3d 259, 277 (3d Cir. 2007); Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000).

Shaw's unjust enrichment argument provides no traction for the Motion because Shaw can in no way show that it is inequitable for the Trust to retain any benefits that it may receive out of the Saudi Aramco Proceeding.  There is no inequity because any "enrichment" that the Trust may receive out of its

relationship with Shaw is explicitly called for in the APA, which Shaw willingly agreed to.  As discussed above, for good reason, the District Court concluded that Shaw assumed the Guaranty and the Payment Letter, but not In-Kingdom Contract -- a specifically "Excluded Asset."  Not only was there no assignment of the proceeds of the In-Kingdom Contract, Schedule 2.02(e) specifically reserved solely to the Debtors any and all claims related to the In-Kingdom Contract.  Shaw signed on to the APA, which provides for a result that now appears to be unfavorable to Shaw.  The Court cannot rewrite that contract under the guise of unjust enrichment.

VI.  The Settlement Stipulation Release

Given the complexity of the APA transaction, after the closing and over the course of several years, the Debtors and Shaw had numerous disputes between themselves and with numerous third parties.  In order to resolve many of these disputes, on November 30, 2004 the Consolidated SWINC Estate and the Trust entered into a settlement stipulation with Shaw (the "Settlement Stipulation"). (Adv. Doc. # 69 (filed under seal).)

The Trust argues that Shaw is not entitled to intervene in the Saudi Aramco Proceeding, and thereby obtain relief against the Trust, because in the Settlement Stipulation Shaw released the Trust from numerous liabilities or obligations, including that related to SAMBA.  The Settlement Stipulation contains a broad release provision that states that Shaw releases the Trust

of and from any and all manner of action or
actions, cause or causes of action, in law or
in equity, suits, debts, liens, contracts,
agreements, promises, liabilities, claims
(including, but not limited to claims for
attorneys' fees, costs and sanctions),
damages, demands, losses, costs, or expenses
of any nature, <u>currently existing or arising
in the future</u>, whether known or unknown,
suspected or unsuspected, fixed or <u>contingent</u>,
concealed or hidden, latent or patent, which
Shaw has or may have <u>with respect to</u> the Filed
Claims. No provision herein shall limit or
affect the ability of the Consolidated SWE&C
Estate, the SWE&C Liquidating Trust or Shaw to
assert any right, claim or cause of action
against the Settling Party <u>unrelated</u> to the
Filed Claims.

(<u>Id.</u> at ¶ 9 (emphasis added).) If Shaw's claim to the proceeds of

the In-Kingdom Contract is "with respect to" a "Filed Claim," then

Shaw waived its right to divert the Trust's recovery to itself and

therefore it has no basis to intervene. The term "Filed Claims"

means the "approximately 5,700 claims" filed against the Debtors as

of the date of the Settlement Stipulation. (<u>Id.</u> at Recital C.) As

noted above, on August 24, 2000 SAMBA filed a cure claim in the

amount of $6,872,979, which the parties agree was timely filed.

Given the numerous types of claims identified in the Settlement

Stipulation, including particularly contingent claims, I believe

the words "with respect to" covers Shaw's claim to the proceeds of

the In-Kingdom Contract.

Although SAMBA's cure claim was filed in the Debtors'

chapter 11 cases, it asserts a claim against Shaw and alternatively

against the Debtors.  Specifically, SAMBA's cure claim asserts:

> The lists of Assumed Contracts filed by Debtor
> and its affiliates in these proceedings
> include Claimant as a party with respect to
> which two (2) contracts which have been
> assumed by SWINC Acquisition Three, Inc.
> ("Shaw") under the Asset Purchase Agreement by
> and among the Debtor, said affiliates and
> Shaw.  On information and belief, <u>the Guaranty</u>
> <u>is one of the Assumed Contracts the</u>
> <u>liabilities under which have been assumed by</u>
> <u>Shaw</u>.  In the event it is determined that the
> Guaranty is not a contract assumed by Shaw, or
> in the event that any portion of the Claim set
> forth above is for any reason determined not
> to be a Cure Claim, Claimant hereby claims the
> right to have such portion of this claim
> treated as a Proof of claim, rather than a
> Statement of Cure Claim.

(Adv. Proc. # 01-7766, Doc. # 1, Ex. D, p. 3 (emphasis added).)  In

substance, SAMBA's cure claim is against Shaw.  Contingently, if

the claim is found not to be against Shaw, then it is a claim

against the Debtors.  Clearly then, SAMBA's cure claim recites a

claim against Shaw that falls within the defined term "Filed

Claims."  Finally, the fact that the claim is labeled a "cure

claim" directly implicates the Guaranty and the Payment Letter that

the District Court found Shaw to have assumed.  Shaw was certainly

aware of SAMBA's August 24, 2000 cure claim against it long before

Shaw agreed to the Settlement Stipulation.  If Shaw was not served

with notice at the time of the filing of the cure claim, Shaw at

least knew about it by April 17, 2001 when Shaw objected to the

cure claim in its second omnibus objection to claims.  (Case No.

00-2142, Doc. # 1657, Ex. B, p. 60.)

      The last sentence of the release provision in the Settlement Stipulation states that the release does not "limit or affect the ability . . . to assert any right, claim or cause of action . . . <u>unrelated</u> to the Filed Claims." (Adv. Doc. # 69, ¶ 9 (emphasis added).) Clearly, the assertion by SAMBA against Shaw as quoted above in the cure claim shows that that claim is related to a Filed Claim. The last sentence can be viewed as further defining the term "with respect to," showing that the latter term is not intended to mean simply SAMBA's contingent claim against the Debtors.

