## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| STONE & WEBSTER, INCORPORATED | ) |
| *et al.*, | )    Case No. 00-02142 (PJW) |
| | )    Jointly Administered |
| Debtors, | )    Adv. Pro. No. 02-3963 (PJW) |
| ———————————————— | ) |
| | ) |
| THE SHAW GROUP INC. | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | )    C.A. No. 07-00616 (SLR) |
| | ) |
| SWE&C LIQUIDATING TRUST, | ) |
| | ) |
| Appellee. | ) |
| ———————————————— | ) |

**APPENDIX, VOLUME I OF II**
**TO THE OPENING BRIEF OF APPELLANT THE SHAW GROUP INC.**

**ASHBY & GEDDES**
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

Dated: February 29, 2008      *Attorneys for The Shaw Group Inc.*

## TABLE OF CONTENTS

| Document | Page |
|---|---|
| October 18, 2001 Complaint by Saudi American Bank against The Shaw Group Inc. (Adv. Pro. 01-07766, D.I. 1)............................................................. | A1 |
| May 31, 2002 Complaint by Stone & Webster Engineering Corporation against Saudi Arabian Oil Company, including Exhibit (D.I. 1)............................ | A14 |
| November 7, 2002 Motion to Intervene by Saudi American Bank, including Exhibits (D.I. 19)............................................................. | A220 |
| June 29, 2007 Motion to Intervene Filed by Shaw Group Inc., including Exhibits (D.I. 61)............................................................. | A309 |
| July 30, 2007 Reply in Further Support of The Shaw Group Inc.'s Motion to Intervene (D.I. 68)............................................................. | A522 |
| August 31, 2007 Memorandum Opinion (D.I. 79)............................................. | A540 |
| August 31, 2007 Order Denying The Shaw Group Inc.'s Motion To Intervene (D.I. 80)............................................................. | A574 |
| September 7, 2007 Notice of Appeal (D.I. 81).......................................... | A575 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED et al., | ) | Case No. 00-02143 (RRM) |
| | ) | |
| | ) | Jointly Administered |
| Debtors | ) | |
| | ) | |
| SAUDI AMERICAN BANK , | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| -against- | ) | Adversary Proceeding |
| | ) | No.: _____ |
| | ) | |
| THE SHAW GROUP, INC. and SWINC ACQUISITION THREE, INC., and STONE & WEBSTER ENGINEERING CORPORATION, et. al. | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT OF SAUDI AMERICAN BANK

Plaintiff Saudi American Bank ("SAMBA"), by and through its undersigned

attorneys, as and for its complaint alleges, as follows:

### NATURE OF THE CASE

This is an action under 11 U.S.C. §§105, 363 and 365 and under Fed. R. Bankr.

P. 7001 and 7019, and under orders of this Court entered in this case on July 13, 2000

and December 27, 2000, against The Shaw Group, Inc. and SWINC Acquisition Three,

Inc. (collectively, "Shaw") to recover money or property from Shaw in connection with

SAMBA's Cure Claim Numbered 22220169 in this case (the "Cure Claim"), or, in the

alternative, to have the Cure Claim allowed as an unsecured claim against Stone & Webster Engineering Corporation ("SWEC") in the amount of $6,728,549.00.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. §§157 and 1334.  This action is a core proceeding only to the extent it is for the allowance of a claim pursuant to 28 U.S.C. §157(b)(2)(B).  With respect to SAMBA's claims against Shaw, this Court retained jurisdiction in its Sale and Assumption Order dated July 13, 2000 (as defined in paragraph 11 below).

2.      Venue is proper as provided in 28 U.S.C. § 1409 because this proceeding arises in and is related to the bankruptcy cases brought by debtors Stone & Webster, Incorporated ("S&W") and SWEC (collectively, the "Debtors"), which cases are pending in this District, and because this proceeding is related to an adversary proceeding brought by the Debtors against SAMBA, which proceeding is pending in this District. SAMBA's claims against Shaw are related to the Debtors' bankruptcy cases because Shaw purchased substantially all of the assets of the Debtors pursuant to an Asset Purchase Agreement with the Debtors approved by this Court (the "Asset Purchase Agreement"), and because Shaw is an indispensable party to an equitable resolution of the Debtors' preference claims against SAMBA.

3.      The Court has personal jurisdiction over Shaw pursuant to Bankruptcy Rule 7004, by virtue of the Order entered by this Court on July 13, 2000 confirming the sale of the assets of the Debtors and their affiliates to Shaw, and because Shaw has consented to the jurisdiction of this Court in the Asset Purchase Agreement approved in said Order.

-2-

A2

## PARTIES

4.    SAMBA is a corporation organized and existing under the laws of the Kingdom of Saudi Arabia and maintains its principal place of business in Riyadh, Saudi Arabia.

5.    The Shaw Group, Inc. is a corporation organized under the laws of Louisiana and maintains its principal place of business in Baton Rouge, Louisiana.

6.    SWINC Acquisition Three, Inc. is a Louisiana corporation having its principal place of business in Baton Rouge, Louisiana, and a wholly owned subsidiary of The Shaw Group, Inc.

7.    SWEC is a corporation organized under the laws of the state of Delaware and maintains offices in Boston, Massachusetts.

## FACTUAL BACKGROUND

### Shaw's Assumption of Liabilities

8.    An auction sale of the Debtors' assets was held in this Court on July 6 and 7, 2000.

9.    A hearing to consider the proposed sale of Debtors' assets was held in this Court on July 7 and 12, 2000.

10.    At that auction sale and subsequent hearing to consider whether the proposed sale of the Debtors' assets should be approved, after making numerous representations to the Court and interested parties committing to assume the liabilities and obligations of the Debtors, Shaw emerged as the successful bidder.

11.    On or about July 13, 2000 the Court issued a "Revised Order under 11 U.S.C. §105(a), 363, 365 and 1146(c) . . . (A) Approving Asset Purchase Agreement, (B) Authorizing (I) Sale of Substantially All of Debtors Assets . . . , (II) Assumption and Assignment of Certain Executory Contracts . . . , and (III) Assumption of Certain

-3-

A3

Liabilities" (the "Sale and Assumption Order") approving the sale of substantially all of the Debtors' assets to Shaw.

12.     On or about July 14, 2000 Shaw entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with the Debtors and the affiliated entities party to that Agreement (collectively "Stone & Webster").

13.     The liabilities and contractual obligations assumed by Shaw as part of its bid for the Debtors' assets were an essential part of the consideration it agreed to pay and which rendered Shaw's bid the highest and best offer for the assets of Stone and Webster.

14.     In the Sale and Assumption Order, this Court found that "[t]he Assumed Contracts being assigned to, and the liabilities being assumed by, Shaw . . . are an integral part of the Assets being purchased by Shaw . . . ." This Court further found that Shaw's bid was "the highest and best offer for the Assets" of the Debtors.

15.     In the Sale and Assumption Order, this Court retained jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, including jurisdiction to resolve any disputes arising under or related to the Asset Purchase Agreement and to interpret and enforce the terms of the Sale and Assumption Order.

16.     In the Sale and Assumption Order, this Court required Shaw to assume the liabilities of SWEC. Paragraph 40 of the Sale and Assumption Order expressly provides: "Notwithstanding anything to the contrary herein, Shaw shall not be relieved from any Assumed Liabilities as defined in the Shaw Agreement."

17.     Under Section 2.03 of the Asset Purchase Agreement, Shaw agreed to assume and pay the Assumed Liabilities, which, as set forth in the Schedule 2.03 attached to the Asset Purchase Agreement, included outstanding bank indebtedness,

A4

liabilities related to Assumed Contracts (as defined in the Asset Purchase Agreement) and other liabilities related to the Assumed Assets and Assumed Contracts.

### The Joint Venture, SAMBA'S Financing and SWEC'S Obligations

18.    On May 31, 1980, SWEC and Abdulla Said Bugshan & Brothers ("Bugshan") a Saudi Arabian business enterprise, formed a joint venture, Bugshan Stone & Webster Limited ("BS&W") under the laws of Saudi Arabia.  The purpose of this joint venture was to conduct an engineering and construction business in Saudi Arabia. BS&W was owned in equal shares by SWEC and Bugshan.  SWEC did business in Saudi Arabia through BS&W.

19.    To induce SAMBA to grant credit facilities to BS&W, Bugshan and SWEC each agreed to issue guaranties to SAMBA of 50% of certain obligations of BS&W to SAMBA.  Specifically, on or about October 11, 1994, SWEC delivered a letter of guaranty (the "Guaranty") guaranteeing payment of 50% of all obligations of BS&W to SAMBA up to THIRTY FIVE MILLION DOLLARS ($35,000,000).  A copy of the Guaranty is attached as Exhibit A.

20.    SAMBA made loans to BS&W by crediting funds to BS&W's deposit account at SAMBA (the "Current Account").  In January of 1998, SAMBA made a new loan of THIRTY FIVE MILLION DOLLARS ($35,000,000) to BS&W (the "'98 Loan").  A portion of the proceeds of the '98 Loan were used to pay off all then existing and outstanding loan obligations of BS&W to SAMBA, and the balance was credited to a deposit account of BS&W at SAMBA (the "Current Account").  In connection with the '98 Loan, BS&W executed and delivered a loan agreement (the "Loan Agreement") and a promissory note (the "Note"), copies of which are attached as Exhibits B and C, respectively.

A5

21.    Late in 1998 Bugshan and SWEC became concerned about BS&W's ability to repay the balance then outstanding on the '98 Loan. Bugshan and SWEC each agreed to pay one-half of the balance owing to SAMBA. To memorialize their respective liabilities with respect to the balance of the '98 Loan then outstanding, Bugshan and SWEC prepared and submitted to SAMBA a letter agreement dated December 22, 1998 (the "Funding Letter") under which each undertook to pay its share of the '98 Loan by making monthly deposits of SIX HUNDRED AND FIFTY THOUSAND DOLLARS ($650,000) to the Current Account, which funds would then be used to make monthly payments to SAMBA on the 1998 Loan in the amount of ONE MILLION THREE HUNDRED THOUSAND DOLLARS ($1,300,000).

22.    SWEC's obligation under the Funding Letter at the time it was signed was $15,650.000. At the time SWEC filed its petition for relief in this case, the balance owing to SAMBA by SWEC was $6,728,529, consisting of $6,725,000 of principal and $3,529 of interest. Commissions accrue on the outstanding balance of the '98 Loan in accordance with the terms of the Loan Agreement.

23.    SAMBA had no other credit relationships with the Debtors or their affiliated entities at the time SWEC filed its petition commencing these proceedings.

### Liability Under the Cure Claim

24.    On July 18, 2001, this Court approved a Notice of Cure Claims Bar Date for filing Statements of Cure Claim (the "Cure Claims Bar Date Notice").

25.    The Cure Claims Bar Date Notice established a deadline of August 25, 2001 for the holders of Cure Claims to file statements as to the amount of their Cure Claims. The Cure Claim Bar Date Notice defined "Cure Claim" to mean all liquidated monetary claims arising or accruing before July 14, 2000 under the Assumed Contracts and actually known by the non-Debtor party to an Assumed Contract.

26.    SAMBA filed a Cure Claim on August 24, 2001, with respect to the '98 Loan and, on a contingent basis, with respect to a certain demand for payment made on SAMBA with respect to a letter of credit issued by SAMBA for the account of BS&W, enforcement of which demand has been stayed by a permanent injunction obtained by BS&W from a court in England. A copy of SAMBA's Cure Claim is attached hereto as Exhibit D and is incorporated herein by reference.

27.    SWEC's liability to SAMBA under the 1994 Guaranty and under the Funding Letter constitute bank indebtedness and thus are part of the Assumed Liabilities expressly assumed by Shaw under the Asset Purchase Agreement.

28.    Each the Guaranty and the Funding Letter is an Assumed Contract within the meaning of that term as defined in the Asset Purchase Agreement.

29.    Pursuant to the terms of the Asset Purchase Agreement the Assumed Liabilities were to be paid promptly pursuant to Section 365(b)(1) of the Bankruptcy Code.

30.    SWEC's liability under the Guaranty was disclosed to Shaw. Schedule 3.17 to the Asset Purchase Agreement purports to be a true, complete and correct list of all contracts to which the Debtors are parties, including any "note, loan or credit agreement . . . or other Contract relating to the borrowing of money or the direct or indirect guaranty or assumption of the obligations of any other person for borrowed money." Schedule 3.17(a)(ix) lists a guaranty of obligations of "Bugshan S&W Limited" in favor of SAMBA as lender. A copy of the relevant portion of Schedule 3.17(a)(ix) is attached as Exhibit E.

31.    The Cure Claims Bar Date Notice stated that the Debtors would file with the Court on or before July 21, 2000, a list of all Assumed Contracts and an amended

A7

list of Excluded Contracts, defined as the Rejected Contracts and Completed Contracts
as those terms are defined in the Asset Purchase Agreement.

32.    Lists of Assumed Contracts and Excluded Contracts were filed.

33.    SAMBA obtained copies of said lists from IKON Solutions pursuant to
instructions in the Cure Claim Bar Date Notice.

34.    SAMBA's name appears twice on the Assumed Contract List.

35.    SAMBA's name does not appear on the Excluded Contract List.

### Shaw's Objection to the Cure Claim

36.    In April 2001, Shaw filed its Second Omnibus Objection to Claims under
U.S.C. §502(b) and Fed. R. Bankr. P. 3007 (the Second Shaw Objection).  In the
Second Shaw Objection, SAMBA's Cure Claim was included in a list of claims to which
Shaw objected on the grounds that it was a "duplicate claim".

37.    On or about May 14, 2001, SAMBA filed its response to Shaw's objection.
A copy of SAMBA's response is attached as Exhibit F.

38.    In its response, SAMBA disclosed that Trumbull Services Company
("Trumbull"), the official claims agent for the Debtors, made a mistake in processing the
Cure Claim and the Proof of Claim filed by SAMBA on August 24, 2001.  Trumbull
acknowledged orally to SAMBA's counsel that it mistakenly detached the cover sheet
for the Cure Claim (a modified B10 Proof of Claim form), processed only SAMBA's
counsel's August 23, 2000 transmittal letter and Exhibits A-G to the Statement of Cure
Claim as a Cure Claim, assigning it Cure Claim No. 22220169, and that it mistakenly
processed the modified B10 form intended as the cover sheet for the Statement of Cure
Claim as a separate proof of claim, assigning it Proof of Claim No. 3194.  Following
telephone conversations with SAMBA's counsel, Trumbull has placed the document
originally designated by Trumbull as Proof of Claim No. 3194 with SAMBA's Cure Claim

-8-

A8

No. 22220169, and deleted claim no. 3194 from the claims listing. Therefore, there is no longer any duplication of claims.

### The December Letter Agreement

39.    On or about December 2000, Stone & Webster and Shaw entered into a Letter Agreement ("the Letter Agreement") supplementing the Asset Purchase Agreement between Shaw and Stone & Webster. This Court entered an Order on or about December 20, 2000 approving the Letter Agreement.

40.    Pursuant to the Letter Agreement, the Debtors and Shaw agreed to use commercially reasonable efforts to review and pay uncontested Cure Claims and Proofs of Claim with respect to Assumed Liabilities and to resolve contested Cure Claims and Proofs of Claim on or before December 30, 2000 (see Letter Agreement, ¶7). Neither the Debtors nor Shaw has paid any part of SAMBA's Cure Claim. Shaw did not file the Shaw Second Objection until April 17, 2001.

41.    Shaw's response to SAMBA's Cure Claim did not constitute compliance with Shaw's obligations under the Letter Agreement.

42.    Shaw agreed to provide on or before January 15, 2001 to the Debtors, the creditors committee and the equity committee a list of each Cure Claim and Proof of Claim that Shaw contends (i) is a filed Cure Claim or filed Proof of Claim that does not constitute, in whole or in part, an Assumed Liability, or (ii) as to which Shaw contends the asserted amount of any such filed Cure Claim or any such filed Proof of Claim is overstated, and shall set forth therein the specific basis for such contention (Letter Agreement, ¶7).

43.    Shaw did not list SAMBA's claim as a contested Assumed Liability or as an overstated amount in any list filed by Shaw pursuant to the above-referenced provision of the Letter Agreement.

-9-

44.    In the Letter Agreement, Shaw further agreed to file and serve on or before January 31, 2001 an objection to those Proofs of Claim or Cure Claims that Shaw agrees are its liabilities under the Asset Purchase Agreement but as to which Shaw disputes the amount of the Proof of Claim or Cure Claim, which objection was to be set for a hearing date on the next omnibus hearing date within 30 days following January 31, 2001 (Letter Agreement, ¶7).

45.    Shaw did not file any objection to SAMBA's Cure Claim by that deadline. SAMBA's Cure Claim was not listed in the First Omnibus Objection to Claims filed by Shaw on or about January 30, 2001 or in the supplement thereto filed on or about February 5, 2001. Shaw did not file the Second Shaw Objection until April 17, 2001, more than 2 ½ months after the deadline to which Shaw agreed in the Letter Agreement.

46.    The order of this Court approving the Letter Agreement allowed any party to seek extensions of the deadlines set forth therein. Shaw never applied for any extension of any of the deadlines in the Letter Agreement.

47.    On March 27, 2001, SAMBA made demand for payment of its Cure Claim on Shaw. A copy of SAMBA's demand letter is attached as Exhibit G.

48.    Shaw has failed and refused to pay the sums demanded in connection with SAMBA's Cure Claim.

## FIRST CAUSE OF ACTION
## SAMBA v. SHAW
### (Recovery of Money or Property Fed. R. Bankr. P. 7001)

49.    SAMBA repeats and realleges the foregoing paragraphs as if they are fully set forth herein.

50.    The Guaranty is an Assumed Contract.

51.    The Funding Letter is an Assumed Contract.

52.    SWEC's liability under the Guaranty is an Assumed Liability that Shaw has assumed under the Asset Purchase Agreement.

53.    SWEC's liability under the Funding Letter is an Assumed Liability that Shaw has assumed under the terms of the Asset Purchase Agreement.

54.    Shaw is obligated to pay SAMBA under the Guaranty, the Funding Letter, and SAMBA's Cure Claim.

55.    Shaw has defaulted in its obligations to pay SAMBA under the Guaranty, the Funding Letter, and SAMBA's Cure Claim and it is liable for the amount of the Cure Claim plus interest and commissions in accordance with the terms of the Note and Loan Agreement.

## SECOND CAUSE OF ACTION
## SAMBA v. SWEC
### (Allowance of SWEC's Contingent Proof of Claim)

56.    SAMBA repeats and realleges the foregoing paragraphs as if they are fully set forth herein.

57.    Late in 1998, SWEC agreed it should pay one-half of the balance owing to SAMBA on the '98 Loan. To memorialize its portion of the liabilities with respect to the balance of the '98 Loan then outstanding, SWEC submitted the Funding Letter under which it undertook to pay its share of the '98 Loan by making monthly deposits of SIX

A11

HUNDRED AND FIFTY THOUSAND DOLLARS ($650,000) to the Current Account,
which funds would then be used to make monthly payments to SAMBA.

58.    SWEC's obligation under the Funding Letter at the time it was signed was
$15,650,000.  At the time SWEC filed its petition for relief in this case, the balance
owing to SAMBA by SWEC was $6,728,529, consisting of $6,725,000 of principal and
$3,529 of interest.  Commissions accrue on the outstanding balance of the '98 Loan in
accordance with the terms of the Loan Agreement.

59.    SAMBA had no other credit relationships with the Debtors or their affiliated
entities at the time SWEC filed its petition commencing these proceedings.

60.    Unless Shaw assumes its obligation to pay SAMBA under the Guaranty,
the Funding Letter, and SAMBA's Cure Claim, SWEC is obligated to pay SAMBA under
the Guaranty, the Funding Letter, and SAMBA's Proof of Claim.

61.    Unless Shaw is determined to have assumed the obligation to pay
SAMBA under the Guaranty, the Funding Letter, and SAMBA's Cure Claim, SWEC has
defaulted in its obligations to pay SAMBA under the Guaranty and the Funding Letter,
and it is liable for the amount claimed in SAMBA's Cure Claim, plus interest and
commissions in accordance with the terms of the Note and Loan Agreement.

WHEREFORE, SAMBA respectfully requests that the Court (a) enter judgment in
favor of SAMBA and against Shaw in the balance owing to SAMBA by Shaw of
$6,728,529, consisting of $6,725,000 of principal and $3,529 of interest, plus interest
and commissions accrued after June 2, 2000, in accordance with the Loan Agreement,
the Guaranty and applicable law, and reasonable attorneys' fees and costs, or (b)
alternatively, enter judgment in favor of SAMBA and against SWEC allowing SAMBA's

Cure Claim as an unsecured claim against SWEC in the amount of $6,728,549.00, and

(c) grant such other and further relief as this Court deems is just and proper.

Respectfully submitted,
The Plaintiff, Saudi American Bank,
By its attorneys,


_____
Francis A. Monaco, Jr. (#2078)
Kevin Mangan (#3810)
**WALSH MONZACK & MONACO, P.A.**
1201 N. Orange Street, Suite 400
Wilmington, DE  19801
Tel. (302) 656-8163


Of Counsel:


John C. Hutchins (BBO# 246060)
Daniel E. Rosenfeld (BBO# 560226)
Amy Beth Abbott (BBO# 648072)
**KIRKPATRICK & LOCKHART LLP**
75 State Street
Boston, Massachusetts 02109
Tel:  (617) 261-3100


Dated: October 18, 2001

A13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - x
                           :
In re:                     :  Chapter 11
                           :
STONE & WEBSTER, INCORPORATED, :  Case No. 00-02142 (RRM)
    et al.,                :
                           :  Jointly Administered
        Debtors.          :
                           :
- - - - - - - - - - - - - - x
                           :
STONE & WEBSTER, INCORPORATED, :
and STONE & WEBSTER ENGINEER- :
ING CORPORATION, et al.,   :
                           :
        Plaintiffs,       :
                           :
    -against-             :
                           :  Adversary Proceeding
SAUDI ARABIAN OIL COMPANY, :  No.:_____
                           :
        Defendant.        :
                           :
- - - - - - - - - - - - - - :
                           x
```

## COMPLAINT

Plaintiffs Stone & Webster, Incorporated ("SWINC"), and its direct and indirect subsidiaries, including Stone & Webster Engineering Corporation ("SWEC"), debtors and debtors-in-possession in the above-captioned cases (collectively, "Debtors"), by and through their undersigned attorneys, as and for their complaint allege as to themselves and their own acts and state upon

A14

information and belief as to all other matters as fol-
lows:

## NATURE OF CASE

1. This is an action under 11 U.S.C. §§ 105,
542; 28 U.S.C. §§ 157, 1330, 1334, 2201-2202 and Fed. R.
Bankr. P. 7001 against the Saudi Arabian Oil Company
("Saudi ARAMCO") for declaratory judgment, indemnifica-
tion, breach of contract and turnover of estate property.

2. Specifically, SWINC, by this action, seeks
a declaration that it is not liable to Saudi ARAMCO under
a parent guarantee obligating SWINC to satisfy certain
claims against Bugshan S&W Company Limited ("BS&W")
relating to the Ras Tanura Oil Refinery Upgrade Project
("Project").

3. By this action, SWEC seeks indemnifica-
tion of any amounts for which it is individually liable,
as a shareholder of BS&W, for a claim brought against
BS&W by one of its subcontractors on the Project. SWEC
also seeks damages caused by Saudi Aramco's breach of its
contract with BS&W as well as the turnover of estate
property held by Saudi ARAMCO.

2

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action under 28 U.S.C. §§ 157, 1330 and 1334.  This action is a core proceeding under 28 U.S.C. § 157(b)(2)(E), and (O).

5.  Venue is proper as provided in 28 U.S.C. § 1409 because this proceeding arises in and is related to the Debtors' bankruptcy cases pending in this District.

6.  This Court has personal jurisdiction over Saudi ARAMCO pursuant to 28 U.S.C. § 1330 and Fed. R. Bankr. P. 7004(f).

## PARTIES

7.  SWINC is a corporation organized under the laws of the State of Delaware, and maintains its principal place of business in Boston, Massachusetts.

8.  SWEC is a corporation organized under the laws of Delaware and maintains its principal place of business in Boston, Massachusetts.

9.  Saudi ARAMCO is a company organized under the laws of the Kingdom of Saudi Arabia and has alleged in other cases in the United States Courts that it is an "agency or instrumentality" of the Kingdom of Saudi

3

A16

Arabia under § 1603(b) of the Foreign Sovereign Immuni-
ties Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611.

**FACTUAL BACKGROUND**

**The Bankruptcy Cases.**

       10.    On June 2, 2000 (the "Petition Date"),
Debtors each filed voluntary petitions in this Court for
reorganization relief under chapter 11 of title 11 of the
United States Code, 11 U.S.C. §§ 101-1330 (as amended,
the "Code").

       11.    Debtors continue to operate their busi-
nesses and manage their properties as debtors and
debtors-in-possession pursuant to Code sections 1107(a)
and 1108.

       12.    On or about June 14, 2000, a creditors'
committee was appointed in these cases by the United
States Trustee.  On or about June 26, 2000, the United
States Trustee appointed an equity committee.  No trustee
or examiner has been appointed in any of Debtors' chapter
11 cases.

       13.    On July 18, 2000, this Court signed an
Order Establishing Bar Date For Filing Proofs of Claim
(the "Bar Date Order").  Pursuant to the Bar Date Order,

the deadline for filing proofs of claim (the "Bar Date")
was August 25, 2000.

**The In-Kingdom Contract**

14.    On or about June 28, 1994, Saudi ARAMCO
and BS&W entered into Contract No. 65004/00 (the "In-
Kingdom Contract"). A copy of the In-Kingdom Contract is
attached hereto as Exhibit A.

15.    BS&W is a limited liability company
organized under the laws of the Kingdom of Saudi Arabia.
SWEC and Abdullah Said Bugshan & Brothers ("ASB&B"),
another entity based in Saudi Arabia, are the two joint
shareholders of BS&W. Notwithstanding BS&W's status as a
limited liability company, allegations have been made
that, under Saudi law, SWEC is liable for the debts of
BS&W. Specifically, ASB&B has filed proof of claim 4419
seeking reimbursement of a claim against BS&W in a Saudi
lawsuit as well as for costs it incurred defending BS&W
against the claim. Debtors objected to BS&W's proof of
claim. As explained more fully below, Debtors maintain,
among other things, that the enforcement of an arbitra-
tion award against it presupposes shareholder liability
for corporate debts in contravention of United States and
Saudi law.

5

A18

16.    The In-Kingdom Contract provides that BS&W is to "totally design, engineer, procure, construct, conduct final testing, inspection, checkout and provide start-up and commissioning assistance for" a variety of utility facilities associated with the Project. (In-Kingdom Contract Schedule "B", ¶ 3.1).

17.    In consideration, Saudi ARAMCO agreed to pay BS&W a lump sum price of $115,131,421. (In-Kingdom Contract, Schedule "C", § 1.1).

18.    Additionally, Saudi ARAMCO agreed to "promptly pay [BS&W] one hundred percent (100%)" of compensation for changes involving work outside the scope of the In-Kingdom Contract, compensation for start-up and commissioning assistance, compensation for standby time, compensation for adjustments related to material, tools and equipment, and compensation for incidental costs. (In-Kingdom Contract, Schedule "C", § 2).

19.    By virtue of various acts related to the In-Kingdom Contract, including sending personnel to Houston on several occasions, Saudi ARAMCO engaged in commercial activity within the United States.  Additionally, the In-Kingdom Contract was intertwined with a contract (the "Out-of-Kingdom Contract") between Aramco

6

A19

Services Corporation, a wholly-owned subsidiary of Saudi
ARAMCO incorporated in Delaware and based Houston, Texas
("ASC" and collectively with Saudi ARAMCO the "ARAMCO
Entities"), and SWEC to provide air compressors and high
pressure boilers for the Project.  The Out-of-Kingdom
Contract was largely performed in the United States.
Despite the fact that the In-Kingdom Contract and Out-of-
Kingdom Contract purport to be two separate contracts,
the ARAMCO Entities did not always draw formal distinc-
tions between the two contracts.  For example, the ARAMCO
Entities both responded to SWEC using the stationary of
the other entity on matters concerning the contracts.

**The Guarantee**

     20.  On June 2, 1994, SWINC, in connection with
the In-Kingdom Contract, executed a parent company per-
formance guarantee ("Guarantee") to the benefit of Saudi
ARAMCO. A copy of the Guarantee is attached hereto as
Exhibit B.

     21.  Among other things, the Guarantee obli-
gates SWINC to "unconditionally guarantee satisfaction
within thirty (30) days of any award rendered against
[BS&W] in any arbitration held pursuant to the terms of
the [In-Kingdom Contract]." Para. (d).

<div align="center">7</div>

22.  Paragraph (f) of the Guarantee provides:

It shall not be necessary, in order to enforce
this guarantee, for SAUDI ARAMCO to institute
suit or obtain a judgment, whether in the
United States, the Kingdom of Saudi Arabia or
anywhere else, or exhaust its legal remedies
against [BS&W]...

23.  Paragraph (j) of the Guarantee provides:

This guarantee is governed by and shall be
construed in accordance with the laws and regu-
lations of the State of New York.

24.  SWINC executed a similar guarantee with

respect to the Out-of-Kingdom Contract.

**Saudi ARAMCO's Wrongdoing and Breach of the In-Kingdom
Contract**

25.  Saudi ARAMCO failed to perform its obliga-

tions under the In-Kingdom Contract in several respects,

including but not limited to providing flawed conceptual

designs for the Project; failing to provide Deliverables

(as defined in In-Kingdom Contract) on schedule; failing

to render decisions on change order requests in a timely

fashion; and failing to consider any scheduling impacts

to the Project, despite its frequent and often unneces-

sary change order requests.

26.  Saudi ARAMCO also required BS&W to conduct

work outside the agreed upon scope of the In-Kingdom

Contract for which it has not been paid.

8

A21

27.  Additionally, Saudi ARAMCO engaged in the affirmative act of corrupting the logic ties for the Critical Path Method schedule, the computerized sequencing program for the Project, to achieve its goal of mandating zero changes to the Project's schedule despite over 220 approved change orders.

28.  All of these actions caused BS&W to incur substantially increased costs.  Notwithstanding Saudi ARAMCO's improper conduct, BS&W continued to perform under the In-Kingdom Contract.  For its part, SWEC, a shareholder of BS&W, fully performed all of its obligations under the In-Kingdom Contract.

**The Mohammad Al-Mojil Group Claim and Award**

29.  In connection with the In-Kingdom Contract, BS&W entered into agreements with several subcontractors to perform various portions of the work related to the Project.  One such subcontractor was Mohammad Al-Mojil Group ("Al-Mojil").

30.  More specifically, on August 24, 1994, BS&W subcontracted to Al-Mojil various construction work relating to the Project.  The scope of Al-Mojil's work included, among other things, the procurement and construction of interconnecting pipeways, high pressure

9

boilers, North and South air compressors, nitrogen sys-
tem, caustic system, desalination system, firewater
distribution system, sanitary sewage system, and fuel gas
system.

    31.  Saudi ARAMCO's wrongdoing and failure to
perform under the In-Kingdom Contract impacted Al-Mojil's
obligations under the subcontract.  For example, Saudi
ARAMCO's frequent and unnecessary change orders resulted
in compression and revising of the schedule for Al-Mojil
to complete its work.

    32.  BS&W determined that Al-Mojil's perfor-
mance was unsatisfactory.  Consequently, in June 1997,
and again in July 1997, BS&W terminated portions of Al-
Mojil's scope of work under the subcontract and re-con-
tracted the work to other construction contractors.

    33.  On or about July 4, 2000, Al-Mojil com-
menced an arbitration proceeding in Saudi Arabia against
BS&W.  Al-Mojil sought damages for delays and various
alleged wrongdoings by BS&W.  The arbitration was subse-
quently referred to the Saudi courts for adjudication.

    34.  As set forth above, Al-Mojil's claims
against BS&W are substantially related to the BS&W Claim.
In its dispute with Al-Mojil, BS&W has expressly stated

<div align="center">10</div>

that Saudi ARAMCO is responsible for any and all damages for which BS&W could be liable to Al-Mojil.

35.  On or about May 21, 2001, the Board of Grievances lower court in Dammam, Saudi Arabia, issued a judgment against BS&W for approximately $51,000,000 (the "Al-Mojil Award").[1]

36.  By virtue of paragraph (d) of the Guarantee, SWINC is exposed to potential liability to Saudi ARAMCO for satisfaction of the Al-Mojil Award (the "Guarantee Claim").  As noted above, the Guarantee Claim is governed by New York law.

**BS&W's Inability to be Heard on the Merits of its Claim Against Saudi ARAMCO in Saudi Arabia**

37.  On or about June 30 1998, BS&W submitted a claim to Saudi ARAMCO for approximately $112.9 million, later adjusted to $148 million, due and owing under the In-Kingdom Contract (the "BS&W Claim").  A portion of the damages in the BS&W Claim relates to additional man-hours necessary to redesign Saudi ARAMCO's flawed conceptual

---

[1]    BS&W appealed the Al-Mojil Award to the Board of Grievances Court of Appeal ("Court of Appeal").  The Court of Appeal issued comments and referred the case back to the lower court in Dammam.  The lower court in Dammam has not yet issued a decision stating whether it will modify the Al-Mojil Award.

11

design bid documents as well as problems associated with the pipe rack engineering. Another significant portion of the BS&W Claim relates to the claim for damages by Al-Mojil, as described above.

38.    BS&W, in good faith, attempted to negotiate a settlement of the BS&W Claim with Saudi ARAMCO. Notwithstanding, Saudi ARAMCO has failed to remit the funds due and owing to BS&W (the "Withheld Funds").

39.    Consequently, BS&W was forced to seek a formal resolution of the BS&W Claim. BS&W has been seeking such a resolution on the merits since 1999. The efforts taken by BS&W include seeking a resolution pursuant to the arbitration provisions of the In-Kingdom Contract, as well as attempting to adjudicate its claim against Saudi ARAMCO in several Saudi Arabian judicial forums, including the Sharia court, the court of general jurisdiction in Saudi Arabia.

40.    Additionally, BS&W sought to add Saudi ARAMCO as a party to Al-Mojil's lawsuit. Notwithstanding, the Saudi tribunals have consistently refused to join Saudi ARAMCO or hear the merits of the BS&W Claim.

41.    To date, BS&W has not even been able to get a judicial forum to accept jurisdiction over the BS&W

12

Claim.  Throughout the course of this process-- from 1999 to present--the question of which Saudi judicial forum has jurisdiction has been circulated between numerous Saudi Arabian governmental entities, including the Council of Ministers, the Ministry of Interior, and the Ministry of Petroleum.  Despite BS&W's efforts, none of these entities has been willing to decide where BS&W can adjudicate the merits of the BS&W Claim.

42.  As a result, SWEC has been denied due process.  Thus, the arbitration provision of the In-Kingdom Contract is null and void.

43.  Moreover, ASB&B has maintained in its proof of claim that SWEC should be held liable for the Al-Mojil Award.  Although SWEC denies this contention, ASB&B's proof of claim raises the risk that SWEC's assets will be implicated by the Al-Mojil Award.  Because its assets are at risk, SWEC is entitled to bring this action on its own behalf.

### FIRST CAUSE OF ACTION
#### (Declaratory Judgment, 11 U.S.C. § 105 and 28 U.S.C. §§ 2201-2202)

44.  SWINC repeats and realleges the foregoing paragraphs as if fully set forth herein.

13

A26

45.  The Al-Mojil Award is an award against BS&W for which SWINC faces potential liability to Saudi ARAMCO under the Guarantee.  Notwithstanding, there is no actual liability because (1) Saudi ARAMCO failed to file a timely proof of claim against SWINC, (2) all conditions precedent to SWINC's liability under the Guarantee have not been satisfied, (3) SWINC should be entitled to assert the defenses available to BS&W, and (4) enforcing the Al-Mojil Award against SWEC, and SWINC as guarantor, violates public policy.  Thus, SWINC is entitled to a declaration that the Guarantee is not implicated by the Al-Mojil Award.

46.  First, under Fed. R. Bankr. P. 3002, Saudi ARAMCO must file a proof of claim in SWINC's bankruptcy to recover any amounts allegedly owed under the Guarantee, including the Guarantee Claim.

47.  The time for filing such a proof of claim is governed by Fed. R. Bankr. P. 3003, which provides that "[t]he court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed."  In this case, the Bar Date Order estab-lishes the Bar Date as August 25, 2000.

14

48.   To date, Saudi ARAMCO has not filed a proof of claim against SWINC.

49.   Consequently, any claim by Saudi ARAMCO against SWINC is barred under Fed. R. Bankr. P. 3003 and the Bar Date Order.

50.   Second, even if the Court permits Saudi ARAMCO to file a proof a claim seeking to require SWINC to satisfy the Al-Mojil Award pursuant to the terms of the Guarantee, such a claim would fail because all conditions precedent to SWINC's liability under the Guarantee have not been satisfied.  Unsatisfied conditions include, but are not limited to, the condition that there has been an award rendered under any arbitration held pursuant to the terms of the In-Kingdom Contract.  Here, the Al-Mojil Award was rendered by a court rather than in an arbitration.

51.   Accordingly, SWINC cannot incur any liability under the Guarantee.

52.   Third, even if the Guarantee is implicated and Saudi ARAMCO is permitted to assert the Guarantee Claim, SWINC is still not liable because it is entitled to assert the claims and defenses that BS&W had in the Al-Mojil arbitration and related judicial proceedings.

15

A28

Although SWEC asserts that it is not liable for the debts of BS&W, if the Court rules against SWEC on this issue, then SWEC is the real party in interest and should be entitled to assert the claims and defenses of BS&W. Moreover, SWEC may assign these rights to SWINC. Under New York law, which governs the Guarantee, SWINC, as guarantor, may assert the claims and defenses of the principal where the principal is insolvent.

53. These claims and defenses include those BS&W has been unable to have resolved in connection with the BS&W Claim. More specifically, these claims and defenses include, but are not limited to, the assertion that the Al-Mojil Award includes damages that are attributable to Saudi ARAMCO's wrongdoing and breach of the In-Kingdom Contract.

54. Finally, the Guarantee is unenforceable against SWINC to the extent that enforcing the Al-Mojil Award violates public policy. See, e.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984) ("No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."). Specifically, enforcing the Al-Mojil Award violates

16

public policy because it violates fundamental corporate principles such as limited shareholder liability, particularly as it relates to U.S. companies doing business in foreign markets and because BS&W has consistently been denied a forum to have the BS&W Claim heard in Saudi Arabia.

55.    Accordingly, SWINC is entitled to a declaration that it is not liable to Saudi ARAMCO under the Guarantee for any amounts, including the Al-Mojil Award.

### SECOND CAUSE OF ACTION
### (Indemnification)

56.    SWEC repeats and realleges the foregoing paragraphs as if fully set forth herein.

57.    Should the Court conclude that the Al-Mojil award is enforceable, Saudi ARAMCO must indemnify SWEC to the extent that SWEC is individually liable.

58.    As stated, SWEC, as a shareholder, is alleged to be individually liable for the debts of BS&W, including the Al-Mojil Award.

59.    For the reasons set forth above, however, neither BS&W nor SWEC should be liable for the Al-Mojil Award because Al-Mojil's damages were caused by Saudi

17

ARAMCO's wrongdoings and failure to perform under the In-Kingdom Contract.

60.   Accordingly, Saudi ARAMCO must indemnify SWEC for any portion of the Al-Mojil Award for which SWEC is liable.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

61.   SWEC repeats and realleges the foregoing paragraphs as if fully set forth herein.

62.   The In-Kingdom Contract is a valid contract between BS&W and Saudi ARAMCO.

63.   Saudi ARAMCO failed to perform its obligations under the In-Kingdom Contract in several regards, including but not limited to providing flawed conceptual designs for the Project; failing to provide Deliverables (as defined in In-Kingdom Contract) on schedule; failing to render decisions on change order requests in a timely fashion; refusing to process or negotiate BS&W's claims in good faith; and failing to consider any scheduling impacts to the Project, despite its frequent and often unnecessary change order requests.

64.   Additionally, Saudi ARAMCO engaged in the affirmative act of corrupting the logic ties for the

18

Critical Path Method schedule, the computerized sequenc-
ing program for the Project, to achieve its goal of
mandating zero changes to the Project's schedule despite
over 220 approved change orders.

65.  Further, Saudi ARAMCO has failed to remit
the Withheld Funds due and owing to BS&W pursuant to the
In-Kingdom Contract.

66.  Saudi ARAMCO's conduct constitutes a
breach of the In-Kingdom Contract.

67.  BS&W has suffered damages as a result of
Saudi ARAMCO's breach of the In-Kingdom Contract.

68.  Should the Court determine that SWEC is
liable for the debts of BS&W under Saudi law, then SWEC
is entitled to assert the rights of BS&W against Saudi
ARAMCO, including BS&W's right to assert a breach of
contract action.

### FOURTH CAUSE OF ACTION
### (Turnover, 11 U.S.C. § 542(b))

69.  SWEC repeats and realleges the foregoing
paragraphs as if fully set forth herein.

70.  The Withheld Funds constitute assets of
BS&W.

19

A32

71. For the reasons set forth above, SWEC is entitled to assert the rights of BS&W should the Court determine that Saudi law disregards BS&W's corporate form as a limited liability company. This includes BS&W's right to the Withheld Funds.

72. Accordingly, the Withheld Funds constitute estate property and must be turned over by Saudi ARAMCO pursuant to 11 U.S.C. § 542(b).

73. Section 542(b) of the Code states in part:

> [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt....

74. The Withheld Funds owed by Saudi ARAMCO are estate property. This debt is matured, payable on demand, or payable on order, and aggregates to at least $148,000,000 together with interest thereon.

75. Saudi ARAMCO is in possession, custody or control of the Withheld Funds and has neither delivered nor accounted for the Withheld Funds.

76. Accordingly, SWEC is entitled to immediate payment of the Withheld Funds, plus interest, under Code § 542(b)

20

A33

## RELIEF REQUESTED

WHEREFORE, Debtors respectfully request that the

Court enter judgment:

A.    Declaring that SWINC is not liable to Saudi
ARAMCO for any amounts under the Guarantee;

B.    Ordering Saudi ARAMCO to indemnify SWEC for any
portion of the Al-Mojil Award for which SWEC is
liable;

C.    Awarding SWEC damages for breach of contract in
an amount to be determined at trial;

D.    Ordering Saudi ARAMCO to account for and turn-
over the Withheld funds to SWEC pursuant to 11
U.S.C. § 542; and

21

**A34**

E.    Awarding Debtors such other and further relief
      as is just and proper.

Dated:    Wilmington, Delaware
          May 31, 2002

_____
Gregg M. Galardi (I.D. No. 2991)
Gary A. Rubin (I.D. No. 4140)
SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

                    - and -

Edward J. Meehan
Alexander W. Powell, Jr.
SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM LLP
1440 New York Avenue
Washington, DC  20005-2111
(202) 371-7000

Attorneys for Debtors and
    Debtors-in-Possession

22

A35

FROM                                    (FRI) 5. 31' 02   4:59/ST.  4:57/NO. 4261977542 P  7

# EXHIBIT A

FROM                          (FRI) 5. 31' 02  4:59/ST. 4:57/NO. 4261977542 P  8



CONTRACT NO. 65004/00
JOB TITLE: UTILITIES

### CONTRACT FOR CONSTRUCTION

THIS CONTRACT is made and entered into effective as of the 19th day of Muharram 1415, corresponding to the 28th day of June 1994,

#### by and between

SAUDI ARABIAN OIL COMPANY ("SAUDI ARAMCO"), a company of limited liability organized under the Laws of the Kingdom of Saudi Arabia.

#### and

BUGSHAN S&W CO. LTD. ("CONTRACTOR"), having offices at Dammam, P.O. Box 4639, Dammam 31412, Saudi Arabia. Commercial Registration Number 1010038670, issued at Riyadh on 19 April, 1981

This Contract consists of this signed document, the following attached schedules, and all drawings, standards, specifications and other documents referred to in the schedules or in any of the referenced documents.

SCHEDULE "A"      General Terms and Conditions

SCHEDULE "B"      Job Specification

SCHEDULE "C"      Contract Price and Payment Provisions

SCHEDULE "D"      Safety, Health and Environmental Requirements

SCHEDULE "E"      Settlement of Disputes, Arbitration and Choice of Law

SCHEDULE "F"      Taxes, Duties and Related Obligations

SCHEDULE "G"      Materials, Tools and Equipment

SCHEDULE "H"      Special Terms and Conditions

## CONTROLLED COPY N0. 2 - M. M. WRIGHT

I

A37

<u>CONTRACT NO. 65004/00</u>

A reference in this Contract to any of the Schedules listed above shall, in addition, be considered a reference to any Attachments to said Schedules and to all documents referred to in said Schedules or Attachments.

Should there be any conflict between Schedule "H" and any other Schedule, the terms of Schedule "H" shall control. Should there be any conflict between Schedule "A" and Schedules "B" through "G", Schedule "A" shall control. Should there be any conflict between Schedule "B" and documents referred to in Schedule "B", Schedule "B" shall control.

All notices, authorizations, and approvals pertaining to this Contract shall be in writing. Except as otherwise provided below, all notices between the parties shall be sufficient when delivered in person or sent by telex or cable, or by certified or registered mail, to the appropriate address as follows:

| SAUDI ARAMCO | CONTRACTOR |
|---|---|
| S.F. Al-Dosari | M.M. Wright |
| Executive Director (AA) | General Manager |
| Saudi Arabian Oil Company | Bugshan S&W Co. Ltd. |
| R-3040 | P.O. Box 4639, Dammam 31412 |
| Dhahran 31311 | Saudi Arabia |
| Saudi Arabia | Telephone: 827-5977 |
| Telephone: 874-1247 | Fax : 827-5343 |
| Fax : 873-3566 | |

The parties hereby designate the following agents for the purpose of receiving any notice of referral to arbitration and receiving any further notice and documents during the course of the proceedings unless and until they have designated in writing another agent for that latter purpose:

| SAUDI ARAMCO | CONTRACTOR |
|---|---|
| General Counsel | M.M. Wright |
| Law Department | General Manager |
| Saudi Arabian Oil Company | Bugshan S&W Co. Ltd. |
| P.O. Box 5000 | P.O. Box 4639, Dammam 31412 |
| Dhahran 31311 | Saudi Arabia |
| Saudi Arabia | Telephone: 827-5977 |
| | Fax : 827-5343 |

II

A38

FROM                                    (FRI) 5. 31' 02  4:59/ST. 4:57/NO. 4261977542 P 10

<u>CONTRACT NO. 65004/00</u>

IN WITNESS WHEREOF the parties have executed this Contract in duplicate, intending each to serve as an original, as of the effective date set forth above.

WITNESS:                          SAUDI ARABIAN OIL COMPANY
                                  (SAUDI ARAMCO)

                                  By: _Saad f.A.2____

                                  Title: Exec Dir. proj Mgmt.

                                  Date: ___6/28/94.___

WITNESS:                          BUGSHAN S&W CO. LTD.

                                  By: _____

                                  Title: General Manager

                                  Date: June 29, 1994

III

A39

CONTRACT NO. 65004/00

## SCHEDULE "A"

## GENERAL TERMS AND CONDITIONS

## TABLE OF CONTENTS

1.    Definitions
2.    CONTRACTOR Obligations
3.    CONTRACTOR Personnel
4.    CONTRACTOR Equipment
5.    CONTRACTOR WORK Site Responsibility
6.    Local Conditions
7.    SAUDI ARAMCO Obligations
8.    WORK Schedule and Progress Reports
9.    WORK Commencement, Prosecution and Completion
10.   Changes
11.   Warranties and Remedy of Defects
12.   Standards, Drawings and Specifications
13.   Inspection and Testing
14.   Subcontracts
15.   Standby Time
16.   Distribution of Risks
17.   Insurance
18.   Pollution
19.   Title to Designs, Confidential Information and Patents
20.   Claims Settlement; Disputes
21.   Conflict of Interest
22.   Suspension of WORK
23.   Termination at SAUDI ARAMCO Convenience
24.   Termination by SAUDI ARAMCO for Cause
25.   Termination by CONTRACTOR
26.   CONTRACTOR's Obligations Upon Suspension or Termination
27.   Force Majeure
28.   Publicity Releases
29.   Arabic Translation
30.   Government Relations Activities
31.   General Provisions

i

CONTRACT NO. 65004/00

## SCHEDULE "A"

### GENERAL TERMS AND CONDITIONS

1.    DEFINITIONS

1.1    "Amendment" means any written alteration of this Contract expressly designated as an amendment and signed by both parties.

1.2    "Company Representative" means a party or parties duly authorized by SAUDI ARAMCO to act on behalf of SAUDI ARAMCO, with whom CONTRACTOR may consult at all reasonable times, and whose instructions, requests and decisions shall be binding on SAUDI ARAMCO as to all matters pertaining to this Contract.

1.3    "Contractor Representative" means a party or parties duly authorized by CONTRACTOR to act on behalf of CONTRACTOR, with whom SAUDI ARAMCO may consult at all reasonable times, and whose instructions, requests, and decisions shall be binding on CONTRACTOR as to all matters pertaining to this Contract.

1.4    "Affiliated Contractor" means CONTRACTOR's affiliated company responsible for performing services related to the FACILITIES outside of Saudi Arabia under a separate agreement.

1.5    "FACILITIES" means the structures or items being designed, procured, fabricated or constructed by CONTRACTOR pursuant to this Contract.

1.6    "WORK" means all the work and services to be performed by CONTRACTOR pursuant to this Contract.

1.7    "WORK Site" means all locations at which CONTRACTOR performs any portion of the WORK.

1.8    The "Scheduled Completion Date" means the agreed date set forth in Schedule "B" by which the CONTRACTOR shall achieve Mechanical Completion.

1.9    "Mechanical Completion" is defined in Paragraph 9.3.

1.10    "Critical Milestone Dates" means the agreed dates set forth in Schedule "B", by which specified portions of the WORK are to be completed.



A-1

FROM                              (FRI) 5. 31' 02  5:00/ST. 4:57/NO. 4261977542 P 13

CONTRACT NO. 65004/00

1.11 "Project Completion" shall be achieved when all Exception Items have been completed or corrected by CONTRACTOR.

1.12 "Software" means all computer programs, procedures, rules and design matter (e.g., flow charts, logic diagrams, and all other design documentation) to be provided by CONTRACTOR under this Contract, including but not limited to source code, file and design layout, configuration data elements, assembler or compiler output, binary machine usable code, and user manuals.

1.13 "Computer System" means hardware and associated Software to be provided by CONTRACTOR under this Contract.

1.14 All dates and periods shall refer to the Gregorian calendar but the corresponding Hijrah dates shall be provided.

2.    **CONTRACTOR OBLIGATIONS**

CONTRACTOR shall, in accordance with and subject to the terms and conditions of this Contract, and, in particular, in conformity with Schedule "B":

2.1 Perform all detailed design and engineering for the FACILITIES in accordance with SAUDI ARAMCO-provided preliminary design and the drawings, specifications and standards referenced in this Contract, so that the FACILITIES can be constructed, operated and maintained in accordance with FACILITIES performance specifications.

2.2 Promptly after this Contract's effective date, review and evaluate SAUDI ARAMCO-provided preliminary design to ensure that it does not conflict with another drawing, specification or standard referenced in this Contract.

  2.2.1 If CONTRACTOR notifies SAUDI ARAMCO of such a conflict within six (6) months after this Contract's effective date, and the resolution of such a conflict in accordance with Paragraph 12.1 of this Schedule would result in a drawing, specification or standard requiring a more expensive alternative controlling over a drawing, specification, or standard requiring a less expensive alternative, SAUDI ARAMCO shall have the right to require that CONTRACTOR implement either:

    a)    the more expensive alternative, in which case SAUDI ARAMCO shall issue a Change Order which compensates CONTRACTOR for the difference in cost; or



A-2

A42

<u>CONTRACT NO. 65004/00</u>

b)    the less expensive alternative, without additional compensation, in which case SAUDI ARAMCO shall issue a written notice to CONTRACTOR.

CONTRACTOR shall be entitled to no additional compensation for such conflicts discovered more than six (6) months after this Contract's effective date.

2.2.2  If at any time such a conflict is identified by either SAUDI ARAMCO or CONTRACTOR, and the resolution in accordance with Paragraph 12.1 of this Schedule would result in a drawing, specification, or standard requiring a less expensive alternative controlling over a drawing, specification, or standard requiring a more expensive alternative, SAUDI ARAMCO shall have the right to require that CONTRACTOR implement either:

a)    the more expensive alternative without any additional compensation; or

b)    the less expensive alternative, in which case SAUDI ARAMCO shall issue a Change Order which credits SAUDI ARAMCO for the difference in cost.

2.3    Prepare all additional standards, specifications, designs, drawings and other documents required for the design, procurement of materials and construction of the FACILITIES.

2.4    Provide those permanent materials, subassemblies, and spare parts for the FACILITIES which are to be provided by CONTRACTOR ("CONTRACTOR-supplied materials"), including procurement, testing, inspection, expediting, customs clearance and transportation.

2.5    Provide support facilities, machinery and equipment required to perform the WORK ("CONTRACTOR's equipment").

2.6    Provide all the labor and supervision required to perform the WORK ("CONTRACTOR's personnel").

2.7    Obtain all permits, licenses and other governmental authorizations, which are necessary for the performance of the WORK, except for those which must be obtained in SAUDI ARAMCO's name.

2.8    Provide proper security at the WORK Site and at CONTRACTOR's materials yard acceptable to SAUDI ARAMCO.



FROM

(FRI) 5.31'02  5:01/ST. 4:57/NO. 4261977542 P 15

CONTRACT NO. 65004/00

2.9 Provide "as built" drawings and Project Record Books, all in the English language, to facilitate operation and maintenance of the FACILITIES.

2.10 Participate in regular WORK progress meetings to be scheduled by SAUDI ARAMCO.

2.11 Construct and conduct final testing, inspection and checkout of the FACILITIES.

2.12 Provide commissioning and start-up assistance.

2.13 Appoint one or more Contractor Representatives for the duration of the WORK. At least one Contractor Representative able to speak, read, and write English and able to read and interpret drawings and specifications shall be present at the WORK Site.

2.14 Provide, or arrange for, facilities for a SAUDI ARAMCO Project Management Team to be located at the principal location (s) of the WORK. CONTRACTOR shall provide complete clerical and secretarial staff assistance, as well as such additional incidental support as may be reasonable and appropriate, as requested by SAUDI ARAMCO.

2.15 Perform all other obligations, work and services and furnish all other things which are required by the terms of this Contract or which can reasonably be inferred from the terms of this Contract as being necessary for the successful and timely completion of the WORK.

3. **CONTRACTOR PERSONNEL**

3.1 CONTRACTOR warrants that it has sufficient competent and fully qualified personnel to execute the WORK in the manner and within the time required by this Contract.

3.2 In obtaining additional personnel to supplement its permanent staff in the performance of the WORK, CONTRACTOR shall give priority to qualified Saudi Arab nationals and shall ensure that all its subcontractors, at whatever tier, do the same.

3.3 If CONTRACTOR is unable to obtain sufficient numbers of qualified Saudi Arab nationals to satisfy its requirements for the performance of the WORK, CONTRACTOR shall obtain the additional personnel required by recruiting them outside Saudi Arabia.

3.4 CONTRACTOR's expatriate personnel shall obtain the required passports, visas, and permits necessary to gain entrance into and to exit from Saudi Arabia.

3.5 CONTRACTOR shall not, during the course of the WORK, offer employment to any Saudi Arab national who is at such time an employee of SAUDI ARAMCO, without SAUDI ARAMCO's prior written consent.



A-4

CONTRACT NO. 65004/00

3.6    All of CONTRACTOR's personnel and its subcontractors' personnel shall have in their possession all required and properly validated licenses or certificates prescribed by the Saudi Arab Government or SAUDI ARAMCO as being necessary for the performance of those aspects of the WORK to which they are assigned.

3.7    CONTRACTOR's personnel and the personnel of its subcontractors shall comply with all applicable rules and instructions issued by SAUDI ARAMCO and with generally acceptable standards of conduct for expatriate personnel living and working in Saudi Arabia.  Upon SAUDI ARAMCO's written request, CONTRACTOR shall, at its own expense, remove from involvement with or performance of the WORK and replace at its own cost and expense any CONTRACTOR or subcontractor personnel who fail to comply with the foregoing rules and instructions.

3.8    If not accomplished before the effective date of this Contract, within thirty (30) days thereafter, CONTRACTOR shall submit to Company Representative an organization chart for the WORK.  Key personnel as designated in the chart shall be assigned to the WORK and shall not be removed or reassigned without SAUDI ARAMCO's prior written permission.

3.9    Upon SAUDI ARAMCO's written request, CONTRACTOR shall remove from involvement with or performance of the WORK and replace at its own cost and expense any CONTRACTOR personnel determined to be unsuitable by SAUDI ARAMCO.

3.10    CONTRACTOR agrees to defend, indemnify, and hold SAUDI ARAMCO harmless from any expense, loss, damage, fine or penalty incurred by, assessed against or demanded from SAUDI ARAMCO as a result of CONTRACTOR's or any subcontractor's failure to fulfill the obligations set forth in this Paragraph 3.

4.    CONTRACTOR EQUIPMENT

All of CONTRACTOR's equipment and the equipment of its subcontractors shall be suitable for the safe and efficient performance of the WORK.  All such equipment shall be subject to inspection from time to time by SAUDI ARAMCO.  Any such equipment which is found to be in an unsafe condition shall be promptly removed from the WORK by CONTRACTOR and replaced or repaired without additional cost to SAUDI ARAMCO and without delay in completion of the FACILITIES.



A-5

CONTRACT NO. 65004/00

5.    CONTRACTOR WORK SITE RESPONSIBILITY

5.1    The establishment or construction by CONTRACTOR of all WORK-related storage areas and temporary structures on or adjacent to SAUDI ARAMCO premises must be authorized in advance by SAUDI ARAMCO and shall be confined to areas specified by SAUDI ARAMCO. Authorized temporary structures shall be provided by CONTRACTOR at its own expense. If not accomplished prior to the effective date of this Contract, promptly thereafter, CONTRACTOR shall submit to Company Representative, for SAUDI ARAMCO's review, a plan for proposed ancillary site facilities required by CONTRACTOR during performance of the WORK. This plan shall include, but not be limited to, materials and equipment storage facilities, site offices, sanitary facilities, vehicle parking areas, temporary electrical supply locations and trash collection areas, including proposed locations for each.

5.2    CONTRACTOR shall preserve and protect the environment at and adjacent to the WORK site.

5.3    Except as may be otherwise provided in Schedule "B", CONTRACTOR shall protect from damage all existing structures, improvements or utilities at or near the WORK Site, and shall repair and restore any damage thereto resulting from CONTRACTOR's failure to exercise reasonable care in protecting the same during CONTRACTOR's performance of the WORK. If CONTRACTOR fails or refuses to promptly repair any such damage, SAUDI ARAMCO may perform such repairs, or have them performed by others. Paragraph 16.2 shall control with respect to CONTRACTOR's financial liability arising from or related to such damage.

5.4    CONTRACTOR shall provide and maintain for its personnel ample toilet facilities at the WORK Site in accordance with applicable SAUDI ARAMCO standards and specifications and current Saudi Arabian Government regulations. Sanitary facilities shall be operational at all times while there are personnel on the WORK Site.

5.5    Where applicable, all of CONTRACTOR's personnel and those of its visitors, agents and subcontractors shall wear an identification card issued by SAUDI ARAMCO on their outer garments whenever on the WORK site. Such identification cards remain the property of SAUDI ARAMCO and CONTRACTOR shall return them to SAUDI ARAMCO upon Project Completion, or upon demand by Company Representative.

5.6    CONTRACTOR shall at all times keep the WORK Site neat, clean and free of waste material and rubbish. CONTRACTOR shall, at the direction of SAUDI ARAMCO, promptly remove from the WORK Site any surplus equipment and materials not required for the WORK. Before completion of the WORK and before final payment is made, CONTRACTOR shall, unless otherwise provided in this Contract, at SAUDI ARAMCO's direction, remove from the WORK Site at CONTRACTOR's expense all equipment, temporary structures, rubbish, unused materials and other such items. In the event of CONTRACTOR's failure to discharge the foregoing obligation, SAUDI ARAMCO may accomplish the same or have it accomplished by others, all at CONTRACTOR's expense.



A-6

CONTRACT NO. 65004/00

5.7  It is understood that SAUDI ARAMCO may itself perform work at or near the WORK Site, or have such work performed by others. CONTRACTOR agrees to cooperate fully with SAUDI ARAMCO or any other contractor performing such work, and not to interfere with the performance of such work.

6.    LOCAL CONDITIONS

6.1    CONTRACTOR acknowledges that it has thoroughly investigated, or has had the opportunity to do so, and satisfied itself as to all general and local conditions affecting the WORK, including, but not limited to: transportation and access to the WORK Site, including the availability and conditions of roads; topography and ground surface conditions at the WORK Site, including the nature and quantity of surface and subsurface conditions, materials or obstacles to be encountered to the extent such conditions are not latent or concealed; disposal, handling and storage of materials; availability and quality of labor, water and electric power; climatic conditions, tides and ground water; and equipment, machinery and materials required by CONTRACTOR prior to and during performance of the WORK. The failure of CONTRACTOR to acquaint itself with these conditions will not entitle CONTRACTOR to any additional compensation and will not relieve it from the responsibility for meeting the Scheduled Completion Date or the Critical Milestone Dates.

6.2    Notwithstanding Paragraph 6.1 above, CONTRACTOR shall be entitled to rely on subsurface data and soils reports on subsurface conditions provided by SAUDI ARAMCO or on any subsurface conditions indicated in Schedule "B". In the absence of such information, CONTRACTOR shall be responsible for subsurface conditions in accordance with its bid. CONTRACTOR's failure to make clear the subsurface conditions assumed in such bid shall preclude CONTRACTOR from claiming additional compensation or any extension to the Scheduled Completion Date or Critical Milestone Dates on account of the actual subsurface conditions encountered in the performance of the WORK.

6.3    Should actual subsurface conditions encountered in the performance of the WORK be at variance with the conditions on which CONTRACTOR is entitled to rely or indicated in Schedule "B", or for which CONTRACTOR is responsible under Paragraph 6.2, CONTRACTOR shall promptly, and before such conditions are altered, notify SAUDI ARAMCO orally, followed by prompt written confirmation. SAUDI ARAMCO shall promptly investigate such conditions and, if they will affect CONTRACTOR's costs or the Scheduled Completion Date or Critical Milestone Dates, issue a Change Order pursuant to Paragraph 10 or an Amendment, making appropriate adjustments.

A-7



FROM                                    (FRI) 5.31'02  5:02/ST. 4:57/NO. 4261977542 P 19

CONTRACT NO. 65004/00

7.    **SAUDI ARAMCO OBLIGATIONS**

SAUDI ARAMCO shall, in accordance with and subject to the terms and conditions of this Contract, and, in particular, in conformity with Schedule "B":

7.1    Perform SAUDI ARAMCO procurement responsibilities in accordance with Schedule "G".

7.2    Obtain all permits, licenses, and other governmental authorizations which must be obtained in SAUDI ARAMCO's name and which are necessary for the performance of the WORK.

7.3    Allow CONTRACTOR access, subject to SAUDI ARAMCO's normal security control and safety procedures, to the WORK Site as required for the orderly performance of the WORK.

7.4    Obtain any rights-of-way that are determined by SAUDI ARAMCO to be required for the performance of the WORK.

7.5    Appoint one or more Company Representatives.

7.6    Perform all other obligations required of it by the terms of this Contract in such time and manner as to facilitate the orderly prosecution of the WORK.

8.    **WORK SCHEDULE AND PROGRESS REPORTS**

8.1    The CONTRACTOR shall plan, schedule and report WORK progress using the Critical Path Method (CPM) and an automated scheduling system reviewed by the Company Representative. If not accomplished before the effective date of this Contract, within thirty (30) days following this Contract's effective date, and at least monthly thereafter, CONTRACTOR shall submit for SAUDI ARAMCO's review CONTRACTOR's proposed or updated WORK Schedule, which shall include the following interrelated documents:

8.1.1    A Detailed Level CPM network logic diagram in arrow diagram (ADM) or precedence diagram (PDM) format describing all the significant activities to be accomplished to perform the WORK and their restraints and dependencies, with no individual activity duration longer than twenty-five (25) work days, and with the critical path (zero float) highlighted;

8.1.2    Tabulated lists of such activities containing for each activity its number, description, discipline, FACILITY area, duration (original and remaining) in work days, early and late start and finish dates, total float, and required manhours and other resources; such lists shall be sorted by activity number, total float-early start, early start-total float, and discipline and FACILITY area;

A-8



CONTRACT NO. 6500400

8.1.3    A Summary Level CPM timescaled network logic diagram in ADM or
         PDM format summarizing the Detailed Level CPM diagram and containing
         between fifty (50) and two hundred (200) activities and their restraints and
         dependencies;

8.1.4    A Milestone Schedule in the form of a bar graph which indicates the
         original, revised, and forecasted Critical Milestone Dates and Scheduled
         Completion Date, and their current ahead or behind schedule conditions
         noted as plus (+) or minus (-) work days;

8.1.5    Resources Requirement Forecasts in the form of a series of graphic
         displays depicting manpower requirements (original and remaining) by
         discipline and type and in the aggregate, in manhours of effort by month,
         and equipment requirements (original and remaining) by month;

8.1.6    A Narrative Report, in a format acceptable to SAUDI ARAMCO,
         summarizing each month's progress, areas of concern, delays and solutions
         to the delays, and WORK anticipated in the next month.

8.2      The WORK Schedule shall be based upon and incorporate the Critical Milestone
         Dates, Inter-Contract Milestone Dates, Key Milestone Dates and the Scheduled
         Completion Date, and shall be regularly updated or revised and resubmitted to
         SAUDI ARAMCO for review so that it accurately reflects actual and forecasted
         WORK progress, including the impact of Changes.  CONTRACTOR shall perform
         the WORK in accordance with the latest SAUDI ARAMCO-reviewed version of the
         WORK Schedule, which shall serve as the basis for WORK progress payment and
         reporting and schedule controlling and forecasting, including the determination of
         CONTRACTOR's entitlement, if any, to a time extension under Paragraph 8.6.

8.3      CONTRACTOR's failure to submit and update the WORK Schedule as required in
         this Paragraph 8 shall entitle SAUDI ARAMCO to withhold progress payments
         otherwise due CONTRACTOR until CONTRACTOR complies with this Paragraph
         8.  Furthermore, if CONTRACTOR fails to achieve a Critical, Inter-Contract or Key
         Milestone Date(s), SAUDI ARAMCO may, at its sole option, withhold any and all
         progress payments otherwise due CONTRACTOR until such time as
         CONTRACTOR achieves the milestone that triggered progress payment(s)
         withholding.

8.4      CONTRACTOR shall promptly notify SAUDI ARAMCO of any anticipated or
         actual slippage in the performance of the WORK as compared to the WORK
         Schedule and any currently due time extensions, together with the extended
         completion date.

A49

FROM                                    (FRI) 5. 31' 02  5:02/ST. 4:57/NO. 4261977542 P 21

CONTRACT NO. 65004/00

8.5     Upon SAUDI ARAMCO's request, CONTRACTOR shall provide to SAUDI ARAMCO all of CONTRACTOR's calculations and documents supporting the WORK Schedule and any other related schedules, reports, and forecasts.

8.6     The Critical, Inter-Contract and Key Milestone Dates and Scheduled Completion Date shall be adjusted only when necessary to reflect any actual delay in the performance of a work activity in the critical path either occasioned by force majeure (as defined in Paragraph 27), or for which SAUDI ARAMCO is responsible under this Contract. The Critical, Inter-Contract and Key Milestone Dates and Scheduled Completion Date shall not be adjusted for delay if the affected activity is not in the critical path and the duration of the delay does not exceed the activity's total float as reflected in the latest reviewed WORK Schedule. The Critical and Inter-Contract Milestone Dates shall be adjusted only by Change Order or Amendment and the Scheduled Completion Date shall be adjusted only by Amendment.

9.     WORK COMMENCEMENT, PROSECUTION AND COMPLETION

9.1     Except for WORK directly related to the actual physical installation of the FACILITIES, CONTRACTOR shall commence the WORK promptly upon the effective date of this Contract. CONTRACTOR shall commence the remaining WORK promptly upon the receipt of a written "Notice to Proceed" from the Company Representative, which notice shall, provided CONTRACTOR has complied with all other contractual obligations, be issued not later than the date specified in Schedule "B". CONTRACTOR shall prosecute WORK completion with diligence and dispatch so that the Critical, Inter-Contract and Key Milestone Dates and Scheduled Completion Date are met and Exception Items are promptly completed or corrected.

9.2     CONTRACTOR's failure to comply with Paragraph 9.1 above shall, unless otherwise excused pursuant to this Contract, constitute a substantial breach of this Contract; provided, however, that failure to achieve any Critical Milestone Date shall not constitute a substantial breach if CONTRACTOR promptly develops a revised WORK Schedule which SAUDI ARAMCO approves and to which CONTRACTOR conforms within seven (7) calendar days after receipt of SAUDI ARAMCO's approval (or such longer period as SAUDI ARAMCO may authorize in writing).

9.3     "Mechanical Completion" shall be achieved for the FACILITIES, or any separable portion thereof, when:

9.3.1     The FACILITIES, or portion thereof, are constructed in strict compliance with all requirements of this CONTRACT, including the successful completion of all required inspection, testing, and precommissioning;



A-10

A50

FROM                                (FRI) 5. 31' 02   5:03/ST. 4:57/NO. 4261977542 P 22

CONTRACT NO. 65004/00

9.3.2   All utility and electric power systems are fully operational;

9.3.3   The WORK Site is in a clean and safe condition, with all surface and subsea construction debris, equipment, and excess materials removed; and

9.3.4   SAUDI ARAMCO has issued a Mechanical Completion Acceptance Notice ("MCAN") for the FACILITIES, or a partial MCAN for any portion thereof.

9.4   Not less than thirty (30) days prior to the date CONTRACTOR anticipates Mechanical Completion will be achieved, CONTRACTOR shall notify Company Representative of the anticipated date. When CONTRACTOR considers that Mechanical Completion has been achieved, SAUDI ARAMCO will inspect the FACILITIES as soon as practicable. If the WORK is not in accord with this Contract, SAUDI ARAMCO shall so notify CONTRACTOR, specifying the respects in which the WORK is deficient, and CONTRACTOR shall promptly remedy the deficiency at his expense.

9.5   SAUDI ARAMCO may, at its option, issue a MCAN or partial MCAN with a list of items ("Exception Items") which are incomplete, defective or otherwise not in accordance with this Contract and which do not affect safe and orderly start-up and operation of the FACILITIES. The issuance of such a notice shall not relieve CONTRACTOR of its obligation to remobilize, if necessary, and complete or correct such items at no cost to SAUDI ARAMCO, or preclude SAUDI ARAMCO from adding additional Exception Items for a period not to exceed two (2) months after the issuance of the applicable MCAN.

9.6   Following the issuance of a MCAN or partial MCAN, CONTRACTOR shall perform start-up and commissioning assistance by providing labor and equipment up to the limits set forth in Schedule "B", as directed in writing by the Company Representative, until the FACILITIES have been successfully operated, but in no event longer than six (6) months after Mechanical Completion. Compensation for such WORK shall be paid in accordance with Schedule "C", Attachment III, Time Unit Rates, and shall not be included in the Contract Price.

9.7   SAUDI ARAMCO shall have the right to take possession of, and use for any purpose, any part of the FACILITIES at any time prior to Mechanical Completion after so notifying CONTRACTOR. Such taking possession or use shall not be deemed to be SAUDI ARAMCO's acknowledgement of Mechanical Completion and shall in no way limit or waive CONTRACTOR's obligations. If such taking possession or use affects CONTRACTOR's costs or the time required for completing the WORK, SAUDI ARAMCO will initiate an Amendment or Change Order making any required adjustment to the Critical Milestone Dates, the Scheduled Completion Date, or the compensation due CONTRACTOR. However, should such taking possession or use result from CONTRACTOR's failure to prosecute the WORK according to the WORK Schedule, CONTRACTOR shall not be entitled to any such adjustment.



A-11

FROM

(FRI) 5. 31' 02  5:03/ST.  4:57/NO. 4261977542 P 23

CONTRACT NO. 65004/00

10.    **CHANGES**

10.1    At any time, the Company Representative may direct CONTRACTOR to make a change within the general scope of this Contract ("Change") such as, but not limited to, alterations of the FACILITIES or changes in the sequence of performance of the WORK, and CONTRACTOR shall perform the WORK as changed.  Such Changes shall be set forth in writing ("Change Order") in accordance with Paragraph 10.2. Except as provided in Paragraph 10.5, each Change Order shall be signed by both parties. All WORK involved in a Change shall be performed in accordance with the terms and conditions of this Contract, and shall not otherwise affect the existing rights or obligations of the parties except as expressly provided in this Contract  or in a signed Change Order.

10.2    In addition to describing the Change, a Change Order shall include:

10.2.1    Any adjustment in the Critical Milestone Dates resulting from the Change; and

10.2.2    The lump sum price of or the basis for determining any increase in the compensation due CONTRACTOR or credit due SAUDI ARAMCO as a result of the Change, if any.

10.3    If a Change may result in a request for an adjustment in the compensation due CONTRACTOR or a request for an adjustment to the Scheduled Completion Date or Critical Milestone Dates, CONTRACTOR shall promptly notify the Company Representative orally, followed by prompt written notification.  In no event shall CONTRACTOR proceed with the WORK involved in the Change without a Change Order or an Amendment. If CONTRACTOR proceeds with the additional WORK involved in a Change without notifying the Company Representative and without a Change Order or an Amendment, CONTRACTOR shall not be entitled to any additional compensation for the WORK performed or to any adjustment of the Scheduled Completion Date and/or Critical Milestone Dates as a result of the Change.

10.4    Compensation for WORK performed under a Change Order, or credit to SAUDI ARAMCO for WORK deleted by a Change Order shall be calculated and paid or offset in accordance with Schedule "C".

CONTRACT NO. 65004/00

10.5    Should SAUDI ARAMCO and CONTRACTOR fail to agree as to the amount or method of determining adjustments in compensation due CONTRACTOR, adjustments in the Critical Milestone Dates, or whether a direction from SAUDI ARAMCO constitutes a Change, SAUDI ARAMCO may direct CONTRACTOR, in writing, to proceed with the WORK as changed and CONTRACTOR shall proceed with the WORK as changed. SAUDI ARAMCO shall compensate CONTRACTOR or calculate the credit due SAUDI ARAMCO in accordance with its good faith estimate of the cost or savings resulting from the Change. ·CONTRACTOR's performance of the WORK as changed shall not prejudice its position that such direction constitutes a Change, that the Critical Milestone Dates should be adjusted, or that CONTRACTOR should receive additional compensation for such WORK; or SAUDI ARAMCO's position that it is entitled to a credit. Such disputes shall be resolved in accordance with Paragraph 20.

11.    <u>WARRANTIES AND REMEDY OF DEFECTS</u>

11.1    CONTRACTOR warrants (1) that the FACILITIES shall be engineered, designed, fabricated and constructed in accordance with all applicable designs, drawings and specifications and good and efficient engineering, fabrication, construction and craft practices; (2) that the FACILITIES as engineered, designed, fabricated and constructed shall be free from defects in workmanship and fit for the purposes intended; (3) that the Computer System shall operate in accordance with the performance and other criteria contained in Schedule "B"; and (4) that the CONTRACTOR supplied materials for the FACILITIES shall be merchantable, fit for the purposes intended and free of defects in design, material, or workmanship, and (5) that the FACILITIES shall meet the design criteria and conform to the standards and specifications contained in Schedule "B" and any additional standards and specifications agreed to by SAUDI ARAMCO and CONTRACTOR. CONTRACTOR does not warrant the FACILITIES against failure due to faulty operation by SAUDI ARAMCO, conditions of service more severe than specified in Schedule "B", deficiency in SAUDI ARAMCO-supplied design documents, or unsuitability or defect of SAUDI ARAMCO-supplied materials which have not been modified, altered or refurbished by CONTRACTOR; provided, however, that such unsuitability or defect was not reasonably detectable by CONTRACTOR.

11.2    Any reproducible or documentable recurring error which causes the Computer System not to operate in accordance with the requirements of Schedule "B" shall constitute a breach of warranty hereunder. A reproducible error is defined as a chain of events that can be executed upon request. A documentable recurring error is an error that appears repetitively but cannot be reproduced upon request. For purposes of this warranty, SAUDI ARAMCO will maintain a log in which failures, descriptions of failures, time and the observing person are recorded. When a given failure has occurred three (3) times, it shall be deemed a documentable recurring error.

A-13



CONTRACT NO. 65004/00

11.3    If at any time during a one (1) year period after CONTRACTOR corrects or completes all Exception Items, if any, relating to a MCAN or partial MCAN, it is discovered that the FACILITIES covered by that MCAN or partial MCAN, or any of their constituent parts or units, or the incorporated CONTRACTOR supplied materials, do not meet the foregoing warranties, CONTRACTOR shall, at no cost to SAUDI ARAMCO, promptly perform or arrange for the performance of any remedial work required to make the FACILITIES conform to such warranties, including remobilization to the WORK Site, the removal of non-conforming WORK, the purchase of replacement materials originally supplied by CONTRACTOR, and reinstallation as may be necessary.  With respect to any Computer System, CONTRACTOR's remedial work shall not be considered prompt unless CONTRACTOR provides a qualified service representative at the installation site within twenty four (24) hours, plus reasonable travel time not exceeding two (2) days if the service representative is not in Saudi Arabia, of CONTRACTOR's receipt of SAUDI ARAMCO's written notice of warranty claim.

11.4    If CONTRACTOR fails to start or arrange for the start of any remedial work promptly after receipt of notice from SAUDI ARAMCO to do so, or fails to perform or cause the performance of such work continuously and with due diligence to completion, SAUDI ARAMCO may, at its option and without prejudice to any other rights or remedies which may be available to it, perform such work either itself or through others at CONTRACTOR's expense.

11.5    If CONTRACTOR performs remedial work, the provisions of Paragraph 11 shall apply to such work for a period of one (1) year from the date it is completed. However, the total warranty period shall in no case be extended beyond two (2) years from the date of Project Completion.

11.6    CONTRACTOR, for SAUDI ARAMCO's benefit, shall obtain a warranty pass-through statement from its Vendors stating substantially that:

"Seller and Buyer understand that Buyer is contracting with Seller for the purchase of goods hereunder for ultimate transfer to, and use by, the Saudi Arabian Oil Company (SAUDI ARAMCO) in Saudi Arabia. Therefore, Seller agrees that, in any event, all rights of Buyer for any failure to meet specifications, or for any other breach of warranty shall run to the benefit of and be fully enforceable by SAUDI ARAMCO."

A-14



CONTRACT NO. 65004/00

12.    **STANDARDS, DRAWINGS AND SPECIFICATIONS**

12.1    CONTRACTOR shall keep at the WORK Site a copy of all drawings, specifications and standards for the FACILITIES. Anything mentioned in specifications and not shown on drawings, or shown on drawings and not mentioned in specifications, shall be of like effect as if shown or mentioned in both.

In case of conflict between or within the drawings, specifications or standards, the matter shall be promptly submitted to Company Representative, and, except as provided in Paragraph 2.2 of this Schedule, the conflict shall be resolved in accordance with the following order of precedence:

12.1.1    FACILITIES performance specifications;

12.1.2    SAUDI ARAMCO-provided Waivers;

12.1.3    SAUDI ARAMCO Engineering Standards (SAES's);

12.1.4    SAUDI ARAMCO Materials Systems Specifications (SAMSS's);

12.1.5    SAUDI ARAMCO Mandatory Drawings;

12.1.6    SAUDI ARAMCO Engineering Procedures (SAEP's);

12.1.7    SAUDI ARAMCO Design Practices (SADP's);

12.1.8    SAUDI ARAMCO Drafting Manuals (SADM's);

12.1.9    SAUDI ARAMCO Typical Installation Drawings (Non-Mandatory);

12.1.10    SAUDI ARAMCO-provided Design Notes;

12.1.11    SAUDI ARAMCO-provided Material Selection Diagrams;

12.1.12    SAUDI ARAMCO-provided Process Flow Diagrams;

12.1.13    SAUDI ARAMCO-provided Heat and Material Balances;

12.1.14    SAUDI ARAMCO-provided Process Piping and Instrument Diagrams;

CONTRACT NO. 65004/00

12.1.15  SAUDI ARAMCO-provided Equipment Data Sheets;

12.1.16  SAUDI ARAMCO-provided Equipment Technical Specifications;

12.1.17  Other SAUDI ARAMCO-provided Design Specifications;

12.1.18  SAUDI ARAMCO-provided Plot Plans;

12.1.19  Other drawings, specifications, or standards referenced in the Contract. If the conflict is between or within the documents in this Paragraph 12.1.19, the most stringent drawing, specification or standard shall control.

12.2  Dimensions and locations of existing and proposed installations and appurtenances shown on the SAUDI ARAMCO-supplied drawings are approximate only. All dimensions and locations relating to existing and proposed installations shall be checked by CONTRACTOR at the WORK Site before starting the WORK. Furthermore, CONTRACTOR shall hand excavate to a depth of 4½ ft. at the location of all proposed foundations to ascertain existing conditions before starting any foundation design work.

12.3  During the performance of the WORK, CONTRACTOR shall maintain a set of Project drawings to reflect the current as-built status of the FACILITIES. Following Project Completion, CONTRACTOR shall furnish to SAUDI ARAMCO one set of final transparencies redrafted to reflect the FACILITIES as-built.

13.  INSPECTION AND TESTING

13.1  CONTRACTOR shall inspect, test and accept all materials procured for the FACILITIES as well as any material supplied by SAUDI ARAMCO and shall inspect, test and accept all fabrication and the component parts of the WORK, including its subcontractors' WORK, in conformance with Schedule "B".

13.2  CONTRACTOR shall perform Quality Assurance/Quality Control ("QA/QC") functions of all component parts of the WORK, including its subcontractors' WORK.

13.3  If not accomplished before the effective date of this Contract, within sixty (60) days thereafter, CONTRACTOR shall submit to Company Representative for review CONTRACTOR's QA/QC Manual for the procurement, engineering, design, fabrication, inspection and construction phases in accordance with Schedule "B".



A56

CONTRACT NO. 65004/00

13.4   SAUDI ARAMCO shall be entitled to have its representatives present at all locations where CONTRACTOR or its subcontractors and suppliers are engaged in the performance of the WORK, at any and all times, to review all aspects of CONTRACTOR's QA/QC activities. CONTRACTOR shall not refuse access to technical or other data which CONTRACTOR considers proprietary or confidential, and which is reasonably required to inspect CONTRACTOR's performance of the WORK, except where SAUDI ARAMCO's representative is itself a competitor of CONTRACTOR in the sale, engineering, or installation of systems similar to the FACILITIES or is related to or affiliated with such a firm.

13.5   In connection with SAUDI ARAMCO's right to review CONTRACTOR's QA/QC activities and assigned personnel, CONTRACTOR shall cooperate with SAUDI ARAMCO and accept its reasonable suggestions to achieve results satisfactory to it.

13.6   For any inspection or any test to be witnessed by SAUDI ARAMCO, including any required by applicable Saudi Arab laws, rules and regulations, CONTRACTOR shall advise Company Representative of said inspection or test sufficiently in advance (but in any event no later than seven (7) calendar days prior to the date thereof) to enable Company Representative to attend. If any part of the WORK or the FACILITIES is closed or covered before the required inspection or witnessing has been performed or without agreement by SAUDI ARAMCO, it must, if required by SAUDI ARAMCO, be opened or uncovered for inspection or witnessing and reclosed or recovered, all at CONTRACTOR's expense.

13.7   Should any inspection or test reveal any defect in CONTRACTOR-supplied materials or in the WORK, CONTRACTOR shall promptly correct such defect at CONTRACTOR's expense.

14.   SUBCONTRACTS

14.1   Subcontracts for the performance of any portion of the WORK shall be procured only after CONTRACTOR has received written authorization from SAUDI ARAMCO that CONTRACTOR may subcontract that portion of the WORK. If not accomplished prior to the effective date of this Contract, then promptly thereafter, CONTRACTOR shall prepare and submit to the Company Representative for SAUDI ARAMCO's approval CONTRACTOR's subcontracting plan specifically identifying those portions of the WORK which CONTRACTOR proposes to subcontract. In procuring subcontracts, CONTRACTOR shall select subcontractors solely on the basis of financial and technical considerations.

14.2   After receiving SAUDI ARAMCO's written authorization that a portion of the WORK may be subcontracted, CONTRACTOR shall, before procuring any subcontract for part or all of that portion of the WORK, submit a notification to SAUDI ARAMCO containing the following information:



CONTRACT NO. 65004/00

14.2.1   If the proposed subcontractor is a sole proprietorship or partnership, the name(s) and address(es) of the proprietor or all members of the partnership, as the case may be.

14.2.2   If the proposed subcontractor is a corporation, the place of its incorporation or formation and its corporate headquarters.

14.2.3   The name and address of the proposed subcontractor's principal bank and a copy of the subcontractor's latest audited financial statement.

14.2.4   Evidence acceptable to SAUDI ARAMCO of the proposed subcontractor's technical qualifications to perform the WORK to be subcontracted.

SAUDI ARAMCO shall, in a timely manner, review the information and, provided that the proposed subcontractor is, in SAUDI ARAMCO's opinion, both technically competent and financially able to perform the WORK to be subcontracted, SAUDI ARAMCO shall advise CONTRACTOR in writing of its non-objection to the proposed subcontractor. If SAUDI ARAMCO objects to the proposed subcontractor, CONTRACTOR shall either itself accomplish the WORK which would have been performed by the proposed subcontractor or shall select another subcontractor to which SAUDI ARAMCO has no objection.

14.3   CONTRACTOR shall ensure that all subcontractors selected by CONTRACTOR abide by and observe, to the same extent required of CONTRACTOR, all applicable SAUDI ARAMCO regulations, and CONTRACTOR agrees to insert or cause to be inserted into all subcontracts provisions to that effect.

14.4   In the event of any substantial breach of this Contract by CONTRACTOR and without regard to whether SAUDI ARAMCO terminates this Contract or a portion of the WORK pursuant to Paragraph 24, CONTRACTOR shall, if SAUDI ARAMCO requests, assign to SAUDI ARAMCO all of its rights under all subcontracts entered into by CONTRACTOR, and SAUDI ARAMCO may, to the extent permitted by applicable law and after prior written notice to CONTRACTOR, enforce directly against any such subcontractor all rights of CONTRACTOR under such subcontract. All subcontracts entered into by CONTRACTOR shall contain a provision whereby the subcontractor agrees and consents to such assignment by CONTRACTOR to SAUDI ARAMCO.

14.5   CONTRACTOR shall include in every subcontract under this Contract a provision prohibiting any further subcontracting of any portion of the WORK by the subcontractor unless the subcontractor first obtains the approval of CONTRACTOR. CONTRACTOR shall not give such approval without first obtaining the approval of SAUDI ARAMCO. If SAUDI ARAMCO gives such approval, CONTRACTOR shall ensure that all further subcontracts entered into by its subcontractor:



A-18

CONTRACT NO. 65004/00

14.5.1    are entered into only after receipt by CONTRACTOR of the information described in Paragraph 14.2 and CONTRACTOR's notification to the subcontractor of its non-objection to the subcontractor selected on the basis described in Paragraph 14.2;

14.5.2    contain a provision prohibiting any further subcontracting of any portion of the WORK without first obtaining the approval of CONTRACTOR, which approval may be given only in accordance with the provisions of this Paragraph.

14.6    CONTRACTOR shall be fully responsible to SAUDI ARAMCO for the acts and omissions of all its subcontractors at whatever tier, and their personnel. CONTRACTOR shall manage, schedule and coordinate the work of all its subcontractors so as to meet the Scheduled Completion Date and Critical Milestone Dates. Nothing in this Contract shall create any contractual relation between SAUDI ARAMCO and any subcontractor unless SAUDI ARAMCO elects to exercise its rights under Paragraph 14.4. SAUDI ARAMCO's approval to subcontract any portion of the WORK and SAUDI ARAMCO's non-objection to CONTRACTOR's subcontractor selection shall not relieve CONTRACTOR of any of its obligations under this Contract.

## 15.    STANDBY TIME

15.1    SAUDI ARAMCO shall not be liable for or charged by CONTRACTOR for lost time ("Standby Time") due to CONTRACTOR's inability to supply materials, equipment and/or personnel, malfunction of CONTRACTOR's equipment, inclement weather conditions, or, subject to the specific exceptions in Paragraph 15.3, force majeure. Compensation for Standby Time shall be payable only for periods in which CONTRACTOR's equipment or personnel are committed exclusively to the WORK, are ready for immediate use in the WORK, but cannot be used in performing the WORK due to circumstances within the sole control of SAUDI ARAMCO; provided, however, that in all such cases, CONTRACTOR shall, whenever possible, reschedule such personnel or equipment for use elsewhere so as to minimize Standby Time.

15.2    CONTRACTOR shall immediately notify Company Representative orally when CONTRACTOR first anticipates Standby Time may occur, and shall confirm such notification in writing as soon as practicable. Compensation for Standby Time shall be payable under the terms of this Contract only for Standby Time of which SAUDI ARAMCO has been notified as provided herein. SAUDI ARAMCO reserves the right to reject any request for compensation for Standby Time in the absence of such timely notice.



A-19

<u>CONTRACT NO. 65004/00</u>

15.3   SAUDI ARAMCO shall pay CONTRACTOR's request for compensation for Standby Time caused by acts of war (declared or undeclared), riots and civil commotion, hostilities, insurrection or blockades, which occur in the Middle East.

15.4   All requests for compensation for Standby Time must be substantiated by daily time sheets prepared by CONTRACTOR stating the reasons therefor and submitted to Company Representative for confirmation no later than the following scheduled work day. Verified Standby Time will be paid for by SAUDI ARAMCO only if falling on a scheduled work day.

16.   <u>DISTRIBUTION OF RISKS</u>

The distribution of risks between SAUDI ARAMCO and CONTRACTOR set forth in Paragraphs 16.1 through 16.3 hereunder are subject to the specific exclusions set forth in Paragraph 16.4.

16.1   <u>Property Associated with the FACILITIES</u>

16.1.1   CONTRACTOR shall be responsible for all materials in its custody until they are delivered to the WORK Site where they will be incorporated into the FACILITIES. CONTRACTOR shall, up to a limit of $10,000 per occurrence ($50,000 per occurrence if the loss or damage occurs offshore), compensate SAUDI ARAMCO for loss of, or damage to, SAUDI ARAMCO-supplied materials, and shall hold SAUDI ARAMCO free and harmless from liability for any loss of, or damage to, materials supplied by CONTRACTOR or third parties.

16.1.2   Subject to the exclusions set forth in Paragraph 16.1.4, SAUDI ARAMCO shall be responsible for all materials after they are delivered to the WORK Site where they will be incorporated into the FACILITIES; provided that CONTRACTOR shall be responsible for the first $10,000 per occurrence ($50,000 per occurrence if the loss or damage occurs offshore) for loss of, or damage to, these materials.

16.1.3   If prior to Project Completion, all or any part of the FACILITIES are lost, damaged or destroyed, SAUDI ARAMCO may direct CONTRACTOR by Change Order to carry out the reconstruction, repair or replacement WORK, including the removal of debris, and CONTRACTOR shall promptly undertake the WORK so directed.

A-20



CONTRACT NO. 65004/00

Subject to the exclusions set forth in Paragraph 16.1.4, SAUDI ARAMCO shall compensate CONTRACTOR for such WORK in accordance with Paragraph 10; provided that: a) CONTRACTOR shall be responsible for the first $10,000 per occurrence ($50,000 per occurrence if the loss or damage or destruction occurs offshore); and b) no profit or fee shall be allowed for such WORK if the loss, damage or destruction is due to the failure of CONTRACTOR or its subcontractors or the employees or agents of any of them having broad supervision or direction of the WORK to observe and exercise the standard of care necessary to assure that the original WORK was performed in accordance with sound and generally accepted engineering and construction practices.  To the extent that SAUDI ARAMCO is not liable for the loss, damage or destruction under Paragraph 16.1.4, CONTRACTOR shall carry out the reconstruction, repair or replacement work directed by SAUDI ARAMCO at CONTRACTOR's sole cost and expense.

16.1.4   In no event shall SAUDI ARAMCO be liable for:

a.   cost of making good faulty or defective workmanship or material not supplied by SAUDI ARAMCO;

b.   cost of making good fault, defect, error or omission in design, plan or specification not provided by SAUDI ARAMCO;

c.   electrical or mechanical breakdown or loss of service;

d.   wear and tear or gradual deterioration due to rust, corrosion, erosion or exposure; or

e.   loss due to disappearance or shortage where such loss is only revealed by the making of an inventory;

provided that the foregoing exclusions shall not apply to physical damage caused by these excluded events.

16.1.5   CONTRACTOR shall release and hold harmless SAUDI ARAMCO, SAUDI ARAMCO's other contractors, their subcontractors, and the employees or agents of any of them from liability resulting from loss of, damage or destruction to CONTRACTOR's or its subcontractors' tools and equipment (including "Marine Craft" as defined in Paragraph 17.1.4) , whether owned or rented, and wherever located, which are used or intended for use in performing the WORK even if such loss, damage or destruction results from SAUDI ARAMCO 's negligence, or the negligence

A-21



CONTRACT NO. 65004/00

of SAUDI ARAMCO's other contractors, their subcontractors, or the employees or agents of any of them. SAUDI ARAMCO shall release and hold harmless CONTRACTOR, its subcontractors and the employees or agents of any of them from liability in excess of $10,000 per occurrence where such liability results from loss of, damage or destruction to SAUDI ARAMCO's tools and equipment, whether owned or rented, and wherever located, which are used or intended for use in performing the WORK even if such loss, damage or destruction results from CONTRACTOR's negligence, or the negligence of CONTRACTOR's subcontractors, or the personnel or agents of any of them.

16.1.6    Upon the payment of any claim for which SAUDI ARAMCO is liable hereunder, SAUDI ARAMCO shall be subrogated to all the rights and remedies of CONTRACTOR arising out of such claim. The word "occurrence" shall mean any one loss, disaster or casualty or series of losses, disasters or casualties arising out of one event. In respect of the perils of flood, earthquake or windstorm, one event shall be construed to be all losses arising during a continuous period of 72 hours.

16.2    **SAUDI ARAMCO's Other Property**

16.2.1    CONTRACTOR shall compensate SAUDI ARAMCO for loss of or damage to SAUDI ARAMCO's other property which results from the negligence or willful misconduct of CONTRACTOR or its subcontractor in the performance of the WORK. Where such loss or damage is the result of the joint negligence or willful misconduct of CONTRACTOR and/or its subcontractors with any other party including SAUDI ARAMCO, CONTRACTOR's duty to compensate SAUDI ARAMCO shall be in proportion to CONTRACTOR's and its subcontractors' allocable share of such joint negligence or misconduct.

16.2.2    As used herein, SAUDI ARAMCO's other property shall include, but not be limited to:

a.    SAUDI ARAMCO's units, systems, structures, plant and equipment existing separately from the FACILITIES;

b.    any part of the FACILITIES which is part of the WORK which has been terminated; and

c.    all or any part of the FACILITIES from and after the date SAUDI ARAMCO assumes custody and control thereof pursuant to Paragraph 9.7.



A62

<u>CONTRACT NO. 65004/00</u>

16.2.3   Subject to the provisions of Paragraph 18 CONTRACTOR's duty to compensate SAUDI ARAMCO under Paragraph 16.2.1 shall not exceed the amount recoverable by CONTRACTOR or its subcontractors under the insurance required to be carried by CONTRACTOR and its subcontractors pursuant to Paragraph 17.1 or the amount which would have been recoverable under such insurance if all conditions, requirements, and warranties imposed on the insured by the insurer are being or had been met. SAUDI ARAMCO shall hold CONTRACTOR, its subcontractors and the personnel or agents of any of them free and harmless from liability to SAUDI ARAMCO for loss or damage exceeding the amounts so recoverable.

16.3   <u>Third Parties</u>

16.3.1   CONTRACTOR shall indemnify, defend and hold harmless SAUDI ARAMCO, its affiliates, and the personnel or agents of any of them (hereafter individually and collectively referred to as "indemnitee") from any person (including, without limitation, CONTRACTOR's and indemnitee's employees, CONTRACTOR's subcontractors and employees of such subcontractors, and any other third party) for personal injury or death and for loss of or damage to property and resulting from the negligence or willful misconduct hereunder of CONTRACTOR, its subcontractors or the employees or agents of any of them, and except as provided in 16.3.3, without regard to whether any acts or omissions of other parties contributed to the personal injury or death, or loss of or damage to property.

16.3.2   SAUDI ARAMCO shall indemnify, defend and hold harmless CONTRACTOR and its subcontractors from claims, demands and causes of action asserted against CONTRACTOR and its subcontractors by any person (except CONTRACTOR's personnel and the personnel of CONTRACTOR's subcontractors) for personal injury or death, or for loss of or damage to property (except CONTRACTOR's property and the property of CONTRACTOR's subcontractors), and resulting from the negligence or willful misconduct hereunder of SAUDI ARAMCO, its employees or agents.

16.3.3   Where personal injury, death or loss of or damage to property referred to in Paragraphs 16.3.1 or 16.3.2 is the result of the joint negligence or willful misconduct of SAUDI ARAMCO and any other party, including CONTRACTOR, CONTRACTOR's duty of indemnification under Paragraph 16.3.1 shall be diminished by, and SAUDI ARAMCO's duty of indemnification under Paragraph 16.3.2 shall be limited to, SAUDI ARAMCO's allocable share of such joint negligence or misconduct.



CONTRACT NO. 65004/00

### 16.4    Consequential Damages and Criminal Misappropriation

16.4.1    CONTRACTOR, its agents and subcontractors shall not be liable to SAUDI ARAMCO nor shall SAUDI ARAMCO be liable to CONTRACTOR, its agents and subcontractors, for any consequential damages, including but not limited to loss of profit or products, whether such liability is based, or claimed to be based upon any breach of either party's obligations under this Contract, or whether such liability is based, or claimed to be based, upon any negligent act or omission of a party, its personnel, agents, appointed representatives or subcontractors.

16.4.2    CONTRACTOR shall indemnify, defend and hold SAUDI ARAMCO harmless from any and all claims, losses, expenses and damages arising from or related to any criminal misappropriation or misapplication by any of CONTRACTOR's personnel of any property, whether tangible or intangible, occurring during the course of or in connection with the performance of the WORK. CONTRACTOR shall obtain similar indemnities running to SAUDI ARAMCO from each subcontractor.

### 17.    INSURANCE

17.1    CONTRACTOR shall carry and maintain in force at all times during the term of this Contract the following insurances:

17.1.1    Workers' Compensation and Employer's Liability

Employer's Liability and such Worker's Compensation Insurance or similar social insurance as shall be necessary and adequate to cover all CONTRACTOR's personnel while engaged in the performance of the WORK under this Contract.

17.1.2    Comprehensive General Liability

Its normal and customary comprehensive general liability insurance coverage with policy limits of at least one million U. S. Dollars (US $1,000,000) for personal injury, death or property damage resulting from each occurrence and covering all of CONTRACTOR's operations under this Contract. CONTRACTOR represents and warrants that the aforesaid insurance covers, without limitation, loss of or damage to SAUDI ARAMCO's other property for which CONTRACTOR is responsible pursuant to Paragraph 16.2.

A-24



CONTRACT NO. 65004/00

**17.1.3  Automobile Liability**

Automobile liability insurance covering owned, non-owned and hired motor vehicles, with limits of at least one million U. S. Dollars (US $1,000,000) for personal injury, death, or property damage resulting from each occurrence.

**17.1.4  Marine Insurance**

Marine insurance with policy limits adequate to cover and protect; (i) the full value of CONTRACTOR's vessels, barges, boats, tugs and all other marine equipment (hereinafter "Marine Craft"), if any, engaged in the WORK; (ii) injury to or death of the personnel engaged in WORK on such Marine Craft and; (iii) any other liability that may result from the operation of such Marine Craft.

**17.1.5  Fabrication and Transit Insurance**

Insurance to cover the full value of any loss, damage or destruction of any materials outside Saudi Arabia for the FACILITIES and which shall cover fabricated subassemblies incorporating those materials while they are located at fabrication yard(s), while in storage and during transit from these foregoing locations to the CONTRACTOR.

17.2    SAUDI ARAMCO and CONTRACTOR agree that the insurance coverages listed under Paragraph 17.1 are minimum coverages required to be purchased by CONTRACTOR under this Contract. Should any loss occur for which CONTRACTOR is responsible, CONTRACTOR shall, except as provided in Paragraph 16.2.3, be liable for the full amount of the loss, including the amount in excess of CONTRACTOR's insurance limits and including the amount of any deductible specified in CONTRACTOR's insurance policy.

17.3    If requested by SAUDI ARAMCO, CONTRACTOR shall have its insurance carrier(s) furnish to SAUDI ARAMCO insurance certificates specifying the types and amounts of coverage in effect and the expiration dates of each policy, and a statement that no insurance will be cancelled or materially changed without thirty (30) days prior written notice to SAUDI ARAMCO. If requested by SAUDI ARAMCO, CONTRACTOR shall permit SAUDI ARAMCO to examine the original insurance policies or at SAUDI ARAMCO's option, CONTRACTOR shall furnish SAUDI ARAMCO with copies of insurance policies certified by the carrier(s) as being true and complete copies of the original policies. SAUDI ARAMCO's approval of or non-objection to CONTRACTOR's insurance certificates or policies shall not relieve CONTRACTOR of any obligation or liability under this Contract.



A-25

A65

FROM                                    (FRI) 5. 31' 02  5:07/ST. 4:57/NO. 4261977542 P 37

CONTRACT NO. 65004/00

17.4    In all insurance coverage purchased by CONTRACTOR pursuant to Paragraph 17.1, CONTRACTOR shall have the insurance carriers waive all rights of subrogation against SAUDI ARAMCO, its affiliated companies and any of their officers, directors, employees, agents and appointed representatives. In addition to the foregoing, and if the provisions of Paragraph 17.1.4 apply, CONTRACTOR shall have its marine insurance carriers waive all rights of subrogation against SAUDI ARAMCO's other contractors, their subcontractors, and the personnel or agents of any of them. Comprehensive General and Automobile Liability and Marine Liability Insurance policies shall designate SAUDI ARAMCO as an additional insured as regards SAUDI ARAMCO's liabilities for WORK performed by CONTRACTOR pursuant to this Contract. Such policies shall contain a cross-liability clause so that SAUDI ARAMCO and CONTRACTOR are regarded as third parties to each other.

17.5    If CONTRACTOR subcontracts any part of the WORK, CONTRACTOR shall not require subcontractors to insure against liability waived by SAUDI ARAMCO pursuant to Paragraphs 16.1.2, 16.2.3 and 16.4. CONTRACTOR shall require its subcontractors to maintain insurances specified in the subcontracts, and shall further require that provisions giving SAUDI ARAMCO the rights specified in Paragraphs 17.3 and 17.4 be included in such subcontracts.

18.    ENVIRONMENTAL IMPACT

18.1    CONTRACTOR shall use its best efforts to prevent and take all reasonable precautions to avoid pollution or contamination of the land, air or water arising out of CONTRACTOR's or its subcontractors' performance of the WORK. Should there be a discharge or escape of any appreciable quantity of pollutants or contaminants during the performance of the WORK, CONTRACTOR shall immediately notify SAUDI ARAMCO so that SAUDI ARAMCO may take the necessary action to contain, control, recover or disperse the substance.

18.2    CONTRACTOR assumes all liability for and shall defend, indemnify, and hold SAUDI ARAMCO harmless from expenses incurred in the control and removal of, any and all pollution or contamination of the land, air or water arising from spills or discharges of all solid, liquid and gaseous wastes, including but not limited to asbestos, polychlorinated biphenyls (PCB), chemicals, fuels, lubricants, motor oils, pipe dope, paints, solvents, bilge, garbage and other like materials wholly in CONTRACTOR's or its subcontractors' possession and control and directly associated with CONTRACTOR's or any subcontractor's equipment and facilities. CONTRACTOR shall defend, indemnify, and hold SAUDI ARAMCO harmless from all claims, losses, expenses or damages in connection with such pollution or contamination. CONTRACTOR shall lend every reasonable assistance to SAUDI ARAMCO in handling, controlling or cleaning up such pollutants or contaminants.

A-26                    

<u>CONTRACT NO. 65004/00</u>

18.3    Subject to the following proviso, SAUDI ARAMCO assumes liability for and shall defend, indemnify, and hold CONTRACTOR harmless against all claims, losses, expenses or damages, to the extent they are not recoverable under CONTRACTOR's insurance coverage carried pursuant to Paragraph 17.1, both in connection with personal injury, including death, of any person (except CONTRACTOR's personnel or the personnel of any subcontractor) and in connection with damage to property (except the property of CONTRACTOR or any subcontractor or the personnel of either of them) when the injury, death or damage is caused by pollution or contamination resulting from the discharge or escape, during the performance of the WORK, of crude oil or other like pollutants or contaminants, or pollutants or contaminants other than as provided in Paragraph 18.2. This indemnity shall be effective whether or not the discharge or escape is caused or alleged to have been caused in whole or in part by the negligence or default of CONTRACTOR; provided, however, that this indemnity shall not be applicable to, and CONTRACTOR shall be solely responsible for, any claims, losses, expenses or damage arising out of the negligence or default of CONTRACTOR or any subcontractor up to a maximum of U. S. Dollars Five Hundred Thousand (US $500,000) in the aggregate in respect of all such incidents.

18.4    CONTRACTOR shall lend every reasonable assistance to SAUDI ARAMCO in handling, controlling or cleaning up any discharge or escape of pollutants or contaminants as provided in Paragraph 18.3. If the discharge or escape arises out of the negligence or default of CONTRACTOR or any subcontractor, CONTRACTOR's assistance will be at CONTRACTOR's expense, up to a maximum of U. S. Dollars One Hundred Thousand (US$100,000), and such expense shall be borne by CONTRACTOR in addition to any amounts for which CONTRACTOR may be liable under said Paragraph 18.3. Costs to CONTRACTOR in excess of such maximum shall be borne by SAUDI ARAMCO. If the pollution or contamination is not the result of the negligence or default of CONTRACTOR or any subcontractor, the costs of such assistance shall be borne by SAUDI ARAMCO.

18.5    At the same time the initial WORK Schedule is prepared as provided in Paragraph 8.1, CONTRACTOR shall prepare and submit to SAUDI ARAMCO a contingency plan designed for use if any appreciable quantity of pollutants or contaminants should be discharged or escape during the performance of the WORK. The contingency plan shall include: actions to be taken should such an incident occur; provisions for the notification of SAUDI ARAMCO and others; the delegation of responsibility for the direction (subject always to SAUDI ARAMCO's overall direction and control) of efforts to contain, control, recover or disperse the pollutants or contaminants; and safety procedures to be followed.



A67

FROM                            (FRI) 5. 31' 02  5:08/ST. 4:57/NO. 4261977542 P 39

<u>CONTRACT NO. 65004/00</u>

19.   <u>TITLE TO DESIGNS, CONFIDENTIAL INFORMATION AND PATENTS</u>

19.1   All technical data, standards, specifications, designs, drawings and the like furnished to CONTRACTOR are and shall continue to be the property of SAUDI ARAMCO. Neither CONTRACTOR, nor any subcontractor, shall reproduce or copy any such materials in whole or in part except as required to perform the WORK. All such material, together with all reproductions or copies of it, shall be returned to SAUDI ARAMCO upon Project Completion or termination of this Contract.

19.2   Except for such designs, drawings and calculations as are considered proprietary by CONTRACTOR and of which SAUDI ARAMCO is given notice as provided below, all designs, drawings and calculations developed by CONTRACTOR, its subcontractors or suppliers, and all Software initially and specifically developed by CONTRACTOR or its subcontractors or suppliers, under this Contract shall at all times be the property of SAUDI ARAMCO. SAUDI ARAMCO shall have the unlimited and unrestricted right to use or possess such material for whatever purpose. CONTRACTOR shall not incorporate or procure any material considered proprietary by CONTRACTOR or its subcontractors or suppliers into designs or drawings developed under this Contract without first informing SAUDI ARAMCO of the nature of the proprietary material and obtaining SAUDI ARAMCO's approval of its incorporation or its procurement. Unless otherwise directed by SAUDI ARAMCO, CONTRACTOR shall keep all designs, drawings and calculations in a neat and legible manner as required by SAUDI ARAMCO and, following completion of the WORK, shall surrender the originals of all material to SAUDI ARAMCO. Except as provided above, no design or drawing developed under this Contract may be duplicated in whole or in part by CONTRACTOR without first obtaining the written consent of SAUDI ARAMCO.

19.3   Except as described in Paragraph 19.2, Software and enhancements developed by CONTRACTOR or its subcontractors or suppliers for the Computer System are the property of the CONTRACTOR. An enhancement is Software which improves the Computer System, but which is not described in Schedule "B" and not specifically developed for the Computer System. CONTRACTOR hereby grants SAUDI ARAMCO a royalty free, non-exclusive, perpetual, non-transferrable license to use all such Software and enhancements on the Computer System and to make copies of the Software and enhancements for use only with the Computer System.

A-28



FROM                                    (FRI) 5.31'02  5:09/ST. 4:57/NO. 4261977542 P 40

CONTRACT NO. 65004/00

19.4    If any design, drawing or Software developed under this Contract results in any device, idea, process, or technology, whether patentable or not, all rights to that device, idea, process, or technology shall be the property of SAUDI ARAMCO. Accordingly, CONTRACTOR shall execute any patent applications, assignments, releases, plans, drawings, papers, and/or instruments which SAUDI ARAMCO may require in order to fully enjoy the provisions of this Paragraph; provided, however, that SAUDI ARAMCO shall reimburse CONTRACTOR for any costs incurred by CONTRACTOR in assisting SAUDI ARAMCO in the perfection of the latter's rights hereunder. CONTRACTOR represents that all CONTRACTOR personnel, including agency personnel, and the personnel of its subcontractors have agreed to assign to CONTRACTOR all discoveries, inventions and improvements made.

19.5    Neither party to this Contract nor their personnel, agents or any subcontractor shall divulge to anyone other than persons designated by the disclosing party, any information supplied by the disclosing party during the course of the WORK so long as, and to the extent that, the information does not become part of the public domain, does not correspond to information lawfully furnished or made known to the other party by a third party, without restriction as to its use, or was not within the other party's possession at the time of disclosure by the disclosing party.

19.6    CONTRACTOR shall limit its disclosure of any information supplied by SAUDI ARAMCO during the course of the WORK to those of its personnel who require it for the performance of the WORK. If SAUDI ARAMCO designates any other person who may receive such information, CONTRACTOR shall obtain from each such person a written agreement obligating them with respect to such information to the same extent that CONTRACTOR is obligated under this Contract.

19.7    CONTRACTOR warrants that any designs, drawings and calculations developed, any Software developed or procured, and any materials procured, by CONTRACTOR under this Contract shall not infringe any valid patent, copyright or trade secret owned or controlled by any other party. As regards such designs, drawings, calculations, Software, and materials, CONTRACTOR shall defend, indemnify, and hold SAUDI ARAMCO harmless from any losses, expenses or damages arising out of or incurred by reason of any actual or alleged infringement of any patent, copyright or trade secret.

19.8    SAUDI ARAMCO warrants that the use by CONTRACTOR in its performance of the WORK of the technical data, standards, specifications and similar information furnished by SAUDI ARAMCO to CONTRACTOR for use in accomplishing the WORK shall not infringe any valid patent, copyright or trade secret owned or controlled by any other party. As regards such information SAUDI ARAMCO shall defend, indemnify, and hold CONTRACTOR harmless from any losses, expenses or damages arising out of or incurred by reason of any actual or alleged infringement of any patent, copyright or trade secret.



A-29

A69

FROM                               (FRI) 5. 31' 02  5:09/ST. 4:57/NO. 4261977542 P 41

<u>CONTRACT NO. 65004/00</u>

19.9  CONTRACTOR agrees that it will not transmit, disclose, ship, export, or re-export either directly or indirectly any technical data (including, but not limited to, models, prototypes, blueprints, operating manuals, or technical services) furnished to it by SAUDI ARAMCO or its affiliated companies pursuant to this Contract, or any direct product based on or resulting therefrom (including, but not limited to, equipment, plant, process or service) to: (1) any of the countries to which the written assurance provisions of the United States Export Administration Regulations may apply now or in the future, (2) any other country, entity or destination to which the transmission, disclosure, shipment, export or re-export of technical data or direct product based on or resulting therefrom is proscribed under the laws or regulations of the United States. CONTRACTOR agrees to obtain an undertaking identical in terms to the foregoing from any subcontractor performing work under this Contract which is given access to any technical data furnished by SAUDI ARAMCO or its affiliated companies.

19.10  Any agreements between CONTRACTOR and SAUDI ARAMCO entered into prior to the effective date of this Contract relating to the secrecy or confidentiality of information exchanged between CONTRACTOR and SAUDI ARAMCO shall survive the execution of this Contract, in accordance with the terms of such agreements.

19.11  Within thirty (30) days after this Contract's effective date, CONTRACTOR shall submit to the Company Representative CONTRACTOR's plan describing how CONTRACTOR will protect SAUDI ARAMCO's confidential information as required by this Paragraph 19.

20.    <u>CLAIMS SETTLEMENT: DISPUTES</u>

20.1  CONTRACTOR shall inform SAUDI ARAMCO, promptly following its occurrence or discovery, of any item or event which CONTRACTOR knows, or reasonably should know, may result in a request for an extension of time for completing the WORK or any separate portion thereof, or for additional or reduced compensation under this Contract. SAUDI ARAMCO and CONTRACTOR shall endeavour to satisfactorily resolve the matter. Should it not be disposed of to CONTRACTOR's satisfaction, CONTRACTOR shall forthwith deliver a written notice of all elements of the claim in triplicate to SAUDI ARAMCO at the following address:

        The Manager
        Contracting Department
        Attention:  Supervisor, Claims & Contract Control Unit
                    Saudi Arabian Oil Company
        P.O. Box 1500
        Dhahran 31311
        Saudi Arabia



A-30

CONTRACT NO. 65004/00

20.2   Any claim of CONTRACTOR against SAUDI ARAMCO for an extension of time for completion of the WORK or any separable portion thereof, or for additional compensation of any kind under this Contract, shall be deemed conclusively to have been waived by CONTRACTOR unless notice of said claim is set forth in writing by CONTRACTOR and filed with SAUDI ARAMCO within thirty (30) days after the conditions which give rise to the claim become known, or reasonably should have become known, to CONTRACTOR. Within sixty (60) days after SAUDI ARAMCO's receipt of the notice of said claim, CONTRACTOR shall file with SAUDI ARAMCO a written analysis of all elements of the claim accompanied by itemized supporting data identifying, to the extent practicable, the effect on time for completion of the WORK or any separable portion thereof and the amount of additional compensation claimed by CONTRACTOR. Failure by CONTRACTOR to so file such written analysis with supporting data within said sixty (60) days period shall be deemed conclusively to be a waiver of all of CONTRACTOR's rights to any such extension of time for completion or to additional compensation.

20.3   Should CONTRACTOR and SAUDI ARAMCO be unable to agree upon a settlement of any claim, the matter shall be treated as an unresolved dispute in accordance with Schedule "E".

20.4   Should any dispute arise between SAUDI ARAMCO and CONTRACTOR during CONTRACTOR's performance of the WORK, CONTRACTOR shall, unless SAUDI ARAMCO directs otherwise, continue to perform the WORK and any additional WORK which SAUDI ARAMCO may direct CONTRACTOR to perform.

21.   **CONFLICT OF INTEREST**

Except for customary promotional material and occasional business entertainment, limited in value in any instance to the reasonable cost of a business meal, and other than as specifically authorized under the terms of this Contract, CONTRACTOR shall not give, offer, or accept, and warrants that it has not given, offered or accepted, directly or indirectly any money, personal services, credit or other thing of value, to or from:

21.1   SAUDI ARAMCO or its affiliated or related companies, or

21.2   Any of their agents, independent contractors or subcontractors, or

21.3   The employees of any of the foregoing,

A-31



<u>CONTRACT NO. 65004/00</u>

in order to influence the award of this or any other Contract that has been or may be awarded by SAUDI ARAMCO, or their terms, performance, administration, extension or termination.

Any violation of this provision shall constitute a substantial breach of this Contract which, without prejudice to SAUDI ARAMCO's right to enforce any other remedy provided by law, shall empower SAUDI ARAMCO to terminate this Contract for default and claim damages including, but not limited to, any increased costs incurred by SAUDI ARAMCO as a result of such breach.

22.   <u>SUSPENSION OF WORK</u>

22.1   SAUDI ARAMCO may at any time, with or without cause, suspend performance of the WORK or any part thereof by giving CONTRACTOR prior notice specifying the WORK to be suspended and the effective date of such suspension. CONTRACTOR shall cease all activity on suspended WORK on the effective date of suspension but shall continue to prosecute any unsuspended WORK. CONTRACTOR shall take all actions necessary to maintain and safeguard the suspended WORK. SAUDI ARAMCO shall not be liable for loss of anticipated profits or for any damages or any other costs incurred with respect to suspended WORK during the period of suspension, provided that when the suspension is without cause, SAUDI ARAMCO shall pay reasonable, auditable and verifiable costs which:

22.1.1   Are incurred for the purpose of safeguarding the WORK and materials and equipment in transit to or at the WORK Site;

22.1.2   Are incurred for such CONTRACTOR or subcontractor personnel, or for such CONTRACTOR or subcontractor equipment, which CONTRACTOR continues to maintain, at SAUDI ARAMCO's request, at the WORK Site; or

22.1.3   Are otherwise reasonable and unavoidable costs of suspending the WORK and of reassembling personnel and equipment.

22.2   SAUDI ARAMCO may, at any time, authorize resumption of all or any part of the suspended WORK by giving notice to CONTRACTOR specifying the part of WORK to be resumed and the effective date of the resumption. Suspended WORK shall be promptly resumed by CONTRACTOR after receipt of such notice. Upon resumption of the suspended WORK, SAUDI ARAMCO shall initiate a Change Order pursuant to Paragraph 10 or an Amendment, as appropriate, describing any required adjustments to the Scheduled Completion Date, Critical Milestone Dates or compensation to CONTRACTOR that result from the suspension of the WORK under this Paragraph.



CONTRACT NO. 65004/00

## 23.  TERMINATION AT SAUDI ARAMCO CONVENIENCE

23.1   SAUDI ARAMCO may at any time and at its sole convenience terminate this Contract or any part of the WORK by giving written notice to CONTRACTOR specifying the extent and the effective date of the termination ("Termination Date"). Should SAUDI ARAMCO terminate this Contract or any part of the WORK in accordance with this Paragraph 23, CONTRACTOR shall immediately stop performance of the terminated WORK, and demobilize within ninety (90) days unless otherwise directed by SAUDI ARAMCO.

23.2   Subject to the provisions of Paragraph 23.3, CONTRACTOR shall accept in full and final settlement of all CONTRACTOR entitlements of any kind for performance of terminated WORK up to the Termination Date and arising from any termination under this Paragraph 23 compensation ("Termination Compensation") for:

   a.   All reasonable, auditable and verifiable costs necessarily incurred by CONTRACTOR on or before the Termination Date attributable to terminated WORK; and

   b.   All reasonable, auditable and verifiable costs necessarily incurred by CONTRACTOR after the Termination date as a direct result of the termination including, but not limited to, costs arising from compliance with CONTRACTOR's obligations in this Paragraph and Paragraph 26; and

   c.   An amount equal to ten percent (10%) of the sum of the amounts due under Paragraphs 23.2a and 23.2b.

23.3   Termination Compensation shall be subject to Schedule "C" retention requirements, shall be reduced by all amounts previously paid to CONTRACTOR under Schedule "C" for performance of terminated WORK before the Termination Date (even if resulting in a credit to SAUDI ARAMCO), and shall exclude compensation for depreciation, liquidation, the unexpired portion of leases for capital equipment and facilities, or other capital costs attributable to WORK not to be performed as a result of the termination. The amount due under Paragraph 23.2 shall exclude compensation paid by CONTRACTOR to any affiliated subcontractor or vendor to settle their entitlements of any kind arising from terminated WORK to the extent such compensation is not a reasonable, auditable and verifiable cost of such subcontractor or vendor attributable to terminated WORK. Specifically, compensation in the nature of Paragraph 23.2c shall not be reimbursed by SAUDI ARAMCO in respect of such subcontractors or vendor. The Termination Compensation due under Paragraph 23.2 less reductions and exclusions under this Paragraph 23.3, shall in no event exceed the Contract Price less amounts previously paid to CONTRACTOR under Schedule "C".



A-33

CONTRACT NO. 65004/00

a.   The term "affiliated" shall mean directly or indirectly controlled by the CONTRACTOR, any parent entity which ultimately, directly or indirectly, controls the CONTRACTOR, and any entity controlled by such parent.

b.   The term "control" shall mean the possession, directly or indirectly, of a twenty five percent (25%) or more beneficial ownership interest in another entity.

23.4   CONTRACTOR shall promptly invoice SAUDI ARAMCO for compensation due under this Paragraph 23, in the format of amounts due under Paragraphs 23.2a, 23.2b, and 23.2c, less reductions and exclusions under Paragraph 23.3.  SAUDI ARAMCO shall promptly pay such amounts upon receipt and verification of CONTRACTOR's invoice.  Notwithstanding any other provision of this Contract, SAUDI ARAMCO shall have the right to audit all of CONTRACTOR's records for the purpose of verifying compensation paid for terminated WORK, including lump sum and work unit rate compensation paid pursuant to Schedule "C".

## 24.   TERMINATION BY SAUDI ARAMCO FOR CAUSE

24.1   Should CONTRACTOR commit a substantial breach of this Contract, SAUDI ARAMCO may demand, in writing, that CONTRACTOR comply with the terms of this Contract.  If within ten (10) days after receipt of such a demand, CONTRACTOR has failed to take satisfactory steps to comply, or if within thirty (30) days CONTRACTOR has not remedied the breach, SAUDI ARAMCO may without prejudice to the exercise of any other rights or remedies which may be available to it, terminate this Contract or any part of the WORK by giving CONTRACTOR notice to that effect.  Should CONTRACTOR commit an act of bankruptcy, or seek legal or equitable relief for reasons of insolvency, or become unable to meet its financial obligations, SAUDI ARAMCO may, without prejudice to the exercise of any other rights or remedies which may be available to it, terminate this Contract by giving CONTRACTOR notice to that effect.  Termination shall be effective on the date specified in SAUDI ARAMCO's termination notice but in no event prior to CONTRACTOR's actual receipt of such notice.

24.2   On the day on which termination under Paragraph 24.1 becomes effective, CONTRACTOR shall stop performance of the terminated WORK.  SAUDI ARAMCO shall retain all amounts which are then due and payable to CONTRACTOR plus reimbursements due CONTRACTOR for its reasonable and auditable costs incurred in the performance of the WORK required by Paragraph 26. If the cost to SAUDI ARAMCO of completing the terminated WORK is greater than the compensation SAUDI ARAMCO would have paid CONTRACTOR for completing such WORK pursuant to this Contract, then SAUDI ARAMCO shall deduct the difference from the retained amounts.  If the difference exceeds the retained amounts, CONTRACTOR shall pay SAUDI ARAMCO that difference less the retained amounts.



A74

CONTRACT NO. 65004/00

### 25.    TERMINATION BY CONTRACTOR

25.1    Should SAUDI ARAMCO commit a substantial breach of this Contract, CONTRACTOR may demand, in writing, that SAUDI ARAMCO comply with the terms of this Contract. If within ten (10) days after receipt of such a demand, SAUDI ARAMCO has failed to take satisfactory steps to comply, or within thirty (30) days SAUDI ARAMCO has not remedied the breach, CONTRACTOR may, without prejudice to the exercise of any other rights or remedies which may be available to it, terminate this Contract by giving SAUDI ARAMCO notice to that effect. Should SAUDI ARAMCO commit an act of bankruptcy, or seek legal or equitable relief for reasons of insolvency, or become unable to meet its financial obligations, CONTRACTOR may, without prejudice to the exercise of any other rights or remedies which may be available to it, terminate this Contract by giving SAUDI ARAMCO notice to that effect. Such termination shall be effective on the date SAUDI ARAMCO receives CONTRACTOR's notice.

25.2    Should CONTRACTOR terminate this Contract pursuant to Paragraph 25.1, SAUDI ARAMCO shall pay and CONTRACTOR shall accept in full and final settlement of all obligations, losses, costs, lost profits and damages connected with such termination the amounts calculated in accordance with Paragraph 23.

### 26.    CONTRACTOR OBLIGATIONS UPON SUSPENSION OR TERMINATION

CONTRACTOR shall minimize all costs to SAUDI ARAMCO resulting from such termination or suspension. Unless otherwise directed in writing by SAUDI ARAMCO, CONTRACTOR shall enter into no further contracts or other obligations, and immediately make every reasonable effort to terminate or suspend contracts or other obligations, other than as may be required to complete those portions of the WORK not suspended or terminated. If SAUDI ARAMCO so directs, CONTRACTOR shall execute and deliver all documents required to fully vest in SAUDI ARAMCO CONTRACTOR's rights in contracts and other obligations. CONTRACTOR shall take any action that may be necessary, or that SAUDI ARAMCO may direct, for the protection and preservation of WORK in progress.

### 27.    FORCE MAJEURE

27.1    If either party is rendered unable, wholly or in part, by force majeure to perform its obligations under this Contract, it is agreed that performance of such obligations by such party, so far as they are affected by force majeure, shall be excused from the inception of any such inability until it is corrected, but for no longer period. The party claiming an inability to perform shall, immediately after the occurrence of the force majeure event, notify the other party orally of the nature, date of inception and expected duration of the force majeure and the extent to which it will prevent the party giving such notice from performing its obligations under this Contract. The party giving notice shall confirm such notification in writing as soon as practicable. The party claiming inability to perform shall promptly correct such inability to the extent it may be corrected through the exercise of reasonable diligence.

A-35



CONTRACT NO. 65004/00

27.2    The term "force majeure" as used in this Contract shall mean any act, event, cause or occurrence rendering a party unable to perform its obligation which is not within the reasonable control and not caused by the negligence or fault of such party.

27.3    The following are specifically excluded as force majeure and shall not constitute a basis for claims for WORK Schedule extensions or costs, or both, under this Contract:

    27.3.1    Late performance by a subcontractor caused by a shortage of supervisors or labor, inefficiencies, or similar occurrences;

    27.3.2    Late delivery of CONTRACTOR-supplied equipment or materials by supplier and caused by congestion at a manufacturer's plant or elsewhere, an oversold condition of the market, inefficiencies, or similar occurrences; or

    27.3.3    Any inability to obtain Iqamas or visas or renewal of Iqamas or visas for expatriate workers.

    The exclusions in Paragraphs 27.3.1 and 27.3.2 shall not apply, however, where a subcontractor or supplier (i) is unable to perform due to force majeure as described in Paragraph 27.2 and (ii) an acceptable alternative source of service, equipment or materials is unavailable.

27.4    Should the WORK be delayed for more than forty-five (45) consecutive days as a result of force majeure, SAUDI ARAMCO shall either suspend the WORK affected pursuant to Paragraph 22 or terminate this Contract or the portion of the WORK involved pursuant to Paragraph 23. Except for certain costs incurred after the forty-fifth (45th) consecutive day as a result of termination or suspension of the WORK as specifically provided in Paragraphs 22 and 23, and except as provided for in Paragraph 15, neither party shall be liable to the other for costs incurred by the other as a result of any delay or failure to perform arising out of force majeure.

## 28.    PUBLICITY RELEASES

Should CONTRACTOR or any of its subcontractors desire to publish or release any publicity or public relations materials of any kind concerning or relating to this Contract or to CONTRACTOR's or its subcontractors' activities in connection with this Contract, CONTRACTOR shall first submit such material to SAUDI ARAMCO for review. CONTRACTOR shall not publish or release, and shall ensure that its subcontractors do not publish or release, any such material without SAUDI ARAMCO's prior approval.

A-36

CONTRACT NO. 65004/00

29.    **ARABIC TRANSLATION**

Certain sections of this Contract may not have been translated into Arabic at the date of signature. Except where expressly stated otherwise, it is the intention of the parties that these sections be promptly translated into Arabic and incorporated into the Contract. Until such time as they are translated, the English text of those provisions shall constitute the sole statement of the agreement between the parties in regard to the matters covered therein. Because of their technical nature, attachments to Schedules C & G have not been translated into Arabic.

30.    **GOVERNMENT RELATIONS ACTIVITIES**

CONTRACTOR shall be fully responsible for conducting all government relations activities within Saudi Arabia on its own behalf and for its personnel. Government relations activities shall include, without limitation, all contacts with the Saudi Arab Government, its agencies and officials, concerning matters arising out of or connected with CONTRACTOR's performance of this Contract. If requested by CONTRACTOR, SAUDI ARAMCO may provide general guidance to assist CONTRACTOR in the conduct of such government relations activities; provided that SAUDI ARAMCO shall not be liable for any loss, claim or award as a result of providing such guidance to CONTRACTOR. CONTRACTOR shall hold SAUDI ARAMCO harmless from any loss, claim, or award resulting from CONTRACTOR's failure to perform its obligations under this Paragraph.

31.    **GENERAL PROVISIONS**

31.1    This Contract shall be binding upon and inure to the benefit of the successors and assigns of the parties to this Contract; however, this Contract may neither be assigned nor transferred, either in whole or in part, by CONTRACTOR without first obtaining the written consent of SAUDI ARAMCO.

31.2    No benefit or right accruing to either party under this Contract shall be waived unless the waiver is reduced to writing and signed by both parties to this Contract. The waiver, in one instance, of any act, condition or requirement stipulated in this Contract shall not constitute a continuing waiver or a waiver of any other act, condition or requirement or a waiver of the same act, condition or requirement in other instances, unless specifically so stated.

31.3    Failure of either party to exercise any of its rights under this Contract shall in no way constitute a waiver of those rights, nor shall such failure excuse the other party from any of its obligations under this Contract. Neither SAUDI ARAMCO's exercise of any of its rights of review, inspection or testing, nor CONTRACTOR's submission or updating, or SAUDI ARAMCO's review, revision, certification, acceptance or approval, of documents prepared by CONTRACTOR, shall have the effect of amending, modifying, or limiting in any way the CONTRACTOR's obligations under this Contract, nor the effect of acknowledging or warranting that the designs, plans, or WORK Schedules contained in such documents are feasible or achievable.

A-37



A77

FROM                    (FRI) 5. 31' 02  5:12/ST. 4:57/NO. 4261977542 P 49

<u>CONTRACT NO. 65004/00</u>

31.4    CONTRACTOR shall be an independent contractor with respect to the WORK under this Contract. Neither CONTRACTOR, any subcontractor nor the personnel of either of them shall be deemed to be the servants, agents or employees of SAUDI ARAMCO.

31.5    This Contract shall not be deemed for the benefit of any third party nor shall it give any person not a party to this Contract any right to enforce its provisions.

31.6    The warranty, liability, indemnity and confidentiality (including publicity releases) provisions of this Contract shall survive its termination or final settlement. The provisions of this Contract relating to termination and dispute settlement (including choice of law and arbitration) shall survive its termination, but not its final settlement.

31.7    This Contract supersedes all previous contracts, correspondence and understandings between the parties concerning the WORK, except for those understandings or agreements described in Paragraph 19.10 of Schedule "A" and constitutes their entire agreement concerning the WORK to be performed hereunder. It shall not be amended except by a writing signed by both of the parties. No promise, agreement, representation or modification to this Contract shall be of any force or effect between the parties, unless set forth or provided for in this Contract, a Change Order or an Amendment.

31.8    In the event CONTRACTOR fails to perform any of its obligations under this Contract, SAUDI ARAMCO may, upon fourteen (14) days prior written notice, and without prejudice to any other remedies permitted by law or this Contract, perform the CONTRACTOR's obligations, or cause them to be performed, at CONTRACTOR's expense.

31.9    Where this Contract requires compliance with applicable SAUDI ARAMCO specifications, standards, manuals, procedures, and similar documents which were developed by SAUDI ARAMCO's predecessor, the Arabian American Oil Company (ARAMCO), CONTRACTOR agrees to comply with the corresponding ARAMCO specifications, standards, manuals, procedures and similar documents.

31.10   Because of its complexity, certain portions of this Contract have not been translated into Arabic. Notwithstanding, CONTRACTOR agrees to be bound by the English text.

END OF SCHEDULE "A"

A-38

A78

FROM                                (FRI) 5.31'02  5:12/ST. 4:57/NO. 4261977542 P 50

CONTRACT NO. 65004/00

# SCHEDULE "B"

## JOB SPECIFICATION

### TABLE OF CONTENTS

1.    DEFINITION OF TERMS

2.    GENERAL PROVISIONS

    2.1    Purpose
    2.2    Notice to Proceed
    2.3    Scheduled Completion Date
    2.4    SAUDI ARAMCO's Right to Inspect, Review and Monitor
    2.5    Project Language
    2.6    Optional Solutions

3.    DESCRIPTION OF WORK

4.    DIVISION OF RESPONSIBILITIES

    4.1    Administration
    4.2    CONTRACTOR-Provided Facilities and Services for SAUDI ARAMCO
    4.3    Design & Engineering
    4.4    Materials and Equipment Procurement
    4.5    Production of CADD Drawing Deliverables
    4.6    Control of Drawings and Related Documents
    4.7    Project Record Books
    4.8    Construction
    4.9    Changes In WORK
    4.10   Scheduling
    4.11   Progress Reports and Management Review Meetings
    4.12   Interface With Other Contractors
    4.13   QA/QC Activities
    4.14   Constructability Program

5.    LIST OF REFERENCED DOCUMENTS

    5.1    FACILITIES Specifications
    5.2    Administrative and Construction Specifications
    5.3    SAUDI ARAMCO Standards and Specifications

6.    MILESTONE DATES

    6.1    Critical Milestone Dates
    6.2    Inter-Contract Milestone Dates

7.    SAUDI ARAMCO DELIVERABLE DATES

8.    CONTRACTOR DELIVERABLES

SCHEDULE "B"                              CONTRACT NO. 65004/00

## JOB SPECIFICATION

1.    **DEFINITION OF TERMS**

The following terminology is used throughout Schedule "B". These definitions are in addition to the definitions set forth in Schedule "A" and throughout other parts of this Contract.

1.1    "Boundary Condition" means the design and/or construction interface points which describe various physical boundaries between WORK being performed by CONTRACTOR and work being performed by Other Contractor(s) or Plant Automation System Integrator Contractor (PAS Integrator Contractor).

1.2    "Budget Item" (BI) means a unique SAUDI ARAMCO designation used to identify a particular project.

1.3    "Commissioning" means all activities associated with start-up of the FACILITIES after Mechanical Completion has been achieved.

1.4    "Construction Site" is the location where the FACILITIES are to be constructed.

1.5    "Fabrication Yard(s)" means the location or locations in Saudi Arabia, in proximity to the WORK Site, where the components and materials for the FACILITIES shall be fabricated or assembled or preconstructed by CONTRACTOR.

1.6    "Inter-Contract Milestone Dates" means the agreed dates set forth in Schedule "B" by which CONTRACTOR shall complete specified portions of the WORK that are associated with the work of Other Contractors or the PAS Integrator Contractor.

1.7    "Job Specification" is a term defined to include the entire Schedule "B" of this Contract including all documents referenced therein which establishes the scope of the WORK.

1.8    "Key Milestone Dates" means the dates set forth in CONTRACTORS WORK Schedule and which are identified by SAUDI ARAMCO after award by which CONTRACTOR shall complete specified portions of the WORK.

1.9    "Licensor" is an entity which owns exclusive rights to a particular process technology and which SAUDI ARAMCO (Licensee) has obtained a non-exclusive right to use at its Ras Tanura Refinery.

1.10    "Onstream" means the FACILITIES are operational in accordance with the Job Specification.



SCHEDULE "B"                                    CONTRACT NO. 65004/00

1.11  "Other Contractor" means an organization contracted by SAUDI ARAMCO to execute other work, excluding PAS Integrator Contractor work, outside the scope of the WORK of CONTRACTOR.

1.12  "PAS Integrator Contractor" means an organization contracted by SAUDI ARAMCO to execute Plant Automation System work outside the scope of the WORK of CONTRACTOR.

1.13  "Precommissioning" is a collective term meaning all those activities required to prepare the FACILITIES for Mechanical Completion (MC).

1.14  "Subcontractor", "Manufacturer", "Fabricator", "Supplier", means an organization contracted by and wholly responsible to CONTRACTOR for executing a specific portion of the WORK.

1.15  "Vendor" means a CONTRACTOR supplier of materials or equipment for the FACILITIES.

2.    GENERAL PROVISIONS

2.1   Purpose

      This Job Specification establishes the Scope of the WORK to be performed pursuant to this Contract and contains or references the applicable drawings, standards, specifications, as well as the administrative, procedural, and technical requirements that CONTRACTOR shall satisfy and follow in accomplishing the WORK.

2.2   Notice to Proceed

      SAUDI ARAMCO shall, in accordance with Schedule "A", Paragraph 9.1, issue CONTRACTOR a Notice to Proceed within thirty (30) days from the Contract effective date.

2.3   Scheduled Completion Date

      The Scheduled Completion Date for the WORK, as defined in Schedule "A" Paragraph 1.8, is One Thousand Three Hundred Twenty Six (1,326) calendar days after the issuance of Notice to Proceed as set forth in Paragraph 2.2 of this Schedule "B". Separable portions of the WORK as specified in Paragraph 6.0 of this Schedule "B" shall be completed by the dates specified therein.



B-2

A81

**SCHEDULE "B"**                                          **CONTRACT NO. 65004/00**

2.4   Saudi Aramco's Right to Inspect, Review and Monitor

    2.4.1   SAUDI ARAMCO, while discharging its obligations to facilitate the orderly prosecution of the WORK, shall have the right to inspect, review, and monitor any and all aspects of the WORK being performed by CONTRACTOR.

    2.4.2   SAUDI ARAMCO's exercise of its right to inspect, review, and monitor CONTRACTOR's WORK hereunder shall not relieve CONTRACTOR from any of its obligations under this Contract and shall not constitute a basis for a Change Order or claims by CONTRACTOR for delays or additional compensation from SAUDI ARAMCO.

    2.4.3   Company Representative's written comments on project documents resulting from SAUDI ARAMCO inspection, review, and monitoring activities shall serve as notification to CONTRACTOR of any non-compliance of such documents with this Job Specification. Absence of verbal and/or written comments from the Company Representative or his designee shall not relieve CONTRACTOR from any of its obligations under this contract.

    2.4.4   The authority to approve Vendor generated documents e.g. Nonmaterial Requirements (NMRs), excluding spare parts data packages, as "Saudi Aramco's Engineer" is delegated to CONTRACTOR. Furthermore, Project Drawings shall not be signed by SAUDI ARAMCO before CONTRACTOR completes as-built drawings.

2.5   Project Language

All correspondence and project documents, including, but not limited to drawings, specifications, data sheets, manuals, reports, and other NMR's shall be in the English language. CONTRACTOR shall ensure that all such documents are prepared in the English language.

2.6   Optional Solutions

Whenever this Contract's standards, specifications, drawings, or preliminary design allow for two or more optional solutions to a design problem, CONTRACTOR shall promptly submit the matter to the Company Representative for resolution. CONTRACTOR is obligated in all cases to implement the most stringent solution.

3.   **DESCRIPTION OF WORK**

3.1   Further to the provisions of Schedule "A", Paragraph 2, CONTRACTOR shall furnish without limitation, all facilities, tools, labor, supervision, technical and professional services, material, equipment, supplies and articles (except those items to be supplied by SAUDI ARAMCO as specified in Schedule "G") and shall perform all operations and incidentals required to totally design, engineer, procure, construct, conduct final testing, inspection, checkout and provide start-up and commissioning assistance for the FACILITIES as described in this Job Specification, all in accordance with the Design and Construction Interface Plan. These FACILITIES are described below:



A82

**SCHEDULE "B"**                                        CONTRACT NO. 65004/00

### 3.1.1  GENERAL

The general purpose of the Utility Plants is to provide utilities to both the new and existing Ras Tanura Refinery (Refinery) facilities. The Utility Plants generate the quantity of commodity required for all modes of operation including start-up, shutdown, upset conditions, and plant turn-around. All Utility Plants, with exception of the new Nitrogen Plant are designed as an integrated addition to the existing Ras Tanura Refinery (Refinery) utility systems.

### 3.1.2  FIREWATER

The new Firewater System provides seawater dedicated for fire fighting requirements and plant washdown.

### 3.1.3  SANITARY SEWERS

The Sanitary Sewer System collects sewage and transports it to the Rahima Home Ownership Sewage Treatment Plant.

### 3.1.4  RAW WATER

The Raw Water System provides chlorinated water which is mainly used by the Refinery workers on an intermittent basis for personnel use, and for emergency eyewash and safety showers.

### 3.1.5  DRINKING WATER

The Drinking Water System provides drinking water for drinking purposes only.

### 3.1.6  NORTH FLARE

The existing North Plant Flare System is upgraded to accommodate relief loads from the new and future plants.

### 3.1.7  COOLING WATER

The Cooling Water System provides chlorinated seawater which is used as once through cooling water for Refinery coolers/condensers and for the production of make-up boiler feed water and process water.

Case 1:07-cv-00616-SLR    Document 11-2    Filed 02/29/2008    Page 6 of 74

### 3.1.8  DESALINATION

The new Desalination System provides make-up boiler feed water and process water for the new Plants.

### 3.1.9  HIGH PRESSURE BOILERS

The new High Pressure Boilers provide additional 600 psi steam for the new Plants.

### 3.1.10  FUEL GAS

The Fuel Gas System provides High Pressure and Low Pressure fuel gas. The Fuel Gas System receives imported GART gas and collects Refinery off-gases from various Plants. Propane vaporization is provided to supplement the GART supply.

### 3.1.11  CAUSTIC

The Caustic System provides diluted caustic to various users at specific strengths. All user Plants receive caustic at 26° Be' and are equipped with additional dilution facilities as required for specific plant requirements.

### 3.1.12  NITROGEN STORAGE

The Nitrogen Storage Plant stores liquid Nitrogen and supplies it in a gaseous state to the new Plants. Nitrogen from the Nitrogen Storage System is continuously used for blanketing and instrument purging. It is also used intermittently for start-up, shutdown and catalyst regeneration.

### 3.1.13  MEDIUM VOLTAGE POWER DISTRIBUTION

The Medium Voltage Power Distribution System consists of a new 13.8KV emergency power distribution system, new substations in the Blending, Storage and Transfer Systems and the modification of existing 5KV and 480V substations to accommodate the electrical demand of the new Plants.

### 3.1.14  AIR COMPRESSORS

The Air Compression Plant supplies compressed air for distribution to all existing Refinery and new Plants. The compressed air is supplied to the Refinery through a three header arrangement consisting of Plant Air, Instrument and Process Air and Emergency Instrument Air.



A84

SCHEDULE "B"                                      CONTRACT NO. 65004/00

### 3.1.15 BLENDING, STORAGE AND TRANSFER (BS&T)

The BS&T Systems consist of tankage, pumps, blenders and piping to handle Mogas, Natural Gasoline, Kerosene, Jet Fuel JP4, Diesel, Fuel Oil Products and their various components. The BS&T systems are being upgraded to handle a broader product mix, increase blending capability and add a new Black Oil System to produce Fuel Oil.

### 3.1.16 INTERCONNECTING PIPEWAYS

The Interconnecting Pipeway connects new and existing plants, storage facilities, Utilities Plants and flares. All process and utility streams are transferred from plant battery limits via the Interconnecting Pipeway to their final destinations. The Interconnecting Pipeway consists of structural steel frames elevated above grade and follow the same route as the existing pipeways located at grade.

### 3.1.17 PLANT MODIFICATIONS

The Plant Modifications consist of piping and valve additions to the Crude Unit which are required to provide new sidecuts to the plant battery limit.

### 3.1.18 EXISTING PLANT TIE-INS

The Existing Plant Tie-Ins, located in all areas of the North Refinery, integrate the new FACILITIES into the existing facilities.

4.   DIVISION OF RESPONSIBILITIES

4.1   Administration

4.1.1   SAUDI ARAMCO shall:

4.1.1.1   Provide the use of land near Ju'aymah and in the Ras Tanura Refinery for CONTRACTOR's use as a Fabrication Yard/ Laydown Yard and Laydown area, respectively, in support of the WORK. CONTRACTOR may use other laydown/ fabrication facilities within Saudi Arabia not provided by SAUDI ARAMCO. Such facilities will be considered "Official Laydown Yards."

4.1.1.2   Provide the use of land near Ju'aymah for CONTRACTOR as a construction camp in support of the WORK.

4.1.1.3   Provide the use of land in the Ras Tanura Refinery for CONTRACTOR's Construction Site offices in support of the WORK.



A85

**SCHEDULE "B"**                                         <u>CONTRACT NO. 65004/00</u>

4.1.1.4    Provide limited access, at no cost to CONTRACTOR, to
telephone trunkline junction boxes at CONTRACTOR's
construction camp, the Ju'aymah laydown yard / Fabrication
Yard and Construction Site offices for use by CONTRACTOR
and SAUDI ARAMCO personnel for routine business activities.
This telephone trunkline is limited to handling calls within the
SAUDI ARAMCO telephone system.

4.1.1.5    Provide access, through the SAUDI ARAMCO supplied
telephone trunkline, to National and International dialing
capability.  Charges incurred by CONTRACTOR via this access
shall be for CONTRACTOR's account, and be setoff against
CONTRACTOR's invoices on monthly basis.

4.1.1.6    Provide access, at no cost to CONTRACTOR to limited
electrical power, raw water, fire water and sewers at
CONTRACTOR's construction camp (only provided if camp is
constructed on land provided by SAUDI ARAMCO pursuant to
Paragraph 4.1.1.2 above) and limited electrical power, raw
water and sewers at the Construction Site offices (only
provided if constructed on land provided by SAUDI ARAMCO
pursuant to Paragraph 4.1.1.3 above).

4.1.2   <u>CONTRACTOR shall:</u>

4.1.2.1    Prepare and submit for review by the Company Representative,
a detailed WORK Execution Plan and Procedure (WEPP). The
WEPP shall establish CONTRACTOR's plan and minimum
administrative requirements for the execution of all phases of
the WORK and shall provide a uniform system for the
performance, monitoring, reporting, and controlling of all
Contract and WORK activities.  After its review,
CONTRACTOR shall provide eighteen (18) controlled copies
of the WEPP for SAUDI ARAMCO use.  CONTRACTOR
shall, as required, update and revise the WEPP to facilitate the
efficient and timely execution and completion of the WORK.

4.1.2.2    Perform the WORK, to the maximum extent possible, on a
Project Task Force basis.  All key Project Task Force personnel
shall be fluent in the written and spoken English language.



A86

**SCHEDULE "B"**　　　　　　　　　　　　　　　　　　　　**CONTRACT NO. 65004/00**

4.1.2.3　　Coordinate the WORK, including interfaces and communications between CONTRACTOR, Engineering Contractor, Other Contractor(s), PAS Integrator Contractor, and SAUDI ARAMCO so as to minimize the impact of the WORK on the operation of the Refinery and on work being performed by the PAS Integrator Contractor and Other Contractor(s).

4.1.2.4　　Copy SAUDI ARAMCO on all communication (outgoing and incoming) between Licensor(s), Other Contractor(s), and PAS Integrator Contractor.

4.1.2.5　　Conduct weekly WORK progress meetings and other meetings necessary to support the WORK, including all meetings requested by SAUDI ARAMCO. As appropriate, CONTRACTOR personnel with full decision - making authority shall attend these meetings. Provide the written meeting agenda two (2) working days in advance of the weekly WORK progress meetings and other meetings, for the Company Representative's review.

4.1.2.6　　Minute and distribute records of the WORK progress meetings, and all other meetings attended by SAUDI ARAMCO and CONTRACTOR. Provide the minutes to Company Representative and Contractor Representative for review within two (2) working days after each such meeting.

4.1.2.7　　Confirm and document in writing all verbal instructions from the Company Representative before such instructions are implemented.

4.1.2.8　　Provide Company Representative with schedule and travel plans for CONTRACTOR's personnel, and those of Vendors' representatives and Subcontractors' personnel, who will travel out-of-Kingdom in support of the WORK.

4.1.2.9　　Ensure that CONTRACTOR senior staff, as appropriate, attend regularly scheduled in-Kingdom coordination meetings at SAUDI ARAMCO-designated site offices, as required, throughout the duration of the contract. These meetings shall normally be held monthly and are intended to ensure early identification and resolution of constraints affecting the overall execution of WORK including but not limited to engineering,



A87

**SCHEDULE "B"**                                                    **CONTRACT NO. 65004/00**

design, procurement, safety, security, quality assurance, logistics, heavy-lift loading and off-loading, transportation, installation, personnel transport, Commissioning, and interface with SAUDI ARAMCO, the PAS Integrator Contractor, and Other Contractors.

4.1.2.10    Maintain all WORK Site engineering and procurement functions for continuous support of the WORK until Project Completion has been achieved and for such additional time necessary to complete the specific requirements of this Contract.

4.1.2.11    Only photograph the FACILITIES after complying with all SAUDI ARAMCO procedures and obtaining the written consent of the Company Representative.

4.2    **CONTRACTOR-Provided Facilities and Services for SAUDI ARAMCO**

4.2.1    **CONTRACTOR Design Office**

4.2.1.1    CONTRACTOR shall provide for temporary SAUDI ARAMCO occupancy immediately after the effective date of this Contract and only until the permanent facilities as specified in Paragraph 4.2.1.2 below are available, office space, including telephones, for six (6) SAUDI ARAMCO personnel.

4.2.1.2    CONTRACTOR shall provide for permanent SAUDI ARAMCO occupancy within thirty (30) days of the effective date of this Contract and for the duration of SAUDI ARAMCO presence at CONTRACTOR's Design Office(s), suitably furnished offices and two (2) conference rooms for the following personnel:

One (1)      Project Manager
Two (2)      Senior Project Engineers
Five (5)     Project Engineers
Five(5)      Professional Employees
One (1)      Senior Secretary
Two (2)      Secretaries
Two (2)      Clerks

In addition to office space, CONTRACTOR shall provide convenient parking spaces, office supplies, coffee and kitchen area, coffee and tea supplies and western style lavatories for SAUDI ARAMCO personnel at CONTRACTOR's Design Office. These facilities shall be provided and maintained with adequate power, lighting, heating and air conditioning (twenty-four hours per day year round), ventilation, partitions, required maintenance and daily janitorial services.

SCHEDULE "B"                                              CONTRACT NO. 65004/00

4.2.1.3    CONTRACTOR shall provide the office space specified in Paragraph 4.2.1.2 in one (1) consolidated area contiguous, to the maximum extent possible, to CONTRACTOR's Project Task Force office area, for SAUDI ARAMCO personnel only.

4.2.1.4    CONTRACTOR shall submit to the Company Representative for non-objection, prior to implementation, an overall office plan depicting all the facilities specified in Paragraph 4.2.1.2.

4.2.2    Construction Site Office

4.2.2.1    Provide for SAUDI ARAMCO occupancy within sixty (60) days of the effective date of this Contract, until Project Completion, suitably furnished Construction Site offices for the following personnel:

One (1)      Project Manager
Two (2)      Senior Project Engineers
Five (5)     Project Engineers
Five(5)      Professional Employees
One (1)      Senior Secretary
Three (3)    Secretaries
Three (3)    Clerks

In addition to office space, CONTRACTOR shall provide two (2) conference rooms (1 large and 1 small), a prayer shelter, convenient parking spaces, office supplies, coffee and kitchen area, coffee and tea supplies, and western style lavatories. These facilities shall be provided and maintained with adequate, lighting, heating and required air conditioning (twenty-four hours per day year round), ventilation, partitions, required maintenance, pest control services and daily janitorial services.

4.2.2.2    Provide the office space specified in Paragraph 4.2.2.1 in one (1) consolidated area contiguous, to the maximum extent possible, to CONTRACTOR's Project Task Force office area, for SAUDI ARAMCO personnel only.

4.2.2.3    Submit to the Company Representative for non-objection, prior to implementation, an overall office plan depicting all the facilities specified in Paragraph 4.2.2.1.

**SCHEDULE "B"**                                              CONTRACT NO. 65004/00

### 4.2.3   CONTRACTOR-Provided Secretarial Support For SAUDI ARAMCO

CONTRACTOR shall provide at CONTRACTOR's Design Office, for sole SAUDI ARAMCO use, two (2) dedicated, full-time secretaries and two (2) full-time clerks fluent and proficient in written and spoken English. The secretaries shall be proficient in the use of office equipment, personal computer systems, and computer software including word processing, spreadsheet and database management programs. Company Representative shall review and approve all nominations for the secretarial positions.

### 4.2.4   Incidental Services

SAUDI ARAMCO shall reimburse CONTRACTOR for the following in accordance with Schedule "C", Paragraph 2.8.

#### 4.2.4.1
Actual long-distance telephone communication charges directly incurred by SAUDI ARAMCO through the use of SAUDI ARAMCO-dedicated telephones and facsimile machines.

#### 4.2.4.2
The actual cost of reproduction services, when requested in writing by Company Representative, in addition to those services specified in Paragraph 4.11 and elsewhere in the Job Specification or this Contract.

#### 4.2.4.3
Notwithstanding the provisions of Schedule "C", Attachment III, Time Unit Rates, Paragraph 1.1.2, the actual cost of travel, lodging and subsistence in support of HAZOP studies and other studies requested pursuant to Schedule "B", Paragraph 4.3.2.1.3 and which are incurred in business travel away from the cities in which CONTRACTOR maintains offices.

## 4.3   Design and Engineering

### 4.3.1
SAUDI ARAMCO shall provide all documents referenced in Paragraph 5 of this Job Specification.

### 4.3.2   CONTRACTOR shall:

#### 4.3.2.1
Design and engineer the FACILITIES, including, but not limited to, process, mechanical, and piping systems and all associated utilities, electrical, instrumentation, painting and architectural, civil and structural WORK necessary for the procurement and construction of the FACILITIES. The WORK shall include, but is not necessarily limited to the following:



**SCHEDULE "B"**                                              CONTRACT NO. 65004/00

4.3.2.1.1   Prepare utility and chemical consumption rates (expected during normal, maximum, and minimum operating conditions, as well as during summer and winter operating conditions, and any other limiting conditions) for all chemicals and utilities for the FACILITIES, along with utility balances for each operating condition. These balances shall be updated to reflect Changes in WORK, if any, during the execution of the WORK.

4.3.2.1.2   Provide data in support of Hazard and Operability (HAZOP) studies to be performed by SAUDI ARAMCO and/or by Other Contractor(s) when requested by the Company Representative.

4.3.2.1.3   Provide personnel to participate in HAZOP studies and other studies to be performed by SAUDI ARAMCO and/or Other Contractor(s) when requested by Change Order. SAUDI ARAMCO shall compensate CONTRACTOR for such personnel in accordance with the provisions of Attachment III, Exhibit I to Schedule "C". Following the HAZOP study the CONTRACTOR shall maintain an accurate log of all changes to the Process and Instrument Diagrams and other relevant documents. This log shall be submitted to SAUDI ARAMCO monthly.

4.3.2.1.4   During the execution of the engineering and design portion of the WORK, participate in and conduct design reviews at approximately the thirty (30), sixty (60) and ninety (90) percent complete stages of the detailed design effort. These general design reviews normally involve personnel from various Departments within SAUDI ARAMCO. During such reviews, CONTRACTOR shall afford SAUDI ARAMCO their full cooperation. Such cooperation shall include, but not be limited to: providing meeting space, discipline personnel, calculations, drawings, design data and other information as may be relevant to the specific topic under review.

B-12



**SCHEDULE "B"**                                    **CONTRACT NO. 65004/00**

    4.3.2.1.5  Perform site specific sub-surface investigations for the basis of final foundation design.

   4.3.2.2  Prepare a Pre-commissioning Plan and submit to Company Representative for review ninety (90) days before any pre-commissioning WORK begins.

**4.4**  Materials and Equipment Procurement

  **4.4.1**  Plans and Reports

CONTRACTOR shall prepare and submit a Procurement Plan for review by the Company Representative. This Plan shall include a Monthly Materials Procurement Status Report, a Saudi Participation Status Report, a Spare Parts Procurement Plan, a Log of Anticipated Purchase Requisitions, a Parent Equipment Purchase Order and Spare Parts Data Control Log, a Spare Parts Data Package, and an Operating Material List. CONTRACTOR shall, as part of the Monthly Materials Procurement Status Report:

   4.4.1.1  Assign SAUDI ARAMCO-furnished purchase order identification numbers to all purchase orders.

   4.4.1.2  Provide a forecast of all heavy-lift and oversize equipment items, with projected ex-works and WORK Site arrival dates.

   4.4.1.3  Compile and maintain a complete list of all operating materials required for the normal operation of the FACILITIES. The operating materials list shall include all chemicals, industrial gases, desiccants, catalysts, emulsifiers, batteries, lubricants, oils, and other items which are consumed during the operation of the FACILITIES and which are required for its operation.

   4.4.1.4  The format, content, and issue timing of the procurement reports referenced in Schedule "G" shall be included as a part of the WEPP.

   4.4.1.5  For each purchase of material valued in excess of $5,000.00, CONTRACTOR shall create a purchase file. The file shall be organized in a uniform manner, be in the English language, and contain the purchase requisition, related specification, the invitation to bidders, the list of bidders, a bid summary identifying all bidders, evidence of technical review, a purchase order placement recommendation, copy of the purchase order and change orders, all specifications, spare parts requirements and spare parts data package requirements. The files shall be continuously updated.



FROM                                    (FRI) 5. 31' 02  5:16/ST. 4:57/NO. 4261977542 P 64

### 4.4.2 Weld Procedures and Maps

CONTRACTOR shall submit, for SAUDI ARAMCO approval, Welding Procedures and Weld Maps for all shop fabricated items prior to commencement of any fabrication.

### 4.5 Production of CADD Drawing Deliverables

CONTRACTOR shall prepare Project Drawings and any as-builts thereto on 2D CADD equipment. Project Drawings shall include new drawings, existing 2D CADD drawings, and any existing manually-prepared drawings which are modified by CONTRACTOR as part of the WORK.

### 4.6 Control of Drawings and Related Documents

#### 4.6.1 Record Center

CONTRACTOR shall establish, operate, and maintain a Record Center complete with equipment required for storage, care, retrieval, and management of project documents (engineering calculations, CADD files, engineering studies, vellum drawings, electronic files, design specifications, data sheets, Vendor drawings, applicable codes and standards and SAUDI ARAMCO and industry standards ) at the Design Office.  In addition, CONTRACTOR shall develop and implement:

4.6.1.1    A Document Control and Transmittal System at CONTRACTOR's Design Office to record, monitor, transmit, distribute and to verify receipt of all project documents including, but not necessarily limited to, drawings, electronic files, data sheets, installation and operating instructions.

4.6.1.2    A dedicated and continuously updated library of project drawings, data sheets, specifications, and procedures; SAUDI ARAMCO project description documents (standards, specifications, narratives); and Vendor data for project equipment. The document library shall include standards and specifications which are referenced in the project documents.

#### 4.6.2 Document Control Staff

CONTRACTOR shall provide at the Design Office, a dedicated staff throughout the duration of the Contract to operate, maintain, update, revise, and distribute as required, documents that shall be turned over to SAUDI ARAMCO. Such documentation shall include, but not be limited to: all drawings, as-built drawings, Vendor drawings and NMR's, spare parts lists, Vendor equipment operations and maintenance manuals and Project Records Books. These documents shall be readily accessible for review and use by SAUDI ARAMCO at any time.



SCHEDULE "B"

CONTRACT NO. 65004/00

4.6.3  Technical Document Access

CONTRACTOR shall allow SAUDI ARAMCO personnel access to and use of CONTRACTOR's technical library and vendor catalog files.

4.6.4  Provision and Maintenance of Project Drawings

CONTRACTOR shall provide and maintain, for exclusive SAUDI ARAMCO use in SAUDI ARAMCO's work area, two (2) complete sets of Project Drawings on stick files (both "A" size and "D" size). CONTRACTOR shall maintain these stick files so that they reflect the current status of the WORK.

4.7  Project Record Books

CONTRACTOR shall provide Project Record Books for the FACILITIES, which shall include: a Drawing Book, an Inspection Book, an Operating Instruction Book, an Equipment Manual, a Calculation Book and a Precommissioning Book.

4.8  Construction

4.8.1  CONTRACTOR shall:

4.8.1.1  Perform its WORK in accordance with the Job Specification, and CONTRACTOR or Affiliated Contractor-generated Issued For Construction (IFC) drawings and specifications.

Maintain a WORK Site log until the satisfactory conclusion of the WORK to record changes to the IFC Drawings. Immediately notify Company Representative when planning to deviate, for any reason, from the IFC Drawings or specifications.

4.8.1.2  Be solely and completely responsible for handling, transporting, receiving, marshaling, segregating, storing, safekeeping, environmentally protecting, and issuing all CONTRACTOR-supplied equipment, materials, and spare parts required for the WORK at CONTRACTOR's Fabrication Yard/Laydown Yard.

4.8.1.3  Preserve the FACILITIES, and components thereof, until MC or until SAUDI ARAMCO takes possession, by way of inert gas blanketing; energizing, furnishing initial and replacement desiccants; lubricants; preservatives; heaters; temporary guards or enclosures and any other such measures that are necessary.

4.8.1.4  Protect against corrosion and damage when transporting all fabricated portions of the FACILITIES from CONTRACTOR's Fabrication Yard/Laydown Yard and including engineered equipment from Port facilities to the WORK Site.



A94

**SCHEDULE "B"**                                          CONTRACT NO. 65004/00

4.8.1.5    Provide adequate workshops, covered and environmentally controlled storage and painting areas, at CONTRACTOR's Fabrication Yard/Laydown Yard.

4.8.1.6    Provide and maintain fabrication, assembly, pre-construction, and construction equipment, plant, machinery, tools, spare parts, and consumable materials in good operating condition, size, capacity, and numbers to ensure the timely and safe performance of the WORK at CONTRACTOR's Fabrication Yard and WORK Site.

4.8.1.7    Provide appropriate protection from damage to SAUDI ARAMCO's bench marks and monuments.

4.8.1.8    Provide Company Representative with a daily force report indicating the WORK in progress, numbers of CONTRACTOR's and its Subcontractors' personnel by craft, including a list of the equipment at the WORK Site.

4.8.1.9    Obtain SAUDI ARAMCO approval of weld procedure qualifications, weld maps and welder job clearance cards in accordance with SAUDI ARAMCO requirements.

4.8.1.10   Obtain all required governmental and SAUDI ARAMCO certifications for CONTRACTOR crane, lifting, construction equipment, vehicles, and associated operators.

4.8.1.11   Obtain all necessary work permits, including hot work permits, for the performance of WORK in the Refinery and under no circumstances carry out any WORK without such permits.

4.8.1.12   Notify Company Representative a minimum of two (2) weeks prior to the scheduled start WORK dates related to existing facilities in order to allow for required coordination to accommodate the WORK.

4.8.1.13   Provide Company Representative minimum of sixty (60) days notice before demobilizing of CONTRACTOR's Personnel or equipment used on the WORK.

4.8.1.14   Remove, test, certify and carseal all safety valves in the FACILITIES, including Vendor supplied equipment. CONTRACTOR shall ensure that carsealing of all safety valves is maintained at all times after permanent installation and shall have safety valves retested, re-certified and carsealed, if carsealing is broken for any reason.

A95

FROM                                    (FRI) 5. 31' 02  5:16/ST. 4:57/NO. 4261977542 P 67

**SCHEDULE "B"**                                        CONTRACT NO. 65004/00

4.8.1.15    Prepare SAUDI ARAMCO Form 3099 for each safety valve in the FACILITIES, including Vendor Equipment. Assemble the Forms into a package which shall include applicable P&ID's; Safety Instruction Sheets; valve specification sheets and relief calculation sheets for each safety valve and maintain a Data Base for all Safety Valves in the FACILITIES. Check the various documents in the package against the nameplate of the valve for errors or inconsistencies and submit one (1) copy of each package to Company Representative at least four (4) months prior to MC.

4.8.1.16    Provide a Heavy-Lift Plan for the review by the Company Representative One Hundred Eighty (180) days prior to expected delivery of the first major piece of equipment.

4.8.1.17    Provide all Vendor representatives required to achieve MC of the FACILITIES. As a minimum, Vendor representatives will be required for all Compressors, Electric Motors, Steam Turbines, Pumps, Motor Operated Valves, Air Operated Valves, Safety Shutdown Valves, Switchgear, Transformers, Emergency Shutdown Device Instruments, Pressure Control Valves, Temperature Control Valves, and Flow Control Valves.

4.8.1.18    Provide and load all required catalysts, chemicals, gases, solvents, desiccants, lubricants, oils, and all items necessary for pre-commissioning and the initial operation of the FACILITIES.

4.8.1.19    Provide start-up and Commissioning assistance not to exceed $2,000,000 as directed by Company Representative, limited to the provision of labor and equipment specified by SAUDI ARAMCO per Paragraph 9.6 of Schedule "A". CONTRACTOR shall be compensated for personnel and equipment at rates included in Attachment III of Schedule "C".

4.9    **Changes in WORK**

CONTRACTOR shall, in accordance with the provisions of Schedule "A", Paragraph 10, develop a formal Change Order System to control and process Changes to the WORK. The Change Order System shall be subject to Company Representative's review prior to its implementation.



B-17

**SCHEDULE "B"**                                **CONTRACT NO. 65004/00**

**4.10**   Scheduling

Further to the requirements of Paragraph 8 of Schedule "A", CONTRACTOR shall produce from time to time, as directed by SAUDI ARAMCO, other schedule documents in SAUDI ARAMCO - provided formats, such as look-ahead, Inter-dependency and recovery schedules, which shall support and become an integral part of the WORK Schedule.

**4.10.1**  The Inter-dependency Schedule demonstrates the schedule for the availability of the required information between CONTRACTOR and the PAS Integrator Contractor or between CONTRACTOR and Other Contractor(s) so as to allow the CONTRACTOR's WORK and the work of others which require such information, to proceed without delay. The Inter-dependency Schedule shall be mutually developed, agreed to, and maintained between the parties involved.

**4.11**  Progress Reports and Management Review Meetings

**4.11.1**  Progress Reports

CONTRACTOR, in conjunction with Engineering Contractor, shall issue an electronic file in addition to twelve (12) copies of the Monthly Progress Report to SAUDI ARAMCO, not later than three (3) working days after the last day of each month. The last day of a month shall be a calendar date specified on a SAUDI ARAMCO reporting calendar provided by the Company Representative.

**4.11.2**  Management Review Meetings

CONTRACTOR shall prepare presentations and participate in SAUDI ARAMCO Management Review Meetings which are held periodically, but not less than twice each year. CONTRACTOR shall provide thirty-six (36) sets of the Management Review Meeting Presentation Books. These presentations shall provide SAUDI ARAMCO Executive Management with the then-current status of the WORK and shall be conducted in or near CONTRACTOR offices.

**4.12**  Interface With Other Contractors

**4.12.1**  CONTRACTOR shall:

**4.12.1.1**  Provide interface drawings in sufficient detail to define, in accordance with SAUDI ARAMCO required specifications, the method and location of Boundary Condition interfaces of the WORK and the work provided by Other Contractor(s).



**SCHEDULE "B"**                                    **CONTRACT NO. 65004/00**

4.12.1.2    Provide matrices of responsibilities which shall clearly specify the scope of CONTRACTOR WORK at all Boundary Condition interfaces along with all Other Contractor(s) work at these junctions.

4.12.1.3    Provide an Instrument Data Base that shall include all data on all CONTRACTOR-provided instruments specified on P&ID's. This Data Base shall be kept current at all times and transmitted weekly, via express mail service, to Other Contractors as determined by PAS Integrator Contractor and SAUDI ARAMCO.

4.12.1.4    Maintain the SAUDI ARAMCO-supplied Boundary Condition Data Base. This Data Base shall be kept current at all times and transmitted weekly, via express mail service, to Other Contractors as determined by PAS Integrator Contractor and SAUDI ARAMCO.

4.12.1.5    Evaluate the weekly Boundary Condition Data Base update supplied by Other Contractors to identify and determine the nature and magnitude of the impact of changes reported therein.

4.12.1.6    Maintain the SAUDI ARAMCO-supplied Equipment Utility Summary Data Base. This Data Base shall be kept current at all times and transmitted weekly, via express mail service, to Other Contractors as determined by SAUDI ARAMCO.

4.12.1.7    Evaluate the weekly Equipment Utility Summary Data Base update supplied by Other Contractors to identify and determine the nature and magnitude of the impact of changes reported therein.

4.13    **QA/QC Activities**

CONTRACTOR's QA/QC Supervisor shall sign all invoices for payment attesting that all required Quality Control activities and documentation have been completed in accordance with all applicable contract provisions for the WORK being invoiced.

4.14    **Constructability Program**

4.14.1    CONTRACTOR shall furnish experienced construction personnel in the engineering and design office to provide input to, coordination and documentation of a constructability program. CONTRACTOR shall identify one experienced person on its project team to be responsible for managing the constructability program. This individual shall be assigned to this task until the Scheduled Completion Date.

FROM                                    (FRI) 5. 31' 02  5:17/ST. 4:57/NO. 4261977542 P 70

SCHEDULE "B"                                      CONTRACT NO. 6S004/00

4.14.2  CONTRACTOR shall develop and submit for SAUDI ARAMCO comment, prior to implementation, a project specific constructability program. The minimum requirements for this program are:

    4.14.2.1  Development of the construction execution plan for integration into the WEPP.

    4.14.2.2  Identification of major or special construction methods for incorporation into the WEPP.

    4.14.2.3  Development of construction logic and activity durations in order to achieve a construction driven schedule.

    4.14.2.4  Development of a logistics plan for the WORK.

    4.14.2.5  Development of a comprehensive interface plan with Other Contractors working in adjacent sites.

4.14.3  Following implementation of the constructability program, CONTRACTOR shall maintain an accurate log which lists constructability issues that have been considered, benefits derived, and schedule impacts. CONTRACTOR shall issue monthly constructability reports to SAUDI ARAMCO.

## 5.0  LIST OF REFERENCED DOCUMENTS

The following documents are by this reference incorporated into and made part of this Schedule "B":

5.1  FACILITIES Specifications - (IFP Package Volume II)

    5.1.1  Book 1 -  Firewater System
                      Sanitary Sewers System
                      Raw Water System
                      Drinking Water System
                      North Flare

    5.1.2  Book 2 -  Cooling Water System

    5.1.3  Book 3 -  Desalination

    5.1.4  Book 4 -  High Pressure Boilers

    5.1.5  Book 5 -  Fuel Gas System
                      Caustic System
                      Nitrogen System
                      Medium Voltage Power Distribution



A99

SCHEDULE "B"                                    CONTRACT NO. 65004/00

      5.1.6   Book 6  -   Air Compressors

      5.1.7   Book 7  -   Blending, Storage and Transfer

      5.1.8   Book 8  -   Interconnecting Pipeways
                    Plant Modifications

      5.1.9   Book 9  -   Existing Plant Tie-Ins

      5.1.10  Book 10 -   Common Information

   5.2   Administrative and Construction Specifications - (IFP Package Volume III)

      5.2.1   Administrative Specifications
      5.2.2   Construction Specifications

   5.3   SAUDI ARAMCO Standards and Specifications - (IFP Package Volume IV)

      5.3.1   SAUDI ARAMCO Standards on Computer
      5.3.2   SAUDI ARAMCO Standards and Specifications
      5.3.3   SAUDI ARAMCO Material System (SAMS) General Catalog
      5.3.4   SAUDI ARAMCO Standard Drawings
      5.3.5   SAUDI ARAMCO General Instructions
      5.3.6   SAUDI ARAMCO Refinery Instruction Manuals
      5.3.7   SAUDI ARAMCO Terminal Instruction Manuals

6.0   MILESTONE DATES

   6.1   Critical Milestone Dates:

| ACTIVITY | DATE REQUIRED |
|---|---|
| 6.1.1   WORK Schedule | Notice to Proceed (NTP)+30 Days |
| 6.1.2   Waste Management | NTP+30 Days |
| 6.1.3   Contingency Pollution Plan | NTP+30 Days |
| 6.1.4   Confidential Information Plan | NTP+30 Days |
| 6.1.5   Ancillary Site Facility Plan | NTP+30 Days |



SCHEDULE "B"                                          CONTRACT NO. 65004/00

| ACTIVITY | DATE REQUIRED |
|---|---|
| 6.1.6   Procurement Plan | NTP+30 Days |
| 6.1.7   WEPP | NTP+ 60 Days |
| 6.1.8   QA/QC Manual and Plan | NTP+ 60 Days |
| 6.1.9   Precommissioning Plan | No less than 90 Days before any precommissioning activities take place |
| 6.1.10  Place Desalination Unit Purchase Order | NTP+187 Days |
| 6.1.11  IFC Drawings Complete for SACH Structural Steel | NTP+353 Days |
| 6.1.12  IFC Drawings Complete for Piling and Foundations | NTP+506 Days |
| 6.1.13  IFC Drawings Complete for I/C Pipeway | NTP+686 Days |
| 6.1.14  Mechanical Completion | |
| 6.1.14.1   Caustic System | NTP+  834 Days |
| 6.1.14.2   South Air Compressors | NTP+  950 Days |
| 6.1.14.3   Firewater | NTP+ 1,097 Days |
| 6.1.14.4   Medium Voltage Power Distribution | NTP+ 1,116 Days |
| 6.1.14.5   Plant 15 Modification | NTP+ 1,134 Days |
| 6.1.14.6   I/C Pipeway | NTP+ 1,140 Days |
| 6.1.14.7   Nitrogen | NTP+ 1,140 Days |
| 6.1.14.8   Fuel Gas | NTP+ 1,169 Days |

**SCHEDULE "B"**                                           **CONTRACT NO. 65004/00**

| ACTIVITY | DATE REQUIRED |
|---|---|
| 6.1.14.9   Sanitary Sewer | NTP+ 1,169 Days |
| 6.1.14.10  Blending Storage and Transfer | NTP+ 1,169 Days |
| 6.1.14.11  Cooling Water | NTP+ 1,183 Days |
| 6.1.14.12  Flare System | NTP+ 1,195 Days |
| 6.1.14.13  Desalination Plants | NTP+ 1,212 Days |
| 6.1.14.14  North Air Compressors | NTP+ 1,222 Days |
| 6.1.14.15  H.P. Boilers | |
|     6.1.14.15.1    No. 1 | NTP+ 1,240 Days |
|     6.1.14.15.2    No. 2 | NTP+ 1,267 Days |
| 6.1.15  Project Record Books | NTP+1326 Days |

6.2    <u>Inter-Contract Milestone Dates:</u>

| | |
|---|---|
| 6.2.1  Interdependency Schedule | (45 days after effective date of Contract) |
| 6.2.2  Boundary Condition Database Issued For Design | NTP+180 Days |
| 6.2.3  Underground Cable and Utility Routing Plans-IFC | NTP+294 Days |
| 6.2.4  Logic Diagrams With Narratives-IFC | NTP+335 Days |
| 6.2.5  P&ID's-IFC | NTP+361 Days |
| 6.2.6  PIB Civil Design and Layout-IFC | NTP+413 Days |
| 6.2.7  Electrical Single Lines - IFC | NTP+442 Days |
| 6.2.8  Instrument Database (Final) | NTP+454 Days |
| 6.2.9  Duct Banks Complete, ready for PAS Communications Cable | NTP+675 Days |
| 6.2.10  PIB Construction Complete, ready for PAS Equipment | NTP+751 Days |

<div align="center">B-23</div>



FROM                                        (FRI) 5. 31' 02  5:18/ST.  4:57/NO. 4261977542 P 74

SCHEDULE "B"                                        CONTRACT NO. 6S004/00

| ACTIVITY | DATE REQUIRED |
|---|---|
| 6.2.11  13.8KV Cable to NHT/CCR | NTP+861 Days |
| 6.2.12  Boundary Piping ready for Tie-in | NTP+897 Days |
| 6.2.13  Field Cable Installed/Terminated/Checked | (60 days prior to start of commissioning) |

## 7.0    SAUDI ARAMCO DELIVERABLE DATES

7.1    SAUDI ARAMCO shall transfer the following deliverables to the CONTRACTOR on the dates indicated:

| DELIVERABLE | TRANSFER DATES |
|---|---|
| 7.1.1    Utility Requirements | NTP+204 Days |
| 7.1.2    Analyzer Shelter Size & Utilities Loads | NTP+216 Days |
| 7.1.3    PIB Grounding/UPS/HVAC Requirements | NTP+219 Days |
| 7.1.4    Hardened Work Station and Communication Cable Design Requirements | NTP+243 Days |
| 7.1.5    P&ID's with PAS Subsystem Representation | NTP+276 Days |
| 7.1.6    RTU and Communication Cable Design Requirements | NTP+281 Days |
| 7.1.7    Marshalling Cabinet and PIB Cable Tray Design | |
|     7.1.7.1    Others | NTP+549 Days |
|     7.1.7.2    Blending, Storage and Transfer | NTP+600 Days |

7.2    SAUDI ARAMCO shall provide the following facilities to the CONTRACTOR on the dates indicated:



| <u>FACILITY</u> | <u>DATE</u> |
|---|---|
| 7.2.1   PAS Equipment Ready for Field Side Termination | 120 days prior to Mechanical Completion |
| 7.2.2   High Lift Pump House Area Available for Demolition | NTP+279 Days |

8.0    <u>CONTRACTOR DELIVERABLES</u>

CONTRACTOR shall prepare and submit the documents listed below to the Company Representative, in addition to other documentation required by this Contract.  The delivery dates for these documents shall be as specified in this Schedule "B", Paragraph 6.1.15.

8.1   All project drawings including as-built drawings, both a signed original and a magnetic tape of all 2D CADD drawing files.

8.2   Project Record Books (electronic file and 3 hard copies).

<u>END OF SCHEDULE "B"</u>

B-25



A104

3.3.3   oversized equipment
3.3.4   special fabrication items
3.3.5   vessels
3.3.6   heavy lift items
3.3.7   heavy lift equipment

## 4.0   PROCUREMENT CORRESPONDENCE

All correspondence, specifications, drawings, data on spare parts and special tools, or other papers pertaining to procurement shall bear the following references:

4.1   Name of FACILITIES and location
4.2   Symbol or code of FACILITIES
4.3   Equipment plant tag numbers, if any
4.4   SAUDI ARAMCO Contract number
4.5   Quotation request or purchase order number

## 5.0   SHIPPING AND HANDLING

5.1   CONTRACTOR shall be responsible for shipping, export customs duties, storage and care and protection of materials to be imported into Saudi Arabia. CONTRACTOR shall be responsible for clearing the material through Saudi Arabia Customs, offloading, inspection on receipt, delivery to the WORK Site, and care and protection of material in Saudi Arabia until Project Completion.

5.2   CONTRACTOR shall arrange for all in-Kingdom heavy lifts including all coordination activities with Saudi Arab traffic authorities and SCECO. CONTRACTOR shall provide equipment necessary to offload at the port, transport to WORK Site, offload and position the equipment at WORK Site.


### END OF ATTACHMENT II

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

CONTRACT NO. 65004/00

## SCHEDULE "G"

## ATTACHMENT III

### SPARE PARTS FOR PARENT EQUIPMENT

**1.0    DEFINITIONS**

   1.1    "Parent Equipment" is any equipment to be permanently incorporated into the FACILITIES that may require parts replacement.

   1.2    "Original Equipment Manufacturer (OEM)" is the primary manufacturer/assembler of the parent equipment, with the parent equipment bearing that manufacturer/assembler's name, model number and serial number.

   1.3    "Start-Up Spare Parts" are spare parts or components which may be required during construction and commissioning until the FACILITY is accepted by SAUDI ARAMCO.

   1.4    "Operating Spare Parts" are spare parts or components which may be required for continuous operation of the plant, equipment, or system, and which may be subject to:

      1.4.1    Wear, corrosion or erosion during normal operation;

      1.4.2    Failure which could cause shutdown of the equipment; or

      1.4.3    Damage during routine maintenance or inspection of the equipment.

   1.5    "Capital Spare Parts" are those major replacement parts or complete units essential to continuous operation when long delivery or manufacturing economy is a significant factor. These Capital Spare Parts are subject to Start-up and Operating Spare Parts support the same as Parent Equipment.

G-III-1

MP-IK-LSTK     11/92
OFF-IK-LSPB
MP-IK-LSPB

**2.0  SPARE PARTS COORDINATOR**

Within 30 days of the effective date of this Contract, CONTRACTOR shall appoint a Spare Parts Coordinator who shall ensure the development and implementation of all spare parts procurement procedures.

**3.0  SPARE PARTS PROCUREMENT PLAN**

Within 60 days of the effective date of this Contract, CONTRACTOR shall prepare and submit for SAUDI ARAMCO review a Spare Parts Procurement Plan. This plan shall establish procedures to satisfy the requirements of this Attachment III to Schedule "G".

**4.0  START-UP SPARE PARTS**

CONTRACTOR shall provide the Start-Up Spare Parts associated with all CONTRACTOR-furnished equipment and specifically identified SAUDI ARAMCO-furnished Parent Equipment.

**5.0  CAPITAL SPARE PARTS**

CONTRACTOR shall supply the Capital Spare Parts listed in Exhibit I concurrently with the procurement of Parent Equipment. Prior to issuing purchase orders, CONTRACTOR shall identify and recommend to SAUDI ARAMCO additional requirements for Capital Spare Parts not identified in Exhibit I, including long lead time, machined, molded or cast parts which can best be supplied when included in the manufacturing schedule of the Parent Equipment, their quoted material price and any other information required for their justification. If SAUDI ARAMCO determines that additional Capital Spare Parts are necessary, a Change Order will be issued.

**6.0  PROCUREMENT ASSISTANCE FOR OPERATING SPARE PARTS**

6.1  SAUDI ARAMCO shall purchase and ship all Operating Spare Parts for all CONTRACTOR-furnished and SAUDI ARAMCO-furnished Parent Equipment or Capital Spare Parts.

6.2  CONTRACTOR shall provide procurement assistance, including, but not limited to, coordinating with all vendors and sub-vendors as necessary to ensure all Operating Spare Parts data requirements have been met for all Parent Equipment. In all appropriate Parent Equipment quotation requests and purchase orders, CONTRACTOR shall include all requirements for Original Equipment Manufacturer's Spare Parts Data Packages as specified by Exhibit II.

MP-IK-LSTK   11/92
OFF-IK-LSPB
MP-IK-LSPB

6.2.1   For non-engineered equipment (existing designed assemblies, components or equipment), CONTRACTOR shall submit to SAUDI ARAMCO three original sets of the Original Equipment Manufacturer's spare parts data package within forty-five days of vendor's receipt of CONTRACTOR's Parent Equipment order.

6.2.2   For engineered equipment CONTRACTOR shall submit to SAUDI ARAMCO three original sets of the Original Equipment Manufacturer's spare parts data package, including vendor's and all sub-vendors' packages, concurrent with receipt by CONTRACTOR of vendor's CONTRACTOR-approved certified drawings for the Parent Equipment.

6.2.3   For purposes of establishing Contract payments pursuant to Schedule "C," procurement of any Parent Equipment item shall not be considered complete unless CONTRACTOR has submitted, and SAUDI ARAMCO has approved, the associated documentation indicated in Paragraphs 6.2.1 and 6.2.2.

7.0   **MAINTAINING A PARENT EQUIPMENT PURCHASE ORDER AND SPARE PARTS DATA CONTROL LOG**

7.1   For all Parent Equipment, CONTRACTOR shall maintain a Parent Equipment Purchase Order and Spare Parts Data Control Log. This log shall be in a format acceptable to SAUDI ARAMCO and shall contain at least the following information:

7.1.1   Budget item number

7.1.2   Job order number

7.1.3   Engineering plant/item number (tag number)

7.1.4   Accounting plant number (when assigned)

7.1.5   Original Equipment Manufacturer information, including: Full name, address, and contact name, position or title, address, telephone number, and FAX/telex number

7.1.5.1   Name of equipment, subassembly, or component
7.1.5.2   Model/type number and part number, if any
7.1.5.3   Function/service
7.1.5.4   Speed/rating/capacity/etc.

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

7.1.5.5  Serial number, if available
7.1.5.6  Vendor/SAUDI ARAMCO drawing number, if any
7.1.5.7  Manufacturer's job/shop order number, if any

7.1.6  Information for equipment, subassemblies, and subassembly components, if not provided by Original Equipment Manufacturer, including:

7.1.6.1  Name of equipment, subassembly, or component
7.1.6.2  Manufacturer's name and address
7.1.6.3  Model/type number and part number, if any
7.1.6.4  Function/service
7.1.6.5  Speed/rating/capacity/etc.
7.1.6.6  Serial number, if available
7.1.6.7  Vendor/SAUDI ARAMCO drawing number, if any
7.1.6.8  Manufacturer's job/shop order number, if any

7.1.7  CONTRACTOR's parent equipment purchase requisition/order number.

7.1.8  Date Original Equipment Manufacturer's Spare Parts Package received from vendor.

7.1.9  Date Original Equipment Manufacturer spare parts package delivered to SAUDI ARAMCO.

7.2  This log shall be continuously updated and submitted to SAUDI ARAMCO on a monthly basis. Unpriced copies of new requisitions, change requisitions, purchase orders, and change orders shall be attached to the log submitted to SAUDI ARAMCO.

**END OF ATTACHMENT III**

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

**SCHEDULE "G"**                                    <u>CONTRACT No. 65004/00</u>

## EXHIBIT I, ATTACHMENT III, SCHEDULE "G"

## CAPITAL SPARE PARTS

**UTILITIES**

| Description | Unit | Quantity |
|---|---|---|
| 78-G-73 North Administration Building Sump Pump | EA | 1 |
| Acid Pump for 035-Y-111 Acid Cleaning Equipment | EA | 1 |

## END OF EXHIBIT I

FROM                              (FRI) 5. 31' 02  5:20/ST. 4:57/NO. 4261977542 P 82

CONTRACT NO.  65004/00

EXHIBIT II, ATTACHMENT III, SCHEDULE "G"

INSTRUCTIONS FOR PROVIDING EQUIPMENT MANUFACTURER PARTS DATA TO SAUDI ARAMCO

1.0    GENERAL INFORMATION

The parent equipment, for which this order is or will be placed, will be installed in facilities owned and operated by Saudi Arabian Oil Company ("SAUDI ARAMCO"). Upon being selected as a successful bidder, the vendor/seller is obligated to provide SAUDI ARAMCO an original equipment manufacturer spare parts data package containing full and complete spare parts information for each item of equipment to be supplied. All information and drawings must be in the English language.

For non-engineered equipment, data must be made available within 45 calendar days of the vendor's/seller's receipt of the purchase order. For engineered equipment, data must be made available within 45 calendar days of approved drawings.

For skid-mounted parent equipment or parent equipment assembled from equipment provided by other manufacturers, a separate spare parts data package must be provided for each manufacturer.

The cost of the original equipment manufacturer spare parts data packages is to be included in the cost of the parent equipment.

2.0    REQUIRED INFORMATION

The vendor/seller must provide SAUDI ARAMCO 3 sets of original equipment manufacturer spare parts' data for each equipment item. Data must consist of original, machine-printed documents. Photocopies or handwritten documents are not acceptable.

2.1    Each spare parts' data package will be identified by:

2.1.1    Original equipment manufacturer name and address, including contact name, telephone number, and fax number.

EX-II-1

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

A111

2.1.2    Original equipment manufacturer sales order and line item numbers.

2.1.3    SAUDI ARAMCO or SAUDI ARAMCO contractor purchase order and line item numbers.

2.1.4    Original equipment manufacturer model/type number.

2.1.5    Equipment serial number(s).

2.2    Each spare parts data package must include:

2.2.1    The parts lists, or bills of material showing an original equipment manufacturer part-identification number for each reorderable part, component, and assembly for the equipment.

   2.2.1.1    The part-identification number must be the same as that used by the original equipment manufacturer's spare parts reordering function.

   2.2.1.2    If a part-identification number is not available, data must be provided which explains how to reorder each part (for example, descriptive data including material specifications and equipment serial numbers).

   2.2.1.3    The contents of kits and sets must be fully detailed, including the quantity and part-identification number for each enclosed part.

   2.2.1.4    The part-identification number must be either the same as that used by the original equipment manufacturer or, if obsolete or superseded, the new part number assigned which has a form, fit and function interchangeable with the original.

2.2.2    The true manufacturer's name, part-identification number, and description for parts which are not manufactured or modified by the original equipment manufacturer. Such parts include, but are not limited to, bearings, O-rings, lamps, switches, resistors, diodes, etc.

EX-II-2

MP-IK-LSTK   11/92
OFF-IK-LSPB
MP-IK-LSPB

A112

2.2.3   All other information, including data sheets, engineering dra-
wings, manufacturer's catalogs, and operating and maintenance
manuals required to identify the function of, and fully describe all
parts associated with the equipment.

2.2.4   The identification of spare parts that can, when worn, be repaired
or refurbished to reusable condition.

2.2.5   The installed quantity of each part per equipment unit and, if
available, expected life expectancy in normal operation.

2.2.6   The unit price of each part, kit, assembly, or component.

2.2.7   A list and description of special tools and material required for
maintenance, repair, and operation of the equipment.

3.0   **NONCOMPLIANCE**

Noncompliance with these instructions will result in the withholding of payment
to the vendor/seller and will affect the vendor/seller/original equipment manu-
facturer's consideration on other parent equipment quotations and evaluations
until these requirements are met to the satisfaction of SAUDI ARAMCO.

EX-II-3

MP-IK-LSTK   11/92
OFF-IK-LSPB
MP-IK-LSPB

A113

CONTRACT NO. 65004/00

## SCHEDULE "G"-

## ATTACHMENT IV-MATERIALS STANDARDIZATION LIST

I.  Rotating Equipment

| | | |
|---|---|---|
| **A.** | **Drivers** | **Selected Vendor List** |
| 1. | NEMA Frame Electric Motors up to 200 HP | GE, Siemens, Reliance, Louis Allis |
| 2. | Electric Motors Greater than 200 HP | GE, Westinghouse, Siemens, Louis Allis, GEC, Brush |
| 3. | Electric Motors - Synchronous Greater than 1000 HP | GE, Dresser Rand (Elec. Mach.), Siemens, Louis Allis |
| 4. | Steam Turbines - General Purpose to 1340 HP | Elliott, Dresser-Rand, Coppus Murray |
| 5. | Steam Turbines - Special Purpose over 1340 HP | Elliott, Dresser-Rand, Imo-Delaval |
| **B.** | **Pumps** | **Selected Vendor List** |
| 1. | ANSI B73.1M and B73.2M | Goulds, Ingersoll-Dresser, LaBour, Peerless |
| 2. | Vertical Volute Sump | Goulds, Ingersoll-Dresser, Begemann |
| 3. | Vertical Turbine | Ingersoll-Dresser, Johnston, Sulzer, Goulds |
| 4. | Vertical Can (Tank Farm) | Goulds, Ingersoll-Dresser, Johnston, BW/IP |
| 5. | 31-SAMSS-004 Horiz End Suctn/Split Case-API Process | Goulds, Ingersoll-Dresser, BW/IP |
| 6. | 31-SAMSS-004 Axial Split/Radial Split Multistage | Ingersoll-Dresser, Sulzer-Bingham, BW/IP |
| 7. | 31-SAMSS-004 Radially Split, Single Stage between brgs | Ingersoll-Dresser, Sulzer-Bingham, BW/IP, Weir |
| 8. | 31-SAMSS-009 Controlled Volume (Metering) | Bran & Luebbe, Milton Roy |
| 9. | Positive Displacement Rotary, Screw Type (lube oil service) | Allweiler, IMO, Bornemann |

G-IV-1

A114

CONTRACT NO. 65004/00

## SCHEDULE "G"

## ATTACHMENT IV-MATERIALS STANDARDIZATION LIST

**C.**   Compressors                                    **Selected Vendor List**

   1.   Centrifugal Process                        Elliott, Dresser-Rand, IMO-Delaval,
                                             Nuovo Pignone, Sulzer

   2.   Centrifugal Plant Air                      Elliott, Joy, ATLAS COPCO

   3.   Reciprocating Process up to 1000 HP        Dresser-Rand, Cooper, Thomassen,
                                             Nuovo Pignone

   4.   Reciprocating Process over 1000 HP (inc.   Dresser-Rand, Cooper, Thomassen,
      driver & skid)                             Nuovo Pignone

   5.   Blowers up to 5000 HP                      Dresser-Rand, Elliott, Buffalo Forge,
                                             MAN/GHH

**D.**   Miscellaneous Items                            **Selected Vendor List**

   1.   Pump Mechanical Seals                      BW/IP, John Crane, Sealol

   2.   Dry Gas Seals                              John Crane, Burgman, Sealol

   3.   Couplings                                  Lucas, Koppers, Thomas,
                                             Metastream

   4.   Governors, Electronic                      Woodward, Tri-Sen

   5.   Governors, Mechanical                      Woodward



FROM                                      (FRI) 5. 31' 02  5:21/ST. 4:57/NO. 4261977542 P 87

CONTRACT NO. 65004/00

SCHEDULE "G"

ATTACHMENT IV-MATERIALS STANDARDIZATION LIST

II.   Valves

    A.   Safety Relief Valves                    **Selected Vendor List**

        1.  Pilot Type                           Crosby, Dresser Consolidated, Anderson Greenwood

        2.  Flanged Conventional and Balanced      Crosby, Dresser Consolidated, Anderson Greenwood

        3.  Pressure Vacuum Vent            L&J Technologies, Groth, Varec/ Whessoe

    B.   Control Valves                     Fisher, Masoneilan, Valtek, CCI (for severe service)

    C.   Valve Actuators

        1.  Electric: MOVs                   Rotork, Limitorque

        2.  Pneumatic: ZVs                Bettis, Rotork

    D.   Isolation Valves for MOVs        **Selected Vendor List**

        1.  Ball Valves:

             •Utility Service (air water)         •Nibco, Watts, Apollo
             •General Hydrocarbon under 400 F  •Grove, TK, Borsig, Neles-Jamesbury
             •High Performance service over 400 F  •Neles OY, TK(UK only),Grove Italia

        2.  Butterfly Valves:

             •Utility Service (air water)         •WKM, Centerline, Keystone
             •High Performance              •Fisher (Posi-seal), Neles-Jamesbury, Vanessa

        3.  Special Type: (zero leakage, dbl, block &   Orbit Valve, General Valve Co, Daniel, bleed, diverter, intrinsically           Borsig Mokveld, Mannesman dampened/non-slam/check)

A116

CONTRACT NO. 65004/00

SCHEDULE "G"

ATTACHMENT IV-MATERIALS STANDARDIZATION LIST

III. Exchangers

|   |   |   | Selected Vendor List |
|---|---|---|---|
| A. | 1. | Air Cooled Heat Exchangers | Hudson USA, Hudson Italani, GEA (Germany), Belleli Saudi (carbon steel only up to 300 psi design press) |
| B. | 2. | Exchanger Bundles (Type AET & AEU) | Hughes Anderson, Hudson/FMB(Italy), Hitachi, Slagle, Shell and Tube Inc., Belleli Saudi (carbon steel only up to 300 psi design press) |

IV. Electrical

A. Switchgear                                    Selected Vendor List

    1.  230 KV Breakers                        ABB, Siemens, Hitachi

    2.  13.8 KV SF6 Compact Breakers           ABB, Siemens, G & W

    3.  13.8, 4.16 KV & 480 V Switchgear       ABB, Siemens, GE, Westinghouse

B. Transformers                                  Selected Vendor List

    1.  230 KV - 13.8 KV Power Transformers    GE, McGraw Edison, ABB, Brush

    2.  13.8 KV - 4.16 KV Transformers         GE, ABB, Brush

    3.  13.8 KV - 0.48 KV Transformers         GE, ABB, Brush

A117

CONTRACT NO. 65004/00

## SCHEDULE "G"

## ATTACHMENT IV-MATERIALS STANDARDIZATION LIST

| C. | Motor Control Centres (line ups) | **Selected Vendor List** |
|---|---|---|
| | 1.  4.16 KV MCCs | ABB, GE, Westinghouse, Siemens |
| | 2.  480 V MCCs | ABB, GE, Westinghouse, Siemens |
| D. | Uninterruptable Power Supply (UPS) | **Cyberex** |

V.  Analyzers                                    **Selected Vendor List**

| | 1.  Gas Chromatographs | ABB/Process Analytics, Applied Automation |
|---|---|---|
| | 2.  Oxygen, CO, $CO_2$ | Rosemont, Teledyne, Servomax |
| | 3.  $SO_2$ | Western Research, Teledyne Analytical |
| | 4.  Ph | Teledyne Analytical, Rosemont |
| | 5.  Moisture Analyzers | Panametrics, Rosemont, Amtek |
| | 6.  Viscosity | Dynatrol, Brookfield, Rotork (Fluid Data Analyzers) |
| | 7.  Octane Monitor, V/L | Core, Lbs, TL Industries, Bran & Luebee |
| | 8.  RVP, Distillation | Precision Scientific, ABB, Process Analytics, Fluid Data |
| | 9.  $H_2S$ | General Monitors, Bacharach |

VI.  Instrumentation                              **Selected Vendor List**

| | 1.  Gas Detectors | General Monitors |
|---|---|---|

## END OF ATTACHMENT IV

G-IV-5

<u>CONTRACT NO. 65004/00</u>

<u>SCHEDULE "H"</u>

<u>SPECIAL TERMS AND CONDITIONS</u>

Should the special terms and conditions set forth below conflict with any terms and conditions of another Schedule to this Contract, the special terms and conditions contained herein shall control.

1.  <u>Change Order Progress Payment</u>

Notwithstanding Paragraph 2.4 of Schedule "C", which provides that WORK performed or deleted pursuant to a Change Order shall be paid upon completion, SAUDI ARAMCO shall have the right to elect that the Change Order Price be paid on a progress or milestone basis by referencing one of the following sub-paragraphs on the Change Order, provided that the Change Order Price exceeds $500,000 and the Change will take more than six (6) months to complete:

1.1  CONTRACTOR shall separately invoice SAUDI ARAMCO for the portion of the Change Order Price allocated to the milestone events specified on an attachment to the Change Order upon completion of such events, as certified by the Company Representative. Such invoice shall include the Change Order number, a description of the milestone event and Company Representative's certification that it is complete.

1.2  On or before the tenth day of each Gregorian month during the progress of the Change, CONTRACTOR shall separately invoice SAUDI ARAMCO for a proportionate part of the Change Order attributable to work on such Change completed during the preceding month and not included on previous invoices. CONTRACTOR shall submit a statement with his invoice signed by Company Representative, which in reasonable detail estimates and itemizes the percentage of the Change completed during the preceding month. In case of disagreement, Company Representative's determination as to the percentage of work on the Change completed shall control.

2.  <u>Normal Work Hours</u>

Normal SAUDI ARAMCO CONTRACTOR WORK Site hours are sixty (60) hours per week, ten (10) hours per day, six (6) days per week, Saturday through Thursday, including Ramadhan. If necessary, CONTRACTOR shall propose to SAUDI ARAMCO to work any required additional hours in order to coordinate and schedule the WORK under this Contract with construction activities to be executed by Other Contractor(s). CONTRACTOR shall notify SAUDI ARAMCO one (1) week in advance of any proposed scheduled WORK outside of SAUDI ARAMCO's normal CONTRACTOR working hours as depicted above. SAUDI ARAMCO, at it sole option may issue WORK permits so as to allow CONTRACTOR to perform WORK outside normal working hours.



A119

FROM                              (FRI) 5.31'02  5:21/ST. 4:57/NO. 4261977542 P 91

CONTRACT NO. 65004/00

3.  **Release of Guarantee**

In consideration for award of this Contract, CONTRACTOR has provided SAUDI ARAMCO with a Parent Company Performance Guarantee which CONTRACTOR agrees shall only be released in accordance with its terms.

4.  **Same Meaning**

Wherever the words "Contractor" or "contractor" appear in the drawings, specifications or standards referenced in this Contract, such words shall have the same meaning as does "CONTRACTOR". Wherever the words "Owner" or "owner" or "Saudi Aramco" or "saudi aramco" appear, such words shall have the same meaning as "SAUDI ARAMCO".

5.  **Vendor Obligation**

Wherever this Contract imposes an obligation on any Vendor, such obligation shall be performed by CONTRACTOR.

6.  **Additional Material Requirements**

Further to the provisions of Schedule "G", Paragraph 2.1, CONTRACTOR shall also supply the initial charge of all catalysts, chemicals, lubricants, and any other material required to start-up and commission the FACILITIES.

7.  **Saudi Arab Custom Duty on CONTRACTOR Tools and Equipment**

Add the following new Paragraph 6.5 to Schedule "G".

"6.5    Further to Schedule "G", Paragraph 6.1, CONTRACTOR shall not include in the Contract Price Saudi Arab Customs duties for any CONTRACTOR-supplied tools and equipment to be used in connection with the WORK and then re-exported. If CONTRACTOR re-exports such tools and equipment and is unable to obtain a refund of Saudi Arab Customs duties deposited with Saudi Arab Customs, SAUDI ARAMCO shall promptly reimburse CONTRACTOR for Saudi Arab Customs duties paid by CONTRACTOR on such tools and equipment. CONTRACTOR shall submit its invoice to SAUDI ARAMCO for such reimbursement accompanied with proof that CONTRACTOR has deposited the duties, re-exported the tools and equipment, and failed after a reasonable effort to obtain a refund of deposited duties."



A120

<u>CONTRACT NO. 65004/00</u>

8.  <u>Mechanical Completion</u>

Notwithstanding Paragraph 6.0 of Schedule "B", CONTRACTOR may complete
Mechanical Completion prior to the dates specified therein. SAUDI ARAMCO in any
case is not obligated to issue a MCAN or a partial MCAN for the FACILITIES until 60
days prior to the Mechanical Completion dates listed in Paragraph 6.0 of Schedule "B".
CONTRACTOR shall preserve the FACILITIES in accordance with Paragraph 4.8.1.3 of
Schedule "B".

9.  <u>Reimbursement for Rock Area Excavation</u>

The Lump Sum Contract Price in Schedule "C", Paragraph 1.1 shall include the cost of
all excavation as required in the Scope of Work referred to in Schedule "B" and
documents incorporated into Schedule "B" by reference. Rock area and non-rock area
excavation shall be required as part of the WORK, but the Lump Sum Contract Price is
based on the assumption that all excavation will be in non-rock areas. Rock area
excavation is defined as excavation which cannot be accomplished using a CAT 245
backhoe suitably equipped with a rock bucket sized and operated in accordance with
good construction practice, and which requires removal by other mechanical equipment.
Any rock area excavation shall be subject to additional payment as described hereinafter.
For calculation purposes, the depth of the excavation and width at bottom of the
excavation shall be the minimum dimensions as defined by the SAUDI ARAMCO
Engineering Standards or applicable Schedule "B" reference document.

The sides of the excavation shall be established by vertical lines extending from the
extremities of the aforementioned excavation bottom to the existing grade. Rock area
excavation within these confines shall be used in the calculation of the total volume of
rock area excavated. Any excavation, for whatever purpose, outside of these dimensions
shall be at CONTRACTOR's expense. Additional payment for rock area excavation shall
be the difference between the applicable non-rock area work unit rates for excavation by
hand (pay item 1.1.1) or excavation by machine (pay item 1.1.2) in comparison to the
rock area work unit rates for excavation by hand (pay item 1.2.1) or excavation by
machine (pay item 1.2.2) as set forth in Schedule "C", Attachment III, Exhibit V,
multiplied by the quantity of rock area calculated in accordance with the definition stated
herein. The calculated amounts shall be recorded on quantity sheets signed by both
CONTRACTOR and Company Representative. The amount of such payments shall be
identified as additional attachments to the monthly invoices and each such payment shall
be identified as to locality. In case of disagreement, Company Representative's
determination on the quantity of rock area excavation shall control.

H-3



CONTRACT NO. 65004/00

10.   Material Indemnity - Perils of War-Middle East

SAUDI ARAMCO assumes liability for and shall indemnify and hold CONTRACTOR harmless against loss of, damage to, or destruction of the FACILITIES, materials incorporated into the FACILITIES and materials to be incorporated into the FACILITIES (all of which are collectively referred to hereafter as "Construction Materials") to the extent such loss, destruction or damage is not recoverable under the CONTRACTOR's or its subcontractors' insurance coverage, if such loss, damage or destruction occurs in the Middle East and is directly or indirectly caused by or results from: war; invasion; acts of foreign enemies; hostilities (whether war be declared or not); military or usurped power; or confiscation, nationalization, requisition or destruction of or damage to the Construction Materials by or under the order of any government or public or local authority. In the event of a claim under this Paragraph, settlement shall be based on the cost of repair or replacement, whichever is less, of the Construction Materials lost, damaged or destroyed with Construction Materials of like kind and quality (meaning alternative or substitute by equivalent as distinguished from reproduction or identical) without deduction for depreciation, but not exceeding the actual expenditure for repair of replacement. If repair or replacement is not made within two years from the date of loss, damage or destruction, the value of such Construction Materials shall be the actual cash value at the time and place of loss. Any settlement under this Paragraph shall include reductions for any amounts previously paid for Construction Materials. Construction Materials shall be considered to be lost if confiscation, nationalization, or requisition exceeds twelve (12) continuous months.

11.   Calendar Dates

Wherever a fixed calendar date appears in Schedule "G", Attachment I, that date ("the Original Date"), shall be revised to an earlier date ("the Revised Date"). The Revised Date shall be earlier than the Original Date by the same number of days earlier than 26 July 1994 by which SAUDI ARAMCO issues the Notice to Proceed.

12.   CONTRACTOR shall comply with the REFERENCE FOR SAUDI MANUFACTURERS provisions detailed in Schedule "G", Paragraph 4.0 for materials which appear in the Materials Standardization List in Attachment IV to Schedule "G".

END OF SCHEDULE "H"

H-4



CONTRACT NO. 65004/00

## SCHEDULE "C"

## CONTRACT PRICE AND PAYMENT PROVISIONS

1. **CONTRACT PRICE**

1.1   As full and complete compensation for CONTRACTOR's performance of the WORK and all of CONTRACTOR's obligations hereunder in accordance with the terms and conditions of this Contract, SAUDI ARAMCO shall pay CONTRACTOR a lump sum Contract Price of One Hundred Fifteen Million One Hundred Thirty One Thousand and Four Hundred and Twenty one US Dollars (US$ 115,131,421).

1.2   Except as otherwise provided hereinbelow, the Contract Price constitutes the entire compensation due CONTRACTOR for the WORK and all of CONTRACTOR's obligations hereunder and includes, but is not limited to, compensation for any Government-caused cost increases imposed at any time, all applicable taxes, duties, fees, overheads, profit, mobilization and demobilization, and all other direct and indirect costs and expenses incurred or to be incurred by CONTRACTOR hereunder.  The Contract Price covers any overtime premiums and payments.

1.3   The Contract Price and rates in Attachments III are firm for the duration of the Contract and are not subject to escalation for any reason.  No adjustments in the Contract Price or rates in Attachments III shall be made as a result of changes in the relative value of any currency.  The Contract Price shown in Paragraph 1.1 represents the sum of the individual lump sum prices for those categories shown in Attachment I as detailed below:

1.3.1   An amount to compensate CONTRACTOR for all costs, overhead and profit relating to design and engineering services for the FACILITIES ("Design Price").

1.3.2   An amount to compensate CONTRACTOR for all costs, overhead and profit relating to purchase of materials, services for material procurement, and all transportation necessary to deliver required materials to the WORK Site in Saudi Arabia ("Material Price"). The Material Price is allocated to major equipment and bulk material items as set forth in Attachment I.

1.3.3   An amount to compensate CONTRACTOR for all costs, overhead and profit relating to construction of the FACILITIES ("Construction Price").

C-1



A123

1.4    The Contract Price and rates in Attachments III shall be adjusted only by an Amendment. Compensation for Changes and any adjustment in the Contract Price shall also be broken down in the format set forth in Attachment I.

2.    <u>COMPENSATION FOR CHANGES AND OTHER ADJUSTMENTS</u>

2.1    Compensation or credit for Changes pursuant to Paragraph 10 of Schedule "A", compensation for start-up and commissioning assistance pursuant to Paragraph 9.6 of Schedule "A", compensation for standby time pursuant to Paragraph 15 of Schedule "A", material compensation adjustments pursuant to Schedule "G" and compensation for incidental costs pursuant to Paragraph 2.8 below do not constitute adjustments to the Contract Price.

2.2    The compensation due CONTRACTOR or the credit due SAUDI ARAMCO for Changes shall be established on one or more of the following bases at SAUDI ARAMCO's option:

2.2.1    Lump Sum basis.

2.2.2    Time Unit Rate basis as set forth in Attachment III, Exhibits I, II, III and IV of this Schedule.

2.2.3    Work Unit Rate basis as set forth in Attachment III, Exhibit V of this Schedule.

Once established, the amount of the compensation due CONTRACTOR or credit due SAUDI ARAMCO for a Change shall not be subject to adjustment for any reason including changes in the value of any currency.

2.3    With respect to WORK performed pursuant to Paragraph 2.2.2, on each scheduled working day, not later than 10:00 a.m., CONTRACTOR shall submit to Company Representative, in duplicate, detailed time sheets listing the categories and amounts of labor and equipment for which Change Order compensation is to be charged for the previous work day. CONTRACTOR shall commence submission of such time sheets immediately upon commencement of the Change Order WORK and continue to submit them until completion of the Change Order WORK. Company Representative's signature on the time sheet shall constitute only an attestation of the time periods involved.

2.4    For WORK performed or deleted pursuant to Paragraph 10 of Schedule "A", CONTRACTOR and Company Representative, upon completion or deletion of such WORK, shall prepare and execute appropriate documentation certifying that the WORK is completed or deleted and the compensation or credit due. This documentation shall be processed by SAUDI ARAMCO as an invoice for payment or setoff.



2.5    Pursuant to Paragraph 15 of Schedule "A", CONTRACTOR shall be paid for all SAUDI ARAMCO approved Standby Time at seventy percent (70%) of the rates for CONTRACTOR equipment up to a maximum of eight (8) hours per day and one hundred percent (100%) of the rates for CONTRACTOR personnel up to a maximum of eight (8) hours per day as set forth in Attachment III.

2.6    Requests for standby compensation shall be submitted at the end of standby periods. All such requests shall be supported by daily time sheets as provided in Paragraph 15.4 of Schedule "A".

2.7    With respect to WORK performed pursuant to Paragraph 9.6 of Schedule "A", on each scheduled working day, not later than 10:00 a.m., CONTRACTOR shall submit to Company Representative in duplicate, detailed time sheets listing categories and amounts of labor and equipment for which compensation is to be charged for the previous work day.

CONTRACTOR shall commence submission of such time sheets immediately upon commencement of start-up and commissioning assistance and continue to submit them until the FACILITIES have been successfully operated at the conditions specified in Schedule "B" or six months after Mechanical Completion, whichever comes first. CONTRACTOR shall invoice SAUDI ARAMCO monthly for such WORK supported by applicable time sheets. Company Representative's signature on the time sheet shall constitute only an attestation of the time periods involved.

2.8    SAUDI ARAMCO shall reimburse CONTRACTOR for actual, auditable and verifiable incidental costs as specified in Schedule "B", Paragraph 4.2.4, incurred on SAUDI ARAMCO's behalf provided such costs are not included in the Contract Price or Paragraphs 2.1 or 2.2 above, are incurred pursuant to SAUDI ARAMCO's advance written direction, and do not exceed a cumulative value of $100,000 per calendar year. CONTRACTOR shall invoice SAUDI ARAMCO monthly for such incidental costs with substantiating documentation acceptable to SAUDI ARAMCO.

2.9    After approval of invoices by Company Representative, SAUDI ARAMCO will promptly pay CONTRACTOR one hundred percent (100%) of the amounts certified as due and owing under this Paragraph 2.

3.    **PAYMENT OF CONTRACT PRICE**

3.1    CONTRACTOR shall invoice SAUDI ARAMCO monthly for that portion of the Contract Price composed of Design Price in accordance with Attachment I, Paragraph 1.1 and 2.0. All invoices submitted by CONTRACTOR should state in both words and numbers the net amounts payable. The amounts invoiced for WORK shall be directly proportional to WORK

progress at the end of the invoice period, less amounts previously invoiced. CONTRACTOR shall submit a statement approved by the Company Representative, which in reasonable detail estimates and itemizes the percentage of WORK completed during the preceding month. In case of disagreement, the Company Representative's determination as to the percentage of WORK completed shall control.

3.2    CONTRACTOR shall invoice SAUDI ARAMCO monthly for that portion of the Contract Price composed of the Materials Price detailed in Attachment II as follows:

3.2.1    Sixty percent (60%) of the Material Price allocated to each line item in the Materials Price Tables included in Attachment I, Paragraph 3.0 upon shipment of all material comprising the specific line item, including all its parts, by the supplier(s) thereof to CONTRACTOR, supported by the supplier's invoice and proof of shipment.

3.2.2    Forty percent (40%) of the Material Price allocated to each line item in the Materials Price Tables on final receipt of all material comprising the specific line item, including all its parts and all nonmaterial requirements (NMRs) by the CONTRACTOR at a SAUDI ARAMCO-approved laydown area, upon proof of receipt. NMRs are requirements referenced throughout the Contract for technical drawings, manuals, literature, or data for parent equipment specified in a purchase requisition.

3.3    CONTRACTOR shall invoice SAUDI ARAMCO monthly for that portion of the Contract Price composed of the Construction Price in accordance with Attachment I. The amounts invoiced shall be for the constituent portions of the WORK (as identified in the WORK Breakdown Structure included in Attachment I, Paragraph 4.0) which are one hundred percent (100%) complete at the end of the invoice period, less amounts previously invoiced. All invoices submitted by CONTRACTOR shall state in both words and numbers the net amount payable. CONTRACTOR shall submit a statement approved by the Company Representative, which in reasonable detail estimates and itemizes the constituent portions of the WORK completed the preceding month. In case of disagreement, the Company Representative's determination as to the constituent portions of the WORK completed shall control.

3.4    After approval by Company Representative of invoices submitted in accordance with Paragraph 3.1, 3.2 and 3.3, SAUDI ARAMCO will promptly pay CONTRACTOR ninety percent (90%) of the amounts invoiced, provided that the aggregate of sums retained pursuant to this Paragraph shall not at any given time exceed five percent (5%) of the Contract Price. All such payments by SAUDI ARAMCO shall not be construed as acceptance of any part of the WORK. Sums retained pursuant to this Paragraph shall be paid to CONTRACTOR in accordance with Paragraph 3.7.



C-4

3.5   CONTRACTOR shall provide SAUDI ARAMCO with a bank guarantee in the form set forth in Attachment IV from a bank acceptable to SAUDI ARAMCO . SAUDI ARAMCO shall not pay CONTRACTOR's Materials Price invoices unless the current amount of such guarantee certified to SAUDI ARAMCO by the bank is no less than the difference between (1) the total amount invoiced to date pursuant to Paragraph 3.2.1 for major equipment items and bulks material items which remain undelivered to the WORK Site and (2) SAUDI ARAMCO retention on such amount.

3.6   CONTRACTOR shall invoice SAUDI ARAMCO in the currency set forth in Paragraph 1.1 and shall be paid in such currency or, at CONTRACTOR's request and subject to SAUDI ARAMCO's approval, a Contract awarded in Saudi Riyals may be paid in U.S. Dollars. The rate of exchange used by SAUDI ARAMCO to convert Saudi Riyals to U.S. Dollars will be the SAUDI ARAMCO rate of exchange in effect on the date each invoice is processed for payment by SAUDI ARAMCO.

3.7   Following Contract completion and after fulfillment by CONTRACTOR of all of its duties and obligations under this Contract, CONTRACTOR shall furnish SAUDI ARAMCO with:

3.7.1   A final invoice for amounts retained under Paragraph 3.4; and

3.7.2   A Final Release Agreement (SA5715-3) discharging SAUDI ARAMCO from all liabilities, obligations and claims arising out of or under this Contract, except for final payment and any surviving obligations as defined in Schedule "A".

3.7.3   Proof satisfactory to SAUDI ARAMCO that there are no unsatisfied third party claims or other indebtedness existing in connection with the WORK (or if such claims or indebtedness exist, indemnities sufficient to hold SAUDI ARAMCO harmless from any liability connected with said claims or indebtedness); and

3.7.4   A tax clearance certificate as required by Paragraph 3.4 of Schedule "F".

After SAUDI ARAMCO's receipt of the foregoing documents SAUDI ARAMCO shall pay CONTRACTOR's final invoice.

4.   ADDRESS FOR INVOICING AND PLACE OF PAYMENT

4.1   CONTRACTOR's invoices shall be submitted in quadruplicate to:

Assistant Controller
Operations Accounting
Box 5000
Saudi Arabian Oil Company
Dhahran 31311
Saudi Arabia



A127

or such other addressee and location as SAUDI ARAMCO may direct in writing.

4.2    All payments to CONTRACTOR under this Contract shall be made by check at SAUDI ARAMCO's offices or mailed to such place as CONTRACTOR shall request in writing.

5.    ## SAUDI ARAMCO'S AUDIT RIGHTS

CONTRACTOR and its affiliated companies shall maintain, and shall cause their subcontractors to maintain, books, records, correspondence, instructions, plans, drawings, receipts, vouchers, memoranda and other evidence (the foregoing constitute "records" for the purpose of this Paragraph), according to such accounting procedures and practices as are satisfactory to SAUDI ARAMCO, sufficient to accurately and properly reflect costs incurred by CONTRACTOR and invoiced to SAUDI ARAMCO under this Contract (except for compensation payable under Paragraphs 1.1 and 2.2.1, of this Schedule) and the disposition of any material, tools or equipment provided by SAUDI ARAMCO to CONTRACTOR. SAUDI ARAMCO, or any firm of auditors appointed by SAUDI ARAMCO, shall have access, at all reasonable times, to all such records for the purpose of auditing and verifying costs or for any other reasonable purpose, and shall have the right to reproduce any such records. CONTRACTOR shall preserve and make available, and shall cause its affiliated companies and subcontractors to preserve and make available, all such records for a period of two (2) years after Project Completion or termination of this Contract; provided, however, that if any such records are or may be required to resolve any claim or arbitration, or any legal proceeding pursuant to this Contract, the period of retention and the rights of access and examination described in this Paragraph shall continue until final disposition of such claim or arbitration.

6.    ## SETOFF

SAUDI ARAMCO may deduct from amounts which are payable to CONTRACTOR under this Contract any amounts which are payable to SAUDI ARAMCO by CONTRACTOR under this or any other contract between them.

7.    ## TRANSLATION

Because of the technical nature of Attachments I through III, they have not been translated into Arabic. CONTRACTOR and SAUDI ARAMCO agree to be bound by the English text.

### END OF SCHEDULE "C"

C-6

A128

SCHEDULE "C"                                          CONTRACT NO. 65004/00

## SCHEDULE "C"

## ATTACHMENT I

## CONTRACT PRICE BREAKDOWN

### 1.0    SUMMARY OF INDIVIDUAL LUMP SUM PRICES

The Contract Price is composed entirely of the following Lump Sum Prices:

|      |                     |                |
|------|---------------------|----------------|
| 1.1  | Design Price        | $    9,987,170 |
| 1.2  | Material Price      | $   62,079,669 |
| 1.3  | Construction Price* | $   43,064,582 |

**TOTAL CONTRACT PRICE          $  115,131,421**

* CONTRACTOR shall invoice SAUDI ARAMCO for the portions of the Contract Price allocated to individual activities which the Company Representative certifies as 100 percent complete as specified in the following WORK Breakdown Structure (WBS). Prices for WORK not specifically identified in the WBS are included in the specified prices. Activities in the WBS shall be derived from activities in the WORK Schedule required by Schedule "A", Paragraph 8.1.3.

### 2.0    DESIGN WORK BREAKDOWN STRUCTURE

| JOB ORDER | J.O. DESCRIPTION / ACTIVITIES UTILITIES | ACTIVITIES WEIGHTED % WITHIN DESIGN PRICE |
|-----------|------------------------------------------|-------------------------------------------|
|           | I.      Drawings*                        | 80                                        |
|           | II.     Purchase Requisitions**          | 15                                        |
|           | III.    Project Record Books             | 5                                         |
| Total     |                                          | 100                                       |

Physical progress measurement for invoice purposes shall be certified by CONTRACTOR on a monthly basis for the Design Price item set forth in Paragraph 1.1 above.

A129

SCHEDULE "C"                                        CONTRACT NO. 65004/00

• The following criteria shall be used to measure drawing progress:

|  | MAXIMUM PROGRESS CREDIT |
|---|---|
| **DRAWING PRODUCTION** | |
| Initial Drafting:  Layout and design completed and actual line work visible. | 20% |
| Drafting Complete:  Drawing has been completed by Drafting, checked by Chief Draftsman, and issued to Engineering for checking. | 65% |
| Discipline Check:  All engineering disciplines involved have checked drawing. | 80% |
| Drawing is complete, checked and issued for construction (IFC) with no holds indicated. | 100% |

•• Progress payment for this item shall be calculated by dividing the number of Purchase Requisitions placed by the total number of anticipated Purchase Requisitions.

A130

SCHEDULE "C"                                      CONTRACT NO. 65004/00

3.  MATERIALS PRICE TABLES

The Material Price shall be paid based on the following description and weighted
percentages.  Progress payments for the Material Price shown on each line item will not be
paid until all items comprising a specific line item in the Materials Price Tables are shipped
(60% payment) / received at the CONTRACTOR's SAUDI ARAMCO-approved laydown
area (40% payment).  Prices for all Materials/Equipment not specifically identified below
are included in the specified prices.

| JOB ORDER (J.O.) No. | DESCRIPTION | ACTIVITIES WEIGHTED % WITHIN MATERIALS PRICE |
|---|---|---|
| 50172 | AIR COMPRESSORS SOUTH AND NORTH | |
| | Compressor Packages | 0.00 |
| | Dryer Packages | 0.00 |
| | Air Receiver | 0.20 |
| | Plate and Frame Exchangers | 0.18 |
| | Strainers | 0.26 |
| | Tempered Water Drum | 0.12 |
| | Piles | 1.67 |
| | Underground Piping | 0.23 |
| | Above Ground Piping | 1.04 |
| | Structural Steel | 0.58 |
| | Shelter Materials | 0.89 |
| | Pumps and Drivers | 0.83 |
| | Electrical including Switchgear/MCCs | 1.17 |
| | Instrumentation | 1.19 |
| | Misc. Equipment & Materials | 0.64 |
| | SUB-TOTAL | 9 |
| 50174 | BLENDING, STORAGE AND TRANSFER | |
| | Piles | 1.47 |
| | Electrical including Switchgear/MCCs | 0.85 |
| | Underground Piping | 0.76 |
| | Above Ground Piping | 2.82 |
| | Pumps and Drivers | 1.81 |
| | Blenders | 0.15 |
| | Instrumentation | 0.93 |
| | Insulation | 0.29 |
| | Substation Building Bulk | 0.61 |
| | Misc. Equipment & Materials | 1.33 |
| | SUB-TOTAL | 11 |

C - 1 - 3 of 10



SCHEDULE "C"                                          CONTRACT NO. 65004/00

## MATERIALS PRICE TABLES

| JOB ORDER (J.O.) No. | DESCRIPTION | ACTIVITIES WEIGHTED % WITHIN MATERIALS PRICE |
|---|---|---|
| 50168 | **COOLING WATER** | |
| | Pumps | 2.23 |
| | Travelling Screens | 0.51 |
| | Hypochlorite Generators | 1.40 |
| | Plate and Frame Exchangers | 0.02 |
| | Lube Oil Equipment | 0.05 |
| | Electrical Switchgear | 0.04 |
| | Underground Electrical | 0.01 |
| | Underground Piping | 0.03 |
| | Piles | 0.42 |
| | Above Ground Piping | 0.61 |
| | Above Ground Electrical Including MCCs | 0.09 |
| | Structural Steel | 0.28 |
| | Misc. Equipment & Materials | 0.05 |
| | Instrumentation | 0.25 |
| | **SUB-TOTAL** | 6 |
| 50168 | **DESALINATION** | |
| | -M.E.D. Units | 12.33 |
| | Chemical Injection Equipment | 0.13 |
| | Process Interface Building Bulk | 0.31 |
| | Underground Electrical | 0.07 |
| | Underground Piping | 0.13 |
| | Piles | 0.49 |
| | Structural Steel | 0.30 |
| | Above Ground Piping | 1.22 |
| | Above Ground Electrical Including MCCs | 0.62 |
| | Process Interface HVAC Equipment | 0.54 |
| | Misc. Equipment & Materials | 0.14 |
| | Instrumentation | 0.23 |
| | **SUB-TOTAL** | 17 |

A132

Case 1:07-cv-00616-SLR    Document 11-2    Filed 02/29/2008    Page 55 of 74

SCHEDULE "C"                                    CONTRACT NO. 65004/00

## MATERIALS PRICE TABLES

| JOB ORDER (J.O.) No. | DESCRIPTION | ACTIVITIES WEIGHTED % WITHIN MATERIALS PRICE |
|---|---|---|
| 50174 | **FUEL GAS** | |
| | Piles | 0.10 |
| | Above Ground Piping | 0.63 |
| | Knockout Drums | 0.24 |
| | Scrubber | 0.22 |
| | Vaporizers | 0.11 |
| | Pumps and Drivers | 0.08 |
| | Misc. Equipment & Materials | 0.32 |
| | Electrical | 0.10 |
| | Instrumentation | 0.19 |
| | **SUB-TOTAL** | **2** |
| 50168 | **HIGH PRESSURE BOILERS** | |
| | Piles | 2.28 |
| | Underground Electrical | 0.13 |
| | Underground Piping | 0.39 |
| | Above Ground Piping | 6.32 |
| | Structural Steel | 1.08 |
| | Vessels/Tanks | 1.66 |
| | Shell & Tube Exchangers | 0.07 |
| | Air Coolers | 0.01 |
| | Pumps and Drivers | 3.34 |
| | Misc. Equipment and Materials | 0.23 |
| | Electrical | 1.22 |
| | Instrumentation | 1.64 |
| | Steam Boilers | 0.00 |
| | HP & LP Process Interface Building Bulk | 1.85 |
| | Transformer/MCC's | 0.34 |
| | HVAC Equipment | 2.26 |
| | Insulation | 5.19 |
| | **SUB-TOTAL** | **28** |
| 50174 | **I/C PIPEWAYS "A, B, C and S"** | |
| | Piles | 4.05 |
| | Structural Steel | 7.43 |
| | Above Ground Piping | 9.60 |
| | Insulation | 1.72 |
| | Electrical | 0.03 |
| | Instrumentation | 0.14 |
| | Misc. Equipment & Materials | 0.04 |
| | **SUB-TOTAL** | **23** |

C - I - 5 of 10

A133

SCHEDULE "C"                                         CONTRACT NO. 65004/00

## MATERIALS PRICE TABLES

| JOB ORDER (J.O.) No. | DESCRIPTION | ACTIVITIES WEIGHTED % WITHIN MATERIALS PRICE |
|---|---|---|
| 50174 | MEDIUM VOLTAGE POWER DISTRIBUTION | |
| | Cable Tray | 0.29 |
| | 13.8KV Cable and Termination Kits | 0.59 |
| | 13.8KV Switchgear | 0.54 |
| | 13.8KV/480V Emergency Power Centres | 0.11 |
| | 480V Cable | 0.16 |
| | Misc. Equipment & Materials | 0.31 |
| | SUB-TOTAL | 2 |
| 50174 | NITROGEN | |
| | Nitrogen Package | 1.54 |
| | Electrical | 0.14 |
| | Instrumentation | 0.12 |
| | Misc. Equipment & Materials | 0.20 |
| | SUB-TOTAL | 2 |
| | GRAND TOTAL | 100% |

A134

SCHEDULE "C"                                    CONTRACT NO. 65004/00

4.0    WORK BREAKDOWN STRUCTURE (WBS) (Prices for WORK not specifically
       identified in the WBS are included in the specified prices.)

## UTILITIES

| ACTIVITY | ACTIVITIES WEIGHTED % WITHIN CONTRACT |
|---|---|
| Piling (Interconnecting Pipeway) | 4.27 |
| Demolish Old High Lift Pump House (Cooling Water) | 0.19 |
| Earthworks (Fire Water) | 0.33 |
| Tank Demolition (High Pressure Boiler) | 0.12 |
| Earthworks (High Pressure Boiler) | 0.12 |
| Earthworks (Sanitary Sewers) | 0.23 |
| Earthworks (South Air Compressor House) | 0.35 |
| Earthworks (Blending Storage and Transfer) | 0.54 |
| Underground Piping (Fire Water) | 0.13 |
| Foundations (Interconnecting Pipeway) | 3.25 |
| Set Sumps (Sanitary Sewers) | 0.42 |
| Piling (South Air Compressor House) | 0.10 |
| Foundations (South Air Compressor House) | 0.46 |
| Paving and Grading (Blending Storage and Transfer) | 0.22 |
| Above Ground Piping (Fire Water) | 0.03 |
| Foundations (Blending Storage and Transfer) | 3.69 |
| Paint and Insulation (Fire Water) | 0.10 |
| Tie-ins (Sanitary Sewers) | 0.02 |
| Foundations (Medium Voltage Power Distribution) | 0.08 |
| Install Travelling Screens (Cooling Water) | 0.70 |
| Underground Piping and Electrical (South Air Compressor House) | 0.20 |
| Underground Piping (Blending Storage and Transfer) | 0.13 |
| Underground Cable (Medium Voltage Power Distribution) | 0.31 |
| Substations/Buildings/Shelter (Blending Storage and Transfer) | 4.95 |
| Underground Piping (Sanitary Sewers) | 0.11 |
| Piling (High Pressure Boilers) | 0.34 |
| Above Ground Cable (Medium Voltage Power Distribution) | 0.09 |
| Erection/Structural Steel (South Air Compressor House) | 0.34 |
| Equipment Installation (Blending Storage and Transfer) | 0.52 |
| Above Ground Piping (Sanitary Sewers) | 0.12 |
| Cable Tray Installation (Medium Voltage Power Distribution) | 0.21 |
| Erection/Installation Air Compressors (South Air Compressor House) | 0.29 |
| Above Ground Piping (Blending Storage and Transfer) | 2.43 |
| Paint and Insulation (Sanitary Sewers) | 0.12 |
| Install Switchgear (Medium Voltage Power Distribution) | 0.02 |
| Install Piperack (South Air Compressor House) | 0.12 |
| Tie-ins (Blending Storage and Transfer) | 0.13 |
| Earthworks (Cooling Water) | 0.36 |
| Test and Pre-commission (Medium Voltage Power Distribution) | 0.02 |
| Above Ground Piping (South Air Compressor House) | 0.09 |
| Electrical Test and Pre-commission (Blending Storage and Transfer) | 0.45 |

A135

MAY. 31. 2002   4:17PM    SASM&F                                  NO. 6013   P. 12

**SCHEDULE "C"**                                    <u>CONTRACT NO. 65004/00</u>

| ACTIVITY | ACTIVITIES WEIGHTED % WITHIN CONTRACT |
|---|---|
| Underground Pipe and Electrical  (Cooling Water) | 0.06 |
| Tie-ins  (South Air Compressor House) | 0.02 |
| Electrical Test and Pre-commission  (South Air Compressor House) | 0.01 |
| Instrumentation Test and Pre-commission  (Blending Storage and Transfer) | 0.56 |
| Instrumentation Test and Pre-commission (South Air Compressor House) | 0.17 |
| Paint and Insulation  (Blending Storage and Transfer) | 2.09 |
| Paving and Grading  (Cooling Water) | 0.03 |
| Paint and Insulation  (South Air Compressor House) | 0.14 |
| Construct Pump Cells  (Cooling Water) | 0.01 |
| Piling (Desalination) | 0.10 |
| Demolish Old North Air Compressor House | 0.12 |
| Construct Pump Foundations  (Cooling Water) | 0.57 |
| Foundations (Desalination) | 0.51 |
| Earthworks (North Air Compressor House) | 0.21 |
| Install Pumps and Drivers (Cooling Water) | 0.03 |
| Underground Piping and Electrical  (Desalination) | 0.25 |
| Piling (North Air Compressor House) | 0.21 |
| Install Ancillary Equipment  (Cooling Water) | 0.07 |
| Paving and Grading (Desalination) | 0.14 |
| Foundations (North Air Compressor House) | 0.54 |
| Above Ground Piping  (Cooling Water) | 0.49 |
| PIB Building (Desalination) | 2.16 |
| Underground Piping and Electrical  (North Air Compressor House) | 0.15 |
| Install Chlorination System  (Cooling Water) | 0.13 |
| Erection/Installation - Train A  (Desalination) | 0.41 |
| Electrical Test and Pre-commission  (Cooling Water) | 0.02 |
| Erection/Installation - Train B  (Desalination) | 0.02 |
| Foundations (High Pressure Boilers) | 1.73 |
| Erection Structural Steel (North Air Compressor House) | 0.29 |
| Instrumentation Test and Pre-commission  (Cooling Water) | 0.30 |
| Installation Chemical Injection Equipment  (Desalination) | 0.03 |
| Erection/Installation Air Compressors (North Air Compressor House) | 0.29 |
| Painting and Insulation  (Cooling Water) | 0.49 |
| Install Piperack  (Desalination) | 0.25 |
| Structural Steel  (Interconnecting Pipeway) | 10.51 |
| Complete Piperack  (North Air Compressor House) | 0.19 |
| Above Ground Piping and Tie-ins  (Desalination) | 1.71 |
| Above Ground Piping (North Air Compressor House) | 0.38 |
| Electrical Test and Pre-commission  (Desalination) | 0.06 |
| Erection/Installation - Boiler F-100  (High Pressure Boiler) | 0.93 |
| Tie-ins  (North Air Compressor House) | 0.02 |

C - I - 8 of 10

A136

MAY. 31. 2002  4:17PM    SASM&F                                    NO. 6013   P. 13

SCHEDULE "C"                                    CONTRACT NO. 65004/00

| ACTIVITY | ACTIVITIES WEIGHTED % WITHIN CONTRACT |
|---|---|
| Electrical Test and Pre-commission (North Air Compressor House) | 0.01 |
| Instrumentation Test and Pre-commission (Desalination) | 0.50 |
| Piling (Fuel Gas) | 0.05 |
| Instrumentation Test and Pre-commission (North Air Compressor House) | 0.34 |
| Paint and Insulation (Desalination) | 1.22 |
| Erection/Installation -Boiler F-200 (High Pressure Boilers) | 0.93 |
| Paint and Insulation (North Air Compressor House) | 0.42 |
| Underground Pipe and Electrical (High Pressure Boilers) | 0.34 |
| Foundations (Fuel Gas) | 0.22 |
| Demolition (Old South Air Compressor House) | 0.10 |
| Install Piperack (High Pressure Boilers) | 0.71 |
| Install Piperack (Fuel Gas) | 0.09 |
| Above Ground pipe and Electrical (Interconnecting Pipeway) | 7.76 |
| Above Ground Piping (High Pressure Boilers) | 1.70 |
| Above Ground Piping (Fuel Gas) | 0.69 |
| PIB Buildings (High Pressure Boilers) | 4.84 |
| Tie-ins (Fuel Gas) | 0.02 |
| Pilings (Scrubber) | 0.01 |
| Paving and Grading (High Pressure Boilers) | 0.44 |
| Erect Vaporizers (Fuel Gas) | 0.02 |
| Foundations (Scrubber) | 0.14 |
| Tie-ins (Interconnecting Pipeway) | 0.06 |
| Tie-ins (High Pressure Boilers) | 0.02 |
| Electrical Test and Pre-commission (Fuel Gas) | 0.02 |
| Electrical Test and Pre-commission (High Pressure Boilers) | 0.01 |
| Instrumentation Test and Pre-commission (Fuel Gas) | 0.08 |
| Underground Pipe and Electrical (Scrubber) | 0.11 |
| Painting and Insulation (Interconnecting Pipeway) | 13.58 |
| Instrumentation Test and Pre-commission (High Pressure Boilers) | 0.52 |
| Painting and Insulation (Fuel Gas) | 0.30 |
| Painting and Insulation (High Pressure Boilers) | 10.18 |
| Erection Equipment (Scrubber) | 0.01 |
| Foundations (Caustic) | 0.01 |
| Above Ground Piping (Scrubber) | 0.10 |
| Installation Pumps (Caustic) | 0.02 |
| Erection Skids (Nitrogen) | 0.06 |
| Tie-ins (Scrubber) | 0.02 |
| Above Ground Piping (Caustic) | 0.02 |
| Electrical Test and Pre-commission (Scrubber) | 0.02 |
| Tie-ins (Caustic) | 0.02 |
| Above Ground Piping (Nitrogen) | 0.09 |
| Instrumentation Test and Pre-commission (Scrubber) | 0.24 |
| Electrical Test and Pre-commission (Caustic) | 0.01 |



A137

**SCHEDULE "C"**                                    **CONTRACT NO. 65004/00**

| ACTIVITY | ACTIVITIES WEIGHTED % WITHIN CONTRACT |
|---|---|
| Tie-ins (Nitrogen) | 0.01 |
| Painting and Insulation (Scrubber) | 0.05 |
| Instrumentation Test and Pre-commission (Caustic) | 0.02 |
| Electrical Test and Pre-commission (Nitrogen) | 0.02 |
| Painting and Insulation (Caustic) | 0.02 |
| Instrumentation Test and Pre-commission (Nitrogen) | 0.06 |
| Civil Works (North Flare) | 0.05 |
| Painting and Insulation (Nitrogen) | 0.40 |
| Underground Piping (North Flare) | 0.03 |
| Above Ground Piping (Raw Water) | 0.01 |
| Above Ground Piping (North Flare) | 0.04 |
| Tie-ins (Raw Water) | 0.01 |
| Tie-ins (North Flare) | 0.01 |
| Electrical Test and Pre-commission (North Flare) | 0.01 |
| Electrical Test and Pre-commission (Raw Water) | 0.02 |
| Instrumentation Test and Pre-commission (North Flare) | 0.01 |
| Instrumentation Test and Pre-commission (Raw Water) | 0.01 |
| Above Ground Piping (Drinking Water) | 0.01 |
| Painting and Insulation (North Flare) | 0.01 |
| Painting and Insulation (Raw Water) | 0.02 |
| Tie-ins (Drinking Water) | 0.01 |
| Painting and Insulation (Drinking Water) | 0.02 |

**END OF ATTACHMENT I**



A138

<u>SCHEDULE "C"</u>                                      <u>CONTRACT NO. 65004/00</u>

# ATTACHMENT II

## NOT APPLICABLE

## END OF ATTACHMENT II

C II - 1 of 1

CONTRACT NO. 65004/00

SCHEDULE "C"

ATTACHMENT III

TIME AND WORK UNIT RATES FOR CHANGES

1.  TIME UNIT RATES FOR DESIGN AND ENGINEERING PERSONNEL

1.1  The Labor Rates for CONTRACTOR personnel, specified in Exhibit I of this Attachment, represent full and complete compensation to CONTRACTOR for WORK performed pursuant to Paragraph 9 of Schedule "A" and Paragraph 2.2.2 of Schedule "C", and are inclusive of all costs as set forth herein.

1.1.1  Labor Rates constitute all-inclusive payment to CONTRACTOR per hour worked by CONTRACTOR personnel directly engaged in performance of the WORK and include compensation for overtime premium costs for any hours worked in excess of CONTRACTOR's normal work week or for hours worked on holidays and weekends.

1.1.2  Labor Rates include compensation for all labor costs to CONTRACTOR, including but not limited to all direct salary costs, vacation pay, holiday pay, payroll insurances, sick pay, completion and retirement bonuses, transportation, living allowances and all other burdens and indirects, as well as profit. Labor Rates shall apply to WORK performed at any time of the day or night or any day of the week.

1.1.3  The normal work week for CONTRACTOR's personnel shall be consistent with the Labor and Workmen Law of the Kingdom of Saudi Arabia. CONTRACTOR's actual work schedule, including overtime worked by CONTRACTOR's personnel, shall be in accordance with a schedule authorized by SAUDI ARAMCO. It is further agreed that the Labor Rates represent payment by SAUDI ARAMCO to CONTRACTOR, and not to CONTRACTOR's personnel.

1.1.4  Personnel required in the performance of Change Order Work who are not listed by classification below are deemed to be included in the overhead portion of the stated rates.

C-III-1 of 5

A140

SCHEDULE "C"                              CONTRACT NO. 65004/00
ATTACHMENT III

2.0    TIME UNIT RATES FOR CONSTRUCTION PERSONNEL

2.1    The Labor Rates for CONTRACTOR personnel, specified in Exhibit II of
       this Attachment, represent full and complete compensation to
       CONTRACTOR for WORK performed pursuant to Paragraphs 9.6 and 10
       of Schedule "A" and Paragraphs 2.2.2 and 2.7 of Schedule "C", and are
       inclusive of all costs as set forth herein.

    2.1.1    Labor Rates constitute all-inclusive payment to CONTRACTOR
             per hour worked by CONTRACTOR personnel directly engaged in
             performance of the WORK and include compensation for overtime
             premium costs for any hours worked in excess of
             CONTRACTOR's normal work week or for hours worked on
             holidays and weekends.

    2.1.2    Labor Rates include compensation for all costs to CONTRACTOR,
             including but not limited to mobilization/demobilization, site
             overheads, camp and catering/maintenance costs, all direct salary
             costs, Ramadhan premiums, vacation pay, holiday pay, payroll
             insurances, sick pay, completion and severance awards,
             transportation, living allowances, any Government-caused cost
             increases imposed at any time, and all other burdens and indirects,
             as well as profit. Labor Rates shall apply to WORK performed at
             any time of the day or night or any day of the week. The maximum
             hours billable per any day worked is ten (10) hours per day.

    2.1.3    The normal work week for CONTRACTOR's personnel shall be
             consistent with the Labor and Workmen law of the Kingdom of
             Saudi Arabia. CONTRACTOR's actual work schedule, including
             overtime worked by CONTRACTOR's personnel, shall be in
             accordance with a schedule authorized by SAUDI ARAMCO. It is
             further agreed that the Labor Rates represent payment by SAUDI
             ARAMCO to CONTRACTOR, and not to CONTRACTOR's
             personnel.

    2.1.4    Personnel required in the performance of Change Order Work who
             are not listed by classification below are deemed to be included in
             the overhead portion of the stated rates. The mere listing of a
             classification does not constitute a requirement for performance of
             WORK.

A141

**SCHEDULE "C"**                                    CONTRACT NO. 65004/00
**ATTACHMENT III**

3.   TIME UNIT RATES FOR CONSTRUCTION EQUIPMENT

   3.1   The Equipment Rates for equipment, specified in Exhibit III to this
       Attachment, utilized for the WORK represent full and complete
       compensation to CONTRACTOR for WORK performed pursuant to
       Paragraphs 9.6 and 10 of Schedule "A" and Paragraphs 2.2.2 and 2.7 of
       Schedule "C".

      3.1.1   Equipment rates constitute all-inclusive payment to
           CONTRACTOR per hour worked by CONTRACTOR equipment
           at the WORK Site, provided that in any scheduled work day each
           item of equipment shall only be charged if the equipment was
           available, and approved to work.  Equipment rates shall apply at
           any time of the day or night and any day of the week, but charges
           for periods in excess of ten hours per scheduled work day require
           SAUDI ARAMCO's prior approval.

      3.1.2   Equipment rates include, but are not limited to, all costs such as
           mobilization/demobilization, transporation and travel time to and
           from the WORK Site, site overheads, all maintenance costs
           including maintenance labor and catering and accommodation costs
           related thereto, repairs, fuel, lubricants, spare parts, operating
           supplies, tools, consumables, depreciation, standby time, insurance
           and taxes associated with the supply and operation of the
           equipment, any Government-caused cost increases imposed at any
           time, and all overheads as well as profit.  They include the cost of
           equipment drivers or operators, if applicable.  SAUDI ARAMCO
           shall not be charged for equipment idle time due to
           CONTRACTOR's failure to provide operators.



A142

SCHEDULE "C"                                    CONTRACT NO. 65004/00
ATTACHMENT III

3.1.3   Equipment rates for overtime usage will be based on time actually
        worked in excess of a normal ten (10) hour daily shift, regardless of
        the day of the week.  All overtime shall require prior SAUDI
        ARAMCO approval.  Equipment overtime shall be chargeable only
        so long as the equipment operator is available.

3.1.4   SAUDI ARAMCO shall not be charged for equipment downtime
        due to breakdown or major maintenance.  For purposes of this
        Paragraph, maintenance or repair work on the affected equipment
        which is accomplished within two (2) consecutive working hours of
        its removal from the WORK shall be considered routine
        maintenance.  All other maintenance and repair work shall be
        considered major maintenance and the period encompassed shall be
        non-chargeable from the time the affected equipment becomes
        inoperable.

3.1.5   Should the removal from the WORK Site or any item of
        CONTRACTOR equipment requiring major repair impede the
        progress of the WORK or should any item of CONTRACTOR
        equipment be lost or destroyed, CONTRACTOR shall promptly
        supply an equipment substitute unless otherwise agreed by SAUDI
        ARAMCO.  Equipment not meeting SAUDI ARAMCO safety
        standards shall be considered inoperative and shall be non-
        chargeable hereunder.

3.1.6   CONTRACTOR shall be responsible for delivery of its equipment
        to and removal from the WORK Site at no additional cost to
        SAUDI ARAMCO.  CONTRACTOR must obtain SAUDI
        ARAMCO's approval of use of equipment in the WORK prior to
        charging SAUDI ARAMCO for such equipment.

A143

MAY. 31, 2002  4:19PM    SASM&F                                    NO. 6013   P. 20

SCHEDULE "C"                              <u>CONTRACT NO. 65004/00</u>
<u>ATTACHMENT III</u>

4.   <u>TIME UNIT RATES FOR CHANGES IN OFFICE SPACE</u>

   4.1   CONTRACTOR shall, as required by Change Order, add or delete office
         space for permanent SAUDI ARAMCO occupancy and/or computer
         systems at any time during the duration of SAUDI ARAMCO 's presence
         at CONTRACTOR's design office(s).

   4.2   The rates for office space and computer systems are as specified in Exhibit
         IV to this Attachment:

5.   <u>WORK UNIT RATES</u>

   WORK Unit Rates for Changes, as specified in Exhibit V to this Attachment,
   represent an alternative basis for determining the full and complete compensation
   due to CONTRACTOR for accomplishing a Change, or the credit due SAUDI
   ARAMCO for deleted WORK. They are inclusive of all costs, including but not
   limited to the cost of labor and associated payroll additives, equipment and
   equipment maintenance, scaffolding, consumables, material, engineering, taxes,
   transportation, preparation, handling, fabrication, construction, overheads, any
   Government-caused cost increases imposed at any time, profit and fee as
   applicable. Work Unit Rates for Changes shall remain the same whether the
   Change represents an increase or decrease in WORK.


                        **END OF ATTACHMENT III**

A144

MAY. 31. 2002  4:19PM    SASM&F          202 393 5760          NO. 6013  P. 21

SCHEDULE "C"                                    CONTRACT NO. 65004/00

# ATTACHMENT III

## EXHIBIT I

### TIME UNIT RATES FOR DESIGN AND ENGINEERING PERSONNEL.

| JOB TITLE | HOURLY RATE DESIGN OFFICE (US DOLLARS) | |
|---|---|---|
| | WCN | TCN |
| Buyer | 61.90 | N/A |
| CADD Operator * | N/A | 26.40 |
| Clerk | N/A | 17.38 |
| Cost Engineer | 55.48 | 21.10 |
| Design Discipline Engineer | 72.00 | 26.14 |
| Designer/Checker | 48.08 | 20.00 |
| Draftsman | N/A | 19.80 |
| Estimator** | 55.48 | N/A |
| Expeditor | 48.08 | 20.00 |
| Inspector (Critical Coating, NACE Level III) | 49.50 | 25.67 |
| Inspector (Vendor & Source) | 49.50 | 25.67 |
| Lead Engineer | 72.00 | 32.62 |
| Materials Engineer | 58.40 | 24.06 |
| Principal Engineer | 58.90 | 32.62 |
| Procurement Coordinator | 78.40 | 24.06 |
| Project Engineer | 61.40 | 25.67 |
| QA Engineer** | 55.48 | 25.67 |
| QC Engineer** | 55.48 | 25.67 |
| Schedule Engineer** | 37.60 | 22.73 |
| Secretary** | N/A | 18.18 |
| Senior Designer | 79.00 | 25.67 |
| Senior Project Engineer | 72.00 | 32.62 |
| Sr. Design Discipline Engineer | 66.70 | 27.50 |
| Sr. Inspector | 49.50 | 25.67 |

*    Rate to include complete CADD Systems, inclusive of all required 2D equipment and consumables required to produce CADD deliverables as defined in Schedule "B", Paragraph 4.5

**    Unless these personnel categories are specifically requested in writing by SAUDI ARAMCO to support HAZOP or other studies pursuant to Paragraph 4.3.2.1.3 of Schedule "B", the cost of providing these personnel categories is deemed to be included in CONTRACTOR's overheads as defined in Paragraph 1.2 of Schedule "C".

### END OF EXHIBIT I

C-III-EX-I-1 of 1

A145

MAY. 31, 2002  4:19PM    SASM&F                                    NO. 6013    P. 22

SCHEDULE "C"                                      CONTRACT NO. 65004/00

# ATTACHMENT III

## EXHIBIT II

### TIME UNIT RATES FOR CONSTRUCTION PERSONNEL

| ITEM NO. | JOB TITLE | HOURLY RATE (US DOLLARS) |
|----------|-----------|--------------------------|
| 1.0 | SKILLED | |
| 1.1 | General Foreman | 6.48 |
| 1.2 | Craft Foreman - Structural | 5.99 |
| 1.3 | Craft Foreman - Civil | 5.99 |
| 1.4 | Craft Foreman - Piping | 5.99 |
| 1.5 | Craft Foreman - Mechanical | 5.99 |
| 1.6 | Craft Foreman - Electrical | 5.99 |
| 1.7 | Craft Foreman - Instrumentation | 5.99 |
| 1.8 | Plumber | 4.07 |
| 1.9 | Pipefitter | 4.21 |
| 1.10 | Pipe Welder | 5.72 |
| 1.11 | Structural Welder | 4.39 |
| 1.12 | Electrician | 4.21 |
| 1.13 | Instrument Fitter | 4.45 |
| 1.14 | Stress Relieving Technician | 5.13 |
| 1.15 | Telephone Technician | 5.13 |
| 1.16 | NDT Tech-ASNT-Level I | 5.99 |
| 1.17 | NDT Tech-ASNT-Level II | 5.72 |
| 1.18 | NDT Tech-ASNT-Level III | 5.35 |
| 1.19 | Ironworker | 4.07 |
| 1.20 | Carpenter | 4.00 |
| 1.21 | Sandblaster | 4.07 |
| 1.22 | Painter | 4.00 |
| 1.23 | Millwright | 4.39 |
| 1.24 | Rigger | 4.21 |
| 1.25 | Concrete Finisher | 4.07 |
| 1.26 | Insulator | 4.00 |
| 1.27 | Cable Splicer | 5.13 |
| 1.28 | Sheet Metal Worker | 4.00 |
| 1.29 | Mason | 4.00 |
| 1.30 | Rebar Man | 4.00 |

A146

202 393 5760

**SCHEDULE "C"**                                    **CONTRACT NO. 65004/00**

# ATTACHMENT III

# EXHIBIT II

## TIME UNIT RATES FOR CONSTRUCTION PERSONNEL

| ITEM NO. | JOB TITLE | HOURLY RATE (US DOLLARS) |
|---|---|---|
| 1.31 | Scaffolder | 4.07 |
| 1.32 | Surveyor | 5.99 |
| 1.33 | Rodman | 4.07 |
| 1.34 | Labor Foreman | 5.99 |
| 1.35 | Laborer | 3.71 |
| 2.0 | **TECHNICAL** | |
| 2.1 | HVAC Engineer | 6.93 |
| 2.2 | Mechanical Engineer | 6.93 |
| 2.3 | Electrical Engineer | 6.93 |
| 2.4 | Civil Engineer | 6.93 |
| 2.5 | Instrument Engineer | 6.93 |
| 2.6 | Piping Engineer | 6.93 |
| 2.7 | Structural Engineer | 6.93 |
| 2.8 | Design Engineer | 6.93 |
| 2.9 | Design Draftsman | 6.24 |
| 2.10 | Draftsman | 5.99 |
| 2.11 | Project Engineer | 6.93 |
| 2.12 | CADD Operator* | 6.24 |
| 2.13 | Pre-commissioning Engineer | 6.93 |
| 2.14 | Pre-commissioning Technician | 6.24 |

* Rate to include complete CADD Systems,
  inclusive of all required 2D equipment
  and consumables.

## END OF EXHIBIT II

A147

SCHEDULE "C"                                    CONTRACT NO. 65004/00

# ATTACHMENT III

## EXHIBIT III

### TIME UNIT RATES FOR CONSTRUCTION EQUIPMENT

| ITEM NO. | DESCRIPTION | HOURLY RATE (US Dollars) |
|---|---|---|
| 1.0 | LIGHT VEHICLE | |
| 1.1 | Pick-Up Truck - 1/2 Ton 4 x 2 | 2.67 |
| 1.2 | Pick-Up Truck - 3/4 Ton 4 x 4 | 2.67 |
| 2.0 | LIGHT TRUCKS | |
| 2.1 | Stakeside - 1 Ton | 3.20 |
| 2.2 | Flatbed Truck - 2 Tons | 3.41 |
| 2.3 | Flatbed Truck - 5 Tons | 3.89 |
| 2.4 | Flatbed Truck - 10 Tons | 6.48 |
| 2.5 | Flatbed Truck C/W Crane - 3 Tons | 11.39 |
| 2.6 | Manlift, (Bucket Truck) | 4.00 |
| 3.0 | HEAVY DUTY TRUCK | |
| 3.1 | Dump Truck - 5 C.M. | 4.87 |
| 3.2 | Dump Truck - 15 C.M. | 13.93 |
| 3.3 | Dump Truck - 20 C.M. | 14.56 |
| 3.4 | Tractor Unit - 4 x 2 | 10.63 |
| 3.5 | Tractor Unit - 6 x 4 | 12.85 |
| 4.0 | TANKERS | |
| 4.1 | Water - 3800 Litres With Pump (1,000 GAL) | 3.68 |
| 4.2 | Water - 22700 Litres With Pump (6,000 GAL) | 7.03 |
| 4.3 | Water - 30300 Litres With Pump (8,000 GAL) | 9.91 |
| 4.4 | Water - 37800 Litres With Pump (10,000 GAL) | 13.85 |
| 4.5 | Vacuum - 22700 Litres (6,000 GAL) | 13.85 |
| 5.0 | TRAILERS | |
| 5.1 | Flatbed - 50 Tons w/ Tractor | 18.39 |
| 5.2 | Lowboy - 80 Tons w/ Tractor | 22.99 |
| 5.3 | Lowboy - 100 Tons w/Tractor | 37.49 |
| 5.4 | Lowboy - 200 Tons w/Tractor | N/A |
| 5.5 | Dolly, Pipe | 11.73 |
| 6.0 | FRONT END LOADERS | |
| 6.1 | Bobcat | 4.09 |
| 6.2 | Cat 950 or Equivalent | 19.13 |
| 6.3 | Cat 966 or Equivalent | 29.31 |
| 6.4 | Cat 980 or Equivalent | N/A |
| 7.0 | COMPACTORS | |
| 7.1 | Vibratory Plate | 1.49 |
| 7.2 | Jumping Jack | 2.52 |
| 7.3 | Trench Roller - Self Propelled - 2 Tons | 3.31 |
| 7.4 | Vibratory Roller - 10 Tons | 8.28 |
| 7.5 | Vibratory Roller - 20 Tons | 13.87 |
| 7.6 | Sheepsfoot Roller - 2 X 60" | 12.13 |



SCHEDULE "C"                                    CONTRACT NO. 65004/00

## ATTACHMENT III

### EXHIBIT III

### TIME UNIT RATES FOR CONSTRUCTION EQUIPMENT

| ITEM NO. | DESCRIPTION | HOURLY RATE (US Dollars) |
|---|---|---|
| 8.0 | ROAD EQUIPMENT | |
| 8.1 | Barber - Greene (or equal) Asphalt Layer 8' Wide | 13.91 |
| 8.2 | Barber - Greene (or equal) Asphalt Layer 10' Wide | 22.96 |
| 8.3 | Road Brush - Self Propelled | N/A |
| 8.4 | Line Marker - Self Propelled | N/A |
| 8.5 | Asphalt Cutter | 1.52 |
| 9.0 | CRANES (Including minimum of 2 sets of rigging for each crane, comprising a total of eight (8) slings and eight (8) shackles per Crane, lengths and strengths compatible with crane capacity & reach) | |
| 9.1 | 18 Tons - Grove or Equivalent | 20.44 |
| 9.2 | 35 Tons - Grove or Equivalent | 33.09 |
| 9.3 | 55 Tons - Grove or Equivalent | 43.88 |
| 9.4 | 80 Tons - Grove or Equivalent | 66.13 |
| 9.5 | 140 Tons - Grove or Equivalent | 116.08 |
| 9.6 | 300 Tons - Grove or Equivalent | 278.77 |
| 9.7 | 800 Tons - Demag or Equivalent | N/A |
| 9.8 | 1200 - Tons Manitowoc/Gotwald | N/A |
| 10.0 | COMPRESSORS AND TOOLS | |
| 10.1 | Diesel - 385 CFM w/Filter & Oiler ACC. w/100 ft. hose | 4.48 |
| 10.2 | Diesel - 600 CFM w/Filter & Oiler ACC. w/100 ft. hose | 5.87 |
| 10.3 | Diesel - 750 CFM w/Filter & Oiler ACC. w/100 ft. hose | 7.43 |
| 10.4 | Diesel - 1200 CFM w/Filter & Oiler ACC. w/100 ft. hose | 11.15 |
| 10.5 | Jackhammer - 65 lbs min with breaking tools, and 100 ft. length of hose including coupling. | 0.67 |
| 10.6 | Sandblasting Set - Abrasive blasting pot complete, Hose, Gun, Protective Suit, Hood and 100 ft. of Airline | 2.11 |
| 10.7 | Paint Spraying Set and 100 ft. hose. | 1.63 |
| 10.8 | Portable Fan Blower/Exhauster, 11,000 CFM and 100 ft. of hose. | 2.88 |
| 10.9 | Additional 100 ft lengths of hose for items 10.1, 10.2, 10.3 and 10.4. | 0.99 |
| 10.10 | Ditto for items 10.5, 10.6, 10.7 and 10.8. | 0.99 |
| 11.0 | PUMPS | |
| 11.1 | Bumble Bee (Submersible) w/100 ft. of hose. | 0.92 |
| 11.2 | Centrifugal - 4" w/100 ft. of hose | 4.12 |
| 11.3 | Centrifugal - 6" w/100 ft. of hose | 7.11 |
| 11.4 | Pressure Pump (10000 PSI) with recorder w/100 ft. of hose. | 5.27 |
| 11.5 | Additional 100 ft lengths of hose and couplings for items 11.1, 11.2, 11.3 and 11.4. | 0.99 |

SCHEDULE "C"                                    CONTRACT NO. 65004/00

## ATTACHMENT III

## EXHIBIT III

## TIME UNIT RATES FOR CONSTRUCTION EQUIPMENT

| ITEM NO. | DESCRIPTION | HOURLY RATE (US Dollars) |
|---|---|---|
| 11.6 | Injection Pump, Chemical - Complete w/valves, gauges hoses, and connections | 3.36 |
| 11.7 | Wellpoint dewatering system, 3" header and 6 wellpoints at 10' on center x 22' deep complete with vacuum pump to deliver 5 p.s.i. absolute pressure | 3.72 |
| 12.0 | Welding/Cutting Equipment | |
| 12.1 | Diesel - 300 AMPS w/200 ft. of Leads | 2.40 |
| 12.2 | Diesel - 400 AMPS w/200 ft. of Leads | 2.67 |
| 12.3 | TIG Welding Set complete with all accessories including, but not limited to, gas etc. | 2.28 |
| 12.4 | Air Arc. Cutting Equipment Set | 2.09 |
| 12.5 | Oxy/Acetylene Cutting Set, complete with all accessories including, but not limited to: gauges, gases, bottle rack, cutting torch, striker, hoses etc. | 13.33 |
| 13.0 | FLOODLIGHTS/LTG EQUIPMENT | |
| 13.1 | Portable Diesel Light Tower, 10 to 25 KW. | 5.21 |
| 13.2 | Portable Diesel Light Tower, 26 to 50 KW. | 7.56 |
| 14.0 | PILE DRIVING EQUIPMENT | |
| 14.1 | Pile Driving Hammer, Steam or Air, 4,150 ft.-LB. @ 225 BPM | 26.13 |
| 14.2 | Pile Driving Hammer, Steam or Air, 15,000 ft.-LB. @ 60 BPM | 53.76 |
| 14.3 | Pile Driving Hammer, Steam or Air, 24,450 ft.-LB. @ 111BPM | 54.69 |
| 14.4 | Diesel Type Hammer, 22,400 ft. -LB. | 43.87 |
| 14.5 | Diesel Type Hammer, 41,300 ft. - LB | 70.40 |
| 15.0 | CONCRETE EQUIPMENT | |
| 15.1 | Concrete Pump, Truck Mounted | 21.33 |
| 15.2 | Concrete Mixer - 6CF | 2.04 |
| 15.3 | Curbing Machine | N/A |
| 16.0 | PIPING EQUIPMENT | |
| 16.1 | WACHS Saw - Travel Cutter w/Chain to 56" | 1.07 |
| 16.2 | Guillotine Saw | 1.07 |
| 16.3 | Holiday Detector | 1.64 |
| 16.4 | Jack - 10 Tons | 1.95 |
| 16.5 | Jack - 50 Tons with Jackrods | 5.95 |
| 16.6 | Jack - 25 Tons, Enerpack | 3.82 |
| 16.7 | Jack - 50 Tons, Enerpack | 7.02 |
| 17.0 | GENERATOR SETS COMPLETE w/CONTROL PANEL, TANKS | |
| 17.1 | 5 KW | 1.07 |
| 17.2 | 10 KW | 1.41 |
| 17.3 | 100 - 150 KW | 8.81 |
| 17.4 | 400 - 600 KW | 3.33 |

A150

MAY. 31. 2002  4:20PM    SASM&F    202 393 3786    NO. 6013   P. 27

SCHEDULE "C"    CONTRACT NO. 65004/00

# ATTACHMENT III

## EXHIBIT III

### TIME UNIT RATES FOR CONSTRUCTION EQUIPMENT

| ITEM NO. | DESCRIPTION | HOURLY RATE (US Dollars) |
|---|---|---|
| 18.0 | TOOLS/EQUIPMENT MISC. | |
| 18.1 | Theodolite and Tripod | 2.11 |
| 18.2 | Torque Wrenches 8000 PSI w/Full Range Sockets 3/4" Drive | 1.39 |
| 18.3 | Impact Wrenches 1/2" Drive w/Full Range of Sockets (Imperial 1-3/8" TO 4-3/4" Metric 41 MM to 135 MM) | 7.70 / 14.52 |
| 18.4 | 300 GPH at 1500 PSI 160°F water temp. trailer mounted diesel hot water blaster as manufactured by SIOUX or equivalent complete with 100 ft. hose | N/A |
| 18.5 | Additional 100 ft lengths of hose and couplings for item 18.4. | 0.99 |
| 18.6 | Dead Weight Tester, 10,000 PSI w/Full Set of Weights From 2 LB to 50 LB | 1.41 |
| 18.7 | 500 volt, portable, electrical cable megger test set. | 0.85 |
| 18.8 | 1000 volt, portable, electrical cable megger test set. | 0.85 |
| 18.9 | 5000 volt, portable, electrical cable megger test set. | 1.36 |
| 18.10 | 100 KV, portable, electrical cable hi-pot test set. | 1.64 |
| 18.11 | Portable circuit tester, volt/ohm/amp meter. | 0.85 |
| 18.12 | Portable grounding tester. | 0.85 |
| 18.13 | Transformer/motor low resistance and power factor tester. | 0.85 |
| 18.14 | Line frequency rotation indicator. | 0.53 |
| 19.0 | ELECTRIC POWER TOOLS | |
| 19.1 | Air Mover (Explosion Proof)5200 CFM w/100 ft. Flexible Hose and Couplings | 1.68 |
| 19.2 | Additional 100 ft length of hose and couplings for item 19.1. | 0.99 |
| 19.3 | Threading Machine, Pipe and Bolt Complete with two sets of dies 1/8" TO 2" (Set) and 2-1/4" to 4" (Set) Rigid 300 | 1.13 |
| 19.4 | Threading Machine, Pipe and Bolt Complete with Three Sets of Dies 1/8" to 2" (set) and 2-1/2" to 4" (set) and 4" to 6". | 1.13 |
| 19.5 | Engine powered, hydraulic, auto tension sensing cable puller. | 1.33 |

### END OF EXHIBIT III

A151

SCHEDULE "C"                              CONTRACT NO. 65004/00

## ATTACHMENT III

### EXHIBIT IV

### TIME UNIT RATES FOR CHANGES IN OFFICE SPACE

1. **OFFICE SPACE**

|  |  | Per Month Addition or Deletion * (US Dollars) |
|---|---|---|
| 1.1 | Project Manager | 0 |
| 1.2 | Senior Project Engineer | 0 |
| 1.3 | Project Engineer | 0 |
| 1.4 | Professional Employee | 0 |
| 1.5 | Senior Secretary | 0 |
| 1.6 | CONTRACTOR-Supplied Secretary | 0 |
| 1.7 | CONTRACTOR-Supplied Clerk | 0 |

* Based on the requirements listed in Schedule "B", Paragraph 4.2.1.2 and 4.2.2.1.

## END OF EXHIBIT IV

SCHEDULE "C"                                    CONTRACT NO. 65004/00

ATTACHMENT III

EXHIBIT V

WORK UNIT RATES FOR CHANGES

NOTES:

- The Unit Short Ton shall be defined as "2000 pounds".

- The linear measurement of piping, cable and cable tray for the purposes of establishing installation, painting, insulation costs, and the like, shall be taken at the center line.

| WORK UNIT DESCRIPTION | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|

1.  **CIVIL**

1.1.  Excavation, non-rock areas including, but not limited to: removal and disposal of excess material to a dump site approved by SAUDI ARAMCO (within 15 KM from WORK Site) including, shoring, dewatering and leveling (measured in place).

| | | |
|---|---|---|
| 1.1.1  Excavation by Hand | CM | 23.90 |
| 1.1.2  Excavation by Machine | CM | 6.80 |
| 1.1.3  Additional rate per KM for disposal more than 15 KM from the WORK Site | CM | 0.20 |

1.2  Excavation, rock areas including, but not limited to: removal and disposal of excess material to a dump site approved by SAUDI ARAMCO (within 15 KM from WORK Site) including, but not limited to: shoring, dewatering, and leveling (measured in place).  Rock area excavation is defined as excavation which cannot be accomplished using a CAT 245 backhoe suitably equipped with a rock bucket sized and operated in accordance with good construction practice, and which requires removal by other mechanical equipment.  Any rock area excavation shall be subject to the additional payment provisions set forth in Schedule "H", Paragraph 15.

| | | |
|---|---|---|
| 1.2.1  By hand – Jackhammer or equal | CM | 114.79 |
| 1.2.2  By machine – hydraulic, pneumatic, rotary, etc. | CM | N/A |
| 1.2.3  Additional rate per KM for disposal more than 15 KM from the WORK Site. | CM | 0.40 |

A153

SCHEDULE "C"                                          CONTRACT NO. 65004/00

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|---|
| 1.3 | Supply and install select fill material including, but not limited to, loading, handling placing, compaction and testing (measured in place) | | |
| 1.3.1 | Sand | CM | N/A |
| 1.3.2 | Marl | CM | 8.70 |
| 1.4 | Supply and install asphalt paving including, but not limited to: constructing 150mm aggregate base course, applying prime coat, tack coat, 50mm asphalt binder course (4A mix), 50mm asphalt wearing course (6A mix), compaction, leveling and testing | SM | N/A |
| 1.5 | Supply and install reinforced concrete including, but not limited to: formwork, rebar, finishing and curing in foundations, pads, pedestals, thrust blocks, retaining walls and culverts. | CM | 344.50 |
| 1.6 | Supply and install additional floor space in the PIB including, but not limited to: building, air conditioning, mechanical, and electrical systems. | SM | 1,471.50 |
| 1.7 | Supply and install additional floor space in the Substation including, but not limited to: building, air conditioning, mechanical, and electrical systems | SM | 1,060.00 |

## 2.0  STEEL WORK

2.1    Supply, fabricate and install structural steel ASTM-A-36

| Type | 40#/Ft. | 80#/Ft. |
|---|---|---|
| Short ton | 1,447.80 | 1,330.30 |

2.2    Supply, fabricate and install miscellaneous light steel including, but not limited to: railings (SAUDI ARAMCO standard drawing 990-M-AE-036087 sheet 001 and M-AB-036103 sheet 001), and caged ladders (SAUDI ARAMCO standard drawings 990-M-AA-036088 sheet 002 and 12-SAMSS-7)    Short Ton    3,008.82



A154

SCHEDULE "C"                                    CONTRACT NO. 65004/00

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|

**3.0   ELECTRICAL**

3.1   Supply and install RGS Conduit, PVC Coated, including, but not limited to: couplings, unions bodies, sealing fittings, sealing compound, hubs, deck penetrations, cutting, clamping, fittings and necessary supports.

| 1" | LM | 27.90 | 3" | LM | 90.59 |
|---|---|---|---|---|---|

**Notes:   Cable Trays**

1.   Cable trays/ladder racks shall be measured over all fittings, short running lengths and branches, etc.

2.   Fittings shall be measured as "extra over" the tray or ladder.

3.   Tees with different size branches shall be measured "extra over" the largest size tray or ladder.

4.   Reducers have not been listed separately but will be included in the lengths of tray/ladder where they shall be measured as the larger size of tray or ladder. In addition to the cost elements enumerated on page C-III - 1 of 1, Work Unit Rates, the Work Unit Rates for item 3.2 also include allowance for:

   a.   Fixing to steel work as specified and all jointing supports and hangers required, including surface preparation, priming and painting and designing the supports and hangers.
   b.   All joints in the running length, short lengths, branches, etc. and all cutting and waste.
   c.   Fixing of bond straps.

3.2   Supply and install cable trays and covers (including, but not limited to: fittings, splice plates, end plates, dropout plates, covers, hardware, and necessary supports):

| 12" | Cable Tray | LM | N/A | 30" | Cable Tray | LM | N/A |
|---|---|---|---|---|---|---|---|

3.3   Terminate and test cable, both ends:

|  |  |  |  |
|---|---|---|---|
| 3.3.1 | 0-25 HP (Horsepower) (480V) | EA | 55.90 |
| 3.3.2 | 50-100 HP (480V) | EA | 181.80 |

A155

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|
| 3.3.3  101 - 200 HP (480V) | EA | 325.00 |
| 3.3.4  201 - 500 HP (4,160V) | EA | 455.44 |
| 3.3.5  501 - 1,500 HP (4,160V) | EA | 677.47 |
| 3.3.6  1,501 - 4,999 (4,160V) | EA | 1,102.63 |
| 3.3.7  5,000 HP & Over (13,800V) | EA | 1,171.70 |

**3.4    Miscellaneous Electrical:**

| | | |
|---|---|---|
| 3.4.1  Supply and install 120 Volt outdoor light fixture, including, but not limited to: stanchion mount and lamp wiring | EA | 367.00 |
| 3.4.2  Supply and install field junction box. | | |
| 3.4.2.1  12" x 12" | EA | N/A |
| 3.4.2.2  24" x 24" | EA | N/A |
| 3.4.2.3  36" x 36" | EA | N/A |
| 3.4.2.4  48" x 48" | EA | N/A |
| 3.4.3  Supply and install grounding cable (size 4/Ø AWG) | LM | 6.00 |
| 3.4.4  Supply and install 480V floodlight fixture and 30-foot pole. | EA | 568.10 |
| 3.4.5  Supply, install and terminate outdoor 2/3 pushbutton control station (including stand). | EA | N/A |
| 3.4.6  Supply, install, ground and terminate outdoor, 12-circuit, 240/120 Volt lighting circuit breaker panel. | EA | 3,159.35 |
| 3.4.7  Supply and install outdoor dry type 15 KVA transformer 480 - 240V/120 Volts, including, but not limited to: grounding and termination | EA | 1,242.60 |



A156

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|

3.4.8  Excavate, supply, install
and backfill road crossing ducts
consisting of two 6" PVC ducts
with bell-ends, entirely
encased with red colored,
reinforced concrete.                   LM           95.50

3.5  Supply and installation of cable or wire into conduit or duct, including, but not limited to: ample length of tail for terminations, sealing open ends of cable after cutting, anti-vibration loops, cable supports, identification numbers and color bands:

3.5.1  Wire, 2000 volts or less, in
above grade or below grade
conduit or duct:

    3.5.1.1  No. 10 AWG (6 sq mm),        LM          0.60
    3.5.1.2  No. 1/0 AWG (50 sq mm),      LM          3.90
    3.5.1.3  500 kcmil (240 sq mm),       LM          16.10

3.5.2  Cable, composite, 3 core w/ground,
National Electric Code (NEC) Type TC,
unarmored, 2000 volts or less, in above
grade or below grade conduit or duct:

    3.5.2.1  No. 10 AWG (6 sq mm)         LM          2.30
    3.5.2.2  No. 1/0 AWG (50 sq mm)       LM          12.40
    3.5.2.3  500 kcmil (240 sq mm)        LM          47.60

3.5.3  Cable, composite, 3 core w/ground NEC
Type MV-90, unarmored, 2001 volts to
5000 volts, in above grade or below grade
conduit or duct:

    3.5.3.1  No. 8 AWG (10 sq mm)         LM          11.61
    3.5.3.2  No. 1/0 AWG (50 sq mm)       LM          22.40
    3.5.3.3  500 kcmil (240 sq mm)        LM          68.70

3.5.4  Cable, composite, 3 core w/ground, NEC
Type MV-90, No. 4/0 AWG (120 sq mm),
unarmored, 5001 volts to 15000 volts, in
above grade or below grade conduit or duct.   LM          33.80

SCHEDULE "C"                                        CONTRACT NO. 65004/00

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | — UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|

3.5.5   Cable, multi-conductor, NEC
Type TC, unarmored, 600 volts, in above
grade or below grade conduit or duct:

| | | | |
|---|---|---|---|
| 3.5.5.1 | 7/c-No. 14 AWG (2.5 sq mm) | LM | 2.80 |
| 3.5.5.2 | 4/c-No. 12 AWG (4 sq mm) | LM | 1.80 |

3.5.6   Cable, multi-pair or triad, individual and
overall shielded, NEC Type PLTC,
unarmoured, 300 volts, in above grade
or below grade conduit or duct:

| | | | |
|---|---|---|---|
| 3.5.6.1 | 1/pr No. 18 AWG (1.0. sq mm) | LM | 0.80 |
| 3.5.6.2 | 12/pr No. 18 AWG (1.0 sq mm) | LM | 5.50 |
| 3.5.6.3 | 36/pr No. 18 AWG (1.0 sq mm) | LM | 13.30 |
| 3.5.6.4 | 4/triad No. 18 AWG(1.0 sq mm) | LM | 2.60 |

3.6   Supply and installation of direct burial cable,
including, but not limited to: trenching, cable
laying, red colored protective tile, backfill material,
backfill, compaction, above grade cable marker,
ample length of tail for terminations; sealing
open ends of cable after cutting, identification
numbers and color bands:

3.6.1   Cable, composite, 3 core w/ground,
NEC Type TC, direct burial,
unarmored, 2000 volts or less:

| | | | |
|---|---|---|---|
| 3.6.1.1 | No. 10 AWG (6 sq mm) | LM | 13.20 |
| 3.6.1.2 | No. 1/0 AWG (50 sq mm) | LM | 20.70 |
| 3.6.1.3 | 500 kcmil (240 sq mm) | LM | 55.20 |

3.6.2   Cable, composite, 3 core w/ground,
NEC Type MV-90, direct burial
unarmoured, 2001 volts to 5000 volts:

| | | | |
|---|---|---|---|
| 3.6.2.1 | No. 8 AWG (10 sq mm) | LM | 20.00 |
| 3.6.2.2 | No. 1/0 AWG (50 sq mm) | LM | 32.10 |
| 3.6.2.3 | 500 kcmil (240 sq mm) | LM | 72.91 |

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | | --UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|---|
| 3.6.3 | Cable, composite, 3 core w/ground, NEC Type MV-90, No. 4/0 AWG (120 sq mm), direct burial, unarmored, 5001 volts to 15000 volts | LM | 43.60 |
| 3.6.4 | Cable, multi-conductor, NEC Type TC, direct burial unarmored 600 volts: | | |
| 3.6.4.1 | 7/c-No. 14 AWG (2.5 sq mm) | LM | 11.70 |
| 3.6.4.2 | 19/c-No. 14 AWG (2.5 sq mm) | LM | 15.70 |
| 3.6.4.3 | 4/c-No. 12 AWG (4 sq mm) | LM | 10.80 |
| 3.6.5 | Cable, multi-pair or triad, individual and overall shielded, NEC Type PLTC, unarmored, 300 volts: | | |
| 3.6.5.1 | 1/pr No. 18 AWG (1.0 sq mm) | LM | 8.90 |
| 3.6.5.2 | 8/pr No. 18 AWG (1.0 sq mm) | LM | 12.70 |
| 3.6.5.3 | 4/triad No. 18 AWG(1.0 sq mm) | LM | 11.10 |
| 3.7 | Supply, install and terminate new combination Motor Starter cubicle in 480 Volt Motor Control Center: | | |
| 3.7.1 | NEMA size 1 | EA | 448.30 |
| 3.7.2 | NEMA size 2 | EA | 464.90 |
| 3.7.3 | NEMA size 3 | EA | 688.00 |
| 3.7.4 | NEMA size 4 | EA | 936.50 |
| 3.8 | Supply, install and connect new column section to existing 480 Volt Motor Control Center | EA | 3,472.50 |
| 3.9 | Supply, install and terminate new molded case Circuit Breaker Feeder Cubicle in 480 Volt Motor Control Center | | |
| 3.9.1 | 100 AMP frame | EA | 695.20 |
| 3.9.2 | 225 AMP frame | EA | 1,796.60 |
| 3.9.3 | 400 AMP frame | EA | 2,549.80 |

SCHEDULE "C"                                 CONTRACT NO. 65004/00

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | -- UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|

**4.0    PIPING**

In addition to the cost elements enumerated on page C-III - 1 of 1, Work Unit Rates, Work Unit Rates for items 4.1 through 4.5 also include, but are not limited to, allowance for supply of all necessary permanent and consumable materials and;

- All office field work associated with pipework including checking of all dimensions and clearances.

- Bends and bending.

- Bolting, clamping or otherwise direct fixing installation of pipework to the structure and pipe supports or hangers, sleeves, guides, anchors as required including, but not limited to: associated sleeving, guides, anchors, blocking, vapor seals and all connecting hardware.

- All pipework joints shall include everything necessary for connecting the pipe and/or fittings including, but not limited to: cutting the pipe to length, end preparation for threaded or butt weld connections as applicable, cleaning, beveling and alignment, weld rod, gaskets, bolting hardware, bolt-up and torquing, welding, and all labor and consumables necessary to complete making the joint.

- All pipe fittings (flanges, elbows, tees) installation including, but not limited to: cutting perforations on the receiving pipe, weld preparation, cleaning, alignment, weld rod, welding or thread-on as applicable, and all consumables and labor necessary to install the fittings.

- All required testing and examinations including, but not limited to: radiography, MPI, hydrostatic and liquid penetrant.

- For pipe systems where NACE requirements must be met, add 15% to the Work Unit Rates depicted in Table 4.1.

- All Work Unit Rates for flanges are for 150 pound ratings. In Tables 4.1 thru 4.4 utilize the following multipliers for other ratings:

           300    <u>175%</u>

           600    <u>365%</u>

        1500    <u>1135%</u>

        2500    <u>1925%</u>

MAY. 31. 2002  4:23PM    SASM&F    NO. 6013  P. 37

CONTRACT NO. 6S004/00

SCHEDULE "C"

ATTACHMENT III - EXHIBIT V

**4.1    CARBON STEEL PIPING CLASSES (US Dollars)**

For piping class numbers: 1A1, 1A1B, 1A1C, 1A1S, 1A1K, 2D3, 3A1, 3A1B, 3A1C, 3A1H, 3A1K, 3A1S, 6A1, 6A1C, 6A1S.

| Pipe Size (Inches) | Wall Thick (Inches) | Flange (Each) | Tee (Each) | Ell (Each) | $ Per L.M.Pipe |
|---|---|---|---|---|---|
| 4 | STD | 49 | 91 | 72.28 | 27 |
| 6 | STD | 72 | 138 | 125 | 45 |
| 10 | STD | 138 | 284 | 253 | 82 |
| 16 | <.375 | 252 | 596 | 437 | 137 |
| | >.375-.500 | 300 | 723 | 595 | 174 |
| 24 | .375 | 499 | 1075 | 803 | 182 |
| | >.375-.500 | 554 | N/A | N/A | 294 |
| | >.500-.750 | 676 | 1631 | 995 | 410 |
| | >.750-1.250 | 1151 | N/A | 1222 | 735 |
| 30 | <.375 | 645 | 1573 | 2048 | 246 |
| | >.375-.500 | 778 | N/A | 1453 | 325 |
| | >.500-.750 | 905 | N/A | N/A | 448 |
| | >.750-1.250 | 1457 | N/A | N/A | 826 |
| 36 | ≤.375 | 1007 | 2101 | 1752 | 278 |
| | >.375-.500 | 1028 | 3064 | 2397 | 411 |
| | >.500-.750 | 1159 | 3497 | N/A | 536 |
| | >.750-1.250 | 1801 | N/A | N/A | 1014 |
| 42 | ≤.375 | 1215 | N/A | N/A | 351 |
| | >.375-.500 | 1443 | N/A | N/A | 448 |
| | >.500-.750 | 1575 | 5619 | N/A | 643 |
| | >.750-1.250 | 2658 | 8181 | N/A | 1172 |
| 60 | ≤.375 | 3699 | N/A | N/A | 516 |
| | >.375-.500 | 4056 | N/A | N/A | 676 |
| | >.500-.750 | 4919 | 10424 | 8204 | 1045 |
| | >.750-1.250 | 5971 | 13133 | 12721 | 2001 |

C-III-EX-V-9 of 21



A161

CONTRACT NO. 65004/00

SCHEDULE "C"

ATTACHMENT III - EXHIBIT V

**4.2  STAINLESS STEEL TYPE 304L AND 316L PIPING CLASSES (US Dollars)**

For piping class numbers: 1A1P, 1C1J, 1C1K, 3A1P, 3C1H, 3C1K, 6C1H

| Pipe Size (inches) | Wall Thick (inches) | Flange (Each) | Tee (Each) | Ell (Each) | Per L.M.Pipe |
|---|---|---|---|---|---|
| 4 | <.375 | 155 | 231 | 184 | 71 |
|  | >.375-.500 | 185 | 405 | 246 | 158 |
| 6 | <.375 | 240 | 399 | 360 | 112 |
|  | >.375-.500 | 290 | 690 | 467 | 145 |
| 10 | <.375 | 521 | 996 | 765 | 536 |
|  | >.375-.500 | 574 | 1336 | 1026 | 720 |
| 16 | <.375 | 1206 | 3315 | 1932 | 896 |
|  | >.375-.500 | 1246 | 4016 | 2127 | 926 |
|  | >.500-.843 | 1371 | 6049 | 4141 | 1501 |
| 24 | <.375 | 2162 | 6140 | 4458 | N/A |
|  | >.375-.500 | 2427 | 9311 | 7964 | N/A |
|  | >.500-.750 | 2453 | 11952 | 8674 | N/A |
|  | >.750-1.218 | 2741 | 19363 | 14071 | N/A |





C-III-EX-V-10 of 21

A162

CONTRACT NO. 65004/00

ATTACHMENT III - EXHIBIT V

SCHEDULE "C"

**4.3** **1-1/4 CR PIPING CLASSES (US Dollars)**
For piping class numbers: 3A1M, 3A1MT, 6A1G, 3T2DT

| Pipe Size (Inches) | Wall thickness (Inches) | FLANGE (Each) | TEE (Each) | ELL (Each) | Per LM Pipe |
|---|---|---|---|---|---|
| 4 | STD | N/A | N/A | N/A | N/A |
| 6 | STD | 272 | N/A | N/A | N/A |
| 10 | STD | 467 | N/A | N/A | N/A |
| 16 | ≤.375 | 839 | 1751 | N/A | N/A |
|  | >.375-.500 | 937 | 2401 | N/A | N/A |
|  | >.500-.750 | 1177 | 3185 | 2458 | N/A |
| 24 | ≤.375 | 1437 | N/A | N/A | N/A |
|  | >.375-.500 | 1531 | N/A | N/A | N/A |
|  | >.500-.750 | 1730 | N/A | N/A | N/A |
|  | >.750-1.250 | 2126 | N/A | N/A | N/A |
| 30 | ≤.375 | 1827 | N/A | N/A | N/A |
|  | >.375-.500 | 1894 | N/A | N/A | N/A |
|  | >.500-.750 | 2112 | 9933 | 7939 | N/A |
|  | >.750-1.250 | 2945 | 11522 | 10079 | N/A |
| 36 | ≤.375 | 2518 | N/A | N/A | N/A |
|  | >.375-.500 | 2828 | N/A | N/A | N/A |
|  | >.500-.750 | 3117 | 12305 | N/A | N/A |
|  | >.750-1.250 | 3655 | 13795 | 12653 | N/A |

C-III-EX-V-11 of 21



A163

MAY. 31. 2002  4:23PM    SASM&F    202 393 5760    NO. 6013    P. 40

CONTRACT NO. 65004/00

ATTACHMENT III - EXHIBIT V

**4.4    CEMENT LINED CARBON STEEL PIPING CLASSES (US Dollars)**
For piping class numbers: 2E3AL, 2E3AX, 2E3AY

| Pipe Size (inches) | Wall Thick. (inches) | Flange (Each) | Tee (Each) | Ell (Each) | Per L.M. Pipe |
|---|---|---|---|---|---|
| 4 | STD | 61 | N/A | N/A | 46 |
| 6 | STD | 45 | N/A | N/A | 71 |
| 10 | STD | 89 | 638 | 495 | 117 |
| 16 | STD | 205 | 1113 | 897 | 220 |
| 24 | STD | 799 | 2238 | 892 | N/A |
| 30 | STD | 1195 | 3,333 | 1319 | 349 |
| 36 | <.375 | 1724 | 3954 | 3414 | 526 |
| 36 | >.375-.500 | 1482 | 4377 | 4077 | 701 |
| 48 | <.375 | 3143 | 6453 | 3994 | 641 |
| 48 | >.375-.500 | 3298 | 7376 | 6877 | 897 |
| 60 | <.375 | 4703 | 12509 | 10813 | 1,163 |
| 60 | >.375-.500 | 5255 | 13856 | 12673 | 1,468 |

C-III-EX-V-12 of 21

A164

CONTRACT NO. 6500400

ATTACHMENT III - EXHIBIT V

SCHEDULE "C"

| 4.5 | PIPING HOT TAPS (US Dollars) | | |
| --- | --- | --- | --- |
| Pipe Size (Inches) | Wall thickness (inches) | | Specify (Euro/c) |
| 4 | STD | | N/A |
| 6 | STD | | N/A |
| 10 | STD | | N/A |
| 16 | ≤.375 | | N/A |
|  | >.375-.500 | | N/A |
| 24 | ≤.375 | | N/A |
|  | >.375-.500 | | N/A |
| 30 | ≤.375 | | N/A |
|  | >.375-.500 | | N/A |
| 36 | ≤.375 | | N/A |
|  | >.375-.500 | | N/A |

C-III-EX-V-13 of 21

SCHEDULE "C"

CONTRACT NO. 65004/00

ATTACHMENT III - EXHIBIT V

4.4   CEMENT LINED CARBON STEEL PIPING CLASSES (US Dollars)
For piping class numbers: 2E3AI, 2E3AX, 2E3AY

| Pipe Size (Inches) | Wall Thick (Inches) | Flange (Each) | Tee (Each) | Ell (Each) | Per LM Pipe |
|---|---|---|---|---|---|
| 4 | STD | 61 | N/A | N/A | 46 |
| 6 | STD | 45 | N/A | N/A | 71 |
| 10 | STD | 89 | 638 | 495 | 117 |
| 16 | STD | 205 | 1113 | 897 | 220 |
| 24 | STD | 799 | 2238 | 892 | N/A |
| 30 | STD | 1195 | 3,333 | 1319 | 549 |
| 36 | <.375 | 1724 | 3954 | 3414 | 526 |
| 36 | >.375-.500 | 1482 | 4377 | 4077 | 701 |
| 48 | <.375 | 3143 | 6453 | 3994 | 641 |
| 48 | >.375-.500 | 3298 | 7376 | 6877 | 897 |
| 60 | <.375 | 4703 | 12509 | 10813 | 1,163 |
| 60 | >.375-.500 | 5255 | 13856 | 12673 | 1,468 |

C-III-EX-V-12 of 21

CONTRACT NO. 65004/00

ATTACHMENT III - EXHIBIT V

SCHEDULE "C"

| 4.5 | PIPING HOT TAPS (US Dollars) | | |
| --- | --- | --- | --- |
| Pipe Size (inches) | Wall Thick (inches) | | Specia Current? |
| 4 | STD | | N/A |
| 6 | STD | | N/A |
| 10 | STD | | N/A |
| 16 | <.375 | | N/A |
| | >.375-.500 | | N/A |
| 24 | <.375 | | N/A |
| | >.375-.500 | | N/A |
| 30 | <.375 | | N/A |
| | >.375-.500 | | N/A |
| 36 | <.375 | | N/A |
| | >.375-.500 | | N/A |

C-III-EX-V-13 of 21



A167

SCHEDULE "C"                                                        CONTRACT NO. 65004/00

## ATTACHMENT III - EXHIBIT V

**5.0   Rates include supply and installation and shall apply whether the valve is flanged or welded.**

**5.1   CARBON STEEL VALVES (US Dollars)**
Supply and install Carbon Steel Valves including handling and setting in place (per valve)

| SIZE | GATES 150 | GATES 300 | GATES 600 | BALL 150 | BALL 300 | BALL 600 | BUTTERFLY 150 | BUTTERFLY 300 | BUTTERFLY 600 | GLOBE 150 | GLOBE 300 | GLOBE 600 | PLUG 150 | PLUG 300 | PLUG 600 | SWING CHECK 150 | SWING CHECK 300 | SWING CHECK 600 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-1/2" | 116 | 165 | 203 | 170 | 213 | | N/A | 430 | | 214 | 474 | 392 | 388 | | | | | |
| 2" | 174 | 227 | 328 | 187 | 265 | | 553 | 665 | | 279 | 679 | 554 | 499 | | | 242 | 277 | 476 |
| 3" | 231 | 310 | 540 | 337 | 441 | | 664 | 780 | | 401 | 927 | 1088 | 868 | | | 346 | 479 | 775 |
| 4" | 316 | 428 | 470 | 540 | 678 | | 782 | 1015 | | 674 | 1484 | 2679 | 1070 | | | 467 | 705 | 840 |
| 6" | 477 | 717 | 1698 | 578 | | | 903 | 1371 | | 1246 | 1940 | N/A | 1666 | | | 739 | 1137 | 2134 |
| 8" | 767 | 1061 | 2569 | 1156 | | | 1023 | 1723 | | 1856 | 4068 | | 4184 | | | 1073 | 1632 | 2291 |
| 10" | 1116 | 1460 | 3394 | 2673 | | | 1747 | 3485 | | 3235 | | | 5445 | | | 1514 | 2083 | 2830 |
| 12" | 1396 | 2215 | 4613 | N/A | | | 3235 | 5267 | | | | | 6875 | | | 2189 | | |
| 14" | 2224 | 3030 | 8480 | | | | 3692 | 6241 | | | | | | | | 2705 | | |
| 16" | 2467 | 3656 | 11041 | | | | 4481 | 8425 | | | | | | | | 3741 | | |
| 18" | 3595 | 5490 | 12302 | | | | 5485 | 9079 | | | | | | | | 4469 | | |
| 20" | 4154 | 8776 | 14224 | | | | 6603 | 11664 | | | | | | | | 5844 | | |
| 24" | 6281 | 13100 | 34902 | | | | 12248 | 15825 | | | | | | | | N/A | | |
| 30" | 12226 | 25927 | | | | | 13452 | 18297 | | | | | | | | N/A | | |
| 36" | 24516 | 39406 | | | | | | | | | | | | | | N/A | | |
| 42" | 34491 | 44168 | | | | | | | | | | | | | | N/A | | |
| 48" | 40104 | 54377 | | | | | | | | | | | | | | | | |
| 54" | 63491 | | | | | | | | | | | | | | | | | |

C-III-EX-V-14 of 21



A168

MAY. 31. 2002  4:25PM    SASM&F    202 393 5760    NO. 6013. P. 45

SCHEDULE "C"    CONTRACT NO. 6500a/00

## ATTACHMENT III - EXHIBIT V

**5.2  VALVES CLASS 2E3AX (US Dollars)**
Supply and install Butterfly Valve Per Class 2E3AX of Project Specification
R-198001 including handling and setting in place.(per valve).

| SIZE | BUTTERFLY LUG (Class 150) | BUTTERFLY WAFER (Class 150) |
|---|---|---|
| 4" | 274 | 263 |
| 6" | 413 | 412 |
| 8" | 559 | 572 |
| 10" | 767 | 771 |
| 12" | 1043 | 1027 |
| 14" | 1621 | 1591 |
| 16" | 2192 | 2103 |
| 18" | 2542 | 2578 |
| 20" | 3551 | 3487 |
| 24" | 5708 | 5688 |
| 30" | 8220 | 8378 |

**5.3  STAINLESS STEEL VALVES (US Dollars)**
Supply and install Stainless Steel Valve Type 316L including handling and setting
in place (per valve).

| SIZE | GATE Class | | | GLOBE Class | | | CHECK Class | | |
|---|---|---|---|---|---|---|---|---|---|
| | 150 | 300 | 600 | 150 | 300 | 600 | 150 | 300 | 600 |
| 1-1/2" | 225 | 456 | 539 | 258 | 554 | 663 | 244 | 456 | 500 |
| 2" | 270 | 551 | 992 | 335 | 665 | 1101 | 281 | 541 | 883 |
| 3" | 426 | 889 | 2371 | 653 | 998 | 2278 | N/A | 867 | 2524 |
| 4" | 619 | 1288 | 3268 | 782 | 1669 | 4251 | 728 | 1342 | 3958 |
| 6" | 1100 | 2352 | 7257 | 1394 | 2788 | 7366 | 1339 | 2679 | 6712 |
| 8" | 2113 | 3903 | 12070 | 3203 | 4448 | 13019 | N/A | 4448 | 12187 |
| 10" | 3436 | 6537 | 18229 | 4744 | 9262 | N/A | N/A | 6101 | 18636 |
| 12" | 5197 | 9191 | 24261 | 7625 | 12134 | 27015 | 6069 | 8755 | 23034 |
| 14" | 7725 | 17636 | 33986 | 11540 | 21556 | 39953 | 8488 | 15419 | 31806 |
| 16" | 10476 | 20960 | 42760 | 16471 | 27329 | 52570 | 15381 | 18780 | 41670 |
| 18" | 13224 | 26472 | 59768 | 18618 | 35148 | 68918 | 18674 | 23202 | 62422 |
| 20" | 17612 | 31991 | 75510 | 24346 | 45071 | 86661 | N/A | 27631 | 78861 |

A169

<u>SCHEDULE "C"</u>                                    <u>CONTRACT NO. 65004/00</u>

## ATTACHMENT III - EXHIBIT V

| 5.4 | STAINLESS STEEL VALVES (US Dollars) |
|---|---|

Supply and install Stainless Steel Valve Type 410 including handling and setting    in place (per valve).

| | GATE | | | GLOBE | | | CHECK | | |
| | Class | | | Class | | | Class | | |
| SIZE | 150 | 300 | 600 | 150 | 300 | 600 | 150 | 300 | 600 |
|---|---|---|---|---|---|---|---|---|---|
| 1-1/2" | 275 | 609 | 1051 | 334 | 707 | 743 | 326 | 610 | 685 |
| 2" | 359 | 738 | 1275 | 411 | 847 | 1478 | 394 | 723 | 1444 |
| 3" | 568 | 1192 | 3723 | 849 | 1312 | 3614 | 621 | 1164 | 3396 |
| 4" | 822 | 1715 | 5811 | 1039 | 2160 | 6349 | 943 | 1778 | 5321 |
| 6" | 1470 | 3093 | 9546 | 1830 | 3660 | N/A | 1666 | N/A | N/A |
| 8" | 2739 | 5267 | 18073 | N/A | 5898 | 22978 | N/A | 5865 | 17528 |
| 10" | 4581 | N/A | 27356 | 6401 | 11551 | N/A | 5507 | 9589 | N/A |
| 12" | 6876 | N/A | 33934 | 9884 | N/A | N/A | N/A | N/A | N/A |
| 14" | 10340 | N/A | 56876 | N/A | N/A | N/A | N/A | N/A | 25266 |
| 16" | 13637 | N/A | 66740 | N/A | N/A | 101620 | N/A | N/A | 36220 |
| 18" | 17039 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 53722 |
| 20" | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 63601 |

| 5.5 | ALLOY STEEL VALVES (US Dollars) |
|---|---|

Supply and install Alloy Steel 5 Chrome Valve including handling and setting in place (per valve).

| | GATE | | | GLOBE | | | CHECK | | |
| | Class | | | Class | | | Class | | |
| SIZE | 150 | 300 | 600 | 150 | 300 | 600 | 150 | 300 | 600 |
|---|---|---|---|---|---|---|---|---|---|
| 1-1/2" | 225 | 243 | 265 | 258 | 292 | 325 | 214 | 232 | 249 |
| 2" | 431 | 487 | 820 | 466 | 567 | 689 | 281 | 383 | 501 |
| 3" | 528 | 693 | 1870 | 718 | 983 | 1145 | 446 | 671 | 944 |
| 4" | 701 | 879 | 2160 | 902 | 1342 | 1996 | 631 | 1015 | 1560 |
| 6" | 957 | 1589 | 2897 | 1416 | 2461 | 4096 | 1121 | 2025 | 3224 |
| 8" | 1568 | 2159 | 5876 | 2985 | 4448 | 7402 | 2004 | 3140 | 4666 |
| 10" | 2019 | 5229 | 8860 | 4308 | 5883 | 13186 | 2782 | 4793 | 7736 |
| 12" | 3774 | 7229 | 12134 | 5524 | 10499 | 18674 | 4107 | 7665 | 12134 |
| 14" | 6614 | 14257 | 15456 | 10559 | 19816 | 24176 | 7071 | 10115 | 14257 |
| 16" | 7642 | 17799 | 19325 | 12656 | 26410 | 29680 | 8187 | 12240 | 18780 |
| 18" | 7883 | 21349 | 27562 | 15404 | 34102 | 41732 | 9300 | 15572 | 27562 |
| 20" | 14233 | 24361 | 35261 | 23062 | 42891 | 53791 | 13797 | 17821 | 30901 |

A170

SCHEDULE "C"                                    CONTRACT NO. 65004/00

### ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|

5.6   Supply and install screwed and seal welded
or socket welded 1-1/2 and smaller valves
including, but not limited to, handling, setting
in place, sealant/weld rod as applicable,
thread-on or welding as applicable.

| Carbon Steel (ea.) | | Stainless Steel (ea.) | | Chrome (ea.) | |
|---|---|---|---|---|---|
| 800# | 1500# | 800# | 1500# | 800# | 1500# |
| N/A | N/A | 427.69 | N/A | 330.68 | N/A |

6.0   **Insulation, Lagging and Fireproofing**

6.1   Supply and install lagging and insulation per Project Specification R-198010,
including, but not limited to: surface preparation per Project Specification R-198002.

| Pipe Dia System (Inches) | 4 | 6 | 10 | 16 | 24 | 30 | 36 | 42 | 60 |
|---|---|---|---|---|---|---|---|---|---|
| LM | 36.30 | 51.30 | 82.50 | 125.80 | 185.60 | N/A | N/A | N/A | N/A |

6.2   Supply and install concrete fireproofing
50 mm thick                              SM        26.70

7.0   **Surface Preparation, Painting and Coating**

In addition to the cost elements enumerated on page C-III-1 of 1, Work Unit Rates, Work
Unit Rates for items listed below including, but not limited to: the supply of all permanent
and consumable materials and all necessary labor, staging, protection, and equipment for
complete surface preparation, painting and coating in accordance with Project
Specification R-198010:

| Paint System | 1A | 1B | 1C | 2A | 2B | 2C | 3 | 4 | 6 | 9 | 10 | 11A | 11B | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SM | NA | NA | 11.38 | NA | NA | NA | 9.42 | 11.30 | 11.30 | NA | NA | 9.79 | 8.72 | NA |

| Paint System | 17A | 17B | 19A | 19B | 20A | 20B | 22 | 23 | 24 | 25 | 26A | 26B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SM | 7.39 | 7.47 | NA | 25.48 | 24.30 | NA | NA | NA | NA | NA | NA | 7.71 |



SCHEDULE "C"                                      CONTRACT NO. 65004/00

ATTACHMENT III - EXHIBIT V

|                                              | UNIT OF | UNIT PRICE |
| WORK UNIT DESCRIPTION                        | MEASURE | (US Dollars) |

**8.0   FIELD INSTRUMENTATION**

In addition to the other cost elements enumerated on page C-III-1 of 1, Work Unit Rates, Work Unit Rates for items 8.1 through 8.18 are inclusive of, but not limited to: all engineering, design, procurement, calibration, installation, process connections, testing, instrument installation details, material take-offs and instrument data sheets. Instrumentation shall include provisions for all air supply components (instrument valves, filter regulators) from first instrument valve.

| | | | |
|---|---|---|---|
| 8.1 | Installation and testing of stainless steel tubing including, but not limited to: bending, fittings, straightening, scaffolding, cutting, reaming, clamping and deck penetrations and necessary supports: | | |
| | 8.1.1   .375" (diameter) | LM | 17.50 |
| | 8.1.2   .750" (diameter) | LM | 24.10 |
| 8.2 | Supply and install Moore pneumatic pressure transmitter or equal. | EA | 1,542.30 |
| 8.3 | Supply and install electronic Honeywell smart transmitter or equal including, but not limited to: all process connections and signal cable terminations for following measurements: | | |
| | 8.3.1   Pressure | EA | 1,959.70 |
| | 8.3.2   Differential Pressure | EA | 2,246.50 |
| 8.4 | Supply and install Honeywell Smart temperature transmitter or equal including , but not limited to: thermowell and dual thermocouple. | EA | 1,049.10 |
| 8.5 | Supply and install 4" Daniel model #3400 series in-line flowmeter or equal. | EA | 4,022.10 |
| 8.6 | Supply and install Magnatrol model #B73 series or equal float type level switch. | EA | 923.40 |

A172

### ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|---|
| 8.7 | Supply and install non-contacting Saab radar type level transmitter or equal. | EA | NA |
| 8.8 | Supply and install Consolidated, or equal, carbon steel body, stainless steel trim 1900 series safety relief valves. | | |

| 3" x 4" EA 2601.60. | 4" x 6" EA  NA | 6" x 8" EA  7096.30 |
|---|---|---|

| | | | |
|---|---|---|---|
| 8.9 | Supply and install 6-ft visible length stainless steel vessel mounted level gauge glasses. (complete assembly) | EA | 2,507.49 |
| 8.10 | Supply and install electronic Honeywell non-smart differential pressure transmitter or equal including all process connections and signal cable terminations. | EA | 1,581.90 |
| 8.11 | Supply and install electronic Honeywell non-smart pressure transmitter or equal including all process connections and signal cable terminations. | EA | 1,685.10 |
| 8.12 | Supply and install Honeywell non-smart temperature transmitter or equal including thermowell and dual thermocouple. | EA | 799.10 |
| 8.13 | Supply and install rotating machinery vibration probe and transmitter, Bentley-Nevada or equal. | EA | 1,936.60 |
| 8.14 | Supply and install local electronic receivers (indicators to be either digital or analog), Honeywell or equal. | EA | 572.10 |

A173

CONTRACT NO. 65004/00

## ATTACHMENT III - EXHIBIT V

| WORK UNIT DESCRIPTION | UNIT OF MEASURE | UNIT PRICE (US Dollars) |
|---|---|---|
| 8.15  Supply and install local HOA switch on Start/Stop Panel with Red/Green Run/Stop indication. | EA | 827.80 |
| 8.16  Install field-mounted hardened CRTs (supplied by SAUDI ARAMCO). | EA | 59.50 |
| 8.17  Supply and install analyzers without sampling systems (line mounted). | | |
| 8.17.1    Viscosity | EA | 50,114.00 |
| 8.17.2    Conductivity | EA | 3,314.00 |
| 8.17.3    Turbidity | EA | 1,614.00 |
| 8.17.4    pH | EA | 1,614.00 |
| 8.17.5    $H_2O$ | EA | 2,614.00 |
| 8.17.6    Sulfur | EA | 70,114.00 |
| 8.17.7    $O_2$ in gas (such as fuel gas) | EA | 4,414.00 |
| 8.17.8    $O_2$ in liquid (such as dissolved $H_2O$) | EA | 5,114.00 |
| 8.17.9    Oil in water | EA | 40,114.00 |
| 8.17.10   Density | EA | 10,114.00 |
| 8.17.11   Hydrocarbon Monitor (atmosphere) | EA | 1,222.00 |
| 8.17.12   $H_2S$ Monitor (atmosphere) | EA | 1,422.00 |

SCHEDULE

CONTRACT NO. 6500

## ATTACHMENT III - EXHIBIT V

8.18   Supply and install control valves with carbon steel body and stainless steel trim, including, but not limited to: handling and setting in place (per valve), as follows:

| DESCRIPTION | MANUFACTURER MODEL NO. OR SAUDI ARAMCO APPROVED EQUAL | 3" | 4" | 6" | 8" | 10" | 12" | 14" | 16" | 18" | 20" | 24" | 36" | 42" | 48" | 54" |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| air operated globe type (AOV) valve with positioner and I/P transducer | Fisher Type E | 3217 | 3920 | 5107 | 7562 | 12805 | 23308 | NA | NA | | | | | | | |
| motor operated gate valve (MOV) | Rotork IQ range type actuator | 4339 | 4823 | 5367 | 6187 | 7008 | 8724 | 10075 | 11870 | 13542 | 14549 | 19935 | NA | NA | NA | NA |
| self actuated pressure regulator | Fisher model no. 1098-EGR | 4577 | 6464 | 10288 | 15149 | 18648 | 23790 | | | | | | | | | |
| motor operated ball valve (MOV) | Rotork IQ range type actuator | 5312 | 5777 | 6559 | 7163 | 9780 | 10568 | 11490 | 13050 | 14287 | 16162 | 19519 | 56497 | 72128 | 95043 | 129535 |
| air operated gate valve (AOV) | Fisher Type 1031 (piston operated) | NA | NA | NA | NA | NA | 12009 | 13458 | 17360 | 19013 | 23281 | NA | 67671. | 87137 | 116535 | 208520 |
| air operated ball valve (AOV) | Fisher Type 1031 (piston operated) | NA | NA | 8347 | 8952 | 12166 | 12980 | 13911 | 15739 | 16975 | 18979 | 22558 | NA | NA | NA | NA |

END OF EXHIBIT V

C-III-EX-V-21 of 21

A175

CONTRACT NO. 65004/00

SCHEDULE "C"

ATTACHMENT IV

GUARANTEE FOR ADVANCES

Attention: The Treasurer

Gentlemen:

Since you have awarded our clients Messrs _____  _____
("Contractor") a contract (the "Contract") for detailed design and material procurement,
and since you have agreed to make an advance payment not to exceed (sixty percent of
the Material Price) to Contractor against sums which will later be earned and become due
Contractor pursuant to the Contract upon receipt of a letter guaranteeing such payment,
_____ (Name of Bank) _____ ("Guarantor") hereby irrevocably
and unconditionally covenants and agrees as follows:

 (a) Should you alone determine that Contractor has failed to perform
according to the terms of the Contract, as amended from time to time,
upon your first written or telexed demand the Guarantor shall
immediately pay to you without any reservation the amount you demand,
notwithstanding objection by the Contractor. The amount payable to you
under this guarantee shall not exceed in the aggregate the above-
mentioned amount. Payment under this guarantee shall be made in such
manner as you alone shall stipulate.

 (b) Payments made hereunder shall be free and clear of, and without
deduction for any taxes, levies, imposts, duties, charges, fees, deductions
or withholdings of any nature, including Guarantor's right of set-off.

 (c) The covenants hereof constitute unconditional and irrevocable direct
obligations of Guarantor. No alteration in the terms of the Contract or of
the work to be performed thereunder, and no act or omission by you
which might otherwise discharge Guarantor shall release Guarantor from
any liability hereunder. The covenants hereof shall be binding upon and
inure to the benefit of your successors or assigns.

 (d) For purposes of this guarantee, amounts invoiced under Paragraph 3.2.1 of
Schedule "C" of the Contract less any amounts retained from such

MAY. 31, 2002  4:26PM    SASM&F    202 393 5760    NO. 6013    P. 53

CONTRACT NO. 65004/00

amounts under Paragraph 3.3 shall be called "material advances". Amounts previously paid under Paragraph 3.2.1 for major equipment items and bulk material items which have also been invoiced under Paragraph 3.2.2 shall be called "delivery set offs". On the same day Contractor invoices you each month, Contractor shall advise Guarantor of the total "material advances" and the total "delivery set offs" to date and, if necessary, Guarantor shall adjust this guarantee to be no less than the difference between such amounts. After each adjustment, Guarantor shall certify the current amount of this guarantee to you.

(e)   This guarantee shall remain valid and in full force and effect until _____ ___(A)___, 19 ____ or, if earlier, the date on which you certify to the Guarantor that the Contractor has delivered all major equipment items and bulk materials for the FACILITIES to the WORK Site, as required by the Contract ("Certification Date"). If the Certification Date is later than ___(A)___, 19 ____, this guarantee shall automatically be extended for successive periods of three (3) months each thereafter, until the Certificate Date.

(f)   Guarantor represents and covenants that the amount of this guarantee, when added to any other financial liability incurred by the Guarantor in respect of the Contractor, does not exceed twenty-five percent (25%) of the aggregate amount of the Guarantor's reserves and paid-in capital.

(g)   This guarantee sets forth the full terms of the Guarantor's undertaking, and such undertaking shall not be modified, annulled, or amplified by reference to any other document referred to herein or to which this guarantee relates and any such reference shall not be deemed to incorporate such document herein.

(h)   This guarantee is governed by and shall be construed in accordance with the laws and regulations of (jurisdiction where bank assets are located).

_____
(Authorized Signature)

Name    _____
Title    _____
Bank    _____

END OF ATTACHMENT IV

C-IV-2 of 2

A177

## SCHEDULE "D"

## SAFETY, HEALTH AND ENVIRONMENTAL REQUIREMENTS

### TABLE OF CONTENTS

#### GENERAL PROVISIONS

1.  COMPLIANCE WITH SAFETY, HEALTH AND ENVIRONMENTAL REQUIREMENTS
2.  DEVIATION FROM SAFETY AND ENVIRONMENTAL REQUIREMENTS
3.  FAILURE TO COMPLY
4.  SAUDI ARAMCO ASSISTANCE


#### SECTION I - SAFETY AND HEALTH REQUIREMENTS:

1.  LOSS PREVENTION PROGRAM
2.  WORK PERMITS
3.  WELDING AND CUTTING EQUIPMENT
4.  PERSONAL PROTECTIVE EQUIPMENT
5.  TOOLS AND PORTABLE POWER TOOLS
6.  CARTRIDGE OPERATED TOOLS
7.  LADDERS
8.  SCAFFOLDING
9.  ELECTRICAL INSTALLATIONS AND EQUIPMENT
10. CRANES AND RIGGING EQUIPMENT
11. MECHANICAL EQUIPMENT
12. SAUDI ARAMCO PLANT OPERATIONS
13. TRANSPORTATION
14. INJURY AND DAMAGE REPORTING
15. EXCAVATIONS
16. WORK OVER OR ADJACENT TO WATER
17. FIRE PREVENTION
18. FORMWORK
19. IONIZING RADIATION
20. FIRST-AID FACILITIES
21. EXPLOSIVES
22. ABRASIVE BLASTING AND PAINTING/COATING
23. CONTRACTOR CAMPS

I

A178

## SECTION II - ENVIRONMENTAL REQUIREMENTS:

1.    INTRODUCTION
2.    APPLICABLE SAUDI ARAMCO ENGINEERING REQUIREMENT
3.    WASTE MANAGEMENT PROGRAM
4.    WATER SUPPLY PROTECTION
5.    WASTEWATER MANAGEMENT
6.    SPILL CONTROL
7.    SOLID WASTE MANAGEMENT
8.    AIR POLLUTION MITIGATION
9.    NOISE CONTROL

A179

MAY. 31. 2002  4:27PM    SASM&F        202 393 5760        NO. 6013   P. 56

CONTRACT NO. 65004/00

SCHEDULE "D"

SCHEDULE "D"

SAFETY, HEALTH AND ENVIRONMENTAL REQUIREMENTS

GENERAL PROVISIONS

1.  COMPLIANCE WITH SAFETY, HEALTH AND ENVIRONMENTAL
REQUIREMENTS

CONTRACTOR and all CONTRACTOR employees, agents and subcontractors shall
comply with all applicable Saudi Arab Government safety and environmental
regulations and all SAUDI ARAMCO safety, health and environmental General
Instructions (G.I.s), and other related rules and regulations at all times.  Specifically,
CONTRACTOR shall comply with the provisions of the SAUDI ARAMCO
Construction Safety Manual, sections I & II of this Schedule and all other such related
requirements, specifications and standards as are made known to CONTRACTOR by
SAUDI ARAMCO.  Additionally, the CONTRACTOR shall comply with Producing
Department's Operations Instruction Manual (O.I.M. Number 1.519) and Marine
Department's latest updated versions of the "Basic Marine Vessel Specifications and
Requirements" as applicable for offshore WORK Environment.  CCNTRACTOR may
request from the Company Representative copies of those SAUDI ARAMCO
standards, rules and regulations which are applicable to this contract.
CONTRACTOR shall also take or cause to be taken any additional measures under
the direction of the Company Representative to prevent the injury or death of any
person, or any damage or loss of property during CONTRACTOR's performance of
the WORK.  CONTRACTOR shall maintain the SAUDI ARAMCO Construction
Safety Manual and all applicable SAUDI ARAMCO G.I.s and Engineering Standards
at the WORK Site.

SAUDI ARAMCO may monitor and inspect any WORK Site for compliance with the
above referenced fire, safety, health and environmental standards/requirements.

2.  DEVIATION FROM SAFETY, HEALTH AND ENVIRONMENTAL
REQUIREMENTS

Any deviation by CONTRACTOR from SAUDI ARAMCO's (or other applicable)
safety, health and environmental requirements (or rules and regulations) must be
approved, in advance, in writing by the Company Representative.



D-1

A180

<u>SCHEDULE "D"</u>                                    <u>CONTRACT NO. 65004/00</u>

3.    <u>FAILURE TO COMPLY</u>

Should CONTRACTOR fail to comply with any of the requirements of this Schedule "D", SAUDI ARAMCO shall notify CONTRACTOR in writing of this situation. Upon receiving such notification, the CONTRACTOR shall immediately take all necessary corrective actions. Any corrective action shall, unless provided otherwise in this Contract, be taken at CONTRACTOR's expense. If CONTRACTOR fails to take prompt corrective action, the Company Representative may direct CONTRACTOR to suspend all or part of the WORK pursuant to Schedule "A", Paragraph 22 until satisfactory corrective action has been taken. Costs incurred by CONTRACTOR as a result of such WORK suspension shall be solely the CONTRACTOR's responsibility, and any resultant CONTRACTOR performance delays shall not be deemed excusable hereunder.

4.    <u>SAUDI ARAMCO ASSISTANCE</u>

CONTRACTOR may request assistance from SAUDI ARAMCO with respect to the implementation of its Safety, Health and Environmental requirements. The Company Representative (or the Company Representative's designated party or parties) shall assist CONTRACTOR by explaining good safety and sound environmental practices, pointing out unsafe conditions, and by applying experience and judgment, to assist CONTRACTOR in improving safety and to safeguard the environment. Such assistance by SAUDI ARAMCO shall in no way relieve CONTRACTOR of its responsibilities set forth in this Schedule "D".

5.    Because of the technical nature of this Schedule it has not been translated into Arabic. CONTRACTOR and SAUDI ARAMCO agree to be bound by the English text.


END OF GENERAL PROVISIONS




D-2

A181

<u>SCHEDULE "D"</u>                                            <u>CONTRACT NO. 65004/00</u>

# <u>SECTION I - SAFETY AND HEALTH REQUIREMENTS:</u>

1.    <u>LOSS PREVENTION PROGRAM</u>

The CONTRACTOR shall prepare and submit a Safety and Loss Prevention Program
to the Company Representative for approval no later than fifteen (15) working days
following the execution of this Contract. CONTRACTOR shall ensure full
implementation of the Program. CONTRACTOR shall appoint a qualified full-time
Safety Supervisor to coordinate the Program. The name and address of the Safety
Supervisor shall be submitted to the Company Representative no later than the
Program's submission.

The Program shall outline specific essential measures to be taken by CONTRACTOR
to prevent human injuries and property damage and to ensure compliance with this
Schedule "D".

The Program shall be organized and implemented by each craft or crew supervisor. It
shall include a specific plan to hold a ten minute safety discussion organized and
implemented by each craft or crew supervisor on at least one day in each working
week (see sections I-1, I-4 and I-6 of the SAUDI ARAMCO Construction Safety
Manual, and G.I. Nos. 5.002 and 150.001).

2.    <u>WORK PERMITS</u>

CONTRACTOR shall obtain a WORK Permit (SAUDI ARAMCO form 924-1
through 924-4) for any WORK to be carried out during each shift in any SAUDI
ARAMCO specified "Restricted Area". It shall be CONTRACTOR's responsibility to
ascertain, in advance, whether the WORK Area is designated a Restricted Area. The
Company Representative can give guidance on Restricted Area locations.
CONTRACTOR shall only provide qualified and certified craft personnel to execute
and/or supervise WORK in these Restricted Areas. WORK Permit courses are
provided by the Loss Prevention Department. The certificates of all SAUDI
ARAMCO contractors shall be approved by SAUDI ARAMCO. Supervisory
personnel or other qualified staff must always be present at the WORK Site while any
WORK is in progress. All WORK Permit procedures shall be carried out by the
CONTRACTOR in accordance with SAUDI ARAMCO G.I. No. 2.100. Other G.I.s
may apply as well, such as 2.102, 6.012 and 520.001. (Also see section II-1 of the
SAUDI ARAMCO Construction Safety Manual.)



D-3

**SCHEDULE "D"**                                      **CONTRACT NO. 65004/00**

3.    **WELDING AND CUTTING EQUIPMENT**

All welding and cutting equipment shall comply with best industry standards, and be maintained in good condition. All SAUDI ARAMCO maintenance contractor welders or welding operators must be qualified under the provisions of G.I. Nos. 401.081 and 441.010 as appropriate for the WORK they will be doing. (Also see section II-5 of the SAUDI ARAMCO Construction Safety Manual.)

4.    **PERSONAL PROTECTIVE EQUIPMENT**

CONTRACTOR shall, as a minimum, provide, maintain and enforce the use of the items of equivalent personal protective equipment listed in section I-9 of the SAUDI ARAMCO Construction Safety Manual, and G.I. Nos. 6.020, 7.027, 8.002, 8.003 and 8.005. SAUDI ARAMCO may require "special" protective equipment to be used for any operation involving chemical handling, tetraethyl lead, asbestos, abrasive blasting, painting/coating or other hazardous/toxic material. CONTRACTOR must comply with these requirements when requested by SAUDI ARAMCO.

5.    **TOOLS AND PORTABLE POWER TOOLS**

Tools shall be equipped with proper safeguards and used only in applications for which they were designed. Portable power tools shall be of the double insulated type or three-wire grounded type, and should not be rated or used at a voltage exceeding 125 volts (see section II-10.3 of the SAUDI ARAMCO Construction Safety Manual). All electrical outlets servicing these power tools must be protected by Ground Fault Circuit Interrupters (GFCIs) unless approved otherwise by SAUDI ARAMCO (also see section 9 of this Schedule). All tools shall be free from any defect and maintained in a good operating condition. SAUDI ARAMCO will reject tools found to be defective or of substandard quality.

6.    **CARTRIDGE OPERATED TOOLS**

Cartridge operated tools shall be used only with the prior written approval of the Company Representative. CONTRACTOR shall ensure that only SAUDI ARAMCO approved cartridge tools are used and maintained in good condition, in compliance with section II-10.5 of the SAUDI ARAMCO Construction Safety Manual. (Also see G.I. 2.100.)

No person shall operate, clean, maintain, or repair any cartridge tool unless certified by the cartridge tool manufacturer or an equivalent qualification acceptable to SAUDI ARAMCO. Documentation of certification shall be in the possession of the person on the WORK Site at all times as proof of qualification.



A183

7.  **LADDERS**

CONTRACTOR shall ensure that only metal or timber ladders meeting SAUDI ARAMCO standards are provided and used for ingress to and egress from WORK places, where other means of ingress and egress are not available. (See section II-9.2 of the SAUDI ARAMCO Construction Safety Manual and G.I. 8.001.)

8.  **SCAFFOLDING**

CONTRACTOR shall provide and use scaffolding, platforms or temporary floors for all WORK which cannot be done safely from ground level. The scaffolding shall be constructed of metal components which meet SAUDI ARAMCO standards and erected in compliance with the requirements of section II-9 of the SAUDI ARAMCO Construction Safety Manual. Scaffold planks shall meet the provisions of section II-9.3.6 of the SAUDI ARAMCO Construction Safety Manual (also see G.I. 8.001).

9.  **ELECTRICAL INSTALLATIONS AND EQUIPMENT**

All material and equipment used in temporary electrical installations shall be of a type meeting SAUDI ARAMCO standards including SAUDI ARAMCO Construction Safety Manual requirements(section IV-1). CONTRACTOR shall ensure that all 125 volt, single phase 15 and 20 ampere receptacle outlets not part of the permanent wiring of any building or structure, shall have Ground Fault Circuit Interrupters (GFCIs) for personal protection. (See section IV-I of the SAUDI ARAMCO Construction Safety Manual for details.)

10. **CRANES AND RIGGING EQUIPMENT**

CONTRACTOR shall ensure that all lifting appliances and every part thereof, including all equipment used for anchoring or fixing such appliances, shall be in good mechanical operating condition, free from any defect, and constructed of materials with a specified strength suitable for the intended use. CONTRACTOR shall also ensure that such lifting appliances are properly inspected, maintained, and affixed with SAUDI ARAMCO certification stickers. All chains, hooks, slings, shackles and other equipment on a lifting appliance used for raising or lowering shall be of a SAUDI ARAMCO approved type and maintained in good condition. All mobile heavy equipment and crane operators must possess a valid Kingdom of Saudi Arabia heavy equipment operator's license and be certified by SAUDI ARAMCO to operate such equipment (see G.I. 7.025). All cranes and lifting equipment must be inspected and certified by SAUDI ARAMCO before being permitted to operate on SAUDI ARAMCO projects (see G.I. 7.030). Certified riggers shall be provided per G.I. 7.030. (Also see G.I. Nos. 2.702, 7.026, 7.028 and 7.029 for other related requirements. See sections III-1 and 2 of the SAUDI ARAMCO Construction Safety Manual for other details.)



A184

11.  **MECHANICAL EQUIPMENT**

CONTRACTOR shall ensure that all mechanical equipment provided is maintained in good condition.

All moving parts of any equipment shall be securely guarded to prevent access to these parts by persons working on or passing through the WORK Site. (Also see section III-3 of the SAUDI ARAMCO Construction Safety Manual.)

12.  **SAUDI ARAMCO PLANT OPERATIONS**

CONTRACTOR shall ensure that CONTRACTOR's personnel and the personnel of its subcontractors do not open or close any valves, or operate any electrical switches or any other equipment in SAUDI ARAMCO plant facilities without the prior approval of SAUDI ARAMCO, and only under the direct supervision of the supervising operator or plant foreman. (Also see section II-1 of the SAUDI ARAMCO Construction Safety Manual and G.I. 2.100.)

13.  **TRANSPORTATION**

CONTRACTOR shall ensure that passengers shall travel only in vehicles that are provided with passenger seats. This requirement shall apply for travel to and from any WORK Site, and at the WORK Site itself. Seat belts shall be installed and used in all vehicles carrying personnel (except in the case of buses where seat belts are mandatory only for the driver).

The towing of small equipment such as compressors, welding machines, etc. is allowed, but only after the equipment is properly and safely connected to the tow vehicle (i.e. all safety pins, safety chains, shackles and brake/indicator lights are in place). The towing speed of the vehicle must not exceed 40 kilometers per hour at any time.

CONTRACTOR shall comply with all pertinent requirements of the Saudi traffic regulations for transporting construction materials and supplies between storehouses and WORK Site (see G.I. Nos. 1183.215 and 6.030; and section I-13 of the SAUDI ARAMCO Construction Safety Manual).

14.  **INJURY AND DAMAGE REPORTING**

CONTRACTOR shall ensure that an immediate oral report is made to the Company Representative in the case of all:



A185

**SCHEDULE "D"**                                      CONTRACT NO. 65004/00

- Fatal injuries
- Injuries requiring medical attention which result in lost time
- Damage over SR10,000 to the CONTRACTOR's plant or equipment
- Damage, in any amount, to SAUDI ARAMCO's equipment or property
- Fires
- Damage and all accidents involving cranes and heavy equipment (G.I. 7.026)

For accidents resulting in CONTRACTOR employee fatalities, serious injury to five or more CONTRACTOR employees, or damage to SAUDI ARAMCO equipment or property, a written report (including Saudi Aramco Form 6437 where applicable) shall be submitted promptly to the Company Representative. In addition, SAUDI ARAMCO may convene an engineering review or investigation committee in accordance with the requirements of G.I. 6.001 and G.I. 6.003.

CONTRACTOR shall maintain, in a format approved by the Company Representative, a current record showing all:

- WORK Injuries
- Fires
- Incidents or property damage over SR10,000
- Motor vehicle collisions
- Incidents involving damage to SAUDI ARAMCO equipment and property
- Damage and all accidents involving cranes and heavy equipment (G.I. 7.026)

This record shall be available for inspection at all reasonable times and shall be submitted to SAUDI ARAMCO upon request. (Also see section I-3 of the SAUDI ARAMCO Construction Safety Manual.)

15.  **EXCAVATIONS**

CONTRACTOR shall ensure that all excavation WORK is carried out according to the requirements of section II-2 of the SAUDI ARAMCO Construction Safety Manual.

16.  **WORK OVER OR ADJACENT TO WATER**

Adequate lifesaving and rescue equipment shall be provided by CONTRACTOR on every seagoing vessel, and at every WORK Station where WORK is being carried out over or adjacent to water. Appropriate personal flotation devices shall be used by CONTRACTOR's personnel working over water as prescribed in SAUDI ARAMCO G.I. 6.020. (Also see section VI-2 of the SAUDI ARAMCO Construction Safety Manual and G.I. 1197.001.)



A186

17. **FIRE PREVENTION**

CONTRACTOR shall provide and maintain in good working order suitable fire fighting equipment per the provisions of section I-11.8 of the SAUDI ARAMCO Construction Safety Manual. All CONTRACTOR's personnel shall be properly trained in the use of such equipment. Storage, laydown and fabrication yards shall be laid out in accordance with SAUDI ARAMCO Standards (SAES-B-7A; SAES-B-7C) and NFPA 231 with respect to the spacing of rows, fire lanes and compatibility of material (also see G.I. Nos. 2.711, 1781.001-1 and 1787.000-1; and section I-11 of the SAUDI ARAMCO Construction Safety Manual).

18. **FORMWORK**

CONTRACTOR shall ensure that all formwork supports are constructed to SAUDI ARAMCO standards. As far as practicable, steel units shall be used.

Where the WORK requires a timber supporting structure, the timber used shall be of suitable quality and adequate strength. CONTRACTOR shall obtain prior written approval from the Company Representative before any timber supporting structure is erected.

CONTRACTOR shall ensure that prior to any concrete being placed into any supported formwork structure, approval shall be obtained from the Company Representative (see section II-12 of the SAUDI ARAMCO Construction Safety Manual).

19. **IONIZING RADIATION**

CONTRACTOR shall ensure that any radioactive source used is with the prior written approval of SAUDI ARAMCO in compliance with the provisions of G.I. 150.003 and section IV-2 of the SAUDI ARAMCO Construction Safety Manual. CONTRACTOR shall implement safe working procedures for all operations involving radioactive materials, ensure that all employees using this equipment have a valid "Permit to Use Material/Equipment Producing Ionizing Radiation" and are aware of the mandatory precautions to be taken against ionizing radiation hazards. During any industrial radiographic operation, if a radiation source cannot be retracted, CONTRACTOR shall immediately notify SAUDI ARAMCO so that the latter can provide appropriate assistance to control the damaging effect of ionizing radiation (also see 00-AIP-08 - Radiation Safety Manual).

MAY. 31, 2002  4:29PM    SASM&F                                NO. 6013  P. 64

**20.    FIRST-AID FACILITIES**

CONTRACTOR shall provide and maintain adequate first-aid facilities at the WORK Site in accordance with Articles 134 and 135 of the Saudi Arabian Labor and Workmen Law. When CONTRACTOR employs 50 or more workmen at a WORK Site, CONTRACTOR shall provide a qualified nurse and a dedicated emergency vehicle (ambulance), properly supplied and marked, to transport injured personnel to the nearest health care facility (see section I-8 of the SAUDI ARAMCO Construction Safety Manual and G.I. 150.002).

**21.    EXPLOSIVES**

CONTRACTOR shall promptly advise the Company Representative of any requirement for explosives and only use such explosives after the written approval of Company Representative.

CONTRACTOR shall comply with the General Rules and Requirements for the Handling and Use of Explosives issued by the Saudi Arab Government Ministry of Interior and all SAUDI ARAMCO requirements for explosives contained in section II-6 of the SAUDI ARAMCO Construction Safety Manual and G.I. Nos. 355.015-01 and 475.001.

**22.    ABRASIVE BLASTING AND PAINTING/COATING**

CONTRACTOR shall comply with SAUDI ARAMCO requirements on abrasive blasting and painting/coating contained in G.I. 6.021 and section II-11 of the SAUDI ARAMCO Construction Safety Manual.

**23.    CONTRACTOR CAMPS**

Prior to the commencement of any contractual activity at any site, CONTRACTOR shall obtain through the Company Representative the required Land Use Permit(LUP) in accordance with G.I. 2.718 and SA 8037. Additionally, a Letter of Undertaking for CONTRACTOR site allocation shall be signed, and all stipulated conditions stated therein shall be complied with by the CONTRACTOR. (See G.I. Nos. 2.716 and 2.718).

CONTRACTOR shall ensure that any CONTRACTOR camp facility provided for all CONTRACTOR personnel and Saudi Aramco employees meet the provisions of Saudi Arabia's Labor and Workmen Law and Saudi Aramco fire, safety and environmental health standards. (Also see section I-7 of the SAUDI ARAMCO Construction Safety Manual and G.I. 151.006). SAUDI ARAMCO reserves the right to inspect all CONTRACTOR camp facilities to ensure compliance with applicable laws and SAUDI ARAMCO standards.



A188

SCHEDULE "D"                                          CONTRACT NO. 65004/00

Prior to occupancy and permanent connection of utilities, the CONTRACTOR's camp facilities shall be subject to inspection by SAUDI ARAMCO Loss Prevention Department, Fire Protection Department, and the Preventive Medicine Services Division, and shall meet all applicable safety, fire and health standards. Any additional concerns generated during the inspection shall be brought to the attention of the CONTRACTOR for resolution or action as needed (see G.I. 2.718).

The Loss Prevention Department or other concerned organization may periodically re-inspect any camp facility to ensure that all SAUDI ARAMCO fire, safety and health standards/requirements are being complied with.

END OF SECTION I

D-10

SCHEDULE "D"                                            CONTRACT NO. 65004/00

## SECTION II - ENVIRONMENTAL REQUIREMENTS:

1.   **INTRODUCTION**

   This section covers the handling, treatment and disposal of liquid and solid wastes generated in the course of SAUDI ARAMCO construction projects, both onshore and offshore. This applies to both construction sites and CONTRACTOR camps located on or above SAUDI ARAMCO controlled land.

2.   **APPLICABLE SAUDI ARAMCO AND/OR OTHER ENGINEERING REQUIREMENTS**

   2.1   All SAUDI ARAMCO and/or other engineering requirements referred to herein shall be the current issue and shall be furnished to CONTRACTOR by the Company Representative, upon request. Company Representative will assist CONTRACTOR to obtain other (non-SAUDI ARAMCO) engineering documents.

   2.2   If current SAUDI ARAMCO and/or other engineering requirements do not cover a specific situation, Contractor shall contact the Company Representative for guidance and resolution.

3.   **WASTE MANAGEMENT PROGRAM**

   Concurrent with the preparation of the initial WORK Schedule, CONTRACTOR shall prepare and submit for review to the Company Representative a "Waste Management Program" that details sources and disposal methods for all liquid and solid wastes. This Program shall be in accordance with the recommendations of the "Project Environmental Assessment" (if available) prepared for the project to outline the basic environmental framework for the project execution. CONTRACTOR shall appoint a qualified Environmental Coordinator to coordinate the Program. The name and address of the Environmental Coordinator shall be submitted to the Company Representative no later than the Program's submittal.

4.   **WATER SUPPLY PROTECTION**

   CONTRACTOR shall properly dispose of liquid and solid wastes in accordance with SAUDI ARAMCO Engineering Standards: SAES-A-103, SAES-A-104, SAES-S-007, and SAES-S-010, to insure that water sources and supplies are not contaminated.



A190

MAY. 31, 2002  4:30PM    SASM&F                    202 393 5760            NO. 6013    P. 67

SCHEDULE "D"                                    CONTRACT NO. 65004/00

5.  **WASTEWATER MANAGEMENT**

The basic design of all wastewater treatment units and the disposal of sanitary/
industrial wastewater shall comply with the following: SAUDI ARAMCO Engineering
Standards SAES-A-103 and SAES-A-104, the Saudi Aramco Sanitary Code, GI-
151.006 "Implementing the Saudi Aramco Sanitary Code", the Meteorology and
Environmental Protection Administration (MEPA) Environmental Protection
Standards and, when applicable, the Royal Commission Jubail "Procedure for
Environmental Impact Assessment and the Criteria for Discharge to the Environment",
the Yanbu Environmental Protection Manual, and the Regional Organization for the
Protection of the Marine Environment (ROPME) Protocol Concerning Marine
Pollution Resulting from Exploration and Exploitation of the Continental Shelf and the
International Conference for the Prevention of Pollution at Sea by Ships (MARPOL).

Hydrotest wastewater shall be in accordance with GI-432.000, Pipeline Hydrotest
Water Disposal and SAES-A-007, Hydrostatic Testing Fluids and Lay-up Procedures.

6.  **SPILL CONTROL**

6.1    In the event of an offshore oil spill, the procedures outlined in GI-2.400,
       Offshore Oil Spill Contingency Plan shall be followed. In the event of an
       inland oil spill, the procedures of GI-2.401, Inland Oil Spill Contingency Plan,
       shall be followed.

6.2    CONTRACTOR shall take immediate action to stop a spill and promptly notify
       the appropriate parties as provided for in GI-2.104, Leak and Spill Reporting,
       Section 4.

6.3    In the event of a chemical/oil spill, the CONTRACTOR shall promptly notify
       the Company Representative.

7.  **SOLID WASTE MANAGEMENT**

7.1    **Waste Disposal Program**

       The solid waste portion of CONTRACTOR's Waste Disposal Program shall
       include provisions for temporary site storage, collection, transportation and
       disposal practices.

7.2    **Containers and Storage**

7.2.1    Solid waste shall be stored such that it will not constitute a fire, health,
         safety or environmental hazard or be accessible to animals and
         vectors.



D-12

A191

SCHEDULE "D"                                    CONTRACT NO. 6S004/00

7.2.2   All refuse containing food wastes shall be stored in covered or closed
        containers which are leak-proof, durable and designed for safe
        handling and easy cleaning.

7.2.3   Storage containers shall be of sufficient size and number to contain all
        solid wastes generated between collections.

7.2.4   Construction debris and demolition material will not be allowed to
        accumulate such that it presents an environmental health and/or safety
        hazard.

7.3   Hazardous Waste Storage and Handling

7.3.1   CONTRACTOR shall, when applicable, use the following Company
        General Instructions as guides for its operations involving Hazardous
        Waste Storage and Handling : GI-150.001 Asbestos Regulation; GI-
        355.001, Identifying, Cataloging, Ordering, and Tracking Hazardous
        Material; GI-355.002, Receiving, Storage and Issuing Hazardous
        Material; GI-355.003, Disposing of Hazardous Material; GI-355.004,
        Handling and Storing Polychlorinated Biphenyl ( PCB ) for Disposal.
        The CONTRACTOR shall in conjunction with the initial Work
        Schedule, prepare and submit for review to Company Representative
        the design, construction and method of operation hazardous waste
        storage and handling equipment and facilities as part of the waste
        management program (paragraph 3, Section II of Schedule 'D' ).

7.3.2   All hazardous waste shall be stored in tightly closed, leak proof
        containers made of or lined with materials which are compatible with
        the hazardous waste to be stored. Containers shall be marked with
        warning labels to accurately describe their contents and detail
        appropriate safety precautions.

7.3.3   Incompatible hazardous wastes shall not be stored in the same storage
        or transportation container. The Company Representative will assist
        in determining the compatibility of the wastes.

7.3.4   Hazardous chemicals shall be stored and handled in accordance with
        SAUDI ARAMCO Chemical Hazard Bulletins (CHB) issued by the
        Preventive Medicine Services Division, the manufacturer's Material
        Safety Data sheet (MSDS) or as defined by the Company
        Representative.

D-13

7.3.5   The CONTRACTOR shall have readily available all the relevant
CHB/MSDS's at the chemical storage area and the location where
chemicals are being used.

7.4   Method of Collection

7.4.1   Residential and construction wastes shall be transported by the
CONTRACTOR to disposal areas in vehicles equipped to minimize
windblown debris.

7.4.2   CONTRACTOR shall promptly clean up all spillages and waste lost
from the vehicle on route to the disposal site.

7.4.3   Hazardous waste containers shall be collected and transported by the
CONTRACTOR in a manner which minimizes environmental, fire
and explosion hazards and worker exposure. Transporting vehicles
shall be properly marked and drivers shall carry the appropriate
documents describing the nature of the waste transported and its
degree of hazard.

7.4.4   All vehicles and containers shall be designed to prevent the release of
transported liquid and solid wastes.

7.4.5   Drivers shall have specialized training related to the handling and
disposal of their cargo and carry on board the relevant
CHB/MSDS's. Safety and fire prevention equipment and a telephone
number to contact in an emergency shall be provided on the vehicle.

7.5   Requirements for Establishing a Landfill Disposal Site

CONTRACTOR may choose to operate its own solid waste disposal system,
or to utilize a central waste management system. Prior to establishing or
operating a landfill disposal site on SAUDI ARAMCO controlled land, the
CONTRACTOR shall obtain through the Company Representative a 'Land
Use Permit (LUP)'. Landfill design requirements for municipal solid wastes
shall be in accordance with SAES-S-007, Municipal Solid Waste Disposal
Standard.

7.6   Classification of Landfill Disposal Sites

7.6.1   If the CONTRACTOR operates its own, or uses an existing solid waste
disposal site, the CONTRACTOR shall dispose of waste in an area
which will adequately contain it. The following describes three
landfill types and the material which may be disposed of in each:



A193

7.6.1.1    Class I Landfill Disposal Site - isolates solid wastes from surface water or groundwater. The site shall have a stable foundation and two impermeable liners with leachate collection and removal systems. Precipitation runoff from surrounding areas shall be diverted away from the site. A Class I landfill disposal site must be used for the disposal of Class I hazardous wastes and may be used for the disposal of Class II biodegradable and chemically decomposable wastes and Class III inert wastes.

7.6.1.2    Class II Landfill Disposal Site - shall be above the highest groundwater elevation to prevent direct contact of the wastes with surface water or groundwater. The landfill site shall have a stable foundation and provisions shall be made for diversion of runoff. A Class II landfill disposal site must be used for Class II wastes and may be used for Class III wastes.

7.6.1.3    Class III Landfill Disposal Site - provides little or no protection from underlying groundwater. Surface water adjacent to the disposal site may contact the waste material. A Class III disposal site is for the disposal of Class III inert waste only.

7.6.2    Waste classification will be according to the following:

Class I Hazardous Waste - Wastes which constitute a high degree of hazard to the public health and the environment. These include materials which are flammable, corrosive, reactive, toxic, radioactive, infectious, carcinogenic, mutagenic or teratogenic.

Class II Biodegradable or Chemically Decomposable Waste - Non-hazardous solid wastes and sludges which are biologically or chemically decomposable in the natural environment. Examples include paper, digested sewage, animal wastes, garbage and other putrescible wastes and wood.

Class III Inert Wastes - Wastes which are not biologically or chemically active in the natural environment. Examples include glass, most plastics, rubber products, and construction debris.

7.7    Solid Waste Disposal, Site Design and Operations

Solid waste landfills shall be designed and operated in accordance with SAES-S-007, Municipal Solid Waste Disposal Standard, and the SAUDI ARAMCO Sanitary Code. CONTRACTOR shall incorporate the following into its solid waste portion of the "Waste Disposal Program" as minimum requirements during disposal operations:



SCHEDULE "D"                                    CONTRACT NO. 65004/00

7.7.1    Discharge of Municipal and Construction Waste - Unloading of solid waste shall be confined to as small an area within which equipment can safely and efficiently operate.

7.7.2    Unauthorized Dumping - Provision shall be made to restrict access and dumping of unauthorized material. This includes the overboard dumping of construction debris or refuse from offshore construction activities.

7.7.3    The Company Representative will advise on problematic waste, as required, and provide disposal instructions.

7.7.4    Incompatible Wastes - These wastes shall not be placed in common cells, tanks or containment areas. Exceptions to this include the intentional combination of certain hazardous wastes to achieve neutralization and detoxification by qualified waste management personnel.

7.7.5    Sludge Disposal - Domestic wastewater treatment plant sludges containing greater than or equal to fifteen percent solids shall be disposed in a Class II waste disposal site. The sludge shall be placed over the working face (the area of a landfill in which waste is currently being deposited) and shall be mixed in an appropriate ratio with dry waste to absorb moisture.

7.7.6    Environmental/Water Pollution - Landfill operations shall not cause or allow the discharge of contaminants into the environment or adversely impact surface or groundwater systems.

7.8    Offshore Disposal

7.8.1    Offshore disposal of solid and hazardous waste shall not be allowed. All such waste shall be brought onshore for proper disposal.

7.8.2    Liquid waste treatment and disposal shall be in accordance with ROPME and MARPOL requirements.

7.8.3    Sanitary and industrial wastewater treatment and handling shall be per Paragraph 5 WASTEWATER MANAGEMENT (Section II of Schedule "D").

7.8.4    Disposal of drilling mud and cuttings shall be in accordance with ROPME Protocol Concerning Marine Pollution Resulting from Exploration and Exploitation of the Continental Shelf.

A195

202 393 5760

SCHEDULE "D"                                                   CONTRACT NO. 65004/00

8.     **AIR POLLUTION MITIGATION**

8.1    CONTRACTOR shall comply with SAES-A-102, Ambient Air Quality and
       Source Emission Standard.

8.2    All vehicles shall be properly maintained to minimize excessive exhaust
       emissions and shall comply with the Standardization & Metrology
       Organization for Gulf Cooperation Council (GCC) Countries Standards:

       -    GCC Standard # 47/1984 "Motor Vehicles - Allowable Limits of
            Gaseous Pollutants Emitted to the Atmosphere from Gasoline Engine
            Vehicles".

       -    GCC Standard # 144/1991 "Motor Vehicles - Allowable limits of
            Pollutants Emitted to the Atmosphere from Heavy Duty Diesel Engine
            Vehicles".

       -    GCC Standard # 145/1991 "Motor Vehicles - Method for Testing for
            Pollutants Emitted from Heavy Duty Diesel Engine Vehicles - Part 1 :
            Determination of Exhaust Gaseous Pollutants".

8.3    Dust control shall be accomplished by properly wetting the WORK area prior
       to commencing the WORK and/ or other approved measures.

9.     **NOISE CONTROL**

       Control of noise shall be accomplished in accordance with SAES-A-105 "Noise". For
       construction related noise the CONTRACTOR shall use appropriate abatement and
       mitigation control measures.

                                **END OF SECTION II**

                                **END OF SCHEDULE "D"**

A196

CONTRACT NO. 65004/00

# SCHEDULE "E"

## SETTLEMENT OF DISPUTES, ARBITRATION AND CHOICE OF LAW

1.  **CLAIMS APPEALS**

    If CONTRACTOR rejects SAUDI ARAMCO's written determination (as required by Schedule "A") in regard to any CONTRACTOR claim, CONTRACTOR may resort to the following:

    1.1  **Notice of Appeal.** CONTRACTOR may file a notice of appeal. Any such notice shall:

        1.1.1  Be in writing and addressed to:

               The Manager
               Contracting Department
               Saudi Arabian Oil Company
               P.O. Box 1500
               Dhahran 31311
               Saudi Arabia

        1.1.2  Be submitted within thirty (30) days after receipt of SAUDI ARAMCO's written determination;

        1.1.3  Specify all the reasons why CONTRACTOR deems SAUDI ARAMCO's written determination to be unsatisfactory.

    1.2  **Contract Dispute Settlement Board.** As soon as practicable after SAUDI ARAMCO's receipt of CONTRACTOR's notice of appeal, SAUDI ARAMCO shall establish a Contract Dispute Settlement Board ("Board"). The Board shall review all available information concerning CONTRACTOR's claim.

    1.3  **Final Decision.** SAUDI ARAMCO's final decision shall be communicated by SAUDI ARAMCO to CONTRACTOR in a letter which shall set forth its final offer of settlement. Should CONTRACTOR accept SAUDI ARAMCO's final offer CONTRACTOR shall execute an appropriate settlement document. At any time prior to CONTRACTOR's receipt and acceptance of SAUDI ARAMCO's final decision, CONTRACTOR may proceed as set forth in Paragraph 3 of this Schedule.

Saudi Law - IK    4/89
Revised           4/89

MAY. 31, 2002  4:32PM    SASM&F    ~~202 393 5760~~    NO. 6013   P. 74

Nothing contained herein shall preclude CONTRACTOR or SAUDI ARAMCO from exercising their rights under Paragraph 3 notwithstanding CONTRACTOR's failure to pursue the rights afforded under this Paragraph 1.

2.  <u>CHOICE OF LAW</u>

The laws of Saudi Arabia shall control the interpretation and the performance of this Contract and any other agreements arising out of or relating to it, regardless of where this Contract shall be entered into or performed.

3.  <u>ARBITRATION</u>

Any dispute, controversy or claim arising out of or relating to this Contract or any other agreements arising out of or relating to it, which is not settled by agreement between the parties shall be finally settled in accord with the Arbitration Regulations, Council of Ministers Decision No. 164, dated 21 Jumada II 1403 (the "Regulations") and the Rules For Implementation of the Arbitration Regulations effective as of 10 Shawwal 1405 (the "Rules") and any amendments to either then in force, by one or more arbitrators appointed in accordance with the Regulations, the Rules and this Contract.

3.1  <u>Arbitration by One Arbitrator</u>.  If the parties agree to a one-arbitrator arbitration, the parties shall agree upon and appoint an arbitrator, after first ascertaining that the appointee consents to act, within thirty (30) days from the date on which written notice of referral to arbitration by one party is received by the other party (the "notice date").

3.2  <u>Arbitration by Three Arbitrators</u>.  If the parties are unable to agree on a one-arbitrator arbitration, or, having so agreed, are unable to agree on the arbitrator within thirty (30) days from the notice date, then the arbitration shall be conducted by and before three arbitrators, who shall be appointed as follows.  Each party shall appoint one arbitrator, after first ascertaining that the appointee consents to act, and notify the other party in writing of the appointment within sixty (60) days from the notice date.  The appointed arbitrators shall agree upon and appoint the third arbitrator, after first ascertaining that the appointee consents to act, and notify the parties in writing of the appointment within ninety (90) days from the notice date.

Saudi Law - IK     4/89

MAY. 31, 2002  4:32PM    SASM&F        202 393 5760        NO. 6013  P. 75

3.3 **Arbitrator Qualifications.** The arbitrator(s) selected shall be impartial, and shall have had no interest in or previous connection with the matters in dispute. Neither past or present employees or directors of either party, legal counsel retained by either party, nor persons related to these persons shall be selected as arbitrators.

3.4 **Arbitration Procedures.** The parties shall agree upon the rules of procedure which shall govern the arbitration proceedings. If the parties are unable to agree upon the applicable rules of procedure, the arbitrators shall by majority vote establish the applicable rules of procedure.

3.5 **Arbitrators Not Conciliators.** The parties hereby explicitly consent to the appointment of arbitrators in accordance with the Regulations and Rules and this Contract, and the parties expressly agree that the arbitrators so appointed are arbitrators and not conciliators, and have no authority to effect conciliation.

3.6 **Arbitrator Replacement.** If, at any time, any arbitrator who was appointed by one of the parties dies, withdraws or otherwise becomes incapable of acting, he shall be replaced with another arbitrator by the party who appointed him within a period of thirty (30) days from his death or from the date on which the remaining arbitrators serve a joint, written notice of such withdrawal or incapacity upon the parties. If, at any time, any arbitrator who was appointed by agreement of the parties or by the remaining arbitrators dies, withdraws, or otherwise becomes incapable of acting, he shall be replaced by agreement of the parties or by the remaining arbitrators within a period of sixty (60) days from his death, or from the date on which the remaining arbitrators serve a joint, written notice of such withdrawal or incapacity upon the parties. In the event of the replacement of any arbitrator, the arbitration proceedings shall thereupon, insofar as possible, be continued without rehearing unless all the parties and the arbitrators agree to recommence the proceedings.

3.7 **Basis For Award.** The arbitrators shall base their award only upon the evidence presented to them, the terms of the contractual arrangements between the parties, and the laws of Saudi Arabia.

Saudi Law - IK    4/89    

3.8  <u>Costs, Expenses and Fees</u>.  The arbitrators shall assess in their award the amount of the costs and expenses of arbitration and the arbitrators' fees.  These costs, expenses and fees shall be paid by the party who has lost the arbitration.  If each party has partly lost and partly won, the arbitrators shall apportion the costs, expenses and fees between the parties.

3.9  <u>Finality</u>.  This arbitration provision shall be specifically enforceable by both parties under the Regulations and Rules, and the award of the arbitrators shall be final and binding upon the parties.

3.10  <u>Severability</u>.  Should any part of this Contract or any other agreements arising out of or relating to it be null and void by force of law, such nullity shall not otherwise affect the validity of the arbitration provisions.


**END OF SCHEDULE "E"**


E-4

Saudi Law : IK    4/89

A200

CONTRACT NO. 65004/00

SCHEDULE "F"

TAXES, DUTIES AND RELATED OBLIGATIONS

1.  **REGISTRATION**

CONTRACTOR warrants that it is duly licensed, registered or
otherwise qualified to do business within Saudi Arabia and to
perform the WORK contemplated under this Contract.

2.  **TAX LIABILITY**

CONTRACTOR shall be fully liable for and pay, without
reimbursement from SAUDI ARAMCO, any and all taxes, levies,
fines, penalties, assessments and fees of every kind and
nature, or increases in the foregoing, imposed on CONTRACTOR
as a result of CONTRACTOR's performance of the WORK or in
connection with income earned by CONTRACTOR under this
Contract.

3.  **TAX CERTIFICATES**

3.1  CONTRACTOR hereby agrees to present to SAUDI ARAMCO,
     promptly after the commencement of this Contract and at
     the beginning of each Hijrah year or applicable fiscal
     period thereafter, a certificate from the Saudi Arab
     Government Directorate of Zakah and Income Tax which
     certifies that CONTRACTOR has submitted its final or
     temporary Zakah/Tax Declaration through the previous
     year or period and entitles the CONTRACTOR to receive
     payments until its expiry date.  Notwithstanding
     anything contained elsewhere in this Contract to the
     contrary, no invoice of any kind shall be paid until
     such a certificate, covering the previous Hijrah year or
     applicable fiscal period, has been received by SAUDI
     ARAMCO.  Pending delivery to SAUDI ARAMCO of any such
     certificate, however, CONTRACTOR shall continue to
     perform diligently and to fulfill all obligations under
     the Contract.

3.2  SAUDI ARAMCO shall also withhold payment of CONTRACTOR's
     final invoice under this Contract until CONTRACTOR has
     presented to SAUDI ARAMCO a certificate from the
     Directorate of Zakah and Income Tax which confirms that
     all applicable Zakah and company income tax obligations
     have been paid by CONTRACTOR through the Hijrah year or
     applicable fiscal period in which the final invoice was
     submitted.

F-1

C/R        4/89
MP-IK-LS
OFF-IK-LS
MP-IK-LSTK
Revised    4/92



3.3    All tax certificates shall be delivered to:

        Assistant Controller
        Operations Accounting
        Box 5000
        Saudi Arabian Oil Company
        Dhahran 31311
        Saudi Arabia

4.    <u>DELINQUENT TAXES</u>

If SAUDI ARAMCO is notified in writing by the Saudi Arab
Government to withhold any taxes (including, but not limited
to, company income taxes and the Zakah), fines or related
obligations from any amounts due to CONTRACTOR pursuant to
this Contract, SAUDI ARAMCO shall withhold such amounts and
CONTRACTOR hereby agrees to release SAUDI ARAMCO from and
indemnify and hold SAUDI ARAMCO harmless against any liability
of any nature whatsoever arising out of or by reason of such
withholding. SAUDI ARAMCO will notify CONTRACTOR as soon as
practicable upon receipt of any such notice.  Should SAUDI
ARAMCO be requested to pay any of CONTRACTOR's taxes, fines or
related obligations, CONTRACTOR shall reimburse SAUDI ARAMCO
for any payments so made, or alternatively, at SAUDI ARAMCO's
option, SAUDI ARAMCO may setoff any such sums it has paid to
the Saudi Arab Government against any sums due CONTRACTOR or
which hereafter may become due CONTRACTOR under this Contract
or any other contract which CONTRACTOR may have with SAUDI
ARAMCO at any time.  The provisions of this Paragraph are
continuing ones and their continuing, binding effect shall
survive the expiration or termination of this Contract.

5.    <u>CUSTOMS CLEARANCES AND DUTIES</u>

5.1    SAUDI ARAMCO shall endeavor to secure, and shall pay
    for, all clearances, permits, licenses and any govern-
    mental authorizations required by the Saudi Arab
    Government which must be in SAUDI ARAMCO's name and
    which are necessary for the import or export of any
    SAUDI ARAMCO-supplied materials and fabricated
    structures and subassemblies required for incorporation
    into the FACILITIES.

5.2    CONTRACTOR shall endeavor to secure, and shall pay for,
    without reimbursement from SAUDI ARAMCO, all clearances,
    permits, licenses and any governmental authorizations
    required by the Saudi Arab Government which must be in
    CONTRACTOR's name and which are necessary for the import
    or export of CONTRACTOR's equipment, tools and related
    property to be used by

F-2

C/R          4/89
MP-IK-LS
OFF-IK-LS
MP-IK-LSTK
Revised.      4/92

CONTRACTOR in connection with the WORK and any CON-
TRACTOR-supplied materials and fabricated structures and
subassemblies required for incorporation into the
FACILITIES.

5.3    Except as specifically provided in Schedule "G"
CONTRACTOR shall pay without reimbursement from SAUDI
ARAMCO, all customs duties, transportation fees, port
fees, quarantine fees and any other fees, levies,
assessments, fines or charges of every kind and nature
required or levied by the Saudi Arab Government or by
any other government on CONTRACTOR's equipment, tools
and related property to be used by CONTRACTOR in
connection with the WORK and on any CONTRACTOR-supplied
materials and fabricated structures and subassemblies
required for incotporation into the FACILITIES.

5.4    CONTRACTOR or CONTRACTOR's personnel shall pay, without
reimbursement from SAUDI ARAMCO, all customs duties,
fees, levies, assessments, fines and charges of every
kind and nature required or levied by any government on
the persons or possessions of CONTRACTOR's personnel.


6.    <u>REIMBURSEMENT TO SAUDI ARAMCO</u>

If SAUDI ARAMCO is ordered by any governmental authority in
Saudi Arabia to pay any sum of money in satisfaction of any
debt or obligation in Saudi Arabia of CONTRACTOR, any sub-
contractor or the personnel of either of them, SAUDI ARAMCO
shall give CONTRACTOR written notice of its payment.  CON-
TRACTOR shall reimburse SAUDI ARAMCO for the amount paid upon
receipt of SAUDI ARAMCO's billing and evidence of the
governmental order which required SAUDI ARAMCO to make the
payment.


END OF SCHEDULE "F"


F-3


C/R            3/91
MP-IK-LS
OFF-IK-LS
MP-IK-LSTK
Revised        4/92

CONTRACT NO. 65004/00

# SCHEDULE "G"

# I N D E X

| Item | Description | Page |
|------|-------------|------|
| Schedule "G" | Material, Tools and Equipment | G-1 thru G-5 |
| Schedule "G" Attachment I | COMPANY-Supplied Materials, Tools and Equipment | G-I-1 of 2 of G-I-2 of 2 |
| Schedule "G" Attachment II | Materials Procurement by CONTRACTOR | G-II-1 thru G-II-3 |
| Schedule "G" Attachment III | Spare Parts For Parent Equipment | G-III-1 thru G-III-4 |
| Schedule "G" Exhibit I, Attachment III | Capital Spare Parts | EX-I-1 of 1 |
| Schedule "G" Exhibit II, Attachment III | Instructions For Providing Equipment Manufacturer Parts Data to SAUDI ARAMCO | EX-II-1 thru EX-II-2 |
| Schedule "G" Attachment IV | Materials Standardization List | G-IV-1 thru G-IV-5 |

### END OF SCHEDULE "G" INDEX

CONTRACT NO. 65004 /00

## SCHEDULE "G"

## MATERIALS, TOOLS, AND EQUIPMENT

**1.0    SAUDI ARAMCO-SUPPLIED MATERIAL, TOOLS AND EQUIPMENT**

1.1    The material listed on Attachment I shall be furnished to CONTRACTOR by SAUDI ARAMCO, or, if applicable, to the Affiliated Contractor at its fabrication yard outside Saudi Arabia, during normal working hours from the locations noted on Attachment I, at no cost, and in usable condition subject only to repairs or reconditioning normal to material received at a fabrication yard or construction site.

1.2    The tools and equipment listed on Attachment I shall be furnished to CONTRACTOR by SAUDI ARAMCO during normal working hours from the locations noted on Attachment I on an "as is, where is" basis.

1.3    CONTRACTOR shall be responsible for safeguarding SAUDI ARAMCO-supplied material, tools, and equipment and ensuring that they are treated with due care, properly maintained, and used and operated in a prudent manner.

1.4    Upon completion of the WORK, or at any other time as directed by Company Representative, CONTRACTOR shall document as required by SAUDI ARAMCO, properly pack, identify and return unused or reusable SAUDI ARAMCO-supplied material, tools and equipment to any SAUDI ARAMCO designated location which is no further from the WORK Site than the original delivery point of such items. The condition of all returned SAUDI ARAMCO-supplied material, tools, and equipment shall be as good as when received by CONTRACTOR, normal wear and tear excepted.

1.5    Except as noted in Paragraph 1.1 with regard to furnishing material outside Saudi Arabia, SAUDI ARAMCO shall be responsible only for loading and unloading those SAUDI ARAMCO-supplied items located within a SAUDI ARAMCO-operated materials supply facility. CONTRACTOR, or its Affiliated Contractor shall provide ten (10) SAUDI ARAMCO work days advance written notice of its marine vessels' arrival at a commercial port or a SAUDI ARAMCO wharf facility for receipt of SAUDI ARAMCO-supplied items. CONTRACTOR shall be represented at the loading or unloading for its entire duration, and shall sign a receiving form attesting to the quantity and condition of the SAUDI ARAMCO-supplied material, tools, and equipment upon receipt.

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

A205

1.6  All SAUDI ARAMCO-supplied material, tools, and equipment deemed by the Company Representative to be unusable shall be documented as required by SAUDI ARAMCO, and transported by CONTRACTOR to any SAUDI ARAMCO-designated disposal location, where CONTRACTOR shall make disposal in accordance with instructions received from the Company Representative.

## 2.0  CONTRACTOR-SUPPLIED MATERIALS, TOOLS AND EQUIPMENT

2.1  Except as provided in Paragraph 1, CONTRACTOR shall supply all materials, tools and equipment, and all else required for the successful completion of the WORK. CONTRACTOR-supplied material shall be new and unused, and shall be procured in accordance with Attachment II of this Schedule "G".

2.1.1  Except as may result from the application of this Schedule "G", Paragraph 4, all engineered equipment as set forth in Attachment IV of this Schedule "G", shall only be supplied from the selected Vendors identified therein.

2.2  CONTRACTOR-supplied material, its sources and related services shall be selected solely on the basis of financial and technical criteria, provided that Saudi Manufacturers, vendors and carriers shall be preferred in accordance with Paragraphs 3.0 and 4.0.

2.3  CONTRACTOR-supplied materials shall duplicate, or have interchangeable parts with, other similar materials either being used in the construction of the FACILITIES or already listed in the SAUDI ARAMCO Materials System (SAMS) catalog.

2.4  If a Saudi Arab Standards Organization (SASO) certificate is required for CONTRACTOR-supplied materials, CONTRACTOR shall promptly forward a copy of the SASO-approved certificate to the Company Representative.

## 3.0  PREFERENCE FOR SAUDI VENDORS AND CARRIERS

SAUDI ARAMCO utilizes Saudi vendors and Saudi carriers for procuring and shipping a significant portion of its material requirements, and encourages its suppliers and contractors to utilize the services of these Saudi companies for a significant share of their procurement and transportation requirements for SAUDI ARAMCO projects.

Whenever CONTRACTOR procures material or makes transportation arrangements, SAUDI ARAMCO encourages CONTRACTOR to contact Saudi vendors, the two national ocean carriers, the National Shipping Company of Saudi Arabia (NSCSA) and the United Arab Shipping Company (UASC), and the national airline, Saudi Arabian Airlines (SAUDIA), or their representatives (full details of which may be obtained from SAUDI ARAMCO), and to give them the opportunity of quoting in respect to CONTRACTOR's requirements.

G-2

MP-IK-LSTK 11/92
OFF-IK-LSPB
MP-IK-LSPB
NS        1/31/94

**4.0    PREFERENCE FOR SAUDI MANUFACTURERS**

4.1    "Saudi Manufacturers" are industrial establishments within Saudi Arabia who mine, manufacture or assemble products using reasonable amounts of local raw materials or local manpower in their production, as certified by the Ministry of Industry and Electricity.

4.2    As far as is practicable, CONTRACTOR shall standardize material types, sizes and characteristics so that products of Saudi Manufacturers can be used as standard or acceptable alternative materials.

4.3    For each material requirement whose value exceeds Ten Thousand U.S. Dollars ($10,000), and for which SAUDI ARAMCO's Industrial Development Division Report IDD4A lists a Saudi Manufacturer, CONTRACTOR shall develop competitive quotations from at least three (3) Saudi Manufacturers. If less than three (3) manufacturers are listed then all shall receive quotation requests. If CONTRACTOR determines to purchase such material from a Saudi Manufacturer, CONTRACTOR may place the order without further SAUDI ARAMCO involvement or compensation. Otherwise, CONTRACTOR shall advise SAUDI ARAMCO of:

   4.3.1    the lowest technically acceptable Saudi Manufacturer quotation, including the price F.O.B. the manufacturer's plant or warehouse plus the costs of moving the material to the WORK Site; and

   4.3.2    the lowest technically acceptable non-Saudi Manufacturer quotation, including the price F.O.B. the port of export plus the cost of export packing and preparation, insurance, ocean freight, levies and port fees, and the other costs of moving the material to the WORK Site.

   CONTRACTOR shall separately state the costs comprising each quotation in Saudi Riyals, converted, if necessary, at SAUDI ARAMCO's prevailing currency exchange rates.

4.4    Promptly after receipt of the two quotations described in Paragraphs 4.3.1 and 4.3.2, SAUDI ARAMCO shall have the right to direct CONTRACTOR to purchase the material from the Saudi Manufacturer, and CONTRACTOR shall comply with SAUDI ARAMCO's direction. SAUDI ARAMCO's exercise of its right shall have no effect on any of CONTRACTOR's other obligations under this Contract, and the material so purchased shall be considered CONTRACTOR-supplied material.

G-3

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

A207

4.5    If SAUDI ARAMCO exercises its right under Paragraph 4.4, upon receipt of the material at the WORK Site SAUDI ARAMCO shall pay CONTRAC- TOR an amount determined by subtracting the price described in Para- graph 4.3.2 from the price described in Paragraph 4.3.1. Except for this amount, SAUDI ARAMCO shall pay no other compensation of any kind arising out of or as a result of SAUDI ARAMCO's direction.

4.6    If CONTRACTOR's records do not establish CONTRACTOR's compliance with this Paragraph 4, CONTRACTOR shall pay SAUDI ARAMCO ten percent (10%) of the purchase price for material so procured.

## 5.0    ADDITIONAL MATERIALS, TOOLS AND EQUIPMENT

5.1    If, through no fault of CONTRACTOR, CONTRACTOR is unable to furnish certain of those items specified in Paragraph 2.1 of Schedule "G" in time to meet the Scheduled Completion Date or Critical Milestone Dates, SAUDI ARAMCO may, at its discretion, furnish CONTRACTOR with such items as are requsted by CONTRACTOR. CONTRACTOR undertakes to pay for such additional materials, tools and equipment at the prices/usage rates established therefore by SAUDI ARAMCO. Material shall be transferred by Change Order or sale, as agreed by the parties.

5.2    Sales under this Paragraph shall have no effect on the Contract Price and the material sold shall be considered CONTRACTOR-supplied ma- terial. Materials issued by Change Order pursuant to this Paragraph shall be considered SAUDI ARAMCO-supplied, additional to that listed in Attachment I of Schedule "G".

## 6.0    SAUDI ARAB CUSTOMS DUTY

6.1    CONTRACTOR shall not include in the Contract Price Saudi Arab Cus- toms duties for any CONTRACTOR-supplied material. For materials which are exempt from customs duties CONTRACTOR shall proceed with its Saudi Arab Customs responsibilities in strict accordance with SAUDI ARAMCO General Instruction (G.I.) 399.452, which is incorporated by reference in this Contract.

6.2    If CONTRACTOR is unable to import any or all CONTRACTOR-supplied material duty-free, and has strictly complied with G.I. 399.452, SAUDI ARAMCO shall promptly reimburse CONTRACTOR for Saudi Arab Cus- toms duties paid by CONTRACTOR on any such CONTRACTOR-sup- plied material. CONTRACTOR shall submit its invoices to SAUDI ARAMCO for such reimbursement, together with proof of payment and an "Application for Customs Duties Paid", and with any other documents re- quired by such application. CONTRACTOR hereby authorizes SAUDI ARAMCO to apply to Saudi Arab Customs, and keep for SAUDI ARAM- CO's account, any customs duty refunds on such materials.

G-4

6.3    SAUDI ARAMCO shall have no obligation to reimburse CONTRACTOR for customs duties if CONTRACTOR fails to submit the support documentation required or if CONTRACTOR fails to comply with G.I. 399.452.

6.4    CONTRACTOR shall maintain complete material records, and shall repay to SAUDI ARAMCO any reimbursement of duties on those unused materials purchased in connection with the WORK that can reasonably be used for other work.

## 7.0    TRANSLATION

Because of the technical nature of Attachment I, it has not been translated into Arabic. CONTRACTOR and SAUDI ARAMCO agree to be bound by the English text.

### END OF SCHEDULE "G"

G-5



MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

SCHEDULE "G"

ATTACHMENT I

SAUDI ARAMCO-SUPPLIED MATERIALS, TOOLS AND EQUIPMENT

1.    SAUDI ARAMCO-SUPPLIED MATERIAL

NONE

2.    SAUDI ARAMCO-SUPPLIED TOOLS AND EQUIPMENT

| Description | Unit | Qty | Place of Delivery | Date of Delivery |
|---|---|---|---|---|
| 139-D-211 Tempered Water Expansion Drum | Ea. | 1 | SA Laydown Yard** | At contract signing |
| 139-D-212 Makeup Inhibitor Tank | Ea. | 1 | SA Laydown Yard** | At contract signing |
| 139-E-112 A-D Black Oil Heat Exchangers (Train 1) | Ea. | 4 | SA Laydown Yard** | At contract signing |
| 139-E-112 E-H Black Oil Heat Exchangers (Train 2) | Ea. | 4 | SA Laydown Yard** | At contract signing |
| 139-E-203 A-J Tempered Water Air Coolers | Ea. | 10 | SA Laydown Yard** | At contract signing |
| 139-G-206 A-C Tempered Water Pumps | Ea. | 3 | SA Laydown Yard** | At contract signing |
| Emergency Power Distribution Multi-Way Disconnect Switches | Ea. | 2 | SA Laydown Yard** | June 15, 1996 |

A210

SCHEDULE "G"                                          CONTRACT NO. 65004/00

### ATTACHMENT I

2.    **SAUDI ARAMCO - SUPPLIED TOOLS AND EQUIPMENT - (Contd)**

| Description | Unit | Qty | Place of Delivery | Date of Delivery |
|---|---|---|---|---|
| In-Plant Telephones   Handsets | Ea. | 28 | SA Laydown Yard** | July 2, 1996 |
| Speakers | Ea. | 28 | SA Laydown Yard** | July 2, 1996 |
| Analyzer Shelter with Associated Fast Loop Pump and Communications Cable | Ea. | 5 | SA Laydown Yard** | September 1, 1996 |
| Analyzer Cabinets | Ea. | 2 | SA Laydown Yard** | September 1, 1996 |
| PAS Hardened Work Station and Associated Communications Cable | Ea. | 1 | SA Laydown Yard** | December 6, 1996 |
| Remote Terminal Unit (Remote I/O Serial Port) | Ea. | 2 | SA Laydown Yard** | June 24, 1997 |

** Note:  Saudi Aramco Logistics Laydown Yard, located at Ras Tanura, Saudi Arabia

### END OF ATTACHMENT I

CONTRACT NO. 65004/00

SCHEDULE "G"

ATTACHMENT II

MATERIALS PROCUREMENT BY CONTRACTOR

1.0    CONTRACTOR's PROCUREMENT PLAN

CONTRACTOR shall submit for SAUDI ARAMCO's review a Procurement Plan within thirty (30) days after the effective date of this Contract.  At minimum, the Procurement Plan shall cover the following:

1.1    A description of the procurement process and the way procurement information will flow from quotation development through delivery to WORK Site.

1.2    A description of engineering/procurement/purchasing interfaces, corrective actions, and procedures for SAUDI ARAMCO review of documents when required.

1.3    A description of all periodic reports to be produced and their scheduled issue dates, which reports shall include a Monthly Materials Procurement Status Report and a Spare Parts Control Log per Schedule "G", Attachment III.

1.4    A procedure for accomplishing the standardization of material pursuant to Schedule "G" and detailed procedures for control of all material substitutions.

2.0    CONTRACTOR'S PROCUREMENT DOCUMENTS

2.1    CONTRACTOR shall analyze all bids and, if requested by SAUDI ARAMCO, provide the technical and scheduling details of any proposed placement.

2.2    CONTRACTOR's purchase orders and quotation requests shall include the following requirements:

2.2.1    Capital Spare Parts per Schedule "G", Attachment III, Exhibit I or as otherwise required by SAUDI ARAMCO.

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

2.2.2    Spare parts data requirements per Schedule "G",
        Attachment III.

2.2.3    Operating and maintenance manuals requirements.

2.2.4    Quality Assurance and Quality Control requirements.

2.2.5    Special tools to install, adjust and maintain equipment during
        start-up. Special tools needed for subsequent maintenance
        shall be provided and turned over to SAUDI ARAMCO at Project
        Completion.

2.2.6    Vendor representatives as agreed necessary for start up of
        equipment.

2.2.7    All information submitted shall be in the English language and
        units of measure as indicated in the job specification.

## 3.0    MATERIALS PROCUREMENT STATUS REPORT

3.1    CONTRACTOR shall issue a Record of Orders report monthly, or as
      otherwise requested, reporting on the status of each order. The report
      shall include information on at least the following:

      3.1.1.    Quotation request number and date.
      3.1.2    Order number and date.
      3.1.3    Vendor and country of manufacture.
      3.1.4    Brief description.
      3.1.5    Item number.
      3.1.6    Required delivery date for design data.
      3.1.7    Delivery date for equipment/materials.
      3.1.8    Delivery date for principal spare parts.

3.2    CONTRACTOR shall submit to SAUDI ARAMCO a Saudi Participation
      Status Report once CONTRACTOR has completed fifty per cent (50%)
      and one hundred per cent (100%) of the material procurement under this
      Contract showing cumulative deliveries of Saudi vendors' and Saudi
      Manufacturers' orders.

3.3    CONTRACTOR shall submit monthly to SAUDI ARAMCO a report identi-
      fying and tracking all:

      3.3.1    long lead items
      3.3.2    specialized installation equipment

MP-IK-LSTK    11/92
OFF-IK-LSPB
MP-IK-LSPB

A213

MAY. 31. 2002  4:35PM    SASM&F                                    NO. 6013   P. 90

202 393 5760

A214

FROM

(FRI) 5.31'02  4:58/ST. 4:57/NO. 4261977542 P 3



**STONE & WEBSTER, INCORPORATED**

ONE PENN PLAZA

250 WEST 34TH STREET

NEW YORK, NEW YORK

212-290-7500

ADDRESS ALL CORRESPONDENCE TO P. O. BOX 1244, NEW YORK, NEW YORK 10116

June 2, 1994

PARENT COMPANY
PERFORMANCE GUARANTEE

The Treasurer
Box 5000
Saudi Arabian Oil Company
Dhahran 31311
Saudi Arabia

Gentlemen:

In consideration of the Saudi Arabian Oil Company ("SAUDI ARAMCO") entering into Contract No. 65004/00 ("the Contract") with BUGSHAN S&W COMPANY, LTD.Commercial Registration Number 1010038670, issued at Riyadh on 15 Jumada II 1401 ("CONTRACTOR"), a company in which the undersigned has a direct or indirect interest, the undersigned "Guarantor" hereby irrevocably, unconditionally and absolutely guarantees the full and faithful performance of the Contract by CONTRACTOR.

Without limiting the undertakings of Guarantor set forth in the preceding paragraph, Guarantor specifically agrees to the following:

(a)  Should SAUDI ARAMCO in its sole judgment determine that CONTRACTOR has failed in any respect to perform according to the terms of the Contract, or that CONTRACTOR has become bankrupt or insolvent or otherwise unable to meet its financial obligations, Guarantor shall promptly perform or arrange for the prompt performance of all uncompleted obligations of CONTRACTOR under or arising out of the Contract, in any case without regard to whether CONTRACTOR objects or SAUDI ARAMCO elects to terminate any part of the Contract for cause.

(b)  The covenants hereof constitute unconditional and irrevocable direct obligations of Guarantor. No alteration in the terms of the Contract or of the WORK to be performed thereunder, no termination of the Contract, or any part thereof, and no act or omission by SAUDI ARAMCO which might otherwise discharge Guarantor, shall release Guarantor from any liability hereunder. The covenants hereof shall inure to the benefit of SAUDI ARAMCO's successors or assigns.

1889 · STONE & WEBSTER · 1989
100

A216

- 2 -

Saudi Arabian Oil Company                    June 2, 1994

(c)  Guarantor shall insure the performance by CONTRACTOR of
     CONTRACTOR's tax obligations as set forth in the
     Contract.  If a demand is made that SAUDI ARAMCO pay or
     if SAUDI ARAMCO is required to pay any Saudi Arab or
     other Government taxes, fines or related obligations of
     CONTRACTOR and CONTRACTOR fails to pay upon being
     notified of the demand or fails to reimburse SAUDI
     ARAMCO, Guarantor shall pay such taxes, fines or related
     obligations or shall reimburse SAUDI ARAMCO fully
     therefor.

(d)  Guarantor  does  hereby  unconditionally  guarantee
     satisfaction within thirty (30) days of any award
     rendered against CONTRACTOR in any arbitration held
     pursuant to the terms of the Contract.  If CONTRACTOR
     fails to satisfy the award, then Guarantor agrees to
     satisfy the award within the next thirty (30) days.

(e)  In the event that SAUDI ARAMCO terminates the Contract,
     or any part thereof, for cause and either itself or
     through others completes all or any part of the
     uncompleted WORK, Guarantor shall reimburse SAUDI ARAMCO
     for the excess cost to SAUDI ARAMCO for completing the
     uncompleted WORK over and above sums paid and to have
     been paid to CONTRACTOR for the performance of such WORK.
     Guarantor shall also reimburse to SAUDI ARAMCO all
     unearned partial payments, progress payments and advanced
     payments previously made by SAUDI ARAMCO in respect of
     the terminated WORK.  The foregoing notwithstanding,
     SAUDI ARAMCO shall not perform or have others perform the
     terminated WORK without first advising Guarantor of its
     intent to do so and allowing Guarantor not less than
     fourteen (14) calendar days to commence performance of
     such terminated work.

(f)  It shall not be necessary, in order to enforce this
     guarantee, for SAUDI ARAMCO to institute suit or obtain
     a judgment, whether in the United States, the Kingdom of
     Saudi Arabia or anywhere else, or exhaust its legal
     remedies against CONTRACTOR.  Guarantor shall reimburse
     SAUDI ARAMCO for all costs or expenses incurred by SAUDI
     ARAMCO in enforcing this guarantee

(g)  Guarantor hereby waives notice by SAUDI ARAMCO of any of
     the following:

     (i) Acceptance of this guarantee by SAUDI ARAMCO.

A217

— 3 —

Saudi Arabian Oil Company                      June 2, 1994

(ii) Extension of time granted by SAUDI ARAMCO for the performance by CONTRACTOR of its obligations under or arising out of the Contract.

(iii) Demand by SAUDI ARAMCO for performance of, or failure by CONTRACTOR to perform, its obligations under or arising out of the Contract.

(iv) All other notices for which Guarantor might otherwise by entitled in connection with this guarantee, except the notice required by Paragraph (e) above of SAUDI ARAMCO's intent to perform uncompleted work itself or through others.

(h) All notices to SAUDI ARAMCO concerning this guarantee shall be sufficient when delivered in person or sent by telex or cable or by certified or registered mail to the Treasurer at the address set forth above, telex ASAO 801219 TREAS SJ..

(i) This guarantee shall bind the undersigned Guarantor, its successors and assigns. If any party becomes obligated to perform any obligation of CONTRACTOR under or arising out of the Contract, whether by operation of law or otherwise, any and all rights of SAUDI ARAMCO against Guarantor shall remain in full force.

(j) This guarantee is governed by and shall be construed in accordance with the laws and regulations of the State of New York.

(k) This guarantee is effective and enforceable as of the effective date of Contract No. 65004/00

Very truly yours,

STONE & WEBSTER, INCORPORATED

By: _____
Title:  President
Date:  June 2, 1994

A218

FROM                          (FRI) 5. 31' 02   4:59/ST. 4:57/NO. 4261977542 P  6

- 4 -

Saudi Arabian Oil Company                    June 2, 1994

IN CONSIDERATION of the award of Contract
No. 65004/00, CONTRACTOR acknowledges
and consents to the foregoing.

ACKNOWLEDGED AND AGREED:
BUGSHAN S&W COMPANY, LTD.

By:
Title: _____ GENERAL MANAGER _____
Date: _____

A219

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED | ) | Case No. 00-02142-PJW |
| et al., | ) | |
| | ) | Jointly Administered |
| Debtors | ) | |
| | ) | |
| | ) | |
| STONE & WEBSTER, INCORPORATED, | ) | |
| and STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION, et al., | ) | |
| Plaintiffs | ) | |
| | ) | |
| -against- | ) | Adversary Proceeding |
| | ) | No.: 02-03963-PJW |
| SAUDI ARABIAN OIL COMPANY and | ) | |
| ABDULLAH SAID BUGSHAN & BROTHERS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| SAUDI AMERICAN BANK | ) | |
| | ) | |
| Intervenor | ) | |

**SAUDI AMERICAN BANK'S MOTION TO
INTERVENE AND TO JOIN ABDULLAH SAID
BUGSHAN & BROTHERS AS A DEFENDANT**

Saudi American Bank ("SAMBA") respectfully moves this Court for an order (i)

allowing it to intervene as a plaintiff in this Adversary Proceeding as a matter of right pursuant to

Rule 24(a) of the Federal Rules of Civil Procedure; or alternatively, (ii) allowing it to intervene

as a plaintiff in this action permissively pursuant to Rule 24(b) of the Federal Rules of Civil

Procedure;[1] and (iii) joining Abdullah Said Bugshan & Brothers ("ASB&B") as a party in this action.

By intervening in this action and joining ASB&B as a party, SAMBA seeks to assert the claims set forth in its Complaint in Intervention, a copy of which is attached to this motion as Exhibit A.

As grounds for this motion, SAMBA states, as follows:

SAMBA is entitled to intervene in this action as a matter of right, or permissively, because:

1. SAMBA has a legally protectable interest in the subject matter of this action for the reasons described in the Complaint in Intervention. Specifically,

A. The subject matter of Adversary Proceeding No. 02-03963-PJW (hereinafter, the "Saudi Aramco Proceeding") concerns rights to payments and proceeds under Contract No. 65004/00 between Saudi Arabian Oil Company ("Saudi Aramco") and Bugshan S&W Company Ltd ("BS&W") (hereinafter, the "In-Kingdom Contract");

B. Debtors, the plaintiffs in the above-captioned action, have alleged that the proceeds of the In-Kingdom Contract are assets of BS&W as to which debtor SWEC is entitled to assert rights because they constitute estate property held by Saudi Aramco.

C. Debtors, Saudi Aramco, the defendant in the above-captioned action, and Abdullah Said Bugshan & Brothers ("ASB&B"), a creditor in the above-captioned cases with an objected-to proof of claim that is substantially related to the In-Kingdom Contract, have stated their intention to enter a settlement that will result in the payment of sums by Saudi Aramco that constitute proceeds under the In-Kingdom Contract.

D. SAMBA holds an assignment by BS&W (the "Assignment") of all proceeds of the In-Kingdom Contract, including all claims arising out of the In-Kingdom Contract. The Assignment provides that such proceeds shall be security for all obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations, whether incurred in connection with the In-

---

[1] Rules 24(a) and 24(b) are applicable in the instant adversary proceeding pursuant to Bankruptcy Rule 7024. See Fed. R. Bankr. P. 7024.

2

Kingdom Contract or otherwise. BS&W remains obligated to SAMBA for an amount in excess of $7,000,000.

E.    SAMBA's contractual right under the Assignment to the proceeds of the In-Kingdom Contract, along with Saudi Aramco's acknowledgment of those rights, entitles SAMBA to receive all payments made by Saudi Aramco in connection with the In-Kingdom Contract. Notwithstanding these rights, the proposed settlement among Debtors, Saudi Aramco, and ASB&B described at the hearing held by this Court on October 3, 2002 would deprive SAMBA of its rights under the Assignment to receive all proceeds of the In-Kingdom Contract. Saudi Aramco and ASB&B have provided no assurances that they will refrain from such conduct.

2.    SAMBA's interests in the action will be substantially impaired or impeded if it is not allowed to intervene. In particular, SAMBA would be deprived of more than $7,000,000 to which it is entitled to as security for obligations of BS&W and which it is entitled to apply in satisfaction of obligations of BS&W to SAMBA. As such, SAMBA has a strong financial interest in any disposition of the litigation.

3.    The motion is timely since it is made prior to Saudi Aramco having answered Debtors' Complaint, prior to the completion of briefing with respect to Saudi Aramco's motion to dismiss the complaint in this adversary proceeding, prior to the documentation of any settlement, and prior to any motion or hearing for approval of a settlement of this action. This motion is made within approximately one month of SAMBA having discovered that Debtors, Saudi Aramco, and ASB&B were planning to attempt a settlement intended to circumvent SAMBA's rights under the assignment of contract proceeds and to damage SAMBA by means of the proposed settlement.

4.    SAMBA has attached its proposed Complaint in Intervention to this Motion.

SAMBA is entitled to an order joining ASB&B as a party because ASB&B is a "person to be joined if feasible." In short, ASB&B is a necessary party within the meaning of Rule 19(a)

3

A222

of the Federal Rules of Civil Procedure because in its absence, complete relief may not be accorded to SAMBA or the other parties.  In particular, unless ASB&B is joined as a party, the injunctive relief requested in SAMBA's Complaint in Intervention cannot be granted in its entirety.

 The grounds for this motion are more fully set forth in the accompanying Opening Brief in Support of SAMBA's Motion to Intervene and to Join ASB&B as a Defendant.

Respectfully submitted,
Saudi American Bank,
By its attorneys,

Francis A. Monaco, Jr. (#2078)
Kevin J. Mangan (#3810)
**WALSH MONZACK & MONACO, P.A.**
1201 N. Orange Street, Suite 400
Wilmington, DE  19801
Tel. (302) 656-8163

Of Counsel:

John C. Hutchins (BBO# 246060)
Daniel E. Rosenfeld (BBO# 560226)
Amy Beth Abbott (BBO# 648072)
**KIRKPATRICK & LOCKHART LLP**
75 State Street
Boston, Massachusetts 02109
Tel:  (617) 261-3100

Dated: November 7, 2002

4

A223

# EXHIBIT "A"

Document #: 8529

EXHIBIT "A"

Document #: 8529

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| STONE & WEBSTER, INCORPORATED <u>et al.</u>, | Case No. 00-02142-PJW |
| Debtors | Jointly Administered |
| STONE & WEBSTER, INCORPORATED, and STONE & WEBSTER ENGINEERING CORPORATION, <u>et al.</u>, Plaintiffs | |
| -against- | Adversary Proceeding No.: 02-03963-PJW |
| SAUDI ARABIAN OIL COMPANY and ABDULLAH SAID BUGSHAN & BROTHERS, Defendants | |
| SAUDI AMERICAN BANK, Intervenor | |

## <u>COMPLAINT IN INTERVENTION</u>

Intervenor-plaintiff Saudi American Bank ("SAMBA"), by and through its undersigned

attorneys, as and for its Complaint in Intervention (hereinafter, referred to as the "Complaint in

Intervention") alleges, as follows:

A.   <u>NATURE OF THE PROCEEDING</u>

1.   On or about May 31, 2002, plaintiffs Stone & Webster, Incorporated ("SWINC"), and

its direct and indirect subsidiaries, including Stone & Webster Engineering Corporation

Document #17903

A225

("SWEC"), debtors and debtors-in-possession in the above-captioned cases (collectively, "Debtors"), commenced this adversary proceeding against Saudi Arabian Oil Company ("Saudi Aramco"). Hereinafter, this adversary proceeding is referred to as the "Saudi Aramco Proceeding."

2. Debtors' Complaint in the Saudi Aramco Proceeding (hereinafter, the "Complaint") sets forth four causes of action against Saudi Aramco, including counts for declaratory relief pursuant to 11 U.S.C. § 105 and 28 U.S.C. §§ 2201-2202, indemnification, breach of contract, and turnover pursuant to 11 U.S.C. § 542(b). A complete description of Debtors' Complaint (D.I. 1) is incorporated by reference to said Complaint.

3. As relief for the claims alleged in the Saudi Aramco Proceeding, Debtors seek (1) a declaration that SWINC is not liable to Saudi Aramco under a parent guarantee obligating SWINC to satisfy certain claims against Bugshan S&W Company Limited ("BS&W"), a Saudi Arabian limited liability company in which SWEC was one of two shareholders, (2) indemnification with respect to any amounts for which SWEC is individually liable as a shareholder of BS&W for a claim brought against BS&W by one of its subcontractors, Mohammad Al-Mojil Group ("Al-Mojil"), (3) damages caused by Saudi Aramco's breach of its contract with BS&W, and (4) the turnover of $148 million, due and owing to BS&W under a contract between BS&W and Saudi Aramco, Contract No. 65004/00, a copy of which is attached as Exhibit A to Debtors' Complaint (D.I. 1). Hereinafter, Contract No. 65004/00 is referred to as the "In-Kingdom Contract," which is the same reference used by Debtors in their Complaint. According to Debtors, the proceeds of the In-Kingdom Contract are assets of BS&W as to which SWEC is entitled to assert rights, and which constitute estate property held by Saudi Aramco.

2

A226

4.  This Complaint in Intervention is an action for declaratory relief pursuant to 11 U.S.C. § 105 and 28 U.S.C. §§ 157, 1330, 1331, 1334, 2201-2202 and Fed. R. Bankr. P. 7001 and injunctive relief pursuant to 11 U.S. C. § 105 and Fed. R. Bankr. P. 7065.

5.  Specifically, SAMBA, by this action, seeks a declaration that BS&W's assignment of the In-Kingdom Contract proceeds dated January 22, 1995 (a copy of which is attached as Exhibit 1 and incorporated herein by reference) is valid and enforceable.  Hereinafter, said assignment of the In-Kingdom Contract proceeds is referred to as the "Assignment of Contract Proceeds."

6.  By this action, SAMBA also seeks a declaration that BS&W's specific payment instruction letter dated September 21, 1994 (hereinafter, the "Specific Payment Instruction Letter"), a copy of which is attached as Exhibit 2 hereto and incorporated by reference, Saudi Aramco's acknowledgement letter dated November 13, 1994 (hereinafter, "Saudi Aramco's Acknowledgment"), a copy of which is attached as Exhibit 3 hereto and incorporated by reference, SAMBA's reminder letter to Saudi Aramco dated May 11, 2002 regarding the Specific Payment Instruction Letter to Saudi Aramco (hereinafter, "SAMBA's Reminder Letter"), a copy of which is attached as Exhibit 4 hereto and is incorporated by reference, and Saudi Aramco's confirmation dated June 2, 2002 that the assignment and authorization contained in the Specific Payment Instruction Letter are irrevocable and continue to be in full force and effect (hereinafter, "Saudi Aramco's Confirmation"), a copy of which is attached as Exhibit 5 hereto and is incorporated by reference, all result in a valid, enforceable, and irrevocable requirement that any and all compensation due from Saudi Aramco under the In-Kingdom Contract be paid to Saudi American Bank, Fluor Branch, P.O. Box 842, Al-Khobar 31952, Saudi Arabia for credit to BS&W's account.

3

A227

7.  By this action, SAMBA seeks a declaration that all proceeds of the In-Kingdom Contract, including but not limited to proceeds arising from the award of monetary judgments and/or settlement proceeds of claims arising out of the In-Kingdom Contract, are assigned to SAMBA and that such proceeds shall be security for obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations whether incurred in connection with the In-Kingdom Contract or otherwise.

8.  By this action, SAMBA further seeks a declaration that all proceeds of the In-Kingdom Contract, including any proceeds arising from settlements between or among Debtors, Saudi Aramco, and/or Abdullah Said Bugshan & Brothers ("ASB&B") or judgments arising in connection with the Saudi Aramco Proceeding are to be paid directly to SAMBA, Al-Khobar (Fluor Branch), P.O. Box 842, Al-Khobar, Saudi Arabia for credit to BS&W's account, and that none of the proceeds of the In-Kingdom Contract are to be paid by Saudi Aramco to Debtors or ASB&B, without the express written permission of SAMBA, or further order of this Court.

9.  By this action, SAMBA further seeks injunctive relief (i) prohibiting Saudi Aramco from making payments related to the In-Kingdom Contract, unless such payments are paid directly to SAMBA, Al-Khobar (Fluor Branch), P.O. Box 842, Al-Khobar for credit to BS&W's account, and (ii) prohibiting Debtors and ASB&B from accepting payments directly or indirectly from Saudi Aramco related to the In-Kingdom Contract, unless such payments are made with the express written permission of SAMBA, or pursuant to further order of this Court.

B.  <u>JURISDICTION AND VENUE</u>

10.  This Court has jurisdiction over this action under 28 U.S.C. §§157, 1330 and 1334. This action is a core proceeding because it is for the allowance of a claim pursuant to 28 U.S.C. §157.

<div align="center">4</div>

11.    Venue is proper under 28 U.S.C. § 1409 because this proceeding arises in and is related to the bankruptcy cases brought by debtor SWINC, and its direct and indirect subsidiaries, including SWEC, which cases are pending in this District.

12.    On information and belief, the Court has personal jurisdiction over Saudi Aramco pursuant to 28 U.S.C. 1330 and Fed. R. Bankr. P. 7004(f).

13.    The Court has personal jurisdiction over ASB&B pursuant to Bankruptcy Rule 7004(f).  The Court also has jurisdiction over ASB&B by virtue of the fact that it has previously submitted to this Court's jurisdiction by entering its appearance in the Debtors' bankruptcy cases in and by filing its Proof of Claim, Proof of Claim No. 4419.

C.    <u>PARTIES</u>

14.    SAMBA is a corporation organized and existing under the laws of the Kingdom of Saudi Arabia and maintains its principal place of business in Riyadh, Saudi Arabia.

15.    SWINC is a corporation organized under the laws of the State of Delaware, and maintains its principal place of business in Boston, Massachusetts.

16.    SWEC is a corporation organized under the laws of the state of Delaware and maintains offices in Boston, Massachusetts.

17.    Upon information and belief, Saudi Aramco is a company organized under the laws of the Kingdom of Saudi Arabia.

18.    Upon information and belief, ASB&B is a company organized under the laws of the Kingdom of Saudi Arabia and maintains offices in Riyadh, Saudi Arabia.  Upon information and belief, ASB&B is one of the shareholders of BS&W.  ASB&B has made a general

5

A229

appearance in Debtors' bankruptcy cases through its counsel, Akin, Gump, Strauss, Hauer & Feld, LLP.

D.     FACTUAL BACKGROUND

        a)     Debtors' Complaint against Saudi Aramco

19.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that BS&W is a limited liability company organized under the laws of the Kingdom of Saudi Arabia, that SWEC and ASB&B are the two joint shareholders of BS&W, and that notwithstanding BS&W's status as a limited liability company, allegations have been made that, under Saudi law, SWEC is liable for the debts of BS&W. See Complaint at ¶ 15.

20.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that on or about June 28, 1994, Saudi Aramco and BS&W entered into the "In-Kingdom Contract." See Complaint at paragraph 14.

21.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that Saudi Aramco failed to perform its obligations under the In-Kingdom Contract in several respects. See Complaint at ¶¶ 25-28.

22.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that Saudi Aramco's actions caused BS&W to incur substantially increased costs, and that notwithstanding Saudi Aramco's improper conduct, BS&W continued to perform under the In-Kingdom Contract. See Complaint at ¶ 28.

23.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that on or about June 30, 1998, BS&W submitted to Saudi Aramco a claim against it for approximately $112.9

<div align="center">6</div>

million, later adjusted to $148 million, allegedly due and owing under the In-Kingdom Contract (the "BS&W Claim"). See Complaint at ¶ 37.

24.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that claims of Al-Mojil, a Saudi Arabian sub-contractor on the In-Kingdom Contract, against BS&W, are substantially related to the BS&W Claim. See Complaint at ¶ 34.

25.     Debtors' Complaint in the Saudi Aramco Proceeding alleges that SWEC may be entitled to indemnification from Saudi Aramco in connection with the claims of Al-Mojil.

        b)     ASB&B'S Proof of Claim and Debtors' Objection

26.     On or about August 20, 2000, ASB&B filed a Proof of Claim in the Debtors' above-captioned bankruptcy cases. ASB&B's Proof of Claim was designated as Proof of Claim No. 4419.

27.     ASB&B's Proof of Claim contained a Statement of Claim, which stated,

Abdullah Said Bugshan & Brothers ("ASB&B") is a general partnership founded and existing under the laws of the Kingdom of Saudi Arabia having claims against Stone & Webster, Inc., the Debtor in Jointly Administered Chapter 11 Bankruptcy Case No. 00-2412. The legal basis for the claim of ASB&B is a right of contribution pursuant to its legal relationship with the Debtor and Bugshan Stone & Webster Saudi Ltd. ("BS&W"). The Debtor and ASB&B are members of BS&W, a company whose organizational structure under Saudi law provides for certain contribution rights of its members. Any right of contribution would arise out of the pending commercial dispute between Mohammad Al-Mo'Jil Group and BS&W pending before the Board of Grievances located in Dammam, Saudi Arabia. Attached hereto as Tab "B" is a copy of the pleading filed by the plaintiff in the lawsuit styled *Mohhammad Al-Mo'Jil Group v. BS&W* (the "Saudi Lawsuit"). In the Saudi Lawsuit, the plaintiff is seeking compensatory damages for an alleged breach of contract by BS&W in connection with a construction project undertaken for the Saudi Arabian Oil Company ("ARAMCO"). In the Saudi Lawsuit, plaintiff is seeking damages in the approximate amount of 231,204,026 Saudi Riyals, which is the equivalent to $61,654,407 in U.S. currency. If the plaintiff is successful in the Saudi Lawsuit, ASB&B will have a contribution claim against the Debtor for at least 50% of the damages awarded plus the costs of defense. Although the clam of ASB&B is contingent at this

7

time, ASB&B reserves all rights to amend this claim pursuant to 11 U.S.C. § 501(d), 11 U.S.C. § 502(e)(2), FED. R. BANKR. P. 3002(c)(3) and other applicable provisions of the United States Bankruptcy Code and Bankruptcy Rules of Procedure.

28.     On or about August 1, 2001, Debtors filed an Objection to Claim of Abdulla Said Bugshan & Brothers Under 11 U.S.C. § 502(e) (hereinafter, the "Objection"). Debtors' Objection asserts that ASB&B's Proof of Claim No. 4419 should be disallowed in its entirety pursuant to 11 U.S.C. § 502(e), first because neither SWEC nor ASB&B is liable for the judgment assessed against BS&W inasmuch as neither SWEC nor ASB&B is individually responsible for any debt owed by BS&W to Al-Mojil, and since ASB&B has no liability to Al-Mojil, it has no contingent right to contribution, and second, because the arbitration judgment is unenforceable against SWEC. The Objection is attached hereto as Exhibit 6.

c)     SAMBA's Rights to the Proceeds of the In-Kingdom Contract Under the Assignment of Contract Proceeds

29.     On or about January 22, 1995, BS&W executed and delivered to SAMBA an Assignment of Contract Proceeds. A copy of the Assignment of Contract Proceeds is attached hereto as Exhibit 1.

30.     Pursuant to the Assignment of Contract Proceeds, BS&W assigned to SAMBA all proceeds of the In-Kingdom Contract, including proceeds of all claims arising out of the In-Kingdom Contract.

31.     Pursuant to the Assignment of Contract Proceeds, all proceeds of the In-Kingdom Contract are security for all obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations whether incurred in connection with the In-Kingdom Contract or otherwise.

8

A232

32.    Pursuant to the Assignment of Contract Proceeds, BS&W agreed to notify all payors under the In-Kingdom Contract, including but not limited to Saudi Aramco, that an assignment of proceeds of the In-Kingdom Contract was executed by BS&W in favor of SAMBA, that all proceeds of the In-Kingdom Contract due to BS&W should therefore be paid directly to Saudi American Bank, Al-Khobar (Fluor Branch), P.O. Box 842, Al Khobar, Saudi Arabia, and that BS&W's authorization would remain in effect unless and until such payors received written revocation signed by SAMBA.

33.    Pursuant to the Assignment of Contract Proceeds, BS&W agreed that it would not agree to any material modification of the In-Kingdom Contract or waive or release any substantial rights thereunder, or make any assignment of the In-Kingdom Contract or any part thereof without the prior written consent of SAMBA.

34.    Pursuant to the Assignment of Contract Proceeds, BS&W agreed that SAMBA could establish a collateral account for BS&W and deposit all proceeds of the In-Kingdom Contract in such account.

35.    Pursuant to the Assignment of Contract Proceeds, BS&W appointed SAMBA as its attorney to file claims, institute proceedings and take such other action concerning proceeds as SAMBA may consider necessary or desirable to protect its rights under the Assignment of Contract Proceeds.

36.    On or about September 21, 1994, BS&W sent the Specific Payment Instruction Letter to Saudi Aramco. A copy of the Specific Payment Instruction Letter is attached as Exhibit 2 hereto and is incorporated herein by reference.

9

A233

37.    The Specific Payment Instruction Letter requests and authorizes Saudi Aramco to pay SAMBA for credit to BS&W's account any and all compensation due from Saudi Aramco under the In-Kingdom Contract, as it may be changed from time to time. The Specific Payment Instruction Letter states that it shall not be revocable by BS&W, shall be effective on the date it is acknowledged by Saudi Aramco, and shall continue in effect until final settlement of the In-Kingdom Contract, including payment of any retention.

38.    On or about November 13, 1994, Saudi Aramco executed and returned to BS&W its Acknowledgment of Assignment to BS&W, attaching BS&W's September 21, 1994 Specific Payment Instruction Letter. At the same time Saudi Aramco sent a copy of said Acknowledgement of Assignment to SAMBA.

39.    On or about May 11, 2002, SAMBA sent its Reminder Letter to Saudi Aramco, informing Saudi Aramco that the Assignment of Contract Proceeds remained in full force and effect and that the Specific Payment Instruction Letter including the assignment and authorization referred to therein, was not revocable and continued in effect. SAMBA further requested and directed Saudi Aramco to continue to pay any proceeds (whether progress payments, retention payments, or in settlement of claims or otherwise) directly to SAMBA. SAMBA further notified Saudi Aramco that BS&W remained in debt to SAMBA for an amount in excess of $7,000,000.

40.    On or about June 2, 2002, Saudi Aramco sent to SAMBA Saudi Aramco's Confirmation, confirming that the Assignment of Contract Proceeds and authorization contained in the Specific Payment Instruction Letter are irrevocable and continue to be in full force and effect.

10

A234

41.     On or about May 31, 2002, Debtors commenced the Saudi Aramco Proceeding.

42.     On or about September 25, 2002, Saudi Aramco filed a motion to dismiss the Complaint on the grounds that Saudi Aramco is immune from suit under the Foreign Sovereign Immunities Act, that SWINC's cause of action for declaratory judgment is not ripe for adjudication, frivolous and subject to arbitration, that SWEC has failed to state a breach of contract claim against Saudi Aramco, that Debtors have failed to state a claim under § 542(b) of the Bankruptcy Code, and that SWEC cannot sustain any of its claims to the extent its objections to the Bugshan claim are upheld.

43.     Saudi Aramco has not yet filed an answer to Debtors' Complaint in the Saudi Aramco Proceeding.

44.     Debtors have not yet responded to Saudi Aramco's Motion to Dismiss.

45.     On or about May 31, 2000, SAMBA notified BS&W that it was in default of its obligations to SAMBA and SAMBA demanded payment by BS&W of $12,150,000, plus fees and expenses owing as of that date.  A copy of SAMBA's notice and demand dated May 31, 2000 is attached as Exhibit 7 hereto and is incorporated herein by reference thereto.

46.     On October 3, 2002, at a hearing before the United States Bankruptcy Court for the District of Delaware, Debtors, Saudi Aramco and ASB&B made appearances in this Court in which they represented to the Court that conditioned upon the resolution of the Saudi Lawsuit between BS&W and Al-Mojil (as described in ASB&B's Proof of Claim No. 4419) prior to November 13, 2002, a settlement will be presented to this Court for final approval.

47.     During the October 3, 2002 hearing, Debtors' counsel stated that the settlements between Debtors, Saudi Aramco and ASB&B all relate to each other.  Debtors' counsel further

11

A235

stated that the settlement would resolve the Saudi Aramco Proceeding as well as ASB&B's Proof of Claim No. 4419 and Debtors' Objection thereto.

48.    Debtors' counsel stated that the contract that gave rise to the disputes between Debtors and Saudi Aramco and Debtors and ASB&B was a contract between Saudi Aramco and BS&W.

49.    Upon information and belief, the contract Debtors' counsel was referring to as having given rise to the disputes between Debtors and Saudi Aramco and Debtors and ASB&B is the In-Kingdom Contract.

50.    On October 3, 2002, SAMBA's counsel informed Debtors' counsel that to the extent a settlement of the claims arising out of the In-Kingdom Contract involved a payment by Saudi Aramco such settlement would violate SAMBA's rights under the Assignment of Contract Proceeds. In response thereto, Debtors' counsel made a statement to the effect that Debtors intended to circumvent SAMBA's rights under the Assignment of Contract Proceeds and to damage SAMBA by means of the proposed settlement.

51.    During the October 3, 2002 hearing, Debtors' counsel stated that the proposed settlement between Debtors, Saudi Aramco and ASB&B includes a pledge by Saudi Aramco to pay at least $15,000,000 towards a resolution of the claims.

52.    The payment by Saudi Aramco described to the Court in the October 3, 2002 hearing will result in the payment of proceeds for claims arising out of the In-Kingdom Contract.

53.    Saudi Aramco's counsel confirmed that the proposed settlement would result in the payment of $15,000,000 towards a resolution of claims arising out of the In-Kingdom Contract.

A236

54.     ASB&B's counsel confirmed that the proposed settlement would result in the payment of $15,000,000 towards a resolution of claims arising out of the In-Kingdom Contract.

55.     On or about October 29, 2002, Saudi Aramco's counsel stated that Saudi Aramco will proceed with the proposed settlement provided that its payments are made to BS&W and that the settlement is approved by this Court after SAMBA has had an opportunity to be heard. Saudi Aramco's counsel has not confirmed that the payments in connection with the proposed settlement will be made pursuant to the Assignment of Contract Proceeds, Specific Payment Instruction Letter, Saudi Aramco's Acknowledgement, SAMBA's Letter, and/or Saudi Aramco's Confirmation.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment pursuant to 11 U.S.C. § 105
and 28 U.S.C. §§ 157, 1330, 1331, 1334, 2201-2202
and Fed. R. Bankr. P. 7001)**

56.     The allegations of paragraphs 1 through 55 of this Complaint in Intervention are repeated and realleged as if fully set forth herein.

57.     Pursuant to relevant statutory provisions, described above and incorporated herein by reference, including but not limited to, 11 U.S.C. § 105 and 28 U.S.C. §§ 2201 – 2202, and within the context of the causes of action pleaded within Debtors' Complaint and this Complaint in Intervention, SAMBA is entitled to a declaration as to the rights and obligations of the parties, including SAMBA and Saudi Aramco. The specific declaratory relief sought is set forth in SAMBA's Prayers for Relief set forth below.

A237

**SECOND CAUSE OF ACTION**
**(Injunctive Relief pursuant to 11 U.S.C. § 105**
**and Fed. R. Bankr. P. 7065)**

58.     The allegations of paragraphs 1 through 57 of this Complaint in Intervention are repeated and realleged as if fully set forth herein.

59.     SAMBA has demonstrated a strong likelihood of success on the merits of its claim for declaratory relief and that settlement of the Saudi Aramco Proceeding and ASB&B's Proof of Claim No. 4419 and Debtors' Objection thereto upon the terms proposed at the October 3, 2002 hearing in this Court will violate SAMBA's rights under the Assignment of Contract Proceeds, Specific Payment Instruction Letter, Saudi Aramco's Acknowledgement and Saudi Aramco's Confirmation.

60.     Absent the requested relief, SAMBA faces an imminent threat of irreparable harm.

61.     Accordingly, SAMBA is entitled to entry of an order for injunctive relief as set forth in SAMBA's prayer for relief below.

WHEREFORE, SAMBA respectfully seeks the following:

    a.     Declaratory judgment in its favor that BS&W's Assignment of Contract Proceeds is valid and enforceable;

    b.     Declaratory judgment in its favor that the Specific Payment Instruction Letter, Saudi Aramco's Acknowledgment, SAMBA's Letter, and Saudi Aramco's Confirmation all result in a valid, enforceable, and irrevocable requirement that any and all compensation due from Saudi Aramco under the In-Kingdom Contract be paid to Saudi American Bank, Fluor Branch, P.O. Box 842, Al-Khobar 31952, Saudi Arabia for credit to BS&W's account;

    c.     Declaratory judgment in its favor that all proceeds of the In-Kingdom Contract, including but not limited to proceeds arising from the award of monetary judgments and/or settlement proceeds of claims arising out of the In-Kingdom Contract, are assigned to SAMBA and that such proceeds

14

A238

shall be security for obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations, whether incurred in connection with the In-Kingdom Contract or otherwise;

d.  Declaratory judgment in its favor that all proceeds of the In-Kingdom Contract, including any proceeds arising from settlements between or among Debtors, Saudi Aramco, and/or ASB&B or judgments arising in connection with the Saudi Aramco Proceeding are to be paid directly to SAMBA, Al-Khobar (Fluor Branch), P.O. Box 842, Al-Khobar, Saudi Arabia for credit to BS&W's account, and that none of the proceeds of the In-Kingdom Contract are to be paid by Saudi Aramco to Debtors or ASB&B, without the express written permission of SAMBA, or further order of this Court;

e.  Injunctive relief (i) prohibiting Saudi Aramco from making payments related to the In-Kingdom Contract, unless such payments are paid directly to SAMBA, Al-Khobar (Fluor Branch), P.O. Box 842, Al-Khobar for credit to BS&W's account, and (ii) prohibiting Debtors and ASB&B from accepting payments directly or indirectly from Saudi Aramco related to the In-Kingdom Contract, unless such payments are made with the express written permission of SAMBA, or pursuant to further order of this Court;

f.  Awarding SAMBA its attorneys' fees, costs and other expenses in this action;

g.  Granting such other and further relief as to which SAMBA is entitled.

Respectfully submitted,
Saudi American Bank,
By its attorneys,

Dated:  November 7, 2002

_____
Francis A. Monaco, Jr. (#2078)
Kevin J. Mangan (#3810)
**WALSH MONZACK & MONACO, P.A.**
1201 N. Orange Street, Suite 400
Wilmington, DE  19801
Tel. (302) 656-8163

Of Counsel:
John C. Hutchins (BBO# 246060)
Daniel E. Rosenfeld (BBO# 560226)
Amy Beth Abbott (BBO# 648072)
**KIRKPATRICK & LOCKHART LLP**
75 State Street
Boston, Massachusetts 02109
Tel:  (617) 261-3100

A239

# EXHIBIT 1



البنك السعودي الأمريكي
## Saudi American Bank

(٨٢/٦/١ رقمي ثمانية مزود)

| ASSIGNMENT OF CONTRACT PROCEEDS | تنازل عن عوائد عقد |
|---|---|

**BUGSHAN S&W COMPANY LIMITED**

By _____

(the Assignor) to Saudi American Bank (the Bank).

In consideration of the Bank having granted credit facilities to the Assignor in connection with the following described contract (the Contract):

Project Name **Ras-Tanura Refinery Upgrade Package # 2 - Utilities**

Reference No **Contract No. 65004/00.**

Owner **Saudi Aramco**

Description **In-Kingdom Construction and Procurement Services**

The Assignor hereby assigns to the Bank all proceeds of the Contract (Proceeds), which shall include proceeds of claims arising out of the Contract and proceeds of all bonds and insurances effected in connection with the Contract. Such proceeds shall be security for all obligations of the Assignor to the Bank and may be applied by the Bank in satisfaction of all such obligations whether incurred in connection with the Contract or otherwise.

The Assignor hereby further agrees that:

(1)  The Assignor shall immediately notify all payors under the Contract of this assignment in such form as may be required by payor, or, if no specific form is required, by letter in substantially the following form:

" Re: (Contract)

Dear Sirs:

We hereby advise you that we have executed an assignment of proceeds of (the Contract) in favour of Saudi American Bank. All proceeds of the Contract due to us should therefore be paid directly to Account No.

Saudi American Bank.
Branch. **Al-Khobar (Fluor Branch)**
P.O. Box **842, Al-Khobar**

من قبل : _____

(الأصيل) الى البنك السعودي الأمريكي (البنك) .

حيث أن البنك قد قدم تسهيلات ائتمانية الى العميل بخصوص العقد المبين أدناه ( العقد ) :

اسم المشروع : _____

الرقم الإشاري : _____

المالك : _____

البيان : _____

فان العميل بهذا يتنازل لصالح البنك عن كافة عوائد العقد (العوائد)، والتي تشمل عوائد المطالبات الناشئة عن العقد وعوائد كافة الضمانات والتأمينات المتعلقة بشأن العقد. ومثل هذه العوائد ستكون ضمانا عن كافة الإلتزامات العميل تجاه البنك ويمكن أن تستخدم من قبل البنك للوفاء بكافة هذه الإلتزامات، سواء جرى تحميلها بخصوص العقد أو بصورة أخرى .

كما يوافق العميل بهذا على :

١)  يبلغ العميل وفورا كافة الدافعين بموجب العقد بهذا التنازل، بالصيغة التي يطلبها الدافع، أو اذا لم يكن هناك صيغة مطلوبة، عن طريق خطاب بالصيغة التالية على وجه التحديد .

«ا بخصوص: (العقد )

بعد التحية،

بهذا نفيدكم أننا قد نفذنا تنازلا عن عوائد (العقد) لصالح البنك السعودي الأمريكي. وعليه يتوجب دفع كافة عوائد العقد المستحقة لنا، مباشرة الى حساب رقم:

البنك السعودي الأمريكي

فرع : _____

ص . ب : _____

شركة مساهمة   ،   رأس المال ٢٠٠ مليون ريال  -  سجل تجاري ٣٥٣١٩  -  المركز الرئيسي : الرياض

SHAW000092

A241

<div dir="rtl">

١ ( تمهيد م شقد ، توقيع ١/٦/٨٢ )

المملكة العربية السعودية . بظل هذا التفويض بكامل قوته
ونفذ ه ما لم تتلقون نفضا خطيا له من البنك السعودي
الذ يكي .

١١ . الرجاء اشعارنا باستلامكم لهذا الاشعار وبموافقتكم على
قيامكم للتنازل بترقيع الصورة المرفقة لهذا الخطاب واعادتها
بدرة الى البنك السعودي الأمريكي على العنوان أعلاه
اعتنا .

٦ ) ان المحيل لن يوافق على أي تعديل جوهري في العقد ، ولن
يتنازل ، أو يتحلل عن أية حقوق أساسية بمقتضى العقد ، أو
عمل أي تنازل آخر عن العقد أو عن جزء منه دون الموافقة
الخطية المسبقة من البنك .

١٣ ) للبنك أن يفتح حساب ضمان للمحيل ويودع العوائد في
مثل هذا الحساب . ويتم الافراج عن المبالغ المودعة في هذا
الحساب طالما لا يوجد تقصير بمقتضى أية اتفاقية اتفاق مع
البنك ، وطالما أن البنك لم يطالب بدفع ، أو بضمان مالي
لأية تسهيلات مقدمة للمحيل .

١٤ ) يقر المحيل ويلتزم بصلاحية العقد وبقابلية للانفاذ ، وبعدم
وجود تنازل مسبق عن العوائد وان المحيل غير مقصر بموجب
العقد .
كنه لم يتلق اشعارا بشأن نزاع متصل بالعقد . كما يؤكد
محيل ويلتزم بأن لديه كل الصلاحية العامة للتنازل عن العقد
عن موافقة الحكومة على هذا التنازل . ( بخلاف الموافقة
نطلوبة بمقتضى الفقرة ١ من هذا الطلب ) هي غير مطلوبة
م الحصول عليها .

١٥ ) شيء في هذا الطلب يلزم البنك بأداء العقد أو يتحمل أية
سئولية بخصوص العقد .

١٦ ) يعين المحيل البنك كوكيل لأعطاء ايصالات ، ايصالات استلام العوائد ،
تجيير الشيكات وكافة الأدوات المثلة للعوائد ، ورفع
دعاوى ، واتخاذ الأجراءات والقيام بالأعمال الأخرى المتصلة
بالعوائد التي يراها البنك ضرورية أو مطلوبة لحماية حقوقه
بموجب هذا التنازل ، شريطة أن لا يكون للبنك أي التزام
للقيام بمثل هذه الأعمال وان يكون مسؤولا عن أية خطوة
تخذ عن حسن نية .

</div>

---

Saudi Arabia. This authorization shall remain in effect unless and until you receive written revocation signed by Saudi American Bank.

Please acknowledge receipt of this notice and your agreement and consent to this assignment by executing the enclosed copy of this letter and returning it directly to Saudi American Bank at the above address, Attention:

(2)   The Assignor will not agree to any material modification of the Contract or waive or release any substantial rights thereunder, or make any other assignment of the Contract or any part thereof without the prior written consent of the Bank.

(3)   The Bank may establish a collateral account for the Assignor and deposit Proceeds in such account. Amounts so deposited shall be released to the Assignor so long as no event of default exists under any credit agreement with the Bank and the Bank has not demanded payment of, or cash collateral for, any facilities extended to the Assignor.

(4)   The Assignor represents and warrants that the Contract is valid and enforceable, that there have been no prior assignments of proceeds, that it is not in default under the Contract and has received no notice of dispute in connection with the Contract. The Assignor further represents and warrants that it has all required corporate authority to assign the Contract and that government approvals of this Assignment (other than the approval requested under paragraph 1 hereof) are not required or have been obtained.

(5)   Nothing herein shall obligate the Bank to perform the Contract or to assume any responsibility with respect to the Contract.

(6)   The Assignor appoints the Bank as its attorney to give receipts for Proceeds, endorse checks and other instruments representing Proceeds, and file claims, institute proceedings or take such other action concerning Proceeds as the Bank may consider necessary or desirable to protect its rights under this Assignment, provided that the Bank shall have no obligation to take any such action and shall not be liable for any action taken in good faith.

SHAW000093

3                                                          ٣

Signed this
day    22nd
of     January
19  1995
at     Al-Khobar
Saudi Arabia

**ASSIGNOR**

Company Name    BUGSHAN S&W COMPANY LIMITED

Signature

Name    MALCOLM M. WRIGHT

Title    GENERAL MANAGER

**WITNESSED BY:**

Signature

Name    Mohamoud Hashi Ahmed

Address    P.O. BOX 4639 Dammam

Identity Card    2018293 171  Dammam
(Number & City of Issue)

**WITNESSED BY:**

Signature

Name

Address

Identity Card
(Number & City of Issue)

SHAW000094

A243

# EXHIBIT 2



an S & W Company Limited

SR 7 Million (Fully Paid)
Riyadh C.R. 1010038670 Dammam Branch C.R. 1010038670/001
P.O. Box 4639, Dammam 31412
Saudi Arabia

شركة بيتشان اس - اند ديليو للمحدودة
رأس المال المدفوع بالكامل ٧٠٠٠٠٠٠٠ ريال سعودي
الرياض س.ت.١٠١٠٠٣٨٦٧٠ فرع الدمام س.ت.١٠١٠٠٣٨٦٧٠/٠٠١
ص.ب ٤٦٣٩ ، الدمام ٣١٤١٢
المملكة العربية السعودية

ع ص ٦٩١٩

Dammam - September 21, 1994

الدمام فى ٢١ سبتمبر ١٩٩٤ م

<u>Specific Payment Instruction Letter</u>

OK
BM

تعليمات الدفع الخاص

Saudi Arabian Oil Company
(Saudi Aramco)
Treasurer's Operations Department
Banking Credit & Collection Division
Room T-475
Dhahran 31311
Saudi Arabia

شركة الزيت العربية السعودية ( ارامكو السعودية )
ادارة اعمال الخزينة
قسم الاعمال المعرفية والائتمان والتحصيل
الفرقة رقم ت - ٤٧٥
الظهران ٣١٣١١
المملكة العربية السعودية

Gentlemen:

السلام عليكم ورحمة الله وبركاته

This letter requests and authorizes you to pay Saudi American Bank, Fluor Branch, P.O. Box 842, Al-Khobar 31952, Saudi Arabia for credit to our account any and all compensation due from you under Contract No. 65004, as it may be changed from time to time.

نطلب منكم ونفوضكم بموجب هذا الكتاب ان تدفعوا الى البنك السعودي الامريكي ، فرع فلور ص ب رقم ٨٤٢،الخبر ٣١٩٥٢،المملكة العربية السعودية للقيد فى حسابنا اى وكل عوض يستحق منكم بموجب هذا العقد رقم ٦٥٠٠٤ حسب ما قد يدخل عليها من تغييرات بين الحين والاخر .

We shall mark all our invoices presented to you Pay to Saudi American Bank, Fluor Branch, P.O. Box 842, Al-Khobar 31952, Saudi Arabia for account of "Bugshan S&W Company Limited". Payments hereunder shall only be made against invoices submitted by us and not otherwise.

سوف نثبت في جميع فواتيرنا المقدمة اليكم العبارة " ادفعوا الى البنك السعودي الامريكي ، فرع فلور ص ب رقم ٨٤٢،الخبر ٣١٩٥٢،بالمملكة العربية السعودية لحساب شركة بقشان اس اند دبليو المحدوده " ولايجوز دفع اية مبالغ بموجب هذا الكتاب الا على اساس الفواتير المقدمة من جانبنا دون سواها .

This request and authorization shall be revocable by us, shall be effective on the date it is acknowledged by you, and shall continue in effect until final settlement of the above referenced agreement, including payment of any retention. However, you shall have the right to revoke this request and authorization if you are directed to do so by any Government agency. Additionally, if

وهذا الطلب والتفويض لايجوز الغاؤه من جانبنا ويظل ساري المفعول من تاريخ اقراركم باستلامه وحتى تتم تسوية الاتفاقية المذكورة نهائيا بما فى ذلك دفع اية مبالغ مستبقاة الا انه يكون لكم الحق فى الامتناع عن التقيد بهذا الطلب والتفويض اذا اوعزت اليكم بذلك اية جهة حكومية ، وبالاضافة الى ...

A245

Specific Payment Instruction Letter
Page 2

_____

تعليمات الدفع الخاص
صفحة رقم ٢

conflicting claims are asserted to
payments to be made under this
request and authorization, you shall
have the right to suspend such
payments until a final settlement or
a final order by a competent
authority specifies how the payments
involved are to be despersed.

We hereby release you from any claims
by us, and indemnify and hold you
ha___ess from any claims by third
parties and from any costs or losses
you may incur, in connection with
making payments pursuant to this
req___t and authorization.

y my signature below, I represent
hat I am duly authorized by my
ompany to make this request and
uthorization.

ما تقدم اذا تلقيتم مطالبات متعارضة بشأن
مبالغ مستحقة وفقا لهذا الطلب والتفويض فانه
يحق لكم التوقف عن دفع تلك المبالغ الى ان يتم
التوصل الى تسوية نهائية او تتلقون أمرا نهائيا
من سلطة مختصة بشأن التصرف بالمبالغ المذكورة .

واننا بهذا نبرئ ذمتكم من اية مطالبة من قبلنا ونتعهد
بأن نعوضكم ونخلى طرفكم من اية مطالبات يقدمها
الغير من اية تكاليف او خسائر قد تتكبدونها من جراء
قيامكم بالدفع بموجب هذا الطلب والتفويــــض .

ويعتبر وتوقيعى ادناه بمثابة اقرار منى بأننى مفوض
حسب الاصول من قبل شركتى باصدار هذا الطلب
والتفويـــض .

ry truly yours,

gshan S&W Company Limited



M. IGHT
eral Manager

وتفضلـــوا بقبول فائق الاحترام .

شركة بقشان اس اند دبليو المحدوده



م م رائــــت
المديـــــر العـــــام



BUGSHAN S&W

# EXHIBIT 3

Saudi Aramco 7377 (5/88)

*B*

## ACKNOWLEDGEMENT OF ASSIGNMENT

**SAUDI ARABIAN OIL COMPANY (Saudi Aramco)**
**TREASURER'S OPERATIONS DEPARTMENT**
Dhahran. Saudi Arabia

اقرار باستلام حوالة

شركة الزيت العربية السعودية (ارامكو السعودية)
ادارة اعمال الخزينة
الظهران — المملكة العربية السعودية

السادة/شركة بقشان اس آند دبليو المحدودة

PI — 0115/94

M/S BUGSHAN S & W COMPANY LIMITED
Gentlemen:

السلام عليكم ورحمة الله وبركاته ،

We hereby acknowledge receipt of your payment
assignment letter as per copy attached and will
comply with its terms and conditions. All invoices
relating to this assignment must be marked for
payment exactly as specified in the attached letter.

تلقينا كتابكم المرفقة صورته بهذا والمتضمن الحوالة الصادرة
منكم ، ونفيدكم بأننا سنعمل بمقتضى الاحكام والشروط الواردة
فيه ويجب أن تتضمن جميع الفواتير التي تنطبق عليها هذه الحوالة
عبارة تفويض بالدفع مطابقة تماما لما في الكتاب المرفق

Yours very truly,

المخلص

_signature_

Treasurer

امين الخزينة

NOVEMBER 13, 1994
Date

م١٩٩٤ — ١١ — ١٣
التاريخ

Attachment(s) YOUR LETTER DATED SEPTEMBER 21, 1994

المرفقات:
خطابكم المؤرخ في ١٢ — ٩ — ١٩٩٤ م

cc: SAUDI AMERICAN BANK, FLUOR BR, P.O.BOX 842, AL-KHOBAR
(bank or supplier)

نسخة : (البنك أو المورد)
البنك السعودي الامريكي فرع فلور / الخبر

# EXHIBIT 4

P.O. Box 833
Riyadh 11421
Kingdom of Saudi Arabia
Tel +966-1-477 4770
Telex: 400195 SAMBA SJ



Saturday, 11 May 2002

Saudi Arabian Oil Company ("Saudi Aramco")
Treasurer's Operations Department
Banking, Credit & Collection Division
T-475
Dhahran 31311 Saudi Arabia

Re: Bugshan Stone & Webster Company Limited ("BS&W"):
Assignment of Contract Proceeds for the Ras Tanura Refinery
Up-Grade Package # 2 - Utilities, Contract No. 65004

Dear Sirs:

Bugshan Stone & Webster Company, Ltd ("BS&W") is indebted to Saudi American Bank ("SAMBA") for an amount in excess of US$7,000,000. To secure all of its obligations to SAMBA, BS&W assigned to SAMBA, among other things, its rights to all payments to be made by Saudi Arabian Oil Company ("Saudi Aramco") to BS&W from time to time under or in connection with the Ras Tanura Refinery Up-Grade Package #2 – Utilities, Contract No. 65004 (the "Project Contract"), including proceeds of claims arising out of the Project Contract.

We write to remind Saudi Aramco that BS&W, by letter dated September 21, 1994 (the "Specific Payment Instruction Letter"), a copy of which is attached, requested and authorized Saudi Aramco to make all payments under the Project Contract to SAMBA at our address, P.O. Box 842, Al-Khobar 31952, Saudi Arabia.

Saudi Aramco acknowledged the assignment and agreed to comply with the Specific Payment Instruction Letter in an Acknowledgment of Assignment dated November 13, 1994, PI-0115/94 (the "Acknowledgment"), a copy of which is enclosed for your convenience.

The Assignment of Contract Proceeds executed by BS&W continues in full force and effect. The Specific Payment Instruction Letter expressly states that the Assignment and Authorization referred to therein are not revocable by BS&W and continue in effect until final settlement of the Project Contract.

Because BS&W continues to be indebted to SAMBA, we request and direct Saudi Aramco to continue to pay any proceeds (whether progress payments, retention payments, or in settlement of claims or otherwise) directly to SAMBA. We understand that claims under or relating to the Project Contract have been, or may be, made upon Saudi Aramco.

Thanking you for your kind attention to this matter, we remain.

Very truly yours

Mohammad Masood
Assistant General Manager
The Saudi American Bank

A250

# EXHIBIT 5

SAUDI ARABIAN OIL COMPANY
(SAUDI ARAMCO)
Treasurer's Operations Department, Banking Operations Division
Dhahran, Room, T-485 ☎ 875-5623,🖷 875-0800
June 2, 2002

**SAMAB-000/2002**

Mr. Mohammad Masood
Assistant General Manager
Saudi American Bank
Riyadh, 11421
Saudi Arabia

> Bugshan Stone & Webster Company Limited ("BS&W"): Assignment of Contract Proceeds for the Ras Tnaura Refinery Up-Grade Package # 2 – Utilities, Contract No. 65004

Dear Sir,

Reference is made to your letter dated May 11, 2002; concerning the above subject. We would like to confirm that the assignment and authorization contained in the subject Specific Payment Instruction Letter are irrevocable and continue to be in full force and effect.

Accept our kind regards,

Truly yours,

S. A. Al-Dossary, Administrator

YAM/

A252

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - x
                           :
In re:                     :  Chapter 11
                           :
STONE & WEBSTER, INCORPORATED, :  Case No. 00-2142 (RRM)
et al.,                    :
               Debtors.    :  Jointly Administered
                           :
                           :  Hrg. Date: 9/26/01 at 12:00 p.m.
- - - - - - - - - - - - - - x  Resp. Due: 8/24/01 at 4:00 p.m.
```

### OBJECTION TO CLAIM OF ABDULLA SAID BUGSHAN & BROTHERS UNDER 11 U.S.C. § 502(e)

Stone & Webster, Incorporated ("SWINC"), and its direct and indirect subsidiaries, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby object (the "Objection"), pursuant to Fed. R. Bankr. P. 3007 and 11 U.S.C. § 502(e), to claim no. 4419 (the "Bugshan Claim") filed by Abdulla Said Bugshan & Brothers ("ASB&B"). In support of the Objection, the Debtors respectfully represent as follows:

### BACKGROUND

1. On June 2, 2000 (the "Petition Date"), the Debtors each filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Code"). The Debtors continue to operate their businesses

and manage their properties as debtors and debtors-in-possession pursuant to Code sections 1107(a) and 1108.

2.  On or about June 14, 2000, a creditors' committee was appointed in these cases by the United States Trustee.  On or about June 26, 2000, the United States Trustee appointed an equity committee.  No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

3.  On July 18, 2000, this Court signed an Order Establishing Bar Date For Filing Proofs of Claim (the "Bar Date Order").  Pursuant to the Bar Date Order, the deadline for filing proofs of claim was August 25, 2000.

4.  On August 23, 2000, ASB&B filed a contingent claim (the "Original Bugshan Claim") for reimbursement or contribution against Stone and Webster Engineering Corporation ("SWEC") alleging that SWEC is liable for at least 50% of any judgment that might result from a then-pending arbitration (the "Arbitration") in Saudi Arabia between Bugshan S&W Company Limited ("BS&W"), a limited liability company whose shareholders are ASB&B and SWEC, and Mohammad Al-Mo'jil Group ("MMG"), BS&W's subcontractor.  In addition, ASB&B seeks to recover from SWEC costs incurred in defending against the Arbitration.  See ASB&B's Proof of Claim, attached hereto as Exhibit A.

2

5.    The Debtors' cases have been consolidated for procedural purposes and are being jointly administered by the Court under Case No. 00-2142 (RRM).

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

7.    The statutory predicate for the relief requested herein is Code section 502(e) and Rule 3007 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

### RELIEF REQUESTED

8.    By this Objection, the Debtors seek entry of an order under Code section 502(e) disallowing and expunging the Original and Amended Bugshan Claims (defined below).

### FACTUAL BASIS FOR RELIEF

**BS&W and the Ras Tanura Project.**

9.    On May 31, 1980, SWEC and ASB&B formed BS&W, a limited liability company, to undertake "construction management and execution of mechanical, electrical, chemical, desalination and hydrocarbon processing projects." BS&W Articles of Association, attached hereto as Exhibit B. BS&W was founded in and is governed by the laws of the Kingdom of Saudi Arabia.

3

A256

10. On June 28, 1994, BS&W entered into an agreement with the Saudi Arabian Oil Company for the engineering, procurement, and construction of the Ras Tanura Oil Refinery Utilities Upgrade Package #2 Project ("Ras Tanura Project") in Saudi Arabia. The targeted completion date for the Ras Tanura Project was February 1998.

11. On August 24, 1994, BS&W subcontracted to MMG various construction work relating to the Ras Tanura Project. Under the terms of the subcontracting agreement (the "Contract"), MMG agreed to render certain construction services to BS&W in return for the fixed, lump sum price of $44,652,000. The scope of MMG's work under the Contract included, <u>inter</u> <u>alia</u>, the procurement and construction of interconnecting pipeways, high pressure boilers, North and South air compressors, nitrogen system, caustic system, desalination system, firewater distribution system, sanitary sewage system, and fuel gas system.

12. During the course of MMG's engagement by BS&W, it failed to act in accordance with approved schedules and other terms of the Contract. MMG's performance was unsatisfactory to BS&W, and consequently, in June 1997, and again in July 1997, BS&W terminated portions of MMG's scope of work under the Contract and subsequently re-contracted the work to other construction contractors.

4

13.   The Ras Tanura Project was completed by BS&W in September 1999, sixteen months after the original targeted completion date.

14.   On or about July 4, 2000, MMG commenced the Arbitration in Saudi Arabia against BS&W claiming, <u>inter alia</u>, that it was entitled to approximately $62 million in compensation for added expenses and duties incurred on the Ras Tanura Project as a result of alleged delays and other wrongdoing attributable to BS&W.  BS&W denied MMG's allegations and filed various counterclaims against MMG.

15.   The Arbitration was governed by Saudi law.

16.   On or about May 21, 2001, the arbitrator entered judgment against BS&W for approximately $51 million.[1]

17.   Neither BS&W nor MMG has filed a proof of claim against any of the Debtors in these bankruptcy cases. Because the Bar Date (August 25, 2000) for filing such a claim has passed, neither BS&W nor MMG can assert any claim in the Debtors' pending bankruptcy cases.

18.   Nor has ASB&B filed a proof of claim on behalf of MMG pursuant to Bankruptcy Rule 3005.  The

_____

[1]     Under Code section 362(a)(1), this judgment is void as to SWEC in light of the automatic stay.  Additionally, MMG has not filed a proof of claim against SWEC based upon this judgment.  <u>See</u> Parts I, II, and III, <u>infra</u>.

<div align="center">5</div>

deadline for filing such a claim was thirty days after the Bar Date, or September 24, 2000.

**The Bugshan Claims.**

19.   The Original Bugshan Claim seeks contribution and/or reimbursement from SWEC for at least 50% of the judgment against BS&W, in addition to the costs of defending the Arbitration.   Neither BS&W nor ASB&B has made any payment to MMG, and indeed, BS&W is pursuing its appeal rights in Saudi Arabia.

20.   Subsequently, on or about July 13, 2001, ASB&B filed an amended proof of claim (the "Amended Bugshan Claim").   The Amended Bugshan Claim supersedes the Original Bugshan Claim and contains specific dollar amounts reflecting the final arbitral award and the costs ASB&B allegedly incurred in the defense of the Arbitration.   See the first page of the Amended Bugshan Claim, attached hereto as Exhibit C.   As such, Debtors request that the Original Bugshan Claim be disallowed and expunged because it has been superseded by the Amended Bugshan Claim.

                              **SUMMARY OF ARGUMENT**

21.   For the reasons set forth herein, the Amended Bugshan Claim should be disallowed in its entirety pursuant to Code section 502(e) because SWEC is not liable for the judgment assessed against BS&W inasmuch as neither SWEC nor ASB&B is individually responsible for any debt owed by BS&W

<center>6</center>

to MMG, and because the Arbitration judgment is unenforceable against SWEC. Accordingly, SWEC requests that the Court disallow the Amended Bugshan Claim under Code section 502(e).

<div align="center">

**ARGUMENT**

</div>

22. Pursuant to Code section 502(e)(1):

> the court <u>shall</u> disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on . . . the <u>claim</u> of a creditor, to the extent that–
>
> > (A) such creditor's claim against the estate is disallowed; [or]
> >
> > (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e) (emphasis added). For the reasons set forth herein, the Court must disallow the Amended Bugshan Claim.

**I.    Any MMG or BS&W Claim is Disallowed Under Bankruptcy Rule 3002, 3003, and 3005.**

23. Code section 502(e)(1)(A) expressly provides that a court "shall" disallow any claim for contribution to the extent that the underlying creditor's claim is itself disallowed. This section should apply with equal force where a claim is disallowed because a proof of the claim is not filed pursuant to Bankruptcy Rules 3002 and 3003.

24. Bankruptcy Rule 3002 plainly states that "[a]n unsecured creditor . . . <u>must</u> file a proof of claim .

<div align="center">

7

</div>

. . for the claim  . . . to be allowed . . .." Fed. R.
Bankr. P. 3002(a).

    25.  Additionally, Bankruptcy Rule 3003 provides
that where, as in the instant cases, a debtor has scheduled
a claim as contingent, disputed, or unliquidated, the would-
be creditor "shall file a proof of claim[, and] any creditor
who fails to do so shall not be treated as a creditor with
respect to such claim for the purposes of voting and
distribution." Fed. R. Bankr. P. 3003(c)(2).

    26.  Neither MMG nor BS&W has filed a proof of
claim against the Debtors, and therefore any claim of MMG or
BS&W against the Debtors' estates is disallowed pursuant to
Bankruptcy Rules 3002 and 3003.  Therefore, inasmuch as the
Amended Bugshan Claim asks for contribution on a disallowed
claim, the Amended Bugshan Claim should be disallowed
pursuant to Code section 502(e)(1)(A).

    27.  Moreover, under Bankruptcy Rule 3005, ASB&B
had the opportunity, until 30 days after the Bar Date, or
September 25, 2000, to file a proof of claim on behalf of
BS&W or MMG.  ASB&B did not exercise its rights under
Bankruptcy Rule 3005 and file a claim on behalf of either
BS&W or MMG, and the Court should therefore determine that
ASB&B has waived any rights it might otherwise have had to
assert a claim against the Debtors based upon a claim by
BS&W or MMG.

8

A261

**II.  Any MMG or BS&W Claim is Disallowed as Untimely Under Code section 502(b)(9).**

28.  Alternatively, Code section 502(e)'s provision that a court "shall" disallow any claim for contribution to the extent that the underlying creditor's claim is itself disallowed should apply with equal force where the underlying creditor's claim is disallowed under Code section 502(b)(9) as not timely filed.  See In re Bicostal Corp., 141 B.R. 231 (Bankr. M.D. Fla. 1992) (implying that where underlying creditor's claim is not timely filed, contribution claim is disallowed).

29.  Neither MMG nor BS&W have filed a proof of claim against the Debtors, and therefore any claim of MMG or BS&W against the Debtors' estates is disallowed pursuant to Code section 502(b)(9).  Therefore, inasmuch as the Amended Bugshan Claim asks for contribution on a claim that would be disallowed as untimely if filed, the Amended Bugshan Claim should be disallowed pursuant to Code section 502(e)(1)(A).

**III. Any MMG or BS&W Claim is Disallowed as Unenforceable Under Code section 502(b)(1).**

30.  Alternatively, the requirement in Code section 502(e)(1)(A) that courts disallow claims for contribution where the underlying creditor's claim is itself disallowed should apply with equal force where the underlying creditor's claim is disallowed as unenforceable under applicable law pursuant to Code section 502(b)(1).

9

A262

31.  The Amended Bugshan Claim seeks contribution on the judgment obtained in the Arbitration by MMG against BS&W.  However, the Arbitration judgment cannot be enforced against SWEC or ASB&B for two reasons.  First, the Arbitration itself and the Arbitration judgment are both void as a matter of law under Code section 362(a); and second, enforcement of the Arbitration judgment would presuppose shareholder liability for corporate debts and would thus contravene state and Saudi law, as well as the public policy of the United States.  Therefore, to the extent ASB&B claims that SWEC is liable on the Arbitration judgment, the Court should disallow the claim as unenforceable pursuant to Code section 502(b)(1).  See Bellini Imports, Ltd. v. Mason and Dixon Lines, Inc., 944 F.2d 199 (4th Cir. 1991) (claim disallowed under Code section 502(b)(1) where unenforceable judgment is sole basis therefor).  Furthermore, because any enforcement of the underlying claim must be disallowed, the Court should disallow the Amended Bugshan Claim as a claim for contribution under Code section 502(e)(1)(A).

**A.    The Arbitration Judgment is Void Against the Debtors As a Matter of Law.**

32.  Code section 362(a) (the "Automatic Stay") states that:

a petition filed under section 301 . . . of this title, . . . . operates as a stay, applicable to all entities, of—

10

A263

> (1) the commencement of continuation . . . of
> a judicial, administrative, or other action
> or proceeding against the debtor that was or
> could have been commenced before the
> commencement of the case under this title . .
> ..

11 U.S.C. § 362(a).

33.    To whatever extent the Arbitration implicates

the Debtors, it falls within the purview of the Automatic

Stay, and therefore any proceedings in the Arbitration,

including the Arbitration judgment, are stayed.  Moreover,

because the Arbitration judgment was handed down in

derogation of the Automatic Stay, the judgment is void ab

initio; cf. Gruntz v. County of Los Angeles (In re Gruntz),

202 F.3d 1074, 1082 (9th Cir. 2000) (judicial proceedings in

violation of Automatic Stay are void).  The District Court

is not obligated to extend full faith and credit to the

Arbitration judgment.  Cf. id. at 1082 n. 6, citing, Kremer

v. Chemical Construction Corp., 456 U.S. 461, 482-483

(1982).  See also Contractors' State License Board of

California, et al. v. Dunbar (In re Dunbar), 245 F.3d 1058,

1063 (9th Cir. 2001) (state agency proceedings in violation

of Automatic Stay are void).

34.    Because any attempt to construe the

Arbitration as a proceeding against SWEC will render it void

ab initio, the Arbitration judgment is unenforceable against

SWEC.  Indeed, SWEC is entitled to seek relief from the

Arbitration judgment before this Court.  See Gruntz, 202

11

A264

F.3d at 1083 ("A bankruptcy court simply does not conduct an improper appellate review of a state court when it enforces an automatic stay that issues from its own federal statutory authority.").

35. For all of these reasons, the Automatic Stay prevents enforcement of the Arbitration judgment against the Debtors. Consequently, any claim by BS&W or MMG seeking enforcement of the Arbitration judgment would be disallowed as unenforceable within the meaning of Code section 502(b)(1). Therefore, to the extent that the Amended Bugshan Claim is a claim for reimbursement or contribution on a claim that would be disallowed if filed under Code section 362(a)(1), the Amended Bugshan Claim itself must be disallowed pursuant to Code section 502(e)(1)(A).

**B.    The Arbitration Judgment Violates Law and Policy.**

    **i.    Shareholders in a Limited Liability Company are Protected from Liability Under United States and Saudi Law.**

36. ASB&B's theory of contribution against SWEC rests on a view of shareholder liability that contravenes established United States law. In the United States, a shareholder becomes a member of a limited liability company for the express purpose of limiting its exposure to liability for claims brought against the company. See, e.g., Phillip Blumberg, Corporate Groups and Enterprise Liability, 602 PLI/CORP 7, 14-24 (1988). The limitation on

12

shareholder liability is a fundamental tenet of corporate law in the United States and is rooted in the well-settled notion that the corporate entity has a distinct legal personality separate from its shareholders. See id. at 21.

37. This concept of separateness of a corporation and its shareholders is also endorsed in Saudi law. Mega Tech International Corporation v. Al-Saghyir Establishment and National Kitchens Factory Co. Ltd., ___ F. Supp.2d ___, 1999 WL 269896, *8 (S.D.N.Y. 1999) (accepting defendant's contention that Saudi law generally does not recognize veil-piercing, and refusing to disregard form of Saudi corporation under Saudi and New York law). See also Chibli Mallat, Commercial Law in the Middle East, 48 Am. J. Comp. L. 81, 114 (2000) ("All Middle Eastern countries have adopted [the concept of] a strict separation between the assets of a company and the individual assets of shareholders and directors.").[2]

38. SWEC has not acted in a manner that would permit the piercing of the corporate veil such that SWEC and BS&W should be treated as one. Nonetheless, ASB&B seems to rely on principles of law that contradict modern concepts of shareholder separateness that are a fundamental part of

---

[2] In many Middle Eastern countries, there remains a tension between the modern concept of limited shareholder liability and the classic Islamic law, termed shari'a, which endorses the concept that shareholders are liable in their own assets for payment of corporate debts. See Mallat, Commercial Law in the Middle East, 48 Am. J. Comp. L. at 117.

13

United States corporate law and are recognized under modern Saudi law.  Thus, imposing any portion of BS&W's liability on SWEC is not consistent with modern limited liability principles.

39.  For these reasons, any attempt to enforce the Arbitration judgment against SWEC should be disallowed under Code section 502(b)(1), and the Amended Bugshan Claim should therefore be disallowed under Code section 502(e)(1)(A).

**ii.  Assuming Arguendo that Saudi Law Permits Shareholder Liability for Corporate Debts, then Saudi Law Contravenes the Public Policy of the United States, and this Court is Not Bound Thereby.**

40.  In seeking a right of contribution against SWEC, ASB&B is requesting that the Court enforce a foreign arbitral judgment, or at least a portion of that judgment, against SWEC.  However, even if the arbitral judgment against BS&W could be read as imposing liability on SWEC under Saudi law, such an interpretation would not be enforceable in United States courts.

41.  Principles of comity govern the enforcement of foreign arbitral awards in the United States.  Comity is "the recognition which one nation allows within its territory to the . . . judicial acts of another nation, having due regard . . . to the rights of its own citizens or of other persons who are under the protection of its law." Hilton v. Guyot, 159 U.S. 113, 163-64 (1895).

14

A267

42.    "It is a settled princip[le] of comity that deference need not be given to foreign judgments in the face of significant countervailing public policy reasons." Overseas Inns v. United States, 685 F. Supp. 968, 972 (N.D. Tex. 1988) (finding public policy considerations weighed against according comity to foreign judgment that permitted foreign corporate taxpayer to satisfy United States income tax obligation by paying only a percentage of taxes owed).

43.    A foreign judgment will not be enforced in the United States if it is contrary to the strong public policies of the forum state in which enforcement is being requested. See, e.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984) ("No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."); see also Robert R. Keating, Limited Liability Companies, C727 ALI-ABA 1, 17 (1992) ("The established public policy of the forum is supreme, and will not be relaxed upon the ground of comity to enforce contracts which contravene such policy, even though the contracts are valid where made.").

44.    Generally, in cases where the courts have found public policy violations, there is an interest at stake that is greater than the personal interest of the aggrieved litigant.  See, e.g., Ackermann v. Levine, 788

15

F.2d 830, 845 (2d Cir. 1986) (finding German default

judgment violated New York public policy against enforcement

of unconscionable attorney fees because it permitted

attorney's fee award for work not authorized by client and

for which there was "not a scintilla of evidence of work

product"); see also, Jonathan H. Pittman, The Public Policy

Exception to the Recognition of Foreign Judgments, 22 VAND.

J. TRANSNAT'L L. 969, 991 (1989).

     45.  The larger interests at stake in this case

are the protection of fundamental corporate and bankruptcy

law principles such as limited shareholder liability,

particularly as it relates to U.S. companies doing business

in foreign markets, and the Code's statutory Automatic Stay

protections for companies in chapter 11.  These policies bar

the imposition of liability against SWEC, despite the

Arbitration judgment against BS&W, even if the judgment is

interpreted as making SWEC liable under traditional Islamic

law because it is a member of BS&W.[3]  See Tahan v. Hodgson,

662 F.2d 862 (D.C. Cir. 1981) (implying that public policy

exception to comity doctrine would exist if the foreign

forum did not recognize concept of limited liability);

---

[3]    As noted above, it appears that modern Saudi law deci-
sions recognize the separateness of a corporation and its
shareholders.  Therefore, SWEC does not concede the correct-
ness of ASB&B's apparent argument, see Exhibit A, that any
ruling against BS&W in the Saudi arbitration would result in
liability being imposed on SWEC under Saudi law merely
because it is a member of BS&W.

16

A269

Pittman, <u>The Public Policy Exception to the Recognition of Foreign Judgments</u>, 22 VAND. J. TRANSNAT'L L., at 985 ("It seems clear that had the [Tahan] defendant appeared in the [foreign] action and lost an argument against "piercing the veil," the United States court would have made an examination [to determine whether the foreign judgment violated United States public policy.]"). <u>Cf. Gruntz</u>, 202 F.3d at 1082 n. 6 (bankruptcy court need not give full faith and credit to judicial proceedings in violation of Automatic Stay).

46.    Therefore, the Court should disallow the Amended Bugshan Claim under Code section 502(e)(1)(A) because any claim against SWEC by MMG or BS&W on the basis of the Arbitration judgment would be unenforceable in the United States and would be disallowed pursuant to Code section 502(b)(1).

**IV.   The Amended Bugshan Claim is Contingent.**

47.    As noted above, Code section 502(e)(1)(B) provides for the court to disallow any claim of an entity seeking contribution to the extent that the claim is contingent as of the time of allowance or disallowance of the entity's claim.

48.    A claim for contribution is contingent until such time as the entity seeking contribution independently satisfies the underlying creditor's claim, thereby

17

establishing the entity's right to payment from the debtor.
In re Baldwin-United Corp., 55 B.R. 885, 895 (Bankr. S.D.
Ohio 1985). Moreover, a claim for contribution remains
contingent until the entity seeking contribution actually
pays the underlying creditor's claim, even if the entity
seeking contribution obtains a judgment granting it a right
to payment from the debtor. In re Friendship Child
Development Center, Inc., 164 B.R. 625, 627 (Bankr. D.
Minnesota 1992) (where guarantor of debtor's obligation had
not paid obligation, guarantor had only contingent claim
even though guarantor obtained judgment giving right to
indemnification by debtor; guarantor's claim was
disallowed).

  49. Regardless of the Arbitration judgment
against BS&W, the Amended Bugshan claim remains contingent
because ASB&B has not independently satisfied the judgment.
Therefore, the Court should disallow the Amended Bugshan
Claim as a contingent claim for contribution pursuant to
Code section 502(e)(1)(B).

18

A271

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) disallowing the Original Bugshan Claim in its entirety because it has been superseded; (ii) disallowing the Amended Bugshan Claim in its entirety under Code section 502(e), and (iii) granting Debtors such other and further relief as is just and proper.

Dated:      Wilmington, Delaware
            August 1, 2001

                        /s/ Gregg M. Galardi
                        _____
                        Gregg M. Galardi (I.D. No. 2991)
                        SKADDEN, ARPS, SLATE, MEAGHER
                           & FLOM
                        One Rodney quare
                        P.O. Box 636
                        Wilmington, Delaware  19899
                        (302) 651-3000

                              - and -

                        Edward J. Meehan
                        SKADDEN, ARPS, SLATE, MEAGHER
                           & FLOM LLP
                        1440 New York Avenue
                        Washington, DC  20005-2111
                        (202) 371-7000

                        Attorneys for Debtors and
                           Debtors-in-Possession

332082.07-D.C. SIA                    19

A272

EXHIBIT "A"

Document #: 8529

Official Form 10
(Rev. 2/87)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|
| Stone & Webster, Inc., et al. | 00-02412 (RRM) Jointly Administered |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor** (The person or other entity to whom the debtor owes money or property):

Abdulla Said Bugshan & Brothers

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

**Name and Address Where Notices Should Be sent:**

Abdulla Said Bugshan & Brothers
c/o G. Michael Curran
Akin, Gump, Strauss, Hauer & Feld, LLP
1700 Pacific, Suite 4100
Dallas, TX 75201
Telephone number: (214) 969-2800

☒ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

**Account or other number by which creditor identifies debtor:**

Check here if this claim ☐ replaces
☐ amends          a previously filed claim, dated: _____

**1. BASIS FOR CLAIM**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other (Describe briefly)  Contribution Claim

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)

Your Social Security Number _____
Unpaid compensation for services performed
from _____ to _____
         (date)              (date)

**2. Date debt was incurred:**
See Tab "A"

**3. If court judgment, date obtained:**

**4. Total amount of Claim at Time Case Filed:**    $ See Tab "A"
· If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate
☐ Motor Vehicle
☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4000),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan—11 U.S.C. § 507(a)(4).
☐ Up to $1,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use—11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child—11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units—11 U.S.C. § 507(a)(8).
☐ Other—Specify applicable paragraph of 11 U.S.C. § 507(a)___.
*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

FILED '00 AUG 23 ...

4419

| Date: | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any). |
|---|---|
| August 20, 2000 | Abdulla Said Bugshan & Brothers |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Prepared by Trumbull Services on Time: 9:38 pm Date: 11-September-00

Prepared by Trumbull Services on Time: 9:38 pm Date: 11 September 00

## STATEMENT OF CLAIM

Abdulla Said Bugshan & Brothers ("ASB&B") is a general partnership founded and existing under the laws of the Kingdom of Saudi Arabia having claims against Stone & Webster, Inc., the Debtor in Jointly Administered Chapter 11 Bankruptcy Case No. 00-02412. The legal basis for the claim of ASB&B is a right of contribution pursuant to its legal relationship with the Debtor and Bugshan Stone & Webster Saudi Ltd. ("BS&W"). The Debtor and ASB&B are members of BS&W, a company whose organizational structure under Saudi law provides for certain contribution rights of its members. Any right of contribution would arise out of the pending commercial dispute between Mohammad Al-Mo'Jil Group and BS&W pending before the Board of Grievances located in Dammam, Saudi Arabia. Attached hereto as Tab "B" is a copy of the pleading filed by the plaintiff in the lawsuit styled *Mohammad Al-Mo'Jil Group v. BS&W* (the "Saudi Lawsuit"). In the Saudi Lawsuit, the plaintiff is seeking compensatory damages for an alleged breach of contract by BS&W in connection with a construction project undertaken for the Saudi Arabian Oil Company ("ARAMCO"). In the Saudi Lawsuit, plaintiff is seeking damages in the approximate amount of 231,204,026 Saudi Riyals, which is the equivalent to $61,654,407 in U.S. currency. If the plaintiff is successful in the Saudi Lawsuit, ASB&B will have a contribution claim against the Debtor for at least 50% of the damages awarded plus the costs of defense. Although the claim of ASB&B is contingent at this time, ASB&B reserves all rights to amend this claim pursuant to 11 U.S.C. § 501(d), 11 U.S.C. § 502(e)(2), FED. R. BANKR. P. 3002(e)(3) and other applicable provisions of the United States Bankruptcy Code and Bankruptcy Rules of Procedure .

Date: 2/4/1421H  Corresponding to July 4, 2000

Office of Dr/ Fahd A. Al-Khalaif
Attorney at Law and Legal Office Consultant

The Honorable
Chief of the 16th Commercial Circle

Greetings,

Plaintiff:   Mohammad Al-Mo'jil Group, having its legal representative Dr.
Fahd Abdul Aziz Al-Khlaif, with address at Tel. 887-2887, Facsimile: 887-
2800, Al-  Khobar.

Defendant: Bugshan Stone & Webster Saudi Ltd., having its legal
representative Abdulla   Awad Al-Hebardi, with address at 464-8081,
Facsimile 462-4968, Riyadh.

## Subject: Pleading

On behalf of my client, Mohammad Al-Mo'jil Group, I present the
following pleading against  the defendant Bugshan Stone & Webster Saudi
Ltd., requesting compensations for my client due to the following reasons:

1. On 17/3/1415H, corresponding to 24/8/1994, my client subcontracted
   with the defendant for construction works in the Ras Tanura expansion
   project for the Saudi Arabian Oil Company (ARAMCO). The
   subcontract contained work specifications, value, payment conditions,
   materials delivery schedule, tools, equipment, diagrams, drawings, and
   specifications. (See Attachment #1).

2. My client signed the contract on the basis of a lump sum of US$ 44,652,000.00, being compensation for execution of the works to be executed by my client (See Attachment #2).

3. My client specified the contract price offered in its bid based on considerations related to project site, duration of contract execution, work specifications, time schedule, volume of manpower, equipment, materials, methods and means of work, dates of receiving project's drawings, plans, and specifications.

4. On September 1994, the Defendant handed the site to the Plaintiff, and on September 1994, the Plaintiff mobilized manpower to the site to begin excavation manually to locate the pipe lines, and to examine obstacles under the soil as there were no drawings. On September 1995, the Plaintiff began the constructional work according to the time schedule agreed upon. The Plaintiff made all necessary arrangements to execute the work according to the time schedule and was always ready to execute the work on the specified dates. While executing the construction works, my client faced obstacles, received unexpected modifications and new assignments from the defendant that resulted in tremendous unexpected losses. My client has had the following documents and information in its possession at the time of presenting its bid and on which basis pricing was made:

- Contract Document Table (A) - General Terms and Conditions,
Article (2) - Contractor's General Commitments,
Article (3) - Contractor's Personnel,
Article (4) - Contractor's Equipment,
Article (5) - Contractor's Responsibility At Work Site,
Article (12) - Contractor's Measurements, Drawings, And Specifications.

- Contract Document Table (B) - Work Specifications
Article (2) - General Conditions,

A279

Article (3) - Work Description,
Article (4) - Sharing Responsibilities,
Article (5) - Reference Documents,
Article (6) - Final Critical Dates.

- Contract Document Table (C) - Materials, Tools And Equipment
- Article  (1)  -  Items, Equipment And Tools supplied by Saudi Aramco and BSW.

According to Contract's Conditions, the Defendant was committed to deliver the deliverables according to a specified timetable, sequence and order. But the Defendant did not fulfill its commitment to the timetable, sequence and order which caused the Plaintiff to face obstacles and difficulties that affected work plan and its execution. This also resulted in tremendous increases in the actual cost. The attached documents stand as evidence (See Attachments #3, 4, 5 and 6).

5. The Defendant delayed providing my client with the diagrams, equipment, materials, specifications and measurements, and did not fulfill its commitments as required to begin work as scheduled. Delivery of the materials and diagrams was as follows:

| Item (1) | Beginning of delivery date (2) | End of delivery date (3) | Percentage of what has been delivered till the end of delivery Date (4) | Percentage of what has not been delivered till the end of delivery date (5) | Duration on which remaining of deliverables Was Made (6) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

A280

| | | | | | |
|---|---|---|---|---|---|
| Structures | January 1996 | April 1996 | 0.78% i.e., less than 1% | 99.22% | Within 11 months, i.e., from May 1996 to March 1997 |
| Roofs, Sideways, and Structure Stairs | January 1996 | April 1996 | 1.4% | 98.6% | With 16 months, i.e., from October 1996 to January 1998 |
| Pipes | August 1995 | April 1996 | 29.62% | 70.38% | Within 17 months, i.e., from August 1996 to December 1997 |
| Basic Equipment and Tools | February 1996 | April 1996 | 8.09% | 91.91% | Within 21 months, i.e., from January 1997 to September 1998 |
| Electrical | February | | | | Within 21 months, i.e., from |

| Materials And Cables | 1996 | April 1996 | 50.86% | 49.14% | January 1997 to September 1998 |
| Drawings And Designs | January 1996 | April 1996 | 48.01% | 51.99% | Within 21 months, i.e., from January 1997 to September 1998 |

Above table indicates that the supply of materials was extended in a manner that had exceeded all scheduled dates and continued till after the date of completing the mechanical works specified in the Contract. This is evident in the Defendant's Material Receiving Records. The Defendant also confirmed this in its claims to Saudi Aramco, in pages number 71, 72, 75, 81 and 119.

The Table also indicates that the construction plans should have been issued and handed maximum by December 1996, but these were not all issued till the end of 1998. The Defendant confirmed through its Chart No. A-7-2, attached to its claim to Aramco, that it issued the large portion of the plans by the end of 1997. The charts No. E.1, 6, E.3, 6, E.4.6 and E.8.6, issued by the Defendant indicate the planned dates and actual dates of issuing the charts of the main four systems of the project, and they confirm the delay that had extended to two years to complete the engineering works. The Defendant confirmed the engineering delays by its claim to Saudi Aramco, pages Nos. 71, 77, 79, 121, 135, 142, 143, 174, 175, 221, and 223.

Failure of the Defendant to deliver the drawings, diagrams, materials and equipment on the specified delivery dates undermined the basis on which

project's prices were made, as the basis were not applicable and consequently the lump sum prices were not viable. The equipment and labor costs and indirect costs were estimated on basis of the basic timetable on basis of which contract was made. But term contracted for had increased due to the delay in providing my client with the drawings and materials. My client's requirements for equipment and manpower were estimated on basis of the logical sequence and order of work. But the non-delivery of drawings, diagrams, and materials in the prearranged sequence led to great inefficiency and non-operation and use of manpower and equipment in the planned manner and on basis of which the bid was made. It also led to wasting time and affected productivity of the manpower and led to splitting the work in stead of being sequenced. The price my Client had presented was not calculated to be executed in the manner in which the work was actually executed, and in which my Client was forced by the Defendant to execute. This makes imperative to pay the actual cost and not the price stated at the bidding. The Defendant acknowledged all that in the claim made to Aramco which was supported by detailed tables, charts, and detailed information about the outcome that resulted from the delay, faults, and modifications introduced to the designs and drawings and the impact on the actual cost of executing the project (See Attachments No. 4, 5 and 6).

6. The Defendant did not honor its commitments with regard to the timing and method that would facilitate regular execution of the work as provided for in the Contract, which had led to facing difficulties, delay of work program and non-execution in a logical sequence. The work was split and it was impossible to adhere to the planned sequence and order, and the Contract execution schedule was affected by these obstacles. The Defendant had modified the method of preparing the pipes and this method was less effective than the original plan prepared at bidding. As a result, my client had to double its efforts and speed up work to overcome the obstacles caused by the Defendant. This led to a

big increase in the cost that was unforeseen at the time of bidding. Aramco has commended achievements of the Plaintiff and regarded them as distinguished achievements (See Attachments Nos. 5, 6 and 9.)

7.  The Defendant, without any legal justification, refused my Client's request to amend the scheduled completion date. This refusal caused my Client to double the manpower and double work hours which led to extra costs. My Client was forced to reconsider work priorities to meet the scheduled completion requirements. Chart 1.A prepared by the Defendant indicates that the Plaintiff had recruited a large number of laborers that had exceeded the numbers planned for and on basis of which the bid was made. This is also confirmed by chart No. 1.B (See Attachment No. 6.)

8.  My Client sustained additional costs because of the restrictions imposed by the Defendant, change of instructions with regard to methods of work execution, responding to improper questions from the sites, change of written work orders, delay in receiving drawings, designs, pipes, equipment, and tools which were all interrelated and any delay in either of them would led to overall delay (See Attachments Nos. 4, 5 and 7.)

9.  The Defendant had issued a large number of memos related to design amendment and correction of 2495 drawings. The Defendant also made mistakes in the specifications that led to modifying work plans, methods of execution, drawings, and designs. Eventually, this led to increases in the duration, manpower, and costs that exceeded those estimated at the time of bidding (See Attachment No. 8.)

10. The Defendant delayed payment of amounts due to the Plaintiff for works executed on due dates, though the Defendant had received due payments from Aramco. This led to cash flow difficulties and forced the Defendant to make other arrangements to allow progress of work, thus

leading to increase in the cost of executing the Contract. (See Attachment No. 9.)

11. My Client requested the Defendant to pay the actual cost of project and explained the grounds for its claim. The Defendant had requested Aramco to amend the Contract on grounds that there were situations that entitled the Defendant to extension of the completion date to allow completion of the works, in addition to additional compensation as per Contract. The Defendant determined the required time, compensation, reasons and the grounds justifying that. Following a review that took over a year and consultations with technical parties, the Defendant requested Aramco, owner of the Project, to pay the actual cost of the Project, specifying the reasons for that. In its claim, the Defendant admitted the problems and obstacles that faced my Client in execution of the Project, and the delay in delivering the materials, equipment, tools, designs, drawings, and the errors in the specifications, drawings, designs, modification, correction of designs, drawings and that my Client deserve to be paid the actual cost of Project to convert the Contract from a lump sum contract to an actual cost contract as the basis for the lump sum contract had changed. The Defendant stated legal and technical justifications, and attached information and analysis that conforms with the reasons, justifications and argument on which my Client based its claim. (See Attachment No. 10.)

12. The Defendant's breach of Contract, abandoning of commitments, and managing the work according to priorities led to adverse impact and inefficiency. The changes and modifications from one side led to changing the goal of Contract, affected the work plan and undermined the basis of the lump sum price. This led to a fundamental conversion of the Contract as none of the main elements of the lump sum contract had remained. The makes it imperative to convert to Aramco's form of contract to compensate the costs as the behavior of the parties proofs that their will tend to execute work on basis other than those agreed

upon, and to oblige the Defendant to pay the actual cost that resulted from executing the Project, which is SR. 358,951,470.00 (See Attachment No. 11.)

13. Due to the above indicated reasons, my Client requests that the Defendant be committed to pay the amount of SR. 231,204,026.00, which is equivalent to US# 61,654,407.00. This amount represent the increase that had resulted from execution of the Project and the difference between the actual cost of the Project and the amounts actually paid by the Defendant, with redemption of a reasonable profit as at the time of bidding the price was calculated with expectation of a 10% profit. Details are as follows:

|                                | Saudi Riyals   |
| ------------------------------ | -------------: |
| Total Cost of Contract         | 270,312,725.00 |
| Indirect Cost                  | 18,921,891.00  |
| Shortage of Cash flow          | 39,560,411.00  |
| Zakat                          | 1,232,981.00   |
| 10% Profit                     | 28,923,462.00  |
| **Total**                      | 358,951,470.00 |
| Deduct amounts paid by Bugshan Stone & Webster Saudi Ltd. | 127,747,444.00 |
| Additional cost that resulted from execution in a manner different from the one agreed upon due to breach of commitment by Bugshan Stone & Webster Saudi Ltd. | 231,204,026.00 |
| Equivalent to US Dollars       | **61,654,407.00** |

Above clarification is presented upon your Circle's Decision.

Dr. Fahd bin Abdul Aziz Al-Khlaif
Representative of the Plaintiff

Prepared by Trumbull Services on Time: 9:38 pm Date: 11 September 00

A286

EXHIBIT "B"

ARTICLES  OF  ASSOCIATION
OF
BUGSHAN S&W COMPANY LIMITED

A LIMITED LIABILITY COMPANY

On the date hereinafter specified,
this Agreement has been entered
into by and between:

FIRST PARTY:

Abdulla Said Bugshan & Brothers,
a general partnership founded
and existing under the laws of
the Kingdom of Saudi Arabia and
registered in the Commercial
Register of Jeddah under No.1615
having its head offices at King
Abdul Aziz Street, Jeddah, S.A.,
hereinafter referred to as
"BUGSHAN", represented for the
signing of these Articles by
Sheikh Salim Ahmed Bugshan;

and

SECOND PARTY:

Stone & Webster Engineering
Corporation, a company having
its head office at 245 Summer
Street, Boston, Massachusetts,
hereinafter referred to as
"SWEC", represented for the
signing of these Articles by its
Senior Vice President, John W. Landis.


The Parties (hereinafter sometimes
referred to as " Partners " have
agreed to establish a limited
liability company in accordance
with the Saudi Arabian Companies
Act promulgated under Royal
Decree No. M/6 dated 22/3/1385 A.H.,
the Foreign Capital Investment Code

*AE*

..2..

عـقـــد تأسيـس

شركة بـكـشـان أس • أند • دبليو المحدودة
( شركة ذات مسـؤوليـة محـدودة )

فى التاريخ الموضح أدناه تم الاتفاق
بين كل مــــــن :

الطـــــــرف الاولــــــــــ :
عبد الله سعيد بغشان واخوانـــــــا
شركة تضامن مؤسسة وقائمة طبقـــــا
لقوانين المملكة العربية السعوديـة
ومسجلة بالسجل التجارى بجــده
تحت رقم ١٦١٥ ومركزها الرئيسى
فى شارع الملك عبد العزيز بمدينـة
جده بالمملكة العربية الســــعوديـة
ويطلق عليهـا تباليل "بغشــان "
ويمثلها وينوب عنها فى التوقيع على
هذا العقد الشيخ سالم احمد بغشان

و

الطرف الثانــــــى :
شركة ستون أند وبستر الهندسيه
ومركزها الرئيسى فى ٢٤٥ صنـارع
سمرلى مدينة بوسـطن بولايـــة
ماسوشوستس بالولايات المتحدة الامريكية
ويطلق عليها فيما يلى "سويك ".
يمثلها وينوب عنها فى التوقيع على
هذا العقد السيد/ جون دبليو
لأنـــدس ـ نائب رئيس الشركة الاقدم .

أتفق الطرفان "يطلق عليهما أحيانا
كلمة الشركا" "على تأسيس شركة ذات
مسؤولية محدودة وفقا لنظـــــــام
الشركات فى المملكة العربية السعودية
الصادر بموجب المرسوم الملكى رقم
م/٦ بتاريخ ٢٢/ ٣/ ١٣٨٥ هـ
ونظام استثمار رأس المـــــــــال

- 2 -

and any other regulations in force
in the Kingdom of Saudi Arabia, and
the provisions set forth in these
Articles.

1.  **The Name**

    The name of the Company is
    "Bugshan S&W Company Limited,"
    a Limited Liability Company.

2.  **The Objects**

    The objects of the Company shall
    be to undertake construction
    management and execution of mecha-
    nical, electrical, chemical,
    desalination and hydrocarbon pro-
    cessing projects including the
    associated engineering and Civil works.

3.  **Duration of the Company**

    The duration of the Company
    shall be for a period of fif-
    teen(15) Gregorian calendar
    years commencing as of the
    date of its registration in
    the Commercial Register and
    shall be renewed automatically
    for similar fifteen(15) year
    periods unless either partner
    notifies the other by regis-
    tered mail, at least six(6)
    months in advance of the end
    of the original or any subse-
    quent fifteen(15) year period
    of its intention not to have
    the duration of the Company
    renewed beyond the expiration
    of the fifteen(15) year period
    then in effect, in which event
    the duration of the Company
    shall expire at the end of the
    fifteen year period in which
    such notice is given.

..3..

الاجنبى وغيرها من الانظمة المعمول
بها فى المملكة العربية السعودية
والاحكام الوارده فى هذا العقد .

1 - أسم الشركة :

يكون أسم الشركة " شركة
"بقشان . س . أند . دبليو
المحدودة" شركة ذات مسئولية
محدودة .

2 - الاغراض :

أن أغراض الشركة هى ادارة
تنفيذ الاعمال الانشائية والقيام
بتنفيذ المشروعات الميكانيكية
والكيماوية والكهربائية ومشروعات
تحلية المياه ومعالجة المهد روكربونات
بما فى ذلك الاعمال الهندسية
والمدنية المرتبطة بهذه المشاريع

3 - مدة الشركة :

مدة الشركة (15) خمسة عشر
سنة ميلادية تبدأ أعتبارا
من تاريخ قيدها فى السجل
التجارى ويتم تجديدها تلقائيا
لمدد مماثلة مالم يخطر أحمد
الطرفين الاخر بالبريد
المسجل قبل ستة أشهر
على الاقل من انتهاء المدة
الاصلية أو أى مدة مجددة
بعدم رغبته فى تجديد مدة الشركة
بعد انتهاء الخمسة عشر سنة
السارية المفعول . وفى هذه
الحالة تنتهى مدة الشركة
بانتهاء مدة الخمسة عشر سنة
التى تم خلالها تقديم
هذا الاخطار .

- 3 -

## 4. Head Office and Branches

١ ــ المركز الرئيسي والفروع :

The Company's Head office shall be situated in Riyadh, Saudi Arabia, with branch offices in Dhahran and Jeddah. The Company by resolution of the Board of Directors may establish branches within or outside the Kingdom of Saudi Arabia after obtaining the approval of the concerned authorities.

يكون مركز الشركة الرئيسي فى مدينة الرياض بالمملكة العربية السعودية ويكون فرعها فى الظهران وجده ٠ ويجوز للشركة انشاء فروع لها داخل او خارج المملكة العربية السعودية بقرار من مجلس الادارة بعد الحصول على موافقة الجهات المختصة ٠

## 5. Share Capital

٥ ــ رأس المال :

The share capital of the Company is fixed at S.R. 5,000,000 (Five million Saudi Riyals) divided into 5,000 (Five thousand) shares which have a value each of S.R. 1000 (One thousand Saudi Riyals) and are indivisible. Bugshan has subscribed for 2,500 of said shares (Two thousand five hundred shares) in cash, valued at S.R. 2,500,000 (Two million fivehundred thousand Saudi Riyals) and Stone & Webster Engineering Corporation has subscribed for 2,500 of said shares (two thousand five hundred shares) in cash, valued at S.R. 2,500,000 (Two million five hundred thousand Saudi Riyals)

حدد رأسمال الشركة بمبلغ (٥٠٠٠٠٠٠) خمسة ملايين ريال سعودى مقسم الى (٥٠٠٠) خمسة الاف حصة نقدية غير قابلة للتجزئة قيمة كل منها (١٠٠٠) الف ريال سعودى وقد اشترك شركاؤها بما يلى : شركة عبد الله سعيد بقشان واخوانه (٢٥٠٠) الفان وخمسمائة حصة نقدية قيمتها (٢٥٠٠٠٠٠) مليون وخمسمائة الف ريال سعودى ٠ شركة ستون اند وبستر الهندسية (٢٥٠٠) الفان وخمسمائة حصة نقدية قيمتها (٢٥٠٠٠٠٠) مليون وخمسمائة الف ريال سعودى ٠ واقر " الشريكان بتوزيع الحصص فيما بينها

The parties hereto declare that the share capital has been allocated and paid up in full and is deposited with an appropriate bank in Riyadh in the name of the Company under formation.

وسداد رأس المال التقدى كاملا وايداعه لدى بنك مرخص له بالرياض باسم الشركة تحت التأسيس ٠

## 6. Transferability of Shares

٦ ــ تداول الحصص :

No partner shall assign or transfer his shares of the

لا يجوز لأى شريك ان يتنازل او ينقل ملكية حصة

..4..

company to a third party without the prior written agreement of all other partners. If a partner wishes to assign or transfer his shares, he shall give notice to the other partners through the general manager, which notice shall set out clearly the terms and conditions of the proposed assignment or transfer. If any partner does not consent in writing to the assignment or transfer of said shares, then the Partner giving said notice may initiate dissolution of the Company pursuant to Article 15.

7. Increase of Capital

By unanimous resolution of the Partners representing all of the capital of the Company, the share capital may be increased. The Partners shall have preemptive rights to subscribe to all new share capital of the company in the same proportion as each partner's shareholding in the capital of the Company immediately prior to such increase in the share capital. If any partner does not wish to subscribe and pay for its portion of such increase in share capital, he shall clearly state in writing said wish to the Board of Directors and the other partners and the preemptive rights of such partner shall pass pro-rata to the other partner. If and to the extent that the partners do not exercise their preemptive rights hereinabove set forth, such increase in the Company's share capital may be offered and subscribed to by any third party acceptable to

في الشركة للغير دون موافقة كتابية مسبقة من كافة الشركاء الاخرين وإذا مارغب الشريك التنازل أو نقل ملكية حصصه تعين عليه التقدم باخطار الى الشركاء الاخرين عن طريق المدير العام للشركة يعرض فيه بوضوح بنود وشروط التنازل أو الانتقال المقترح . وإذا لم يوافق أى من الشركاء كتابيا على التنازل أو انتقال ملكية الحصص المذكورة يجوز للشريك المتقدم بالاخطار المنوه عنه أعلاه الشروع في حل الشركة وفقا لاحكام المادة الخامسة عشر .

٧ ـ زيادة رأس المال :

يجوز زيادة رأس المال بموجب قرار يتخذ باجماع الشركاء الممثلين لكامل رأسمال الشركة ويكون للشركاء الاولوية في الاشتراك بكامل رأس المال الجديد كل بنسبة مايملكه من حصص في رأسمال الشركة قبل زيادته مباشرة وإذا لم يرغب أحد الشركاء الاشتراك ودفع نصيبه في زيادة رأس المال يتعين عليه توضيح هذه الرغبة كتابة الى مجلس الادارة والشركاء الاخرين . وفي هذه الحالة تنتقل حقوق الاولوية الخاصة بهذا الشريك للشركاء الاخرين بنسبة حصصهم في رأسمال الشركة . وإذا لم يمارس الشركاء حقوق الاولوية الموضحة أعلاه يجوز طرح الزيادة في حصص رأسمال الشركة للاشتراك فيها من قبل الغير الذى يجب أن يقبل به كافة الشركاء .

..5..

- 5 -

all of the Partners, provided
that an approval is obtained
from the concerned authorities.

8. **The Register of Shareholders**

The Company shall keep a special reg-
ister containing the names of the Part-
ners, the number of shares held by each
and all transactions affecting such
shares including the name and signature
of the transferor, the name and signat-
ure of the transferee and the date of
transfer.

No transfer of shares shall be
valid against the Company or third
parties unless it is registered
in the said register. Nothing
herein shall be deemed to make
valid any transfer of shares con-
trary to the provision of Article
6 above. Any Partner shall have
access to this register during
the Company's working hours.

9. **General Meetings of Partners**

**Section 1 Place of General**
**Meetings**

Each general meeting of the part-
ners shall be held at such place,
within or without the Kingdom of
Saudi Arabia, as shall be stated
in the notice calling the meeting.

**Section 2 General Meetings**

A general meeting of the Partners
shall be held at least once a year
within three (3) months following
the end of each fiscal year. A
general meeting may be called at
any time at the request of the
Chairman of the Board of Directors,
any two (2) Directors, the Auditor,

..6..

وذلك كله شريطة أخذ موافقة
السلطات المختصة .

٨ ــ سجل الشركاء :

تحتفظ الشركة بسجل خاص
يتضمن أسماء الشركاء وعدد
الحصص المملوكة لكل منهم وكافة
التصرفات التى ترد على هذه
الحصص ويعمل ذلك اسم وتوقيع
المتنازل واسم وتوقيع المتنازل اليه وتاريخ
التنازل ولايكون للتنازل أو الانتقال أى أثر
بالنسبة للشركة أو للغير مالم يكن
مقيدا فى السجل المذكور . ولايتضمن
هذه فم اليمادة ما يجيز التنازل عن
الحصص بما يخالف أحكام ونص
المادة ة السادسة المذكورة أعلاه
ويجوز لكل شريك الاطلاع على هذا السجل
خلال ساعات العمل الرسمية .

٩ ــ الجمعية العمومية للشركاء
الفقرة (١) مكان الاجتماع :

تنعقد الجمعية العمومية للشركاء
فى المكان المحدد فى الاخطار
سواء كان ذلك المكان داخل المملكة
العربية السعودية أو خارجها .

الفقرة (٢) الجمعية العمومية

تنعقد الجمعية العمومية للشركاء
مرة كل سنة على الاقل خلال
الثلاثة أشهر التالية لانتهاء
السنة المالية للشركة ويجوز دعوة
الجمعية العمومية للاجتماع فى أى
وقت بناء على طلب من رئيس مجلس

A292

- 6 -

or a number of Partners repre-
senting at least one-half of the
capital of the Company.

At each such meeting, the Partners
may transact such business as may
properly be brought before them.
Any Partner may require the Board
of Directors to call a general
meeting to deliberate on the
documents sent to the Partners as
required by Article 13 of these
Articles of Association.

### Section 3 Calling General Meetings

The Board of Directors shall by
duly adopted resolutions call the
general meetings requested as
provided in Section 2 of this
Article 9, specifying in such
resolutions the place, the day,
and the hour of each such
meeting, and the purpose or
purposes of the meeting, and
authorizing an individual or occu-
pant of a company position desig-
nated in such resolution to notify
each partner of the company of the
calling of such meeting and the
particulars thereof as set forth
in such resolution. Such notice
is to be sent not less than thirty
(30) days nor more than sixty(60)
days before each such meeting;
provided, however, that such
meeting may be held without notice
with the unanimous written(telex
or otherwise) consent of the Part-
ners. Such notice, when required
shall be given to each Partner,
either personally against hand
receipt or by sending a copy of

..7..

الادارة أو أحد أعضاء من أعضاء
المجلس أو مراقب الحسابات أو عدد
من الشركاء يمثلون على الأقل نصف
رأسمال الشركة .

وفي مثل هذا الاجتماع يجوز للشركاء
انجاز ما يعرض عليهم من أعمال كما يجوز
لأي شريك أن يطلب من مجلس الادارة
الدعوة الى عقد الجمعية العمومية للتداول
في المستندات المرسلة الى الشركاء وفقا
لمقتضيات المادة الثالثة عشر من
هذا العقد .

### الفقرة ( ٣ ) الدعوة لانعقاد الجمعية العمومية

يقــــوم مجلس الادارة بالدعوة الى عقد
الجمعية العمومية وفقا لاحكام الفقرة
الثانية من هذه المادة وبموجب قرارات
صادرة عنه بصورة نظامية . على
أن يحدد في هذه القرارات مكان وزمان
انعقاد الجمعية والغرضين من انعقادها
وتعيين شخص أو موظف بالشركة لاخطار
كافة الشركاء بالاجتماع وتزويدهم بالبيانات
الخاصة بذلك طبقا لما هو موضح بالقرار
ويتعين أن يرسل هذا الاخطار قبــل

موعـــد الاجتمـــاع بفتـــرة
لاتقــل عــن ثلاثين يوما ولا تزيد
عـن ستيـن يوما ومع ذلك يجوز
عقد مثل هـذا الاجتماع دون
اخطار بشرط أن تتم الموافقة عليــــه
كتابيا من الشركاء مبدئيا ان ذلك
عن طريق التلكس أو خلافه . واذا
تطلب الامر هذا الاخطار . وحسب
تسليمه للشركاء اما بموجب توقيعات
اذا سلم اليهم شخصيا أو ارسال صورة

- 7 -

the notice by Telex, registered
mail, or telegraphically, addres-
sed to the Partner at the Partner's
address appearing on the books of
the Company or supplied by the Partner
to the Company for the purpose of notice;pro-
vided that such transmittal shall be by
registered air mail if the partner's
address is in a city other than
the city from which such notice
is transmitted.
Each such notice, when required, shall be
in writing and signed by an individual
authorized by said resolution to send
such notice.

Section 4 Resolutions of the
Partners

Resolutions of the Partners shall
be adopted at a general meeting;
provided, however, that the
Partners may express their
opinions seperately, in which
case the Board of Directors shall
send each partner a registered
letter incorporating the proposed
resolutions, so that the Partner
may vote on them in writing.
Every Partner shall have the
right to participate in
deliberations and in voting and
shall be entitled to a number of
votes equal to the number of
shares he owns.

In all cases, a quorum for a
general meeting of Partners shall
consist of Partners representing all of
the capital of the Company, and resolu-
ions of the Partners shall be valid only
if adopted by Partners representing

منه بالتلكس أو البريد المسجل أو البرق.
على شأنهن للشركة المدرجة فى سجلات
الشركة أو على العنوان الذى تقدم
الشريك لهذا الغرض على أن غرض
الاخطار بالبريد الجوى المسجل اذا
كان عنوان الشريك يقع فى مدينة غير
المدينة التى يرسل منها
الاخطار • ويجب أن يكون الاخطار
خطيا وموقعا عليه من الشخص المخول
باتخاذ اجراءات الاخطار
بمقتضى القرار المذكور •

الفقرة الرابعة : قرارات الشركاء

تتخذ قرارات الشركاء فى الجمعية العمومية
ومع ذلك يجوز للشركاء التعبير عن
أرائهم على انفراد • وفى هذه
الحالة يتحين على مجلس الادارة أن
يرسل لكل شريك خطابا مسجلا يتضمن
القرارات المقترحة للتصويت عليها كتابة
ويحق لكل شريك الاشتراك فى المداولات
والتصويت • كما يكون له الحق
فى عدد من الاصوات يساوى
عدد ما يملكه من حصص
فى جميع الحالات فان النصاب
القانونى للجمعية العمومية يكمل
بحضور شركاء يمثلون كامل
رأسمال الشركة • هذا
ولا تكون قرارات الشركة صحيحة
مالم بوافست عليها عدد من
الشركاء يمثلون

- 8 -

at least three-quarters(3/4) of
the share capital. However, the
financial liabilities of the
Partners may not be increased
without unanimous decision.

<u>Section 5 Special Register</u>

The General Manager shall cause
minutes to be drawn up of the
gist of the deliberations of the
general meetings of the Partners
and shall cause the minutes and
the resolutions of general meet-
ings of the Partners to be re-
corded in a special register kept
for the purpose by the Company
at its head office or such other
place as the Board of Directors
may order. Any Partner shall
have access to this register
during the Company's working
hours.

10. <u>The Company's Management</u>

<u>Section 1 Construction and</u>
<u>Appointment of</u>
<u>Board of Directors</u>

The Company shall be managed by a
Board of Directors, consisting of
six (6) members, three (3) of
whom shall represent BUGSHAN, and
three (3) of whom shall represent
SWEC (each such member shall be
hereinafter referred to as a
"Director").

Each Partner shall, by written
notification to the other
Partner, appoint the Directors
who will represent it on the
Board of Directors and shall have
the right, by similar noti-
fication, to remove from the

..9..

ثلاثة أرباع حصص رأس المال على
الأقل . ولا يجوز زيادة الالتزامات
المالية للشركاء دون قرار اجماعى
فى هذا الشأن .

الفقرة (٥) السجل الخاص

يتخذ المدير العام ترتيبات تدوين
محاضر الجلسات وخلاصة مناقشات الجمعيات
العمومية للشركاء فضلا عن قراراتها لتدوينها
فى سجل خاص تحفظه الشركة فى مركزها
الرئيسى أو فى أى مكان آخر يحدده
مجلس الادارة ويحق لكل شريك الاطلاع
على هذا السجل خلال ساعات العمل
الرسمية .

١٠- ادارة الشركة ــ الفقرة (١)

تشكيل وتعيين مجلس الادارة

يتولى ادارة الشركة مجلس ادارة
يتكون من ستة أعضاء ثلاثة منهم
يمثلون بغشان ويمثل الثلاثة
الآخرين سويك . ويطلق على
كل منهم فيما يلى عضو مجلس الادارة .

ويجوز لكل شريك بموجب اخطار
كتابى يرسله للشريك الآخر تعيين
الأعضاء الذين يمثلونه فى مجلس
الادارة وله الحق
بمقتضى اخطار مماثل

- 9 -

Board of Directors   any such
Director it appoints.

عـزل اى عضـو عضـوين من قبله
فى مجلس الادارة .

## Section 2 Term of Office and Replacement

الفقرة ( ٢ ) مدة عضوية المجلس وأستبدال الأعضاء

The term of office of each
Director shall continue until
his death or his prior resigna-
tion or removal from the Board
of Directors.  Upon the happen-
ing of  any such event, the
Partner who appointed him shall
appoint his successor.

يأمر عضو مجلس الادارة مهام منصبه
حتى وفاته أو أستقالته أو عزله
من مجلس الادارة . وفى حالة وقوع
اى من هذه الحالات يتعين على
الشريك الذى عينه اختيار خلف له .

## Section 3 Chairman of the Board

الفقرة الثالثة : رئيس مجلس الادارة

The   Board  of  Directors shall
appoint a Chairman  from amongst
those  Directors  representing
BUGSHAN on the Board.

يعين مجلس الادارة رئيسا له
من بين الاعضاء الذين يمثلون
بقشان فى مجلس الادارة .

## Section 4 Powers of the Board

الفقرة ( ٤ )  سلطات مجلس الادارة

Subject to  limitations  of the
Islamic Shari'ah, the Articles of
Association, the Companies Act
promulgated  under Royal Decree
No. M/6 of 22/3/1385 A.H., and
of any other applicable laws
and regulations of the Kingdom
of Saudi Arabia, all Company
powers shall be exercised by
or under the authority of, and
the business and affairs of the
Company shall be controlled by,
the Board of Directors.

تتم مارسة كافة سلطات الشركة
وادارة وصيانة أعمالها بمعرفة
مجلس الادارة وتحت اشـرافه
دون الاخلال بأحكام الشريعة الاسلامية
والمواد الواردة فى هذا العقد وفى نظام الشركات
الصادر وبموجب الرسم الملكى رقم م / ٦
وتاريخ ٢٢ / ٣ / ١٣٨٥ ه وأية
أنظمة أخرى معمول بها فى
المملكة العربية السعودية .

## Section 5 Meetings of the Board with Notice

الفقرة ( ٥ ) اجتماعات مجلس الادارة ــ الاخطارات

Regular meetings of the Board
of Directors shall be held
twice a year at such place and
                           ..10..

يعقد مجلس الادارة اجتماعا عاديا
مرتين فى السنة ويتحدد مكان وزمان
انعقاد هــــــــذين

- 10 -

and hour as may be fixed from
time to time by resolution of
the Board of Directors.  Meet-
ings of the Board of Direc-
tors for any purpose or purposes
shall be called at any time by
the Chairman of the Board, the
Auditor, by any other two Di-
rectors, or by the General Mana-
ger.  Written notice of the time
and place of special meetings
shall be delivered personally to
the Directors against hand re-
ceipt or sent to each Director
by letter or telegraphically,
charges prepaid, addressed to
him at his address as is shown
upon the records of the Company.
In such case, notice must be
mailed or telegraphed at least
thirty (30) days prior to the
holding of the meeting.

If the address of the Director to
whom it is mailed is outside of
the city from which it is mailed,
it shall be mailed by Registered
air mail.

Section 6 **Meetings of the**
**Board with waiver**
**of Notice**

The transactions of any meeting
of the  Board  of  Directors,
however  called  and  noticed  or
wherever held, shall be as valid
as though had at a meeting duly
held  after  regular  call  or
notice,  if  a quorum be present,
and if, either before or after
the  time  stated therein, each of
the Directors  present  signs a
written  waiver  of notice.  All
such waivers shall be filed with

..11..

الاجتماع بموجب قرار يصـــــدر
عن المجلس من وقت لاخـر ، وتنعقد
اجتماعات المجلس لأى غـرض او اغراض فى
تستلزم انعقاده ما فى اى وقت بدعوة
من رئيس المجلس ، أو مراقب الحسابات او
اثنين من أعضاء مجلس الادارة ، أو المدير
العام ويتم اخطار أعضاء مجلس الادارة
بمكان وزمان انعقاد الاجتماعات الاستثنائية
للمجلس بموجب اخطار يسلم لكل منهـــم
بموجب توقيعات خطية أو يرسل لهم
بالبريد أو بالبرق مدفوعة قيمته سلفا ، على
عناوينهم الثابتة فى سجلات الشركة
وفى هذه الحالة يتعين ارسال الاخطار
بالاجتماع سواء كان بالبريد أو بالبرق
قبل انعقاده ، بفترة ثلاثين يوما علـــى
الاقــــل ،

واذا كان عنوان عضو المجلس المطلوب اخطاره
يقع خارج المدينة المرسل منها
الاخطار يوجب له ذلك الاخطار بالبريد
الجوى المسجل ،

الفقرة ( ٦ ) اجتماعات مجلس الادارة
التنازل عن الاخـــــطارات

محاضر جلسات اى اجتماع يعقده
مجلس الادارة أيا كانت طريقـــة
الدعوة له والاخطار به وحيثما
كان مكانه تعتبر بمثابة محاضر رسمية
تم اعدادها فى اجتماع عقد بصورة نظامية بعد
الدعوة  لـه والاخــطار به طبقا
للنظام ، واذا اكتمل النصاب القانونى
لانعقاده ، اذا تام كل عضـو
من أعضاء مجلس الادارة يحضـــن حضرا
ذلك الاجتماع بالتوقيع على تنازل كتابى عن

- 11 -

the Company records or made a part of the minutes of the meeting.

الاخطار بحضوره سواء كان ذلك قبل او بعد انعقاد الاجتماع ويجب ان تحفظ كافة تلك التنازلات في سجلات الشركة او تشكل جزءا من محاضر ذلك الاجتماع .

Section 7 Quorum; Voting; Proxy

الفقرة ( ٧ ) النصاب القانوني ــ التصويت ــ الوكالة

At all meetings of the Board of Directors, six (6) Directors present in person or by proxy shall be necessary a sufficient to constitute a quorum for the transaction of business. Every act or decision done or made by the affirmative vote of all of the Directors so present, whether acting in person or by proxy, at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors. Voting may be done by voice or written ballot. Each Director shall have only one (1) vote with respect to any matter, such vote to be exercised in person or by proxy.

يشترط في كافة اجتماعات مجلس الادارة ان يحضرها ستة من أعضاء المجلـــــــس سواء كان ذلك بالاصالة او بالوكالة ويمثل هذا العدد النصاب القانوني الكافي لانعقاد الاجتماع وكل اجراء يتم او قرار يتخذ بنتيجة التصويت عليه بالايجاب من كافة أعضاء المجلس الحاضرين او الممثلين في اجتماع تم عقده بصورة نظامية وحضره النصاب القانوني ســوف يعتبر قرارا من قرارات مجلس الادارة . ويجوز ان يتم التصويت بالتعبير اللفظ او بالاقتراع السري المكتوب . ولكل عضو مجلس ادارة صوت واحد بالنسبة لأي مسألة يدلي به سواء كان ذلك بالاصالــة او بالوكالة .

Each Director may give proxy to another person, either in writing or by telex with a copy to the Company, to be present and act on his behalf at meetings of the Board of Directors and/or to sign on such Director's behalf the waiver of notice and written consent referred to in section 6 and 8 of this Article 10. Such Director may at any time at his discretion revoke, either in writing or by telex with a copy to the Company, any such proxy given by him. such person's proxy shall be deemed automatically revoked upon his death or resignation from such office or upon the expiration of

يجــوز لكل عضو من أعضاء مجلس الادارة اعطاء توكيل لشخص أخر كتابة او بموجب تلكس مع ارسال صورة من هذا التوكيل للشركة وذلك للحضور والتصرف نيابة عنه في اجتماعات المجلس و / أو التوقيع نيابة عن العضو على التنازل عن الاخطار وعلى الموافقة الكتابية المنوه عنها في الفقرتين السادسة والثامنة من المادة العاشرة . ويجوز لهذا العضو في أي وقت يراه مناسبا الغاء مثل هذا التوكيل العام وضع ذلك كتابة أو بموجب تلكس بشريطة اعطاء الشركة صورة من مستند الغاء التوكيل ويعتبر التوكيل المنوه على هذا التوكيل ملغي تلقائيا لدى وفاة الشخص الذي أصدره أو استقالته من هذا المنصب

..12..

- 12 -

the term of office of the Director
who appointed him.  The person
having such proxy shall have
the power set forth in such proxy
and his actions in exercising such
power shall be deemed to be those
of the Director who appointed him
acting by proxy.

No person may act by proxy on be-
half of a Director who is present
in person.  However, a Director
who is present in person may, in
addition to casting his own vote,
cast the vote of a Director(s) who
is(are) not present but has(have)
given his(their) proxy to such
Director who is present.

The Board of Directors shall cause
all such written , notifications
and proxies and revocations . of
proxies to be recorded. in a
special register kept for the pur-
poses by the Company at its head
office or such other place as the
Board of Directors may order.  Any
Partner shall have access to this
register during the Company's work-
ing hours.

### Section 8 Board Action without Meeting

Any action required or permitted to
be taken at any meeting of the Board
of Directors may be taken without
a meeting if a written consent there-
to is signed by all members of the
Board of Directors, acting in person
or by proxy.

### Section 9 Presiding Director

The Chairman of the Board of Direc-
tors or the Director designated by
him shall, preside at all meetings
of the Board of Directors.  The
..13..

- 13 -

Chairman of the Board shall not
have a second or casting vote.

### Section 10 Special Register

The General Manager shall cause
minutes to be drawn up of the
gist of the deliberations of
the Board of Directors and shall
also cause the minutes and reso-
lution of the Board of Directors,
whether adopted at general meet-
ings or otherwise, to be recor-
ded in a special register kept
for the purpose by the Company
at its head office or such other
place as the Board of Directors
may order. Any Partner shall
have access to this register
during the Company's working
hours.

### Section 11 General Manager

The Board of Directors shall by
resolution appoint a General
Manager for the Company, who
shall be nominated by SWEC and
whose powers and term of office
shall be outlined in the appoint-
ment resolution.

The General Manager shall have
the right to attend all meetings
of the Board of Directors and to
express his opinion but shall not
have the right to vote in his
capacity as General Manager.

### 11. Accounts Books and Fiscal Year

#### Section 1 Account Books

The Company shall keep official
accounting books and records
which shall be checked annually
and made ready by the General

..14..

ولا يكون لرئيس مجلس الادارة أو لأى عضو آخر يتولى
رئاسة المجلس ، صوت ثان أو صوت مرجح فى عملية
التصويت .

### البند ( ١٠ ) السجل الخاص

يتخذ المدير العام ترتيبات تدوين محاضر الجلسات
وخلاصة مناقشات مجلس الادارة فضلا من قـراراتـه
سـواء تمت الموافقة عليها أم لم تتم فى سـجل
خاص تحتفظ الشركة فى مركزها الرئيسى أو فى أى
مكان آخر يحدده مجلس الادارة . ويحق لكل
شريك الاطلاع على هذا السجل خلال ساعات
العمل الرسمية .

### الفقرة ( ١١ ) المدير العـام

يعين مجلس الادارة بقرار منه مديرا
عاما يتم اختياره بواسطة شركة ستين
أند وستر البند سـية . ويحدد قرار التعيين
الصادر عن المجلس سلطات المدير العام ومدة
وظيفته . ويحق للمدير عام الشركة حضور كافة
اجتماعات مجلس الادارة وابداء آرائه فى الموضوعات
المطروحة أمام المجلس ، الا أنه لا يحق له التصويت
بصفته مديرا عاما للشـركة .

### ١١ ـ دفاتر الحسابات والسنة المالية

#### الفقرة ( ١ ) دفاتر الحسابات

تمسك الشركة بمسك دفاتر حسابات رسـمية
وسجلات تتم مراجعتها سـنويا وتعد
المدير العام ترتيبات اعداد هـذا

- 14 -

Manager for examination by any
Partner or appointed represen-
tative at any convenient time.

### Section 2 Fiscal Year

Except as provided in Section 3
below, the Company's fiscal year
is the Gregorian calendar year.

### Section 3 First Fiscal Year

The period that has elapsed from
the date of registration in the
Commercial Register until the
thirty-first (31st) day of
October of the following year
shall be the Company's first
fiscal year.

### 12. Auditors

The Partners shall appoint an
auditor for every fiscal year to
be chosen from among those
authorized to work in the Kingdom
of Saudi Arabia. Annual fees
shall be given to this auditor as
specified by the appointment
resolution. The auditor shall
observe the implementation
of the Articles of Association
and the Companies Act and shall
review the inventory lists and
the final annual accounts, for
which he must submit a report
annually, and for which purpose
the Auditor is entitled to check
all books, accounts, and
documents of the Company.

### 13. Financial Statements

The General Manager shall, within
two (2) months following the end

..15..

A301

- 15 -

of each fiscal year, cause to be
prepared for such fiscal year a
balance sheet, a profit and loss
account, a report on the
Company's activities and
financial position, and a
proposal on the distribution of
profits. The General Manager
shall cause copies of these
documents and of the Auditor's
report to be sent to the
Companies Department at the
Ministry of Commerce and to each
Partner within fifteen (15) days
following the preparation of the
said documents.

14. <u>Distribution of Profits; Reserves</u>

The Company's annual net profit
after deducting all general
expenditure and other expenses
shall be distributed between the
Partners, on the basis of fifty
percent (50%) to Bugshan and
fifty percent ( 50%) to SWEC,
provided that ten percent (10%)
of the net profit shall be set
aside annually as a statutory
reserve. The Partners may
resolve to discontinue such
deduction when the statutory
reserve totals one-half (½) of
the capital. Other reserves may
be set aside if necessary.

15. <u>Dissolution and Liquidation of
the Company</u>

The Company's dissolution shall
be determined according to the
provisions of Article 15 of the
Companies Act. In the case of
such determination, the Company

..16..

- 16 -

shall be liquidated according to
the provisions set forth under
Part XI of the said Act and these
Articles. The Partners upon
request of the Board of Directors
shall appoint a team of
liquidators and determine their
powers and remuneration. The
authority of the Board of
Directors shall cease upon the
appointment of said liquidators.
The team of liquidators shall
consist of two (2) members, one
to be appointed by each Partner.
The two liquidators so chosen
shall appoint an umpire prior
to commencing with thier liquida-
tion activities. The two liquida-
tors and umpire shall act jointly.
The decision of the two
liquidators if they are in
agreement shall be binding upon
the Partners and Company. In the
event the two liquidators are
unable to agree, then the
decision of the umpire shall
be binding upon the Partners and
Company. The Partners shall be
entitled to purchase assets of
the company at market price as
determined by the liquidators in
proportion to the share held by
each in the capital of the
Company. The proceeds of the
liquidation after satisfaction of
the debts of the Company and any
expenses including remuneration
of the liquidators shall be
distributed equally among the
partners and shall be allocated
first to the refund to the
Partners of the value of their
share in the capital.

..17..

من أحكام هذا العقد يتم
الشركة بناءا على طلب مجلس الادارة
بتعيين فريق من المصفين
وحده يد سلطاتهم وأتعابهم
وتعيين المصفين تنتهى سلطة مجلس
الادارة ويتكون فريق المصفين من عضوين
يتراس كل شريك تعيين عضو
منهما ، ثم يقوم المصفيان اللذان
تم اختيارهما بتعيين حكم قبل
الشروع فى مباشرة
أعمال التصفية ، ويتولى المصفيان
والحكم مباشرة أعمال التصفية معا ، ويكون
القرار الذى يتم التوصل اليه باتفاق
المصفيين ملزما للشركة والشركة
أما فى حالة عدم تمكن المصفيين من
التوصل الى اتفاق يكون قرار الحكم
ملزما للشركة والشركة ويحق للشركة
شراءا موجودات الشب الشركة
بسعر السوق ـ طبقا
لما يحدده المصفيان ـ كل
بنسبة ما يملكه من حصص فى رأس مال
الشركة ويوزع ناتج التصفية ـ بعد
الوفاء بديون الشركة وتغطية أى نفقات
أخرى بما فى ذلك أتعاب المصفيين فيما
بين الشركاء بالتساوى على أن يخصص ذلك
الناتج بادىء ذى بدء لتسديد قيمة
حصص الشركاء فى رأس المال
وعند تصفية الشركة
يتم الاتفاق فيما بين الأطراف
هذا العقد على
التنازل عن
الشركة التابعة لأى شيما ،

– 17 –

Upon dissolution of the Company,
existing contracts of the Company
shall be assigned to others as
mutually agreed by the Parties,
or if no such assignment may be
made, the liquidation of the
Company shall not be accomplished
until the Company's performance
under any such contract is
completed.

### 16. Notifications

All notifications to be sent by
the Company to any Partner or to
be sent by the Partners to each
other shall be given in writing
in the English language. Such
notices may be made by registered
mail or telex or cable or by
hand-delivery against receipt in
a manner similar to that stated
in Section 3 of Article 9 of
these Articles of Association.
Any notification sent otherwise
shall be considered null and
void. The effective date of any
notice shall be the date on which
it is actually received by the
addressee.

### 17. Application of the Companies Act

Where there is no clear provision
in these Articles in respect of
any subject, the Companies Act
promulgated under Royal Decree
No. M/6 of 22.3.1385 A. H. and
other relevent regulations in
force in Saudi Arabia shall
apply.

### 18. Compliance of Articles with Laws and Regulations of Saudi Arabia

If any provision of these Articles

..18..

وفى حالة عدم الاتفاق على
التنازل للغير • فيؤجل تصفية
الشركة الى أن تنهى التزاماتها
المترتبة عليها بموجب تلك
العقود •

١٦ ــ الاخطارات

جميع الاخطارات والمراسلات الموجهة
من الشركة للشركاء أو التبادل فيما
بينهم يجب أن تكون خطية وباللغة
الانجليزية • وأن يتم ارسالها بالبريد المسجل
أو التلكس أو البرق أو بموجب توقيعات اذا
سلمت اليهم شخصيا على النحو المشروح
فى الفقرة الثالثة من المادة التاسعة من هذا
العقد • وكل مراسلة أو مكاتبة يتم ارسالها
على نحو يخالف ما سبق بيانه تعتبر لاغية
وكأن لم تكن • ويعتبر التاريخ الفعلى لأى مكاتبة
هو تاريخ تسليمها بالفعل للمرسل اليه •

١٧ ــ تطبيق نظام الشركات

فيما لم يرد به نص صريح فى هذا
العقد تطبق أحكام نظام الشركات الصادر
بالمرسوم الملكى رقم م/٦ وتاريخ ٢٢ / ٣ / ١٣٨٥
وغيره من النظم ذات العلاقة المعمول بها
فى المملكة العربية السعودية •

١٨ ــ تمشى أحكام العقد مع القوانين والنظم
المعمول بها فى المملكة العربية السعودية

اذا كان هناك أى حكم من أحكام

-18 -

is or shall be deemed to be
contrary to the Companies Act
or other laws, regulations, and
public policy of the Kingdom of
Saudi Arabia, then such provision
is hereby declared null and void
and the appropriate provision
shall govern. Such nullity shall
not affect any other provision of
these Articles. There shall be
no change in the objects of the
Company or in its share capital
or in any partner's share in the
capital without the prior
approval of the Foreign Capital
Investment Committee at the
Ministry of Industry and
Electricity pursuant to the
Foreign Capital Investment Code.

19. Settlement of Disputes

All controversies and disputes
arising between the parties in
respect of the interpretation
or implementation of these Arti-
cles of Association or breach
thereof, which cannot be settled
amicably between the Parties or
their representatives within
sixty (60) days following written
notice from any party to the
others that such dispute exists,
shall be finally settled by the
Commission for Settlement of
Commercial Disputes in Jeddah,
Kingdom of Saudi Arabia.

20. Force and Effect of Language

These Articles have been execu-
ted in both Arabic and English.
In the case of conflict between
the Arabic and English versions,

..19..

A305

- 19 -

the Arabic version shall prevail

These Articles have been executed
in eight (8) counterpart originals
of which each party has retained
one (1) and the remaining six (6)
shall be used in the publication
and registration formalities.

At Jeddah of the __31st__ day of
__May__, 1980 A.D. Corresponding
to the __17th__ day of __Rajab__,
1400 A.H.

FIRST PARTY:

ABDULLA SAID BUGSHAN & BROTHERS

BY _____
   Name

Title _____

SECOND PARTY:

STONE & WEBSTER ENGINEERING
CORPORATION

BY _JWRandis_____
   Name

Title _SENIOR VICE PRESIDENT_

التصميم يرجح النص العربي •

حرر هذا العقد من ثمانية نسخ
أصلية يحمل كل طرف نسخة منها
والنسخ الست المتبقية سيتم استخدامها
لأغراض النشر والتسجيل •

جدة في يوم ١٧ / رجب / سنة ...
الموافق يوم ٣١ / مايو / ١٨٠ ... م •

الطرف الأول :

عبد الله سعيد بقشان وإخوانه

التوقيع / ..............
الاسم / ..............
الصفة / ..............

الطرف الثاني :

شركة ستون أند وبستر الهندسية : ...

التوقيع / ..............
الاسم / ..............
الصفة / ..............

# EXHIBIT 7

P. O. Box 842
Al Khobar 31952
Kingdom of Saudi Arabia
Tel. : +966 -3- 882 8488
Fax: +966 -3- 882 5609

مرجع: ٨٤٢
الخبر ٣١٩٥٢
المملكة العربية السعودية
هاتف: ٢٨٨٨٢-٣-٩٦٦+
تلكس: ٢٦٠٩ ٨٨٢-٣-٩٦٦+

MISC 11

31 May, 2000

**Bugshan Stone and Webster Company Limited**
P. O. Box 1783
Al-Khobar 31952
Saudi Arabia

Dear Sir:

We refer to the Credit Agreement dated Jan 22nd 1998, Promissory Note dated Jan. 22nd 1998, and other evidence of debt (the Agreements) executed by you in favor of Saudi American Bank (SAMBA).

You have failed to timely honor your obligations under the Agreements; therefore, you are in default of your obligations to us. Accordingly, we hereby demand payment by you of your obligations, which is equal to US$ 12,150,000/- in addition to fees and expenses owing to date.

You will continue to be liable for all (i) commissions that accrue on unpaid balances owing under the agreements and (ii) expenses incurred in connection with enforcement and collection.

If you fail to make payment in full by Wednesday June 07, 2000 by 5:00 PM Riyadh time, we shall be at liberty to take all such action under the Agreements and applicable law as we deem necessary or appropriate to protect our interests and obtain payment.

The foregoing demand and notice are without prejudice to any other rights or remedies which the Bank may have against you, or any other party liable with respect to your obligations to the Bank.

Very truly yours,
Saudi American Bank

Sheheryar Ali
Assistant General Manager
Corporate Banking Group
Al-Khobar

Copy:

–    Stone & Webster Engineering Corporation
     245 Summer Street
     Boston, MA 02210, U. S. A.
     Attn.: Chief Financial Officer.
     Fax: 00-1-617-589-2201

–    Abdullah Said Bugshan & Bros.
     P. O. Box 15963
     Riyadh 11454
     Kingdom of Saudi Arabia
     Fax: 00-966-1-473-0859

SAB 00237

A Joint Stock Company Capital SR. 4,000 Million · Commercial Reg. No. 1010035319 · Head Office : Riyadh    شركة مساهمة سعودية رأس المال ٤٠٠٠ مليون ريال سعودي · السجل التجاري ١٠١٠٠٣٥٣١٩ · المركز الرئيسي · الرياض

A308