**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STONE & WEBSTER, INCORPORATED | ) | |
| *et al.,* | ) | Case No. 00-02142 (PJW) |
| | ) | Jointly Administered |
| Debtors, | ) | Adv. Pro. No. 02-3963 (PJW) |
| | ) | |
| | ) | |
| THE SHAW GROUP INC. | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No.  07-00616 (SLR) |
| | ) | |
| SWE&C LIQUIDATING TRUST, | ) | |
| | ) | |
| Appellee. | ) | |

**APPENDIX, VOLUME II OF II
<u>TO THE OPENING BRIEF OF APPELLANT THE SHAW GROUP INC.</u>**

**ASHBY & GEDDES**
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

Dated:  February 29, 2008          *Attorneys for The Shaw Group Inc.*

## TABLE OF CONTENTS

**Document**                                                                                     **Page**

October 18, 2001 Complaint by Saudi American Bank against The Shaw Group Inc.
(Adv. Pro. 01-07766, D.I. 1)............................................................................  A1

May 31, 2002 Complaint by Stone & Webster Engineering Corporation
against Saudi Arabian Oil Company, including Exhibit (D.I. 1).............................  A14

November 7, 2002 Motion to Intervene by Saudi American Bank,
including Exhibits (D.I. 19)..............................................................................  A220

June 29, 2007 Motion to Intervene Filed by Shaw Group Inc.,
including Exhibits (D.I. 61)..............................................................................  A309

July 30, 2007 Reply in Further Support of The Shaw Group Inc.'s
Motion to Intervene (D.I. 68)...........................................................................  A522

August 31, 2007 Memorandum Opinion (D.I. 79)..............................................  A540

August 31, 2007 Order Denying The Shaw Group Inc.'s
Motion To Intervene (D.I. 80)..........................................................................  A574

September 7, 2007 Notice of Appeal (D.I. 81)....................................................  A575

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED | ) | |
| *et al.*, | ) | Case No. 00-02142 (PJW) |
| | ) | |
| Debtors, | ) | Jointly Administered |
| ———————————————— | ) | |
| | ) | |
| STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION and STONE & WEBSTER, | ) | |
| INCORPORATED, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Adv. Pro. No. 02-3963 (PJW) |
| | ) | |
| SAUDI ARABIAN OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## <u>MOTION TO INTERVENE BY THE SHAW GROUP INC.</u>

The Shaw Group Inc. ("Shaw"), by and through its undersigned counsel, hereby moves

for leave to intervene in this proceeding pursuant to Federal Rule of Civil Procedure 24, as made

applicable by Federal Rule of Bankruptcy Procedure 7024, in order to bring its proposed

Complaint in Intervention (attached hereto as Exhibit 1). In support of its motion, Shaw states as

follows:

### FACTUAL BACKGROUND

**A.      The Ras Tanura Project**

1.      Stone & Webster Engineering Corporation ("SWEC"), a debtor in this case and a

subsidiary of Stone & Webster, Inc. ("S&W"), and Abdullah Said Bugshan & Brothers ("Bugshan")

formed a joint venture, Bugshan Stone & Webster Limited ("BS&W"), under the laws of the

A309

Kingdom of Saudi Arabia. (D.I. 1 at ¶15). On or about June 28, 1994, BS&W entered into Contract No. 65004/00 (the "In-Kingdom Contract") with Saudi Arabian Oil Company ("Saudi Aramco") to upgrade Saudi Aramco's huge oil refinery in Ras Tanura, Saudi Arabia ("the Ras Tanura Project"). (D.I. 1 at ¶14 and Exhibit A).

2.     In order to help secure financing for BS&W from Saudi American Bank ("SAMBA"), by letter dated October 11, 1994, SWEC guaranteed to repay 50% of BS&W's obligations to SAMBA, up to $35,000,000 (the "Guaranty"). (*See* October 11, 1994 Guaranty, Exhibit A to Shaw's Complaint in Intervention). On January 22, 1995, BS&W received a line of credit from SAMBA for $35,000,000 to finance its work on the Ras Tanura Project (the "1995 Loan"). The 1995 Loan was supported by BS&W's receivables from the Ras Tanura Project and the Guaranty from SWEC. On January 22, 1998, SAMBA required BS&W to sign an updated promissory note and credit agreement for the 1995 Loan (the "1998 Loan"). (*See* Credit Agreement and Promissory Note, Exhibit B to Shaw's Complaint in Intervention).

3.     As alleged in SAMBA's Complaint in Intervention in this action, on January 22, 1995, BS&W assigned the proceeds from the In-Kingdom Contract to SAMBA (the "Assignment of Proceeds"). (D.I. 19 at Exhibit A, ¶5 and Ex. 1). In addition, on September 21, 1994, BS&W issued a specific payment letter (the "Specific Payment Instruction Letter") to Saudi Aramco instructing that any and all compensation due from Saudi Aramco under the In-Kingdom Contract be paid to SAMBA. (*Id.* at Exhibit A, ¶6 and Ex. 2). On November 13, 1994, Saudi Aramco acknowledged receipt of the Specific Payment Instruction Letter and its duties thereunder. (*Id.* at Exhibit A, ¶6 and Ex. 3). Saudi Aramco again acknowledged the Assignment of Proceeds and Specific Payment Instruction Letter on June 2, 2002. (*Id.* at Exhibit A, ¶6 and Exs. 4-5).

2

4.    Disputes between BS&W and Saudi Aramco arose under the Ras Tanura Project. Among other things, Saudi Aramco refused to pay over $100 million that BS&W asserted was due it, thus causing BS&W difficulty in repaying SAMBA for the $35,000,000 loan. For example, the Complaint in this proceeding alleges, among other things, that:

> Saudi ARMACO failed to perform its obligations under the In-Kingdom Contract in several regards, including but not limited to providing flawed conceptual designs for the Project; failing to provide Deliverables…on schedule; failing to render decisions on change order requests in a timely fashion; refusing to process or negotiate BS&W's claims in good faith; and failing to consider any scheduling impacts on the Project, despite its frequent and often unnecessary change order requests.

(D.I. 1 at ¶63). The Complaint further alleges that such conduct constituted a breach of the In-Kingdom Contract, and that "BS&W suffered damages as a result of" such breach. (*Id.* at ¶¶66-67).

5.    Because of BS&W's difficulty in repaying SAMBA, SWEC was forced to honor its obligations under the Guaranty, and on December 22, 1998, BS&W's two shareholders, SWEC and Bugshan, each agreed to repay half of the outstanding loan balance, approximately $31,800,000, at the rate of $650,000 per month (the "Payment Letter"). (*See* December 22, 1998 Payment Letter, Exhibit C to Shaw's Complaint in Intervention). SWEC paid most, but not all, of its share of the loan back. Upon information, Bugshan satisfied its obligations to SAMBA under the Payment Letter.

**B.    SWEC Files for Bankruptcy**

6.    On June 2, 2000, Stone & Webster, Inc. ("S&W") and its subsidiaries (collectively, the "Debtors"), including SWEC, filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code. On July 14, 2000, Shaw and the Debtors entered into an Asset Purchase Agreement (the "APA") through which Shaw purchased a substantial portion, but not all, of the Debtors' assets and assumed certain of their liabilities. (*See* Asset Purchase Agreement, Exhibit D to Shaw's Complaint in Intervention).

3

A311

7.     On October 18, 2001, SAMBA brought an adversary proceeding against Shaw and the Debtors alleging that Shaw had assumed the debt owed by SWEC to SAMBA (the "SAMBA Proceeding"). (*See* Complaint of Saudi American Bank in Adversary Proceeding Case No. 01-7766 (the "SAMBA Complaint"), Exhibit F to Shaw's Complaint in Intervention). Specifically, SAMBA alleged that under the APA, Shaw had assumed both the Guaranty and Payment Letter on behalf of SWEC, and thus owed SAMBA the outstanding balance of $6,728,529 in principal and interest. (SAMBA Complaint at ¶¶27, 58). Shaw and the Debtors, however, agreed that Shaw had never assumed the Guaranty or Payment Letter under the APA as those liabilities related to the Ras Tanura project, which was a Completed Contract that was never assumed by Shaw. (*See* Declaration of James P. Carroll, ¶¶7-9, Exhibit E to Shaw's Complaint in Intervention).

8.     On May 31, 2002, S&W and SWEC brought this adversary proceeding against Saudi Aramco seeking, *inter alia*, an award of damages for Saudi Aramco's breach of the In-Kingdom Contract and an order demanding that Saudi Aramco account for and turnover certain withheld funds that are "due and owing to BS&W." (*See, e.g.*, D.I. 1 at ¶¶25-28, 37-38, 61-76).

9.     On August 13, 2002, Shaw moved for summary judgment in the SAMBA Proceeding, and SAMBA subsequently cross-moved for summary judgment. SAMBA and the Debtors settled their claims in the SAMBA Proceeding and in a separate preference action. After briefing, the case was removed to the District Court for the District of Delaware.

10.     In the meantime, on November 7, 2002, SAMBA moved to intervene in this adversary proceeding, and its Complaint in Intervention sought declaratory and injunctive relief that: (i) BS&W's assignment of any proceeds from the In-Kingdom Contract is valid and enforceable; (ii) BS&W's specific payment instruction to Saudi Aramco that all compensation due under the In-Kingdom Contract is to be paid to SAMBA is valid, enforceable and irrevocable; (iii)

A312

all monetary proceeds arising from judgments or settlements of claims arising under the In-Kingdom Contract are assigned to and must be paid directly to SAMBA and "shall be security for obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations whether incurred in connection with the In-Kingdom Contract or otherwise"; and (iv) prohibiting Saudi Aramco from making payments related to the In-Kingdom Contract to any party other than SAMBA, and prohibiting Debtors or BS&W from receiving payments related to the In-Kingdom Contract. (D.I.19 at Exhibit A, ¶¶5-9).

11.    The Court denied SAMBA's motion to intervene on May 1, 2006. (D.I. 5). On May 10, 2006, SAMBA appealed that ruling to the District Court. (D.I. 52).

12.    On June 10, 2004, the Court ordered the parties, including proposed intervenor SAMBA, to meet and confer with a Court-appointed mediator. (D.I. 28). According to a status report filed on April 15, 2005, the parties previously met for a mediation session and tentatively settled the matter. (D.I. 31). An additional mediation session was scheduled for April 15, 2005. (*Id.*). The status report also noted that should a final settlement be reached, the parties anticipated needing twelve to twenty-four months to fulfill all terms of the settlement before this proceeding could be dismissed. (*Id.*). On May 1, 2007, Debtors' successor in interest, the SWE&C Liquidating Trust, filed another status report stating that the parties have agreed to the terms of a settlement and need only to complete documentation of the settlement. (D.I. 60). The report further states that the SWE&C Liquidating Trust believes the settlement will be complete and the parties will seek dismissal of this action "within the next few weeks." (*Id.*).

C.    **The District Court Grants Summary Judgment for SAMBA**

13.    On May 3, 2005, the District Court entered an Order and Memorandum Opinion in the SAMBA Proceeding denying Shaw's motion for summary judgment and granting summary

5

A313

judgment in favor of SAMBA. (*See* May 3 Mem. Op., Exhibit F to Shaw's Complaint in Intervention). The District Court held that, under the APA, Shaw had assumed the Guaranty and Payment Letter on behalf of SWEC and is liable for SWEC's (and hence BS&W's) outstanding obligation to SAMBA. (*Id.* at 17). On May 4, 2005, the District Court entered judgment for SAMBA against Shaw in the amount of $6,728,549. (*See* May 4 Judgment, Exhibit G to Shaw's Complaint in Intervention).

14.     On May 18, 2005, SAMBA filed a Motion for Assessment of Damages seeking to recover interest and attorneys' fees and expenses. On November 8, 2006, the District Court issued an Amended Memorandum Opinion ruling on SAMBA's Motion for Assessment of Damages holding that SAMBA was entitled to prejudgment simple interest at 9%, post-judgment compound interest at 3.33% and attorneys' fees and costs in an amount to be determined. (*See* Nov. 8 Mem. Op., Exhibit H to Shaw's Complaint in Intervention). On February 13, 2007, the District Court issued a Memorandum Opinion and Order awarding SAMBA $345,714.50 in attorneys' fees. (*See* Feb. 13 Mem. Op., Exhibit I to Shaw's Complaint in Intervention).

15.     On May 26, 2005, Shaw filed a Notice of Appeal, appealing the District Court's decision in the SAMBA Proceeding to the United States Court of Appeals for the Third Circuit. On January 19, 2006, SAMBA filed a Motion to Dismiss Appeal for Lack of Jurisdiction because of the outstanding Motion for Assessment of Damages. On February 7, 2006, the Third Circuit denied SAMBA's motion to dismiss the appeal, but remanded the case to the District Court for clarification regarding damages. Since the District Court now has clarified its ruling on damages and attorneys' fees, Shaw has continued to prosecute its appeal to the Third Circuit. Shaw's opening brief on appeal is due July 30, 2007.

6

## ARGUMENT

**A.    Shaw May Intervene as of Right Pursuant to Rule 24(a)(1)**

16.    Rule 24(a)(1) of the Federal Rules of Civil Procedure provides that "[u]pon timely application anyone shall be permitted to intervene in an action . . . when a statute of the United States confers an unconditional right to intervene." Fed. R. Civ. P. 24(a)(1).[1]  Section 1109(b) of the Bankruptcy Code grants Shaw, as a purchaser of nearly all the Debtors' assets and thus a party in interest, the requisite unconditional right to intervene:

> A party in interest, including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and appear and be heard on any issue in a case under this chapter.

11 U.S.C. §1109(b). *See also In re Marin Motor Oil*, 689 F.2d 445, 450 (3d Cir. 1982) (a party in interest under §1109(b) has an unqualified right to intervene in adversary proceedings pursuant to Rule 24(a)(1)).  Although §1109(b) does not list a purchaser of debtors' assets specifically as a party in interest, "the term 'party in interest' is not limited by the small list of examples in §1109(b). ... And courts have not viewed the examples of parties in interest as being exhaustive." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (citations omitted).  Furthermore, §1109(b) "'must be construed broadly to permit parties affected by a chapter 11 proceeding to appear and be heard.'... Consequently, courts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation." *Id.* (citations omitted).

---

[1]  Rule 24(c) states that a motion to intervene "shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought."  Such pleading is filed herewith as Exhibit I.

7

A315

### 1.    Shaw Has More Than a Sufficient Stake in the Proceeding

17.    There can be no question that Shaw has a sufficient stake in the subject matter of this proceeding to qualify as a party in interest under §1109(b). The District Court has decreed that Shaw assumed SWEC's liabilities under the Guaranty and Payment Letter by operation of the APA, and thus is liable under the Guaranty for a portion of BS&W's original debt to SAMBA. (*See* May 3 Mem. Op. at 17). Currently, that amount comes to over $10 million. Shaw respectfully submits that the District Court erred, and that both it and Debtors agree that Shaw never assumed the debt. Shaw is thus appealing the District Court's decision. Nevertheless, if the District Court's decision is upheld and Shaw pays SAMBA under the Guaranty for the remaining balance of BS&W's debt, Shaw is the entity with a right to recover proceeds under the In-Kingdom Contract.

### a.    Assuming the District Court's Decision is Correct, Shaw is Entitled to Any In-Kingdom Proceeds under the APA

18.    For example, to the extent the Guaranty or Payment Letter are considered Assumed Contracts or Assumed Liabilities under the APA (as they were by the Court), Shaw is entitled to recover for any third-party claims or interests in the Ras Tanura Project. Specifically, Section 2.01 of the APA states: "Sellers shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase from Sellers, the Assets…including the following: … (e) all interests of Sellers in the Assumed Contracts; … (k) any and all claims and causes of action, including privileges related thereto, of any Seller against any third parties relating to … (ii) the Assumed Liabilities or the Assumed Contracts…." (Exhibit D to Shaw's Complaint in Intervention at 15-16).

19.    BS&W defaulted on its loan to SAMBA primarily due to Saudi Aramco's breach of the In-Kingdom Contract under the Ras Tanura Project. (*See, e.g.*, D.I. 1 at ¶¶25-28). Had

Saudi Aramco not breached the In-Kingdom Contract, BS&W would have been able to repay SAMBA for its loan, and SWEC would not have had to act on its obligations under the Guaranty and agree to the terms of the Payment Letter. SWEC has brought this adversary proceeding, in part, to assert a breach of the In-Kingdom Contract against Saudi Aramco for which SWEC would have the right to recover if it is held liable for BS&W's debts. (*See, e.g., id.* at ¶¶61-68). In addition, SWEC is seeking to have certain funds owed to BS&W by Saudi Aramco under the In-Kingdom Contract turned over to SWEC pursuant to 11 U.S.C. §542(b). (*See, e.g., id.* at ¶¶69-76). Now that Shaw has been adjudged liable for SWEC's Guaranty, and hence BS&W's outstanding debt to SAMBA, Shaw has a right to recoup its liability that ultimately resulted from breaches by Saudi Aramco of the In-Kingdom Contract.

     **b.     Shaw is Subrogated to SAMBA's Rights to Any In-Kingdom Proceeds**

     20.     Moreover, SAMBA has sought to intervene in this action because BS&W assigned all proceeds from the In-Kingdom Contract to SAMBA and therefore SAMBA has the right to recover any proceeds derived from claims under the In-Kingdom Contract, including the right to such proceeds as "security for obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations whether incurred in connection with the In-Kingdom Contract or otherwise." (D.I. 19 at Exhibit A, ¶5, 7 and Ex. 1). BS&W also issued the Specific Payment Instruction Letter, which was acknowledged by Saudi Aramco as recently as June 2, 2002, that any and all compensation due from Saudi Aramco under the In-Kingdom Contract be paid to SAMBA. (*Id.* at Exhibit A, ¶6 and Exs. 2-5).

     21.     If Shaw's assumption of the Guaranty is upheld on appeal, Shaw will have satisfied BS&W's outstanding debt to SAMBA. Under the principle of equitable subrogation, Shaw will then assume SAMBA's rights to collect from BS&W, including the right to enforce the Assignment

A317

of Proceeds and Specific Payment Instruction Letter. *See, e.g., American Surety Co. of New York v. Bethlehem National Bank of Bethlehem*, 314 U.S. 314, 317 (1941) ("one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against the other") (citations omitted); *Putnam v. Commissioner of Internal Revenue*, 352 U.S. 82, 85 (1956) ("upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor...who steps into the creditor's shoes"); *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 414 (S.D.N.Y. 1994) ("Under the doctrine of equitable subrogation, a guarantor has the right to be subrogated to any and all rights that a creditor or subrogor has against a debtor."). Shaw will be the entity entitled to receive proceeds from the In-Kingdom Contract if the Guaranty is upheld, and as such, Shaw has an obvious and significant pecuniary interest in this adversary proceeding to ensure that SAMBA and SWEC do not recover assets that belong to Shaw.

      **c.**     **Debtors Will Be Unjustly Enriched Unless Shaw Intervenes**

      22.     At all relevant times, Debtors have agreed with Shaw that it did not assume the Guaranty or Payment Letter under the APA and have acted accordingly. (*See* Exhibit E to Shaw's Complaint in Intervention, ¶¶7-10). As noted by the former President and Chief Restructuring Officer of S&W, it was "the Debtors' and Shaw's intention that Shaw assumed neither the benefits of the Ras Tanura Project, including any receivables, nor its burdens, including any obligation to repay the Ras Tanura Loan." (*Id.* at ¶9). However, if it is ultimately determined, despite the parties' contention to the contrary, that Shaw assumed the Guaranty and Payment Letter under the APA, then Debtors will be unjustly enriched if they are allowed to obtain the benefits of the Ras Tanura Project without the concomitant burden of repaying BS&W's loan under that project.

10

A318

### 2.    Shaw's Motion to Intervene Is Timely

23.    In addition, Shaw's application under Rule 24(a)(1) is timely.  As the Third Circuit has explained, "in considering timeliness [of a motion to intervene,] the beginning point should be the stage when inadequate representation becomes apparent." *National Wildlife Federation v. Gorusch*, 744 F.2d 963, 970 (3d Cir. 1984).  In this case, it was not until Shaw learned that the parties to the proceeding planned to settle their dispute that the possibility of inadequate representation in this proceeding became apparent.  Shaw had intended to await the outcome of its pending appeal to determine if it ultimately would be held liable for the Guaranty and Payment Letter, and hence BS&W's obligation to SAMBA, before pursuing its rights against Debtors and Saudi Aramco.  Now that the parties are pursuing a settlement, however, time is of the essence and Shaw is moving to intervene so that its rights are not overlooked.

24.    Furthermore, although it has been five years since this proceeding was filed, it is still in the early stages of litigation, with no discovery having been undertaken nor dispositive motions having been decided.  *See Bank of America Nat. Trust & Savs Ass'n v. Hotel Rittenhouse Assocs.*, 846 F.2d 1050, 1056 (3d Cir. 1988) (timeliness of a motion to intervene is not considered in a vacuum and a mere lapse in time will not make a motion to intervene untimely).

25.    Additionally, intervention by Shaw will not prejudice any of the existing parties to the case.  *See McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1073 (5th Cir. 1970) (describing prejudice to the existing parties as potentially "the *only* significant consideration when the proposed intervenor seeks intervention of right").  Indeed, the Third Circuit has been "reluctant to dismiss a request for intervention as untimely" because "in situations where intervention is as of right, the would-be intervenor may be seriously harmed if he is not permitted to intervene."

11

A319

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995) (citations and internal quotations omitted). Thus, Shaw, as a party in interest with a statutory right to intervene, is the only party that will suffer prejudice if it is denied the ability to intervene and protect its newfound interests in this proceeding.

**B.    Shaw Also May Intervene as of Right Pursuant to Rule 24(a)(2)**

26.    Shaw also should be allowed to intervene as of right in this action pursuant to Rule 24(a)(2), which provides that:

> anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2).

27.    The Third Circuit has interpreted Rule 24(a)(2) as requiring proof of four elements: (1) "timely application for leave to intervene;" (2) "a sufficient interest in the litigation;" (3) "a threat that the interest will be impaired or affected;" and (4) "inadequate representation of the prospective intervenor's interest by existing parties to the litigation." *Kleissler v. United States Forest Service*, 157 F.3d 964, 969 (3d Cir. 1998). Shaw satisfies each of these four elements, and thus should be permitted to intervene in this adversary proceeding as of right.

**1.    Shaw's Motion to Intervene Is Timely**

28.    As set forth in detail in Paragraphs 23 through 25, under the present circumstances and controlling case law, Shaw timely filed its motion to intervene.

12

### 2.    Shaw Has a Significant Interest in this Proceeding

29.    In assessing whether a proposed intervenor has a sufficient interest in the litigation, the Third Circuit has stated that the "polestar for evaluating a claim for intervention as of right is always whether the proposed intervenor's interest is direct or remote." *Kleissler*, 157 F.3d at 972. In addition, the Third Circuit relies on "pragmatic considerations, such as the benefits derived from consolidation of disputes into one proceeding." *Id.* at 970. As set forth in detail in Paragraphs 16 through 19, Shaw has a direct interest in this proceeding and its participation will simplify the litigation.

30.    Shaw's direct interest is so significant it bears repeating. This proceeding seeks to litigate, among other things, Saudi Aramco's breach of the In-Kingdom Contract, which caused damage to BS&W. Those damages include causing BS&W to default on SAMBA's loan, which in turn caused SWEC to act on the Guaranty and execute the Payment Letter. Now that Shaw has been held to have assumed the Guaranty and Payment Letter, and if such decision is upheld on appeal, Shaw will be liable for certain BS&W debts incurred as a result of Saudi Aramco's breach of the In-Kingdom Contract, and thus Shaw has a direct and significantly protectable interest in any damages awarded or agreed upon as a result of such breach.

31.    Under the APA, if Shaw has been determined to assume the Guaranty and Payment Letter as it relates to the Ras Tanura Project, then it also receives any benefits related to the Ras Tanura Project. Because of the structure of the APA, the Debtors will be unjustly enriched unless Shaw is allowed to recover proceeds owing under the In-Kingdom Contract.

32.    Furthermore, SAMBA has the right, under the Assignment of Proceeds and Specific Payment instruction Letter, to any proceeds derived from claims under the In-Kingdom Contract as security for the obligations of BS&W to SAMBA. (D.I. 19 at Exhibit A, ¶5-7). Now

13

A321

that Shaw has been held to have assumed the Guaranty and Payment Letter and thus will be

liable for BS&W's outstanding debt to SAMBA, SAMBA's right to recover proceeds related to

the In-Kingdom Contract has been subrogated to Shaw. *See, e.g., American Surety*, 314 U.S. at

317; *Putnam*, 352 U.S. at 85; *Natwest*, 858 F. Supp. at 414. As such, if the District Court's

decision is upheld on appeal, Shaw will stand in the position of SAMBA and seeks to intervene

in this action in order to recover proceeds derived from any claims under the In-Kingdom

Contract as required by the Assignment of Proceeds and Specific Payment Instruction Letter.

### 3.    Shaw Must Intervene to Protect its Interest in this Proceeding

33.    To satisfy the third element of a motion to intervene under Rule 24(a)(2), the

Third Circuit requires only that an applicant demonstrate "that their interest *might* become

affected or impaired, as a practical matter, by the disposition of the action in their absence."

*Mountain Top Condo.*, 72 F.3d at 368 (emphasis in original). If successful, the attempt by

SWEC or SAMBA to recover for any breach by Saudi Aramco of the In-Kingdom Contract not

only *might* affect or impair Shaw's ability to recover for that same breach, it would eliminate

such ability. As such, Shaw's intervention is necessary to avoid such inability and protect its

interest in proceeds derived under the In-Kingdom Contract.

### 4.    Shaw's Interest Is Inadequately Represented by the Existing Parties

34.    To satisfy the final element of Rule 24(a)(2), an applicant only need demonstrate

"that representation of his interest '*may be*' inadequate; and the burden of making that showing

should be treated as minimal." *Mountain Top Condo.*, 72 F.3d at 368 (emphasis added) (quoting

*Trbovich v. United Mine Workers*, 404 U.S. 528, 538, n.10 (1972)). None of the other parties to

this proceeding will adequately represent Shaw's particular interest in contesting the right of

SAMBA or SWEC to recover from Saudi Aramco for its breach of the In-Kingdom Contract.

Now that Shaw has been held to have assumed the Guaranty and is thus liable for BS&W's

A322

outstanding debt to SAMBA, both SWEC and SAMBA may have less reason to prosecute this action vigorously against Saudi Aramco in order to recover amounts for which Shaw is responsible. As such, Shaw is the only appropriate party to adequately represent its particular financial interest in this proceeding. Even if Saudi Aramco's breach of the In-Kingdom Contract were litigated adequately, there is still a risk that Shaw's unique interest may be inadequately protected. Given the high stakes of this adversary proceeding and Shaw's significant pecuniary interest, Shaw should not be exposed to such risk. The only way Shaw can be assured its rights will be fully protected is if the Court permits it to intervene in this proceeding.

    **B.**    **In The Alternative, The Court Should Permit Shaw to Intervene Pursuant to Rule 24(b)(2)**

    35.    Rule 24(b)(2) provides, in relevant part, that an applicant may be allowed to intervene "when [the] applicant's . . . defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). The Court also must consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* An intervenor's economic interest in the action constitutes grounds for permissive intervention. *See, e.g., Brooks v. Flagg Bros., Inc.,* 63 F.R.D. 409, 415 (S.D.N.Y. 1974). In addition, the "most obvious case" for intervention is when the intervenor has a claim against a party similar to or identical with that asserted by another party. *Automatic Sprinkler Corp. of America v. Fidelity & Deposit Co. of Maryland,* 22 F.R.D. 248, 250 (M.D. Pa. 1958).

    36.    Here, as discussed at length above, Shaw has an overriding economic interest in the outcome of the litigation and seeks to litigate the same breach of contract by Saudi Aramco as alleged by the current parties to this proceeding and to enforce its newfound rights under the Assignment of Proceeds and Specific Payment Instruction Letter. Furthermore, as discussed above, Shaw's intervention will not unduly delay this proceeding as little progress has been

A323

made, and thus the only party that stands to suffer prejudice is Shaw if it is denied the ability to intervene. Therefore, Shaw should be allowed, at a minimum, to permissively intervene in this proceeding.

WHEREFORE, for the foregoing reasons, Shaw respectfully requests that the Court grant Shaw leave to intervene in this adversary proceeding and to bring its Complaint in Intervention.

ASHBY & GEDDES

/s/ Catherine A. Strickler
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
*Attorneys for The Shaw Group Inc.*

Dated: June 29, 2007
158592.1

16

A324

# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STONE & WEBSTER, INCORPORATED | ) | |
| *et al.,* | ) | Case No. 00-02142 (PJW) |
| | ) | |
| Debtors, | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION and STONE & WEBSTER, | ) | |
| INCORPORATED, *et al.,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Adv. Pro. No. 02-3963 (PJW) |
| | ) | |
| SAUDI ARABIAN OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT IN INTERVENTION BY THE SHAW GROUP INC.

Intervenor-plaintiff The Shaw Group Inc. ("Shaw"), by and through its undersigned

counsel, hereby alleges as follows for its Complaint in Intervention:

### A.    Nature of the Proceeding

1.    On or about June 2, 2000, Stone & Webster, Inc. ("S&W") and its subsidiaries

(collectively, "Debtors"), including Stone & Webster Engineering Corporation ("SWEC"), filed a

voluntary petition for relief under Chapter 11, Title 11 of the United States Code.  On or about May

31, 2002, Debtors brought this adversary proceeding against Saudi Arabian Oil Company ("Saudi

Aramco") seeking declaratory relief pursuant to 11 U.S.C. §105 and 28 U.S.C. §§2201-02,

indemnification, damages for breach of contract, and turnover of certain withheld funds pursuant to

11 U.S.C. § 542(b).  (*See* D.I. 1).  The complete content of Debtors' Complaint (D.I. 1) is

A326

incorporated herein by reference.  Debtors' successor in interest recently informed the Court that Saudi Aramco and Debtors' successor are close to reaching a resolution in this proceeding.

    2.    SWEC and Abdullah Said Bugshan & Brothers ("Bugshan") formed a joint venture under the laws of the Kingdom of Saudi Arabia, Bugshan Stone & Webster ("BS&W").  (D.I. 1 at ¶15).  The basis for Debtors' Complaint is Contract No. 65004/00 (the "In-Kingdom Contract"), entered into between BS&W and Saudi Aramco to upgrade the huge Saudi Aramco oil refinery in Ras Tanura, Saudi Arabia ("the Ras Tanura Project").  (D.I. 1 at ¶14 and Exhibit A).  Debtors brought their action seeking: (1) a declaration that S&W is not liable to Saudi Aramco under a parent guaranty for an arbitration award against BS&W; (2) an indemnification on behalf of SWEC if it is held individually liable for claims brought against BS&W by one of its subcontractors to the Ras Tanura Project; (3) damages caused by  Saudi Aramco's breach of the In-Kingdom Contract; and (4) the turnover to SWEC of $148 million owed to BS&W under the In-Kingdom Contract.

    3.    BS&W received a line of credit from Saudi American Bank ("SAMBA") for $35,000,000 to finance its work on the Ras Tanura Project.  BS&W assigned its proceeds from the In-Kingdom Contract to SAMBA (the "Assignment of Proceeds") and issued a specific payment instruction letter to Saudi Aramco (the "Specific Payment Instruction Letter") that any and all compensation due under the In-Kingdom Contract from Saudi Aramco should be paid directly to SAMBA.  (D.I. 19 at Exhibit A, ¶¶5-6 and Exs. 1 through 5).  In order to help secure the financing from SAMBA, SWEC guaranteed to repay 50% of BS&W's obligations to SAMBA, up to $35,000,000 (the "Guaranty").  In acting on the Guaranty after BS&W failed to repay SAMBA's loan, SWEC agreed to repay half of the outstanding loan balance, approximately $31,800,000, at the rate of $650,000 per month (the "Payment Letter").

    4.    On November 7, 2002, SAMBA moved to intervene in this adversary proceeding,

2

A327

and its Complaint in Intervention sought declaratory and injunctive relief that: (i) the Assignment of

Proceeds is valid and enforceable; (ii) the Specific Payment Instruction Letter is valid, enforceable

and irrevocable, and requires Saudi Aramco to pay all compensation due under the In-Kingdom

Contract to SAMBA; (iii) all monetary proceeds arising from judgments or settlements of claims

arising under the In-Kingdom Contract are assigned to and must be paid directly to SAMBA; and

(iv) Saudi Aramco is prohibited from making payments related to the In-Kingdom Contract to any

party other than SAMBA, and Debtors or BS&W are prohibited from receiving payments related to

the In-Kingdom Contract without SAMBA's consent or other Court order.  (D.I.19 at Exhibit A,

¶¶5-9).  The complete content of SAMBA's Complaint in Intervention (D.I. 19 at Exhibit A) is

incorporated herein by reference.  On May 1, 2006, this Court denied SAMBA's motion to

intervene (D.I. 50), and SAMBA appealed that decision to the United States District Court for the

District of Delaware (D.I. 52).

        5.      This Complaint in Intervention is an action by Shaw seeking declaratory and

injunctive relief pursuant to 11 U.S.C. §105, 28 U.S.C. §§157, 1330, 1334 and 2201-2202, and Fed.

R. Bankr. P. 7001 and 7065.

        6.      Shaw and the Debtors entered into an Asset Purchase Agreement (the "APA")

through which Shaw purchased a substantial portion of the Debtors' assets and assumed certain of

their liabilities.  In a separate adversary proceeding to which the Debtors were a party, the District

Court found that, through the APA, Shaw assumed the Guaranty and Payment Letter, and thus

Shaw is responsible for BS&W's outstanding debt to SAMBA.  The District Court came to this

conclusion even though both Shaw and the Debtors agreed that Shaw had not assumed either

liability.  Shaw believes that the District Court's decision is fundamentally incorrect and has

appealed it to the United States Court of Appeals for the Third Circuit, but should the decision be

3

affirmed, then Shaw will be required to satisfy BS&W's outstanding debt to SAMBA and SAMBA's right to recover under the Assignment of Proceeds will be subrogated to Shaw. In addition, the APA assigns claims and causes of actions against third parties relating to assumed liabilities or assumed contracts. As such, Shaw seeks to intervene in this proceeding in order to obtain a declaration that Shaw is entitled to recover any proceeds derived under the In-Kingdom Contract, and to enjoin the other parties to this proceeding from receiving any proceeds under the In-Kingdom Contract.

### B.    Jurisdiction and Venue

7.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§157, 1330 and 1334. This action is a core proceeding under 28 U.S.C. §157.

8.    Venue is proper under 28 U.S.C. §1409 as this proceeding relates to and arises from the Chapter 11 filing brought by Debtors in this District.

9.    On information and belief, the Court has personal jurisdiction over Saudi Aramco pursuant to 28 U.S.C. §1330 and Fed. R. Bankr. P. 7004(f).

### C.    Parties

10.    Plaintiff-intervenor Shaw is a Louisiana corporation with its principle place of business in Baton Rouge, Louisiana.

11.    Debtors, S&W and SWEC, were Delaware corporations that had principle places of business in Boston, Massachusetts. As more particularly set forth in Article VII(B) of the Third Joint Plan as filed in the bankruptcy proceeding, certain debtor subsidiaries of S&W were merged into S&W and their estates have been substantively consolidated to become the SWINC Estate; and certain debtor subsidiaries of Stone & Webster Engineers and Constructors, Inc., including debtor SWEC, were merged into Stone & Webster Engineers and Constructors, Inc., and their estates have

4

been substantively consolidated to become the Consolidated SWE&C Estate. The SWE&C

Liquidating Trust is a trust created pursuant to the SWE&C Liquidating Trust Agreement in

accordance with the Third Joint Plan, the Confirmation Order and the SWE&C Liquidating Trust

Agreement.

12.　　Former attempted intervenor, now appellant SAMBA is a Saudi Arabian corporation

with its principle place of business in Riyadh, Saudi Arabia.

13.　　Saudi Aramco is an entity organized under the laws of the Kingdom of Saudi Arabia

and, as set forth in Debtors' Complaint, "has alleged in other cases in the United States Courts that it

is an 'agency or instrumentality' of the Kingdom of Saudi Arabia under §1603(b) of the Foreign

Sovereign Immunities Act of 1975 ("FSIA"), 28 U.S.C. §§1330, 1602-1611." (D.I. 1 at ¶9).

### D.　　Factual Background

#### i.　　The In-Kingdom Contract

14.　　On or about June 28, 1994, BS&W entered into the In-Kingdom Contract, Contract

No. 65004/00, with Saudi Aramco to complete the Ras Tanura Project. (D.I. 1 at ¶14 and Exhibit

A).

15.　　In order to secure financing for BS&W from SAMBA, SWEC entered the Guaranty

on or about October 11, 1994, and agreed to repay 50% of BS&W's obligations to SAMBA, up to

$35,000,000. (*See* October 11, 1994 Guaranty, attached hereto as Exhibit A). On or about January

22, 1995, BS&W received a line of credit from SAMBA for $35,000,000 to finance its work on the

Ras Tanura Project (the "1995 Loan"). The 1995 Loan was supported by BS&W's receivables

from the Ras Tanura Project and the Guaranty from SWEC. On or about January 22, 1998,

SAMBA required BS&W to sign an updated promissory note and credit agreement for the 1995

Loan (the "1998 Loan"). (*See* Credit Agreement and Promissory Note, attached hereto as Exhibit

B).

16.    On or about January 22, 1995, BS&W entered the Assignment of Proceeds, which assigned any and all proceeds from the In-Kingdom Contract to SAMBA. (D.I. 19 at Exhibit A, ¶5 and Ex. 1). On or about September 21, 1994, BS&W issued the Specific Payment Instruction Letter, which instructed Saud Aramco to pay any and all compensation due from Saudi Aramco under the In-Kingdom Contract to SAMBA. (*Id.* at Exhibit A, ¶6 and Ex. 2). On November 13, 1994, Saudi Aramco acknowledged receipt of the Specific Payment Instruction Letter and its duties thereunder. (*Id.* at Exhibit A, ¶6 and Ex. 3). Saudi Aramco again acknowledged the Assignment of Proceeds and Specific Payment Instruction Letter on June 2, 2002. (*Id.* at Exhibit A, ¶6 and Exs. 4-5).

17.    Disputes between BS&W and Saudi Aramco arose under the Ras Tanura Project, thus causing BS&W difficulty in repaying SAMBA for the $35,000,000 loan. For example, the Complaint in this proceeding alleges, among other things, that:

> Saudi ARAMCO failed to perform its obligations under the In-Kingdom Contract in several regards, including but not limited to providing flawed conceptual designs for the Project; failing to provide Deliverables…on schedule; failing to render decisions on change order requests in a timely fashion; refusing to process or negotiate BS&W's claims in good faith; and failing to consider any scheduling impacts on the Project, despite its frequent and often unnecessary change order requests.

(D.I. 1 at ¶63). The Complaint further alleges that such conduct constituted a breach of the In-Kingdom Contract, and that "BS&W suffered damages as a result of" such breach. (*Id.* at ¶¶66-67).

18.    Due to BS&W's difficulty in repaying SAMBA, SWEC was forced to honor its obligations under the Guaranty, and, on or about December 22, 1998, BS&W's two shareholders, SWEC and Bugshan executed the Payment letter where each agreed to repay half of the outstanding loan balance, approximately $31,800,000, at the rate of $650,000 per month. (*See* December 22, 1998 Payment Letter, attached hereto as Exhibit C). Shaw believes that Bugshan satisfied its

A331

obligations to SAMBA under the Payment Letter.

### ii.  Debtors File for Bankruptcy, Adversary Proceedings Ensue

19.     On or about June 2, 2000, Debtors filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code.  On or about July 14, 2000, Shaw and the Debtors entered into the APA through which Shaw purchased a substantial portion, but not all, of the Debtors' assets and assumed certain of their liabilities.  (*See* Asset Purchase Agreement, attached hereto as Exhibit D).

20.     On or about October 18, 2001, SAMBA brought an adversary proceeding (the "SAMBA Proceeding") against Shaw and the Debtors alleging that under the APA, Shaw assumed the Guaranty and Payment Letter on behalf of SWEC, and thus owed SAMBA $6,728,529 in principal and interest for BS&W's outstanding debt to SAMBA.  Shaw and the Debtors, however, agreed that Shaw had never assumed the Guaranty or Payment Letter under the APA as those liabilities related to the Ras Tanura project, which was a Completed Contract that was never assumed by Shaw.  (*See* Declaration of James P. Carroll, ¶¶7-9, attached hereto as Exhibit E).

21.     On or about May 31, 2002, S&W and SWEC brought this adversary proceeding against Saudi Aramco seeking, *inter alia*, an award of damages for Saudi Aramco's breach of the In-Kingdom Contract and an order demanding that Saudi Aramco account for and turnover certain withheld funds that are "due and owing to BS&W."  (*See, e.g.*, D.I. 1 at ¶¶25-28, 37-38, 61-76).

22.     On or about August 13, 2002, Shaw moved for summary judgment in the SAMBA Proceeding, and SAMBA subsequently cross-moved for summary judgment.  SAMBA and the Debtors settled their claims in the SAMBA Proceeding and in a separate preference action.  After briefing, the case was removed to the District Court for the District of Delaware.

23.     On or about November 7, 2002, SAMBA moved to intervene in this proceeding, and

A332

its Complaint in Intervention sought declaratory and injunctive relief that: (i) the Assignment of

Proceeds is valid and enforceable; (ii) the Specific Payment Instruction Letter is valid, enforceable

and irrevocable, and requires Saudi Aramco to pay all compensation due under the In-Kingdom

Contract to SAMBA; (iii) all monetary proceeds arising from judgments or settlements of claims

arising under the In-Kingdom Contract are assigned to and must be paid directly to SAMBA; and

(iv) Saudi Aramco is prohibited from making payments related to the In-Kingdom Contract to any

party other than SAMBA, and Debtors or BS&W are prohibited from receiving payments related to

the In-Kingdom Contract without SAMBA's consent or other Court order. (D.I.19 at Exhibit A,

¶¶5-9).

     24.     The Court denied SAMBA's motion to intervene on May 1, 2006. (D.I. 5). On May

10, 2006, SAMBA appealed that ruling to the District Court. (D.I. 52).

### iii.    The District Court Grants Summary Judgment for SAMBA

     25.     On or about May 3, 2005, the District Court entered an Order and Memorandum

Opinion in the SAMBA Proceeding denying Shaw's motion for summary judgment and granting

summary judgment in favor of SAMBA. (*See* May 3 Mem. Op., attached hereto as Exhibit F). The

District Court held that, under the APA, Shaw assumed the Guaranty and Payment Letter on behalf

of SWEC and is liable for SWEC's (and hence BS&W's) outstanding obligation to SAMBA. (*Id.* at

17). On or about May 4, 2005, the District Court entered a preliminary judgment for SAMBA

against Shaw, and the docket entry denotes that judgment amount as $6,728,549. (*See* May 4

Judgment, attached hereto as Exhibit G).

     26.     On or about May 18, 2005, SAMBA filed a Motion for Assessment of Damages

seeking to recover interest and attorneys' fees and expenses. On November 8, 2006, the District

Court issued an Amended Memorandum Opinion ruling on SAMBA's Motion for Assessment of

A333

Damages holding that SAMBA was entitled to prejudgment simple interest at 9%, post-judgment compound interest at 3.33% and attorneys' fees and costs in an amount to be determined. (*See* Nov. 8 Mem. Op., attached hereto as Exhibit H). On February 13, 2007, the District Court issued a Memorandum Opinion and Order awarding SAMBA $345,714.50 in attorneys' fees. (*See* Feb. 13 Mem. Op., attached hereto as Exhibit I).

27.    On May 26, 2005, Shaw filed a Notice of Appeal, appealing the District Court's decision in the SAMBA Proceeding to the United States Court of Appeals for the Third Circuit. On January 19, 2006, SAMBA filed a Motion to Dismiss Appeal for Lack of Jurisdiction because of the outstanding Motion for Assessment of Damages. On February 7, 2006, the Third Circuit denied SAMBA's motion to dismiss the appeal, but remanded the case to the District Court for clarification regarding damages. The District Court has clarified its ruling on damages and attorneys' fees, and Shaw has continued to prosecute its appeal to the Third Circuit. Shaw believes that the District Court erred in its findings and that Shaw did not assume the liability to SAMBA. If that is not correct, however, and it is finally determined that Shaw did assume the liability, then Shaw has the right to collect all proceeds paid by Saudi Aramco.

## COUNT I: Declaratory Judgment

28.    Shaw repeats and realleges the allegations of paragraphs 1 through 28 as if fully set forth herein.

29.    Pursuant to 11 U.S.C. §105 and 28 U.S.C. §§2201-02, and within the context of the causes of action pleaded in Debtors' Complaint and SAMBA's Complaint in Intervention, Shaw is entitled to a declaration of the rights and obligations of the parties hereto.

30.    The District Court has decreed that Shaw assumed the Guaranty and Payment Letter by operation of the APA, and thus is liable under the Guaranty for BS&W's outstanding

9

A334

debt to SAMBA. Shaw is appealing the District Court's decision, but if the decision is upheld on appeal and Shaw pays SAMBA under the Guaranty for the remaining balance of BS&W's debt under the Ras Tanura Project, Shaw will be the entity with a right to recover proceeds under the In-Kingdom Contract. The Debtors, which were parties to that case, will be collaterally estopped from challenging the Court's findings (as erroneous as the parties might believe them to be). In addition, Section 2.01 of the APA states: "Sellers shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase from Sellers, the Assets...including the following: ... (e) all interests of Sellers in the Assumed Contracts; ... (k) any and all claims and causes of action, including privileges related thereto, of any Seller against any third parties relating to ... (ii) the Assumed Liabilities or the Assumed Contracts...." (Exhibit E at 15-16). Thus, to the extent the Guaranty or Payment Letter are considered Assumed Contracts or Assumed Liabilities, Shaw is entitled to recover for any third party claims or interests in the Ras Tanura Project.

31.     BS&W defaulted on its loan to SAMBA primarily due to Saudi Aramco's breach of the In-Kingdom Contract under the Ras Tanura Project. (*See, e.g.*, D.I. 1 at ¶¶25-28). Had Saudi Aramco not breached the In-Kingdom Contract, BS&W would have been able to repay SAMBA for its loan, and SWEC would not have had to act on its obligations under the Guaranty and agree to the terms of the Payment Letter. SWEC has brought this adversary proceeding, in part, to assert a breach of the In-Kingdom Contract against Saudi Aramco for which SWEC would have the right to recover if it is held liable for BS&W's debts. (*See, e.g., id.* at ¶¶61-68). SWEC also is seeking to have certain funds owed to BS&W by Saudi Aramco under the In-Kingdom Contract turned over to SWEC pursuant to 11 U.S.C. §542(b). (*See, e.g., id.* at ¶¶69-76). Now that Shaw has been adjudged liable for SWEC's Guaranty, and hence BS&W's outstanding debt to SAMBA, Shaw has a right to recoup at a minimum its liability that

10

A335

ultimately resulted from breaches by Saudi Aramco of the In-Kingdom Contract.

32.    In addition, SAMBA has sought to intervene in this action because BS&W assigned all proceeds from the In-Kingdom Contract to SAMBA and therefore SAMBA has the right the right to recover any proceeds derived from claims under the In-Kingdom Contract, including the right to such proceeds as "security for obligations of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations whether incurred in connection with the In-Kingdom Contract or otherwise." (D.I. 19 at Exhibit A, ¶5, 7 and Ex. 1). BS&W also issued the Specific Payment Instruction Letter, which was acknowledged by Saudi Aramco as recently as June 2, 2002, that any and all compensation due from Saudi Aramco under the In-Kingdom Contract be paid to SAMBA. (*Id* at Exhibit A, ¶6 and Exs. 2-5). If Shaw's assumption of the Guaranty is upheld on appeal, Shaw will have satisfied BS&W's outstanding debt to SAMBA. Under equitable subrogation, Shaw will then assume SAMBA's rights to collect from BS&W, including the right to enforce the Assignment of Proceeds and Specific Payment Instruction Letter.

33.    Shaw is entitled to a declaration, if it is determined ultimately to have assumed the Guaranty and Payment Letter, that: (i) Shaw is entitled to all proceeds derived under the In-Kingdom Contract; (ii) SAMBA's rights to recover from BS&W under the In-Kingdom Contract have been subrogated to Shaw; (iii) BS&W's Assignment of Proceeds is valid and enforceable; and (iv) the Specific Payment Instruction Letter, including acknowledgements and verifications thereof, is valid and enforceable.

## COUNT II: Injunctive Relief

34.    Shaw repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein.

35.    Assuming Shaw's assumption of the Guaranty and Payment Letter is upheld on

11

A336

appeal, Shaw has a strong likelihood of success on the merits of its claim for declaratory relief that Shaw is entitled to proceeds derived under the In-Kingdom Contract. If Shaw is not entitled to relief preventing SAMBA or SWEC from accepting funds that belong to Shaw, Shaw will suffer irreparable harm since it will not have a source of monetary recovery. Furthermore, if Shaw's assumption of the Guaranty and Payment Letter is upheld on appeal, the Debtors or SAMBA will not be prejudiced by being prevented from accepting funds that rightfully belong to Shaw.

36.    If it is determined ultimately that Shaw has assumed the Guaranty and Payment Letter, then Shaw is entitled to an order enjoining: (i) Saudi Aramco from making payments related to the In-Kingdom Contract to any party other than Shaw; and (ii) Debtors and SAMBA from receiving, directly or indirectly, from Saudi Aramco any payments related to the In-Kingdom Contract.

37.    Shaw has no adequate remedy at law.

### COUNT III: Unjust Enrichment

38.    Shaw repeats and realleges the allegations of paragraphs 1 through 37 as if fully set forth herein.

39.    At all relevant times, Debtors have agreed with Shaw that it did not assume the Guaranty or Payment Letter under the APA and have acted accordingly. (*See* Declaration of James P. Carroll, ¶¶7-10). As noted by the former President and Chief Restructuring Officer of S&W, it was "the Debtors' and Shaw's intention that Shaw assumed neither the benefits of the Ras Tanura Project, including any receivables, nor its burdens, including any obligation to repay the Ras Tanura Loan." (*Id.* at ¶9). However, if it is ultimately determined, despite the parties' contention to the contrary, that Shaw assumed the Guaranty and Payment Letter under the APA,

12

A337

then Debtors will be unjustly enriched if they are allowed to obtain the benefits of the Ras Tanura Project without the concomitant burden of repaying BS&W's loan under that project.

40.     Accordingly, Shaw is entitled to a determination that Debtors will be unjustly enriched if Shaw is required to repay BS&W's loan while Debtors recover the receivables from Saudi Aramco needed to repay that same loan.

**COUNT IV: Indemnification**

41.     Shaw repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

42.     At all relevant times, Debtors have agreed with Shaw that it did not assume the Guaranty or Payment Letter under the APA and have acted accordingly.  (*See* Declaration of James P. Carroll, ¶¶7-10).  According to the former President and Chief Restructuring Officer of S&W, the Guaranty and Payment Letter qualify as "Excluded Liabilities" under the APA as they are liabilities arising under the Ras Tanura Project, which is a "Completed Contract" that was not assumed by Shaw.  (*Id.* at ¶7).

43.     Under Section 9.01 of the APA, Debtors agreed to indemnify Shaw for "any Losses incurred or suffered…, directly or indirectly, as a result of or arising from: … (d) the Excluded Liabilities." (Exhibit E at 56).

44.     Since the parties agree that the Guaranty and Payment Letter qualify as Excluded Liabilities, Debtors should be required to honor the indemnification provision under the APA and indemnify Shaw for losses incurred as a result of the Guaranty and Payment Letter.

WHEREFORE, Shaw respectfully requests that the Court enter an order as follows:

a.     Declaring that Shaw, if it is determined ultimately to have assumed the Guaranty and Payment Letter, is entitled to all proceeds derived under the In-Kingdom

A338

Contract;

b.      Declaring that SAMBA's rights to recover from BS&W under the In-Kingdom

Contract have been subrogated to Shaw if Shaw is determined ultimately to have

assumed the Guaranty and Payment Letter;

c.      Declaring that BS&W's Assignment of Proceeds is valid and enforceable;

d.      Declaring that the Specific Payment Instruction Letter, including

acknowledgements and verifications thereof, is valid and enforceable;

e.      Enjoining Saudi Aramco from making payments related to the In-Kingdom

Contract to any party other than Shaw if it is determined ultimately that Shaw

assumed the Guaranty and Payment Letter;

f.      Enjoining Debtors and SAMBA from receiving directly or indirectly from Saudi

Aramco any payments related to the In-Kingdom Contract;

g.      Declaring that Debtors will be unjustly enriched unless Shaw is entitled to receive

all proceeds derived under the In-Kingdom Contract;

h.      In the alternative, declaring that Debtors are required to indemnify Shaw under

the APA for losses related to the Guaranty and Payment Letter;

i.      Awarding Shaw its attorneys' fees, costs and other expenses in this action;

j.      Granting such other and further relief as the Court deems just and proper.

14

A339

ASHBY & GEDDES

*/s/ Catherine A. Strickler*
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
*Attorneys for The Shaw Group Inc.*

Dated: June 29, 2007
162716.1

15

A340

# EXHIBIT A

# STONE & WEBSTER ENGINEERING CORPORATION



245 SUMMER STREET, BOSTON, MASSACHUSETTS 02210

TELEPHONE: 617-589-5111          FAX: 617-589-2156, 5571

BOSTON, MA
CHATTANOOGA, TN
CHERRY HILL, N.J.
DALLAS, TX
DENVER, CO
FT. LAUDERDALE, FL
HOUSTON, TX
MADISON, AL
OAK RIDGE, TN

NEW YORK, NY
PLEASANTON, CA
PORTLAND, ME
PORTLAND, OR
RICHLAND, WA
RICHMOND, VA
TAMPA, FL
WASHINGTON, D.C.

October 11, 1994

Saudi American Bank
P. O. Box 842
Al Khobar 31952
Saudi Arabia

Gentlemen:

To induce you to extend credit by way of overdraft, short termloans, letters of credit, letters of guarantees, to or for the account of Bugshan S&W Company Ltd. (the "Borrower") and purchase or accept instruments upon which the Borrower is liable, the undersigned hereby unconditionally guarantees the punctual payment when due of 50% of all obligations of the Borrower to you now or hereafter existing ("Obligations") together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty. The remaining 50% is guaranteed by A. S. Bugshan & Bros.

The liability of the undersigned under this Guaranty shall be unconditional irrespective of (i) any lack of enforceability of any Obligation, (ii) any change of the time, manner or place of payment, or any other term, of any Obligation, (iii) any exchange, release, or non-perfection of any collateral securing payment of any Obligation, (iv) any law, regulation or order of any jurisdiction affecting any term of any Obligation or your rights with respect thereto, and (v) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

The undersigned waives promptness, diligence, and notices with respect to any Obligation and this Guaranty and any requirement that you exhaust any right or take any action against the Borrower or any collateral security. This Guaranty shall be governed by the laws of the State of New York.

This is a continuing guaranty and shall remain in full force and effect until written notice shall have been received by you from the undersigned that it has been revoked, but any such notice shall not release the undersigned from any liability as to any Obligation existing at the time of receipt of such notice.

· 1889 · STONE & WEBSTER · 1889

A342

2.

If and only if an amount of a designated currency is here specified
Thirty Five Million U.S. Dollars (U.S. $35,000,000.00) then the
liability of the undersigned under this Guaranty with respect to
the aggregate principal amount of Obligations shall not exceed 50%
of the equivalent of the amount here specified.

STONE & WEBSTER ENGINEERING CORPORATION

By: _____

R. B. Kelly, Senior Executive Vice President
and Chief Financial Officer

Notary: _____

Commonwealth of Massachusetts
Middlesex, S.S. Date  October 12, 1994
Then personally appeared the above na...
.....Richard B. Kelly.....
and acknowledged the foregoing instrument
to be his true act and deed, before me
John C. Smith, Notary Public
My Commission Expires  March 30, 2001

003-SAUDAMER.3

A343

# EXHIBIT B

البنك السعودي الامريكي
**Saudi American Bank** 

1

١

## CREDIT AGREEMENT

Between Saudi American Bank
(the "Bank") and
BIGSHAN S&W COMPANY LIMITED

(the "Borrower").

## WITNESSETH:

### 1. The credit

The Bank hereby grants the Borrower a credit facility (the "Facility") in the maximun principal amount of SR/ US$ / _35,000,000.00_ (Saudiriyals / United States Dollars / THIRTY FIVE MILLION ONLY— ) and agrees to consider from time to time the Borrower's requests for advances under such Facility. Neither this Agreement nor the Facility is a commitment to lend, and the Bank reserves the right to terminate the Facility at any time.

### 2. Payment

Borrower hereby agrees to make full and prompt payment of all principal and commission in the currency specified above and in accordance with the terms of this Agreement. The Bank reserves the right at any time to demand payment in full of all outstanding indebtedness, including principal, commission and any expenses payable by the Borrower pursuant to Section 6 of this Agreement.

### 3. The Note; Evidence of Dept.

Borrower has issued and delivered to the Bank a note (the "Note") evidencing the maximum principal indebtedness permitted under the Facility. The Bank agrees not to enforce the Note for more than the amount of indebtedness actually outstanding at the time of enforcement plus any unpaid commission and unreimbursed expenses then due under this Agreement. The Bank will maintain an account or accounts evidencing the Borrower's indebtedness and the amount of principal and commission payable and paid

اتفاقية تسهيلات

فيما بين البنك السعودي الامريكي

( البنك ) و

( المقترض ) .

تمهيد :

١ – التسهيلات

بهذا يمنح البنك المقترض تسهيلات اقتراض ( التسهيلات )

بمبلغ أساسي لا يتجاوز (

ريال سعودي/دولار امريكي/ ) كما

يوافق البنك على ان ينظر بين الحين والآخر ، بعين الاعتبار في طلبات المقترض للحصول على سلف بموجب تلك التسهيلات . ولا تشكل هذه الاتفاقية او التسهيلات الزاما بالاقراض ، ويحتفظ البنك بالحق في انهاء التسهيلات في اي وقت من الاوقات .

٢ – الدفع

بهذا يوافق المقترض على ان يدفع بالكامل وفورا اجمالي المبلغ الاساسي والعمولة وذلك بالعملة المحددة اعلاه وطبقا لنصوص هذه الاتفاقية . ويحتفظ البنك بالحق في أي وقت من الاوقات في ان يطلب السداد الكامل لكافة الديون غير المسددة ، بما في ذلك المبلغ الاساسي ، العمولة واية مصروفات تكون مستحقة على المقترض وفقا للمادة ٦ من هذه الاتفاقية .

٣ – السند : اثبات الدين

لقد اصدر المقترض وسلم البنك سندا ( السند ) يثبت الحد الاقصى للمبلغ الاساسي للدين المصرح به بموجب التسهيلات . ويوافق البنك على عدم انفاذ السند بأكثر من مبلغ الدين الذي يكون غير مسدد فعليا في وقت الانفاذ ، مضافا اليه اية عمولة غير مدفوعة او اية مصاريف تكون في ذلك الوقت مستحقة بموجب لاتفاقية ولم يتم تسديدها . وسيحتفظ البنك بحساب او حسابات ثبيت مديونية المقترض وقيمة المبلغ الاساسي والعمولة المستحقة

A345

2

*from time to time. In any legal action or proceedings, such accounts and the Note shall be conclusive evidence of the existence and amounts of the Borrower's obligations.*

### 4. commission

*Borrower shall pay commission on the unpaid principal balance outstanding from time to time under the Facility, payable monthly or as otherwise advised by the Bank. The commission rate shall be determined by the Bank and subject to change from time to time. Borrower shall be deemed to have agreed to the commission rate as determined by the Bank according to the advices and statements sent to the Borrower unless he notifies the Bank in writing of any objection within 30 days from such advice or statement from the Bank, in which case Borrower shall be bound by the commission rate determined by the Bank until a new rate ( if any ) is agreed. Commission shall be computed on the basis of a 360-days year.*

### 5. Conditions to the Extensions of Credit

#### a) Conditions Precedent

*If so requested by the Bank, the Borrower will furnish to the Bank, as appropriate in the circumstances:*

*i) Certified copies of constitutive and corporate documents of the Borrower and/or such other documents which the Bank may require.*

*ii) A certified copy of a resolution of the Board of Directors of the Borrower and/or the shareholders accepting the Facility on the terms and conditions stated in the Credit Agreement.*

#### b) Security

*As security for the Facility and for all other obligations of the Borrower to the Bank now outstanding or hereafter arising herein or otherwise, the Borrower agrees to provide whatever security that the Bank may request from time to time. Such security shall be furnished or procured by the Borrower at its own expense and shall be in form and substance satisfactory to the Bank. No extension of credit by the Bank (if any) shall be construed as a waiver of Borrower's obligation to provide such security or the*

المدفوعة مرة بعد أخرى . وتعتبر تلك الحسابات والسند بذه ملزمة في ية دعوى أو اجراءات قانونية على قيام وعلى قيمة لتزامات المقترض .

### ٤ – العمولة

يدفع المقترض شهريا ، او وفقا لما يحدده البنك ، عمولة لى المبالغ التي تكون غير مسددة من حين لآخر بموجب اتفاقية تسهيلات ، وتحدد نسبة العمولة بواسطة البنك وتكون خاضعة تغير من حين لآخر . ويعتبر المقترض قد وافق على نسبة عمولة التي حددها البنك وفقا للاشعارات والبيانات الحسابية مرسلة الى المقترض باخطار البنك خطيا بأي اعتراض خلال ٣٠ ما من تاريخ ذلك الاشعار او البيان الحسابي . وفي تلك الحالة ، كون المقترض ملزما بنسبة العمولة التي حددها البنك الى أن يتم تفاق على نسبة جديدة ( ان وجدت ) وتحتسب العمولة على اس أن السنة ٣٦٠ يوما .

### – شروط تمديدات للتسهيلات

#### ا شروط مسبقة

يتعين على المقترض ، اذا طلب منه البنك ، ان يوافي البنك نا لما تقتضيه الظروف بما يلي :

١) صورا مصدقة من مستندات تأسيس وتسجيل المقترض و/أو غير ذلك من المستندات التي قد يطلبها البنك .

٢) صورة مصدقة من قرار مجلس ادارة المقترض و/أو قرار الشركاء القاضي بقبول التسهيلات على أساس الاحكام والشروط المضمنة باتفاقية القرض .

#### الضمان

كضمان للتسهيلات ولكافة الالتزامات الاخرى للمقترض تجاه ، سواء كانت قائمة حاليا أو التي نشأت فيما بعد او غير ذلك ، ن المقترض على تقديم اي ضمان يطلبه البنك بين الحين خر . ويجب على المقترض تقديم او العمل على تقديم ذلك لن على نفقته الخاصة كما يجب ان يكون ذلك الضمان في ، والمضمون الذي يقبله البنك . ولابضر اي تمديد من قبل ، للتسهيلات (ان وجد) على انه تناء لالتزام المقترض بتقديم

A346

**3**

### 6.  Expenses

Borrower shall pay upon demand all expenses, including attorney's fees, court costs, appraisal fees and all other fees and expenses, incurred by the Bank in obtaining or enforcing any of its rights under this Agreement, the Note or the Security Documents.

### 7.  Set-Off; Sale of Property

In the event of failure to make timely payment of any amount due hereunder, the Bank may immediately and without notice set off against such amount any and all of the Borrower's deposits with the Bank or other indebtedness owing from the Bank. Furthermore, without prior notice, the Bank may sell any securities or property of the orrower held by the Bank, and retain from e proceeds the total amount remaining unpaid, including all expenses arising from such sale, and the Borrower shall be responsible to the Bank for any deficiency and will pay on demand to the Bank the amount of any such deficiency. The Bank's rights under this section are in addition to any other rights the Bank may have.

### 8.  Representations and Warranties

If the Borrower is other than an individual, the Borrower represents and warrants that it is an entity duly formed, validly existing and in good standing under the laws of _Kingdom of Saudi Arabia_ that xecution, delivery and performance by the rrower of this Agreement are within the Borrower's powers and in furtherance of its purposes, have been duly authorized by all necessary action on behalf of the Borrower, and do not contravene any law or contractual restriction binding on the Borrower; and that this Agreement is a valid and legally binding obligation of the Borrower enforceable in accordance with its terms.

### 9.  Governing Law and Jurisdiction

This Credit Agreement shall be governed by and construed in accordance with the laws and regulations of the Kingdom of Saudi Arabia and the Borrower agrees that any disputes arising Thereunder shall be submitted to the appropriate courts and/or committees in the Kingdom of Saudi Arabia for

٣

٦ – المصاريف

يدفع المقترض عند الطلب كافة المصاريف بما في ذلك أتعاب المحاماة ، مصروفات المحاكم ، رسوم التثمين وكافة الأتعاب والمصاريف الأخرى التي يكون البنك قد تحملها في الحصول على اقتلاء أي من حقوقه بموجب هذه الاتفاقية ، السند أو مستندات الضمان .

٧ – المقاصة : بيع الممتلكات

في حالة الاخفاق في دفع أي مبلغ مستحق بموجب هذه الاتفاقية في موعده المحدد يجوز للبنك ، دون سابق أخطار ، لإجراء مقاصة ذلك المبلغ من أي من وكافة ودائع المقترض لدى البنك أو من أية ديون أخرى تكون مطلوبة من البنك . وبالاضافة الى ذلك ودون اشعار مسبق ، يجوز للبنك أن يبيع أية أوراق مالية او أيا من ممتلكات المقترض المحفوظة لدى البنك ، وأن يحتفظ من عائدات البيع باجمالي المبلغ غير السدد ، بما في ذلك كافة المصروفات الناشئة عن مثل هذا البيع ، ويكون المقترض مسئولا تجاه البنك عن أي نقص ، وعليه أن يدفع للبنك عند الطلب قيمة ذلك النقص . وتكون حقوق البنك بموجب هذه المادة اضافة الى أي حقوق اخرى يتمتع بها البنك .

٨ – الاقرارات والتعهدات

اذا لم يكن المقترض فردا ، فانه يقر ويتعهد بأنه كيان تأسس حسب الاصول وقائم بطريقة صحيحة وفي وضع سليم بموجب قوانين ——————————————— ، وأن توقيع وتسليم وتنفيذ المقترض لهذه الاتفاقية يقع ضمن صلاحيات المقترض وتحقيقا لاغراضه ، ولايتعارض ذلك مع أي قانون أو التزامات عقدية ملزمة للمقترض ، وأن هذه الاتفاقية هي اتفاقية صحيحة وتشكل التزاما قانونيا قابل للتنفيذ على المقترض وفقا لاحكامها .

٩ – القانون الذي يحكم الاتفاقية والاختصاص

تخضع اتفاقية التسهيلات هذه وتفسر وفقا لقوانين وأنظمة المملكة العربية السعودية ، ويوافق المقترض على تقديم أية منازعات تنشأ عن هذه الاتفاقية للمحاكم و/أو اللجان المختصة

A347

Signed this _____22nd_____ day of .................................. لقد تم التوقيع على هذه الاتفاقية في هذا اليوم

January _____ year 1998 من شهر .................. لسنة

### BORROWER المقترض

Name of Borrower : اسم المقترض :

BUGSHAN S&W COMPANY LIMITED ..................................

1. Signature: _____ ١ – التوقيع : ..................................
   Name: ___MICHAEL W. MOTT___ الاسم : ..................................
   Address: P.O. BOX 3790, AL-KHOBAR31952 العنوان : ..................................

   I. D. No. : 2114890995 رقم الحفيظة : ..................................
   Date of Issue: 6-10-1418 تاريخ الإصدار : ..................................
   Place of Issue : DAMMAM مكان الإصدار : ..................................

2. Signature: _____ ٢ – التوقيع : ..................................
   Name: _____ الاسم : ..................................
   Address: _____ العنوان : ..................................

   I. D. No. : _____ رقم الحفيظة : ..................................
   Date of Issue: _____ تاريخ الإصدار : ..................................
   Place of Issue : _____ مكان الإصدار : ..................................

(Company Stamp/Seal) (ختم الشركة)

### SAUDI AMERICAN BANK البنك السعودي الأمريكي

Renewd

Signature: _____ التوقيع : ..................................
Name: ___SHEHERYAR ALI___ الاسم : ..................................

### WITNESSED BY : يشهد على ذلك :

1. Signature: _____ – التوقيع : ..................................
   Name: DAWOOD S. AL-AWAD الاسم : ..................................
   Address: P.O. BOX 3790 AL KHOBAR العنوان : ..................................
   الجنسية : ..................................
   I. D. No. : 145 457 هوية الشاهد : ..................................
   Date of Issue: 4.7.1400 رقم : ..................................
   Place of Issue : RIYADH مكان الإصدار : ..................................
   تاريخ الإصدار : ..................................

2. Signature: _____ – التوقيع : ..................................
   Name: Mohamoud Hashi Ahd الاسم : ..................................
   Address: P.O. Box 1783 AL-Khoba العنوان : ..................................
   الجنسية : ..................................
   I. D. No. : 2015293171 هوية الشاهد : ..................................
   Date of Issue: 24/3/1414 رقم : ..................................
   Place of Issue : Dammam مكان الإصدار : ..................................
   تاريخ الإصدار : ..................................

A348

البنك السعودي الامريكي 
**Saudi American Bank**

## PROMISSORY NOTE

**SFR US$ 35,000,000.00 (U.S. DOLLARS: THIRTY FIVE MILLION ONLY)**

Place  :  Al-Khobar _____ Saudi Arabia

Day    :  22nd _____

Month  :  January _____

Year   :  1998 _____

For Value Received, the undersigned hereby unconditionally and irrevocably promises to pay on (date) _____ **demand** _____ to the order of Saudi American Bank (the Bank) at the **Fluor Branch** office of the bank in **Al-Khobar** _____ Saudi Arabia, the principal sum of **U.S. Dollars: Thirty Five Million Only**——————————————————————————————

(**SLR. US$ 35,000,000.00**—————————————————————————————— ) in immediately available funds.

The undersigned hereby waives all diligence, presentment, demand, protest, notice of dishonor with respect to this promissory note.

Saudi American Bank may endorse this note to any party without the approval of the undersigned.  The holder of this note may obtain recourse without notice or protest for non-payment.  The undersigned will pay all expenses of the holder of this note in the collection or enforcement of this note.

DEBTOR :

Name of Debtor : **BUGSHAN S&W COMPANY LIMITED**

1) Signature : _____

   Name    :  MICHAEL W. MOTT

   Title   :  GENERAL MANAGER

2) Signature : _____

   Name    : _____

   Title   : _____

                                       **(Company Stamp/Seal)**

WITNESSED BY :

1) Signature of Witness : _____

   Name of Witness    :  DAWOOD S. AL-AWAD

   Address of Witness :  P.O. Box 5790 ALKHOBAR

   Nationality        :  SAUDI

   I.D. of Witness    :  145 457 14.7.1400 | RIYADH

                        No.       Place of Issue   Date of Issue

2) Signature of Witness : _____

   Name of Witness    :  Mohammad Hashi Ahmed

   Address of Witness :  P.O. Box 1763 Al-Khobar

   Nationality        :  Somali

   I.D. of Witness    :  26 18293 671 | Dammam | 29/3/1418

                        No.       Place of Issue   Date of Issue

A349

# EXHIBIT C



# Abdullah Said Bugshan & Bros.

Date: 22nd December, 1998
Ref.: ASB-12/98-1176

To:       **Saudi American Bank**
          Corporate Banking Group
          PO Box 833
          Riyadh 11421

Attention:   **Mr. Tirad M. Mahmoud**

Subject:    ***Re-scheduling of Bugshan Stone & Webster (BSW) loan facility.***

Dear Mr. Tirad,

It is our desire as Shareholders of BS&W to restructure the loan facility of US$ 31,800,000.00 (US Dollars thirty one million and eight hundred thousand only) as follows:

1.  The current outstanding balance is split as follows:
    ASB   - $ 16,150,000.00
    SWEC - $ 15,650,000.00

2.  Monthly payment of US$ 1,300,000.00 will be paid to SAMBA starting from the end of January 1999 until the loan is fully repaid.

3.  It is understood that US$ 1,300,000.00 will be funded equally by the shareholders, which means that Stone & Webster Engineering Corporation will contribute US$ 650,000.00 and A.S. Bugshan & Bros. will contribute US$ 650,000.00.

4.  The loan will remain in the name of BSW and all other security arrangement will remain in place.

Kindly advise if the above are acceptable to you, in order to finalize the arrangement.

Thank you and best regards.

**Abdullah Said Bugshan & Bros.**          **Stone & Webster Engineering Corporation**

MMJ/<sub>slm</sub>

A351

# EXHIBIT D – Part I

Execution Copy

00-2142 (RRM)

ORIGINAL



FILED/RECEIVED

2000 JUL 21  P 4: 01

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

ASSET PURCHASE AGREEMENT

BY AND AMONG

STONE & WEBSTER, INCORPORATED,

CERTAIN SUBSIDIARIES

OF

STONE & WEBSTER, INCORPORATED

AND

THE SHAW GROUP INC.

DATED AS OF JULY 14, 2000

382

A353

Execution Copy

# LIST OF SCHEDULES AND EXHIBITS

Schedule 2.01(a)List of Real Property
Schedule 2.01(e)List of Assumed Contracts
Schedule 2.0l(f)List of Licenses, Permits and Approvals
Schedule 2.0l(g)List of Intellectual Properties
Schedule 2.01(i)List of Investments
Schedule 2.02(b)Completed Contracts
Schedule 2.02(d)Excluded Assets
Schedule 2.03Assumed Liabilities
Schedule 2.02(e)Special Project Claims
Schedule 2.05(c)Schedule of Cold Storage Selling Prices
Schedule 3.02(b)Requisite Approvals, Consents and Filings
Schedule 3.02(c)Breaches of Assumed Contracts
Schedule 3.04Agreements, Contracts, Commitments and Rights
Schedule 3.05Legal and Regulatory Compliance
Schedule 3.06Financial Statements and Quarterly Report on Form 10-Q
Schedule 3.07Undisclosed Liabilities
Schedule 3.08Recent Activities
Schedule 3.09Subsidiaries and Affiliates; Direct, Indirect and Beneficial Interests
Schedule 3.11Title to Personal Property
Schedule 3.12(a)Real Property Encumbrances
Schedule 3.12(b)Permitted Real Property Encumbrances
Schedule 3.13(b)Environmental Claims
Schedule 3.13(c)Contamination and Releases
Schedule 3.13(d)Reports, Audits and Assessments
Schedule 3.13(f)Materials of Environmental Concern and Underground Storage Tanks
Schedule 3.14Intellectual Properties, Computer Software, Etc.
Schedule 3.15Insurance
Schedule 3.16Permits and Licenses
Schedule 3.17List of Contracts
Schedule 3.18Contract Disclosures
Schedule 3.19(b)Employees and Employee Relations
Schedule 3.20(a)Employee Benefit Plans
Schedule 3.20(b)Employee Benefit Plan Audits and Adverse Events
Schedule 3.20(e)Prohibited Transactions
Schedule 3.20(f)Terminations and Reportable Events
Schedule 3.20(g)Multi-Employer Plans, Etc.
Schedule 3.21Litigation and Proceedings
Schedule 3.22Taxes
Schedule 3.32Accounts Receivable
Schedule 3.33Related Party Transactions
Schedule 4.08Actions and Proceedings
Schedule 5.01Retention Plan

A354

Schedule 5.03  Certain Actions: D&O Insurance
Schedule 5.04  Employee Agreements
Schedule 5.15  Encumbrances
Schedule 5.16(b)  List of Rejected Contracts
Schedule 7.02(c)  Consents to Assignment

Exhibit A  Form of Buyer's Counsel Opinion
Exhibit B  Form of Sellers' Counsel Opinion

Execution Copy

## TABLE OF CONTENTS

Page

1. DEFINITIONS AND REFERENCES
   1
   1.01. Definitions
       1
   1.02. Certain References
       14

2. SALE OF ASSETS AND RELATED MATTERS
   14
   2.01. Sale of Assets
       14
   2.02. Excluded Assets
       16
   2.03. Assumed Liabilities
       17
   2.04. Excluded Liabilities
       17
   2.05. Equity Purchase Price; Indemnity Deposit, LC Deposit and Litigation
       Deposit; Delivery of Consideration; Equity Purchase Price
       Adjustments; Allocation of Equity Purchase Price
       18
   2.06. Registration Rights
       20
   2.07. Addition of Sellers; Schedules
       21

3. REPRESENTATIONS AND WARRANTIES OF S&W
   21
   3.01. Organization
       21
   3.02. Powers; Consents; Absence of Conflicts, Etc
       21
   3.03. Binding Agreement
       22
   3.04. Subsidiaries, Investments and Third Party Rights
       22
   3.05. Legal and Regulatory Compliance
       22
   3.06. Financial Statements
       22
   3.07. Undisclosed Liabilities
       22
   3.08. Recent Activities
       22

A356

Execution Copy

3.09.   Subsidiaries and Affiliates; Assets
           23
3.10.   Equipment
           23
3.11.   Title to Personal Property
           23
3.12.   Real Property
           24
3.13.   Environmental Matters
           24
3.14.   Intellectual Properties, Computer Software, etc
           25
3.15.   Insurance
           25
3.16.   Permits and Licenses
           26
3.17.   Agreements and Commitments
           26
3.18.   The Contracts
           27
3.19.   Employees and Employee Relations
           28
3.20.   Employee Benefit Plans
           28
3.21.   Litigation and Proceedings
           30
3.22.   Taxes
           30
3.23.   Brokers and Finders
           30
3.24.   Payments
           31
3.25.   Operation of the Business
           31
3.26.   Customer List
           31
3.27.   Backlog
           31
3.28.   Investment Experience and Intent; No Registration
           31
3.29.   Accredited Investor Status
           31
3.30.   Rule 144
           31
3.31.   Government Contracting
           32

Execution Copy

3.32.   Accounts Receivable
        32
3.33.   Related Party Transactions
        33

4.      REPRESENTATIONS AND WARRANTIES OF BUYER
        33
4.01.   Organization
        33
4.02.   Corporate Powers; Consents; Absence of Conflicts, Etc
        33
4.03.   Binding Agreement
        34
4.04.   Issuance of Share Consideration
        34
4.05.   Brokers and Finders
        34
4.06.   Payments
        34
4.07.   SEC Documents and other Reports
        34
4.08.   Actions and Proceedings
        35
4.09.   Capital Structure
        35
4.10.   Absence of Certain Changes or Events
        35

5.      COVENANTS AND AGREEMENTS OF THE PARTIES
        35
5.01.   Bankruptcy Cases and Sale Motion; Entry of Sale Order; Additional
        Sellers
        35
5.02.   Operations
        35
5.03.   Certain Actions
        36
5.04.   Employee Matters
        37
5.05.   Access to and Provision of Additional Information
        38
5.06.   Post-Closing Maintenance of and Access to Information
        39
5.07.   Governmental Authority Approvals: Consents to Assignment
        40
5.08.   Noncompetition
        41

5.09.   Use of Names
          42
5.10.   Allocation of Equity Purchase Price for Tax Purposes
          42
5.11.   Further Acts and Assurances
          42
5.12.   Costs and Expenses
          42
5.13.   Insurance Ratings
          43
5.14.   Fulfillment of Conditions
          43
5.15.   Release of Encumbrances
          43
5.16.   Assumed and Assigned Contracts; Rejected Contracts
          43
5.17.   Bankruptcy Court Approval
          44
5.18.   Transfer Taxes
          45
5.19.   Listing Application
          45
5.20.   Bankruptcy Filings
          45
5.21.   Non-Solicitation
          46
5.22.   Tail Insurance
          46
5.23.   Other Agreements
          46
5.24.   Temporary Space
          46
5.25.   Schenectady Lease
          46
5.26.   Representation, Warranties and Covenants of Certain Subsidiaries
          46
5.27.   Jacobs Credit Agreement
          48
5.28.   Canadian Transfer
          48

6.   CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS
          49
6.01.   Representations and Warranties; Covenants
          49
6.02.   Adverse Actions or Proceedings
          49

Execution Copy

6.03.   Pre-Closing Confirmations
            49
6.04.   Approval, Execution and Delivery of Additional Agreements
            49
6.05.   Opinion of Buyer's Counsel
            49
6.06.   No Buyer Material Adverse Change
            49

7.      CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER
            49
7.01.   Representations and Warranties; Covenants
            50
7.02.   Pre-Closing Confirmations and Contractual Consents
            50
7.03.   Adverse Actions or Proceedings
            50
7.04.   Operations; No Material Adverse Effect
            50
7.05.   Title Insurance Policies and Surveys
            50
7.06.   Opinion of Sellers' Counsel
            51
7.07.   Deliveries at Closing
            51
7.08.   Lien Searches
            51
7.09.   Approval, Execution and Delivery of Additional Agreements
            51

8.      CLOSING; TERMINATION OF AGREEMENT
            51
8.01.   Closing
            51
8.02.   Action of Sellers at Closing
            52
8.03.   Action of Buyer at Closing
            53
8.04.   Termination Prior to Closing
            53

9.      INDEMNIFICATION
            54
9.01.   Indemnification by Sellers
            54
9.02.   Sellers' Limitations
            55

A360

9.03.    Indemnification by Buyer
55
9.04.    Buyer's Limitations
55
9.05.    Notice and Procedure
56
9.06.    Survival of Representations; Indemnity Periods
58
9.07.    Limitations of Liability
59

10.    GENERAL
59
10.01.    Schedules
59
10.02.    Tax Effect
59
10.03.    Reproduction of Documents
60
10.04.    Time of Essence
60
10.05.    Consents, Approvals and Discretion
60
10.06.    Choice of Law; Submission to Jurisdiction
60
10.07.    Benefit; Assignment
60
10.08.    No Third Party Beneficiary
60
10.09.    Waiver of Breach, Right or Remedy
61
10.10.    Notices
61
10.11.    Misdirected Payments; Offset Rights
62
10.12.    Severability
62
10.13.    Entire Agreement; Counterparts; Amendment
63
10.14.    Drafting
63
10.15.    Confidentiality
63
10.16.    Publicity
63

Execution Copy

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of the 14th day of July, 2000, by and among **The Shaw Group Inc.**, a Louisiana corporation (together with its assignees, if any, "Buyer"), and **Stone & Webster, Incorporated**, a Delaware corporation ("S&W"), and the Subsidiaries (as defined) of S&W that become signatories to this Agreement in accordance with the terms hereof (together with S&W, "Sellers").

### W I T N E S S E T H

WHEREAS, Buyer and Sellers desire to enter into a definitive agreement for the sale and purchase of the Assets (as defined) and the assumption of the Assumed Contracts (as defined) and the Assumed Liabilities (as defined) of Sellers, as more fully described and defined in this Agreement;

WHEREAS, the Assets are owned by S&W and certain of its direct and indirect Subsidiaries and this Agreement is being executed initially by S&W and Buyer with the agreement of S&W as is set forth herein to cause any of its Subsidiaries that has any right, title or interest in or to the Assets to become a party to, and one of the Sellers under, this Agreement by an amendment hereto;

WHEREAS, in order to facilitate the Transaction (as defined), S&W has filed, and has caused certain of the other Sellers to file, cases under chapter 11 of the Bankruptcy Code (as defined);

WHEREAS, in furtherance of the Transaction, Sellers have received approval of the Executory Contract Assumption and Assignment Order (as defined) and the Sale Order (as defined) from the Bankruptcy Court (as defined);

WHEREAS, the Parties intend to consummate the sale and purchase of the Assets owned by the Foreign Sellers (as defined) outside of the Bankruptcy Cases and in compliance with the Legal Requirements (as defined) of such foreign jurisdictions governing the sale and purchase of such Assets; and

WHEREAS, Sellers desire to sell the Assets to Buyer, and Buyer desires to purchase the Assets from Sellers, on the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the foregoing premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and accepted, the parties, intending to be legally bound, hereby agree as follows:

1.  DEFINITIONS AND REFERENCES

    1.01. Definitions. As used in this Agreement, the following terms have the meanings given:

        Accounting Arbitrator: as defined in Section 2.05(c)(i)(C);

1

A362

Accounts Receivable:  all accounts receivable of any Seller, of whatever kind or nature, including all current or deferred rights to payment for projects completed or commenced or services rendered on or prior to the Closing Date, whether or not such services have been billed by Sellers as of the Closing Date;

Accredited Investor:  as defined in Rule 501 of Regulation D promulgated under the Securities Act;

Adjustment Amount:  as defined in Section 2.05(c)(i)(A);

Adjustment Assets:  as defined in Section 2.05(c)(i)(A);

Adjustment Liabilities:  as defined in Section 2.05(c)(i)(A);

Affiliate:  any Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with another Person, including the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of securities, election or appointment of directors, by contract or otherwise;

Affiliated Group:  any affiliated group within the meaning of Code Sec. 1504 or any similar group defined under a similar provision of state, local or foreign law;

Aggregate Consideration: as defined in Section 2.05(a);

Agreement:  this Asset Purchase Agreement and all Exhibits and Schedules attached hereto, as amended, consolidated, supplemented, novated or replaced by the parties from time to time;

Applicable Rate:  shall mean a per annum rate of interest (computed on the basis of the actual number of days elapsed (including the first but excluding the last day) over a year of 365 or 366 days, as the case may be) equal to 3% plus the Prime Rate as from time to time in effect, the Applicable Rate to change automatically from time to time effective at the beginning of each business day on which a change in the Prime Rate becomes effective;

Assets:  all assets, real, personal and mixed, tangible and intangible, owned by Sellers or leased by Sellers pursuant to capital leases, including the assets reflected on the March 31 Balance Sheet, in such amounts as exist on the Closing Date, but excluding in any event the Excluded Assets;

Assumed Contracts:  all Contracts of Sellers (including the Employee Agreements) other than the Rejected Contracts and the Completed Contracts;

Assumed Liabilities:  (i) all liabilities and obligations of Sellers set forth on Schedule 2.03 as of the Closing Date and (ii) with respect to such liabilities and obligations as are properly reflected on a balance sheet under GAAP, in such amounts as

2

are incurred in the ordinary course of the Business and reflected on the Closing Balance Sheet and which are anticipated to be equal to or in excess of Four Hundred Million Dollars ($400,000,000); provided, however, that, notwithstanding anything contained in this Agreement to the contrary, Assumed Liabilities shall not include any Excluded Liability, including those listed in Section 2.04;

Audited Financial Statements: the audited consolidated balance sheet of S&W as of December 31, 1999 and the audited consolidated statements of operations and comprehensive income and cash flows for the three fiscal years then ended, together with the notes thereto and the report thereon of PricewaterhouseCoopers LLP, independent certified public accountants, and any audited restatements thereof;

Average Price: as defined in Section 2.05(a);

Bankruptcy Cases: the cases under chapter 11 of the Bankruptcy Code filed by each of the Sellers (other than the Foreign Sellers) in the Bankruptcy Court or any Person who hereafter becomes a Seller and files a case under chapter 11 of the Bankruptcy Code pursuant to Section 5.01, which cases have been administratively consolidated;

Bankruptcy Code: 11 U.S.C. 101 et. seq., and applicable federal rules of bankruptcy procedure thereunder;

Bankruptcy Court: (a) the United States District Court for the District of Delaware, which has jurisdiction over the Bankruptcy Cases or (b) such other Court to which the Bankruptcy Cases may be transferred;

Bid: any quotation, bid or proposal by any Seller which, if accepted or awarded, would lead to a Fixed Price Contract;

Business: any and all businesses owned, leased, managed or otherwise operated or conducted by any of Sellers;

Buyer: as defined in the Preamble;

Buyer Material Adverse Effect: a material adverse change (or event or condition that could result in a material adverse change) in the business, condition (financial or other), operations, assets or liabilities of Buyer, whether individually or in the aggregate;

Buyer SEC Documents: as defined in Section 4.07;

Buyer's Indemnified Persons: Buyer and Buyer's stockholders, members, Affiliates, successors and assigns, and their respective stockholders, partners, Affiliates, directors, trustees, officers, employees, agents and representatives;

Canadian Assets: Assets held by direct or indirect Canadian Subsidiaries of S&W;

3

Canadian Consideration:  cash in the amount of Three Million Dollars ($3,000,000) and 255,688 shares of Common Stock having a market value of Twelve Million One Hundred Twenty-One Thousand Two Hundred Twelve Thousand Dollars ($12,121,212), which was determined by dividing Ten Million Dollars ($10,000,000) based on the Average Price by the 82.5% rate at which Common Stock was given credit in the auction relating to the Transaction;

Canadian Liabilities:  Assumed Liabilities of direct or indirect Canadian Subsidiaries of S&W;

Canadian Transfer:  as defined in Section 5.28(b);

Canadian Transfer Claim:  as defined in Section 5.28(c);

Cash:  cash and cash equivalents;

Cash Consideration:  as defined in Section 2.05(a);

Claim Notice:  written notification of a Third Party Claim by an Indemnified Party to an Indemnifying Party under Article 9, including a Revenue Agent's Report, Statutory Notice of Deficiency, Notice of Proposed Assessment, or any other official written notice from a Taxing authority that Taxes are due or that a Tax audit will be conducted;

Closing:  as defined in Section 8.01;

Closing Balance Sheet:  the audited consolidated balance sheet of S&W as of the Closing Date prepared in accordance with GAAP, except for using estimated costs of completion, change order recoveries and claim recoveries with respect to Rejected Contracts and Completed Contracts and liability estimates with respect to matters set forth in Section 2.04(f) as of March 31, 2000 without further revisions, and recorded in a manner consistent with the preparation of the March 31 Balance Sheet;

Closing Date:  the date on or as of which the Closing occurs;

Code:  the Internal Revenue Code of 1986, as amended;

Cold Storage Business:  the business of S&W conducted by and through the Nordic Entities, together with all assets and property used by such entities to conduct such business;

Common Stock:  common stock, no par value per share, of Buyer;

Competing Proposal:  a competitive bid or proposal from a third party (a) to purchase (i) substantially all of Sellers' assets, (ii) only the assets of the Cold Storage Business, or (iii) substantially all of the assets of Sellers other than the Cold Storage Business, in each case whether in a separate transaction or series of transactions or as

4

part of a plan of reorganization of Sellers or any of them, (b) for any merger, consolidation, liquidation, dissolution or similar transaction involving Sellers or any of them or (c) to provide debt or equity financing to the Sellers or any of them;

Completed Contracts:  Contracts of Sellers, including those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of Sellers has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims;

Completed Contracts Receivables:  all Accounts Receivables related to Completed Contracts;

Contracts:  all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which any Seller is a party or by which it or any of its Assets are bound;

Controlled Group:  with respect to Sellers, a group consisting of each trade or business (whether or not incorporated) which, together with Sellers, would be deemed a "single employer" within the meaning of Section 4001(b)(l) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Code;

Cost Plus Contract:  any Contract providing for the reimbursement of costs and expenses incurred by a Person in connection with the performance of such Contract, in addition to the payment of any fixed or negotiated fees or charges related to the Contract;

Effective Date:  the date of execution of this Agreement;

Employee Agreements:  all agreements or arrangements set forth on Schedule 5.04;

Employee Benefit Plan:  any (a) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan, (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan), (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan), or (d) Employee Welfare Benefit Plan or material fringe benefit plan or program;

Employee Pension Benefit Plan:  as defined in ERISA Sec. 3(2);

Employee Welfare Benefit Plan:  as defined in ERISA Sec. 3(1);

Encumbrances:  liabilities, levies, claims, charges, assessments, mortgages, security interests, liens, pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, restrictions and other encumbrances, and agreements or commitments to create or suffer any of the foregoing;

<u>Environmental Claim</u>: any oral or written notice by a Person alleging liability (including liability for investigatory costs, cleanup costs, Governmental Authority response costs, natural resource damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or release into the environment, of any Materials of Environmental Concern at any location, whether or not owned by Sellers, (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Laws; or (c) circumstances in which Sellers have or may have retained or assumed either contractually or by operation of law any liability for any Environmental Claims alleged or asserted against any third party;

<u>Environmental Laws</u>: any and all Legal Requirements relating to pollution or protection of human health or the environment (including ground water, land surface or subsurface strata), including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern;

<u>Equity Purchase Price</u>: as defined in <u>Section 2.05(a)</u>;

<u>ERISA</u>: the Employee Retirement Income Security Act of 1974, as amended;

<u>ERISA Fiduciary</u>: as defined in ERISA Section 3(21);

<u>Escrow Agent</u>: a financial institution acceptable to the parties;

<u>ESOP</u>: Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries;

<u>ESOP Note</u>: note receivable reflected on the March 31 Balance Sheet relating to the ESOP;

<u>Excluded Assets</u>: as defined in <u>Section 2.02</u>;

<u>Excluded Liabilities</u>: any and all liabilities or obligations of Sellers of any kind or nature, other than the Assumed Liabilities, including those liabilities or obligations described in <u>Section 2.04</u>, whether known or unknown, fixed or contingent, recorded or unrecorded, and whether arising before or after the Closing, including claims relating to professional liability, errors and omissions, pending and threatened litigation, pending and future claims relating to asbestos, and claims in connection with performance, surety or other bonds relating to Completed Contracts or Rejected Contracts;

<u>Excluded Subsidiary Stock</u>: the capital stock of any direct or indirect Subsidiary of S&W the Assets of which are purchased, but no capital stock is purchased by the Buyer, in the Transaction;

<u>Executory Contract Assumption and Assignment Order</u>: an Order of the Bankruptcy Court, which may be the Sale Order and must be in form and substance

6

A367

acceptable to Buyer, which (a) approves the provisions of Section 5.16(a), (b) authorizes and directs Sellers, pursuant to Section 365 of the Bankruptcy Code, to assume and to assign to Buyer the Assumed Contracts and to make all pre-petition and post-petition payments related thereto that are not Assumed Liabilities and (c) determines that Buyer has provided adequate assurance of future performance relative to the Assumed Contracts;

Final Order:  an order of the Bankruptcy Court, the operation or effect of which has not been stayed, and which is not subject to any pending appeal, request for leave to appeal or request for reconsideration and as to which the time for any such appeal, request for leave to appeal or request for reconsideration has expired;

Financial Statements:  the Audited Financial Statements, the Unaudited Financial Statements, the Interim Financial Statements, the Interim Closing Balance Sheet and the Closing Balance Sheet;

Fixed Price Contracts:  "fixed-price", "guaranteed maximum price", "flat rate" or similar Contracts with fixed or capped payment amounts, including all such Contracts involving a joint venture, partnership or teaming arrangement of any Seller and any other party;

Foreign Sellers:  Sellers incorporated, or otherwise formed or organized, and conducting business in any jurisdiction other than the United States; provided, however, that Foreign Sellers shall not include any Sellers that are eligible to be debtors under Section 109 of the Bankruptcy Code;

Foreign Subsidiaries:  as defined in Section 5.26;

GAAP:  as defined in Section 3.06;

Government Contract:  (i) any Contract between any Seller and (a) any Governmental Authority or (b) any prime contractor to any Governmental Authority, and (ii) any Contract described in clause (i)(a) or (i)(b) which is wholly or partially funded by, directly or indirectly, or through any Governmental Authority;

Governmental Authorities:  all agencies, authorities, bodies, boards, commissions, courts (including the Bankruptcy Court), instrumentalities, legislatures and offices of any nature whatsoever of any federal, state, county, district, municipal, city, foreign or other government or quasi-government unit or political subdivision;

Hired Employees:  employees of Sellers as of the Closing Date hired by Buyer pursuant to Section 5.04;

Holder:  a Seller that is a party to the Registration Rights Agreement;

HSR Act:  the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended;

7

<u>Immaterial Contracts</u>:  Contracts that (i) require (a) the future payment by or to Sellers of (I) Five Hundred Thousand Dollars ($500,000) or less in the case of any Fixed Price Contract or (II) Seven Hundred Fifty Thousand Dollars ($750,000) or less in the case of Cost Plus Contracts or (b) the future performance by Sellers of services having a value of (I) Five Hundred Thousand Dollars ($500,000) or less in the case of any Fixed Price Contract or (II) Seven Hundred Fifty Thousand Dollars ($750,000) or less in the case of Cost Plus Contracts, or (ii) are terminable by Sellers at any time without cause upon 90 days' notice or less; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, Immaterial Contracts shall not include any Contracts set forth on <u>Schedule 3.17</u> or any Contracts that, pursuant to Section 365 of the Bankruptcy Code, are not assumable or assignable without the consent of the non-debtor parties thereto;

<u>Indemnified Party</u>:  any Person entitled to indemnification under <u>Article 9</u>;

<u>Indemnifying Party</u>:  any Person obligated to indemnify another Person under <u>Article 9</u>;

<u>Indemnity Deposit</u>:  shares of Common Stock having an aggregate value of Twenty Five Million Dollars ($25,000,000) based on the Average Price, to be delivered by Buyer to the Escrow Agent pursuant to <u>Section 8.03(b)</u> and subject to the Indemnity Escrow Agreement, and all accumulated dividends or distributions thereon, which shares will be a part of and withheld from the Share Consideration;

<u>Indemnity Escrow Agreement</u>:  the Indemnity Escrow Agreement by and among S&W, Buyer and the Escrow Agent, dated as of the date hereof, pursuant to which the Indemnity Deposit and the LC Deposit will be delivered to the Escrow Agent at Closing to secure certain obligations of indemnity of Sellers under this Agreement;

<u>Indemnity Notice</u>:  written notification of a claim for indemnity under <u>Article 9</u> other than a Third Party Claim, made by an Indemnified Party to an Indemnifying Party pursuant to <u>Section 9.05</u>;

<u>Intellectual Properties</u>:  all of Sellers' marks, names, and all variations of the foregoing, all trademarks, service marks, assumed names, logos, including all goodwill associated therewith, patents, patent rights, copyrights, trade secrets and similar intangibles (including all variants thereof, applications therefor and renewals or extensions thereof);

<u>Interim Closing Balance Sheet</u>:  the unaudited consolidated balance sheet of S&W as of the most recent month end available prior to the Closing Date;

<u>Interim Financial Statements</u>:  the unaudited consolidated balance sheet of S&W as of April 30, 2000 and consolidated statement of operations of S&W for the four months ended April 30, 2000, attached to this Agreement as <u>Schedule 3.06</u>;

8

A369

Investments:  shares of capital stock of any corporation, interests in partnerships or limited liability companies, or other equity or debt instruments issued by any Person, and proceeds from the sale thereof;

Jacobs:  Jacobs Engineering Group Inc., a Delaware corporation;

Jacobs Asset Purchase Agreement:  the Asset Purchase Agreement dated as of June 1, 2000, by and among Jacobs, S&W and certain subsidiaries of S&W, and all Exhibits and Schedules attached thereto, as amended, consolidated, supplemented, novated or replaced by the parties thereto from time to time;

Jacobs Credit Agreement:  the Revolving Credit Agreement dated as of May 9, 2000, between S&W and Jacobs;

Jacobs DIP Agreement:  the Debtor-In-Possession Credit Agreement dated as of June 2, 2000, among Jacobs, S&W and certain subsidiaries of S&W;

Knowledge of Buyer:  with reference to this Agreement means the knowledge of the executive officers of Buyer;

Knowledge of Sellers:  with reference to this Agreement means the knowledge of the executive officers of S&W, the senior officers or managers of each of the other Sellers, or, with respect to any environmental matters, each employee of each Seller responsible for supervising environmental compliance, and the following additional natural persons: James Callahan, Norman Spence, Peter Oppenheim, Keith Dodson and Stanley Genega;

LC Deposit:  shares of Common Stock having an aggregate value of $13,564,051, to be delivered by Buyer to the Escrow Agent pursuant to Section 8.03(b) and subject to the Indemnity Escrow Agreement, and all accumulated dividends or distributions thereon, which shares will be a part of and withheld from the Share Consideration;

Legal Requirements:  with respect to any Person, all statutes, ordinances, by-laws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses;

Litigation Deposit:  cash in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000) to be deducted from the Cash Consideration and which shall be deposited in an account under the control of the Massachusetts Court in connection with case number 99-CV-10939-NG, styled Roy L. Simons v. Stone & Webster Engineering Corporation;

Losses:  any and all damages, claims, costs, losses, liabilities, expenses or obligations (including Taxes, interest, penalties, court costs, costs of preparation and investigation, and reasonable attorneys', accountants' and other professional advisors' fees and expenses);

9

A370

March 31 Balance Sheet:  the consolidated balance sheet of S&W as of March 31, 2000 as published with S&W's April 30, 2000 earnings release, as corrected;

Massachusetts Court:  United States District Court for the District of Massachusetts;

Material Adverse Effect:  a change (or event or condition that could result in a change) resulting in a loss or diminution of value equal to or in excess of Fifteen Million Dollars ($15,000,000) in the business, condition (financial or other), operations, assets or liabilities of Sellers, whether individually or collectively, other than changes resulting from (a) disruptions to the Business as a result of Sellers' financial condition as of the Effective Date, (b) the filing of the Bankruptcy Cases or (c) the effect of the performance of the financial markets generally on the Retirement Plan's assets and investments;

Materials of Environmental Concern:  chemicals, pollutants, contaminants, medical waste or specimens, toxic substances, petroleum and petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, 42 U.S.C. § 6903 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954, as amended, and any rules, regulations or policies promulgated thereunder;

Multiemployer Plan:  defined in ERISA Section 3(37) or Section 4001(a)(3);

Multiple Employer Plan:  an Employee Pension Benefit Plan which is not a Multiemployer Plan and for which a Person who is not a member of a Controlled Group that includes any of Sellers is or has been a contributing sponsor;

Nordic Entities:  Nordic Holdings, Inc., a Delaware corporation, Nordic Investors, Inc., a Nevada corporation, Nordic Rail Services, Inc., a North Carolina corporation, Nordic Transportation Services, Inc., a North Carolina corporation, Nordic Refrigerated Services, Inc., a North Carolina corporation, Nordic Refrigerated Services, Limited Partnership, a Georgia limited partnership, Commercial Cold Storage, Inc., a Georgia corporation, and Polar Transport, Inc., a North Carolina corporation;

Notice Period:  as defined in Section 9.05(a)(i);

Other Plan:  any Contract, program or arrangement which provides cash or non-cash benefits or perquisites to current or former employees of any of Sellers, but which is not an Employee Benefit Plan, as set forth on Schedule 3.20(a);

Party:  any party to this Agreement, its successors and assigns;

Party In Interest:  a "party in interest" as defined in ERISA Section 3(14), and a "party in interest" as defined in the Bankruptcy Code;

10

A371

Permits: all licenses, permits, consents, approvals and other authorizations of or from all Governmental Authorities which are necessary to the ownership of the Assets or in the conduct of the Business as presently conducted and the ownership of the Assets;

Permitted Real Property Encumbrances: those Encumbrances set forth on Schedule 3.12(b), which Encumbrances generally include utility easements and other customary covenants and restrictions of record that do not adversely affect the ownership of the Real Property or the conduct of the Business and Encumbrances related to Assumed Liabilities;

Person: any individual, company, body corporate, association, partnership, firm, joint venture, trust, trustee or Governmental Authority;

Pre-Closing Environmental Matters: all liabilities arising from (i) the pre-closing release of Materials of Environmental Concern either in, on, under or from the Real Property or any current or former facility where any Seller has conducted the Business, including, without limitation, the effects of such release of Materials of Environmental Concern on natural resources, persons or property within or outside the boundaries of the Real Property or any such current or former facility, (ii) the presence as of the Closing Date of Materials of Environmental Concern in, on or under the Real Property or any such current or former facility, (iii) the failure on or prior to the Closing Date of the facility or any former facility or any operations of Sellers to be in compliance with any Environmental Laws in effect at the time of Closing, (iv) the disposal of Materials of Environmental Concern by the Business or arrangement thereof at any location other than the Real Property or the current or former facilities on or prior to the Closing Date, and (v) any other pre-Closing act, omission or condition existing with respect to any of the Assets or related to the Business, the Real Property or any current or former facility prior to the Closing Date which gives rise to liability under any Environmental Laws in effect at the time of Closing;

Preferred Stock: preferred stock, no par value per share, of Buyer;

Prescient Business: the business of Sellers conducted by and through Prescient Technologies, Inc., together with all assets and property used by such entity to conduct its business;

Prime Rate: at the time any determination thereof is to be made, the fluctuating per annum rate of interest then most recently reported in the Wall Street Journal as the "Prime Rate" (the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks) and if reported as a range, the interest rate shall be the mid-point of the range. In the event that the Wall Street Journal ceases to report the Prime Rate, then "Prime Rate" shall mean the fluctuating interest rate per annum announced from time to time by Bank One, NA as its "prime rate" (or, if otherwise denominated, such bank's reference rate for interest rate calculations on general commercial loans), which rate is not necessarily the lowest or best rate that such bank may at any time or from time to time charge any of its customers;

11

Process Business:  certain assets (including real property) and liabilities of Sellers with respect to ethylene process technology (comprising hot-end ethylene technology and cold-end ethylene technology) and fluid catalytic cracking technology;

Prohibited Transaction:  as defined in ERISA Sec. 406 and Code Sec. 4975;

Project Rejected Contracts:  Rejected Contracts and Completed Contracts related to projects as to which standby letters of credit are outstanding under S&W's existing bank credit facilities, which Contracts are set forth and designated as such on Schedule 5.16(b) (as amended or supplemented in accordance with Section 5.16(b)) and to which the LC Deposit relates;

Purchase Price Adjustment Schedule:  as defined in Section 2.05(c)(i)(A);

Real Property:  all real property owned or leased by any Seller, including the real property described on Schedule 2.01(a), together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto;

Real Property Encumbrances:  those Encumbrances set forth on Schedule 3.12(a) related to the Real Property;

Registration Rights Agreement:  the Registration Rights Agreement by and among Buyer and the Holders dated the date hereof;

Rejected Contracts:  all Contracts of Sellers (including the Project Rejected Contracts) designated as such on Schedule 5.16(b) and any obligations (other than Assumed Liabilities) of Sellers in any manner whatsoever connected with such Contracts, including, without limitation, any obligations relating to surety bonds;

Rejected Contracts Receivables:  all Accounts Receivable related to Rejected Contracts;

Reportable Event:  as defined in ERISA Sec. 4043;

Retirement Plans:  The Stone & Webster Pension Plan, Fourth Replacement Definitive Deed, dated 22 December 1999 (to which Stone & Webster Engineering Limited is the Principal Employer) and the Employee Retirement Plan of Stone & Webster Canada Limited;

Sale Motion:  the motion or motions, in form and substance reasonably acceptable to Buyer, filed by Sellers, pursuant to the provisions of Sections 363 and 365 of the Bankruptcy Code, in the Bankruptcy Cases, among other things, to obtain the Sale Order, approve the Transaction and authorize the assumption and assignment of the Assumed Contracts to Buyer;

Sale Order:  the Order of the Bankruptcy Court, dated July 13, 2000, which, among other things, granted the Sale Motion, approved, authorized and directed Sellers

12

A373

Execution Copy

to assume this Agreement and consummate the Transaction and otherwise contained the provisions described in Section 5.17(a);

**SEC**: the Securities and Exchange Commission;

**Sections**: sections of the Agreement, unless the context indicates otherwise;

**Securities Act**: the Securities Act of 1933, as amended;

**Sellers**: as defined in the Preamble;

**Sellers' Indemnified Persons**: Sellers and any of Sellers' members, Affiliates, successors and assigns, and their respective shareholders, members, directors, trustees, officers, employees, agents and representatives;

**Share Consideration**: as defined in Section 2.05(a);

**Special Project Claims**: any and all claims under the project agreements set forth on Schedule 2.02(e) to the extent not reflected on the March 31 Balance Sheet;

**SWEC**: as defined in Section 2.01(b);

**Subsidiaries**: as to any Person, a corporation, partnership, limited liability company or other entity of which 50% or more of the voting power of the outstanding voting equity securities or 50% or more of the outstanding economic equity interest is held or controlled, directly or indirectly, by such Person;

**Tax**: any income, unrelated business income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, privilege, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, stamp, sales, use, transfer, registration, unclaimed property, value added, alternative or add-on minimum, estimated or other tax, assessment, charge, levy or fee of any kind whatsoever, including payments or services in lieu of Taxes, interest or penalties on and additions to all of the foregoing, which are due or alleged to be due to any Governmental Authority, whether disputed or not;

**Tax Return**: any return, declaration, report, claim for refund, information return or statement, including schedules and attachments thereto and amendments, relating to Taxes;

**Third Party Claim**: as defined in Section 9.05(a)(i);

**Time & Material Agreement**: the Time & Material Agreement by and among Buyer and Sellers dated as of the date hereof;

**TPPI Contract**: as defined in Section 2.01(b);

13

A374

TPPI Equipment: as defined in Section 2.01(b);

Transaction: the sale and purchase of the Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Assets;

Unaudited Financial Statements: the unaudited consolidated balance sheet of S&W as of March 31, 2000, and the unaudited consolidated statement of operations and unaudited consolidated statement of cash flows for the three month period then ended, together with the notes thereto, as reflected in S&W's quarterly report on Form 10-Q for the quarter ended March 31, 2000 filed with the SEC, a copy of which is attached to this Agreement as Schedule 3.06; and

WARN Act: the Worker's Adjustment and Retraining Notification Act, 29 U.S.C. §§2101-2109.

1.02. Certain References. As used in this Agreement, and unless the context requires otherwise:

(a) references to "include" or "including" mean including without limitation;

(b) references to "partners" include general and limited partners of partnerships and members of limited liability companies;

(c) references to "partnerships" include general and limited partnerships, joint ventures and limited liability companies;

(d) references to "hereof", "herein" and derivative or similar words refer to this Agreement;

(e) references to any document are references to that document as amended, consolidated, supplemented, novated or replaced by the parties thereto from time to time;

(f) references to any law are references to that law as amended, consolidated, supplemented or replaced from time to time and all rules and regulations promulgated thereunder;

(g) references to time are references to Wilmington, Delaware time;

(h) the gender of all words includes the masculine, feminine and neuter, and the number of all words includes the singular and plural; and

(i) the Table of Contents, the divisions of this Agreement into articles, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

14

A375

2.    SALE OF ASSETS AND RELATED MATTERS

2.01 Sale of Assets.  Subject to the terms and conditions of this Agreement, at Closing Sellers shall sell, assign, convey, transfer and deliver to Buyer, or cause to be sold, assigned, conveyed, transferred and delivered to Buyer, and Buyer shall purchase from Sellers, the Assets, free and clear of all Encumbrances other than the Permitted Real Property Encumbrances, including the following:

(a) the Real Property;

(b) all equipment, vehicles, furniture and furnishings and other tangible personal property of Sellers, including all of the equipment purchased by Stone & Webster Engineering Corporation ("SWEC"), a wholly-owned indirect Subsidiary of S&W, and certain other Subsidiaries and Affiliates of S&W, pursuant to and under the Engineering, Procurement and Construction Contract (the "TPPI Contract") dated January 24, 1997 between P.T. Trans-Pacific Petrochemical Indotama and a consortium consisting of AEC International Projects, Inc., Projects Engineers Incorporated, SWEC and JGC Corporation (collectively, the "TPPI Equipment"), a list of which equipment has been provided to or made available to Buyer;

(c) all usable supplies and inventory of Sellers;

(d) all financial, project-related, personnel and other records of the Business (including equipment records, project plans, documents, catalogs, books, records, files and operating manuals);

(e) all interests of Sellers in the Assumed Contracts;

(f) all Permits and other approvals (including pending approvals) of Governmental Authorities relating to the ownership, development and operations of the Business and the Assets, including the Permits described on Schedule 2.01(f), to the extent transferable or assignable under applicable Legal Requirements;

(g) all interests of Sellers in and to all Intellectual Properties used in connection with, or derived from or arising out of, the ownership and operation of the Business and all computer software, programs and similar systems owned or licensed by any Seller for use at or in connection with the Business, including those set forth on Schedule 2.01(g);

(h) all interests of Sellers in all property, real, personal or mixed, tangible or intangible, arising or acquired between the Effective Date and the Closing Date;

(i) the Investments described on Schedule 2.01(i);

(j) general intangibles of the Business, including goodwill;

(k) any and all claims and causes of action, including privileges related thereto, of any Seller against third parties relating to (i) the value, condition or title to the Assets, manufacturer's or vendor's warranties with respect to the Assets or product liability claims related to the Assets,

15

A376

whether choate or inchoate, known or unknown, contingent or otherwise, (ii) the Assumed Liabilities or the Assumed Contracts or (iii) the Project Rejected Contracts, to the extent of any payments made by Buyer pursuant to letters of credit outstanding with respect to Project Rejected Contracts which payments are not reimbursed from the Indemnity Deposit or otherwise repaid to Buyer by Sellers;

(l) all corporate office furniture and equipment, data center hardware and equipment, residential real property and other assets of Sellers wherever located;

(m) all Accounts Receivable (other than Completed Contracts Receivables and Rejected Contracts Receivables);

(n) all Cash (other than the Cash Consideration);

(o) subject to the Sale Order, all of Sellers' right, title and interest in the Cold Storage Business;

(p) all security or other deposits relating to, without limitation, the Real Property and any equipment owned or leased by any Seller;

(q) any prepaid expenses other than those related to Excluded Assets;

(r) the Retirement Plans;

(s) subject to the Sale Order, all of Sellers' right, title and interest in the Process Business; and

(t) all proceeds of the foregoing and all other property of Sellers of every kind, character or description, tangible and intangible, known or unknown, wherever located and whether or not reflected on the Financial Statements or similar to the properties described above.

2.02. Excluded Assets. Notwithstanding the generality of Section 2.01, the following assets are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Assets (the "Excluded Assets"):

(a) the Rejected Contracts, all Rejected Contracts Receivables, cash in the project bank accounts relating to Rejected Contracts or Completed Contracts (not to exceed $50,000 per Rejected Contract or Completed Contract) and drawings related to, and equipment specifically purchased pursuant to the requirements of, the Rejected Contracts;

(b) the Completed Contracts and all Completed Contracts Receivables and drawings related to the Completed Contracts;

(c) inventory and supplies disposed of or exhausted prior to the Closing Date in the ordinary course of Sellers' Business and Assets transferred or disposed of in accordance with Section 5.03(e);

(d) those other assets of Sellers set forth on Schedule 2.02(d);

16

A377

(e)the Special Project Claims and any avoidance claims available to Sellers under Chapter 5 of the Bankruptcy Code and all claims relating to Excluded Liabilities;

(f)the Share Consideration;

(g)the Cash Consideration;

(h)the Excluded Subsidiary Stock;

(i)items characterized as "deferred income taxes" on the March 31 Balance Sheet and the Closing Balance Sheet;

(j)the ESOP and the ESOP Note; and

(k)any other assets excluded by mutual written agreement of the parties.

2.03.Assumed Liabilities.  As of the Closing Date, Buyer shall assume the Assumed Liabilities.

2.04.Excluded Liabilities.  Under no circumstance shall Buyer assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including the following liabilities, which shall be and remain liabilities of Sellers:

(a)liabilities accrued on the Closing Balance Sheet other than the Assumed Liabilities;

(b)liabilities or obligations for items characterized as deferred income taxes on the March 31 Balance Sheet and the Closing Balance Sheet or Taxes resulting from the consummation of the Transaction;

(c)liabilities or obligations associated with any Excluded Assets;

(d)liabilities or obligations associated with any and all indebtedness of Seller for borrowed money not included in the Assumed Liabilities;

(e)liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts;

(f)liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions which occurred, or arise from events that occurred, prior to the Closing Date, including such liabilities or obligations as are reflected on the March 31 Balance Sheet and will be reflected on the Closing Balance Sheet;

(g)liabilities or obligations (i) to Sellers' employees (other than under the Employee Agreements), (ii) with respect to the Employee Benefit Plans and Other Plans, (iii) of Sellers to the Internal Revenue Service, PBGC or any other Governmental Authority relating to Sellers' employees, in each case arising from or relating to periods prior to Closing (whether or not

17

A378

triggered by the Transaction or the announcement thereof) except to the extent reflected on the Closing Balance Sheet;

(h)liabilities or obligations related to the ESOP, including, without limitation, those liabilities and obligations reflected on the Closing Balance Sheet;

(i)penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by any of Sellers of any Legal Requirement;

(j)liabilities or obligations under the WARN Act, if any, arising out of or resulting from layoffs of employees by Sellers prior to Closing and/or the consummation of the Transaction sufficient in the aggregate to require notice under the WARN Act, but not those that may arise from any layoffs of Hired Employees by Buyer after the Closing;

(k)liabilities related to any debtor in possession financing under Section 364(b), (c) or (d) of the Bankruptcy Code;

(l)all liabilities of Sellers for expenses (i) of the negotiation and preparation of this Agreement, (ii) relating to the Transaction, (iii) of the filing and administration of the Bankruptcy Cases, in each case to the extent incurred by Sellers or any of them and including those related to legal counsel, accounting, brokerage and investment advisors fees and disbursements and (iv) any pending shareholder claim, litigation or proceeding; and

(m)any amounts paid by or on behalf of Sellers to Jacobs, including, without limitation, any amounts paid by or on behalf of Sellers pursuant to the Jacobs Asset Purchase Agreement (including the Break-Up Fee (as defined therein) and the Expense Reimbursement (as defined therein)), the Jacobs Credit Agreement or the Jacobs DIP Agreement.

18

2.05.Equity Purchase Price; Indemnity Deposit, LC Deposit and Litigation Deposit; Delivery of Consideration; Equity Purchase Price Adjustments; Allocation of Equity Purchase Price.

(a)Equity Purchase Price; Aggregate Consideration.  Subject to the terms and conditions hereof, in reliance upon the representations and warranties of S&W and the covenants of Sellers herein set forth, and as consideration for the sale and purchase of the Assets, at Closing, Buyer shall assume the Assumed Liabilities and shall tender to Sellers as the purchase price for the Assets, subject to the provisions of Section 2.05(b) and adjustment as provided in Section 2.05(c), cash and Common Stock having an aggregate value of One Hundred Forty-Three Million Four Hundred Thousand Dollars ($143,400,000) (the aggregate Cash Consideration and Share Consideration being referred to collectively as the "Equity Purchase Price") as follows: (i) cash (the "Cash Consideration") in the amount of Thirty-Seven Million Six Hundred Thousand Dollars ($37,600,000) and (ii) shares of Common Stock (the "Share Consideration") having a market value of One Hundred Five Million Eight Hundred Thousand Dollars ($105,800,000), based on the average closing price on the New York Stock Exchange of a share of Common Stock for the ten trading days ending on the trading day immediately preceding the Closing Date (the "Average Price"); provided, however, that if the Average Price would be greater than Fifty-Five Dollars ($55.00) per share, then the Average Price shall be deemed to be Fifty-Five Dollars ($55.00) per share for purposes of calculating the number of shares of Common Stock to be delivered as the Share Consideration portion of the Equity Purchase Price. The Parties agree that the aggregate consideration to be paid by Buyer to Sellers in connection with the Transaction (the "Aggregate Consideration") comprises (A) the Assumed Liabilities, (B) the Cash Consideration and (C) the Share Consideration.

(b)Indemnity Deposit, LC Deposit  and Litigation Deposit; Delivery of Consideration. The Indemnity Deposit (which shall constitute a part of and be withheld from the Share Consideration otherwise payable to Sellers) and the LC Deposit (which shall constitute a part of and be withheld from the Share Consideration otherwise payable to Sellers) shall be delivered by Buyer to the Escrow Agent as provided in Section 8.03(b) and shall be held and disbursed by the Escrow Agent in accordance with the terms and conditions of the Indemnity Escrow Agreement. The Litigation Deposit (which shall be deducted from and reduce the amount of Cash Consideration otherwise payable to Sellers) shall be delivered by Buyer to an account under the control of the Massachusetts Court as provided in Section 8.03(c) and shall be held and disbursed by the Massachusetts Court.  The Cash Consideration (less the Litigation Deposit) shall be paid at the Closing by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing (and, to the extent applicable, the Litigation Deposit shall be transferred by wire transfer to the account designated by the Massachusetts Court), and the Parties shall execute such receipts or other acknowledgments as are reasonably necessary to evidence payment and receipt of the Cash Consideration.  The Share Consideration, less the Indemnity Deposit and the LC Deposit, shall be paid at the Closing by the issuance of shares of Common Stock to Sellers and the delivery to Sellers at the Closing of one or more stock certificates in the name of Sellers or their designees representing the Common Stock comprising the Share Consideration issued pursuant to this Agreement.

(c)Equity Purchase Price Adjustments.

19

(i)Within 60 days after the Closing Date, S&W shall prepare and deliver to Buyer the Closing Balance Sheet together with the report of PricewaterhouseCoopers LLP thereon. The Closing Balance Sheet will be prepared in accordance with GAAP applied on a basis consistent with the presentation of the March 31 Balance Sheet except with respect to the classification of the TPPI Equipment and except for using estimated costs of completion, change order recoveries and claim recoveries with respect to Rejected Contracts and Completed Contracts and liability estimates with respect to matters set forth in Section 2.04(f) as of March 31, 2000 without further revisions. Buyer shall cause the Hired Employees to assist Seller in connection with the preparation of the Closing Balance Sheet. The Closing Balance Sheet shall be accompanied by an additional schedule of information (the "Purchase Price Adjustment Schedule") which shall contain (x) a detailed list of the assets of Sellers related to the Rejected Contracts and Completed Contracts and the liabilities of Sellers related to the Rejected Contracts, the Completed Contracts and the Excluded Liabilities (other than the liabilities for items characterized as deferred income taxes on the March 31 Balance Sheet and the Closing Balance Sheet, liabilities and obligations related to the ESOP, Taxes resulting from the consummation of the Transaction and those items referenced in Section 2.04(k) and Section 2.04(l) and any liabilities relating to the TPPI Contract), in each case that are included in the Closing Balance Sheet and (y) a calculation showing the sum of such assets (the "Adjustment Assets") and the sum of such liabilities (the "Adjustment Liabilities") and the difference resulting from the Adjustment Assets less the Adjustment Liabilities (the "Adjustment Amount"); provided, however, any adjustments included in the Adjustment Amount as the result of the write off or write down of accounts receivable related to Rejected Contracts or Completed Contracts shall not exceed $2,000,000 in the aggregate.

(ii)If Buyer disagrees with the preparation of the Closing Balance Sheet or the Purchase Price Adjustment Schedule, Buyer shall notify S&W in writing of such disagreement within 30 days after delivery of the Closing Balance Sheet and the Purchase Price Adjustment Schedule, which notice shall describe the nature of any such disagreement and provide reasonable supporting documentation for each such disagreement. During the 30 day period of its review, Buyer shall have reasonable access to any documents, schedules or work papers used in the preparation of the Closing Balance Sheet and the Purchase Price Adjustment Schedule.

(iii)Buyer and S&W agree to negotiate in good faith to resolve any such disagreement regarding the preparation of the Closing Balance Sheet or the Purchase Price Adjustment Schedule, and any resolution of such disagreement agreed to in writing by Buyer and S&W shall be final and binding upon the parties. If Buyer and S&W are unable to resolve all disagreements identified by Buyer pursuant to Section 2.05(c)(ii) within 30 days after delivery to Seller of written notice of such disagreement by Buyer, then the disputed matters shall be referred for final determination to Deloitte & Touche LLP. If Deloitte & Touche LLP is unable to serve, Buyer and S&W shall jointly select an arbiter from one of the "Big 5" accounting firms that is not the independent auditor for either Buyer or S&W; provided, however, that if Buyer and S&W are unable to select such an arbiter within such time period, the American Arbitration Association shall make such selection (Deloitte & Touche LLP or any other person so selected shall be referred to herein as the "Accounting Arbitrator".) The Accounting Arbitrator will only consider those items and amounts as to which Buyer and S&W have disagreed within the time periods and on the terms specified above and must resolve the matter in accordance with the

20

terms and provisions of this Agreement. The Accounting Arbitrator shall select as a resolution the position of either Buyer or S&W for each item of disagreement (based solely on presentations and supporting material provided by the parties and not pursuant to any independent review) and may not impose an alternative resolution. The Accounting Arbitrator shall deliver to Buyer and S&W, as promptly as practicable and in any event within 45 days after its appointment, a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report shall be final and binding upon the parties to the fullest extent permitted by applicable law. The fees, expenses and costs of the Accounting Arbitrator shall be borne one-half by Buyer and one-half by S&W.

(iv) If the Adjustment Amount, as finally determined after the procedures set forth in this Section 2.05(c), is a positive number the Equity Purchase Price shall be decreased dollar for dollar by the Adjustment Amount, and if the Adjustment Amount is a negative number, the Equity Purchase Price shall be increased dollar for dollar by the Adjustment Amount (expressed as a positive number). If the Equity Purchase Price is decreased as a result of the purchase price adjustment, S&W shall pay to Buyer the amount of such decrease, and if the Equity Purchase Price is increased as a result of such adjustment, the Buyer shall pay to S&W the amount of such increase, in each case, by delivery within 5 days of such determination shares of Common Stock calculated on the basis of the Average Price; provided, however, that Buyer may, at its election and in its sole discretion, pay Sellers all or any portion of any increased Equity Purchase Price pursuant to this Section 2.05(c)(iv) in cash in lieu of delivering some or all of any shares of Common Stock to be delivered pursuant to this Section 2.05(c)(iv).

(d) Allocation of Equity Purchase Price. Buyer and Sellers agree that a portion of the Equity Purchase Price shall be allocated and delivered to any Foreign Seller as required by applicable Legal Requirements for the reasonable protection of the Buyer or the Sellers, as the case may be.

2.06. Registration Rights. Sellers shall be given registration rights with respect to the Common Stock comprising the Share Consideration, subject to the terms and conditions of the Registration Rights Agreement by and among Buyer and those Sellers who will hold Common Stock comprising the Share Consideration.

2.07. Addition of Sellers; Schedules. S&W agrees that it will cause this Agreement to be amended to add as Sellers hereunder any of its Subsidiaries that have any right, title or interest in or to any of the Assets. S&W and Buyer agree that any references herein to Sellers shall mean and include S&W and all such Subsidiaries, and the representations and warranties of S&W in this Agreement shall be made with respect to all Sellers as if all Sellers had been Parties to this Agreement on the date hereof. The Schedules referred to in this Agreement shall be delivered concurrently with the execution of this Agreement. Such Schedules may be amended to reflect any changes required as a result of the addition of applicable Subsidiaries as additional Sellers hereunder. Buyer shall have two business days from the delivery of amended Schedules to accept or reject the same.

3.    REPRESENTATIONS AND WARRANTIES OF S&W

S&W hereby represents and warrants to Buyer as follows:

21

3.01. Organization. Each Seller is duly organized, validly existing and, to the extent applicable in the case of Foreign Sellers, in good standing under the laws of its jurisdiction of organization or incorporation, as the case may be. Each Seller is licensed, registered, qualified or admitted to do business in each jurisdiction in which the ownership, use or leasing of any of such Seller's assets or properties (including the Assets), or the conduct or nature of the Business, makes such licensing, registration, qualification or admission necessary, except where such failure would not have a Material Adverse Effect.

3.02. Powers; Consents; Absence of Conflicts, Etc. Subject to approval of this Agreement by the Bankruptcy Court, each Seller has the requisite power and authority to conduct its businesses as now being conducted, to enter into this Agreement and to perform its respective obligations hereunder, and the execution, delivery and performance by each Seller of this Agreement and the consummation of the Transaction:

(a) are within such Seller's corporate powers, are not in contravention of the terms of its articles or certificate of incorporation or other organizational documents, as amended to date, or its bylaws and other governing documents, as amended to date, and have been duly authorized by all appropriate corporate, partnership, shareholder and partner action, as the case may be;

(b) except as otherwise expressly provided in this Agreement or as set forth on Schedule 3.02(b), do not require any approval or consent of, or filing with, any Governmental Authority;

(c) except as set forth on Schedule 3.02(c) or as excused by the Bankruptcy Court, do not conflict with, or result in any breach or contravention of, any Assumed Contract to which any Seller is a party or by which it is bound; and

(d) do not violate any Legal Requirement to which any Seller or the Assets may be subject;

except, in the case of the foregoing clauses (b), (c) and (d), for such conflicts or violations as to which requisite waivers or consents have been obtained or which would not have a Material Adverse Effect.

3.03. Binding Agreement. This Agreement and all instruments and agreements hereunder to which each Seller is or becomes a party are (or upon execution will be) valid and legally binding obligations of each such Seller, enforceable against each Seller in accordance with the respective terms hereof or thereof, except as enforceability may be subject to general principles of equity and enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws effecting creditors' rights generally.

3.04. Subsidiaries, Investments and Third Party Rights. After the Closing, no Seller will conduct any business that competes with the Business and no Seller will own or hold any interests in any Persons that conduct any business that competes with the Business, except and solely to the extent necessary to fulfill the obligations of any Seller under any Contracts other than the Assumed Contracts. Except as set forth on Schedule 2.01(i), no Seller holds any Investments that are not reflected as assets on the March 31 Balance Sheet. Except as set forth

on Schedule 3.04, there are no agreements with, or options, commitments or rights in favor of, any Person to directly or indirectly acquire any of the Assets, or any interest therein.

3.05. Legal and Regulatory Compliance. Except as set forth on Schedule 3.05, each Seller is in compliance with all Legal Requirements, and has timely filed all reports, data and other information required to be filed with Governmental Authorities, except where a failure to be in compliance or file timely would not have a Material Adverse Effect.

3.06. Financial Statements. Attached as Schedule 3.06 are copies of the Audited Financial Statements, the Unaudited Financial Statements, the Interim Financial Statements and the interim financial statements as of June 30, 2000 of the Foreign Subsidiaries. Except as disclosed on Schedule 3.08, the Financial Statements are true, complete and accurate in all material respects and fairly present the financial condition and results of operations of S&W as of the respective dates thereof and for the periods therein referred to, all in accordance with generally accepted accounting principles ("GAAP"); subject in the case of the Unaudited Financial Statements and Interim Financial Statements to normal recurring quarterly and year-end adjustments (the effect of which will not, individually or in the aggregate, be materially adverse) and the absence of notes (which, if presented, would not differ materially from those included in the Audited Financial Statements); and the Financial Statements reflect the consistent application of such accounting principles throughout the periods involved.

3.07. Undisclosed Liabilities. Schedule 3.07 contains an accurate description, to the Knowledge of Sellers, of all material liabilities of Sellers not included in the Audited Financial Statements or the Unaudited Financial Statements of any nature relating to the Assets or the Business, whether accrued, absolute, contingent or otherwise, together with, in the case of those liabilities which are not fixed in amount, a reasonable estimate of the maximum amount which may be payable in respect thereof.

3.08. Recent Activities. Except as set forth on Schedule 3.08:

(a) Since April 30, 2000, and except for the announcement of the Transaction, the filing of the Bankruptcy Cases and disruptions arising therefrom, no event has occurred which has had a Material Adverse Effect.

(b) Since December 31, 1999:

(i) to the Knowledge of Sellers, no material damage, destruction or loss (whether or not covered by insurance) has occurred affecting the Assets;

(ii) no Seller has increased or agreed to increase the compensation payable to any of its employees or agents or made or agreed to make any bonus or severance payment to any of its employees or agents except in the ordinary course of the Business and consistent with past practice, and no Seller has employed any additional management personnel except in the ordinary course of the Business and consistent with past practice;

(iii) no labor dispute, enactment of state or local law, promulgation of state or local regulation, or other event or condition has occurred which has had a Material Adverse Effect;

23

A384

(iv)  no Seller has sold, assigned, transferred, distributed or otherwise disposed of any of the Assets, except in the ordinary course of the Business;

(v)  no Seller has canceled or waived any rights in respect of the Assets, except in the ordinary course of the Business;

(vi)  there has been no change in any accounting method, policy or practice of any Seller, except as required by announcements of the Financial Accounting Standards Board or as disclosed in S&W's Form 10-Q for the quarter ended March 31, 2000;

(vii)  there has been no change in the manner in which any Employee Benefit Plan and any assets or liabilities related thereto has been administered; and

(viii)  to the Knowledge of Sellers, no Seller has received from any Governmental Authority notice that it is in material violation of any Legal Requirement.

3.09. Subsidiaries and Affiliates; Assets.  Each direct and indirect Subsidiary and Affiliate of S&W that owns or has any interest in the Assets is set forth on Schedule 3.09.  Except as set forth on Schedule 3.09, no Person that is not a Seller owns, holds title to or has any other direct, indirect or beneficial interest in any of the Assets.

3.10. Equipment.  All equipment that is material to the conduct of the Business, whether reflected in the Financial Statements or otherwise, is well maintained and in good operating condition, except for reasonable wear and tear.  All leased equipment that is material to the conduct of the Business is maintained in all material respects (either by Sellers, the manufacturer or lessor, as the case may be) in accordance with manufacturer and lessor requirements.

3.11. Title to Personal Property.  Except as described on Schedule 3.11, Sellers own and hold good and valid title or leasehold title, as the case may be, to all the Assets, other than the Real Property, free and clear of any Encumbrances.  At Closing Sellers will convey to Buyer good and valid title to all the Assets, other than the Real Property, free and clear of any material Encumbrances.

3.12. Real Property.

(a) Sellers own or hold fee simple or leasehold title, as the case may be, to the Real Property together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto, free and clear of any Encumbrances other than the Real Property Encumbrances.

(b) At the Closing, Sellers will convey to Buyer good and marketable fee simple or leasehold title, as the case may be, to all Real Property, free and clear of any Encumbrances other than the Permitted Real Property Encumbrances.

(c) The Real Property comprises all of the real property owned or leased by Sellers which is associated with or employed in the operation of the Business.

24

A385

(d)The buildings and other improvements constructed on the Real Property and material to the conduct of the Business are in a state of good condition and repair, in all material respects, and are in need of no maintenance or repairs except for ordinary, routine maintenance.

(e)There are no pending or, to the Knowledge of Sellers, threatened condemnation or similar proceedings or special assessments relating to the Real Property or any part thereof.

(f)To the Knowledge of Sellers, no part of the Real Property contains, is located within or abuts any flood plain, navigable water or other body of water, tideland, wetland, marshland or any other area which is subject to special State, federal or municipal regulation, control or protection.

(g)Sellers have received all required material approvals of Governmental Authorities (including, without limitation, Permits and material certificates of occupancy or other such certificates permitting lawful occupancy of the Real Property) required in connection with the use of the Real Property and all improvements thereon.

3.13.Environmental Matters.

(a)     To the Knowledge of Sellers, the Business is, and since January 1, 1995 has been, in material compliance with all applicable Environmental Laws.

(b)     Except as set forth on Schedule 3.13(b), no Seller has received any written Environmental Claim nor, to the Knowledge of Sellers, is there any basis for any Environmental Claim (including, without limitation, knowledge of any actions, activities, circumstances, conditions, events or incidents, including the release, emission, discharge or disposal of any Materials of Environmental Concern, whether relating to the Assets or the Business or otherwise).

(c)     Except as set forth on Schedule 3.13(c), to the Knowledge of Sellers, there is no existing contamination by, and there has not been any material release of, any Materials of Environmental Concern on, at, under or around any of the Assets or on or in connection with the Business.

(d)     To the Knowledge of Sellers, true, complete and correct copies of the written reports, and all parts thereof, of all environmental audits or assessments which have been conducted with respect to any Seller or the Business, either by any Seller or any environmental consultant or engineer engaged for such purpose, have been made available to Buyer, and a list of all such reports, audits and assessments and any other similar report, audit or assessment is included on Schedule 3.13(d).  To the Knowledge of Sellers, Sellers have provided Buyer with true, complete and correct copies of all environmental audits and assessments in the possession of Sellers relating to any of the Assets or any Pre-Closing Environmental Matter.

(e)Each Seller has all material Permits required under applicable Environmental Laws to own or lease its properties and to conduct the Business thereon.  All Permits currently held by Sellers pursuant to the Environmental Laws are identified on Schedule 2.01(f).

25

A386

(f) Without in any way limiting the generality of the foregoing, except as set forth on Schedule 3.13(f), (i) all Materials of Environmental Concern are handled and disposed of in material compliance with all applicable Environmental Laws, (ii) to the Knowledge of Sellers, all underground storage tanks located on the Real Property, and the capacity and contents of such tanks, are identified on Schedule 3.13(f), (iii) to the Knowledge of Sellers, there is no exposed friable asbestos contained in or forming part of any building, building component, structure or office space owned or leased by Sellers and used in the conduct of the Business, and (iv) no polychlorinated biphenyls are used or stored at any Real Property owned or leased by Sellers.

(g) Notwithstanding the foregoing, the representations and warranties in this Section 3.13 shall be deemed to be made without the benefit of any knowledge or materiality qualifiers with respect to the matters applicable to the Cold Storage Business and with respect to matters involving any handling, storage or release of nuclear materials that constitute Materials of Environmental Concern.

3.14. Intellectual Properties, Computer Software, etc. Except as described on Schedule 3.14 and except for customary licensing fees payable under the Contracts, Sellers have the right to use, free and clear of any royalty or other payment obligations, claims of infringement against Intellectual Properties or computer software, programs or similar systems owned by any Seller or any liens, (a) all Intellectual Properties used or needed by Sellers in the conduct of the Business, and (b) all computer software, programs and similar systems owned by or licensed under Contracts to any Seller and used in the conduct of the Business, and no Seller is in violation or infringement of, nor has any Seller received any notice alleging any conflict with or violation or infringement of, any rights of any other Person with respect to any such Intellectual Properties or computer software, programs or similar systems. Except as set forth on Schedule 3.14 and except for customary licensing fees payable under the Contracts, subsequent to the Closing and without further action or the payment of additional fees, royalties or other compensation to any Person, Buyer will be entitled to unrestricted use of all Intellectual Properties, computer software, programs and similar systems as currently used in the Business.

3.15. Insurance. Schedule 3.15 describes all insurance arrangements, including self-insurance, in place for the benefit of the Assets and the conduct of the Business. True and correct copies of all such policies and any endorsements thereto have been made available to Buyer.

3.16. Permits and Licenses. Schedule 2.01(f) contains a complete and accurate list and summary description of all material Permits and franchises (including applications therefor) owned or held by Sellers relating to the ownership, development or operations of the Business or the Assets, all of which are in good standing and not subject to challenge. Each Seller is, with respect to the Business, duly licensed by the appropriate Governmental Authorities, except where the failure to be so licensed would result in liabilities of less than Five Hundred Thousand Dollars ($500,000) in the aggregate. Each Seller is, and the Business is and has at all time been conducted, in compliance with any and all applicable licensing requirements, except where the failure to be so licensed would result in liabilities of less than Five Hundred Thousand Dollars ($500,000) in the aggregate. There are no provisions in or agreements relating to any such Permits or franchises (including applications therefor) which would preclude or limit Buyer from

26

operating the Business and using all Assets in their current conditions and locations, except for such provisions relating to the assignment or transfer of any Permit or franchise.

### 3.17. Agreements and Commitments.

(a) Schedule 3.17 is a true, complete and correct list of all Contracts (other than Immaterial Contracts) conforming to the descriptions set forth in this Section 3.17 to which any Seller is a party, copies of each of which have been delivered or made available to Buyer:

(i) Contracts involving payments by or to any Seller in excess of One Hundred Thousand Dollars ($100,000) not made in the ordinary course of business;

(ii) any employee collective bargaining agreement or other Contract with any labor union covering employees of any of the Sellers;

(iii) any Contract (including sales orders) involving the obligation of any Seller to deliver products or services;

(iv) any option or other Contract to purchase or otherwise acquire or sell or otherwise dispose of any interest in any real property (including the Real Property);

(v) any Contract under which any Seller has agreed to indemnify any third party with respect to, or to share, the Tax liability of any third party;

(vi) any Contract to make a capital expenditure or to purchase a capital asset in excess of Two Hundred Fifty Thousand Dollars ($250,000) by or on behalf of any Seller in connection with the Assets or the operation of the Business other than capital expenditures relating to assets which are to become part of a project;

(vii) any Contract relating to the location of employees or minimum number of employees to be employed by any Seller with respect to the Business;

(viii) any power of attorney (other than powers of attorney given in the ordinary course of the Business with respect to routine export, tax or securities matters);

(ix) any bond, indenture, note, loan or credit agreement (other than the Jacobs Credit Agreement and the Jacobs DIP Agreement) or other Contract relating to the borrowing of money or to the direct or indirect guarantee or assumption of the obligations of any other Person for borrowed money;

(x) any Contract limiting or restricting in any material manner the operation of the Business;

(xi) any lease or similar Contract under which (i) any Seller is the lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property or real property owned by any third Person for an annual rent in excess of One Hundred Thousand Dollars ($100,000) or (ii) any Seller is the lessor of, or makes available for use by any third Person, any tangible personal property or real property owned by any Seller

A388

for an annual rent in excess of One Hundred Thousand Dollars ($100,000), in each case, other than with respect to machinery, equipment, vehicles or other tangible personal property specifically for use in connection with a project;

(xii)    except as set forth on Schedule 5.04, employment and severance Contracts, including Contracts (i) to employ or terminate executive officers or other personnel and other contracts with present or former officers, directors or shareholders of any Seller or (ii) that will or could result in the payment by or the creation of any commitment or obligation (absolute or contingent) to pay on behalf of Buyer or any Seller any severance, termination, "golden parachute," or other similar payments to any present or former personnel following termination of employment or otherwise as a result of the consummation of the Transactions; and

(xiii)    any joint venture or partnership Contracts.

(b)    Sellers have made available to Buyer true, complete and correct copies of any Contract (including purchase orders) involving the obligation of any Seller to purchase products or services pursuant to which the aggregate of payments to become due from such Seller is equal to or exceeds One Hundred Thousand Dollars ($100,000).

3.18. The Contracts. Except (a) as otherwise set forth on Schedule 3.18, (b) as a result of Sellers' current financial condition, or (c) for events of default that will arise or result from the filing of the Bankruptcy Cases:

(i) the Contracts constitute lawful, valid and legally binding obligations of the Sellers who are parties thereto and are enforceable against such Sellers in accordance with their terms;

(ii) each Contract is in full force and effect and constitutes the entire agreement by and between the parties thereto;

(iii) in all material respects, all obligations required to be performed under the Contracts by the Sellers who are parties thereto on or prior to the date hereof have been performed, and no event has occurred or failed to occur which constitutes, or with the giving of notice, the lapse of time or both would constitute, a default by any Seller under the Contracts;

(iv) except for Government Contracts, no Contract prohibits or requires the consent of any Person to the assignment to and assumption by Buyer of the Contracts;

(v) no Contract will prohibit competition or restrict the ability of Buyer to engage in any lawful business after Closing; and

(vi) the assignment of the Contracts to and assumption of such Contracts by Buyer will not result in any penalty, premium or variation of the rights, remedies, benefits or obligations of any party thereunder.

28

A389

### 3.19. Employees and Employee Relations.

(a) Sellers have made available to Buyer a complete list (as of the date set forth therein) of names, positions, current annual salaries or wage rates, and bonus and other compensation arrangements of all full-time and part-time employees of each Seller (indicating in such list whether each employee is part-time or full-time, whether such employee is employed under written Contract, and, if such employee is not actively at work, the reason therefor).

(b) There is no pending or, to the Knowledge of Sellers, threatened employee strike, work stoppage or slowdown or labor dispute. Except as described on Schedule 3.19(b), no employees of any Seller are represented by a labor union or employee organization, and, to the Knowledge of Sellers, (i) no union or employee organization has made a demand for recognition and (ii) no other union organizing or collective bargaining activities by or with respect to any employees of any Seller are taking place.

### 3.20. Employee Benefit Plans.

(a) Schedule 3.20(a) lists each Employee Benefit Plan and Other Plan that any Seller or any member of the Controlled Group that includes any Seller sponsors or maintains or has within the last five years sponsored or maintained or to which it contributes (including employee elective deferrals) or has within the last five years contributed or been required to contribute.

(b) Each Employee Benefit Plan (and related trust, insurance contract or fund if the Employee Benefit Plan is funded through a trust or third party funding vehicle) complies in form and in operation in all material respects with applicable Legal Requirements, and has been administered and operated in all material respects in accordance with all applicable Legal Requirements. Except as set forth on Schedule 3.20(b), all required reports and descriptions required to be filed with any Governmental Authority (including Form 5500 Annual Reports, Summary Annual Reports, PBGC-1's and Summary Plan Descriptions) have been filed or distributed appropriately with respect to each Employee Benefit Plan. Sellers have delivered or made available to Buyer correct and complete copies of the plan documents and summary plan descriptions, most recent determination letters received from the Internal Revenue Service, most recent Form 5500 Annual Report, and all related trust agreements, insurance contracts and other funding agreements which implement each Employee Benefit Plan (and in the case of any Employee Benefit Plan of any Foreign Seller, any comparable documents under the applicable Legal Requirements of the appropriate Governmental Authorities). Since January 1, 1995, no Employee Benefit Plan has been audited by any Governmental Authority, no Seller has received any written notice that such an audit will or may be conducted and no event has occurred since the date of such determination letter that would operate to jeopardize any Employee Benefit Plan's qualification.

(c) Each Employee Pension Benefit Plan is in material compliance with the requirements of a qualified plan under Code Sec. 401(a), and each qualified plan has received a favorable determination letter from the Internal Revenue Service that is current and valid and no event has occurred since the date of such determination letter that would operate to jeopardize such Employee Pension Benefit Plan's qualification. All contributions (including employer

29

contributions and employee salary reduction contributions) to each Employee Pension Benefit Plan that are required to be paid have been paid, and all Sellers' contributions in respect of periods ending the day prior to the Closing Date will be accrued on the Closing Balance Sheet. The market value of all assets under each Employee Pension Benefit Plan and the present value of all vested and unvested liabilities thereunder have been determined and, with respect to each such Employee Pension Benefit Plan, as of such date of determination the vested and unvested liabilities thereunder were determined in accordance with PBGC immediate and deferred factors and assumptions applicable to an Employee Pension Benefit Plan terminating on the date for determination.

(d) All required premiums or other payments for all periods due on or before the Closing Date have been or will have been paid with respect to each Employee Welfare Benefit Plan.

(e) Except as set forth on Schedule 3.20(e), there have been no Prohibited Transactions with respect to any Employee Benefit Plan that would subject any Seller or any member of the Controlled Group that includes any Seller to any material liability; no Seller has incurred or reasonably expects to incur material excise tax liability under Chapter 43 and Chapter 47 under Subtitle D of the Code; no ERISA Fiduciary has any material liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any Employee Benefit Plan; no action, suit, proceeding, hearing or investigation with respect to the administration or the investment of the assets of any Employee Benefit Plan (other than routine claims for benefits) is pending or, to the Knowledge of Sellers, threatened; and to the Knowledge of Sellers, there exists no basis for any such action, suit, proceeding, hearing or investigation.  No Party in Interest has any interest in any assets of any Employee Benefit Pension Plan other than as a beneficiary by virtue of such Person's participation in such plan.

(f) Except as set forth on Schedule 3.20(f), no Employee Benefit Plan which is an Employee Pension Benefit Plan has been completely or partially terminated or the subject of a Reportable Event and no proceeding by the PBGC to terminate any Employee Pension Benefit Plan has been instituted or threatened; and no Seller has incurred any material liability to the PBGC (other than PBGC premium payments) or otherwise under Title IV of ERISA (including any withdrawal liability) or under the Code with respect to any Employee Pension Benefit Plan.

(g) Except as set forth on Schedule 3.20(g), no Seller, and no member of the Controlled Group that includes any Seller, contributes to, ever has contributed to, or ever has been required to contribute to any Multiple Employer Plan or any Multiemployer Plan or has any liability (including withdrawal liability) under any Multiple Employer Plan or any Multiemployer Plan. Except as set forth on Schedule 3.20(g), no Seller, and no member of the Controlled Group that includes any Seller, maintains or contributes, ever has maintained or contributed, or ever has been required to maintain or contribute to any Employee Welfare Benefit Plan providing medical, health or life insurance or other welfare-type benefits for current or future retired or terminated employees, their spouses or their dependents (other than in accordance with Code Section 4980B).

(h) Each Seller has complied in all material respects with the requirements of Code Sections 4980B, 9801, 9802, 9811 and 9812.

3.21. Litigation and Proceedings.  Except as set forth on Schedule 3.21, (i) there are no claims, actions, suits, litigation, arbitration, mediations, investigations or other proceedings (including qui tam actions) pending, affecting or to the Knowledge of Sellers threatened against any Seller which might have a Material Adverse Effect on the Business or the Assets, and (ii) to the Knowledge of Sellers, there exist no facts that might form the basis of any such claim, action, suit, litigation, arbitration, mediation, investigation or other proceeding.

3.22. Taxes.

(a) Sellers have filed all Tax Returns required to be filed by or on behalf of any of them, all such Tax Returns are correct and complete in all material respects, and Sellers have duly paid or made provision in the Audited Financial Statements for the payment of all Taxes; and as of Closing there will be no Encumbrances on any Assets that arose in connection with any failure (or alleged failure) to pay any Tax.

(b) Except as described on Schedule 3.22, each Seller has withheld proper and accurate amounts from its employees' compensation in full and complete compliance with all withholding and similar provisions of the Code and any and all other applicable Legal Requirements, and has withheld and paid, or caused to be withheld and paid, all Taxes on monies paid by Sellers to independent contractors, creditors and other Persons for which withholding or payment is required by law.

(c) Except as set forth on Schedule 3.22, no taxing authority has advised any Seller that it intends to assess any additional Taxes for any period for which Tax Returns have been filed. Except as set forth on Schedule 3.22, there is no dispute or claim concerning any Tax liability of Sellers either claimed or raised by any Governmental Authority in writing, or as to which any Seller has notice or knowledge.

(d) Except as described on Schedule 3.22, no Seller has or may have any liability for the Taxes of any Person other than Sellers under Reg. § 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by Contract or otherwise.

3.23. Brokers and Finders.  No Seller, nor any officer, director, employee or agent thereof, has engaged any finder or broker in connection with the Transaction, except that S&W has engaged Lazard Freres & Co. LLC and Goldman Sachs & Co. to act as S&W's independent financial advisors in connection with the transactions contemplated by this Agreement.

3.24. Payments.  No Seller has, directly or indirectly, paid or delivered or agreed to pay or deliver any fee, commission or other sum of money or item of property, however characterized, to any Person which is in any manner related to the Assets or the Business in violation of any Legal Requirement.  No Seller, nor any officer, director or employee of any Seller, has received or, as a result of the consummation of the transaction contemplated by this Agreement, will receive any rebate, kickback or other improper or illegal payment from any Person with whom Sellers conduct or have conducted business.

31

A392

3.25. Operation of the Business.  The Assets constitute all assets, properties, goodwill and businesses necessary to operate the Business in all material respects in the manner in which they been operated prior to the Closing Date.

3.26. Customer List.  Sellers have made available to Buyer a true, complete and correct list of all customers of each Seller since January 1, 1997 which generated revenues in excess of One Million Dollars ($1,000,000) in any fiscal year during such period.

3.27. Backlog.  Sellers have made available to Buyer a true, complete and correct list of all unfilled orders for products or services as of April 30, 2000, setting forth the date of such order and the current status.

3.28.    Investment Experience and Intent; No Registration.  Each Holder is experienced in evaluating companies such as Buyer, is able to fend for itself in transactions such as the Transaction, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring and holding the Common Stock comprising the Share Consideration.  Except as may be required in connection with or pursuant to the Bankruptcy Cases, each Holder is acquiring the Common Stock comprising the Share Consideration for investment for its own account and not with the view to, or for resale in connection with, any distribution thereof.  Each Holder understands that the Common Stock comprising the Share Consideration has not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent as expressed herein.  Each Holder further represents that it does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participation to any third party with respect to any of the Common Stock comprising the Share Consideration.  Each Holder understands and acknowledges that the Common Stock comprising the Share Consideration will not be registered under the Securities Act, unless and solely to the extent so required pursuant to the terms and subject to the conditions of the Registration Rights Agreement.

3.29.    Accredited Investor Status.  As of the Effective Date, each Holder is an Accredited Investor.

3.30.    Rule 144.  Each Holder acknowledges that the Common Stock comprising the Share Consideration must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available.  Each Holder is aware of the provisions of Rule 144 promulgated under the Securities Act that permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions.  Each Holder covenants that, in the absence of an effective registration statement covering the Common Stock comprising the Share Consideration, it will sell, transfer or otherwise dispose of such Common Stock only in a manner consistent with its obligations under the Registration Rights Agreement or in compliance with applicable securities laws.  In connection therewith, each Holder acknowledges that Buyer will make a notation on its stock books regarding the restrictions on transfers set forth in this Section 3.30 and the Registration Rights Agreement and will transfer securities on the books of Buyer only to the extent not inconsistent herewith and therewith.

3.31.  <u>Government Contracting.</u>

(a) (i) No Seller, nor any director, officer, employee, agent or consultant of any Seller, is (or during the last five years has been) under administrative, civil or criminal investigation (including as a result of a *qui tam* or similar action brought under the Civil False Claims Act or any similar state or local law, rule or regulation), indictment or information, audit or internal investigation with respect to any alleged irregularity, misstatement or omission arising under or relating to any Government Contract or Bid or is (or during the last five years has been) in violation of any statutes or regulations relative to prohibited practices, including the Civil False Claims Act, prohibitions against "Buying In", the Anti-Kickback Act, the Federal Election Campaign Act, the Truth-In-Negotiations-Act, the Procurement Integrity Act, the Foreign Corrupt Practices Act, International Trade in Arms Regulation, Cost Accounting Standards, prohibitions against conflict of interest and anti-trust laws or any governmental accounting regulations; (ii) no Seller has made a voluntary disclosure to any Governmental Authority with respect to any alleged irregularity, misstatement or omission arising under or relating to any Government Contract or Bid that has led or would reasonably be expected to lead, either before or after the Closing Date, to any of the consequences set forth in <u>clause (i)</u> above or any other material damage, penalty assessment, recoupment of payment or disallowances of cost.

(b)  No Seller, nor any director, officer, employee, agent or consultant of any Seller, is (or during the last five years has been) suspended or debarred from doing business with any Governmental Authority or has been declared nonresponsible or ineligible for U.S. Government contracting.  To the Knowledge of Sellers, there exist no circumstances that would warrant the institution of suspension or debarment proceedings or the finding of nonresponsibility or ineligibility in the future on the part of the Sellers or Buyer as the purchaser of the Assets, except as may result from Sellers' current financial condition or the filing of the Bankruptcy Cases.

(c)  The Company and the Company Subsidiaries are in full compliance with all Foreign Ownership and Control Interests ("<u>FOCI</u>") regulations and have received all appropriate approvals within the last five years.

(d)  Each Sellers' cost accounting and procurement systems with respect to Government Contracts are in compliance in all material respects with all applicable governmental regulations and rules.

3.32.  <u>Accounts Receivable.</u>  Except as described on <u>Schedule 3.32</u>, there is (a) no account debtor that has refused (or to the Knowledge of Sellers, threatened to refuse) to pay its obligations with respect to any Account Receivable for any reason, (b) to Sellers' knowledge, no account debtor that is insolvent or bankrupt, (c) no Account Receivable that was not generated in the ordinary course of the Business, (d) no Account Receivable that is not appropriately reserved and, as reserved, is not good and collectible within 90 days from the Closing Date and (e) with respect to unbilled Accounts Receivable, there exists no fact that would prohibit or restrict the billing of any such unbilled Accounts Receivable in the ordinary course of business or, to the Knowledge of Sellers, would render such unbilled Accounts Receivable uncollectable within 90 days from the date of invoice.

33

A394

3.33.  Related Party Transactions.  Except (i) for compensation and benefits payable in the ordinary course of the Business, (ii) for normal travel advances made in the ordinary course of the Business consistent with past practice and (iii) as set forth on Schedule 3.33, to the Knowledge of Sellers, no director, officer, partner, employee, "affiliate" or "associate" (as such terms are defined in Rule 12b-2 under the Exchange Act) of any Seller (a) since January 1, 1997, has lent or borrowed any monies to or from or has outstanding any indebtedness or other similar obligations to any Seller, (b) owns any direct or indirect interest of any kind (except with respect to the ownership of not more than five percent (5%) of any class of equity security in a publicly held company) in, or is a director, officer, partner, employee, "affiliate" or "associate" of, or consultant or lender to, or borrower from, or has the right to participate in the management, operations or profits of, any Person that is a competitor, supplier, customer, distributor, lessor, tenant, creditor or debtor of any Seller, (c) is otherwise a party to, or since January 1, 1997 has been a party to, any Contract with any Seller involving payments equal to or in excess of One Hundred Thousand Dollars ($100,000) per year or (d) owns or has any rights in any assets, properties, licenses or rights which are used or leased (or, since January 1, 1997, were used or leased) by any Seller in the conduct of the Business.

4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as follows:

4.01. Organization.  Buyer is a corporation duly organized and validly existing in good standing under the laws of the State of Louisiana.

4.02. Corporate Powers; Consents; Absence of Conflicts, Etc.  Buyer has the requisite power and authority to conduct its business as now being conducted, to enter into this Agreement, and to perform its obligations hereunder.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction by Buyer:

(a) are within Buyer's corporate powers and are not in contravention of the terms of its Restated Articles of Incorporation or Amended and Restated Bylaws, each as amended to date, and have been approved by all requisite corporate and shareholder action;

(b) except as otherwise expressly provided in this Agreement or as set forth on Schedule 3.02(b), do not require any approval or consent of, or filing with, any Governmental Authority;

(c) do not conflict with, or result in any breach or contravention of, any material agreement to which Buyer is a party or by which it is bound; and

(d) do not violate any Legal Requirement to which Buyer may be subject.

4.03. Binding Agreement.  This Agreement and all instruments and agreements hereunder to which Buyer is or becomes a party are (or upon execution will be) valid and legally binding obligations of Buyer enforceable against Buyer in accordance with the respective terms hereof and thereof, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

34

A395

4.04. Issuance of Share Consideration. The issuance of the shares of Common Stock comprising the Share Consideration has been duly and validly authorized by all requisite corporate and shareholder action, and, when issued in accordance with the terms and conditions of this Agreement, will be duly authorized, validly issued, fully paid, and non-assessable.

4.05. Brokers and Finders. Neither Buyer, nor any Affiliate of Buyer, nor any officer, director, employee or agent thereof, has engaged any finder or broker in connection with the Transaction, except that Buyer has engaged Jefferies & Company, Inc. and Morgan Keegan & Company, Inc. to act as Buyer's independent financial advisors in connection with the Transaction.

4.06. Payments. Neither Buyer, nor any Affiliate of Buyer, nor any officer, director, employee or agent thereof, has, directly or indirectly, paid or delivered, offered to pay or deliver, or agreed to pay or deliver any fee, commission or other sum of money or item of property, however characterized, to any person which is now or was previously an affiliate or insider (as those terms are defined in the Bankruptcy Code) of any Seller.

4.07. SEC Documents and Other Reports. Buyer has filed all required documents with the SEC since January 1, 1997 (the "Buyer SEC Documents"). As of their respective dates, the Buyer SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and, at the respective times they were filed, none of the Buyer SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements (including, in each case, any notes thereto) of Buyer included in the Buyer SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, were prepared in accordance with GAAP (except, in the case of the unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto) and fairly present in accordance with GAAP the consolidated financial position of Buyer and its consolidated Subsidiaries as at the respective dates thereof and the consolidated results of their operations and their consolidated cash flows for the periods then ended (subject, in the case of unaudited statements, to any other adjustments described therein and normal year-end audit adjustments). Except as disclosed in the Buyer SEC Documents filed prior to the Effective Date or as required by GAAP, Buyer has not, since January 31, 2000, made any change in the accounting practices or policies applied in the preparation of financial statements. The books and records of Buyer and its Subsidiaries have been, and are being, maintained in all material respects in accordance with GAAP and other applicable legal and accounting requirements.

4.08. Actions and Proceedings. Except as set forth in the Buyer SEC Documents filed prior to the Effective Date or on Schedule 4.08, (a) there are no outstanding orders, judgments, injunctions, awards or decrees of any Governmental Authority against or involving Buyer or any of its Subsidiaries, or involving any of its or their properties, assets or business, that would have a Buyer Material Adverse Effect and (b) as of the Effective Date, there are no actions, suits or claims or legal, administrative or arbitrative proceedings or investigations pending or, to the

35

Knowledge of Buyer, threatened against or involving Buyer or any of its Subsidiaries, or involving any of its or their properties, assets or business that, individually or in the aggregate, would have a Buyer Material Adverse Effect.

4.09. Capital Structure. The authorized stock of Buyer consists of 50,000,000 shares of Common Stock and 5,000,000 shares of Preferred Stock. At the close of business on February 29, 2000, (a) 15,298,921 shares of Common Stock were issued and outstanding, all of which were validly issued, fully paid and nonassessable and free of preemptive rights; (b) 8,224,236 shares of Common Stock were held in the treasury of Buyer or by the Subsidiaries of Buyer; (c) 1,152,375 shares of Common Stock were reserved for future issuance pursuant to stock option or stock purchase plans; and (d) no shares of Buyer Preferred Stock were issued or outstanding. Except as disclosed in Buyer SEC Documents filed prior to the date hereof, there are no outstanding contractual obligations of Buyer or any of Buyer's Subsidiaries (i) restricting the transfer of, (ii) affecting the voting rights of, (iii) requiring the registration for sale of, or (iv) granting any preemptive or antidilutive rights with respect to, any shares of Common Stock.

4.10. Absence of Certain Changes or Events. Except as disclosed in Buyer SEC Documents filed prior to the date hereof, since February 29, 2000, none of Buyer or any of its Subsidiaries has incurred any material liability or obligations (direct, indirect or contingent), or entered into any material oral or written agreement or other transaction, that is not in the ordinary course of business or that would result in a Buyer Material Adverse Effect, except for any changes or effects resulting from this Agreement, the Transaction or the announcement thereof.

5.    COVENANTS AND AGREEMENTS OF THE PARTIES

5.01. Bankruptcy Cases and Sale Motion; Entry of Sale Order; Additional Sellers. Sellers shall pursue the Bankruptcy Cases, the Sale Motion and such other motions as are necessary to implement the Transaction. Sellers shall request a prompt hearing relative to, and shall use their respective best efforts to obtain, entry of the Sale Order. From and after the Effective Date, to the extent that any direct or indirect Subsidiary or Affiliate of any Seller acquires, owns or holds any portion of the Assets or conducts any portion of the Business and initially is not a Party hereto, Sellers shall cause each such direct or indirect Subsidiary or Affiliate to become a Party as an additional Seller. In addition, Sellers shall, and shall cause each such Subsidiary or Affiliate to, execute and deliver such further documents and instruments and take such further actions as may be necessary to file a Bankruptcy Case for each Subsidiary and Affiliate of S&W as, in the reasonable judgment of Sellers after consultation with Buyer, are necessary to consummate the Transaction.

5.02. Operations. From the Effective Date until the Closing Date, except as otherwise expressly provided in this Agreement (including Section 5.03) and subject to the obligations of Sellers to comply with any applicable order of the Bankruptcy Court and the provisions of the Bankruptcy Code and taking into account Sellers' current financial condition and the Bankruptcy Cases, Sellers will:

(a) perform when due all Legal Requirements and obligations under Contracts (including the Assumed Contracts) relating to or affecting the Assets or the Business;

36

(b) carry on the Business in substantially the same manner as they have heretofore;

(c) maintain the Assets in good working order and condition, ordinary wear and tear excepted;

(d) take all actions necessary and appropriate to deliver to Buyer title to the Assets free and clear of all Encumbrances (except for the Real Property Encumbrances) and to obtain appropriate releases, consents, estoppels, certificates, opinions and other instruments as Buyer may reasonably request;

(e) keep in full force and effect present insurance policies or other comparable insurance benefiting the Assets and the conduct of the Business;

(f) maintain and preserve their business organizations and operations substantially intact; use their respective commercially reasonable efforts to retain the present employees at the Business (subject to the right of Sellers, after consultation with Buyer, to discharge any employee in the ordinary course of the Business); maintain their relationships with contractors, subcontractors, suppliers, customers and other Persons doing business with Sellers; and take such actions as are reasonably necessary and achievable to cause the smooth, efficient and successful transition to Buyer of the Business at Closing;

(g) permit and allow reasonable access by Buyer to discuss and make offers of post-Closing employment with any of Sellers' personnel, to advertise for post-Closing employment at the Business, and to establish relationships with contractors, subcontractors, suppliers and other Persons having business relations with Sellers; and

(h) use their respective best efforts to accomplish the sale of the Cold Storage Business and the Prescient Business pursuant to any Contracts for such sale entered into and to be performed prior to the Closing Date.

5.03. Certain Actions. From the Effective Date until the Closing Date, except as otherwise expressly provided in this Agreement or as set forth on Schedule 5.03, Sellers shall not take any of the following actions without first obtaining the consent of Buyer:

(a) amend or terminate any Assumed Contract other than an Immaterial Contract, or enter into any Contract involving a commitment on the part of any Seller in excess of One Hundred Thousand Dollars ($100,000);

(b) make offers to any employees of the Business for employment with any Person after Closing or make any material change in personnel, operations, finances, accounting policies, or real or personal property of the Business;

(c) increase compensation payable or to become payable to, make a bonus or severance payment to, or otherwise enter into one or more bonus or severance agreements with, any employee or agent of any Seller;

37

A398

(d)create, assume or permit to exist any new Encumbrance upon any of the Assets, except for Encumbrances providing adequate protection as is required by the Bankruptcy Court;

(e)sell, assign, transfer, distribute or otherwise dispose of any property, plant or equipment of any Seller having an original cost in excess of Fifty Thousand Dollars ($50,000);

(f)take any action outside the ordinary course of the Business;

(g)amend or agree to amend the articles or certificate of incorporation or other organizational documents or the bylaws or other governing documents of any Seller or otherwise take any action relating to any liquidation or dissolution of any Seller;

(h)create, incur, assume, guarantee or otherwise become liable for any liability of any Seller, or agree to do any of the foregoing;

(i)cancel, forgive, release, discharge or waive any receivable or any similar Asset or right with respect to the Business, or agree to do any of the foregoing;

(j)change any accounting method, policy or practice in the Financial Statements; or

(k)terminate, amend or otherwise modify any Employee Benefit Plan or Other Plan, except for amendments required to comply with applicable Legal Requirements or as requested by Buyer.

38

5.04. Employee Matters.

(a) Subject to the exclusions set forth in this Section 5.04, Buyer may communicate (after consulting with management of S&W) with any employees of any Seller and may offer, or cause its Affiliates to offer, to employ as of the Closing Date all active employees of Sellers working at the Business on the Closing Date to whom Buyer, in its sole discretion, may choose to make offers of employment, all in the manner and upon terms and conditions of employment which are generally comparable to similarly situated employees of Buyer. It is the intent of Buyer to make offers of employment to substantially all of Sellers' operating employees. Employees employed under Employee Agreements in place as of March 31, 2000 or authorized as set forth on Schedule 5.04 (the "Employee Agreements") will not be offered employment pursuant to this Section 5.04, but such Employee Agreements shall become Assumed Contracts whether or not the employees employed thereunder become employed by Buyer or any of its Affiliates and employment of any employees employed thereunder by Buyer or any of its Affiliates shall be governed by the terms of the Assumed Contracts relating to such employees. Buyer shall give all Hired Employees credit for their vacation and holiday accumulations to the extent the same constitute Assumed Liabilities. Sellers acknowledge that all employment offers are subject to the satisfactory completion by Buyer of its customary employee background checks. Nothing contained in this Section 5.04 or elsewhere in this Agreement shall be deemed to limit or otherwise affect in any manner the right of Buyer or any Affiliate of Buyer to terminate at will the employment of any Hired Employee (except as otherwise provided in Assumed Contracts with such employees). Sellers shall be responsible for and pay any and all liabilities or obligations arising under the WARN Act, if any, arising out of or resulting from layoffs of employees prior to Closing and/or the consummation of the Transaction, and Sellers shall remain liable for any and all costs and expenses associated with continued employment, or termination and severance, of all employees of Sellers other than the Hired Employees and employees with respect to whom Buyer shall assume any liabilities under the Employee Agreements, including any obligation imposed on Sellers or Buyer to provide such employees with continued health, disability, life or other retirement benefits (whether covered by insurance or not). Buyer shall not, at any time prior to 90 days after the Closing Date, without complying fully with the notice and other requirements of the WARN Act, effectuate (i) a "plant closing" as defined in the WARN Act affecting any site of employment or one or more facilities or operating units within any site of employment of the Business; or (ii) a "mass layoff" as defined in the WARN Act affecting any site of employment of the Business; or any similar action under applicable state or foreign law requiring notice to employees in the event of a plant closing or layoff. In addition, Buyer hereby agrees to indemnify and hold Sellers harmless from and against any and all claims, losses, damages, expenses, obligations and liabilities (including costs of collection, attorney's fees and other costs of defense) which Sellers may incur in connection with any suit or claim of violation brought against Sellers under the WARN Act or any similar state or foreign law, which relates to actions taken by Buyer after the Closing Date with regard to any site of employment or one or more facilities or operating units within any site of employment of the Business.

(b) Buyer shall as of the Closing Date assume the sponsorship of the Retirement Plans (but not any other Employee Benefit Plan listed on Schedule 3.20(a)), and in connection therewith shall assume all responsibility for the administration of such plans and their assets and liabilities. Buyer shall be responsible for all contributions to the Retirement Plans (but not any

Execution Copy

other Employee Benefit Plan listed on Schedule 3.20(a)), due after the Closing Date. Buyer shall arrange effective as of the Closing Date to enter into appropriate agreements or modify existing agreements with trustees and other vendors providing services to the Retirement Plans.

(c)Buyer and Sellers agree to negotiate in good faith with respect to certain additional terms of employment for Hired Employees relating to eligibility and participation (including recognition of S&W service) in the Employee Benefit Plans of Buyer and the disposition of benefits under the Employee Benefit Plans of Sellers.

5.05.Access to and Provision of Additional Information.

(a)From the Effective Date until the Closing Date, Sellers shall cooperate fully with Buyer and Buyer's representatives in connection with Buyer's due diligence investigation of the prospects, business, assets, Contracts, rights, liabilities and obligations of Sellers and the Business, and shall provide to Buyer and Buyer's representatives full and complete access to and the right to inspect the Business, any facilities associated with or used in the Business, the Assets, and books and records of Sellers relating to Sellers, the Assets and the Business, and will furnish to Buyer all material information concerning Sellers, the Assets and the Business not otherwise disclosed pursuant to this Agreement, all pleadings and other documents or schedules filed with the Bankruptcy Court, access to Sellers' files and other records regarding claims, actions, suits, litigation, arbitration, mediations, investigations and other proceedings pending against or otherwise affecting any Seller, the Assets or the Business, and such additional financial, operating and other data and information regarding the Business as Buyer may from time to time reasonably request, without regard to where such information may be located. In addition, each Seller shall use its respective best efforts to cause its agents, representatives, employees, officers, directors, vendors, suppliers, and customers to cooperate with Buyer and Buyer's representatives in connection with Buyer's due diligence review as it relates to any Contracts between any such vendors, suppliers, and customers and any Seller.

(b)From the Effective Date until the Closing Date, Sellers shall cause their respective officers and employees to confer on a regular and frequent basis with one or more representatives of Buyer and to answer Buyer's questions regarding matters relating to the conduct of the Business and the status of the Transaction. Sellers shall notify Buyer in writing of any material changes in the operations, financial condition or prospects of the Business and of any complaints, investigations, hearings or adjudicatory proceedings (or communications indicating that the same may be contemplated) of any Person and shall keep Buyer reasonably informed of such matters.

(c)The exercise by Buyer of any right of access granted herein shall not materially interfere with the business operations of Sellers.

(d)Except as provided in Article 8, each Party shall be responsible for its own costs and expenses incurred pursuant to this Section 5.05.

A401

Execution Copy

5.06. Post-Closing Maintenance of and Access to Information.

(a) The parties acknowledge that after Closing each party may need access to information or documents in the control or possession of another party for the purposes of concluding the transactions herein contemplated, Tax Returns or audits, the Assumed Contracts and other Legal Requirements, and the prosecution or defense of third party claims. Accordingly, each party shall keep, preserve and maintain in the ordinary course of business, and as required by Legal Requirements and relevant insurance carriers, all books, records, documents and other information in the possession or control of such party and relevant to the foregoing purposes at least until the expiration of any applicable statute of limitations or extensions thereof.

(b) Each party shall cooperate fully in connection with, and make available for inspection and copying by, the other party, its employees, agents, counsel and accountants and/or Governmental Authorities, upon written request and at the expense of the requesting party, such books, records documents and other information to the extent reasonably necessary to facilitate the foregoing purposes. In addition, each party shall cooperate with, and shall permit and use its best efforts to cause, at the expense of the requesting party, its respective former and present directors, officers and employees to cooperate with, the other party on and after Closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the subject matters of this Agreement and pertaining to periods prior to the Closing Date.

(c) Sellers shall be entitled to remove from the Business, at Sellers' sole risk and expense, any records that relate to events or periods prior to Closing for purposes of pending litigation involving matters to which such records refer, as certified in writing prior to removal by counsel retained by Sellers in connection with such litigation. Any records so removed shall be promptly returned to Buyer following their use by Sellers.

(d) The exercise by either party of any right of access granted herein shall not materially interfere with the business operations of the other party.

5.07. Governmental Authority Approvals: Consents to Assignment.

(a) From the Effective Date until the Closing Date, each Seller and Buyer shall (i) promptly apply for and use its respective commercially reasonable efforts to obtain prior to Closing all consents, approvals, authorizations and clearances of Governmental Authorities required of it to consummate the transactions contemplated hereby, (ii) provide such information and communications to Governmental Authorities as the other party or such Persons may reasonably request, and (iii) assist and cooperate with other parties to obtain all Permits and clearances of Governmental Authorities that the other parties reasonably deem necessary or appropriate, and to prepare any document or other information reasonably required of it by any such Persons to consummate the transactions contemplated herein; provided, however, that, notwithstanding the foregoing, no party shall have any obligation under such provisions (x) to pay any cash amounts to Governmental Authorities other than filing fees, or (y) to agree to divest assets or limit the operations of its businesses.

41

A402

(b)From the Effective Date until the Closing Date, each of the parties shall file, if and to the extent required by law, all reports or other documents required or requested by Governmental Authorities under the HSR Act concerning the purchase and sale of the Assets and comply promptly with any requests by the Governmental Authorities for additional information concerning the purchase and sale of the Assets, so that the waiting period specified in the HSR Act with respect to those Assets will expire as soon as reasonably possible after the Effective Date. Each of the parties shall furnish to the other parties such information as the other parties reasonably require to perform their obligations under the HSR Act and shall exchange drafts of the relevant portions of each other's report forms prior to filing.

(c)Sellers shall (i) obtain Bankruptcy Court approval of the assumption by and assignment to Buyer of the Assumed Contracts and (ii) obtain all other consents, approvals and novations required to assign the Assumed Contracts to Buyer.

(d)    In the event that any and all novations, transfer or other agreements, consents, approvals or waivers necessary for the assignments, transfer or novation of any Assumed Contracts, or any claim, right or benefit arising thereunder or resulting therefrom, shall not have been obtained prior to the Closing Date, then as of the Closing, this Agreement, to the extent permitted by law, shall constitute full and equitable assignment by Sellers to Buyer of all of Sellers' right, title and interest in and to, and all of Sellers' obligations and liabilities under, such Assumed Contracts, and Buyer shall be deemed Sellers' agent for the purpose of completing, fulfilling and discharging all of Sellers' liabilities under any such Assumed Contracts. The Parties shall take all necessary steps and actions to provide Buyer with the benefits of such Assumed Contracts, and to relieve Sellers of the performance and other obligations thereunder, including entry into subcontracts for the performance thereof. Buyer agrees to pay, perform and discharge, and indemnify Sellers against and hold Sellers harmless from, all obligations and liabilities of Sellers relating to such performance or failure to perform under such Assumed Contracts after the Closing Date, in accordance with the provisions of Article 9 of this Agreement.

(e)    In the event Sellers shall be unable to make the equitable assignment described in Section 5.07(d), or if such attempted assignment would give rise to any right of termination, or would otherwise adversely affect the rights of Sellers or Buyer under such Assumed Contracts, or would not assign all Sellers' rights thereunder at the Closing, Sellers and Buyer shall continue to cooperate and use all reasonable efforts to provide Buyer with all such rights. To the extent that any such consents and waivers are not obtained, or until the impediments to such assignment are resolved, Sellers shall use all reasonable efforts (without the expenditure, in the aggregate, of any material sum) to (i) provide to Buyer, at the request of Buyer, the benefits of any such Assumed Contract to the extent related to the Business or the Assets, (ii) cooperate in any lawful arrangement designed to provide such benefits to Buyer and (iii) enforce, at the request of and for the account of Buyer, any rights of Sellers arising from any such Assumed Contracts against any third Person (including any Governmental Authority) including the right to elect to terminate in accordance with the terms thereof upon the advice of Buyer. To the extent that Buyer is provided the benefits of any Assumed Contract referred to herein (whether from Sellers or otherwise), Buyer shall perform at the reasonable direction of Sellers and for the benefit of any third Person (including any Governmental Authority) the obligations of Sellers thereunder or in

42

connection therewith, and Buyer agrees to pay, perform and discharge, and indemnify Sellers against and hold Sellers harmless from, all obligations and liabilities of Sellers relating to such performance or failure to perform, after the Closing Date, in accordance with the provisions of Article 9 of this Agreement.

### 5.08. Noncompetition.

(a) For a period of five years from and after the Closing Date, except and solely to the extent as is required to perform any Rejected Contracts assumed pursuant to Section 5.16(b) or Completed Contracts, no Seller shall, directly or indirectly, in any capacity:

(i) own, lease, manage, operate, control, participate in the management or control of, be employed by, or maintain or continue any interest whatsoever in any enterprise engaged in any business competitive with the Business; or

(ii) employ or solicit the employment of any Hired Employee unless (x) such employee resigns voluntarily (without any solicitation from Sellers), (y) Buyer consents in writing to such employment or solicitation, or (z) such employee is terminated by Buyer after the Closing Date; or

(iii) induce, cause or attempt to induce or cause any Person to replace or terminate any Contract relating to the Business with products or services of any other Person at any time after the Closing Date.

(b) Each Seller acknowledges and agrees that any remedy at law for any breach of this Section 5.08 would be inadequate and consents to the granting by any court of an injunction or other equitable relief, without the necessity of actual monetary loss being proved, in order that a breach or threatened breach of this Section may be effectively enjoined.

5.09. Use of Names. From and after Closing, Sellers shall not use any of the names acquired pursuant to this Agreement or any variation of the foregoing in the conduct of any of their businesses, except as is required in or in connection with the Bankruptcy Cases and except and solely to the extent as is required to perform any Rejected Contracts assumed pursuant to Section 5.16(b) or Contracts subject to Section 5.07(d) and Section 5.07(e).

5.10. Allocation of Equity Purchase Price for Tax Purposes. Sellers and Buyer agree that, for tax purposes, the Equity Purchase Price shall be allocated among the Assets as Buyer may determine, in accordance with their fair market values consistent with Section 1060 of the Code, and such allocation shall be binding upon the parties for all applicable federal, state, local and foreign Tax purposes. Sellers and Buyer covenant to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation on all Tax Returns filed by any of them after Closing and not to voluntarily take any inconsistent position therewith in any administrative or judicial proceeding relating to such returns. Sellers and Buyer shall exchange mutually acceptable and completed IRS Forms 8594 (including supplemental forms, if required), which they shall use to report the transaction contemplated hereunder to the Internal Revenue Service in accordance with such allocation. Notwithstanding anything to the contrary, no allocation hereunder shall supersede or otherwise usurp the jurisdiction of the Bankruptcy Court to value

43

the assets for purposes of distribution to the respective Sellers' estates under the Bankruptcy Code.

5.11.Further Acts and Assurances.  At any time and from time to time at and after the Closing, upon request of Buyer, each Seller shall do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as Buyer may reasonably request to more effectively convey, assign and transfer to and vest in Buyer, its successors and assigns, full legal right, title and interest in and actual possession of the Assets and the Business, to confirm such Seller's capacity and ability to perform its pre-Closing and post-Closing covenants and agreements under this Agreement, and to generally carry out the purposes and intent of this Agreement.  Each Seller shall also furnish Buyer with such information and documents in its possession or under its control, or which such Seller can execute or cause to be executed, as will enable Buyer to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Assets and the Business.

5.12.Costs and Expenses.

(a)Except as otherwise expressly set forth in this Agreement, all expenses of the negotiation and preparation of this Agreement and related to the Transaction, including legal counsel, accounting, brokerage and investment advisor fees and disbursements, shall be borne by the respective Party incurring such expense, whether or not the Transaction is consummated. Sellers shall be responsible for paying any allowed fees and expenses of Lazard Freres & Co. LLC and Goldman Sachs & Co. in connection with the transactions contemplated by this Agreement.

(b)Buyer shall pay the cost of Buyer's owner's title insurance policies described in Section 7.05, and Sellers shall pay the cost of removing Encumbrances that are not Permitted Real Property Encumbrances.  Buyer shall pay the cost of Buyer's land title surveys of the Real Property, and environmental, engineering and other professional studies undertaken by Buyer.

(c)In the event any Party elects to incur legal fees or expenses to enforce or interpret any provision of this Agreement and subject to any required approvals of the Bankruptcy Court, the prevailing Party will be entitled to recover such legal fees and expenses, including attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such Party shall be entitled.

5.13.Insurance Ratings.  From the Effective Date until the Closing Date, Sellers will take all actions reasonably requested by Buyer to enable Buyer to succeed to the Workers' Compensation and Unemployment Insurance ratings, insurance policies, deposits and other interests of Sellers and the Business for insurance or other purposes.  Buyer shall not be obligated to succeed to any such rating, insurance policy, deposit or other interest, except as it may elect to do so.

5.14.Fulfillment of Conditions.  Each party will execute and deliver at Closing each agreement, instrument or other document that such party is required by this Agreement to

44

execute and deliver as a condition to Closing, and will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each other condition to the obligations of the parties contained in this Agreement, to the extent that satisfaction of such condition is within the control of such party.

5.15. Release of Encumbrances. Except as set forth in this Agreement or in the Sale Order, Sellers shall cause all Encumbrances other than the Permitted Real Property Encumbrances to be released and discharged at or prior to Closing, which Encumbrances, as to Sellers that have filed Bankruptcy Cases, may be released and discharged by the Bankruptcy Court in the Sale Order.

5.16. Assumed and Assigned Contracts; Rejected Contracts.

(a) Assumed Contracts. Subject to the approval of the Bankruptcy Court and pursuant to the Executory Contract Assumption and Assignment Order, the Assumed Contracts, including the Employee Agreements, will be assumed by Sellers and assigned to Buyer or Buyer's designee on the Closing Date under Section 365 of the Bankruptcy Code. Sellers shall, consistent with their current financial condition and the Bankruptcy Cases, use their respective best efforts to promptly comply with and perform any obligations under the Assumed Contracts arising from and after the Effective Date and through the Closing Date. In the Sale Motion, or in such additional or subsequent motions as may be appropriate, Sellers will seek authority to assume and assign the Assumed Contracts to Buyer (or Buyer's designee) in accordance with Section 365 of the Bankruptcy Code. All Assumed Contracts shall be assigned to and assumed by Buyer (or Buyer's designee) at Closing. Subject to the following right of Sellers to reject any Contract, the final determination of which Contracts Sellers will assume and assign to Buyer shall be within the sole discretion of Buyer.

(b) Rejected Contracts. Schedule 5.16(b) contains the schedule of Rejected Contracts. Subsequent to the Court's approval of this Agreement and prior to Closing, Sellers shall consult with Buyer about any Contract Sellers seek to reject and consider in good faith Buyer's opinions on any such rejection, in recognition of Buyer's bona fide interest in preserving to the maximum extent possible the Contracts which Buyer believes are reasonably necessary to the continued operation and financial viability of the Business after Closing, but Sellers shall have the right in their discretion to reject any Contract which in their judgment Sellers believe must be rejected to maintain the viability of the Business prior to the Closing Date or to comply with any order of the Bankruptcy Court. In addition, subject to the approval of the Bankruptcy Court and after receipt of Buyer's prior written consent (which shall not be unreasonably withheld), Sellers may assume any Rejected Contract if the total cost of completing such Rejected Contract would be materially less costly than the reasonably anticipated damages that would be payable by Sellers in connection with a claim for material breach of such Rejected Contract. In the event that Sellers should assume any such Rejected Contract, Buyer shall grant Sellers a non-exclusive, royalty-free license to use or exploit those items constituting Intellectual Properties as may be reasonably necessary to perform such Rejected Contract assumed by Sellers pursuant to this Section 5.16(b) and the Completed Contracts.

A406

# EXHIBIT D – Part II

### 5.17. Bankruptcy Court Approval.

(a) Sellers shall use their respective best efforts to obtain the Sale Order which, among other things, (i) determines that this Agreement was proposed by Buyer in good faith and represents the highest and best offer for the Assets and should be approved, (ii) determines that Buyer is a good faith purchaser under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated, (iii) authorizes and directs Sellers to assume this Agreement and sell the Assets to Buyer pursuant to this Agreement and Sections 363 and 365 of the Bankruptcy Code, free and clear of all liens, claims, interests, liabilities and Encumbrances (including any and all "interests" in the Assets within the meaning of Section 363(f) of the Bankruptcy Code), other than the Assumed Liabilities and the Permitted Real Property Encumbrances, such that Buyer shall not incur any liability as a successor to the Business, (iv) authorizes and directs Sellers to execute, deliver, perform under, consummate and implement, this Agreement, together with all additional instruments and documents, including the Indemnity Escrow Agreement, that may be reasonably necessary or desirable to implement the foregoing; (v) authorizes claims and recourse by Buyer against the Indemnity Deposit for any reason set forth in Section 9.01, including breach of any representation and warranty of S&W in this Agreement, regardless of whether such breach relates to Assets owned or leased by S&W or any other Seller (regardless of whether such other Seller is a debtor in the Bankruptcy Cases), (vi) authorizes claims and recourse by Buyer against the LC Deposit as provided in the Indemnity Escrow Agreement and (vii) determines that Buyer is not a successor to Sellers or otherwise liable for any Excluded Liability and permanently enjoins each and every holder of an Excluded Liability from commencing, continuing or otherwise pursuing or enforcing any remedy, claim or cause of action against Buyer relative to such Excluded Liability.

(b) Sellers shall obtain the Executory Contract Assumption and Assignment Order.

(c) Sellers shall promptly make any filings, take all actions, and use their respective best efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the Transaction, subject to their obligations to comply with any order of the Bankruptcy Court.

(d) In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Order or the Executory Contract Assumption and Assignment Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer within one business day a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(e) Buyer shall cooperate in providing such information and evidence as is necessary to obtain the orders described in this Section 5.17.

### 5.18. Transfer Taxes.

In accordance with Section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be in contemplation of a plan or plans of reorganization

to be confirmed in the Bankruptcy Cases, and as such shall be free and clear of any and all transfer Tax, stamp Tax or similar Taxes. The instruments transferring the Assets to Buyer shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the District of Delaware, in contemplation of a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(c)."

In the event real estate transfer Taxes are required to be paid in order to record the deeds to be delivered to Buyer in accordance herewith, or in the event any such Taxes are assessed at any time thereafter, such real estate transfer Taxes incurred as a result of the transactions contemplated hereby shall be paid by Buyer. In the event sales, use or other transfer Taxes are assessed at Closing or at any time thereafter on the transfer of any other Assets, such Taxes incurred as a result of the transactions contemplated hereby shall be paid by Sellers.

5.19.Listing Application. Within 30 days following the Closing, Buyer shall make an application to list the shares of Common Stock comprising the Share Consideration on the New York Stock Exchange and shall execute and deliver such further documents or instruments and take such further actions necessary to consummate such listing expeditiously.

5.20.Bankruptcy Filings. From and after the Effective Date until the Closing Date, Sellers shall deliver to Buyer (a) copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that Sellers file in the Bankruptcy Cases within a reasonable time after filing, but with respect to any such papers that relate, in whole or in part, to this Agreement, the Transaction, or Buyer, its constituent members or its or their agents or representatives, Sellers shall use all their respective reasonable efforts to provide such prior notice as may be reasonable under the circumstances before the filing of such papers and (b) copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in the Bankruptcy Cases.

5.21.Non-Solicitation. From and after the Effective Date, neither Sellers nor any of their respective directors, employees, accountants, attorneys, or other agents or representatives shall directly or indirectly solicit or enter into discussions regarding, or respond to any inquiries or proposals for, a Competing Proposal.

5.22.Tail Insurance. On or prior to the Closing (unless waived by Buyer), Sellers shall purchase and obtain a three-year extended claims reporting provision for all primary and excess insurance policies in force as of the Effective Date which cover any Seller and each employee of any Seller (or for which Seller otherwise has an obligation to provide such insurance) and which are written on a claims made insuring agreement. At the election of Buyer, Sellers shall designate Buyer and other Persons reasonably designated by Buyer as additional named insureds with respect to all such policies except for Sellers' directors and officers, fiduciary duty and wrongful termination policies, and, to the extent such designation requires additional premiums, Buyer shall pay such additional premiums.

47

5.23. <u>Other Agreements</u>.  Buyer agrees, upon request by Sellers, to (a) complete, on behalf of any Seller, any Rejected Contracts assumed by Sellers pursuant to <u>Section 5.16(b)</u> and (b) perform any warranty work relating to any Completed Contract, in each case pursuant to the Time & Material Agreement.

5.24. <u>Temporary Space</u>.  From and after the Closing Date, Buyer agrees, for so long as Buyer occupies the office space utilized as of the Effective Date by S&W in Boston, Massachusetts, to provide S&W with temporary office space at such location in a reasonable amount to be agreed between Buyer and S&W, including the use of office furniture, computers and equipment at no rent; <u>provided, however</u>, that S&W shall be responsible for and shall reimburse Buyer for S&W's pro rata share of utilities, operating maintenance, insurance and real property taxes.

5.25. <u>Schenectady Lease</u>.  Buyer and Sellers shall negotiate in good faith a lease by Buyer of the space comprising a part of the real property, located in Schenectady, New York and set forth on <u>Schedule 2.02(d)</u>, currently used by Sellers' Power Technologies Group, which lease shall be at fair market rental rates for an initial two year period with options to renew for additional periods.

5.26. <u>Representation, Warranties and Covenants of Certain Subsidiaries</u>.  Each of Stone & Webster Engineering Limited, an English limited company, Stone & Webster Group Limited, an English limited company, Stone & Webster Construction Limited, an English limited company, Stone & Webster Services Limited, an English limited company, Stone & Webster Engineering and Field Services Limited, an English limited company, Stone & Webster Management Consultants Limited, an English limited company, Stone & Webster Services SDN BHD, a Malaysian limited company, Stone & Webster Anadolu Mohendislik Ltd. Sirketi, a Turkish limited company, and Stone & Webster Canada Limited, a company incorporated under the federal laws of Canada, joins this Agreement for purposes severally of providing the representations, warranties and covenants stated in this <u>Section 5.26</u>.  Each of the companies listed in this <u>Section 5.26</u> is a directly or indirectly wholly owned subsidiary of S&W and each shall constitute a "Foreign Subsidiary" for purposes of this <u>Section 5.26</u> and as a "Subsidiary" or "Seller" for all other purposes of this Agreement as applicable.  Nothing set forth herein shall limit or replace any other provision of this Agreement, it being the intention of the parties that the provisions of this <u>Section 5.26</u> are in addition to and not in substitution for any other provision of this Agreement.  Each Foreign Subsidiary hereby severally represents, warrants and covenants as to itself to Buyer as follows:

(a) <u>Adherence</u>.  The Board of Directors of such Foreign Subsidiary has reviewed the terms of this Agreement and acknowledges that part of the consideration payable hereunder by Buyer relates to assets of such Foreign Subsidiary.  Such Foreign Subsidiary warrants that the directors have determined that the terms of this Agreement as they relate to such Foreign Subsidiary are in the best interests of such Foreign Subsidiary and that such Foreign Subsidiary has chosen freely to join this Agreement for all such purposes hereunder as are applicable to such Foreign Subsidiary and its assets.

(b)    Apportionment of Consideration. Such Foreign Subsidiary covenants that it will agree to the apportionment and application of the consideration to be paid by Buyer to S&W pursuant to this Agreement in respect of the assets of such Foreign Subsidiary that are to be sold to Buyer hereunder; provided, however, that the consideration to be allocated to such Foreign Subsidiary must be paid to or effectively credited to such Foreign Subsidiary under governing financial accounting practices and, provided further, that such Foreign Subsidiary shall not be obligated to convey an asset if the consideration to be paid in respect of the asset is determined by its directors acting in good faith to be manifestly unfair to such Foreign Subsidiary or otherwise to constitute less than fair value for such asset and such determination by the Board of Directors is supported by the determination of a firm of independent chartered accountants selected by such Foreign Subsidiary and Buyer for such purpose.

(c)    Solvency. Such Foreign Subsidiary is solvent (under the law applicable to such Foreign Subsidiary) as of the date hereof and will immediately following Closing be solvent.

(d)    Pension Plans. If Buyer should become liable under any applicable law to succeed to employment obligations of such Foreign Subsidiary and if such Foreign Subsidiary is a sponsor or employer under a pension plan on the date hereof, then such Foreign Subsidiary covenants that it will exercise its best efforts to complete agreement with Buyer at Buyer's election so as to ensure that Buyer, in its capacity of employer or sponsor of such plan, succeeds to the full benefit of such pension plan (including any funding surplus) in any agreement between such Foreign Subsidiary and Buyer pursuant to which Buyer or its designee elects to succeed to such Foreign Subsidiary's rights and obligations under or in respect of such pension plan.

(e)    Cooperation. Such Foreign Subsidiary, subject to the provisos of Section 5.26(b), will provide its full and complete cooperation in the completion of the sale or transfer of those of its assets to be sold or transferred to Buyer or for its benefit pursuant to the terms of this Agreement so as to vest irrevocable and unencumbered title to all such assets in Buyer or its designee. In furtherance hereof, such Foreign Subsidiary agrees to take all such actions as a Seller as are specified in Section 5.11.

5.27    Jacobs Credit Agreement. Buyer shall refinance or purchase from Jacobs all advances outstanding (including any costs and expenses due) under the Jacobs Credit Agreement within one business day after entry by the Bankruptcy Court of the Sale Order.

5.28    Canadian Transfer.

(a)    The Canadian Assets are included in the Assets. Sellers agree to use best efforts to transfer the Canadian Assets to Buyer as soon as practicable.

(b)    Buyer shall not transfer the Canadian Consideration to Sellers, and Buyer shall not assume the Canadian Liabilities, unless and until Sellers shall make a legal, valid and effective transfer of the Canadian Assets to Buyer (the "Canadian Transfer"). Notwithstanding anything contained in this Agreement to the contrary, until the Canadian Transfer: (i) the Cash Consideration, the Share Consideration and the Aggregate Consideration shall not include the Canadian Consideration, (ii) the Canadian Assets shall be Excluded Assets and (iii) the Canadian

49

A411

Liabilities shall be Excluded Liabilities. Notwithstanding anything contained in this Agreement to the contrary, upon the Canadian Transfer: (x) the Cash Consideration, the Share Consideration and the Aggregate Consideration shall include the Canadian Consideration, (y) the Assets shall include the Canadian Assets and (z) the Assumed Liabilities shall include the Canadian Liabilities. This Section 5.28(b) does not relieve Sellers of their obligations and liabilities under Section 5.28(a) and Section 5.28(c).

(c)    If Sellers do not transfer the Canadian Assets to Buyer or if Buyer must pay amounts in excess of the Canadian Consideration to acquire the Canadian Assets, then Buyer shall have a claim or claims against Sellers under the Agreement for the value of the Canadian Assets not transferred and/or such additional amounts paid (a "Canadian Transfer Claim"), which can be satisfied out of the Canadian Consideration, and if the Canadian Consideration is not sufficient to satisfy such claim, the Canadian Transfer Claim in excess of the Canadian Consideration shall have an administrative priority in Sellers' estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

The parties reserve their right to dispute the appropriate amount of the Canadian Transfer Claim, if any. The amount of the Canadian Consideration shall not be evidence for either party of the appropriate amount of such claim, nor shall it be evidence of the amount of the overall purchase price attributable to the Canadian Assets.

If the Canadian Transfer does not occur, then the parties shall attempt to agree upon the amount of the Canadian Transfer Claim; if they cannot agree, then they shall submit the matter to the Bankruptcy Court for resolution. If the Canadian Transfer does not occur, for purposes of calculating the Adjustment Amount, the Canadian Assets attributable to Completed Contracts and Rejected Contracts shall not be deemed to be Adjustment Assets and the Canadian Liabilities shall not be deemed to be Adjustment Liabilities.

(d)    No Seller nor any Affiliate of any Seller (including any officer or director of any Seller or any Affiliate of any Seller) shall acquire, bid for or otherwise seek to acquire, or assist (except as may be required under Canadian bankruptcy law) any other party in any way in connection with the acquisition, bidding for or attempt to acquire, the Canadian Assets. Sellers shall be liable to Buyer for any out-of-pocket losses, costs or expenses actually incurred by Buyer as a result of a breach of this Section 5.28(d).

6.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers hereunder are subject to the satisfaction on or prior to the Closing Date of the following conditions, unless waived in writing by Sellers:

6.01.    Representations and Warranties; Covenants.

(a)    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Effective Date and, except where expressly limited to a specific date, on and as of the Closing Date.

A412

(b)     Each and all of the terms, covenants and agreements to be complied with or performed by Buyer on or before the Closing Date shall have been complied with or performed in all material respects, including the obligations of Buyer in Section 8.03.

6.02.   Adverse Actions or Proceedings.   No Governmental Authority shall have taken any action or made any request of Sellers or Buyer as a result of which Sellers reasonably and in good faith deem it inadvisable to proceed with the Transaction, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the Transaction.

6.03.   Pre-Closing Confirmations.   Sellers shall have obtained or received from Buyer documentation or other evidence reasonably satisfactory to Sellers that Sellers and Buyer have received or will receive all consents, approvals, authorizations and clearances of Governmental Authorities required to consummate the transactions contemplated hereby and that all applicable waiting periods under the HSR Act have expired.

6.04.   Approval, Execution and Delivery of Additional Agreements.   The Registration Rights Agreement, the Indemnity Escrow Agreement and the Time & Material Agreement shall be approved by the Bankruptcy Court and executed and delivered by Buyer.

6.05.   Opinion of Buyer's Counsel.   Sellers shall have received an opinion or opinions from counsel to Buyer dated as of the Closing Date and addressed to Sellers, substantially in the form attached as Exhibit A.   In rendering such opinion, such counsel may rely upon certificates of governmental officials and may place reasonable reliance upon certificates of officers of Buyer.

6.06.   No Buyer Material Adverse Change.   No event shall have occurred that shall have had a Buyer Material Adverse Effect.

7.   CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless waived in writing by Buyer:

7.01.   Representations and Warranties; Covenants.

(a)     Each of the representations and warranties of each Seller contained in this Agreement shall be true, complete and correct in all material respects on and as of the Effective Date (except with respect to representations and warranties that require or reference a Schedule; which shall be deemed to have been made and delivered as of the Effective Date) and, except where expressly limited to a specific date, on and as of the Closing Date.

(b)     Each and all of the terms, covenants and agreements to be complied with or performed by each Seller on or before the Closing Date shall have been complied with or performed in all material respects, including the obligations of Sellers in Section 8.02.

7.02.   Pre-Closing Confirmations and Contractual Consents.   Buyer shall have obtained or received from Sellers documentation or other evidence reasonably satisfactory to Buyer that:

Execution Copy

(a)    Sellers and Buyer have received all consents, permits, approvals, authorizations and clearances of Governmental Authorities required to consummate the transactions herein contemplated;

(b)    the Sale Order and the Executory Contract Assumption and Assignment Order have been entered by the Bankruptcy Court and have become Final Orders, unless Buyer, in its sole discretion, waives the requirement that one or more of these Orders be a Final Order; provided, however, that, if Buyer waives this requirement and closes prior to Final Orders, Sellers shall use their best efforts, at their expense, to provide Buyer with Final Orders, including moving to dismiss any appeals for mootness;

(c)    Sellers have obtained consents to assignment of the Assumed Contracts set forth on Schedule 7.02(c);

(d)    Buyer has obtained such other consents and approvals as may be legally or contractually required for Buyer's consummation of the transactions described herein; and

(e)    all applicable waiting periods under the HSR Act have expired.

7.03.    Adverse Actions or Proceedings.  No Governmental Authority shall have taken any action or made any request of Sellers or Buyer as a result of which Buyer reasonably and in good faith deems it inadvisable to proceed with the Transaction, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the Transaction.

7.04.    Operations; No Material Adverse Effect.  No event shall have occurred which has had a Material Adverse Effect and there shall have been no material adverse change in the financial markets generally.

7.05.    Title Insurance Policies and Surveys.  Buyer shall have received:

(a)    commitments from a title insurance company or companies designated by Buyer to issue as of the Closing Date one or more ALTA extended coverage owner's title insurance policies for the Real Property, in amounts acceptable to Buyer, in form satisfactory to Buyer and with such endorsements as Buyer may require; and

(b)    ALTA surveys of the Real Property and improvements thereon, in form satisfactory to Buyer and the title insurance company, from an engineering firm designated by Buyer and certified to Buyer, the title insurance company and such other Persons as Buyer may designate.

7.06.    Opinion of Sellers' Counsel.  Buyer shall have received an opinion or opinions from counsel to Sellers dated as of the Closing Date and addressed to Buyer, substantially in the form attached as Exhibit B.  In rendering such opinion, such counsel may rely upon certificates of governmental officials and may place reasonable reliance upon certificates of officers of Sellers.

A414

7.07.  <u>Deliveries at Closing</u>.  Sellers shall have delivered to Buyer, in form reasonably acceptable to Buyer and approved by Buyer's counsel, deeds, bills of sale, assignments or other instruments of transfer, and estoppels, consents and waivers by others, necessary or appropriate to transfer to and effectively vest in Buyer the Assets and all agreements, instruments, certificates or other documents contemplated or required to be executed by any Seller pursuant to this Agreement.

7.08.  <u>Lien Searches</u>.  Sellers shall have delivered to Buyer UCC lien searches showing all Encumbrances on the Assets, accompanied by fully executed UCC or other releases or conveyances relating to all Encumbrances that are not Permitted Real Property Encumbrances.

7.09.  <u>Approval, Execution and Delivery of Additional Agreements</u>.  The Registration Rights Agreement, the Indemnity Escrow Agreement and the Time & Material Agreement shall be approved by the Bankruptcy Court and executed and delivered by Sellers.

8.  <u>CLOSING: TERMINATION OF AGREEMENT</u>

8.01.  <u>Closing</u>.

(a)  Consummation of the sale and purchase of the Assets and the Business and the other transactions contemplated by and described in this Agreement (the "<u>Closing</u>") shall take place at the offices of Fulbright & Jaworski L.L.P., 1301 McKinney, Suite 5100, Houston, Texas at 10:00 a.m. on the first business day following satisfaction or waiver of the conditions set forth in <u>Article 6</u> and <u>Article 7</u>, or at such time or place as the parties may mutually agree.  Unless otherwise agreed in writing by the parties at Closing, the Closing shall be effective for accounting purposes as of 12:01 A.M. on the day following the Closing Date.

(b)  At the Closing, Buyer may designate one or more Affiliates to take title to the Assets, and references to instruments or agreements to be executed and delivered to or by Buyer in this Agreement at Closing shall apply to each such designee with respect to the Assets acquired by it.  Buyer shall notify Sellers prior to Closing of the names of such designees and, from and after Closing, the rights, privileges and benefits of this Agreement applicable to Buyer shall benefit each such designee, subject to the terms, covenants and conditions of this Agreement, with respect to the Assets acquired by it.

8.02.  <u>Action of Sellers at Closing</u>.  At the Closing unless otherwise waived in writing by Buyer, Sellers shall deliver:

(a)  to Buyer deeds containing general warranties of title, fully executed by Sellers in recordable form, conveying to Buyer good and marketable fee title to the Real Property, free and clear of all Encumbrances other than the Permitted Real Property Encumbrances;

(b)  to Buyer bills of sale and assignment, fully executed by Sellers, in form and substance acceptable to Buyer, conveying to Buyer good and valid title to all Assets other than the Real Property, free and clear of all Encumbrances;

(c)     to Buyer assignments, fully executed by Sellers, in form and substance acceptable to Buyer, conveying Sellers' interests in the Assumed Contracts to Buyer;

(d)     to Buyer the Indemnity Escrow Agreement, fully executed by S&W;

(e)     to Buyer the Registration Rights Agreement, fully executed by each Seller;

(f)     to Buyer the Time & Material Agreement, fully executed by Sellers;

(g)     to Buyer copies of resolutions or equivalent instruments duly adopted by the governing body of each Seller and, if required, the partners or members of such Seller, authorizing and approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified as true and in full force and effect as of the Closing Date by the appropriate officers or partners of such Seller;

(h)     to Buyer certificates of the duly authorized President or Vice President or similar officer of each Seller certifying that, except where expressly limited to a specific date, each of the representations and warranties of each Seller contained in this Agreement is true and correct on and as of the Closing Date in all material respects, and that each and all of the terms, covenants and agreements to be complied with or performed by Sellers on or before the Closing Date have been complied with and performed in all material respects;

(i)     to Buyer certificates of incumbency or evidence of appropriate power of attorney for the respective directors or officers of each Seller executing the Agreement and other Closing documents, dated as of the Closing Date;

(j)     to Buyer certificates of existence and good standing from each jurisdiction in which each any Seller is incorporated or organized (and, with respect to any Foreign Seller, only to the extent that the same or equivalent certificates or documents may be obtained in its jurisdiction of organization), each dated the within ten business days prior to Closing;

(k)     to Buyer, appropriate letters or other documentation necessary to transfer and sell the Accounts Receivable to Buyer and to advise the account debtors of such transfer and sale; and

(l)     to Buyer such other instruments, agreements, certificates and documents as Buyer reasonably deems necessary to effect the transactions contemplated hereby.

8.03.    Action of Buyer at Closing.    At the Closing and unless otherwise waived in writing by Sellers, Buyer shall deliver:

(a)     to Sellers the Cash Consideration and the Share Consideration, less the Indemnity Deposit and the LC Deposit;

(b)     to the Escrow Agent the Indemnity Deposit and the LC Deposit in accordance with the Indemnity Escrow Agreement;

A416

(c)    to the extent applicable, to an account under the control of the Massachusetts Court, the Litigation Deposit;

(d)    to Sellers an assumption agreement, fully executed by Buyer, in form and substance reasonably acceptable to Sellers, pursuant to which Buyer shall assume the future payment and performance of the Assumed Liabilities;

(e)    to Sellers the Indemnity Escrow Agreement, fully executed by Buyer;

(f)    to Sellers the Registration Rights Agreement, fully executed by Buyer;

(g)    to Sellers the Time & Material Agreement, fully executed by Buyer;

(h)    to Sellers copies of resolutions duly adopted by the board of directors of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the Transaction, certified as true and in full force and effect as of the Closing Date by an appropriate officer of Buyer;

(i)    to Sellers certificates of the duly authorized President or a Vice President of Buyer certifying that, except as expressly limited to a specific date, each of the representations and warranties of Buyer contained in this Agreement is true and correct on and as of the Closing Date in all material respects, and that each and all of the terms, covenants and agreements to be complied with or performed by Buyer on or before the Closing Date have been complied with and performed in all material respects;

(j)    to Sellers certificates of incumbency for the officers of Buyer executing this Agreement and other Closing documents, dated as of the Closing Date;

(k)    to Sellers certificates of existence and good standing of Buyer from the jurisdiction in which it is incorporated, dated within ten business days date prior to Closing; and

(l)    to Sellers such other agreements, instruments and documents as Sellers reasonably deem necessary to effect the transactions contemplated hereby.

8.04.    Termination Prior to Closing.

(a)    Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, upon notice by the terminating party to the other parties:

(i)    at any time before the Closing, by mutual consent of Buyer and Sellers;

(ii)    at any time before the Closing, by Buyer on the one hand, or S&W on the other hand, in the event of material breach of this Agreement by the non-terminating party or if the satisfaction of any condition to such party's obligations under this Agreement becomes impossible or impracticable with the use of commercially

reasonable efforts and the failure of such condition to be satisfied is not caused by a breach by the terminating party;

(iii)    at any time after September 30, 2000, by S&W or Buyer if the Transaction has not been consummated on or before such date;

(iv)    at any time before the Closing, by Buyer, if any of the following shall occur:

(A)    any of the Bankruptcy Cases is dismissed or converted to chapter 7 of the Bankruptcy Code or a trustee is appointed for any of the Sellers; or

(B)    both the Sale Order and the Executory Contract Assumption and Assignment Agreement shall not have been entered by July 31, 2000.

(b)    If this Agreement is validly terminated pursuant to this Section 8.04, this Agreement will be null and void, and there will be no liability on the part of any party (or any of their respective officers, directors, trustees, employees, agents, consultants or other representatives).

9.    INDEMNIFICATION

9.01.    Indemnification by Sellers.  Subject to and to the extent provided in this Section 9, from and after the Closing, Sellers shall jointly and severally indemnify, defend and hold harmless Buyer's Indemnified Persons, and each of them, from and against any Losses incurred or suffered by Buyer's Indemnified Persons, directly or indirectly, as a result of or arising from:

(a)    any inaccuracy of any representation or warranty of any Seller, whether or not Buyer's Indemnified Persons relied thereon or had knowledge thereof;

(b)    any claims or adjustments arising out of performance of the Assumed Contracts prior to Closing, except to the extent such claims or adjustments constitute an Assumed Liability, and any amount paid under letters of credit called after Closing with respect to any Project Rejected Contracts or financial guarantees in favor of insurance carriers;

(c)    the nonfulfillment of any covenant, agreement or other obligation of any Seller set forth in this Agreement or in any other agreement or instrument delivered by any Seller pursuant to this Agreement; and

(d)    the Excluded Liabilities.

Sellers' obligations under this Section shall have the priority of a claim for the cost of administration in the Bankruptcy Cases under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

9.02.    Sellers' Limitations.  No Seller shall have any liability under Section 9.01 and no claim under Section 9.01 shall:

56

A418

(a)     accrue to any of Buyer's Indemnified Persons against any Seller under <u>Section 9.01(a)</u> unless and until the total liability of Sellers in respect of claims arising under <u>Section 9.01(a)</u> exceeds Two Million Five Hundred Thousand Dollars ($2,500,000) in the aggregate; <u>provided</u>, <u>however</u>, that there shall be no minimum Loss requirement, and liability of Sellers shall arise from and after One Dollar ($1.00) of Losses, in respect of Losses resulting from any Seller's intentional misrepresentation or fraud;

(b)     be made unless notice thereof shall have been given by or on behalf of any of Buyer's Indemnified Persons to Sellers in the manner provided in <u>Section 9.05</u>; or

(c)     be recoverable by Buyer except (i) until a plan of reorganization in the Bankruptcy Cases has become effective or, if the cases are converted to Chapter 7 cases, until each such case is closed, as administrative expenses of Sellers' bankruptcy estates, (ii) against the Indemnity Deposit or the LC Deposit for claims asserted within eighteen months after the Closing Date (unless a longer period is specified in <u>Section 9.06</u> with respect to a representation and warranty), and (iii) pursuant to Buyer's rights of offset and set off in <u>Section 10.11</u>;

<u>provided</u>, <u>however</u>, that all claims for indemnification made by Buyer under this <u>Section 9</u> will survive any termination or expiration described above and be recoverable from the sources described above until such claims shall have been satisfied or otherwise resolved as provided herein.

9.03.     <u>Indemnification by Buyer</u>. Subject to and to the extent provided in this <u>Section 9</u>, from and after the Closing Date, Buyer shall indemnify, defend and hold harmless Sellers' Indemnified Persons, and each of them, from and against any Losses incurred or suffered by Sellers' Indemnified Persons, directly or indirectly, as a result of or arising from:

(a)     any inaccuracy in any representation or warranty of Buyer, whether or not Sellers' Indemnified Persons relied thereon or had knowledge thereof;

(b)     the nonfulfillment of any covenant, agreement or other obligation of Buyer set forth in this Agreement or in any other agreement or instrument delivered by Buyer pursuant to this Agreement; and

(c)     the Assumed Liabilities.

9.04.     <u>Buyer's Limitations</u>. Buyer shall have no liability under <u>Section 9.03</u> and no claim under <u>Section 9.03</u> shall:

(a)     accrue to any of Sellers' Indemnified Persons against Buyer under <u>Section 9.03(a)</u> unless and until the total liability of Buyer in respect of claims arising under <u>Section 9.03(a)</u> exceeds Two Million Five Hundred Thousand Dollars ($2,500,000) in the aggregate; <u>provided</u>, <u>however</u>, that there shall be no minimum Loss requirement, and liability of Buyer shall arise from and after One Dollar ($1.00) of Losses, in respect of Losses resulting from Buyer's intentional misrepresentation or fraud; or

A419

(b)    be made unless notice thereof shall have been given by or on behalf of any of Sellers' Indemnified Persons to Buyer in the manner provided in Section 9.05;

provided, however, that all claims for indemnification made by Sellers under this Section 9 will survive any termination or expiration described above and be recoverable from the sources described above until such claims shall have been satisfied or otherwise resolved as provided herein.

9.05.    Notice and Procedure.    All claims for indemnification by any Indemnified Party against an Indemnifying Party under this Section 9 shall be asserted and resolved as follows:

(a)(i)    If any claim or demand for which an Indemnifying Party would be liable for Losses to an Indemnified Party is alleged or asserted by a Person other than any Buyer's Indemnified Person or any Sellers' Indemnified Person (a "Third Party Claim"), the Indemnified Party shall deliver a Claim Notice with reasonable promptness to the Indemnifying Party, together with a copy of all papers served, if any, and specifying the nature of and alleged basis for the Third Party Claim and, to the extent then feasible, the alleged amount or the estimated amount of the Third Party Claim.    If the Indemnified Party fails to deliver the Claim Notice to the Indemnifying Party within 30 days after the Indemnified Party receives notice of such Third Party Claim, the Indemnifying Party will not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim if and only to the extent that the Indemnifying Party's ability to defend the Third Party Claim has been irreparably prejudiced by such failure.    The Indemnifying Party will notify the Indemnified Party within 30 days after receipt of the Claim Notice (the "Notice Period") whether the Indemnifying Party intends, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against the Third Party Claim.

(ii)    If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party intends to defend the Indemnified Party against the Third Party Claim, then the Indemnifying Party will have the right to defend, at its sole cost and expense, the Third Party Claim by all appropriate proceedings, which proceedings will be diligently prosecuted by the Indemnifying Party to a final conclusion or settled at the discretion of the Indemnifying Party (with the consent of the Indemnified Party).    The Indemnifying Party will have full control of such defense and proceedings; provided, however, that the Indemnified Party may file during the Notice Period, at the sole cost and expense of the Indemnified Party, any motion, answer or other pleading that the Indemnified Party may deem necessary or appropriate to protect its interests and not irrevocably prejudicial to the Indemnifying Party (it being understood and agreed that, except as provided in Section 9.05(a)(iii), if an Indemnified Party takes any such action that is irrevocably prejudicial and conclusively causes a final adjudication that is materially adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations hereunder with respect to that portion of the Third Party Claim prejudiced by the Indemnified Party's action); provided, further, however, that, if requested by the Indemnifying Party, the Indemnified Party shall cooperate, at the sole cost and expense of the Indemnifying Party, with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest or, if appropriate in the

judgment of the Indemnified Party and related to the Third Party Claim, in making any counterclaim or cross-claim against any Person (other than the Indemnified Party). The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim assumed by the Indemnifying Party pursuant to this Section 9.05(a)(ii) and, except as provided in the preceding sentence, the Indemnified Party will bear its own costs and expenses with respect to such participation. Notwithstanding the foregoing, the Indemnifying Party may not assume the defense of the Third Party Claim if (1) the Persons against whom the claim is made, or any impleaded Persons, include both the Indemnifying Party and any Indemnified Party, and (2) representation of both such Persons by the same counsel would be inappropriate due to actual or potential differing interests between them, in which case any Indemnified Party shall have the right to defend the Third Party Claim and to employ counsel at the expense of the Indemnifying Party.

(iii)    If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party intends to defend the Indemnified Party against the Third Party Claim, or if the Indemnifying Party gives such notice but fails to diligently prosecute or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right (but not the obligation) to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be diligently prosecuted by the Indemnified Party to a final conclusion or settled at the discretion of the Indemnified Party. The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that, if requested by the Indemnified Party, the Indemnifying Party shall cooperate, at the sole cost and expense of the Indemnifying Party, with the Indemnified Party and its counsel in contesting the Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim or cross-claim against any Person (other than the Indemnifying Party).

(iv)    Notwithstanding Section 9.05(a)(iii), if the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party disputes its obligation to indemnify the Indemnified Party against the Third Party Claim, and if such dispute is resolved pursuant to Section 9.05(c) in favor of the Indemnifying Party, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to Section 9.05(a)(iii) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all such costs and expenses. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to Section 9.05(a)(iii), but the Indemnifying Party will bear its own costs and expenses with respect thereto if such participation is not at the request of the Indemnified Party.

(b)    In the event any Indemnified Party should have a claim against any Indemnifying Party that is not a Third Party Claim, the Indemnified Party shall deliver an Indemnity Notice with reasonable promptness to the Indemnifying Party specifying the nature of and specific basis

59

for the claim and, to the extent then feasible, the amount or the estimated amount of the claim. The failure by any Indemnified Party to give timely notice referred to in the preceding sentence shall not impair such Person's rights hereunder except to the extent that an Indemnifying Party demonstrates that it has been irreparably prejudiced thereby. If the Indemnifying Party does not notify the Indemnified Party within 30 days following its receipt of the Indemnity Notice that the Indemnifying Party disputes its obligation to indemnify the Indemnified Party hereunder, the claim will be conclusively deemed a liability of the Indemnifying Party hereunder.

(c)    If the Indemnifying Party timely disputes its liability with respect to a claim described in a Claim Notice or an Indemnity Notice, the Indemnifying Party and the Indemnified Party shall proceed promptly and in good faith to negotiate a resolution of such dispute within 60 days following receipt of the Claim Notice or Indemnity Notice and, if such dispute is not resolved through negotiations during such 60-day period, it shall be resolved pursuant to arbitration pursuant to the then effective Commercial Arbitration Rules of the American Arbitration Association to the fullest extent permitted by applicable law.

(d)    Except where liability is disputed pursuant to Section 9.05(c), the Indemnifying Party shall pay the amount of any liability to the Indemnified Party within 30 days following its receipt of a Claim Notice or an Indemnity Notice, or on such later date (i) in the case of a Third Party Claim, as the Indemnified Party suffers Losses in respect of the Third Party Claim, or (ii) in the case of an Indemnity Notice in which the amount of the claim is estimated, promptly after any Losses in respect of such claim are actually incurred by the Indemnified Party. In the event the Indemnified Party is not paid in full for its claim in a timely manner after the Indemnifying Party's obligation to indemnify and the amount thereof has been determined, the amount due shall bear interest from the date that the Indemnifying Party received the Claim Notice or the Indemnity Notice until paid at the Applicable Rate, and in addition to any other rights it may have against the Indemnifying Party, the Indemnified Party shall have the right to set-off the unpaid amount of such claim against any amounts owed by it to the Indemnifying Party.

(e)    Any estimated amount of a claim submitted in a Claim Notice or an Indemnity Notice shall not be conclusive of the final amount of such claim, and the giving of a Claim Notice when an Indemnity Notice is properly due, or the giving of an Indemnity Notice when a Claim Notice is properly due, shall not impair such Indemnified Party's rights hereunder except to the extent that an Indemnifying Party demonstrates that it has been irreparably prejudiced thereby. Notice of any claim comprised in part of Third Party Claims and claims that are not Third Party Claims may be given pursuant to either Section 9.05(a) or Section 9.05(b).

9.06.    Survival of Representations; Indemnity Periods.    Notwithstanding any right of Buyer (whether or not exercised) to investigate the Business or any right of any party (whether or not exercised) to investigate the accuracy of the representations and warranties of the other party contained in this Agreement, Sellers have, on the one hand, and Buyer has, on the other hand, the right to rely fully upon the representations, warranties, covenants and agreements of the other contained in this Agreement. The representations and warranties in this Agreement made by S&W and Buyer respectively will survive the Closing (a) indefinitely with respect to matters covered by Section 2.04, Section 3.01 and Section 4.01, (b) until 60 days after the expiration of all applicable statutes of limitations (including all periods of extension, whether automatic or permissive) with respect to matters covered by Section 3.05, Section 3.07, Section

60

A422

3.13 and Section 3.22 and (c) until the expiration of eighteen calendar months from the Closing Date in the case of all other representations and warranties, except that:

(i)    any representation, warranty, covenant or agreement that would otherwise terminate in accordance with clause (b) or clause (c) above shall survive if a Claim Notice or an Indemnity Notice shall have been given on or prior to such termination date, until the related claim for indemnification has been satisfied or otherwise resolved as provided in this Section 9;

(ii)    in the event of intentional misrepresentation or fraud in the making of any representation or warranty, or intentional, willful or reckless nonfulfillment or breach of any covenant in this Agreement, all representations, warranties, covenants and agreements that are the subject of the intentional misrepresentation, fraud, willful or reckless nonfulfillment or breach, shall survive until 60 days after the expiration of all applicable statutes of limitations (including all periods of extension, whether automatic or permissive) with respect to matters covered thereby; and

(iii)    covenants and agreements to be performed after the Closing Date will survive the Closing for the term specified therein, or, if no term is specified, indefinitely.

9.07.    Limitations of Liability.    Notwithstanding anything in this Section 9 to the contrary, (a) Sellers' liability for indemnification under this Agreement shall be (i) limited in the case of claims other than those related to (A) the letters of credit as shown on Schedule 5.16(b) with respect to the Project Rejected Contracts or financial guarantees in favor of insurance carriers or (B) the Canadian Transfer, to the Indemnity Deposit, (ii) limited in the case of claims related to the letters of credit as shown on Schedule 5.16(b) with respect to the Project Rejected Contracts or financial guarantees in favor of insurance carriers, to the LC Deposit, or (iii) unlimited in the case of claims related to the Canadian Transfer, provided that any such claim shall be satisfied first from the Canadian Consideration, and (b) Buyer's liability for indemnification under this Agreement shall be limited to the sum of Twenty Five Million Dollars ($25,000,000).

10.    **GENERAL**

10.01.    Schedules.    The Schedules and all Exhibits and documents referred to in or attached to this Agreement are integral parts of this Agreement as if fully set forth herein and all statements appearing therein shall be deemed to be representations. Nothing in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Schedule identifies the exception with reasonable particularity.

10.02.    Tax Effect.    None of the parties (nor such parties' counsel or accountants) has made or is making in this Agreement any representation to any other party (or such party's counsel or accountants) concerning any of the Tax effects or consequences on the other party of the transactions provided for in this Agreement. Each party represents that it has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

61

A423

10.03. <u>Reproduction of Documents</u>.  This Agreement and all documents relating hereto, including consents, waivers and modifications which may hereafter be executed, the documents delivered at the Closing, and financial statements, certificates and other information previously or hereafter furnished to any party may be reproduced by any party by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and the parties may destroy any original documents so reproduced.  The parties stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the ordinary course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

10.04. <u>Time of Essence</u>.  Time is of the essence in the performance of this Agreement. This Section may be waived only in a writing expressly referring hereto.

10.05. <u>Consents, Approvals and Discretion</u>.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party that is not in such party's sole discretion or any party must or may exercise discretion (other than its sole discretion), such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

10.06. <u>Choice of Law; Submission to Jurisdiction</u>.  Except as otherwise provided in this <u>Section 10.06</u>, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to such state's conflicts of laws rules.  Each of the Parties hereby (a) submits to the non-exclusive jurisdiction of the courts of the State of Delaware for purposes of all legal proceedings arising out of or relating to this Agreement or the Transaction and irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any such proceeding brought in such court and any claim that such court is an inconvenient forum or (b) with respect to the Bankruptcy Cases and issues relating thereto that are properly within the jurisdiction of the Bankruptcy Court, submits to the exclusive jurisdiction of the Bankruptcy Court for such purposes and irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any such proceeding brought in such Bankruptcy Court and any claim that such Bankruptcy Court is an inconvenient forum; <u>provided, however,</u> that if the Bankruptcy Court abstains or otherwise determines not to hear such proceeding, then the provisions of <u>clause (a)</u> above shall apply.

10.07. <u>Benefit; Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns.  No party may assign this Agreement without the prior written consent of the other parties; <u>provided, however,</u> that Buyer may assign this Agreement, in whole or in part, to any Affiliate of Buyer.

10.08. <u>No Third Party Beneficiary</u>.  The terms and provisions of this Agreement (including provisions regarding employee and employee benefit matters) are intended solely for the benefit of the parties, Buyer's Indemnified Persons, Sellers' Indemnified Persons, and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Person.  Any reference in this Agreement to one or more Employee Benefit Plans of Buyer or S&W includes provisions, if any, in such plans permitting

A424

their termination or amendment and any covenant in this Agreement to provide benefits under any Employee Benefit Plan shall not be deemed or construed to limit Buyer's right to terminate or amend such plan of Buyer in accordance with its terms.

10.09. <u>Waiver of Breach, Right or Remedy</u>.  The waiver by any party of any breach or violation by another party of any provision of this Agreement or of any right or remedy of the waiving party in this Agreement (a) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (b) shall not waive or be construed to waive a breach or violation of any other provision, and (c) shall be in writing and may not be presumed or inferred from any party's conduct.  Except as expressly provided otherwise in this Agreement no remedy conferred by this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be in addition to every other remedy granted in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.  The election of any one or more remedies by a party shall not constitute a waiver of the right of such waiving party to pursue other available remedies.  In addition to any other rights and remedies any party may have at law or in equity for breach of this Agreement, each party shall be entitled to seek an injunction to enforce the provisions of this Agreement.

10.10. <u>Notices</u>.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given if given in writing (a) on the date tendered by personal delivery, (b) on the date received by facsimile or other electronic means, (c) one day after the date tendered for delivery by nationally recognized overnight courier, or (d) three days after the date tendered for delivery by United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in any event addressed as follows:

If to Buyer:

> The Shaw Group Inc.
> 8545 United Plaza Blvd.
> Baton Rouge, Louisiana  70809
> Attn:  Gary P. Graphia, Esq.
> Facsimile:  (225) 932-2642

with a copy to:

> Fulbright & Jaworski L.L.P.
> 1301 McKinney, Suite 5100
> Houston, Texas  77010
> Attn:  Charles L. Strauss, Esq. and
>          William H. Caudill, Esq.
> Facsimile:  (713) 651-5246

If to Seller:

> Stone & Webster, Incorporated
> 245 Summer Street
> Boston, Massachusetts  02210
> Attn:  General Counsel
> Facsimile:  (617) 589-2201

63

A425

with a copy to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> Wilmington, Delaware 19801
> Attn: Gregg Galardi, Esq.
> Facsimile: (302) 651-3001

or to such other address or number, and to the attention of such other Person, as any party may designate at any time in writing in conformity with this Section.

10.11. <u>Misdirected Payments; Offset Rights.</u>  Sellers shall remit to Buyer with reasonable promptness any monies received by Sellers constituting or in respect of the Assets, Assumed Contracts and Assumed Liabilities.  Buyer shall remit to S&W with reasonable promptness any monies received by Buyer constituting or in respect of the Excluded Assets, Rejected Contracts (except Project Rejected Contracts to the extent Buyer has made unreimbursed payments under letters of credit related thereto), Completed Contracts and Excluded Liabilities.  If any Person determines that funds previously paid or credited to any Seller or the Business in respect of services rendered prior to the Closing Date have resulted in an overpayment or must be repaid, Sellers shall be responsible for the repayment of said monies (and the defense of such actions), except to the extent that the repayment obligation was an Assumed Liability.  If Buyer suffers any deduction to or offset against amounts due Buyer of funds previously paid or credited to any Seller or the Business in respect of services rendered prior to the Closing Date, Sellers shall immediately pay to Buyer the amounts so billed or offset upon demand, except to the extent that such amounts represent billings in excess of cost and revenues recognized under the Assumed Contracts.  Any amounts due Buyer by Sellers, or due Sellers by Buyer, may be offset against monies or other funds held by the party entitled to payment of such amounts.

10.12. <u>Severability.</u>  If any provision of this Agreement is held or determined to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party under this Agreement will not be materially and adversely affected thereby: (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

10.13. <u>Entire Agreement; Counterparts; Amendment.</u>  This Agreement, together with the Sale Order (but excluding Exhibit B to the Sale Order), supersedes all prior or contemporaneous contracts, agreements and understandings and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the subject matter of this Agreement and no party shall be entitled to benefits other than those specified herein.  As between or among the parties, any oral or written representation, agreement or statement not expressly incorporated herein, whether given prior to or on the Effective Date, shall be of no

64

A426

force and effect unless and until made in writing and signed by the parties on or after the Effective Date. The representations and warranties set forth in this Agreement shall survive the Closing and remain in full force and effect as provided in Article 9, and shall survive the execution and delivery of all other agreements, instruments or other documents described, referenced or contemplated herein (including any deed, assignment, transfer or conveyance to Buyer) and shall not be merged herewith or therewith. Each representation, warranty and covenant contained in this Agreement has independent significance and if any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative level of specificity) that such party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. This Agreement may not be amended except in a written instrument executed the parties.

10.14. Drafting. No provision of this Agreement shall be interpreted for or against any Person on the basis that such Person was the draftsman of such provision, and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement.

10.15. Confidentiality. The provisions of the confidentiality agreement between Buyer and Sellers dated June 12, 2000 are hereby incorporated by this reference as if fully set forth herein, and shall apply and remain in full force and effect through the Closing Date.

10.16. Publicity. No party to this Agreement shall prior to the Closing, without prior consultation with the other parties to the extent practicable under the circumstances taking into account applicable laws and stock exchange requirements, make any public disclosure with respect to the Transaction, any negotiations or discussions concerning the Transaction or the existence of this Agreement.

[Signature Pages Follow]

A427

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in multiple originals by their duly authorized officers as of the Effective Date.

STONE & WEBSTER, INCORPORATED          THE SHAW GROUP INC.

By: _H. Kerner Smith_____          By: _____

Title: _PRESIDENT AND CEO_____          Title: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in multiple originals by their duly authorized officers as of the Effective Date.

STONE & WEBSTER, INCORPORATED

THE SHAW GROUP INC.

By: _____
Title: _____

By: _____
Title: Executive Vice President and CFc

## DOMESTIC SUBSIDIARIES

**1439 ENCLAVE PARKWAY CORPORATION**

By: _____
Title: _Executive Vice President_

**245 SUMMER STREET CORPORATION**

By: _____
Title: _Executive Vice President_

**AEC INTERNATIONAL PROJECTS, INC.**

By: _____
Title: _Executive Vice President_

**ASSOCIATED ENGINEERS & CONSULTANTS, INC.**

By: _____
Title: _Executive Vice President_

**AUBURN VPS GENERAL CORPORATION**

By: _____
Title: _Executive Vice President_

**AUBURN VPS LIMITED CORPORATION**

By: _____
Title: Executive Vice President

**BELMONT CONSTRUCTORS COMPANY, INC.**

By: _____
Title: Executive Vice President

**BELMONT CONSTRUCTORS COMPANY, L.P.**

By: _____
Title: Executive Vice President

**COMMERCIAL COLD STORAGE, INC.**

By: _____
Title: President

**DSS ENGINEERS, INC.**

By: _____
Title: Executive Vice President

**ENCLAVE PARKWAY REALTY, INC.**

By: _____
Title: President

A431

**FAST SUPPLY CORPORATION**

By: _____
Title: Executive Vice President

**GSES HOLDING, LLC**

By: _____
Title: Executive Vice President

**INTERNATIONAL ENGINEERS & CONSTRUCTORS, INCORPORATED**

By: _____
Title: Executive Vice President

**NORDIC HOLDINGS, INC.**

By: _____
Title: President

**NORDIC INVESTORS, INC.**

By: _____
Title: President

**NORDIC RAIL SERVICES, INC.**

By: _____
Title: President

**NORDIC REFRIGERATED SERVICES, INC.**

By: _____
Title: ___President___

**NORDIC REFRIGERATED SERVICES, LIMITED PARTNERSHIP**

By: _____
Title: ___President___

**NORDIC TRANSPORTATION SERVICES, INC.**

By: _____
Title: ___President___

**POLAR TRANSPORT, INC.**

By: _____
Title: ___President___

**POWER TECHNOLOGIES, INC.**

By: _____
Title: ___Executive Vice President___

**PRESCIENT TECHNOLOGIES, INC.**

By: _____
Title: ___Executive Vice President___

A433

**PROJECTS ENGINEERS, INCORPORATED**

By: _____
Title: Executive Vice President

**ROCKTON ASSOCIATES, INCORPORATED**

By: _____
Title: Executive Vice President

**ROCKTON TECHNICAL SERVICES CORPORATION**

By: _____
Title: Executive Vice President

**SABAL CORPORATION**

By: _____
Title: Executive Vice President

**SABAL REAL ESTATE CORPORATION**

By: _____
Title: Executive Vice President

**SAW CONSULTING SERVICES, INC.**

By: _____
Title: Executive Vice President

**SC WOOD, LLC**

By: _____
Title: _Executive Vice President_

**SELECTIVE TECHNOLOGIES CORPORATION**

By: _____
Title: _Executive Vice President_

**SLEEPER STREET REALTY CORPORATION**

By: _____
Title: _President_

**SNW BINGHAMTON I, LP**

By: _____
Title: _Executive Vice President_

**SNW BINGHAMTON II, LP**

By: _____
Title: _Executive Vice President_

**STONE & WEBSTER ABU DHABI (UNITED ARAB EMIRATES), INC.**

By: _____
Title: _Executive Vice President_

STONE & WEBSTER ASIA CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER AUBURN CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER BHARAT, INCORPORATED

By: _____
Title: Executive Vice President

STONE & WEBSTER BINGHAMTON CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER CIVIL AND TRANSPORTATION SERVICES, INC.

By: _____
Title: Executive Vice President

STONE & WEBSTER CONSTRUCTION COMPANY, INC.

By: _____
Title: Executive Vice President

STONE & WEBSTER DEVELOPMENT CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER DOMINICAN REPUBLIC, INCORPORATED

By: _____
Title: Executive Vice President

STONE & WEBSTER ENGINEERING CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER ENGINEERS AND CONSTRUCTORS, INC.

By: _____
Title: Executive Vice President

STONE & WEBSTER FAR EAST TECHNICAL SERVICES CORP.

By: _____
Title: Executive Vice President

STONE & WEBSTER INDONESIA CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER INDUSTRIAL TECHNOLOGY CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER INTER-AMERICAN CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER INTERNATIONAL CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER INTERNATIONAL PROJECTS CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER INTERNATIONAL SALES CORPORATION

By: _____
Title: President

STONE & WEBSTER ITALIA, INCORPORATED

By: _____
Title: Executive Vice President

A438

**STONE & WEBSTER KOREA CORPORATION**

By: _____
Title: Executive Vice President

**STONE & WEBSTER KUWAIT, INCORPORATED**

By: _____
Title: Executive Vice President

**STONE & WEBSTER MANAGEMENT CONSULTANTS, INC.**

By: _____
Title: Executive Vice President

**STONE & WEBSTER MICHIGAN, INC.**

By: _____
Title: Attorney-in-Fact

**STONE & WEBSTER MIDDLE EAST ENGINEERING SERVICES CORPORATION**

By: _____
Title: Executive Vice President

**STONE & WEBSTER OF ARGENTINA CORPORATION**

By: _____
Title: Executive Vice President

A439

**STONE & WEBSTER OF MEXICO ENGINEERING CORPORATION**

By: _____
Title: _Executive Vice President_____

**STONE & WEBSTER OIL COMPANY, INC.**

By: _____
Title: _Executive Vice President_____

**STONE & WEBSTER OPERATING CORPORATION**

By: _____
Title: _Executive Vice President_____

**STONE & WEBSTER OVERSEAS CONSULTANTS, INC.**

By: _____
Title: _Executive Vice President_____

**STONE & WEBSTER OVERSEAS DEVELOPMENT CORPORATION**

By: _____
Title: _Executive Vice President_____

**STONE & WEBSTER OVERSEAS GROUP, INC.**

By: _____
Title: _Executive Vice President_____

A440

STONE & WEBSTER PACIFIC CORPORATION

By: _____
Title:    Executive Vice President
_____

STONE & WEBSTER POWER ENGINEERING CORPORATION

By: _____
Title:    Executive Vice President
_____

STONE & WEBSTER POWER PROJECTS CORPORATION

By: _____
Title:    Executive Vice President
_____

STONE & WEBSTER PROCUREMENT CORPORATION

By: _____
Title:    Executive Vice President
_____

STONE & WEBSTER PUERTO RICO, INCORPORATED

By: _____
Title:    Executive Vice President
_____

STONE & WEBSTER SAUDI ARABIA, INCORPORATED

By: _____
Title:    Executive Vice President
_____

STONE & WEBSTER TAIWAN CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER TECHNOLOGY CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER WALLINGFORD CORPORATION

By: _____
Title: Executive Vice President

STONE & WEBSTER WORLDWIDE ENGINEERING CORPORATION

By: _____
Title: Executive Vice President

SWL CORPORATION

By: _____
Title: Executive Vice President

## FOREIGN SUBSIDIARIES

STONE & WEBSTER ANADOLU MOHENDISLIK LTD. SIRKETI

By: _____
Title: __Attorney-in-fact__

STONE & WEBSTER CONSTRUCTION LIMITED

By: _____
Title: __Attorney-in-fact__

STONE & WEBSTER ENGINEERING AND FIELD SERVICES LIMITED

By: _____
Title: __Attorney-in-fact__

STONE & WEBSTER ENGINEERING LIMITED

By: _____
Title: __Attorney-in-fact__

STONE & WEBSTER GROUP LIMITED

By: _____
Title: __Attorney-in-fact__

A443

**STONE & WEBSTER MANAGEMENT CONSULTANTS LIMITED**

By: _____
Title: _Attorney-in-fact_____

**STONE & WEBSTER SERVICES LIMITED**

By: _____
Title: _Attorney-in-fact_____

**STONE & WEBSTER SERVICES SDN BHD**

By: _____
Title: _Director_____

**STONE & WEBSTER TECHNOLOGY B.V.**

By: _____
Title: _Attorney-in-fact_____

**STONE & WEBSTER THAILAND LIMITED**

By: _____
Title: _Director_____

**STONE & WEBSTER INDIA LIMITED**

By: _____
Title: _Attorney-in-fact_____

**INTERNATIONAL ASSOCIATES (CAYMAN) LIMITED**

By: _____
Title: Director

**ADVANCED TECHNOLOGIES (CAYMAN) LIMITED**

By: _____
Title: Director

**PROCESS ENGINEERS (CAYMAN) LIMITED**

By: _____
Title: Director

**STONE & WEBSTER DO BRAZIL LIMITADA**

By: _____
Title: Attorney-in-fact

**STONE & WEBSTER CANADA LIMITED**

By: _____
Title: Attorney-in-fact

Execution Copy

## SCHEDULE 2.02(b)

## COMPLETED CONTRACTS

| Project No. | Client Name | Title/Project Description |
|---|---|---|
| 06180011 | Mobil Chemical | Chemical Ethylene Revamp |
| 08743011 | Williams Refinery | Refinery Revamp |
| 08196011 | Maine Yankee | Decommissioning |
| 06103011 | TPPI – Indonesia | Ethylene Plant |
| Unknown | Monsanto (Texas City) | Belmont Construction |
| Unknown | Monsanto (Chocolate Bayou) | Belmont Construction |
| 06489011 | DOE/ICF Kaiser | Rocky Flats (LLC w/JA Jones) |
| 07930011 | Pyramid Corp | Middletown Railroad Station |
| 015590011 | Indian Oil Corp. Ltd. Mathura | FCCU Revamp |
| 05062011 | Aramco Ras Tanura (Bugshan) | Refinery Upgrade |
| 06140011 | Huntsman Odessa | Olefin Plant |
| 06942011 | Hardaway-Florida Rock | Cement Plant |
| 07731011 | CanFibre (Lackawana) | Fiberboard Plant |
| 07613011 | CanFibre (Riverside) | Fiberboard Plant |
| 07385011 | CanFibre (Riverside) | Fiberboard Plant |
| 08206011 | Placid Refining Company | FCC Merox Revamp |
| 07279011 | UPS | Oakhaven Hub Project |
| 08129011 | Chevron | Isocracking for Magyar |
| 07161011 | Petrokemya | Propane Cracker Project |
| 08286042 | Borealis, AB c/o Foster Wheeler France | FCCU Furnace |
| 08291042 | Huntsman SOR | Pilot Skid |
| 10745044/10792044 | Egyptian Electricity Authority (Sidi Krir) | Power Plant |
| 05500044 | China Petrochemicals Daiqiug | FCCU Furnace |
| 06178044 | Takoradi I (Ghana) | Power Plant |
| 07287044 | Takoradi II (Ghana) | Power Plant |
| 06833037 | JGC | Titan #2 Cracker |
| 00106132 | Norsk Hydro | Ethylene Furnace |
| 06336089 | TPI | FCCA |
| 07150089 | Hanwha | Hanwha MTA Ethylene Expansion |
| 07294089 | BG Transco | Hornsea Storage Facility |
| 00197089 | Shell Moerdijk | Ethylene Revamp |
| 00107089 | ELF Oil U.K. | Refinery Revamp |
| 021798089 | Thai Olefins | TOC Plant Expansion |
| 0195089 | BG Transco | Reinforcement Compressor Stations |
| 0104089 | Ruhr Oel GmbH (Veba) | Grass Roots Furnace Project |
| 07966089 | BP SOR | Pilot Skid |
| 10695099 | Isoboard | Fiberboard Plant |
| 08146099 | EPR | Metals Recovery Plant |
| 07019099 | Bayer | Butyl II Capacity Increase |

84

A446

Execution Copy

| Project No. | Client Name | Title/Project Description |
|---|---|---|
| 10482099 | Perusahaan Umum Listrick Negara, Indonesia Suralaya | Steam Power Plant |

85

A447

## SCHEDULE 2.02(d)

## EXCLUDED ASSETS

The following is an enumeration of the Sellers' assets which are not being acquired by the Buyer:

i)     Any personal or other property used by Sellers for or in connection with any Project Rejected Contracts or Completed Contracts (or projects) shall be retained by Sellers; provided that, upon the completion of such use, any such remaining property shall be transferred to Buyer.

ii)     All insurances, insurance coverages and insurance recoveries of the Sellers including, without limitation, those set forth on Schedule 3.15 hereof, as well as, any other (A) Directors and Officers insurance, (B) employment liability insurance, (C) fiduciary liability insurance, (D) professional liability insurance, (F) any and all insurance required for Rejected and Completed Contracts and (G) any other insurance, including retrospectively rated insurance policies, covering any claim or occurrence, acquired by the Sellers following the Effective Date.

iii)     Office Building owned by Power Technologies, Inc., and Schenectady Industrial Development Agency located at 1473 Erie Boulevard, Schnectady, New York.

iv)     Office Building owned by Power Technologies, Inc., and Schenectady Industrial Development Agency Office Building located at 1482 Erie Boulevard, Schenectady, New York.

v)     See also Schedule 2.02(e) hereof.

vi)     The Employee Retirement Plan of Stone & Webster, Incorporated and participating Subsidiaries described as Plan 002 sponsored by Stone & Webster, Inc.

A448

## SCHEDULE 2.03

### LIST OF ASSUMED LIABILITIES

1.     Obligations of Sellers arising out of performance of the Assumed Contracts on and after the Closing Date.  In relation to that certain Settlement Agreement dated April 25, 2000 among Enron Engineering Services, Enron Power Corporation and Stone & Webster Engineering Limited and the Guarantee of even date given by S&W in respect of the obligations of Stone & Webster Engineering Limited under such Settlement Agreement, the Assumed Liability for the purpose of the Closing Balance Sheet shall be deemed to be a liability of S&W and S&W shall apply such liability to its intercompany account with Stone & Webster Engineering Limited.

2.     Liabilities under that certain mortgage loan related to the Houston office building.

3.     Liabilities under Sellers' outstanding bank indebtedness, including amounts outstanding and pursuant to existing standby letters of credit.

4.     Unpaid accounts payable, except for unpaid accounts payable related to Completed Contracts, Rejected Contracts or Excluded Assets.

5.     Billings in excess of cost and revenues recognized with respect to the Assumed Contracts.

6.     Accrued liabilities related to the Assets (including liabilities with respect to the TPPI Equipment), the Assumed Contracts and the Hired Employees.

7.     Liabilities for (a) accrued taxes, other than (i) with respect to items characterized on the March 31 Balance Sheet and the Closing Balance Sheet as deferred income taxes and (ii) Taxes resulting from the consummation of the Transaction and (b) liabilities associated with the Enclave Parkway Realty, Inc. as identified in the Tax Abatement Agreement for Real Property located in the Stone & Webster Reinvestment Zone dated as of November 24, 1992, by and among S&W, Harris County, the Harris County Flood Control District, the Port of Houston Authority of Harris County, Texas and the Harris County Department of Education.

8.     Other liabilities related to the Assets and the Assumed Contracts.

A449

## SCHEDULE 3.12(a)

## REAL PROPERTY ENCUMBRANCES

<u>Encumbrances Applicable to All Real Property:</u>

(i)      Liens for Taxes or special assessments which are not yet due and payable, or which are not shown as existing liens by the public records.

(ii)     Inchoate liens arising by operation of law, including materialman's, mechanic's, repairman's, laborer's, warehousemen, carrier's, employee's, contractor's and operator's liens arising in the ordinary course of business.

(iii)    The terms of any of the leases of the Sellers, and any and all modifications, extensions, amendments or renewals of such leases, including, without limitation, those leases set forth on (A) Schedule 2.01(a) hereof under the heading "Leased Real Property – (Stone & Webster Entity as Lessee)" and (B) Schedule 3.17(a)(xi) hereof under the heading "Leased Real Property – (Stone & Webster Entity as Lessor)", except for any provision purporting to prohibit assumption by Sellers and assignment to Buyer or to impose some economic cost or other restriction on Buyer after such assignment.

(iv)     Encumbrances reflected on Title Commitments.

(v)      Minor defects, irregularities in title, easements, rights of way, encroachments, overlaps, servitudes and similar rights that individually or in the aggregate (1) have not had, and are not reasonably likely to have an adverse effect on the ability of Buyer to use the property covered by such scheduled Lease in the manner previously owned or used by Sellers or (2) materially impair the value of such property.

(vi)     Mortgages, Deeds of Trust and assignments of rents, and associated documents, in favor of Bank of America, N.A., as collateral agent, securing S&W's bank credit facility.

(vii)    Deed of Trust for S&W's Houston office made in favor of Principal Mutual Life Insurance Company, along with any and all extensions, renewals, advances, amendments or modifications thereof.

SCHEDULE 3.12(b)

PERMITTED REAL PROPERTY ENCUMBRANCES

Permitted Encumbrances Applicable to All Real Property:

(i)      Liens for Taxes or special assessments which are not yet due and payable, or which are not shown as existing liens by the public records.

(ii)     Inchoate liens arising by operation of law, including materialman's, mechanic's, repairman's, laborer's, warehousemen, carrier's, employee's, contractor's and operator's liens arising in the ordinary course of business.

(iii)    The terms of any of the leases of the Sellers, and any and all modifications, extensions, amendments or renewals of such leases, including, without limitation, those leases set forth on (A) Schedule 2.01(a) hereof under the heading "Leased Real Property -- (Stone & Webster Entity as Lessee)" and (B) Schedule 3.17(a)(xi) hereof under the heading "Leased Real Property -- (Stone & Webster Entity as Lessor)", except for any provision purporting to prohibit assumption by Sellers and assignment to Buyer or to impose some economic cost or other restriction on Buyer after such assignment.

(iv)     Encumbrances reflected on Title Commitments.

(v)      Minor defects, irregularities in title, easements, rights of way, encroachments, overlaps, servitudes and similar rights that individually or in the aggregate (1) have not had, and are not reasonably likely to have an adverse effect on the ability of Buyer to use the property covered by such scheduled Lease in the manner previously owned or used by Sellers or (2) materially impair the value of such property.

(vi)     Mortgages, Deeds of Trust and assignments of rents, and associated documents, in favor of Bank of America, N.A., as collateral agent, securing S&W's bank credit facility.

(vii)    Deed of Trust for S&W's Houston office made in favor of Principal Mutual Life Insurance Company, along with any and all extensions, renewals, advances, amendments or modifications thereof.

89

## SCHEDULE 5.16(b)

### REJECTED CONTRACTS LIST

| Project No. | Client Name | Title/Project Description |
|---|---|---|
| 07930 | Tampa Bay/Poseidon Resources | Desalination Plant (joint venture is also rejected) |
| 08159099 | CCI Newmarket | Waste Recovery Plant |
| 08402099 | City of Toronto | JV with CCI for Waste to Energy Plant |

### PROJECT REJECTED CONTRACTS
#### (Those Completed Contracts and Rejected Contracts with Letters of Credit)

| Project No. | Client Name | Amount of Letter of Credit |
|---|---|---|
| 07161011 | Petrokemya | $1,545,890 |
| 015590011 | Indian Oil Corp. Ltd. Mathura FCCU values | $34,000 |
| 07731011 | CanFibre (Lackawana) | $3,500,000 |
| 10482099 | Perusahaan Umum Listrick Negara, Indonesia Suralaya | $308,000 |
| 00197089 | Shell Moerdijk | $35,850.00 |
| 0195089 | BG Transco | $2,835,000 |
| 0104089 | Ruhr Oel GmbH (Veba) | $756,000.00 |
| 05500044 | China Petrochemicals Daiquig Furnace Project | $1,124,650 |
| 10745044/10792044 | Egyptian Electricity Authority (Sidi Krir) | $1,251,272.00 and $1,129,120.00 |
| 08286042 | Borealis, AB c/o Foster Wheeler France | $125,346 |
| N/A | St. Paul Fire & Marine Ins. | $818,923.00 |
| N/A | Aetna Casualty & Surety | $100,000.00 |
|  | **TOTAL** | $13,564,051 (the "LC Deposit") |

90

# ESCROW AGREEMENT

July 14, 2000

Bank One, Texas, N.A.
910 Travis, 5th Floor
Houston, Texas 77002
Attention: Global Corporate Trust Department

Ladies and Gentlemen:

In connection with the sale (the "Sale") of substantially all of the assets of Stone & Webster, Incorporated, a Delaware corporation ("S&W"), and certain of its subsidiaries and affiliates (together with S&W, "Sellers") to The Shaw Group Inc., a Louisiana corporation (together with its assignees, "Buyer"), pursuant to the Asset Purchase Agreement dated as of July 14, 2000 (as amended from time to time, the "Purchase Agreement"), you are hereby appointed, and you hereby accept appointment, as escrow agent (the "Escrow Agent") with the duties and upon the terms and conditions set forth in this escrow agreement (the "Escrow Agreement").

1.    Escrow Accounts.

(a)    Deposits into Escrow. On the date the Sale is consummated (the "Closing Date"), Buyer will deposit with the Escrow Agent, and the Escrow Agent hereby agrees to accept for deposit 813,481 shares of Buyer's common stock, no par value per share ("Common Stock"). The Escrow Agent shall hold in trust and disburse such Common Stock and any dividends, distributions or other earnings and any interest and earnings thereon ("Earnings") in accordance with this Agreement. The Common Stock deposited with the Escrow Agent shall be held in two separate accounts (each, an "Account" and collectively, the "Accounts"), the first consisting of 527,357 shares of Common Stock (the "Indemnity Deposit") and the second consisting of 286,124 shares of Common Stock (the "LC Deposit").

(b)    Maintenance of Separate Accounts. The Escrow Agent shall maintain separate books and records for each Account.

(c)    Value of Deposits. The initial value of the Indemnity Deposit (the "Initial Indemnity Value") and the LC Deposit (the "Initial LC Value") are $25,000,000 and $13,564,051, respectively, based on the number of shares of Common Stock to be deposited on the Closing Date in each respective Account multiplied by $47.40625, which represents the average closing price on the New York Stock Exchange of a share of Common Stock for the ten trading days ending on the trading day immediately preceding the Closing Date (the "Average Price").

(d)    Investment. Subject to Section 3(e) and 4(a), the Common Stock in the Accounts shall remain in the form of stock certificates and shall not be sold, converted, or

5499357.6

A453

Very truly yours,

THE SHAW GROUP INC.

By: _____
Name: Gary Graphia
Title: Secretary and General Counsel


STONE & WEBSTER,
INCORPORATED

By: _____
Name: Thomas L. Langford
Title: Executive Vice President


BANK ONE, TEXAS, N.A., as Escrow Agent

By: _____
        Josie L. Hixon, Vice President

5499357.6

A454

Very truly yours,

THE SHAW GROUP INC.

By:_____
Name: _____
Title: _____


STONE & WEBSTER,
INCORPORATED

By:_____
Name: _____
Title: _____


BANK ONE, TEXAS, N.A., as Escrow Agent

By: _____
       Josie L. Hixon, Vice President

5499357.6

A455

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (the "Agreement") is made and entered into as of July 14, 2000, by and between The Shaw Group Inc., a Louisiana corporation (the "Company"), and Stone & Webster, Incorporated, a Delaware corporation ("S&W" and, together with its subsidiaries set forth on the signature page hereto, the "Holders" and each, a "Holder").

This Agreement is made pursuant to that certain Asset Purchase Agreement, dated as of July 14, 2000, between the Company and S&W (as amended from time to time, the "Purchase Agreement"). In order to induce S&W to enter into the Purchase Agreement, the Company has agreed to provide the Holders the registration rights set forth in this Agreement. The execution and delivery of this Agreement by the Company and S&W is a condition to the closing of the transactions contemplated in the Purchase Agreement.

The parties hereby agree as follows:

1.    Definitions

All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Purchase Agreement. In addition to any other terms defined in this Agreement, the following capitalized terms have the following meanings:

Exchange Act:  the Securities Exchange Act of 1934, as amended from time to time.

Holders and Holder:  as defined in the preamble to this Agreement.

NASD:  the National Association of Securities Dealers, Inc.

Prospectus:  the prospectus included in any Registration Statement, as amended or supplemented by any amendments and supplements to the prospectus, including post-effective amendments and all material incorporated by reference in such prospectus.

Registrable Securities:  the 1,976,085 shares of Common Stock issued to the Holders pursuant to the Purchase Agreement (including the shares that are held in the Indemnity Deposit and the LC Deposit), and any Common Stock or other security issued or issuable with respect to such shares of Common Stock by reason of a dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization of the Company; provided, however, that a security ceases to be a Registrable Security when (i) a Registration Statement covering such Registrable Securities has been declared effective under the Securities Act by the SEC and such Registrable Securities have been disposed of pursuant to such effective Registration Statement, (ii) the entire amount of then outstanding Registrable Securities may be sold within a three-month period pursuant to Rule 144 (or any successor provision then in effect) promulgated under the Securities Act ("Rule 144"), (iii) such Registrable Securities have been sold to a Person other than a Holder of Subsidiary or Affiliate thereof pursuant to Rule 144 or (iv) such Registrable Securities are transferred to a Person other than a Holder or Subsidiary or Affiliate thereof in accordance with Section 9(b).

5498993.8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

STONE & WEBSTER, INCORPORATED

By: _____

Name: _____

Title:    Executive Vice President

STONE & WEBSTER GROUP LIMITED

_____

By: _____

Name: _____

Title:    Attorney-in-fact

THE SHAW GROUP INC.

By: _____

Name: _____

Title: _____

A457

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

STONE & WEBSTER, INCORPORATED

By: _____

Name: _____

Title: __Executive Vice President_____


STONE & WEBSTER GROUP LIMITED

_____

By: _____

Name: _____

Title: __Attorney-in-fact_____


THE SHAW GROUP INC.

By: _____

Name: _____

Title: _____

A458

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

STONE & WEBSTER, INCORPORATED

By: _____

Name: _____

Title: _____


STONE & WEBSTER GROUP LIMITED

_____

By: _____

Name: _____

Title: _____


THE SHAW GROUP INC.

By: _____

Name: Gary Graphia

Title: Secretary and General Counsel

A459

## TIME & MATERIAL AGREEMENT

This Time & Material Agreement (hereinafter "Agreement") is entered into effective as of July 14, 2000, by and between The Shaw Group Inc., a Louisiana corporation (hereinafter "SHAW"), and Stone & Webster, Incorporated, a Delaware corporation currently operating as Debtor-In-Possession (hereinafter "SW").

As part of an Asset Purchase Agreement entered into between SHAW and SW on July 14, 2000 (the "Purchase Agreement"), it is contemplated that SHAW would perform services for SW pursuant to a time and material agreement, including, but not limited to, in connection with contracts entered into by SW prior to becoming a Debtor-In-Possession and which are not being assumed by SHAW as part of the Purchase Agreement.

Reference to SHAW and to SW throughout the rest of this Agreement includes reference to any Affiliate of SHAW or SW, as the case may be. Capitalized terms used and not otherwise defined herein shall have the same meanings given such terms in the Purchase Agreement.

## Article 1 -      DESCRIPTION OF SERVICES AND AUTHORIZATION

1.1   SHAW agrees to perform engineering, construction management, consulting and related assignments during the term of this Agreement as SW may request in writing from time to time.

1.2   SHAW will provide to SW reasonable access to and the right to consult with any person who may have relevant knowledge in connection with the conduct of SW's post-closing business, including without limitation with respect to preparation of the Closing Balance Sheet, financial and accounting requirements, litigation, employee benefit plan and ERISA matters, tax requirements (including with respect to Form 1099s and preparation of Tax Returns), and requirements of applicable securities laws. SHAW also will provide SW, at reasonable times and upon reasonable notice, with the services of their former employees on such items where the provision of such services will not unreasonably interfere with SHAW's operations.

1.3   The services set forth in sections 1.1 and 1.2 above are hereinafter collectively referred to as the "Services".

1.4   Each assignment under this Agreement shall be authorized by an appropriate "Task Authorization" (similar in form to Attachment A) which is issued by SW and which shall only become effective upon written acceptance by SHAW. The specific scope of services, list of deliverables, schedule for deliverables, compensation basis, budgetary constraints, incentives, and any agreed additional terms for each assignment shall be identified in the Task Authorization.

5499341 5

A460

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives, as of the date hereinabove first written.

The Shaw Group Inc. (SHAW)                    Stone & Webster, Incorporated (S&W)

By: _____                 By: _____

Title: Secretary and General Counsel          Title: Executive Vice President

Name: Gary Graphia                            Name: Thomas L. Lamford

54993341.5                         8

A461

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>STONE & WEBSTER, INCORPORATED, et al.,<br><br>Debtors,<br><br>_____<br><br>SAUDI AMERICAN BANK<br><br>Plaintiff,<br><br>-against-<br><br>THE SHAW GROUP INC. and<br>SWINC ACQUISITION THREE, INC.,<br>and STONE & WEBSTER ENGINEERING<br>CORPORATION, et. al.<br><br>Defendants<br>_____ | Chapter 11<br><br>Case No. 00-02142 (PJW)<br><br>Jointly Administered<br><br><br>Adversary Proceeding<br>Case No. 01-7766 (PJW)<br><br><br>JURY TRIAL DEMANDED |

## DECLARATION OF JAMES P. CARROLL

I, James Patrick Carroll, declare under penalty of perjury that the following is true and correct.

1.     I am the president and chief restructuring officer for Stone & Webster, Incorporated, a debtor and debtor-in-possession in the above-referenced bankruptcy cases ("SWINC" and together with its subsidiaries and affiliates that are also debtors and debtors-in-possession, the "Debtors") and have held this position since February 1, 2001. From August 14 through January 31, 2001, I was the restructuring controller of SWINC. From approximately

A-209

A463

September 1999 to August 13, 2001, I was the vice president and corporate controller of SWINC and Stone & Webster Engineering Corporation ("SWEC").

2.      I make this affidavit in relation to this adversary proceeding filed by Saudi American Bank ("SAMBA") against certain of the Debtors and The Shaw Group Inc. ("Shaw"). On June 2, 2000, each of the Debtors filed voluntary petitions in bankruptcy in this Court. Shaw purchased substantially all of the assets and certain liabilities of the Debtors pursuant to an asset purchase agreement dated as of July 14, 2000 (the "APA") and approved by the Court by order dated July 13, 2000 (the "Sale Order").

3.      I understand that SAMBA makes two principal contentions in this adversary proceeding. First, SAMBA contends that it is a third-party beneficiary of the APA. Second, SAMBA contends that Shaw assumed the obligation (if any) of SWEC to repay a certain loan (the "Ras Tanura Loan") made by SAMBA to Bugshan Stone & Webster Company Limited ("BS&W"), a Saudi Arabian limited liability company whose shareholders are SWEC and Abdullah Said Bugshan & Brothers (a Saudi Arabian entity).

4.      In the normal and ordinary course of my duties as vice president and corporate controller of SWINC and SWEC, I was involved in the negotiation of the APA on behalf of the Debtors, including SWEC. In the normal and ordinary course of my duties as vice president and corporate controller, restructuring controller, and president and chief restructuring officer of SWINC, I have been principally responsible for implementing the agreements reached with Shaw that are part of the APA. I am familiar with the APA and its terms, and the history of its negotiation, drafting, and implementation.

2

A-210

A464

5.    Based upon my personal knowledge, and upon knowledge gained and beliefs formed in the normal and ordinary course of performing my professional duties on behalf of the Debtors, I can say with certainty that neither of SAMBA's contentions is correct.

6.    SAMBA's first contention – that it is somehow a third-party beneficiary under the APA – is incorrect because section 10.08 of the APA specifically provides that: "[t]he terms and provisions of this [Asset Purchase] Agreement . . . are intended solely for the benefit of the parties . . . and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights on any other [p]erson." APA at § 10.08. In negotiating, drafting, and implementing the APA, the Debtors specifically intended that no party other than the parties to the APA would have beneficiary rights under the APA.

7.    SAMBA's second contention – that Shaw assumed any obligation on the Ras Tanura Loan – is similarly incorrect. The Ras Tanura Loan was specifically for BS&W's mobilization and general operating costs on its Ras Tanura refinery upgrade project (the "Ras Tanura Project") for the Saudi Arabian Oil Company ("Saudi Aramco"). The APA identifies the Ras Tanura Project as a "Completed Contract" (as defined in section 1.01 of the APA). APA at schedule 2.02(b). Additionally, pursuant to section 2.04(e) of the APA, any liability of the Debtors "arising under" a Completed Contract is an "Excluded Liability" (as defined in section 1.01 of the APA) that was not assumed by Shaw. Section 2.04(e) of the APA provides that "[u]nder no circumstances shall [Shaw] assume or be obligated to pay . . . any of the Excluded Liabilities, including the following liabilities, which shall be and remain liabilities of [the Debtors]: . . . liabilities or obligations arising under the . . . Completed Contracts." APA at § 2.04(e).

3

A465

8. Additionally, section 2.02(b) of the APA provides that the Completed Contracts are "Excluded Assets" (as defined in section 1.01 of the APA) that were not assumed by Shaw. Section 2.02(e) of the APA provides that "the following assets are not a part of the sale and purchase contemplated by this [Asset Purchase] Agreement[:] the Completed Contracts . . . ." APA at § 2.02(b).

9. The foregoing provisions of the APA reflect the Debtors' and Shaw's intention that Shaw assumed neither the benefits of the Ras Tanura Project, including any receivables, nor its burdens, including any obligation to repay the Ras Tanura Loan. At all times during the negotiation, execution, and implementation of the APA, Shaw and the Debtors intended that the Ras Tanura Project and its attendant benefits and burdens would not be transferred to Shaw but would rather remain with the Debtors.

10. Neither Shaw nor the Debtors has ever wavered from the understanding of the APA described in the foregoing paragraph. The Debtors have not attempted to shift any burden associated with the Ras Tanura Project to Shaw nor has Shaw attempted to take any benefit from the Ras Tanura Project. Indeed, SWEC has commenced an adversary proceeding against Saudi Aramco to recover damages caused by Saudi Aramco when it wrongfully terminated BS&W from the Ras Tanura Project. And conversely, to the extent that the Ras Tanura Loan is a valid prepetition obligation of SWEC, under the APA the Debtors remain responsible for it.

11. On or about July 21, 2000, the Debtors filed a list of "Assumed Contracts" (as defined in section 1.01 of the APA) and an amended list of Completed Contracts and "Rejected Contracts" (as defined in section 1.01 of the APA). On or about August 4, 2000, the Debtors filed an amended list of Assumed Contracts consisting of five volumes. On the same date, the

4

Debtors filed an amended list of Completed Contracts and Rejected Contracts consisting of three volumes.

12.    In compiling the lists of Assumed, Completed, and Rejected Contracts described in the foregoing paragraph (the "Contracts Lists"), the Debtors acted with reasonable care and due diligence, and in good faith in order to make the Contracts Lists as accurate as possible.

13.    Shaw did not participate in the creation of, did not review or approve, and is not a signatory of, the Contracts Lists. The Contracts Lists were not envisioned, required, or expressly permitted by the APA, and were not intended to and do not amend or supercede the APA. The Debtors did not seek Court approval of, and the Court has not approved, the Contracts Lists. The Debtors did not intend the Contracts Lists to be binding on either the Debtors or Shaw. The Debtors compiled the Contracts Lists solely to aid in the administration of their bankruptcy cases and not for any other purpose.

A-213

A467

14.    When the Debtors filed the Contracts Lists, it was our intention that any discrepancies between the Contracts Lists and the APA be resolved in favor of the APA. It is and has been our intention and position that where the Contracts Lists and the APA disagree, the APA controls. Thus, the Debtors' position is that to whatever extent the Contracts Lists suggest that any prepetition liability for the Ras Tanura Loan of any of the Debtors was transferred to Shaw through the APA, then the Contracts Lists are in error and the APA controls. This is and has always been my understanding as SWINC's president and chief restructuring officer, restructuring controller, and vice president and corporate controller, as an officer of SWINC and SWEC who participated in the negotiation of the APA, and as the officer of SWINC who has been primarily responsible for its implementation.

I declare under penalty of perjury that the foregoing is true and correct.

_James P. Carroll_

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel B. Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick & Lockhart L.L.P., Boston, Massachusetts.

Gregory Alan Taylor, Esquire, Stephen B. Jenkins, Esquire, Christopher S. Sontchi, Esquire and Liza H. Meltzer, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P., Wilmington, Delaware. Counsel for Defendant SWE&C Liquidating Trustee.

MEMORANDUM OPINION

Dated: May 3, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1]
filed a voluntary petition for relief under chapter 11, title 11
of the United States Code.  On October 18, 2001, plaintiff Saudi
American Bank ("SAMBA") filed an adversary action against
defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three,
Inc. and SWE&C Liquidating Trustee (collectively "defendants") in
the United States Bankruptcy Court for the District of Delaware
("the bankruptcy court").  (D.I. 1)[2]  Plaintiff alleged that,
under an Asset Purchase Agreement ("the APA"), defendants assumed
a debt owed to plaintiff by Stone & Webster Engineering
Corporation ("SWEC"), a subsidiary of debtor.  (Id.)  On June 1,
2004, defendants moved to withdraw the adversary proceeding from
the bankruptcy court.  (D.I. 75)  This court granted the motion
on September 13, 2004.  (D.I. 88)  The court has jurisdiction
over actions arising out of chapter 11 of the bankruptcy code
pursuant to 28 U.S.C. § 1334(a).  Presently before the court are
plaintiff's and defendants' motions for summary judgment.  (D.I.
29, 47)[3]  For the reasons set forth below, the court grants

---

[1] Although there are multiple named debtors, for ease of
reference this order shall refer to a single "debtor."

[2] Unless otherwise noted, the docket items (i.e., D.I. __)
will be from the bankruptcy court's docket for this case.

[3] There are several motions which are currently pending
before the court.  While this memorandum opinion will focus on
plaintiff's and defendants' cross motions for summary judgment,

plaintiff's motion for summary judgment (D.I. 47) and denies

defendants' motion for summary judgment (D.I. 29).

II.  BACKGROUND

On May 31, 1980, SWEC and Abdullah Said Bugshan & Bros.

("Bugshan"), a Saudi Arabian business enterprise, formed a joint

venture called Bugshan Stone & Webster ("BSW") under the laws of

Saudi Arabia.  (D.I. 1 at 5)  BSW was owned in equal shares by

SWEC and Bugshan.  (Id.)  In the mid 1990s, BSW entered a $130

million contract with Saudi Arabian American Oil Company

("Aramco") to upgrade a large oil refinery at Ras Tanura in Saudi

Arabia (the "Ras Tanura Contract").  (D.I. 31 at A-173)  In an

attempt to induce plaintiff to grant credit to BSW, Bugshan and

SWEC each agreed to issue guaranties to plaintiff for 50% of any

loans plaintiff made to BSW.  (D.I. 1, ex. A; D.I. 49 at A95-A96,

A125)  On October 11, 1994, SWEC delivered a letter guarantying

payment of 50% of all obligations owed to plaintiff by BSW, up to

thirty five million dollars (the "Guaranty").  (D.I. 1, ex. A)

In a letter dated July 10, 1997, plaintiff approved a loan for

$35 million "to finance mobilization & working capital

---

it will also resolve several other pending motions.  Most notably
this order will address:  (1) plaintiff's motion for leave to
file an amended complaint (D.I. 8); (2) plaintiff's motion for
consolidation or dismissal (D.I. 9); (3) defendants' motion for
summary judgment (D.I. 29); (4) plaintiff's motion for summary
judgment (D.I. 47); and (5) plaintiff's motion to strike the
declaration of James P. Carroll (D.I. 48).  Because debtor Stone
& Webster, Inc. has been terminated from the present matter, its
motion for summary judgment (D.I. 11) is denied as moot.

2

requirements of Saudi Aramco Cont[r]act [No.] 65004/00 (IK)."[4]
(D.I. 31 at A-168)  Unfortunately, BSW ran into difficulties on
the Ras Tanura project and was unable to repay plaintiff the
outstanding amount of the loan when the project was completed.
In late 1998, pursuant to their guaranties, SWEC and Bugshan each
agreed to repay one-half of the outstanding Ras Tanura Contract
loan at a rate of $650,000 per month (the "Payment Letter").
(D.I. 49 at A67, A127)

By June 2000, debtor was operating its businesses and
managing its properties pursuant to 11 U.S.C. §§ 1107(a) and
1108.  At the time of debtor's chapter 11 filing, SWEC allegedly
owed plaintiff approximately $6 million.  (D.I. 49 at A69)  On
July 6 and 7, 2000, substantially all of debtor's assets were
sold to defendant Shaw through an auction sale (the "Auction
Sale").  (D.I. 49 at A131-A291)

On July 7 and 12, 2000, a hearing for approval of the
Auction Sale (the "Sale Hearing") was conducted.[5]  (D.I. 50 at
A497-A648)  At the Sale Hearing, counsel for debtor represented
that debtor had

sent out a notice of sale . . . that said, essentially, if

---

[4] Contract No. 65004/00 (IK) was BSW's name for the contract
to upgrade Aramco's Ras Tanura facility.  (D.I. 31 at A-131, A-
170)

[5] At the time of the Sale Hearing, the United States
District Court for the District of Delaware was hearing
bankruptcy cases pursuant to 28 U.S.C. § 1334(a).

3

you don't see your name on this list, or this schedule of contracts, which is the, what I like to call the excluded contracts, then your contract is being assumed.

. . .

Sometimes, Your Honor, in purchase contracts, schedules are merely informative and not necessarily per se material to the deal. That is not the nature of this agreement. This agreement revolves, in terms of its economics, around three schedules, or let's say two schedules, and whether or not your contract is on one of those two schedules. And those two schedules are the schedule for rejected contracts and the schedule for completed contracts. If they are not on those schedules, in essence, your contract is an assumed contract, and the economic impact to you as a stakeholder is dependent upon whether you are on those two lists . . . .

(D.I. 50 at A518-A529) (emphasis added)

On July 13, 2000, an order (the "Sale and Assumption Order") regarding the Auction Sale was entered.  (D.I. 49 at A1-A36)   In the Sale and Assumption Order, the court stated:

[A]ll rights and remedies of any non-debtor party or Shaw under any of the Assumed Contracts (the "Rights and Remedies") are fully preserved and shall be enforceable after the Closing against Shaw or the non-debtor party unless such Rights and Remedies are or were expressly waived in a separate agreement or on the record of the Auction.

(D.I. 49 at A18-A19)   The court also stated that

[t]he terms and provisions of the [APA] and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the [debtor], [its] estates, and [its] creditors, Shaw, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Shaw pursuant to the [APA] . . . .

(D.I. 49 at A26)   Finally, the court stated that the APA could not be modified without further order unless "such modification, amendment, or supplement does not have a material adverse effect

4

on the [debtor's] estates." (D.I. 49 at A27)

On July 14, 2000, debtor and defendant Shaw entered into the APA whereby Shaw purchased a substantial portion of debtor's assets and assumed many of its liabilities. (D.I. 50 at A861-A969) On the same date, the court entered an order approving the APA.

Section 2.02 of the APA, titled "Excluded Assets," excludes a number of assets from those being acquired by defendant Shaw. (D.I. 31 at A-240) Subsection (b) defines as "Excluded Assets" all "Completed Contracts" of debtor. Section 1.01 of the APA defines "Completed Contracts" as contracts of debtor, "including those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of [debtor] has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims[.]" (Id. at A-229) Schedule 2.02(b) does not include any reference to the Guaranty, the Payment Letter, or the underlying Ras Tanura Contract. (Id. at A-306)

Subsection (e) of Section 2.02 of the APA defines as "Excluded Assets" all the "Special Project Claims". (Id. at A-241) Section 1.01 of the APA defines "Special Project Claims" as "any and all claims under the project agreements set forth on Schedule 2.02(e) to the extent not reflected on the March 31

5

A475

Balance Sheet[.]"⁶ (Id. at A-237) Schedule 2.02(e) lists the "Ras Tanura, Saudi Arabia, Refinery Upgrade Project" as one of the "Special Project Claims.⁶ (D.I. 50 at A979) Schedule 2.02(e) also specifically identifies a "Contract for Construction dated as of June 28, 1994 by and between Saudi Arabian Oil Company ("Saudi Aramco")" and [BSW] (designated by Saudi Aramco as Contract No. 65004/00)[]" as a "Special Project Claim". (Id.) Finally, Schedule 2.02(e) identifies "[o]ne or more potential claims for payment under a series of Letters of Credit issued by [plaintiff] and involving materials supplied under a number of purchase orders issued by [BSW] . . . for materials incorporated into the [Ras Tanura Refinery Upgrade Project]" as "Special Project Claims". (Id.)

Section 2.03 of the APA states that "[Shaw] shall assume the Assumed Liabilities[]" as of the closing date. (Id. at A887) Section 1.01 of the APA defines "Assumed Liabilities" as "all liabilities and obligations of [debtor] set forth on Schedule 2.03 as of the Closing Date . . . ." (Id. at A872) Schedule 2.03 is the "List of Assumed Liabilities". (Id. at A957) Paragraph three of Schedule 2.03 provides that "[l]iabilities

-----

⁶ Although the APA defines "Special Project Claims" as any and all claims set forth on Schedule 2.02(e), the Execution Copy of the APA did not include a Schedule 2.02(e). Rather, Schedule 2.02(e) was added to the APA by debtor and defendant Shaw subsequent to this court's approval of the Execution Copy of the APA. (D.I. 51 at 42; D.I. 57 at 14 n.3)

6

A476

under [debtor's] outstanding bank indebtedness, including amounts outstanding and pursuant to existing standby letters of credit[]" are "Assumed Liabilities." (Id.) Section 3.17 of the APA states that Schedule 3.17(a)(ix) is "a true, complete and correct list" of "any bond, indenture, note, loan or credit agreement . . . or other Contract relating to the borrowing of money or to the direct or indirect guarant[y] or assumption of obligations of any other Person for borrowed money." (Id. at A897) Schedule 3.17(a)(ix) lists: (1) a guaranty by BSW to plaintiff (id. at A983); (2) a letter of guaranty dated September 1, 1992 from SWEC to plaintiff regarding BSW securing credit facilities (id. at A984); and (3) a letter of guaranty dated October 19, 1992 whereby SWEC guaranteed plaintiff the repayment of 40 million Saudi Riyals (id.). Defendant Shaw admits that Schedule 3.17(a)(ix) lists a guaranty by SWEC for BSW's borrowing from plaintiff. (D.I. 49 at A91) Defendant Shaw assumes that the guaranty listed on Schedule 3.17(a)(ix) incorporates the Guaranty by which SWEC guaranteed 50% of BSW's obligations to plaintiff up to $35 million. (Id. at A91-A92) Defendant Shaw admits that Schedule 3.17(a)(ix) lists contractual liabilities disclosed to defendant Shaw by debtor. (D.I. 49 at A91)

Section 2.04 of the APA, captioned "Excluded Liabilities," states that "[u]nder no circumstances shall [defendant Shaw] assume or be obligated to pay . . . any of the Excluded

7

A477

Liabilities, including the following liabilities, which shall be and remain liabilities of [debtor]: . . . (c) liabilities or obligations associated with any Excluded Assets; . . . (e) liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts[.]" (D.I. 31 at A-241)

On July 18, 2001, the court entered an order establishing a cure claim procedure. (D.I. 49 at A293-A307) The cure claim procedure defined "cure claims" as "any and all liquidated monetary claims[7] arising or accruing on or before July 14, 2000 under the Assumed Contracts and actually known by the non-[debtor] party to an Assumed Contract." (Id. at A294) The cure claim procedure also required debtor to file a list of all Assumed Contracts and an amended list of all Excluded Contracts. (Id. at A305) According to the cure claim procedure, a cure claim had to be filed by August 25, 2000. (Id. at A299)

On July 21, 2000, debtor filed an Assumed Contract List, an Excluded Contract List, and an Amended Excluded Contract List. (D.I. 50 at A649-A660) Neither the Guaranty nor the Payment

---

[7] "Liquidated monetary claims" relate to "money due and owing or allegedly due and owing by the [debtor] under the Assumed Contracts, but does not include any claims by the non-[debtor] party for any defective work (whether latent or otherwise) by the [debtor] or [its] subcontractors or under any warranty provisions of the Assumed Contract." (D.I. 49 at A294-A295)

8

Letter was included on any of those lists. On August 4, 2000, debtor filed a Second Amended Excluded Contract List, and a Second Amended Assumed Contract List. (D.I. 50 at A661-A668) The Second Amended Assumed Contract List includes a contract with Aramco Services Co. and two contracts with plaintiff. (D.I. 50 at A666, A668)

On August 24, 2000, plaintiff filed a statement of cure claim against SWEC, alleging that SWEC owed outstanding financial obligations to plaintiff. (D.I. 49 at A52-A85) Plaintiff attached the Guaranty and the Payment Letter as exhibits to its cure claim. (Id. at A56, A67) Defendant Shaw failed to pay or contest plaintiff's cure claim.

On December 28, 2000, the court entered an order approving a letter agreement, dated December 27, 2000, which confirmed the terms of the APA. (D.I. 50 at A857-A860) Pursuant to this letter agreement and order, certain additional projects were to be treated as Completed Contracts under the APA and Schedule 2.02(b). (D.I. 50 at A670) Neither the Guaranty nor the Payment Letter were added to the list of Completed Contracts. (Id.) Debtor also stated that the additional completed contracts "constitute the only completed contracts or substantially completed contracts of which [debtor has] actual knowledge as not being listed on Schedule 2.02(b) to the Disclosure Schedules (collectively with Schedule 2.02(b), the 'Completed Contracts

9

A479

List')."  (Id.)  Neither the letter agreement nor the order
sought to amend the Schedule of Rejected Contracts.

On August 1, 2001, debtor commenced a preference action
against plaintiff to avoid and recover certain preferential
transfers, to disallow plaintiff's claims, to estimate
plaintiff's claims at $0, and to reduce plaintiff's claims to an
amount reflected on the debtor's books and records (the
"Preference Action").  Plaintiff filed its answer and affirmative
defenses on October 18, 2001.

On August 1, 2002, plaintiff commenced the instant adversary
proceeding.  (D.I. 1)  Plaintiff's complaint alleged that, under
the APA, defendant Shaw assumed the $6,728,529 debt owed to
plaintiff by SWBC.  In the alternative, plaintiff claimed that
"[u]nless [defendant] Shaw assume[d] its obligation to pay
[plaintiff] . . . SWBC is obligated to pay [plaintiff] . . . ."
(D.I. 1 at 12)

On January 2, 2002, defendants filed an answer to
plaintiff's adversary proceeding complaint.  (D.I. 5)  Plaintiff
filed a motion for leave to file an amended complaint on January
7, 2002.*  (D.I. 8)  That same day, plaintiff filed a motion
seeking to consolidate the Preference Action and the instant

---

* The court denies plaintiff's motion for leave to file an
amended complaint (D.I. 8), as amending the complaint will
further delay this case, which lingered in the bankruptcy court
for several years before it was withdrawn to this court.

10

litigation.⁹ (D.I. 9)  On August 13, 2002, defendant Shaw filed a motion for summary judgment.¹⁰ (D.I. 29)  On October 18, 2002, plaintiff filed its motion for summary judgment.  (D.I. 47)

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of

---

⁹ The court denies plaintiff's motion to consolidate.  (D.I. 9)  Federal Rule of Civil Procedure 42(a) provides this court with authority to consolidate "actions involving a common question of law or fact . . . pending before the court." Decisions to consolidate cases are at the discretion of the district court, but often courts balance considerations of efficiency, expense and fairness.  See United States v. Dentsply Int'l, Inc., 190 F.R.D. 140, 142-43 (D. Del. 1999).  Because the Preference Action and this litigation stem from different factual circumstances, consolidation is not appropriate.
The court also denies plaintiff's motion to dismiss the preference action (D.I. 9), as the preference action is not pending in this court.

¹⁰ The court grants plaintiff's motion to strike the declaration of James P. Carroll submitted in support of defendants' motion for summary judgment.  (D.I. 48)

11

A481

proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A482

## IV.    DISCUSSION[11]

Construction of contract language is a question of law.  See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992).  The primary consideration in interpreting a contract is to "attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."  See Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13 (Del. Ch. 2003).  In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts.  See Haft v. Haft, 671 A.2d 413, 417 (Del. Ch. 1995).  Under this approach, a contract's "construction should be that which would be understood by an objective reasonable third party."  R.R. Haight & Assocs. v. W.B. Venables & Sons, Inc., C.A. No. 94C-11-023, 1996 WL 658969, at *3 (Del. Super. Oct. 30, 1996) (quoting Demetree v. Commonwealth Trust Co., No. 14354, 1996 WL 494910, at *4 (Del. Ch. Aug. 27, 1996)).  Thus,

> [w]here parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party.  An inquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where the words of the

---

[11] In the case at bar, plaintiff asserts that defendant Shaw assumed a debt owed to plaintiff by SWEC through operation of the Guaranty and Payment Letter.  Because there is no dispute that plaintiff has standing to enforce these contracts if they were assumed by defendant Shaw pursuant to the Sale and Assumption Order and Sections 2.03 and 3.17 of the APA, there can be no dispute that plaintiff has standing to bring the issue for resolution before this court,

13

A483

contract are sufficiently clear to prevent reasonable
persons from disagreeing as to their meaning.

Demetree, 1996 WL 494910, at *4 (citations omitted); accord Eagle
Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232
(Del. 1997) ("Contract terms themselves will be controlling when
they establish the parties' common meaning so that a reasonable
person in the position of either party would have no expectations
inconsistent with the contract language."). The court,
therefore, must determine whether the contractual language in
dispute, when read in the context of the entire contract, is
ambiguous.

Ambiguity exists only when a contractual provision is
"reasonably or fairly susceptible of different interpretations or
may have two or more different meanings." Rhone-Poulenc, 616
A.2d at 1196; accord SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 42
(Del. 1998). Contractual language "is not rendered ambiguous
simply because the parties do not agree upon its proper
construction." Id.; see also City Investing Co. Liquidating
Trust v. Cont'l Cas. Co., 624 A.2d 1191, 1198 (Del. 1993)
(finding contract language is not ambiguous "simply because the
parties in litigation differ concerning its meaning."). However,
inconsistent contractual provisions may create ambiguity in a
contract. Fraternal Order of Police v. City of Fairmont, 468
S.E.2d 712, 717 (W. Va. 1996) ("Contract language usually is
considered ambiguous where an agreement's terms are inconsistent

14

A484

on their face . . . ."); Weber v. Tillman, 913 P.2d 84, 96 (Kan. 1996) ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."); Franklin v. White Egret Condo., Inc., 358 So. 2d 1084 (Fla. Dist. Ct. App. 1977), aff'd, 379 So. 2d 346 (Fla. 1979) (finding "two sections [of a disputed contract] are inconsistent, and inherently ambiguous."). When a contract is ambiguous, it raises "factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties." Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1230 (Del. 1997). If "the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide." In re Columbia Gas Sys., 50 F.3d 233 (3d Cir. 1995).

The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral."[12] Financeamerica Private Brands,

---

[12] Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument that the contract at issue is the Ras Tanura Contract.

15

A485

Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super. 1977); see also Jones Motor Co. v. Teledyne, Inc., 690 F. Supp. 310, 311 (D. Del. 1988). Therefore, the issue presented by the parties is whether the Guaranty and Payment Letter were unambiguously assumed or rejected under the APA.

The court concludes that the Guaranty and Payment Letter were assumed under the APA. First, neither the Guaranty nor the Payment Letter fall within the definition of an "Excluded Asset" either as a "Completed Contract" or as a "Special Project Claim", as defined in Section 2.02 of the APA and the schedules related thereto. Second, Section 1.01 of the APA defines an "Assumed Contract" as any contract that is not specifically identified as a "Rejected Contract" or a "Completed Contract". Sections 1.01 and 2.03 and Schedule 2.03 of the APA define the scope of "Assumed Liabilities" as including "outstanding bank indebtedness". The record indicates that Schedule 3.17, listing those contracts which relate to such outstanding bank indebtedness as guaranties, includes at least an indirect reference to the Guaranty and Payment Letter. Defendant failed to pay or contest plaintiff's cure claim. Finally, and of great significance, are the representations made to this court by counsel for the debtor, that if contracts were not identified on the schedules listing rejected and completed contracts, then the contract would be deemed an assumed contract.

16

A486

**V.    CONCLUSION**

For all of these reasons, the court concludes that the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the APA and the Sale and Assumption Order. Therefore, plaintiff's motion for summary judgment shall be granted. An appropriate order shall issue.

A487

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142 (PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766 (PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

O R D E R

At Wilmington this 3rd day of May, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1.    Defendants' motion for summary judgment (D.I. 29) is denied.

2.    Plaintiff's motion for summary judgment (D.I. 47) is granted.

3.    The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendants.

_____
United States District Judge

A488

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ------------------------------- | | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

JUDGMENT IN A CIVIL CASE

For reasons stated in the court's memorandum opinion
and order of May 3, 2005;

IT IS ORDERED AND ADJUDGED that judgment be and is
hereby entered in favor of plaintiff Saudi American Bank and
against defendants Shaw Group, Inc., SWINC Acquisition Three,
Inc., and SWE&C Liquidating Trustee.

_____
United States District Judge

Dated: May 4, 2005

_____
(By) Deputy Clerk

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh
Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for
Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E.
Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick &
Lockhart L.L.P., Boston, Massachusetts.

**Gregory Alan Taylor, Esquire, and Stephen E. Jenkins, Esquire
of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants
Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P.,
Wilmington, Delaware. Counsel for Defendant SWE&C Liquidating
Trustee.

**AMENDED MEMORANDUM OPINION

Dated:  November 8, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1] filed a voluntary petition for relief under chapter 11, title 11 of the United States Code. On October 18, 2001, plaintiff Saudi American Bank ("SAMBA") filed an adversary action against defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three, Inc. and SWE&C Liquidating Trustee (collectively "defendants") in the United States Bankruptcy Court for the District of Delaware ("the bankruptcy court"). (Bank. D.I. 1)[2] Plaintiff alleged that, under an Asset Purchase Agreement ("the APA"), defendants assumed a debt owed to plaintiff by Stone & Webster Engineering Corporation ("SWEC"), a subsidiary of debtor. (Id.)

The adversary proceeding was withdrawn from bankruptcy court on September 13, 2004. (Bank. D.I. 88) Plaintiff and defendants filed motions for summary judgment. The court granted plaintiff's motion for summary judgment (Bank. D.I. 47) and denied defendants' motion for summary judgment (Bank. D.I. 29). (D.I. 11) Defendant Shaw appealed (D.I. 24) and the case was remanded for clarification on the issue of damages. (D.I. 30) Presently before the court is plaintiff's motion for assessment of damages. (D.I. 14) The court has jurisdiction over actions

---

[1] Although there were multiple named debtors, for ease of reference this order shall refer to a single "debtor."

[2] References to "Bank. D.I." refer to the docket in the bankruptcy court for adversary proceeding number 01-7766.

arising out of chapter 11 of the bankruptcy code pursuant to 28
U.S.C. § 1334(a).

## II. BACKGROUND

The court recited many of the pertinent facts in its
memorandum opinion accompanying its order granting summary
judgment to plaintiff SAMBA (D.I. 11), and the most pertinent
facts related to the present motion for assessment of damages are
summarized below.

In 1980, a joint venture called Bugshan Stone & Webster
("BS&W") was created under the laws of Saudi Arabia. BS&W was
owned in equal shares by SWEC, a subsidiary of Stone & Webster,
Inc., and Abdullah Said Bugshan & Bros. ("Bugshan"). BS&W
entered into a $130 million contract in the mid-1990s to upgrade
a large oil refinery at Ras Tanura in Saudi Arabia (the "Ras
Tanura Contract"). In an effort to induce plaintiff to grant
credit to BS&W, Bugshan and SWEC executed a Guaranty wherein each
party guaranteed 50% of all obligations to plaintiff bank from
BS&W. (D.I. 26 at ex. B) Plaintiff granted $35 million of
credit to BS&W by agreement on January 22, 1998 (the "Credit
Agreement"). (Id. at ex. C) A contract was signed by Bugshan
and SWEC on December 22, 1998 (the "Payment Letter") which
specified that Bugshan and SWEC were each obligated to repay half
of the loan balance to plaintiff, for a total of $650,000 by each
party per month. (Id. at ex. D) The court previously determined

2

that defendant Shaw assumed the obligations of the Guaranty and

Payment Letter when it acquired SWEC. (D.I. 11 at 17)

The Credit Agreement between plaintiff and BS&N stated:

> Borrower shall pay commission on the unpaid principal
> balance outstanding . . . The commission rate shall be
> determined by the Bank and subject to change from time
> to time. Borrower shall be deemed to have agreed to
> the commission rate as determined by the Bank . . .

(D.I. 26 at ex. C, B024). The Credit Agreement further states:

> Borrower shall pay upon demand all expenses, including
> attorney's fees, court costs, appraisal fees and all
> other fees and expenses, incurred by the Bank in
> obtaining or enforcing any of its rights under this
> Agreement, the Note or the Security Documents.

(Id. at B025) (emphasis added).

The Guaranty of Bugshan and SWEC to plaintiff for the loan

provided:

> [T]he undersigned hereby unconditionally guarantees the
> punctual payment when due of 50% of all obligations of
> the Borrower to you now or hereafter existing
> "Obligations" together with interest thereon and any
> and all expenses incurred by you in enforcing your
> rights under this Guaranty.

(Id. at ex. B) (emphasis added).

SWEC made monthly $650,000 payments to BS&N for the

repayment of plaintiff's loan. (D.I. 21 at 7) SWEC filed for

bankruptcy on June 2, 2000, at which time debtor allegedly owed

SAMBA approximately $6 million. (D.I. 11 at 3) Anticipating

SWEC's petition for bankruptcy, SAMBA demanded payment of

$6,728,594 by SWEC on May 31, 2000. (Id.; Bank. D.I. 1) This

amount reflected $6,725,000 in principal and $3549 of interest.

3

A495

SAMBA never received payment from SWEC.  On its bankruptcy petition, SWEC listed the amount owed to SAMBA as $6,728,594.

Plaintiff moved the court for an order that Shaw assumed SWEC's debt to SAMBA by operation of the APA and Sale of Assumption Order.  (Bank. D.I. 29)  In granting plaintiff's motion (D.I. 11), the court awarded SAMBA its requested $6,728,594 in damages on May 4, 2005.

III. DISCUSSION

A. Prejudgment Interest

SAMBA asserts that it is entitled to prejudgment interest on the loan principal of $6,725,000 for which SWEC agreed to be responsible, calculated from SAMBA's date of demand, May 31, 2000.[3]  (D.I. 21 at 4)  SAMBA argues that it is entitled to pre-judgment interest under Delaware law as a matter of right.  (Id. at 15-16)  SAMBA states that "[i]t is beyond dispute that both the Guaranty and the [Credit Agreement] provide that interest is to be paid, but neither document explicitly provides the applicable interest rate."  (D.I. 21 at 16-17)  According to SAMBA, the Delaware legal rate as of May 31, 2000, or 11%, must be applied.  (Id. at 17)  In the alternative, SAMBA argues that the rate SAMBA provided in its interrogatory responses in this

---

[3]If the court awards prejudgment interest, the interest should be applied to the entirety of the judgment, or $6,728,594, and not the outstanding $6,725,000 owed by SWEC under the loan.

4

A496

case, 7.375% compounded daily, should apply.[4]

In opposition, Shaw argues that Saudi Arabian law governs the Credit Agreement, the Guaranty, and the Payment Letter. (D.I. 26 at 4-6)  Shaw states that "BS&W's obligation to SAMBA ultimately arose under and is determined by the Credit Agreement, and SWEC's obligation, which is derivative of that, arises primarily under the Payment Letter."  (Id. at 4)  The Credit Agreement contains a choice of law provision which provides that Saudi Arabian law governs the agreement.  (D.I. 26 at ex. C at B025)  The Payment Letter contains no choice of law provision, however, Shaw argues that the Payment Letter is governed by Saudi Arabian law because that agreement was executed in Saudi Arabia and payment from SWEC to SAMBA was to occur in Saudi Arabia. (D.I. 26 at 4)  Shaw claims that Islamic law forbids collection of interest.[5]  (Id. at 4-5)  Even though the Guaranty states that it is governed by New York law, Shaw argues that "its provisions are entirely derivative" of the Credit Agreement, thus, the prohibition against awards of interest under Saudi law equally

---

[4]SAMBA states the 7.375% rate was in reference to the Ras Tanura Contract and not the Credit Agreement (D.I. 29 at 3), but submits that this rate may be used as the default alternative to the 11% Delaware rate.

[5]SAMBA offers the Declaration of Mohammed Saleh Mohammed Al-Motlaq in support of its counter position that Saudi law does not prohibit prejudgment interest because banking institutions are not subject to a strict interpretation of Islamic law.  (D.I. 29 at 12-13;  D.I. 31)

A497

applies to the Guaranty. (Id. at 5-6)

### 1. The Guaranty Controls the Award of Prejudgment Interest

As discussed previously, the Credit Agreement created a contractual relationship between BS&W and SAMBA. The obligation for SWEC to repay SAMBA did not arise out of the Credit Agreement, as SWEC and Bugshan were not parties to that agreement. The court's prior ruling did not address whether the obligation of SWEC for the loan arose out of the Guaranty, Payment Letter, or both. The court also did not have occasion to evaluate whether the Payment Letter is independent of the Guaranty. The court was asked to evaluate whether either agreement was assumed by defendant Shaw. In its analysis, the court expressly stated that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral." (D.I. 11 at 15) (citing Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super. 1977); Jones Motor Co. v. Teledyne, Inc., 690 F. Supp. 310, 313 (D. Del. 1988)). The court held that since neither obligation was contested,[6] "the Guaranty and Payment Letter are contracts that were assumed by defendant

---

[6] As explained in more detail in the court's prior ruling, debtor never contested plaintiff's cure claim to its debts under the Guaranty and Payment letter, and never listed either agreement on its schedules of Assumed, Excluded, Completed, or Rejected contracts in its bankruptcy proceeding. (D.I. 11 at 7-10, 16)

6

Shaw."[7]   (D.I. 11 at 16)

It is not disputed that the Guaranty obligated SWEC to repay the loan to plaintiff, and that the court has held that defendant Shaw assumed SWEC's obligation.  It is also not disputed that the Guaranty states that SWEC's obligation, "together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty," are recoverable by SAMBA.  The issue of whether prejudgment interest may be awarded can be analyzed solely under the terms of the Guaranty,[8] without resolving whether the Payment Letter also created a separate debt obligation.[9]

---

[7]The court noted that counsel's representations to the court, that contracts not identified on the schedules would be assumed contracts, were "of great significance" to its holding. (D.I. 11 at 16)

[8]In its response to plaintiff's current motion, Shaw argues that the Guaranty is "entirely derivative" of the Credit Agreement.  (D.I. 26 at 5)  This position is entirely inconsistent with the court's prior statement that a guaranty is an independent agreement and, therefore, the law governing the Credit Agreement, namely Islamic law, does not apply to the Guaranty or Payment Letter.  Thus, the court need not resolve the issue of whether Islamic law does in fact prohibit an award of prejudgment interest as defendants assert.  SAMBA also submits that defendants waived any defense that an award of prejudgment interest would be illegal, because defendants failed to affirmatively plead its illegality defense as required by Fed. R. Civ. P. 8, and failed to raise the issue in any prior papers or at oral argument.  (D.I. 29 at 12)  The court need not address these arguments since Saudi Arabian law does not apply to the Guaranty or Payment Letter.

[9]It is nevertheless notable that the Payment Letter does not provide for any remedies and does not contain a choice of law provision.  Defendants suggest that "to the extent SAMBA's claim

A499

## 2. Choice of Law

The Guaranty states that it is governed by New York law.[10]
SAMBA argues that its complaint in this matter arose under the
Bankruptcy Code, which contains no provision governing
prejudgment interest. (D.I. 29 at 2) SAMBA concludes that the
court should turn to Delaware law as instructive and ignore the
parties' choice of New York law, as "none of the parties, nor any
aspect of either the BS&W loan documents, the loan transactions
thereunder, SWEC's Guaranty or the Payment letter, has any
connection or contact with New York." (D.I. 29 at 4-5)

-----------

is predicated on the Payment Letter . . . the substantive law of
Saudi Arabia - which a Delaware court would apply - would not
permit the application of prejudgment interest." (D.I. 26 at 5)
The Payment Letter is a memo-style document to SAMBA, which
states its "Subject" is "Re-scheduling of Bugshan Stone & Webster
(BSW) loan facility." (D.I. 26 at ex. D) The Payment Letter
does not contain a choice of law provision and does not conflict
in this regard with the Guaranty. The body of the document
contains the division of payment between Bugshan and SWEC, and
requests advisement of whether the terms are acceptable "in order
to finalize the arrangement." (Id.) It is highly likely that
the reason that the Payment Letter does not contain any other
standard contract provisions is because the parties did not
intend for the Payment Letter to be a complete representation of
BS&W's obligations, only an addendum to the Guaranty. As the
court resolves the issue of prejudgment interest based on the
Guaranty alone, the court withholds ruling on the legal effect of
the Payment Letter.

[10]New York's General Obligations Law Section 5-1401
specifically contemplates situations where neither contracting
party has significant contacts to New York. That law provides
that parties to an agreement concerning a transaction exceeding
$250,000 may agree that New York law applies "whether or not such
contract, agreement or undertaking bears a reasonable relation to
this state." N.Y. C.P.L.R. § 5-1401(1) (McKinney 2006).

8

A500

The New York legal interest rate is 9% per annum.[11]  N.Y.
C.P.L.R. § 5004 (McKinney 2006).  That rate must be calculated on
a simple interest basis.  See Marfia v. T.C. Ziraat Bankasi, 147
F.3d 83, 90 (2d Cir. 1998) (citations omitted).

The Delaware legal interest rate is 5% over the Federal
Reserve discount rate.  6 DEL. CODE § 2301 (2006);  See U.S. v.
Star Brite Construction Co., 848 F. Supp. 1161, 1169 (D. Del.
1994).  The Federal Reserve discount rate was 6% in May 2000
(D.I. 16 at ¶12 and ex. E), bringing the Delaware legal rate to
11%.

A federal court in a diversity case must apply the conflict
of laws rules of the state in which it is sitting.  See Klaxon
Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941).
Delaware choice of law rules rely on Restatement (Second) of
Conflicts of Law § 187 for the proposition that "the parties'
choice of law, as expressed in their agreement, will be upheld
unless the state whose law would control in the absence of a

---

[11]New York law provides with respect to the award of
interest in breach of contract cases:

> Interest shall be recovered upon a sum awarded because
> of a breach of performance of a contract, or because of
> an act or omission depriving or otherwise interfering
> with title to, or possession or enjoyment of, property,
> except that in an action of an equitable nature,
> interest and the rate and date from which it shall be
> computed shall be in the court's discretion.

NY CPLR § 5001(a) (McKinney's 2006).

9

A501

choice has a materially greater interest in the subject matter." _Hionis Intern. Enterprises, Inc. v. Tandy Corp._, 867 F. Supp. 268, 271 (D. Del. 1994) (citing _Rosenmiller v. Bordes_, 607 A.2d 465, 468 (Del. Ch. 1991)). Under Delaware law, express choice of law provisions are generally given effect. _Id._ (citing _A.I.C. Ltd. v. Mapco Petroleum Inc._, 711 F. Supp. 1230, 1237 (D. Del.1989)).

Because SWEC was a Delaware corporation, and its bankruptcy proceeded in Delaware, Delaware has some, albeit _de minimus_, interest in the resolution of the current conflict. The court, however, declines to disturb the choice of law of the parties based on such limited connections to Delaware. In other words, the court does not find that Delaware has a "materially greater" interest in the subject matter than New York in this case. In view of this determination, the court also notes that the application of New York's prejudgment interest rate is more equitable than the 11% rate due under Delaware law.

**B. Costs & Attorneys Fees**

SAMBA submits that it is entitled to attorneys' fees, costs, and other legal expenses under the Credit Agreement and the Guaranty. (D.I. 29 at 18-22) As discussed previously, the court's prior ruling establishes that the Guaranty is a separate agreement from the Credit Agreement (D.I. 11 at 16), and the Credit Agreement created the debt obligation of the BS&W joint

10

A502

venture to plaintiffs, not the obligation of SWEC (and by assumption, defendant Shaw) to plaintiffs on behalf of BS&W.

The Guaranty expressly provides for "any and all expenses incurred [by SAMBA] in enforcing [SAMBA's] rights under this Guaranty." (D.I. 26 at ex. B, B20) SAMBA has pointed to caselaw interpreting similar provisions ("any and all expenses") to include attorneys' fees. See Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 525 & n.3 (7th Cir. 1995) (guaranty provision for payment and "any and all expenses which may be incurred by [bank] in collecting all or any of the Obligations and/or in enforcing any rights hereunder" held to "undoubtedly also contemplate[] attorneys' fees") (citing Boulevard Bank Nat'l Ass'n v. Philips Medical Sys. Int'l B.V., 15 F.3d 1419, 1426 (7th Cir. 1994) (guaranty provision for "collection costs" held to include attorneys' fees)).

Defendants interpret this cited provision of the Guaranty as specifically excluding attorneys' fees as those fees are not

11

A503

specifically named.[12]   (D.I. 26 at 9)   Shaw argues that if attorneys' fees are awarded, they should be limited to those fees incurred while prosecuting the action to recover against defendants, excluding those fees incurred in defending itself in the bankruptcy preference action or other actions.[13]   (D.I. 26 at 10-11)

The attorneys' fees listed by SAMBA in its motion are

---

[12]   In support, Shaw cites the unpublished Chancery Court opinion of Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc., which held that a contract provision to pay "direct costs" was held not to include "media overhead", where overhead was never clearly identified.  No. Civ. A. 15478, 1999 WL 743479, *11 (Del. Ch. Sept. 10, 1999).  The Active Asset Recovery court stated:

> To the contrary, the reasonableness of Holod's and Holland's belief that media overhead was not included in the term "direct costs" is demonstrated by the contractual terms AMS itself proposed, which never clearly identify "overhead"-i.e., a percentage of AMS's existing fixed costs-as one of the components of direct cost chargeable to the Partnership . . . Overhead is not an obscure term; AMS's failure to use it expressly speaks volumes. Cf. Arthur L. Corbin, 3 Corbin on Contracts § 552 at 206 (1960) (explaining that under the rule of expressio unius est exclusio alteris, "If one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded").

Id.

[13]Specifically, defendants reference the "Saudi Aramco" action, which is an adversary proceeding filed by SAMBA to recover moneys owed by BS&W under an Assignment of Contract Proceeds.  (D.I. 21 at 13-15)  That action is ongoing.

12

$985,663.56.[14] (D.I. 21 at 23)  The court finds Shaw's authority

distinguishable on its facts, as that decision involved the

interpretation of the scope of the term "direct costs" as related

to moneys due under a service agreement for media, goods and

services, not the collection of litigation expenses incurred in

enforcing rights under a contract.  Active Asset Recovery, Inc.,

1999 WL 743479 at *11.  In comparison, the Uniroyal Goodrich Tire

Co. court interpreted the same "any and all expenses [in

enforcing rights]" language present in the Guaranty in this case

to include attorneys' fees.  63 F.3d 525 & n.3.  The court is

persuaded that attorneys' fees and costs were contemplated under

the language of the Guaranty and awards SAMBA its costs and fees

incurred in obtaining the judgment (D.I. 11), as well as

$20,750.00 in costs and fees incurred in connection with the

present motion for assessment of damages (D.I. 21 at 23, sec.

IV(3)(c)).  It is not clear that SAMBA's asserted costs and fees

"incurred in obtaining or enforcing its rights under the Credit

Agreement" (D.I. 21 at 23, sec. IV (3)(b)) are limited to SAMBA's

costs and fees incurred in obtaining the judgment and not, for

example, inclusive of costs incurred by SAMBA in the Saudi Aramco

action.  SAMBA is directed to submit to Shaw, within 30 days, an

_____

[14]This amount represents $1,927,982.56 in fees and expenses
"SAMBA incurred in obtaining or enforcing its rights under the
Credit Agreement," an estimated $20,750.00 in fees and costs
directly related to the present motion, less $1,000,000 already
recovered from SWEC in the Preference Action.  (D.I. 21 at 23)

13

A505

itemized account of its costs and expenses specifically
identifying what portion of its $985,663.56 of asserted costs
were incurred in connection with obtaining judgment in this
case.[15]  Should a dispute arise regarding plaintiff's costs,
defendants shall, within ten days of receipt of plaintiff's
accounting, advise the court of the specific nature of the
dispute.[16]  Plaintiff will thereupon have ten days to respond.

**C.    Post-Judgment Interest**

Post-judgment interest may be awarded pursuant to 28 U.S.C.
§ 1961 from the date of judgment, May 4, 2005.  SAMBA asserts
that it is entitled to an award of post-judgment interest,
beginning May 5, 2005 through the payment date, at 3.33%.[17]

---

[15]To ensure that defendants are not penalized for the time
allotted by the court for plaintiff to clarify its submission,
the number of days plaintiff takes to provide its accounting
shall be credited against the amount payable by defendants in the
calculation of post-judgment interest.

[16]If a dispute is not brought to the court's attention
within the allotted ten day period, defendants shall pay the
costs identified by plaintiff in its accounting as being incurred
in connection with obtaining judgment in this case.  Post-
judgment interest will not accrue between the date of defendants'
submission to the court and the date of the court's resolution of
the dispute.

[17]28 U.S.C. § 1961(a) provides that post-judgment interest
"shall be calculated from the date of the entry of the judgment,
at a rate equal to the weekly average 1-year constant maturity
Treasury yield, as published by the Board of Governors of the
Federal Reserve System, for the calendar week preceding."
Plaintiff's exhibit demonstrates that the 3.33% value represents
the 1-year Treasury interest rate for the week ending April 29,
2005, in accordance with the statute.  (D.I. 16 at ¶14, ex. G)

14

A506

(D.I. 21 at 22 & D.I. 16 at ¶14, ex. G)  SAMBA claims that post-judgment interest should apply to the sum of:  (a) the debt amount of $6,725,000.00;[18] (b) the accumulated prejudgment interest (according to SAMBA, the Delaware 11% rate on the amount of (a)); and (c) SAMBA's net expenses, totaling $985,663.56. (D.I. 21 at 22).

Defendants contest an award of prejudgment interest and SAMBA's attorneys' fees connected to enforcement of the Credit Agreement, but otherwise does not contest that post-judgment interest may be awarded at the 3.33% applicable rate.  The court awards SAMBA post-judgment interest at the rate of 3.33% from May 5, 2005 through the date of payment.  Post-judgment interest applies to the initial judgment of $6,728,594, plus prejudgment interest on that amount through and including May 4, 2005 at the rate of 9% per annum in accordance with this opinion.  N.Y. C.P.L.R. § 5003 (McKinney 2006).  Post-judgment interest at the rate of 3.33% shall also be applied to SAMBA's costs and expenses in accordance with this opinion. (Id.)

**V.  CONCLUSION**

For the aforementioned reasons, plaintiff's motion for assessment of damages is granted.  An appropriate order shall follow.

---

[18]As noted previously, the base amount should likely be the total amount of the court's judgment, or $6,728,594, and not the original loan balance due.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142 (PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766 (PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

**\*\*A M E N D E D   O R D E R**

At Wilmington this 8th day of November, 2006 consistent with

the memorandum opinion issued this same date;

IT IS ORDERED that:

1.    Plaintiff's motion for assessment of damages (D.I. 14)

is granted;

2.    On or before November 20, 2006, plaintiff shall submit

to defendant Shaw an itemized account of its costs and expenses

specifically incurred in connection with obtaining judgment in

this case.

a.    Should defendant dispute the accounting, on or

before December 8, 2006, defendant shall advise the court of the

specific nature of the disputed figures.  Failure to timely respond shall be deemed a waiver of any objections to plaintiff's accounting.

   b.  Plaintiff may file a responsive paper on or before December 18, 2006.

   3.  Defendant will pay to plaintiff the following damages:

   a.  **The initial judgment of $6,728,594 plus prejudgment interest on that amount at a rate of 9% in accordance with N.Y. C.P.L.R. § 5004 calculated from May 31, 2000 through and including May 4, 2005;

   b.  The costs and expenses identified pursuant to ¶2;

   c.  **The $20,750 in costs and expenses incurred in connection with the instant motion;

   d.  Post-judgment interest on the above amounts at the rate of 3.33% from May 5, 2005 through the date of payment, except that post-judgment interest will not accrue as to the ¶2 costs and expenses between the date of this order and either November 20, 2006 (if defendant does not dispute the ¶2 accounting) or the date of the court's order resolving the parties' dispute over the ¶2 accounting.

_____
United States District Judge

2

A509

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Jr., Esquire and Kevin Mangan, Esquire of
Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for
Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E.
Rosenfeld, Esquire and Amy B. Abbott, Esquire of Kirkpatrick &
Lockhart Nicholson Graham L.L.P., Boston, Massachusetts.

Stephen B. Jenkins, Esquire, and Catherine A. Strickler, Esquire
of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendant
Shaw Group, Inc.

MEMORANDUM OPINION

Dated: February 13, 2007
Wilmington, Delaware

A511

ROBINSON, Chief Judge

## I.    INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. filed a
voluntary petition for relief under chapter 11, title 11 of the
United States Code.  On October 18, 2001, plaintiff Saudi
American Bank ("plaintiff") filed an adversary proceeding (Adv.
No. 01-7766) against defendants Shaw Group, Inc. ("Shaw"), SWINC
Acquisition Three, Inc. and SWE&C Liquidating Trustee
(collectively "defendants") in the United States Bankruptcy Court
for the District of Delaware (the "bankruptcy court").  (Bank.
D.I. 1)[1]  In this action, referred to by the parties as the
"recovery action," plaintiff alleged that, under an Asset
Purchase Agreement ("the APA"), defendants assumed a debt owed to
plaintiff by Stone & Webster Engineering Corporation ("SWEC"), a
subsidiary of Stone & Webster.  (Id.)  The adversary proceeding
was withdrawn from bankruptcy court on September 13, 2004.
(Bank. D.I. 88)  Plaintiff and defendants filed motions for
summary judgment.  The court granted plaintiff's motion for
summary judgment (Bank. D.I. 47) and denied defendants' motion
for summary judgment (Bank. D.I. 29).  (D.I. 11)  Defendant Shaw
appealed (D.I. 24) and the case was remanded for clarification on
the issue of damages.  (D.I. 33)

The court issued its amended memorandum opinion regarding

---

[1]References to "Bank. D.I." refer to the docket in the
bankruptcy court for Adv. No. 01-7766.

damages on November 8, 2006. (D.I. 39) In its accompanying order, the court required plaintiff to submit to defendant Shaw an itemized account of its costs and expenses, and set a schedule for submissions regarding any disputes regarding plaintiff's accounting. (D.I. 40) Plaintiff submitted its itemization of fees and costs on November 20, 2006 (D.I. 41), and a revised itemization on November 21, 2006 (D.I. 51). Defendant Shaw filed its response in opposition on December 7, 2006. (D.I. 52) Plaintiff filed its responsive paper on December 12, 2006. (D.I. 54) The court has jurisdiction over actions arising out of chapter 11 of the bankruptcy code pursuant to 28 U.S.C. § 1334(a).

## II.  BACKGROUND

The court recited many of the pertinent facts in its memorandum opinion accompanying its order granting summary judgment to plaintiff (D.I. 11) and memorandum opinion accompanying its order on damages. (D.I. 39) The most pertinent facts related to the present motion for assessment of damages are summarized below.

In 1980, a joint venture called Bugshan Stone & Webster ("BS&W") was created under the laws of Saudi Arabia. BS&W was owned in equal shares by SWEC and Abdullah Said Bugshan & Bros. ("Bugshan"). BS&W entered into a $130 million contract in the mid-1990s to upgrade a large oil refinery at Ras Tanura in Saudi

2

Arabia.  In an effort to induce plaintiff to grant credit to
BS&W, Bugshan and SWEC executed a "Guaranty" wherein each party
guaranteed 50% of all obligations to plaintiff bank from BS&W.
(D.I. 26, ex. B)  Plaintiff granted $35 million of credit to BS&W
by agreement on January 22, 1998.  (Id., ex. C)  A contract was
signed by Bugshan and SWEC on December 22, 1998 (the "Payment
Letter") which specified that Bugshan and SWEC were each
obligated to repay half of the loan balance to plaintiff, with
each party paying $650,000 per month.  (Id., ex. D)  The court
previously determined that defendant Shaw assumed the obligations
of the Guaranty and Payment Letter when it acquired SWEC.  (D.I.
11 at 17)

     SWEC made monthly $650,000 payments to BS&W for the
repayment of plaintiff's loan.  (D.I. 21 at 7)  SWEC filed for
bankruptcy on June 2, 2000, at which time it owed plaintiff
$6,728,549.  (D.I. 11 at 3; Adv. No. 00-2142, D.I. 49 at A69)
This amount reflected $6,725,000 in unpaid principal and $3549 of
interest.  (Id.)  Anticipating SWEC's petition for bankruptcy,
plaintiff demanded payment on May 31, 2000.  (Id.; Bank. D.I. 1)
Plaintiff never received payment from SWEC.  In its bankruptcy
petition, SWEC listed the total debt owed plaintiff.

     Plaintiff moved the court for an order that Shaw assumed
SWEC's debt through its acquisition of SWEC.  (Bank. D.I. 29)
The court granted plaintiff's motion (D.I. 11), and subsequently

3

A514

awarded plaintiff $6,728,549 in damages,[2] prejudgment interest, post-judgment interest, and $20,750 in costs, as well as the fees and costs incurred by plaintiff which were "specifically incurred in connection with obtaining judgment in this case." (D.I. 39, 40) The current dispute arises as the result of plaintiff's accounting of said expenses. (D.I. 41)

III.  DISCUSSION

   A.  Other Actions Involving the Parties

   Several actions have been commenced and litigated by the parties: (1) a preference action (Adv. No. 01-1120); (2) the "Saudi Aramco" action (Adv. No. 02-3963), initiated by Stone & Webster and SWEC, in which plaintiff filed a motion to intervene; and (3) the instant recovery action. Prior to the withdrawal of the recovery action to this court, the recovery action and the preference action identified above (the "preference action") were consolidated for purposes of discovery. (D.I. 21 at 10)

   The preference action was initiated on August 1, 2001 by Stone & Webster and its subsidiaries, including SWEC (collectively, "the debtors"), to recover alleged preferential transfers made by SWEC to plaintiff in March and April of 2000 totaling $975,000. (Adv. No. 01-1120, D.I. 1) The preference

───────────────

   [2]The court incorrectly awarded plaintiff $6,728,594, rather than the $6,728,549 sought by plaintiff. The court hereby amends its order (D.I. 40) to reflect the $6,728,549 sought by plaintiff, irrespective of interest.

4

A515

action was scheduled for trial on May 14, 2003.  Prior to that date, the parties executed an agreement whereby the preference action was settled and SWEC paid plaintiff $1 million.[3]  (Id., D.I. 119, ex. A)  An order dismissing the preference action was issued by the bankruptcy court on May 25, 2004.  (Id., D.I. 120)  Plaintiff states that it applied this $1 million "to the attorneys' fees it had incurred to that time, including fees related to the [r]ecovery [a]ction."  (D.I. 51 at 4-5)

The Saudi Aramco action was filed in bankruptcy court on May 31, 2002 by the debtors against the Saudi Arabian Oil Company for declaratory judgment, indemnification, breach of contract and turnover of estate property.  (Adv. No. 02-3963, D.I. 1)  Plaintiff filed a motion to intervene on November 7, 2002.  (Id., D.I. 19)  Through the Saudi Aramco action, plaintiff sought an alternative source of payment from BS&W for the 1998 loan.  (D.I. 51 at 5)  The bankruptcy court denied plaintiff's motion to intervene on May 1, 2006.[4]  (Adv. No. 02-3963, D.I. 47, 50)

**B.  Plaintiff's Accounting**

Plaintiff's itemization totals $2,124,641.30 in fees and

_____

[3]The agreement also stated that plaintiff retains a general, unsecured claim for $2.5 million against SWEC.  (Adv. No. 01-1121, D.I. 119, ex. A)

[4]Plaintiff has appealed this decision to district court. (Adv. No. 02-3963, D.I. 58)

5

A516

$194,122.75[5] in costs.  (D.I. 51 at 7-9)  Plaintiff claims that

the fees could only be isolated into distinct fee groups

(corresponding to the preference and recovery actions, the

recovery action alone, and the Saudi Aramco action) "in very

limited circumstances," such as when the preference action was

dismissed, or filings in the recovery action which did not relate

to discovery.  (D.I. 51 at 7) (emphasis in original)  To further

complicate matters, plaintiff admits that fees listed in its

"preference and recovery actions" group - by far the fee group

including the largest chunk of attorneys' fees (at

$1,553,254.25)- include "[l]egal fees that are related to

multiple matters . . . (e.g. Saudi Aramco and [r]ecovery)."

(Id.)  Plaintiff also has identified fees incurred in the Saudi

Aramco action or recovery action alone.[6]  (Id. at 8)  Plaintiff

also itemized three additional fees:  (1) $274.50 in fees billed

by plaintiff's counsel; (2) $5,884.05 in fees billed by Clifford

Chance; and (3) $15,334.00 in fees billed by Judge Francis G.

---

[5]In its first non-"revised" filing (November 20, 2006),
plaintiff's costs totaled $192,961.11.  (D.I. 41)  The additional
$1,161.64 corresponds to "[c]osts to be billed by [plaintiff's
counsel Kirkpatrick & Lockhart Nicholson Graham LLP ("K&L")] (as
of 11.20/06)".  (D.I. 51 at 9)

[6]Plaintiff submitted with its original accounting four
affidavits in support.  (D.I.s 42-45)  A revised version of one
of the affidavits was subsequently filed with four additional
exhibits, containing attorney invoices.  (D.I.s 46-50)  All of
plaintiff's exhibits are color-coded to designate fees incurred
in either the preference and recovery actions, the recovery
action, or the Saudi Aramco action.

A517

Conrad. (D.I. 51 at 8)  It is unclear as to what particular
actions these other fees correspond.  Finally, plaintiff has
listed its costs billed by its two law firms and specifically
relating to travel, which are not broken down by action.[7]  (Id.
at 9)

    C. **Analysis**

    In its memorandum opinion, the court specifically stated
that plaintiff could recover only those costs and fees incurred
in obtaining the judgment in this case, in other words, those
fees and expense incurred in enforcing its rights under the
Guaranty.  (D.I. 39)  Plaintiff apparently takes issue with the
court on this point, arguing instead that "the [r]ecovery,
[p]reference, and Saudi Aramco [a]ctions are [all] recoverable in
this proceeding . . . [because they] are so intertwined that, in
the vast majority of instances, it would be both impracticable
and unjust to allocate [plaintiff's] fees and costs to one action
at the exclusion of the other related actions."  (D.I. 51 at 3)
Plaintiff then goes on at length to explain why the recovery,
preference and Saudi Aramco actions are related.  (See D.I. 51 at
6-9)

    Although the court does not dispute that these actions are

_____

        [7]These costs are $151,445.99 in costs billed by K&L, the
$1,161.64 additional in K&L costs discussed supra, $4,584.12 in
costs billed by counsel Monzack & Monaco, P.A., and $36,931.00 in
"travel expenses," which are not attributed to either K&L or M&M
specifically.

A518

related to the same universe of facts, the court decided in plaintiff's favor in the instant litigation based on the legal consequences flowing from the Guaranty, and concluded that only those fees and expenses related to enforcing plaintiff's rights under that instrument should be awarded.[8]  After reviewing the record, therefore, defendant Shaw shall pay plaintiff $345,714.50, the amount identified by plaintiff as its fees attributable solely to the recovery action.  (D.I. 51 at 8)  Defendant Shaw shall not be responsible for any of plaintiff's itemized costs, insofar as these costs have not been clearly correlated to any particular action.  See Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990) ("The party seeking attorneys'

---

[8]Given that plaintiff's motion to intervene in the Saudi Aramco action was denied, the court cannot fathom how any fees and expenses in that litigation could possibly be so "intertwined" with the litigation at bar as to justify allocating said expenses to defendant Shaw.

The court finds that the issues presented in the preference action - whether SWEC made preferential payments to plaintiff in March and April 2000 - differs significantly from those presented in the instant recovery action - whether plaintiff could rightfully recover from Shaw the money owed by SWEC pursuant to the Guaranty.  Further, the settlement agreement specifically provides that it is not intended to have, nor does it have, "any effect with respect to [plaintiff's] action against Shaw in connection with [plaintiff's] Cure Claim" "or any of the claims or causes of action asserted" in the instant adversary proceeding.  (Adv. No. 01-1120, D.I. 199, ex. A)  For these reasons, the court declines to make Shaw responsible for the fees and expenses related to the preference action.  By the same reasoning, the court grants plaintiff's request that the $1 million it recovered in the preference action "be allocated first to the non-recoverable fees and expenses, with only the balance being used to reduce Shaw's liability for the fees and expenses found to be recoverable from Shaw."  (D.I. 51 at 7)

8

A519

fees has the burden to prove that its request is reasonable.").

IV. **CONCLUSION**

For the aforementioned reasons, the court finds that defendant Shaw shall pay plaintiff $345,714.50 in fees, pursuant to its previous memorandum opinion and order. (D.I.s 39, 40) An order shall follow.

9

A520

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INC. et al., | ) Bk. No. 00-2142 (PJW) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| ———————————————— | ) |
| | ) |
| SAUDI AMERICAN BANK, | ) Adv. No. 01-7766 (PJW) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 04-834-SLR |
| | ) |
| SHAW GROUP, INC., SWINC | ) |
| ACQUISITION THREE, INC., and | ) |
| SWE&C LIQUIDATING TRUSTEE, | ) |
| | ) |
| Defendants. | ) |

**O R D E R**

At Wilmington this 13th day of February, 2007, consistent

with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant Shaw shall pay plaintiff $345,714.50 in fees.

2. Section 3(a) of the court's order of November 8, 2006 is

amended to reflect the initial judgment of $6,728,549.

United States District Judge

A521

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STONE & WEBSTER, INCORPORATED | ) | |
| *et al.*, | ) | Case No. 00-02142 (PJW) |
| | ) | |
| Debtors, | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION and STONE & WEBSTER, | ) | |
| INCORPORATED, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Adv. Pro. No. 02-3963 (PJW) |
| | ) | |
| SAUDI ARABIAN OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## THE SHAW GROUP INC.'S REPLY
## IN FURTHER SUPPORT OF ITS MOTION TO INTERVENE

The Shaw Group Inc. ("Shaw"), by and through its undersigned counsel, hereby replies

as follows in further support of its Motion to Intervene and in opposition to the Answering Brief

of the SWE&C Liquidating Trust (the "Trust"):[1]

## PRELIMINARY STATEMENT

1.      Almost ten years ago, BS&W, a joint venture between SWEC and Bugshan, was

engaged in a huge project to help modernize the aging Saudi Aramco refinery at Ras Tanura,

Saudi Arabia.  The contract was worth over $130 million, but payment to BS&W was extremely

slow and then stopped.  Saudi Aramco officially insisted that the problem was caused by BS&W,

---

[1] Unless otherwise noted, capitalized terms used herein are defined either in Shaw's Motion to
Intervene or in the Trust's Answering Brief in Opposition thereto.

A522

but a neutral observer could not have helped noting that oil prices had plunged since the contract had been awarded, Saudi Aramco was strapped for cash, and many other contractors were not getting paid. In any event, Saudi Aramco's failure to pay had ripple effects. BS&W had borrowed $35 million from SAMBA to fund the contract, and by 1998 it could no longer meet its loan payments. SWEC and Bugshan were therefore forced to take over paying the loan. When SWEC and its parent S&W entered Chapter 11 in 2000, SWEC still owed over $6 million on its share of the loan.

2.      Shortly after the Debtors filed for Chapter 11, Shaw won an auction for their assets. Under an Asset Purchase Agreement (the "APA"), Shaw purchased certain assets and assumed certain liabilities from the Debtors. One basic rule of the APA was that Shaw took any liabilities associated with the assets it was buying. And, if it did not buy an asset, it did not assume the associated liabilities. The testimony on that point is categorical and not subject to doubt.

3.      In 2001, SAMBA brought an action in this Court claiming that either the Debtors or Shaw owed it the remaining amount. Both the Debtors and Shaw said that the liability belonged solely to the Debtors and argued that the APA clearly showed that to be the case. After several years of litigation in this Court (which was subsequently withdrawn back to the District Court), the District Court held in 2005 -- contrary to the testimony of both Shaw and the Debtors -- that Shaw had assumed SWEC's Guaranty and Payment Letter. Shaw immediately appealed the initial judgment, but SAMBA filed a Motion for Assessment of Damages and the District Court did not issue a final appealable judgment until February 13, 2007, and it has not been until this month that the appeal has made any progress. Shaw is filing its opening brief on the appeal on the day this Reply is filed. Shaw argues in that appeal that the District Court erred in its

2

A523

judgment, and that under normal principles of Delaware contract law, SAMBA neither had standing to bring its case against Shaw nor can it be correct that Shaw assumed the SAMBA loan. We believe that the Trust shares that view.

4.    But Shaw also must face the reality that the District Court has now ruled -- in an action in which the Debtors were active litigants -- and issued a final judgment. If that judgment is upheld on appeal it will be a statement by the federal courts that the parties were incorrect and that Shaw -- somehow, in some way -- assumed a debt despite the clear intention of both it and the Debtors to the contrary. If that occurs, then the necessary consequence of that ruling will be that Shaw also assumed the concomitant assets -- which are among the assets that the Trust and Saudi Aramco are bargaining over in their mediation. In addition, Shaw believes that it would be entitled to recompense from the Trust on other grounds as well.

5.    Shaw hopes that does not come to pass and that the Court of Appeals reverses the District Court's ruling. But it has brought this Motion because there is now a final judgment against it and the status report filed with this Court reveals that the Trust and Saudi Aramco might soon be reaching a deal over those assets. If Shaw had waited until after the Court of Appeals ruled, the parties might take irreversible steps that would prejudice Shaw's rights. By this action, Shaw does not seek to block the settlement discussions. It merely wants to insure that (1) the parties do not agree to arrange the settlement to place all value in assets over which Shaw might not have a claim; and (2) the proceeds of the settlement are not distributed before it can be determined whether Shaw has a claim to them. As is set forth in the argument below, Shaw believes that the law clearly supports its right to intervene under these circumstances and, accordingly, it respectfully requests the Court to grant its motion.

A524

**ARGUMENT**[2]

I.    **Shaw Has a Significantly Protectable Interest that Allows it to Intervene As of Right or Permissively**

    A.    **Shaw's Complaint in Intervention Attempts to Enforce More Than SAMBA's Assignment Rights, It Seeks to Enforce the APA**

        6.    In its Answering Brief, the Trust argues that Shaw does not have an enforceable legal interest here. *See* Answering Brief at 2, 7, 18-20, 22 and 23. In so arguing, however, the Trust repeatedly ignores that Shaw relies on more than SAMBA's assignment of contract proceeds as a basis for its right to intervene in this proceeding. Shaw has the right to intervene in this proceeding not only because it has been subrogated to SAMBA's rights under the Assignment of Proceeds and Specific Payment Instruction Letter, but more importantly because of the APA (as the District Court has interpreted it) gives Shaw that right. Shaw's proposed Complaint in Intervention seeks to enforce the APA against SWEC as it directly relates to the proceeding here.

        7.    The District Court has decreed that Shaw assumed SWEC's liabilities under the Guaranty and Payment Letter by operation of the APA, and thus is liable for a portion of BS&W's original debt to SAMBA, which currently exceeds $10 million. (*See* May 3 Mem. Op. at 17). While Shaw vehemently contests this finding, if it is upheld on appeal, then the Guaranty and Payment Letter are "Assumed Contracts" or "Assumed Liabilities" under the APA,[3] and

---

[2] The District Court's opinion holding Shaw liable for the Guaranty and Payment Letter is on appeal, and therefore nothing herein is intended to, nor should be, construed as an admission by Shaw that it has assumed the Guaranty and Payment Letter.

[3] "[T]he Court concludes that the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the APA...." May 5 Mem. Op. at 17. Alternatively, the District Court held that the Guaranty and Payment Letter are "Assumed Liabilities" under the APA (*id.* at 16), a holding to which the Trust admits: "the District Court found SWEC's indebtedness to SAMBA [the Guaranty and Payment Letter] to be an assumed liability." Answering Brief at 11.

4

Shaw is entitled under the plain language of the APA to recover for any third-party claims or interests relating to the Guaranty or Payment Letter. Specifically at issue here, Section 2.01 of the APA states: "Sellers shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase from Sellers, the Assets…including the following: … (k) *any and all claims and causes of action*, including privileges related thereto, of any Seller against any third parties *relating to … (ii) the Assumed Liabilities or the Assumed Contracts*…." (Exhibit D to Shaw's Complaint in Intervention at 15-16, emphasis added).

8.    There can be no doubt that the Guaranty and Payment Letter are related to the Debtors' cause of action here to recover under the In-Kingdom Contract. As alleged in the complaint, BS&W defaulted on its loan to SAMBA primarily due to Saudi Aramco's failure to pay what it owed on the Ras Tanura Project. (*See, e.g.*, D.I. 1 at ¶¶25-28). Had Saudi Aramco not breached the In-Kingdom Contract, BS&W would have been able to repay SAMBA for its loan, and SWEC would not have had to act on its obligations under the Guaranty and agree to the terms of the Payment Letter. The Debtors have brought this proceeding, in part, to assert a breach of the In-Kingdom Contract against Saudi Aramco for which SWEC would have the right to recover if it is held liable for BS&W's debts (*see, e.g., id.* at ¶¶61-68), and to have certain funds owed to BS&W by Saudi Aramco under the In-Kingdom Contract turned over to SWEC pursuant to 11 U.S.C. §542(b). (*See, e.g., id.* at ¶¶69-76). Thus, because the Guaranty and Payment Letter are related to this dispute under the In-Kingdom Contract, Shaw -- not the Trust -- is the rightful owner of these proceeds under the APA.[4]

---

[4] Even without Section 2.01 of the APA, Shaw would be entitled to recover under the In-Kingdom Contract under equitable subrogation. If Shaw pays SWEC's liability under the Guaranty and Payment Letter, then SWEC's rights to recover under the In-Kingdom Contract are subrogated to Shaw. To the extent Shaw's Complaint in Intervention does not make this theory

5

A526

9.      The Trust also repeatedly misconstrues the District Court's opinion in order to avoid the effect of Section 2.01 by claiming that the opinion specifically held that Shaw did not assume the In-Kingdom Contract and that the Guaranty and Payment letter are not associated with the In-Kingdom Contract. *See* Answering Brief at 2 ("The District Court concluded that Shaw did not assume the Saudi Aramco contract. The District Court further rejected Shaw's claim that SWEC's liability to SAMBA was 'associated with' the Saudi Aramco Contract."); *and* 20 ("the District Court's findings and conclusions that Shaw did not assume the Saudi Aramco contract, and that Shaw's assumption of the SWEC guarantee is unconnected to BS&W's agreements with SAMBA or Saudi Aramco"). That, however, is not what the District Court found. Rather, the District Court held that the In-Kingdom Contract was not "the contract at issue" in the dispute over whether Shaw assumed the Guaranty and Payment Letter under the APA, and thus the Court's opinion _never_ addresses Shaw's rights under the In-Kingdom Contract. *See* May 5 Mem. Op. at n. 12. Holding that the In-Kingdom Contract was not "at issue" is entirely different than holding that "Shaw did not assume" the In-Kingdom Contract.

10.     Moreover, even if the Trust had been correct and this is what the District Court held -- and it plainly is not -- the District Court's judgment is being appealed and thus would not be final and binding in any case. Finally, the Debtors already acknowledged that the Guaranty and Payment Letter specifically arise under the Ras Tanura Project, and they cannot escape such an admission by misconstruing the District Court's opinion. *See* Exhibit E to Shaw's Complaint in Intervention, Declaration of James P. Carroll at ¶7 ("The Ras Tanura Loan was specifically for BS&W's mobilization and general operating costs on its Ras Tanura refinery upgrade project"

---

clear, Shaw will seek to amend its complaint in order to clarify its equitable subrogation claim against SWEC.

for Saudi Aramco); D.I. 4240 in No. 00-2142, Debtors' Motion for Order Under Fed. R. Bankr. P. 9019 Approving Settlement with Saudi American Bank, ¶13. That statement is binding upon the Trust since Mr. Carroll was the Debtors' principal officer at that time.

11.     Shaw's proposed Complaint in Intervention also brings unjust enrichment and indemnification claims against the Debtors that are related to SWEC's liability and the underlying In-Kingdom Contract. (*See* Exhibit 1 to Shaw's Motion at ¶¶39-44). Despite the District Court's finding to the contrary, both the Debtors and Shaw have always agreed -- indeed we believe that they continue to agree -- that Shaw did not assume the Guaranty or Payment Letter under the APA. *See* Exhibit E to Shaw's Complaint in Intervention, Declaration of James P. Carroll at ¶¶7-10; D.I. 4240 in No. 00-2142, Debtors' Motion for Order Under Fed. R. Bankr. P. 9019 Approving Settlement with Saudi American Bank, ¶13 ("Both Shaw and the Debtors dispute SAMBA's allegation that Shaw assumed any SWEC liability on the SAMBA claims."). However, if it is ultimately determined (despite the parties' agreement of their intent not to transfer the liability to Shaw and their understanding of the language of the APA) that Shaw assumed the Guaranty and Payment Letter under the APA, then the Trust will be unjustly enriched if it is allowed to obtain the benefits of the In-Kingdom Contract without the concomitant burden of repaying SWEC's liability under the Guaranty and Payment Letter.

12.     Similarly, the Debtors specifically have acknowledged that the Guaranty and Payment Letter qualify as "Excluded Liabilities" that Shaw did not assume under the APA. (Exhibit E to Shaw's Complaint in Intervention, Declaration of James P. Carroll at ¶7). Under Section 9.01 of the APA, Debtors agreed to indemnify Shaw for "any Losses incurred or suffered…, directly or indirectly, as a result of or arising from: … (d) the Excluded Liabilities." (Exhibit D to Shaw's Complaint in Intervention at 56). Since the parties agree that the Guaranty

and Payment Letter qualify as Excluded Liabilities and the Trust now is seeking to recover assets

related those liabilities, the Trust should, at a minimum, be required to honor the indemnification

provision under the APA and indemnify Shaw for losses incurred as a result of the Guaranty and

Payment Letter (assuming that the Court of Appeals does not reverse the District Court's

opinion).

      13.    Of course, Shaw also asserts its right to intervene in this proceeding because it has

been subrogated to SAMBA's rights under the Assignment of Proceeds and Specific Payment

Instruction Letter. *See, e.g.*, Exhibit 1 to Shaw's Motion at ¶¶6, 32-33. While this Court has

denied SAMBA's motion to intervene on the assignment theory, that decision is on appeal and

not final, and thus would not be preclusive even if Shaw had been a party to that motion. More

significantly, SAMBA's motion relied solely upon that argument. Shaw's does not, and the

question of the assignment of proceeds takes on a very different air when Shaw asserts it. The

Court's concern that SAMBA ought to have a Saudi court opine on the subject does not apply to

Shaw here.

      **B.  Shaw Does Not Assert a Barred Bankruptcy Claim or Security Interest**

      14.    Despite the Trust's contention to the contrary (*see* Answering Brief at 10, 12, 17-

18, 20), Shaw does not claim a security interest or bankruptcy claim against SWEC as a result of

the District Court's holding that Shaw assumed the Guaranty and Payment Letter. Instead, as

detailed above, Shaw is asserting a contract right against SWEC (now the Trust) under the APA

that first arose long after the general bar date of August 25, 2000 and the deadline to file claims

established by the Confirmation Order of January 2004, and attempts a subrogation right under

SAMBA's assignment of proceeds contract.

A529

15.    Furthermore, the Trust's contention should be precluded by principles of

equitable estoppel. *See, e.g.*, *In the Matter of Gravure Paper & Board Corp.*, 234 F.2d 928, 932

(3d Cir. 1956) ("he who, by his language or conduct, leads another to do what he would not

otherwise have done, shall not subject such person to loss or injury by disappointing the

expectations upon which he acted") (citations omitted).  Throughout this case, the Debtors have

represented that Shaw did not assume the Guaranty and Payment Letter.  Therefore, Shaw would

not have had any claim to the proceeds under the In-Kingdom Contract.  Indeed, had Shaw filed

a proof of claim asserting a right to the In-Kingdom Contract proceeds, the Debtors surely would

have objected to such claim as inappropriate under the APA.  Thus, because Shaw relied upon

the express terms of the APA and the Debtors' overt representations, to which the Trust is bound,

the Trust should be equitably estopped from now arguing that Shaw should have filed a proof of

claim regarding the In-Kingdom Contract.  For these reasons, the Trust's attempt to bar Shaw's

claim as a prohibited bankruptcy claim or security interest must fail.[5]

---

[5] In the alternative, the APA (coupled with the Trust's actual knowledge of the circumstances
surrounding the In-Kingdom Contract and the Guaranty and Payment Letter) qualifies as an
informal proof of claim.  According to the Third Circuit:

> a document will qualify as an informal proof of claim in bankruptcy only if it is in
> writing, contains a demand by the creditor on the bankruptcy estate, expresses an intent to
> hold the debtor liable for the debt, and the document is filed with the bankruptcy court.  If
> a document meets those four requirements, the bankruptcy court must determine whether,
> given the particular surrounding facts of the case, it would be equitable to treat the
> document as a proof of claim.

*In re: American Classic Voyages Co.*, 405 F.3d 127, 131 (3d Cir. 2005) (internal citations
omitted).  Here, the APA is a writing filed with the Bankruptcy Court that put the Debtors on
notice by its express terms that if Shaw had an Assumed Contract or Assumed Liability, then
Shaw would be entitled to any and all claims and causes of action against a third party relating to
that Assumed Contract or Assumed Liability.  When SAMBA filed its action against the Debtors
and Shaw, the Debtors were put on further notice that the Guaranty and Payment Letter -- and
thus any claims relating to them -- were potentially Shaw's assets.  Again, this is not a result that
either party thought was correct, but the Debtors were on notice.  Given the structure of the APA
where the assets followed concomitant liabilities, the Trust cannot now attempt to prohibit
Shaw's access to these assets while leaving Shaw to pay for a related liability.  Given these

16.    The Trust argues that Shaw's claim is a violation of the injunction instituted by the Confirmation Order approving the Debtors' Third Joint Plan. *See* Answering Brief at 12. But as the Trust itself points out in quoting the Confirmation Order, "nothing contained in this Confirmation Order or the Third Joint Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Third Joint Plan...." Answering Brief at 12, *quoting* Confirmation Order, ¶16.  The Third Joint Plan <u>specifically</u> preserves all of Shaw's rights under the APA: "Notwithstanding anything in...this Third Joint Plan to the contrary, all rights, claims and defenses, including but not limited to setoff and recoupment, arising pursuant to or in connection with the Asset Purchase Agreement between the Debtors and Shaw are hereby expressly preserved." Third Joint Plan at 61.  Furthermore, the Confirmation Order retains exclusive jurisdiction "over all matters arising out of, and related to, the Chapter 11 Cases and the Third Joint Plan to the fullest extent permitted by law...." Confirmation Order, ¶35. Therefore, not only is Shaw's claim to the proceeds of the In-Kingdom Contract fully preserved, this Court has exclusive jurisdiction over Shaw's Complaint in Intervention as it seeks to enforce the APA as the District Court has interpreted it.

17.    Similarly, the Trust's attempt to rely on a settlement between the Debtors and Shaw as a bar to Shaw's motion must fail.  The Trust argues that Shaw released all claims against the Debtors with respect to "Filed Claims." Answering Brief at 13. That is correct as far as it goes, but it does not go far enough to get to the truth of the matter.  The defined term "Filed Claims," refers to the "approximately 5,700 claims (all of the claims filed as of the date of this Stipulation, the "Filed Claims")...*filed* against the Debtors in these cases...." November 30,

---

circumstances, it would be equitable to consider the APA as an informal proof of claim to the extent Shaw's Complaint in Intervention is considered a bankruptcy claim.

2004 Settlement Stipulation at Recitals, ¶C (emphasis added). Shaw is not seeking now to collect on a claim filed as of November 30, 2004, but rather is seeking to enforce the express terms of the APA (as those terms have been defined by the District Court) to preclude the Trust from diverting the proceeds to which Shaw will be entitled if the District Court's opinion is upheld. Thus, Shaw's release with respect to Filed Claims has no effect with respect to Shaw's rights under the APA to revenues from the In-Kingdom contract.

### C.  Shaw Has Standing and Is In Privity Under the APA

18.    Shaw has Article III standing to bring its Complaint in Intervention as it is in privity with Debtors under the APA, and Shaw's Complaint seeks to enforce the APA (as construed by the District Court) against the Trust as it relates to its claim to the In-Kingdom Contract. Standing requires injury-in-fact, causation and redressability. *The Pitt News v. Fisher*, 215 F.3d 354, 359-60 (3d Cir. 2000). Under this standard, Shaw has standing to bring its Complaint in Intervention because it has been injured by having a judgment entered against it forcing it to satisfy SWEC's liability to SAMBA without the Debtors allowing Shaw to enforce its concomitant right under the APA to the assets related to that liability. Although Shaw is not in direct privity to the In-Kingdom Contract, Shaw is seeking to enforce its rights under the APA under which it has direct privity with the Trust. Moreover, with respect to the In-Kingdom Contract, Shaw has as much privity as Debtors, whose rights Shaw now seeks to assert under the terms of the APA (an agreement to which Shaw and the Debtors both are parties). Since the Trust is not a party to the In-Kingdom Contract either, if there is any third-party standing problem, that problem lies equally with the Trust.

19.    Causation exists because BS&W defaulted on its loan to SAMBA primarily due to Saudi Aramco's breach of the In-Kingdom Contract under the Ras Tanura Project. (*See, e.g.,*

D.I. 1 at ¶¶25-28). If Saudi Aramco had not breached the In-Kingdom Contract (and Shaw very much agrees with the Trust that there was such a breach), BS&W presumably would have been able to repay SAMBA for its loan, and SWEC would not have had to satisfy its obligations under the Guaranty and agree to the terms of the Payment Letter. This proceeding seeks to remedy that breach by allowing SWEC to recover under the In-Kingdom Contract (*see, e.g., id.* at ¶¶61-68), and seeks to have certain funds owed to BS&W by Saudi Aramco under the In-Kingdom Contract turned over to SWEC. (*See, e.g., id.* at ¶¶69-76).

20.    If Shaw ultimately is liable for SWEC's Guaranty and Payment Letter, and hence BS&W's outstanding debt to SAMBA, Shaw's injury will be redressed only if it is allowed to intervene in this proceeding and obtain the assets it is due under the In-Kingdom Contract in accordance with the APA.

### D. Shaw's Interest is Not Merely Economic Nor Purely Contingent

21.    Shaw's claim to proceeds derived under the In-Kingdom Contract is not a "mere economic interest" or a purely contingent claim that defeats Shaw's right to intervene in this proceeding. *See* Answering Brief at 22. As explained at length above, Shaw has a direct contractual interest in any claims against third parties that relate to the Guaranty or Payment Letter. In this proceeding, the Debtors are asserting rights under the In-Kingdom Contract that directly relate to the Guaranty and Payment Letter. According to the APA (as interpreted by the District Court), those rights do not belong to the Debtors and instead belong to Shaw. Thus, as the only rightful party to recover under the In-Kingdom Contract, Shaw is not asserting a mere economic interest but a contractual right.

22.    On the one hand, the Trust asserts that Shaw was required to assert its "claim" by the applicable bar dates established in this bankruptcy case (*see* Answering Brief at 5-6, 17-18),

A533

yet it also argues that Shaw's claim is merely contingent and not sufficiently protectable. (*See id.* at 22). In other words, it argues both ways: Shaw filed to late, but it also filed too early. The Trust's attempt to defeat Shaw's motion as a claim to contingent proceeds also fails. In support of its argument the Trust quotes *Gen. Star Indem. Co. v. Virgin Island Port Auth.*, 224 F.R.D. 372, 376 (D.V.I. 2004) as holding: "Although identification of an interest in a specific fund has been determined sufficient to allow intervention, an actual fund must exist." To the extent Shaw's action is a claim to proceeds, those proceeds actually exists and are not contingent. If the Debtors have settled with Saudi Aramco, then an actual fund exists and Shaw is entitled to the proceeds of that fund.

## II.    Shaw's Motion is Timely

### A. The Correct Standard to Determine Timeliness

23.    Although the Trust for some reason cites to a four factor test from other circuit courts, the Third Circuit considers three factors in determining whether an intervention motion is timely: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995); *see also Donovan v. United Steelworkers of America, AFL-CIO*, 721 F.2d 126, 127 (3d Cir. 1983). Furthermore, "timeliness is not just a function of counting days; it is determined by the totality of the circumstances." *U.S. v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181 (3d Cir. 1994).

### B. The Stage of the Proceedings Is Early Despite the Passage of Time

24.    The Trust seeks to defeat Shaw's motion by mentioning several time periods when Shaw should have sought to intervene or filed a claim against Debtors. For example, the Trust seeks to make much of the fact that "Shaw did not ask for the opportunity to participate in

A534

the mediation between the Trust and Saudi Aramco." Answering Brief at 3. The fact is, Shaw did participate in one joint mediation session, but since Shaw had not been found liable for the Guaranty and Payment Letter at the time mediation was ordered in this action (June 10, 2004), it had no articulable interest in this litigation. At that time, both Shaw and the Debtors maintained that Shaw never assumed the Guaranty or Payment Letter, and thus any attempt to participate in the mediation at that time likely would have been met with opposition as being, at a minimum, premature. Similarly, the Trust cites to the deadlines for claims under the Confirmation Order and under the Third Joint Plan, February and January 2004, respectively, as evidence that this motion is untimely. *See id.* at 6, 17. Putting aside that Shaw's enforcement of the APA does not qualify as a bankruptcy claim, Shaw could not have made any claim against Debtors over three years ago because the District Court had not issued its opinion holding that Shaw assumed the Guaranty and Payment Letter. Moreover, these deadlines have nothing to do with what has occurred in this proceeding.

25.    The fact of the matter is, although five years have passed since this action was instituted, the stage of the proceedings is still very early since essentially nothing but settlement discussions have taken place. The Third Circuit's discussion of timeliness in *Mountain Top Condo* is instructive in this regard: "The mere passage of time…does not render an application untimely. While four years had elapsed before the [proposed intervenors] filed their motion to intervene, the critical inquiry is: what proceedings of substance have occurred?" *Mountain Top Condo*, 72 F.3d at 369. In that case, some written discovery and settlement negotiations had occurred, but no depositions had been taken, nor any dispositive motions filed. *Id.* at 370. Thus, although four years had passed, the case was still in an early stage of the proceedings and the proposed intervenor was permitted to intervene. *Id.*

14

A535

26.    Similarly here, although five years have passed, this proceeding is still in the early stages of litigation, with no discovery having been undertaken nor dispositive motions having been filed. The most that has occurred is mediation, and as discussed below, the fact that intervention might affect a settlement is not enough to deny Shaw's Motion to Intervene, especially when (if the District Court's opinion is upheld) Shaw is the rightful owner of the settlement proceeds.

27.    Before the District Court issued its May 3 Opinion -- and even more importantly, issued its final judgment on damages in February of this year -- the Trust almost certainly would have opposed Shaw's intervention on the grounds that Shaw did not have a protectable interest at that time. Indeed, before the District Court issued a final, and hence enforceable, judgment, Shaw might not have had a protectable interest. It does so now, however, as the $11 million appeal bond it had to post so pointedly shows. Although the Trust takes issue with Shaw's explanation as to why it has waited two years to attempt to intervene, there was no final judgment until this February. Moreover, Shaw hoped that the entire matter would be decided by the appeal, and thus if it did have to intervene, it would have a final judgment not subject to appeal on which to base its protectable interest. Shaw, however, recently learned that the Trust believes a settlement with Saudi Aramco will be complete and the parties will seek dismissal of this action shortly. [6] Shortly after learning of this development, Shaw filed this motion with its proposed Complaint in Intervention.

---

[6] As an aside, Shaw's motion does not admit that it knew of the tentative settlement between Debtors and Saudi Aramco more than two years ago as claimed by the Trust. *See* Answering Brief at 16. The Motion merely recites facts from the docket that were learned at the time of drafting this Motion and in no way constitute an admission that Shaw was aware of the parties' tentative settlement in April 2005.

A536

## C. Any Prejudice to the Trust is Outweighed by the Prejudice to Shaw

28.     The prejudice to Shaw if its motion is denied severely outweighs any prejudice to the Trust if Shaw is permitted to intervene. The Trust asserts that it has incurred costs associated with the negotiations that have prejudiced the Trust's creditors. Answering Brief at 6. Modest additional costs that potentially resulted from Shaw's "delay," however, do not constitute prejudice. *See Noble v. Yingling*, 37 B.R. 647, 651 (D. Del. 1984) (modest additional attorneys' fees and costs incurred by one party as a result of delay do not constitute prejudice so severe that another party is prevented from bringing a rightful claim, particularly if the right to bring that claim is conditioned on paying those expenses attributable to delay). Furthermore, the extent of those extra costs incurred by the Trust is unknown and thus, at a minimum, discovery on the amount of those costs would be necessary before they are used as a reason to deny Shaw's motion.

29.     The attempt to use the Debtors' $1 million payment to SAMBA in settlement of its claim also does not constitute prejudice for purposes of denying Shaw's Motion to Intervene. The Debtors settled with SAMBA in 2003, at which time the Debtors agreed they were liable for the Guaranty and Payment Letter. *See* Exhibit E to Shaw's Complaint in Intervention, Declaration of James P. Carroll at ¶¶7-10; D.I. 4240 in No. 00-2142, Debtors' Motion for Order Under Fed. R. Bankr. P. 9019 Approving Settlement with Saudi American Bank, ¶13. Thus, the Debtors committed themselves to paying that $1 million long before the District Court found Shaw liable on the Guaranty and Payment Letter, and thus that payment is irrelevant to the timing of Shaw's Motion to Intervene in this action. And "the consideration of whether [plaintiff] will be prejudiced by [proposed intervenor's] intervention is irrelevant. The relevant determination is the prejudice to [plaintiff] resulting from [proposed intervenor's] *delay* in

A537

intervening." *Schultz v. Connery*, 863 F.2d 551, 553-54 (7th Cir. 1988) (emphasis in original).

The $1 million payment to SAMBA is completely unrelated to any delay on the part of Shaw in intervening in this action and cannot constitute prejudice for purposes of this motion.

30.     Similarly, the Trust will have the opportunity to argue the merits of Shaw's claims to the In-Kingdom proceeds after Shaw's intervention. The only thing that is relevant to the instant motion is the intervention standard, and all of the Trust's rights and defenses on the merits are preserved for later argument.

31.     Finally, that the Trust and Saudi Aramco are on the verge of settlement does not constitute prejudice sufficient to defeat Shaw's attempt to intervene. In *Mountain Top Condo*, the plaintiff argued that allowing a third party to intervene would "'deep six' any possible settlement." 72 F.3d at 370 (quotations and citations omitted). In response, the Third Circuit held:

> Even if we were to accept the [plaintiff's] argument that intervention would prejudice settlement negotiations, that prejudice would not be attributable to any time delay. Indeed, the only threat to settlement negotiations between the [plaintiff] and the [defendants] that the intervention might pose would be that the [plaintiff] and the [defendants] might have to consider the [proposed intervenor's] legitimate interest in the funds at issue. But we do not see how this in any way dilutes our practice of encouraging the private settlement of disputes, any more than recognizing the fundamental principal that an injured party has a legitimate right to redress.

*Id.* at 370 (citations omitted). Similarly here, allowing Shaw to intervene in this action only will serve to compel the Trust and Saudi Aramco to consider Shaw's legitimate interest in the funds at issue, and any prejudice suffered by the Trust as a result of its settlement being disrupted is outweighed by the prejudice caused to Shaw if it is not allowed to intervene.

32.     As noted in our Motion, the Third Circuit has been "reluctant to dismiss a request for intervention as untimely" because "in situations where intervention is as of right, the would-

A538

be intervenor may be seriously harmed if he is not permitted to intervene." *Mountain Top Condo*, 72 F.3d at 369 (citations and internal quotations omitted).  There is little doubt that Shaw will be seriously harmed if it is not allowed to intervene and protect its contractual interest under the APA (as determined by the District Court) in the proceeds from the In-Kingdom Contract.  Accordingly, any prejudice caused by Shaw's delay in intervening is outweighed by the severity of this potential prejudice to Shaw.

WHEREFORE, for the foregoing reasons and the reasons set forth in Shaw's Motion to Intervene, Shaw respectfully requests that the Court grant Shaw leave to intervene in this adversary proceeding and to bring its Complaint in Intervention.

ASHBY & GEDDES

/s/ *Catherine A. Strickler*
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
*Attorneys for The Shaw Group Inc.*

Dated: July 30, 2007
182502.1

18

A539

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INCORPORATED, | ) Case No. 00-2142(PJW) |
| et al., | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| ──────────────────────────── | ) |
| | ) |
| SWE&C LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 02-03963(PJW) |
| | ) |
| SAUDI ARABIAN OIL COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Stephen E. Jenkins
Gregory A. Taylor
Catherine A. Strickler
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Attorneys for The Shaw Group
Inc.

Adam G. Landis
Kerri K. Mumford
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Lorraine S. McGowen
Alyssa Englund
Orrick, Herrington &
Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103-0002

James E. Houpt
Orrick, Herrington &
Sutcliffe LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814

Counsel to the SWE&C
Liquidating Trust

Dated: August 31, 2007

2

**WALSH, J.**

This opinion is with respect to the motion (Adv. Doc. # 61) of the Shaw Group Inc. ("Shaw") to intervene (the "Motion") pursuant to Rule 24 of the Federal Rules of Civil Procedure in this adversary proceeding (the "Saudi Aramco Proceeding") between plaintiff SWE&C Liquidating Trust (the "Trust") and defendant Saudi Arabian Oil Co. ("Saudi Aramco"). For the reasons discussed below, the Motion is denied.

## BACKGROUND

### I. The In-Kingdom Contract

The complicated facts of the underlying dispute date back to June 28, 1994. On or about that date, Saudi Aramco entered into a construction contract (the "In-Kingdom Contract") with Bugshan Stone & Webster Limited ("BS&W") to upgrade Saudi Aramco's oil refinery in Ras Tanura, Saudi Arabia (the "Ras Tanura Project"). In this adversary proceeding the subject construction contract is variously referred to in the documents and by the parties as either the In-Kingdom Contract or the Ras Tanura Project. The In-Kingdom Contract is attached to the complaint in the Saudi Aramco Proceeding (the "Complaint") (Adv. Doc. # 1, Ex. A.) and is more accurately identified as a Contract for Construction dated as of June 28, 1994 by and between Saudi Aramco and BS&W (designated by Saudi Aramco as Contract No. 65004/00). BS&W is a joint venture entity formed under the laws of the Kingdom of Saudi Arabia by

3

Abdullah Said Bugshan & Brothers ("Bugshan") and Stone & Webster Engineering Corp. ("SWEC"), a debtor in the related chapter case and a subsidiary of Stone & Webster, Incorporated ("S&W"), another debtor in the related chapter case.

BS&W financed the Ras Tanura Project through a loan of up to $35,000,000 from Saudi American Bank ("SAMBA") (the "Loan"). To secure the Loan, SWEC and Bugshan agreed to each guaranty 50% of the Loan and BS&W purportedly gave SAMBA a security interest in its receivables from the Ras Tanura Project. SWEC issued its guaranty through a letter dated October 11, 1994 (the "Guaranty") (Adv. Doc. # 61, Ex. 1, Ex. A), which it updated and reaffirmed in a January 22, 1998 letter. (Id. at Ex. 1, Ex. B.)

Disputes arose over the Res Tanura Project with BS&W claiming that Saudi Aramco had failed to pay it over $100,000,000. BS&W could not repay the Loan and therefore, on December 22, 1998, SWEC and Bugshan entered into an agreement (the "Payment Letter") to each repay half of the $31,800,000 outstanding balance of the Loan at a rate of $650,000 per month. Bugshan made all of its payments, but SWEC did not pay the full amount it agreed to.

II. Asset Purchase Agreement

On June 2, 2000 S&W, together with its subsidiaries including SWEC (collectively, the "Debtors"), filed a voluntary petition for bankruptcy in this Court under Chapter 11 of the

4

Bankruptcy Code, 11 U.S.C. § 101 et seq.[1]  On the date of the petition SWEC owed SAMBA $6,872,979 on the Guaranty.

On July 14, 2000, the Debtors and Shaw entered into an Asset Purchase Agreement (the "APA") wherein Shaw agreed to purchase substantially all of the Debtors' assets and assume certain of their liabilities.  (Adv. Doc. # 61, Ex. 1, Ex. D.) This Court approved the APA on the same date (Case No. 00-2142, Doc. # 340) and the closing took place shortly thereafter.

Shaw's purchase was not simply the purchase of assets. Shaw entered into a going concern purchase transaction with the Debtors whereby Shaw acquired a large complex international engineering and construction business and assumed a large and varied block of liabilities.  Shaw paid the Debtors $143,400,000 in cash and common stock.  The purchased assets included real property, supplies and inventory, the interest of the Debtors in assumed contracts, permits and other governmental approvals, interest in intellectual properties, investments, general intangibles of the business, all corporate office furniture and equipment, data center hardware and equipment, accounts receivable, cash, a cold storage business, security and other deposits, prepaid expenses, retirement plans, interest in a process business, and all proceeds of the foregoing and all other property of the Debtors of

---

[1]  Individual sections of the Bankruptcy Code will be cited herein as "§ ___."

5

every kind, character or description, tangible and intangible, known or unknown, wherever located and whether or not reflected in the financial statements or similar properties described above. Shaw did not acquire all of the Debtors' assets. Certain assets, identified in the APA as "Excluded Assets," were not sold to Shaw but were retained by the Debtors. (Adv. Doc. # 61, Ex. D, pp. 15-16.) Shaw assumed a myriad of liabilities, identified as obligations of the Debtors arising out of the performance of the assumed contracts, liabilities under certain mortgage loans, liabilities under the seller's outstanding bank indebtedness, unpaid accounts payable (except for unpaid accounts payable related to contracts not assumed or excluded assets), billings in excessive cost and revenues recognized with respect to the assumed contracts, accrued liabilities relating to the assumed contracts and hired employees, liabilities for accrued taxes (subject to certain exceptions), bank indebtedness and specified guarantees, and other liabilities related to the assets and the assumed contracts. (Adv. Doc. # 61, Ex. D, pp. 16-17.) According to the APA, those liabilities exceeded $400,000,000. (Adv. Doc. # 61, Ex. D, pp. 3-4.) At the sale hearing the Debtors' counsel stated that the assumed liabilities actually amounted to $525,772,000. (Doc. # 319, p. 20.)

The Debtors' liquidating plan was confirmed on January 16, 2004. Pursuant to the terms of the plan, certain groups of

6

Debtors were substantively consolidated to become the Consolidated SWINC Estate and other Debtors were substantively consolidated to become the Consolidated SWE&C Estate. As of the effective date of the plan, all the assets of the Consolidated SWE&C Estate were transferred to the Trust.

III. The SAMBA Proceeding

On August 24, 2000 SAMBA filed a cure claim in SWEC's chapter 11 case asserting a claim of $6,872,979 based on the Guaranty and the Payment Letter. The cure claim is asserted first against Shaw and alternatively against SWEC. (Adv. Pro. # 01-7766, Doc. # 1, Ex. D.) Thereafter, on October 18, 2001, SAMBA brought an adversary proceeding (the "SAMBA Proceeding") against Shaw, SWEC and SWINC Acquisition Three, Inc.[2] Like the cure claim, the complaint alleges that through the APA Shaw assumed SWEC's outstanding liability to SAMBA under the Guaranty and the Payment Letter or, alternatively, if there was no such assumption then SWEC remains liable. (Adv. Pro. # 01-7766.) At that time, SAMBA alleged that the outstanding balance of principal and interest owed under the Guaranty and the Payment Letter was $6,728,529.[3] (Adv. Pro. # 01-7766, Doc. # 1, ¶ 58.) Shaw and the Debtors answered in response that Shaw did not assume the Guaranty or the Payment

---

[2]    SWINC Acquisition Three, Inc. was Shaw's intermediary for acquisition of the Debtors' assets.

[3]    The record does not explain why this figure is different from the cure claim figure.

Letter under the APA.  (Adv. Proc. # 01-7766, Doc. ## 5 and 6.) James P. Carroll, the Chief Restructuring Officer of S&W, stated in a sworn declaration that the Debtors and Shaw never intended to include the Guaranty and Payment Letter in the APA.  (Adv. Pro. # 01-7766, Doc. # 31, p. A-212.)  Shaw and SAMBA filed cross motions for summary judgment, and after briefing, the case was removed on September 9, 2004 to the District Court for the District of Delaware.  (Adv. Pro. # 01-7766, Doc. # 88.)  On June 12, 2003 this Court entered an order approving a settlement agreement between the Debtors and SAMBA whereby, inter alia, SAMBA released the Debtors from any claim arising out of the Guaranty and Payment Letter. (Case No. 00-02142, Doc. # 4289.)

On May 3, 2005, the District Court issued an opinion and order denying Shaw's motion for summary judgment and granting SAMBA's cross motion for summary judgment (the "District Court Opinion").  Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), Civ. No. 04-834-SLR, 2005 U.S. Dist. LEXIS 7912 (D. Del. May 3, 2005).  The District Court ruled that according to the plain terms of the APA, Shaw assumed the Guaranty and the Payment Letter and must therefore pay SWEC's outstanding balance.  Shaw filed a Notice of Appeal with the United States Court of Appeals for the Third Circuit on May 26, 2005.  In a February 7, 2006 opinion, the Third Circuit remanded the appeal to the District Court for resolution of issues related to damages.

8

On November 8, 2006, responding to a motion by SAMBA, the District Court issued an Amended Memorandum Opinion holding that SAMBA was entitled to prejudgment simple interest at 9%, post-judgment compound interest at 3.33% and attorneys' fees and costs. Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), 354 B.R. 686 (D. Del. 2006). On February 13, 2007, the District Court issued an order awarding SAMBA $345,714.50 in attorneys' fees. Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), 360 B.R. 64 (D. Del. 2007). As a result of the interest and fees assessments, Shaw's liability to SAMBA is approximately $10,000,000. (Adv. Doc. # 68, p. 4.) Now that all issues of the SAMBA Proceeding have been resolved in the District Court, Shaw's appeal to the Third Circuit is set to move forward with Shaw having filed its opening brief on July 30, 2007. As a result of Shaw posting a supersedeas bond the District Court Opinion is stayed pending appeal.

IV. The Saudi Aramco Proceeding

On July 4, 2000, the Mohammad Al-Mojil Group ("Al-Mojil"), a subcontractor that worked on the Ras Tanura Project, commenced an arbitration proceeding in Saudi Arabia against BS&W after BS&W terminated portions of Al-Mojil's responsibilities. (Adv. Doc. # 1, ¶¶ 32-33.) SWEC and S&W argued that BS&W terminated Al-Mojil's responsibilities because Al-Mojil breached its obligations under its subcontract, which breach was largely

9

caused by Saudi Aramco's wrongdoings and failure to perform its obligations under the In-Kingdom Contract. (Id. at ¶ 31.) On May 21, 2001, a lower court in Saudi Arabia issued a judgment of approximately $51,000,000 in favor of Al-Mojil (the "Al-Mojil Judgment"). (Id. at ¶ 35.) SWEC and S&W believe that they are potentially liable for the Al-Mojil Judgment under a June 2, 1994 guarantee wherein S&W agreed to guarantee any award rendered against BS&W in connection with the In-Kingdom Contract. (Id. at ¶ 36 and Ex. B.) In order to contest this potential liability and to seek redress for Saudi Aramco's alleged wrongdoings and breach of performance under the In-Kingdom Contract, SWEC and S&W commenced the Saudi Aramco Proceeding on May 31, 2002. In their complaint, SWEC and S&W assert the following: (1) SWEC and S&W are entitled to a declaratory judgment stating that they are not liable for the Al-Mojil Judgment; (2) to the extent that SWEC and S&W are found liable for the Al-Mojil Judgment, they are entitled to indemnification from Saudi Aramco; (3) a claim against Saudi Aramco for breach of the In-Kingdom Contract; (4) a claim against Saudi Aramco for withholding at least $148,000,000 in funds from BS&W. (Id. at ¶¶ 44-76.) The Trust, as SWEC's successor in interest, substituted for SWEC as a plaintiff in the Saudi Aramco Proceeding on March 12, 2004. (Adv. Doc. # 26.) S&W withdrew as a plaintiff through a stipulation filed on August 26, 2005 (Adv. Doc. # 24.)

A548

10

On November 7, 2002, when the SAMBA Proceeding was still pending before this Court, SAMBA moved to intervene in the Saudi Aramco Proceeding, arguing that it was entitled to any proceeds arising out of Saudi Aramco's alleged breach of the In-Kingdom Contract. SAMBA requested that the Court recognize a September 21, 1994 letter (the "Specific Payment Instruction Letter") (Adv. Doc. # 19, Ex. A, Ex. 2) and a January 22, 1995 assignment document (the "Assignment of Contract Proceeds") (Id., Ex. A, Ex. 1) as constituting a perfected assignment of the proceeds of the In-Kingdom Contract to SAMBA. This Court denied SAMBA's motion on April 25, 2006, finding that "whether [SAMBA] has an assignment is extremely questionable," and furthermore, it was a question of Saudi law that would be best resolved in a court in Saudi Arabia.[4] (Adv. Doc. # 54, p. 6, line 2 – p. 7, line 21; p. 24, lines 3-13.) SAMBA appealed the denial of its motion to intervene to the District Court and the District Court affirmed this Court's denial of SAMBA's motion on August 29, 2007. Saudi American Bank v. Saudi Arabian Oil Co. (In re Stone & Webster, Inc.), Civ. No. 06-399-SLR, slip op. (D. Del. Aug. 29, 2007).

On June 10, 2004, this Court referred the parties to the Saudi Aramco Proceeding to a Court appointed mediator. (Adv. Doc.

---

[4]    For further details on why this Court finds that the Specific Payment Instruction Letter and the Assignment of Contract Proceeds do not constitute a perfected assignment of the proceeds of the In-Kingdom Contract to SAMBA, see section III. of the Discussion section infra.

A549

11

# 28.)  According to an April 15, 2005 status report, the parties had "tentatively settled the matter."  (Adv. Doc. # 31, p. 1.) After further mediation, the Trust reported in a May 1, 2007 status report that the parties had "agreed to the terms of a settlement" and needed only to "complete documentation of the settlement." (Adv. Doc. # 60, p. 1.)  The Trust stated further that it expected that the parties would seek dismissal of this action "within the next few weeks."  (Id.)  A dismissal has not yet been sought.  At oral argument on the Motion, counsel for the Trust advised the Court that Saudi Aramco did not wish to conclude the settlement until Shaw's Motion was resolved.

On July 29, 2007, Shaw filed the Motion pursuant to Rule 24 of the Federal Rules of Civil Procedure, which is made applicable by Rule 7024 of the Federal Rules of Bankruptcy Procedure.  (Adv. Doc. # 61.)  In its Complaint in Intervention, Shaw requests: (1) a declaration stating that (I) Shaw is entitled to all proceeds[5] derived under the In-Kingdom Contract; (ii) Shaw has subrogated to SAMBA's rights to recover from BS&W under the In-Kingdom Contract; and (iii) BS&W's Assignment of Proceeds and the Specific Payment Instruction Letter are valid and enforceable; (2) an order enjoining Saudi Aramco from making payments related to the

---

[5]  As Shaw has only been found liable to SAMBA for approximately $10,000,000, it is unclear how Shaw could believe itself entitled to all of the proceeds of the In-Kingdom Contract if the recovery against Saudi Aramco exceeds that amount.

12

In-Kingdom Contract to any party other than Shaw and enjoining the
Debtors and SAMBA from receiving any such payments; (3) a ruling
that the Debtors will be unjustly enriched if Shaw is required to
repay the Loan while the Trust recovers from Saudi Aramco; and (4)
indemnification under Section 9.01 of the APA for any losses
incurred as a result of the Guaranty and the Payment Letter. (Adv.
Doc. # 61, Ex. 1, ¶¶ 28-44.)    Simply stated, Shaw seeks
intervention in order to obtain from Saudi Aramco that which
otherwise would go to the Trust if the Trust is successful in its
breach of contract cause of action.    In effect, Shaw is pursuing a
claim against SWEC.

**DISCUSSION**

I. Intervention Under Rule 24

Shaw claims that it is entitled to intervene under either
Rule 24(a)(1) of the Federal Rules of Civil Procedure, which
provides for intervention as of right, or Rule 24(a)(2), which
provides for permissive intervention.    Rule 24(a)(1) provides:
"Upon timely application anyone shall be permitted to intervene in
an action . . . when a statute of the United States confers an
unconditional right to intervene."    Shaw argues that it has an
unconditional right to intervene under § 1109(b).    That section
provides: "A party in interest, including the debtor, the trustee,
a creditors' committee, an equity security holders' committee, a
creditor, an equity security holder, or any indenture trustee, may

raise and may appear and be heard on any issue in a case under this chapter." Courts generally interpret § 1109 broadly to allow interested parties to intervene in adversary proceedings. In re James Wilson Assocs., 965 F.2d 160, 169 (7th Cir. 1992) (interpreting § 1109(b) as meaning that "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains"). However, although the language of § 1109(b) suggests a broad application and makes no mention of standing, courts have held that parties that wish to intervene must show that they have constitutional standing. 7 Collier on Bankruptcy ¶ 1109.04[4][a]; Hobson v. Travelstead (In re Travelstead), 227 B.R. 638, 649 (D. Md. 1998) ("Although § 1109(b) does allow a party in interest to 'be heard on any issue in a case under [Chapter 11],' it does not obviate generally applicable rules of standing."). Standing is a "threshold question in every federal case," including bankruptcy cases. Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm., 321 B.R. 147, 157 (D.N.J. 2005).

The constitutional requirement of standing requires that any party wishing to sue show (1) they suffered an injury, (2) a causal connection between the alleged injury and the conduct being challenged, and (3) redressability. Amtrak v. Pa. PUC, 342 F.3d 242, 254 (3d Cir. 2003). Additionally, courts will also refuse to hear claims on "prudential" grounds if a claim asserted under a

14

statute falls outside of the "zone of interest" of that statute. See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970); Cent. S.D. Coop. Grazing Dist. v. Sec'y of the United States Dep't. of Agriculture, 266 F.3d 889, 895 (8th Cir. 2001). To assert prudential standing, a party must belong to the class of the persons that the statute is intended to protect. In re James Wilson Assocs., 965 F.2d at 168. Courts have ruled that § 1109(b) "does not confer standing in the absence of a legally protected interest affected by the bankruptcy proceeding." In re Martin Paint Stores, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996). Therefore, in order to have standing to intervene under § 1109(b), parties must show that they are intended beneficiaries of another section of the Bankruptcy Code or that they have some other grounds for standing. Id.

In addition to the requirements for showing standing, § 1109(b) contains a "party in interest" requirement that is akin to standing. While the term "party in interest" is nowhere defined, § 1109(b) lists several examples of parties that are considered "parties in interest," "including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." It is clear that this is not an exhaustive list of parties that may be "parties in interest." In re Combustion Eng'g, Inc., 391 F.3d 190, 214 n.21 (3d Cir. 2004); In re Amatex Corp., 755 F.2d 1034,

15

1042 (3d Cir. 1985).  Courts have held that "[t]he test to determine whether an entity is a party in interest is 'whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation.'" Baron & Budd, P.C., 321 B.R. at 158 (quoting In re Torrez, 132 B.R. 924, 934 (Bankr. D. Cal. 1991)); see also In re Amatex, 755 F.2d at 1042; Unofficial Comm. of Zero Coupon Noteholders v. Grand Union Co. (In re Grand Union Co.), 179 B.R. 56, 58 (D. Del. 1995).

In order to show that it has standing (and in order to show grounds for intervention under Rule 24), Shaw must show that it has an interest in the dispute between the Trust and Saudi Aramco.  If Shaw is entitled to the proceeds of the Trust's breach of contract claim, then Shaw has (1) an alleged injury, (2) caused by Saudi Aramco, (3) that can be redressed through participation in this case.  Those three elements are sufficient to establish constitutional standing.  Additionally, if Shaw is entitled to the proceeds of the of the Trust's claim, then Shaw has a "sufficient stake in the outcome of the proceeding," Baron & Budd, P.C., 321 B.R. at 158, and qualifies as a "party in interest" under § 1109(b).  If Shaw is a "party in interest," then Shaw is an intended beneficiary of § 1109(b) and would therefore have prudential standing.  However, as will be shown below, Shaw has no right to the proceeds of the Trust's breach of contract claim

16

against Saudi Aramco, and therefore Shaw lacks standing to participate in the Saudi Aramco Proceeding.

Shaw also argues that it is entitled to intervene under Rule 24(a)(2), which provides: "Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." The Third Circuit has ruled that intervention under Rule 24(a)(2) requires proof of four elements:

> 1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests.

Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 220 (3d Cir. 2005); see also Kleissler v. United States Forest Serv., 157 F.3d 964, 969 (3d Cir. 1998). In order to intervene under Rule 24(a)(2), a party must meet all four of these requirements. Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 366 (3d Cir. 1995). As with Rule 24(a)(1), the determination of whether Shaw may intervene comes down to whether Shaw has a sufficient interest in the Saudi Aramco Proceeding. As will be shown below, Shaw does not qualify under the second and third elements.

II. Overview of Shaw's Position

17

Shaw argues that it has a substantial stake in this adversary proceeding under several theories, all of which are ultimately unconvincing.[6] Shaw claims that it is entitled to the proceeds of the Trust's breach of contract claim against Saudi Aramco under a theory of subrogation. Specifically, Shaw argues that BS&W assigned the proceeds from the In-Kingdom Contract to SAMBA, giving SAMBA the right to recover for any Saudi Aramco breach of contract. Because the District Court has found that Shaw must perform on the Guaranty and the Payment Letter in favor of SAMBA, Shaw argues that it is subrogated to SAMBA's rights to the In-Kingdom Contract proceeds.

Shaw also argues that it assumed the right to any benefits from the In-Kingdom Contract through the APA. According to Shaw, BS&W only failed to repay the Loan because of Saudi Aramco's breach of the In-Kingdom Contract. Therefore, Shaw believes that it is entitled to the proceeds from any breach of contract claims against Saudi Aramco.

Finally, Shaw argues that it is entitled to intervene in the Saudi Aramco Proceeding under a theory of unjust enrichment. Shaw claims that if the District Court Opinion is upheld and Shaw

---

[6]  Shaw only requests permission to intervene provided that the District Court Opinion is upheld. (See Adv. Doc. # 61, ¶ 17.)  Shaw consistently maintains that it did not assume the Guaranty or the Payment Letter and that the District Court was wrong. However, insofar as the District Court Opinion is upheld, Shaw believes that it has a right to intervene in the Saudi Aramco Proceeding.

18

is forced to pay off the Guaranty and the Payment Letter and if the Trust ultimately recovers from Saudi Aramco, then the Trust will be unjustly enriched.

III. Subrogation

The U.S. Supreme Court has summarized the equitable doctrine of subrogation as follows: "[O]ne who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other." American Surety Co. v. Bethlehem Nat'l Bank, 314 U.S. 314, 317, 62 S. Ct. 226, 86 L. Ed. 241 (1941). As an equitable doctrine, subrogation should only be applied in the "'exercise of a proper equitable discretion, with a due regard for the legal and equitable rights of others.'" McAlister v. Sentry Ins. Co., Civ. No. 91-1701, 1991 U.S. Dist. LEXIS 7945, at *20 (E.D. Pa. June 11, 1991) (quoting Am. Surety Co. of New York v. Bethlehem National Bank of Bethlehem, 116 F.2d 75, 76 (3d Cir. 1940), rev'd on other grounds, 314 U.S. 314 (1941)).

Shaw asserts that it has a right to intervene in this action because it is subrogated to SAMBA's rights to the proceeds of the In-Kingdom Contract, which SAMBA allegedly received by assignment from BS&W. Shaw argues, as did SAMBA, that the Assignment of Contract Proceeds and the Specific Payment Instruction Letter operate, in effect, to perfect the security interest created in the Assignment of Contract Proceeds. (See Adv.

A557

19

Doc. # 19, Ex. 1, Ex. B.)  As stated by counsel for SAMBA in the April 25, 2006 SAMBA intervention hearing: "[W]e are asking for injunctive relief.  The injunctive relief is to stop payments from being made that aren't made in accordance with the assignment of contract proceeds and specific payment instruction letter." (Adv. Doc. # 54, p. 15, line 14 - p. 16, line 2.)  Of course, I rejected that argument on April 25, 2006.  (Adv. Doc. # 54, p. 24, lines 3-13.)  I will restate and amplify on my ruling with respect to SAMBA's claim of a security interest.

    Shaw, like SAMBA, claims that BS&W assigned all proceeds from the In-Kingdom Contract to SAMBA through a January 22, 1995 "Assignment of Contract Proceeds" executed by BS&W in favor of SAMBA.  (Adv. Doc. # 19, Ex. 1, Ex. A.)  This document provides for an assignment of the proceeds of the In-Kingdom Contract as a security interest to SAMBA, and contains this important provision: "[BS&W] hereby further agrees that: (1) The Assignor [i.e., BS&W] shall immediately notify all payors under the Contract [i.e., the In-Kingdom Contract] of this assignment in such form as may be requested by the payor, or, if no specific form is required, by letter in substantially the following form." (Id.)  The Assignment of Contract Proceeds then lays out the following form letter:

        Re: (Contract)

        Dear Sirs:

        We hereby advise you that we have executed an
        assignment of proceeds of (the Contract) in

20

> favour of [SAMBA].   All proceeds of the
> Contract due to us should therefore be paid
> directly to Account No. ____.
>
> Saudi American Bank
> Branch, Al-Khobar (Fluor Branch)
> P.O. Box 842, Al-Khobar

(Id.)

As I stated in denying SAMBA's motion to intervene, I doubt that BS&W effected a valid assignment under Saudi banking law, which I assume applies, because BS&W never issued the kind of notice letter called for in the Assignment of Contract Proceeds. (Adv. Doc. # 54, p. 6, line 2 – p. 7, line 21; p. 24, lines 3-13.)

For a number of reasons, the Specific Payment Instruction Letter does not effect the result that SAMBA asserts.

(1) Contrary to BS&W's agreement in the Assignment of Contract Proceeds to advise payors of the assignment of the contract proceeds to SAMBA, the specific Payment Instruction Letter does not even mention an assignment.

(2) That letter only tells Saudi Aramco what BS&W bank account in SAMBA should receive the proceeds.  The Specific Payment Instruction Letter states in relevant part: "This letter requests and authorizes you to pay Saudi American Bank, Fluor Branch, P.O. Box 842, Al Khobar 31952, Saudi Arabia for credit to our account any and all compensation due from you under contract number 65004, as it may be changed from time to time."  (Id. (emphasis added).) BS&W directs payment to go into "our account" at SAMBA, and not to

A559

21

SAMBA itself.  The Specific Payment Instruction Letter then goes on to state: "We shall mark all our invoices presented to you Pay to Saudi American Bank, Fluor Branch, P.O. Box 842, Al Khobar 31952, Saudi Arabia <u>for account of 'Buqshan S&W Company Limited.'"</u>  (<u>Id.</u> (emphasis added).)

(3)  As the Specific Payment Instruction Letter is dated September 21, 1994, four months before the Assignment of Contract Proceeds was signed, it seems highly unlikely that the Specific Payment Instruction Letter was sent pursuant to the instructions in the Assignment of Contract Proceeds.[7]

(4)  Finally, the Specific Payment Instruction Letter also states: "Payments hereunder shall only be made against invoices submitted by us and not otherwise."  (<u>Id.</u>)  There is nothing in the record thus far that suggests that the money judgment being sought by the Trust against Saudi Aramco would be with respect to invoices submitted by BS&W.  Indeed, two of the four counts of the Complaint (declaratory judgment and indemnification) would not likely be the product of invoices submitted by BS&W.  Thus, a judgment in favor of the Trust could be otherwise then from "invoices submitted by" BS&W.

It is Shaw's obligation to prove under applicable law that the Assignment of Contract Proceeds and the Specific Payment

---

[7]    In denying SAMBA's motion to intervene, I did not note this particular infirmity in SAMBA's alleged security interest.

Instruction Letter created a perfected security interest in the proceeds. On this issue, Shaw offers nothing in addition to the argument made by SAMBA in its intervention motion and SAMBA failed to meet its burden. At the hearing on SAMBA's intervention motion, SAMBA's counsel did not attempt to validate the assignment under Saudi law, or any other law. Thus, I conclude again that SAMBA has not proved that it has a perfected security interest in the contract proceeds. (Adv. Doc. # 54, p. 6, line 2 – p. 7 line, 21.) As SAMBA has no legal or equitable rights to the proceeds, there is no basis to apply the doctrine of subrogation in Shaw's favor. See McAlister, 1991 U.S. Dist. LEXIS 7945, at *20.

IV. Claim Arising out of the In-Kingdom Contract

Shaw next argues that it assumed the right to any benefits from the In-Kingdom Contract through the APA. The Motion includes numerous assertions of this entitlement, including the following:

> [I]f the District Court's decision is upheld and Shaw pays SAMBA under the Guaranty for the remaining balance of BS&W's debt, Shaw is the entity with the right to recover proceeds under the In-Kingdom Contract.
>
> * * *
>
> [T]o the extent the Guaranty or Payment Letter are considered Assumed Contracts or Assumed Liabilities under the APA (as they were by the [District] Court) Shaw is entitled to recover for any third-party claims or interests in the Ras Tanura Project.
>
> * * *

> Now that Shaw has been adjudged liable for
> SWEC's Guaranty, and hence BS&W's outstanding
> debt to SAMBA, Shaw has the right to recoup
> its liability that ultimately resulted from
> breaches by Saudi Aramco of the In-Kingdom
> Contract.

(Adv. Doc. # 61, pp. 8-9.)  In its August 8, 2007 letter to the
Court, Shaw restated the relief that it is seeking through the
intervention: "to enforce its ownership of assets under the APA,
namely its right to future revenues from the In-Kingdom contract."
(Adv. Doc. # 73, p. 3 (emphasis added).)  As detailed below, all of
these statements fly in the face of (a) the District Court's
finding that the In-Kingdom Contract is clearly identified in the
APA as an Excluded Asset, and (b) Schedule 2.02(e) of the APA,
which states that the Debtors retain any and all claims arising out
of that contract.

Shaw argues that it obtained the right to intervene in
the Saudi Aramco Proceeding by assuming benefits to the In-Kingdom
Contract through the APA.  The essence of Shaw's position is as
follows: The District Court Opinion found that Shaw assumed the
Guaranty and the Payment Letter.  If that decision is upheld, then
Shaw will have to pay SAMBA over $10,000,000.  But for Saudi
Aramco's breach of the In-Kingdom Contract, Saudi Aramco would have
paid BS&W in full and BS&W would have paid off the Loan.
Consequently, Shaw should receive out of whatever recovery the

24

Trust obtains from Saudi Aramco a reimbursement of the money Shaw must pay to SAMBA.

Since SAMBA's motion to intervene has been denied, the only plaintiff in the Saudi Aramco Proceeding is the Trust. Therefore, if money is diverted to Shaw, it would reduce the Trust's recovery. This produces an anomalous result: the Trust, as successor to SWEC, pays the obligation that the District Court found Shaw to be liable for.

The District Court Opinion hardly serves as a basis for Shaw to argue that it has rights in the In-Kingdom Contract through the APA. To the contrary, the District Court specifically identified the In-Kingdom Contract as an "Excluded Asset," i.e., an asset not assigned to Shaw. In re Stone & Webster, Inc., 2005 U.S. Dist. LEXIS 7912, at *8-9. Thus, in concluding its ruling the District Court stated:

> The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral,"

(Id. at *21 (quoting Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super. 1977))), and noted in an adjoining footnote: "Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument

A563

25

that the contract at issue is the Ras Tanura Contract." (In re
Stone & Webster, Inc., 2005 U.S. Dist. LEXIS 7912, at *21 n.12).

Shaw argues that the District Court did not rule on
whether Shaw assumed the In-Kingdom Contract, noting that the above
quoted footnote only says that In-Kingdom Contract is not "at
issue." (Id.) According to Shaw, "[h]olding that the In-Kingdom
Contract was not 'at issue' is entirely different than holding that
'Shaw did not assume' the In-Kingdom Contract." (Adv. Doc. # 68,
p. 6.) I disagree. While the District Court may not have made a
specific ruling that Shaw did not assume the In-Kingdom Contract,
it did find that the APA explicitly stated that the In-Kingdom
Contract was an "Excluded Asset." In re Stone & Webster, Inc.,
2005 U.S. Dist. LEXIS 7912, at *8-9.

According to Shaw's reading of the APA, the Guaranty and
the Payment Letter are "Assumed Contracts" or "Assumed Liabilities"
under the APA, and therefore Shaw is entitled to recover any third-
party claims or interest relating to the Guaranty or the Payment
Letter. Shaw quotes Section 2.01 of the APA:

> Sellers shall sell, assign, convey, transfer
> and deliver to Buyer . . . and Buyer shall
> purchase from Sellers, the Assets . . .
> including the following: . . . (k) any and all
> claims and causes of action, including
> privileges related thereto, of any Seller
> against any third parties relating to . . .
> (ii) the Assumed Liabilities or the Assumed
> Contracts. . . .

26

(Adv. Doc. # 61, Ex. 1, Ex. D, pp. 15-16 (emphasis added).)  Shaw argues that the Trust's claims against Saudi Aramco in the Saudi Aramco Proceeding are covered by Section 2.01 because they are claims that relate to the Assumed Liabilities or the Assumed Contracts.  However, the Guaranty and the Payment Letter clearly are not a basis for the Debtors having a claim or cause of action against another party.  Just the opposite is the case.  Those two documents constitute the basis of a claim owned by SAMBA against SWEC.  Furthermore, Schedule 2.02(e) of the APA unequivocally states that Shaw has no right to a claim against Saudi Aramco.  Schedule 2.02(e) identifies Special Project Claims which are included in the Excluded Assets.  One of these Special Project Claims is described as

> Any and all claims or liabilities available at law or in equity, or arising under the project agreements in Saudi Arabia for the Ras Tanura Refinery Upgrade Project ("RTRUP") – Package 2 – Utilities, those agreements including, but not limited to, the following:
>
> * * *
>
> Contract for Construction dated as of June 28, 1994 by and between Saudi Arabian Oil Company ("Saudi Aramco") and BS&W (designated by Saudi Aramco as Contract No. 65004/00).

(Adv. Proc. # 01-7766, Doc. # 50, Ex. 22, p. A979 (emphasis added).)

Shaw's argument that the Guaranty and the Payment Letter give rise to rights in the In-Kingdom Contract is contradicted by

27

this provision of the APA, which explicitly severed that contract from the Guaranty and the Payment Letter and left the In-Kingdom Contract claim rights solely with the Debtors.  While at one time the In-Kingdom Contract and the Guaranty and the Payment Letter may have been tangentially related, as of the effective date of the APA they became completely independent of each other.  The plain and explicit language of the APA says that Shaw has no rights whatsoever arising out of the In-Kingdom Contract.

It is also worth noting that Section 31.5 of the In-Kingdom Contract contains the following "no third-party beneficiary" provision: "This Contract shall not be deemed for the benefit of any third party nor shall it give any person not a party to this Contract any right to enforce its provisions." (Adv. Doc. # 1, Ex. A, p. A-38.)  Although the effect of this provision must be determined under Saudi law, there is significant American case law authority for enforcement of such no third-party beneficiary provisions. See, e.g., In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 733 (S.D.N.Y. 1989) (applying Delaware law); India.com, Inc. v. Dalal, 412 F.3d 315, 321 (2d Cir. 2005) (applying New York law); Pa. State Emples. Credit Union v. Fifth Third Bank, 398 F. Supp. 2d 317, 324 (M.D. Pa. 2005) (applying Pennsylvania and Ohio law).

V. Unjust Enrichment

28

Shaw argues that if the Trust recovers from Saudi Aramco in the Saudi Aramco Proceeding and Shaw is not permitted to intervene, then the Trust will be unjustly enriched. According to Shaw:

> Under the APA, if Shaw has been determined to assume the Guaranty and Payment Letter as it relates to the Ras Tanura Project, then it also receives any benefits related to the Ras Tanura Project. Because of the structure of the APA, the Debtors will be unjustly enriched unless Shaw is allowed to recover proceeds owing under the In-Kingdom Contract.

(Adv. Doc. # 61, p. 13.)    This argument is merely a recharacterization of Shaw's contract right argument.

In order to show unjust enrichment, a party must prove the following elements: (1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value. <u>Lauren W. v. DeFlaminis</u>, 480 F.3d 259, 277 (3d Cir. 2007); <u>Allegheny Gen. Hosp. v. Philip Morris, Inc.</u>, 228 F.3d 429, 447 (3d Cir. 2000).

Shaw's unjust enrichment argument provides no traction for the Motion because Shaw can in no way show that it is inequitable for the Trust to retain any benefits that it may receive out of the Saudi Aramco Proceeding. There is no inequity because any "enrichment" that the Trust may receive out of its

29

relationship with Shaw is explicitly called for in the APA, which Shaw willingly agreed to. As discussed above, for good reason, the District Court concluded that Shaw assumed the Guaranty and the Payment Letter, but not In-Kingdom Contract -- a specifically "Excluded Asset." Not only was there no assignment of the proceeds of the In-Kingdom Contract, Schedule 2.02(e) specifically reserved solely to the Debtors any and all claims related to the In-Kingdom Contract. Shaw signed on to the APA, which provides for a result that now appears to be unfavorable to Shaw. The Court cannot rewrite that contract under the guise of unjust enrichment.

## VI.   The Settlement Stipulation Release

Given the complexity of the APA transaction, after the closing and over the course of several years, the Debtors and Shaw had numerous disputes between themselves and with numerous third parties. In order to resolve many of these disputes, on November 30, 2004 the Consolidated SWINC Estate and the Trust entered into a settlement stipulation with Shaw (the "Settlement Stipulation"). (Adv. Doc. # 69 (filed under seal).)

The Trust argues that Shaw is not entitled to intervene in the Saudi Aramco Proceeding, and thereby obtain relief against the Trust, because in the Settlement Stipulation Shaw released the Trust from numerous liabilities or obligations, including that related to SAMBA. The Settlement Stipulation contains a broad release provision that states that Shaw releases the Trust

30

> of and from any and all manner of action or
> actions, cause or causes of action, in law or
> in equity, suits, debts, liens, contracts,
> agreements, promises, liabilities, claims
> (including, but not limited to claims for
> attorneys' fees, costs and sanctions),
> damages, demands, losses, costs, or expenses
> of any nature, <u>currently existing or arising
> in the future</u>, whether known or unknown,
> suspected or unsuspected, fixed or <u>contingent</u>,
> concealed or hidden, latent or patent, which
> Shaw has or may have <u>with respect to</u> the Filed
> Claims.  No provision herein shall limit or
> affect the ability of the Consolidated SWE&C
> Estate, the SWE&C Liquidating Trust or Shaw to
> assert any right, claim or cause of action
> against the Settling Party <u>unrelated</u> to the
> Filed Claims.

(<u>Id.</u> at ¶ 9 (emphasis added).)  If Shaw's claim to the proceeds of

the In-Kingdom Contract is "with respect to" a "Filed Claim," then

Shaw waived its right to divert the Trust's recovery to itself and

therefore it has no basis to intervene.  The term "Filed Claims"

means the "approximately 5,700 claims" filed against the Debtors as

of the date of the Settlement Stipulation.  (<u>Id.</u> at Recital C.)  As

noted above, on August 24, 2000 SAMBA filed a cure claim in the

amount of $6,872,979, which the parties agree was timely filed.

Given the numerous types of claims identified in the Settlement

Stipulation, including particularly contingent claims, I believe

the words "with respect to" covers Shaw's claim to the proceeds of

the In-Kingdom Contract.

Although SAMBA's cure claim was filed in the Debtors'

chapter 11 cases, it asserts a claim against Shaw and alternatively

against the Debtors.  Specifically, SAMBA's cure claim asserts:

> The lists of Assumed Contracts filed by Debtor
> and its affiliates in these proceedings
> include Claimant as a party with respect to
> which two (2) contracts which have been
> assumed by SWINC Acquisition Three, Inc.
> ("Shaw") under the Asset Purchase Agreement by
> and among the Debtor, said affiliates and
> Shaw.  On information and belief, <u>the Guaranty
> is one of the Assumed Contracts the
> liabilities under which have been assumed by
> Shaw</u>.  In the event it is determined that the
> Guaranty is not a contract assumed by Shaw, or
> in the event that any portion of the Claim set
> forth above is for any reason determined not
> to be a Cure Claim, Claimant hereby claims the
> right to have such portion of this claim
> treated as a Proof of claim, rather than a
> Statement of Cure Claim.

(Adv. Proc. # 01-7766, Doc. # 1, Ex. D, p. 3 (emphasis added).)  In

substance, SAMBA's cure claim is against Shaw.  Contingently, if

the claim is found not to be against Shaw, then it is a claim

against the Debtors.  Clearly then, SAMBA's cure claim recites a

claim against Shaw that falls within the defined term "Filed

Claims."  Finally, the fact that the claim is labeled a "cure

claim" directly implicates the Guaranty and the Payment Letter that

the District Court found Shaw to have assumed.  Shaw was certainly

aware of SAMBA's August 24, 2000 cure claim against it long before

Shaw agreed to the Settlement Stipulation.  If Shaw was not served

with notice at the time of the filing of the cure claim, Shaw at

least knew about it by April 17, 2001 when Shaw objected to the

cure claim in its second omnibus objection to claims.  (Case No.

A570

32

00-2142, Doc. # 1657, Ex. B, p. 60.)

The last sentence of the release provision in the Settlement Stipulation states that the release does not "limit or affect the ability . . . to assert any right, claim or cause of action . . . unrelated to the Filed Claims." (Adv. Doc. # 69, ¶ 9 (emphasis added).) Clearly, the assertion by SAMBA against Shaw as quoted above in the cure claim shows that that claim is related to a Filed Claim. The last sentence can be viewed as further defining the term "with respect to," showing that the latter term is not intended to mean simply SAMBA's contingent claim against the Debtors.

In its August 8, 2007 letter to the Court Shaw suggests that the release provision is ambiguous and argues that where a contract is ambiguous courts may receive extrinsic evidence to interpret it. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1013 (3d Cir. 1980). Consequently, Shaw argues that "[i]t is important to understand the circumstances underlying the parties' entry into the Settlement Stipulation that render the agreement's release inapplicable to Shaw's motion." (Adv. Doc. # 73, p. 2.) Shaw then refers to Mr. Carroll's declaration in which he stated, presumably on behalf of the Debtors, that the Debtors and Shaw agreed that the Guaranty and the Payment Letter were not assumed by Shaw. (Adv. Pro. # 01-7766, Doc. # 31, p. A-212.) Shaw then asserts:

> At the time the parties entered into the
> Settlement Stipulation on November 30, 2004,
> Shaw and the Debtors both still agreed that
> Shaw had never assumed the Guaranty and
> Payment Letter.   Thus, when the parties
> entered into the Settlement Stipulation, Shaw
> was in no position to release any cause of
> action with respect to the Guaranty and
> Payment Letter because it was never its claim
> to release – the parties were in agreement
> that it was the Debtors' claim.

(Adv. Doc. # 73, p. 2.)

This argument ignores the fact that when Shaw entered

into the Settlement Stipulation on November 30, 2004, Shaw was well

aware that SAMBA was looking to Shaw to satisfy the Guaranty and

the Payment Letter.  As noted above, Shaw was aware of the August

24, 2004 cure claim against it no later than April 17, 2001.  SAMBA

commenced the SAMBA Proceeding against SWEC and Shaw on October 18,

2001 alleging (with citations to the applicable provisions of the

APA) that Shaw is liable to SAMBA on the Guaranty and Letter

Agreement.  (Adv. Pro. # 01-7766, Doc. # 1.)  SAMBA filed a cross-

motion for summary judgment in the SAMBA Proceeding on October 18,

2002 (with extensive citations to relevant facts, including

applicable provisions of the APA) in support of its position.

(Adv. Pro. # 01-7766, Doc. # 51.)  Furthermore, in the August 8,

2007 letter to the Court Shaw points out that

> on June 3, 2003 in Shaw's Limited Response to
> the Debtors' Motion for Order Under Fed. R.
> Bankr. P. 9019 Approving Settlement with Saudi
> American Bank (Exhibit 7 to the Trust's
> letter), Shaw explicitly reserved "all of its

34

> rights in connection with, or related to: ...
> (iv) any rights, claims, or interests against
> the Debtors for indemnification, contribution
> or the like <u>as a result of any recovery by
> SAMBA against Shaw.</u>"

(Adv. Doc. # 73, p. 3 (emphasis added).)   Thus, prior to November

30, 2004 Settlement Stipulation Shaw was well aware that there was

a serious risk that it could have liability in favor of SAMBA

arising out of the Guaranty and Payment Letter.   The circumstances

underlying the parties' entry into the Settlement Stipulation

clearly support the conclusion that the Settlement Stipulation

release provision precludes any right to future revenues from the

In-Kingdom Contract at the expense of SWEC, now the Trust.   As Shaw

has waived the right to pursue any claim it had as a result of the

SAMBA obligation, allowing Shaw to intervene in the Saudi Aramco

Proceeding serves no purpose.

## CONCLUSION

For the reasons discussed above, I conclude that Shaw is

not entitled to intervene under either Rule 24(a) or 24(b).

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INCORPORATED, | ) Case No. 00-2142(PJW) |
| et al., | ) Jointly Administered |
| | ) |
|         Debtors. | ) |
| ——————————————————— | ) |
| | ) |
| SWE&C LIQUIDATING TRUST, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
|     v. | ) Adv. Proc. No. 02-03963(PJW) |
| | ) |
| SAUDI ARABIAN OIL COMPANY, | ) |
| | ) |
|         Defendant. | ) |

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the motion (Adv. Doc. # 61) of the Shaw Group Inc. to intervene in this adversary proceeding is **denied.**

Peter J. Walsh
United States Bankruptcy Judge

Dated: August 31, 2007

**A574**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:  ) | |
| ) | Chapter 11 |
| STONE & WEBSTER, INCORPORATED ) | |
| *et al.*, ) | Case No. 00-02142 (PJW) |
| ) | |
| Debtors, ) | Jointly Administered |
| —————————————————) | |
| STONE & WEBSTER ENGINEERING ) | |
| CORPORATION and STONE & WEBSTER, ) | |
| INCORPORATED, *et al.*, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -against- ) | Adv. Pro. No. 02-3963 (PJW) |
| ) | |
| SAUDI ARABIAN OIL COMPANY, ) | |
| ) | |
| Defendant. ) | |
| —————————————————) | |

### NOTICE OF APPEAL

TO:   Adam G. Landis, Esquire
      LANDIS RATH & COBB LLP
      919 Market Street
      Suite 600
      Wilmington, DE 19801

      *Counsel for the SWE&C Liquidating Trust*

      Dennis A. Meloro, Esquire
      GREENBERG TRAURIG
      1007 North Orange Street
      Suite 1200
      Wilmington, DE 19801

      *Counsel for Saudi Arabian Oil Company*

      Cyrus Benson, III, Esquire
      WHITE & CASE LLP
      1155 Avenue of the Americas
      New York, NY 10036

      *Counsel for Saudi Arabian Oil Company*

Lorraine McGowen, Esquire
ORRICK HERRINGTON &
 SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103

*Counsel for the SWE&C Liquidating Trust*

James E. Houpt, Esquire
ORRICK HERRINGTON &
SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4417

*Counsel for the SWE&C Liquidating Trust*

A575

PLEASE TAKE NOTICE that, pursuant to Rule 8001 of the Federal Rules of Bankruptcy Procedure, proposed intervenor The Shaw Group Inc. ("Shaw"), by and through its undersigned counsel, hereby appeals to the United States District Court for the District of Delaware from the Opinion and Order entered by the United States Bankruptcy Court for the District of Delaware dated August 31, 2007, denying Shaw's Motion to Intervene. A copy of the Court's Opinion and Order dated August 31, 2007 is attached hereto as Exhibit A.

The names of all parties to this action and their respective attorneys are as set forth above.

ASHBY & GEDDES

/s/ Catherine A. Strickler
Stephen E. Jenkins (I.D. No. 2152)
Gregory A. Taylor (I.D. No. 4008)
Catherine A. Strickler (I.D. No. 4310)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
*Attorneys for The Shaw Group Inc.*

Dated: September 7, 2007
183639.1

2

A576