IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| STONE & WEBSTER, | ) | Bk. Nos. 00-02142(PJW) |
| INCORPORATED, et al., | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |

| | | |
|---|---|---|
| SHAW GROUP, INC., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-616-SLR |
| | ) | Adv. No. 02-3963(PJW) |
| SWE&C LIQUIDATING TRUST, | ) | |
| | ) | |
| Appellee. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 12th day of November, 2008, having reviewed the papers filed in connection with the above captioned bankruptcy appeal;

IT IS ORDERED that the appeal is denied and the August 31, 2007 decision of the bankruptcy court is affirmed, for the reasons that follow:

1. **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of

the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a *de novo* basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

2. **Background.** The history of this litigation has been well documented and will be repeated only to the extent necessary to understand the dispute at bar.

a. On May 31, 1980, Stone & Webster Engineering Corporation ("SWEC") and Abdullah Said Bugshan & Bros. ("Bugshan"), a Saudi Arabian business enterprise, formed a joint venture called Bugshan Stone & Webster ("BS&W") under the laws of Saudi Arabia. In the mid-1990's, BS&W entered a $130 million contract (the "In-Kingdom Contract") with Saudi Arabian American Oil Company ("Saudi Aramco") to upgrade a large oil refinery at Ras Tanura in Saudi Arabia (the "Ras Tanura Project"). In order to induce Saudi American Bank ("SAMBA") to grant credit to BS&W, Bugshan and SWEC each agreed to issue guaranties to SAMBA for 50% of any loans SAMBA made to BS&W. On October 11, 1994, SWEC delivered a letter of guaranty to SAMBA for 50% of all obligations owed to SAMBA by BS&W, up to $35 million (the "Guaranty"). In 1997, SAMBA approved a loan to BS&W for $35 million "to finance mobilization & working capital requirements" for the Ras Tanura Project. Disputes arose in connection

with the Ras Tanura Project, with BS&W claiming that Saudi Aramco had failed to pay it over $100,000,000.  BS&W could not repay SAMBA the outstanding amount of the loan when the project was completed.  In late 1998, pursuant to their guaranties, SWEC and Bugshan each agreed to repay one-half of the outstanding loan at a rate of $650,000 per month.  SWEC has not repaid its portion of the loan.

      b.  On June 2, 2000, Stone & Webster, Inc. ("S&W"), together with its subsidiaries (including SWEC) (collectively, "the debtors"), filed a voluntary petition for bankruptcy in Delaware's bankruptcy court.  On July 14, 2000, the debtors and The Shaw Group, Inc. ("Shaw") entered into an Asset Purchase Agreement ("APA") wherein Shaw acquired a large, complex international engineering and construction business and assumed a large and varied block of liabilities.

      c.  On August 24, 2000, SAMBA filed a cure claim in SWEC's chapter 11 case asserting a claim of $6,872,979 against Shaw (in the first instance) based on the Guaranty.  Thereafter, on October 18, 2001, SAMBA brought an adversary proceeding against Shaw alleging that Shaw, through the APA, assumed SWEC's outstanding liability to SAMBA under the Guaranty ("the SAMBA adversary").[1]  On June 12, 2003, the bankruptcy court entered an order approving a settlement agreement between the debtors and SAMBA whereby, *inter alia*, SAMBA released the debtors from any claim arising out of the Guaranty.  The SAMBA adversary was removed to this court and, by decision dated May 3, 2005, I determined that:  (1) the Guaranty and the In-Kingdom Contract were separate contracts; and (2) the Guaranty was assumed by Shaw under

---

[1] Adversary number 01-7766 (PJW).

the APA. *Saudi American Bank v. Shaw Group,* 2005 WL 1036556 (D. Del. May 3, 2005). That decision is on appeal.

    d. According to the bankruptcy court, on May 21, 2001, a lower court in Saudi Arabia issued a judgment of approximately $51,000,000 in favor of a subcontractor who worked on the Ras Tanura Project. SWEC and S&W believe that they are potentially liable for said judgment under a June 2, 1994 guarantee wherein S&W agreed to guarantee any award rendered against BS&W in connection with the In-Kingdom Contract. In order to contest this potential liability and to seek redress for Saudi Aramco's alleged wrongdoings and breach of performance under the In-Kingdom Contract, SWEC and S&W[2] commenced the above referenced adversary proceeding on May 31, 2002 ("the Saudi Aramco adversary"). On June 10, 2004, the bankruptcy court referred the parties to mediation. Although the parties have agreed to the terms of a settlement, dismissal of the Saudi Aramco adversary has not been sought, pending resolution of the instant dispute.