      In its August 8, 2007 letter to the Court Shaw suggests that the release provision is ambiguous and argues that where a contract is ambiguous courts may receive extrinsic evidence to interpret it. <u>Mellon Bank, N.A. v. Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1013 (3d Cir. 1980). Consequently, Shaw argues that "[i]t is important to understand the circumstances underlying the parties' entry into the Settlement Stipulation that render the agreement's release inapplicable to Shaw's motion." (Adv. Doc. # 73, p. 2.) Shaw then refers to Mr. Carroll's declaration in which he stated, presumably on behalf of the Debtors, that the Debtors and Shaw agreed that the Guaranty and the Payment Letter were not assumed by Shaw. (Adv. Pro. # 01-7766, Doc. # 31, p. A-212.) Shaw then asserts:

> At the time the parties entered into the
> Settlement Stipulation on November 30, 2004,
> Shaw and the Debtors both still agreed that
> Shaw had never assumed the Guaranty and
> Payment Letter.   Thus, when the parties
> entered into the Settlement Stipulation, Shaw
> was in no position to release any cause of
> action with respect to the Guaranty and
> Payment Letter because it was never its claim
> to release - the parties were in agreement
> that it was the Debtors' claim.

(Adv. Doc. # 73, p. 2.)

This argument ignores the fact that when Shaw entered

into the Settlement Stipulation on November 30, 2004, Shaw was well

aware that SAMBA was looking to Shaw to satisfy the Guaranty and

the Payment Letter.  As noted above, Shaw was aware of the August

24, 2004 cure claim against it no later than April 17, 2001.  SAMBA

commenced the SAMBA Proceeding against SWEC and Shaw on October 18,

2001 alleging (with citations to the applicable provisions of the

APA) that Shaw is liable to SAMBA on the Guaranty and Letter

Agreement.  (Adv. Pro. # 01-7766, Doc. # 1.)  SAMBA filed a cross-

motion for summary judgment in the SAMBA Proceeding on October 18,

2002 (with extensive citations to relevant facts, including

applicable provisions of the APA) in support of its position.

(Adv. Pro. # 01-7766, Doc. # 51.)  Furthermore, in the August 8,

2007 letter to the Court Shaw points out that

> on June 3, 2003 in Shaw's Limited Response to
> the Debtors' Motion for Order Under Fed. R.
> Bankr. P. 9019 Approving Settlement with Saudi
> American Bank (Exhibit 7 to the Trust's
> letter), Shaw explicitly reserved "all of its

34

> rights in connection with, or related to: ...
> (iv) any rights, claims, or interests against
> the Debtors for indemnification, contribution
> or the like <u>as a result of any recovery by
> SAMBA against Shaw.</u>"

(Adv. Doc. # 73, p. 3 (emphasis added).)  Thus, prior to November 30, 2004 Settlement Stipulation Shaw was well aware that there was a serious risk that it could have liability in favor of SAMBA arising out of the Guaranty and Payment Letter.  The circumstances underlying the parties' entry into the Settlement Stipulation clearly support the conclusion that the Settlement Stipulation release provision precludes any right to future revenues from the In-Kingdom Contract at the expense of SWEC, now the Trust.  As Shaw has waived the right to pursue any claim it had as a result of the SAMBA obligation, allowing Shaw to intervene in the Saudi Aramco Proceeding serves no purpose.

## CONCLUSION

For the reasons discussed above, I conclude that Shaw is not entitled to intervene under either Rule 24(a) or 24(b).

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED, | ) | Case No. 00-2142(PJW) |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| SWE&C LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 02-03963(PJW) |
| | ) | |
| SAUDI ARABIAN OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons set forth in the Court's memorandum
opinion of this date, the motion (Adv. Doc. # 61) of the Shaw Group
Inc. to intervene in this adversary proceeding is **denied**.

Peter J. Walsh
United States Bankruptcy Judge

Dated: August 31, 2007

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED, | ) | Case No. 00-2142(PJW) |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| SWE&C LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 02-03963(PJW) |
| | ) | |
| SAUDI ARABIAN OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the motion (Adv. Doc. # 61) of the Shaw Group Inc. to intervene in this adversary proceeding is **denied.**


Peter J. Walsh
United States Bankruptcy Judge


Dated: August 31, 2007

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

## APPEAL TRANSMITTAL SHEET

Case Number: _____  ○ BK    ○ AP

   If AP, related BK Case Number: _____

Title of Order Appealed:

_____

      Docket Number: _____        Date Entered: _____

Item Transmitted:   ○ Notice of Appeal              ○ Motion for Leave to Appeal
                    ○ Amended Notice of Appeal       ○ Cross Appeal
                    Docket Number: _____         Date Filed: _____

*Appellant/Cross Appellant:                 *Appellee/Cross Appellee

_____           _____

Counsel for Appellant:                      Counsel for Appellee:

_____           _____

_____           _____

_____           _____

_____           _____

_____           _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?   ○ Yes   ○ No

IFP Motion Filed by Appellant?   ○ Yes   ○ No

Have Additional Appeals to the Same Order been Filed?   ○ Yes   ○ No

   If so, has District Court assigned a Civil Action Number?   ○ Yes   ○ No   Civil Action # _____

Additional Notes:

_____

_____           By: _____

Date                                            Deputy Clerk

_____

                                      FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _____
7/6/06