    e. The dispute at bar revolves around the motion to intervene filed by Shaw on July 29, 2007 in the Saudi Aramco adversary. The bankruptcy court denied said motion by memorandum opinion dated August 31, 2007. On appeal, Shaw argues that its intervention "became appropriate and necessary only as a result of the grant of summary judgment in favor of SAMBA in the separate, but factually related," SAMBA adversary. Shaw further argues that, if it is liable under the APA for the Guaranty, it is entitled to share in the proceeds of the In-Kingdom Contract sought by the Trust in the

---

[2]The SWE&C Liquidating Trust ("the Trust") has since been substituted as plaintiff in the adversary action and appellee in the instant appeal.

Saudi Aramco adversary.

3. **Analysis.** I find no error in the bankruptcy court's decision to deny Shaw's motion to intervene. The bankruptcy court first analyzed intervention under Fed. R. Civ. P. 24(a)(1) and (2) and 11 U.S.C. § 1109(b) in order to determine whether Shaw had prudential standing, that is, a sufficient stake in the outcome of the Saudi Aramco adversary so as to require representation. Within this legal framework, the bankruptcy court analyzed Shaw's arguments under the theories of subrogation and unjust enrichment.

a. With respect to Shaw's subrogation claims, Shaw (as subrogee) cannot acquire rights of action greater than or different from the rights of action, if any, which the subrogors have. See *National Surety Co. v. Perth Amboy Trust Co.*, 76 F.2d 87, 90 (3d Cir. 1935). Insofar as Shaw argues that it is subrogated to SAMBA's rights to collect from BS&W through operation of the Guaranty (D.I. 10 at 13), the bankruptcy court concluded that, because SAMBA did not have a perfected security interest in the proceeds of the In-Kingdom Contract, Shaw could claim no such rights through subrogation. Insofar as Shaw argues that it is subrogated to BS&W's claims against Saudi Aramco by operation of the APA (D.I. 10 at 19), the bankruptcy court concluded that the APA, consistent with my decision in the SAMBA adversary, precludes Shaw's subrogation claims.[3] More specifically, Schedule 2.02(e) of the APA unequivocally identifies the Ras Tanura Project as an "Excluded Asset;" therefore, Section 2.01 of the

---

[3]As does the In-Kingdom Contract itself which, in Section 31.5, contains a "no third-party beneficiary" provision.

APA[4] confers no rights to Shaw to the proceeds of the In-Kingdom Contract, an excluded contract.

b. Insofar as Shaw claims that it is entitled to the proceeds of the In-Kingdom Contract under the theory of unjust enrichment,[5] the bankruptcy court concluded that Shaw could not demonstrate that it is inequitable for the Trust to retain the benefits that it may receive from the Saudi Aramco adversary, as it is specifically provided for under the APA (as explained above). Indeed, if Shaw were to prevail on this argument, it would effectively moot the decision made in the SAMBA adversary in that the Trust, as successor to SWEC, would end up paying what has been determined to be an obligation of Shaw under the APA.

c. Finally, the bankruptcy court held that Shaw has no stake in the Saudi Aramco adversary because, by a "Settlement Stipulation" entered on November 30, 2004 between the Trust and Shaw, Shaw released the Trust from any causes of action arising in the future which Shaw may have with respect to filed claims, including SAMBA's cure claim.

---

[4]Section 2.01 only gives Shaw "any and all claims and causes of action . . . of any Seller against any third parties relating to . . . the **Assumed** Liabilities or the **Assumed** Contracts. . . ." (Emphasis added)

[5]I note further that, for a party seeking equitable relief, Shaw's conduct has been less than sterling, given its untimely (waiting more than two years to file its motion to intervene) and very broad claim (not limiting its proposed recovery to the amount of liability assumed under the Guaranty).

4. **Conclusion.** Having found no errors (factual or legal) in the bankruptcy court's decision, the appeal therefrom is denied.

_____
United States District Judge